**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

APR - 2 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

MINGO LOGAN COAL COMPANY, INC. )
1000 Mingo Logan Ave.                  )
One Wharncliff WV 25651           )
   Plaintiff,                                        \

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY                    )
                                                        )
      Defendant.                              )
_____ )

Case: 1 10-cv-00541
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 4/2/2010
Description: Admin. Agency Review

**COMPLAINT**

Mingo Logan Coal Company, Inc. ("Mingo Logan"), by counsel, files this complaint against the U.S. Environmental Protection Agency ("EPA") seeking relief from that agency's unlawful effort to revoke Mingo Logan's Clean Water Act permit more than three years after the permit's issuance. Mingo Logan states as follows:

**I.    INTRODUCTION**

1.    Mingo Logan operates a coal mine in West Virginia known as Spruce No. 1. In January 2007, the U.S. Army Corps of Engineers ("Corps") issued Mingo Logan a Clean Water Act § 404 permit that authorizes the discharge of fill material into certain waters of the United States in connection with the Spruce No. 1 project.

2.    For a decade before the permit's issuance, the Corps and EPA, in conjunction with several other federal agencies and the West Virginia Department of Environmental Protection ("WVDEP"), studied and evaluated the potential impacts of the Spruce No. 1 project. The Corps imposed extensive mitigation conditions that require Mingo Logan to create wetlands, enhance

1

thousands of feet of existing streams, plant tens of thousands of native trees and shrubs, and engage in long-term monitoring to ensure effective environmental mitigation.

3.  Mingo Logan has complied with the permit since it was issued. EPA has not claimed otherwise.

4.  More than three years after the permit was issued, EPA now seeks to revoke it. "Proposed Determination to Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV," 75 Fed. Reg. 16788 (Apr. 2, 2010) (hereinafter "Proposed Determination").

5.  EPA claims that § 404(c) of the Clean Water Act authorizes it to revoke Mingo Logan's permit, but § 404(c) only authorizes EPA to prohibit or withdraw the specification of disposal sites *before a permit is issued.* EPA's use of § 404(c) against an already-issued permit is unlawful, arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law, and in excess of EPA's statutory jurisdiction, authority and limitation.

6.  EPA acknowledges it has never before used its § 404(c) authority to review an already-issued permit in the 38 years since the Clean Water Act's enactment. *See* EPA Press Release, EPA Proposes Veto of Mine Permit Under the Clean Water Act (Mar. 26, 2010) ("EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and *never* for a previously permitted project.") (emphasis added) *available at* http://www.epa.gov/newsroom (hereinafter "EPA Press Release").

7.  Further, the Corps has recently informed EPA that there are no grounds for suspending Mingo Logan's permit under the Corps's regulations. That includes the purported factual bases that EPA has adduced for its attempted revocation under § 404(c). *See* Letter from Colonel

Robert Peterson, District Engineer, Corps, to William Early, Acting Regional Administrator, EPA Region III (Sept. 30, 2009) (attached as Exhibit A).

8.     Mingo Logan, its employees, and the communities in which they live and work need the Court's help. Mingo Logan asks the Court to: (1) declare that EPA's attempt to revoke Mingo Logan's permit is beyond EPA's authority under § 404(c) of the Clean Water Act; and (2) order EPA to withdraw its notice that it is commencing "veto" proceedings for Mingo Logan's permit.

## II.     JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

10.     Venue for this action exists in this Court pursuant to 28 U.S.C. § 1391(e), as the defendant is an agency of the United States and resides in this judicial district.

## III.     PARTIES

11.     Mingo Logan operates the Spruce No. 1 and Mountain Laurel mines, which are located in West Virginia. Mingo Logan is a subsidiary of Arch Coal, Inc., one of the largest coal companies in the United States. Arch Coal was named in 2008 to *Forbes*' list of America's Most Trustworthy Companies, and recently won an award from the federal Mine Safety and Heath Administration for having the best West Virginia surface mine safety record. Mingo Logan's operation at Mountain Laurel, which is located just down the mountain and adjacent to the Spruce No. 1 site, won the 2007 National Good Neighbor Award from the U.S. Department of the Interior for its exemplary interaction with the surrounding communities.

12.     EPA is a federal agency headquartered in the District of Columbia, and is the agency that has undertaken the illegal conduct that is the subject of this Complaint.

IV.    **FACTS**

    **A.**    **Background**

    13.    Coal mining is essential to West Virginia's economy and the Nation's economic security and well-being. In 2008, West Virginia's coal industry directly employed more than 20,000 people and paid $1.5 billion in wages. A significant percentage of the Nation's power plants run on coal from West Virginia. Reclaimed land from mining is used for airports, industrial parks, retail malls, recreation facilities, schools, correctional facilities, roads, campgrounds, and federal buildings.

    14.    Surface mining produces excess rock and dirt, called spoil or overburden. In West Virginia, much of that material is used to re-contour the mined area to its approximate original contour. Not all of the overburden can return to the excavation area, however, and the excess must be placed elsewhere.

    15.    In the mountainous terrain of West Virginia, the only feasible disposal location for excess overburden in most instances is in adjacent hollows. Those hollows may contain areas regulated under the Clean Water Act as "navigable waters" even if they carry water only in the form of runoff during or after rainstorms.

    16.    Consequently, surface mining operations in West Virginia typically require a permit from the Corps under § 404 of the Clean Water Act for the "discharge of dredged or fill material into the navigable waters at specified disposal sites" in order to dispose of excess overburden in channels that the Corps considers "navigable waters."

    **B.**    **Mingo Logan's Application Under Nationwide Permit 21**

    17.    The permitting process for Spruce No. 1 began in March 1997, when Hobet Mining Inc. ("Hobet Mining"), a former affiliate of Mingo Logan, applied for authorization to conduct fill

operations under the Corps's Nationwide Permit 21, issued pursuant to Clean Water Act § 404(e).

18.    The Corps studied Hobet Mining's proposal for two years, and concluded in January 1999 that "[a]fter evaluation of the submitted information and consideration of the coordination of federal and state agencies, it has been determined that the revised mining plan along with the approved mitigation plan meets the requirements of Nationwide Permit Number 21."  Under § 404(e) of the Clean Water Act, compliance with Nationwide Permit 21 meant that the proposed project would have only minimal impacts, individually and cumulatively, on the aquatic environment.

19.    EPA participated in that review and agreed with the Corps that authorization under Nationwide Permit 21 was proper.  EPA concluded: "In consideration of information in the record for this project, including site-specific data collected by EPA, we accept that the potential individual and cumulative adverse environmental impacts to waters of the United States associated with this proposal have been minimized to the extent possible while maintaining a viable project. . . . We concur that this proposal is consistent with Section 404(e) of the Clean Water Act and with Nationwide Permit 21."

20.    Before the Corps could issue its final approval under Nationwide Permit 21, the United States District Court for the Southern District of West Virginia preliminarily enjoined the approval because of programmatic challenges to Nationwide Permit 21.  *Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D.W.Va. 1999).

21.    The preliminary injunction did not address the Corps's determination that the Spruce No. 1 fill operations would have minimal individual and cumulative adverse effects.

Nonetheless, in the wake of the injunction the Corps withdrew its proffered authorization for the Spruce No. 1 project under Nationwide Permit 21.

> **C.    Mingo Logan's Application for an Individual Permit**

22.    Hobet Mining then applied in 1999 for an individual permit for the Spruce No. 1 site pursuant to Clean Water Act § 404(a).  Due to a company divestiture in 2005, Mingo Logan replaced Hobet Mining as the applicant during the review process.

23.    Notwithstanding the two-year review of the Spruce No. 1 project that it had just completed, the Corps conducted a full *de novo* review of the individual permit application.  That review lasted seven years, generated an administrative record that spans tens of thousands of pages, and cost Mingo Logan millions of dollars.

24.    Mingo Logan worked cooperatively with the Corps and EPA during that multi-year review and, at the Corps's and EPA's request, significantly decreased the proposed scale of its operation from what the agencies had approved under Nationwide Permit 21, going from an initial proposal covering 3,113 acres, recovering virtually all of the site's accessible coal and yielding more than 264 million cubic yards of excess spoil, to a final proposal covering only 2,278 acres.  The reduced-scale proposal limits Mingo Logan to recovery of only 75 percent of the site's total coal reserves and, significantly, cuts the excess spoil to less than half as much as the original proposal.  It also cuts the acreage of affected waters of the United States by more than 30 percent, from more than 12 acres to 8.11 acres.

25.    Mingo Logan also agreed to additional mitigation measures.  Mingo Logan altered the footprint of its operation to avoid disturbing streams that West Virginia designated for protected status.  Mingo Logan also agreed to additional compensatory mitigation such as wetlands creation and stream enhancements in acreages well beyond what EPA and the Corps had previously concluded were sufficient in connection with the Nationwide Permit 21 application.

26.    EPA participated in the review of Mingo Logan's individual permit application.   As part of that review, EPA commented on Mingo Logan's reports, analyses, and data, and provided the Corps additional data bearing on the potential effects of Mingo Logan's proposed operations.

27.    WVDEP also participated in the permit process.   Pursuant to § 401(a) of the Clean Water Act, no § 404 permit may be granted unless and until the affected State certifies that operations conducted under the permit will meet all state water quality requirements.   In West Virginia, WVDEP has the authority to issue or deny water quality certifications.    After scrutinizing Mingo Logan's permit application in light of West Virginia's Water Quality Standards and a Cumulative Hydrologic Impact Assessment, WVDEP granted its water quality certification for the Spruce No. 1 permit, conditioned on Mingo Logan fulfilling its Mitigation and Compensation Agreement.

28.    In conjunction with its review of Mingo Logan's application, the Corps conducted a full environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA") — the only full EIS ever prepared for an individual surface mine in West Virginia. The EIS was comprehensive and exhaustive, and entailed thousands of hours of work by at least five state and federal agencies, including EPA.

29.    The Draft EIS, published in March 2006, included more than 1600 pages of summaries, reports, comments, exhibits, appendices, and conclusions about the proposed mine's potential impacts on mineral resources, groundwater, surface water, wetlands, soils, vegetation, fish, wildlife, cultural resources, air quality, recreation, the economy, noise, scenery, hazardous materials, public health, and environmental justice.

30.    With regard to water quality, the Draft EIS concluded that "Overall, it would be anticipated that the Spruce No. 1 mine would only contribute minimally to cumulative impacts

on surface water quality," and added that "a net gain of waters of the U.S., including wetlands, would occur as a result of past, present, and reasonably foreseeable future actions" at the Spruce No. 1 site.

31.   EPA commented on the Draft EIS in a letter dated June 16, 2006, and the Corps considered and addressed those comments in the Final EIS, which was released in September 2006.  The Final EIS included 58 pages specifically addressing EPA's comments on the Draft EIS.

32.   Following the Final EIS, the Corps and EPA exchanged correspondence, culminating in a final letter from the Corps sending additional "information [to] satisf[y] your concerns" and requesting that EPA send any final comments by the close of business on December 18, 2006. EPA did not send any additional comments.

33.   If, as of December 2006, EPA had unresolved concerns regarding the permit, EPA had several statutory means either to block the permit before the Corps issued it or to require additional review. EPA did not invoke any of those remedies.

34.   During the permit review process, EPA could have, but did not, use its authority under § 404(c) to prohibit, deny, or withdraw the disposal sites specified in the permit application. EPA could have, but did not, use § 404(q) of the Clean Water Act to "elevate" the proposed permit for further review.  EPA could have, but did not, use § 309 of the Clean Air Act to challenge the Corps's Final EIS by referring it to the President's Council on Environmental Quality.

35.   Rather than invoking any of the pre-issuance statutory avenues provided by Congress, EPA remained silent and allowed the Corps to issue the permit.

### D. The Permit

36. The Corps issued a permit to Mingo Logan in January 2007, allowing Mingo Logan to place dredged and fill material—namely, excess overburden—into 8.11 acres of waters of the United States.

37. Those 8.11 acres comprise 0.12 acres of wetland (an abandoned farm pond); 1.83 acres of ephemeral (storm runoff only) streams; 6.13 acres of intermittent (seasonal only) streams, and 0.034 acres of a perennial (permanently flowing) stream. The impact on the 0.034 acres of a perennial stream is temporary.

38. The permit requires extensive on-site and off-site mitigation, including the creation or enhancement of more than 15 acres of perennial and intermittent streams and wetlands. Completing all elements of the mitigation plan is a requirement of the permit.

39. The re-vegetation plan required by the permit calls for the planting of at least 400 trees and 100 shrubs per acre, along with monitoring to ensure an 80 percent survival rate after five years. During the monitoring period, the permittee is also required to seek out and remove invasive plant species that may encroach on the project area.

40. The permit additionally requires Mingo Logan to perform environmental monitoring for a minimum of ten years after completion of the mitigation plans to ensure the effectiveness of the mitigation measures.

41. In issuing the permit, the Corps expressly found that the proposed project complied with the 404(b)(1) Guidelines, which are regulations that the Corps and EPA jointly developed to evaluate Clean Water Act § 404 permit applications. The Corps specifically found, among other things, that the project will not violate water quality standards and that it will not contribute to significant degradation of waters of the United States.

42. The Corps also found that the public interest weighs in favor of the permit.

### E.   Mingo Logan's Reliance on the Permit

43.   After receiving its permit, Mingo Logan spent millions of dollars preparing the site and commencing operations.

44.   Just as operations were getting underway, however, Mingo Logan's permit became entangled in litigation with the Ohio Valley Environmental Coalition ("OVEC"), which added Mingo Logan's permit to others it had already challenged in the United States District Court for the Southern District of West Virginia. *OVEC v. U.S. Army Corps of Engineers*, No. 3:05-cv-00784 (S.D.W.Va.).

45.   As a consequence of the pendency of the *OVEC* lawsuit, Mingo Logan has been able to mine less than 10 percent of the coal that the permit allows.

46.   The Fourth Circuit eventually upheld the permits that were originally part of that lawsuit, *OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), *petition for cert. filed*, 78 U.S.L.W. 3099 (U.S. Aug. 26, 2009) (No. 09-247), but Mingo Logan's permit had been added to the litigation too late to be included in that appeal.

47.   OVEC's challenges to Mingo Logan's permit, however, were the same as those the Fourth Circuit rejected in the appeal. *Id.*

48.   In July 2009 Mingo Logan moved for summary judgment in the Southern District of West Virginia on the basis of the Fourth Circuit's opinion.

49.   Since Mingo Logan filed its motion for summary judgment in the *OVEC* action, the Government has sought and obtained nine extensions of the deadline for responding to that motion.

50.   The Government first claimed that EPA's threats that it would publish a § 404(c) notice justified withholding consideration of Mingo Logan's summary judgment motion.

51.    Now the Government claims that the actual publication of its § 404(c) notice justifies an indefinite stay in the *OVEC* action.

52.    To date, the Southern District of West Virginia has granted the Government's motions for stays, and the resulting effect has been to block action on Mingo Logan's summary judgment motion, thus preventing the dismissal of the judicial challenge to Mingo Logan's permit even though the issues in the *OVEC* lawsuit have nothing to do with § 404(c).

### F.    Corps's Refusal to Suspend the Permit

53.    In 2009, shortly after Mingo Logan moved for summary judgment and two and a half years after the Corps issued Mingo Logan's permit, EPA began to press the Corps to suspend the permit.  EPA sought suspension notwithstanding its participation in the decade-long review of the application and Mingo Logan's compliance with all permit conditions.

54.    On September 3, 2009, EPA sent a letter to the Corps formally requesting that the Corps "use its discretionary authority provided by 33 C.F.R. § 325.7 to suspend, revoke, or modify" Mingo Logan's permit.

55.    The Corps invited the WVDEP to comment on EPA's letter, and the WVDEP did so, strongly defending Mingo Logan's permit.

56.    The WVDEP confirmed that Mingo Logan's permit meets all water quality standards. It stated that the permit "for the Spruce no. 1 Mine (No. WV1017021), which most directly regulates water quality at this location, has been open to scrutiny by USEPA on at least three occasions previously.  Each time . . . USEPA allowed permit approval.  As this permit currently stands, the effluent limitations it establishes are in compliance with all applicable Total Maximum Daily Loads (TMDLs) and West Virginia's federally approved antidegradation policy."  Letter from Scott Mandirola, Acting Director, WVDEP, to Colonel Robert Peterson, District Engineer, Corps, at 2 (Sept. 25, 2009) (attached as Exhibit B).

57.    WVDEP also expressed frustration with EPA's sudden change of heart: "At some point, a project must be deemed to have been studied enough to meet NEPA's requirements. *This is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry.*  It has previously been through . . . twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies.   In addition, it has been examined by the State permitting quality control panel comprised of representatives of the environmental community, the coal industry, the WVDEP and the federal Office of Surface Mining Reclamation and Enforcement." *Id.* at 3 (emphasis added).

58.    The WVDEP's letter affirmed that it "undertakes regular reviews of its water quality standards and other rules to ensure appropriateness" and described EPA's request that the Corps suspend the permit as a "retroactive, ad hoc departure[] from existing laws, rules, and guidelines." *Id.*

59.    On September 30, 2009, the Corps refused EPA's request to suspend Mingo Logan's permit. *See* Exhibit A.

60.    In its decision, the Corps recited the five factors to be considered in suspending a permit under 33 C.F.R. § 325.7: "the extent of the permittee's compliance with the terms of its permit; whether circumstances relating to the authorized activity have changed since the permit was issued; significant permit objections which were not earlier considered; revisions to law; and the extent to which permit suspension, revocation, or modification would adversely affect plans, investments and actions the permittee has reasonably taken in reliance on the permit."  Exhibit A at 2.

61.   The Corps found that none of those factors warranted suspension of Mingo Logan's permit.   Mingo Logan was in compliance with its permit.   There had been no change in circumstances.   All permit objections had been considered by the Corps during the decade the permit application was under review and, in the case of EPA's comments in particular, resolved. There had been no change in the law.

62.   The Corps addressed the issues raised by EPA in EPA's September 3, 2009 letter, including fill minimization, water quality and conductivity, cumulative impacts, and compensatory mitigation, and determined that they did not warrant suspension.   With regard to water quality issues, the Corps noted that "in a letter dated 25 September 2009, the WVDEP stated the effluent limitations established in the Spruce No. 1 Mine NPDES permit are in compliance with all applicable TMDLs and West Virginia's federally approved anti-degradation policy.   [We] have no expectation the disposal of fill material in waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water quality standards."   Exhibit A at 3.

### G.   EPA's Publication of its Intent to Revoke the Permit

63.   Despite the Corps's determination that no grounds exist for suspending or revoking the permit, EPA gave notice on March 26, 2010 that it intends to 'veto' Mingo Logan's permit.   The notice identified § 404(c) of the Clean Water Act as the authority for EPA's action.

64.   EPA's press release accompanying its March 26 notice affirmed that "EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and *never for a previously permitted project.*"   EPA Press Release (emphasis added).

65.   Further, on the same day EPA released its notice, the Government moved for an indefinite stay in the *OVEC* lawsuit.   The basis for the Government's motion is the EPA's § 404(c) notice, even though EPA is not a party to the *OVEC* lawsuit and even though no issue in that lawsuit concerns § 404(c).   That is, EPA is using its § 404(c) notice to hold Mingo Logan's

permit in limbo not only with regard to its potential "veto" but also with regard to the different issue of whether the Corps properly issued the permit—which is the subject of the *OVEC* lawsuit.

66.   On April 2, 2010, EPA published its "Proposed Determination" to "veto" the Spruce No. 1 permit in the Federal Register. 75 Fed. Reg. 16788 (Apr. 2, 2010).

## V.      CLAIMS FOR RELIEF

### A.      COUNT 1:  Administrative Procedure Act:  EPA is Acting Outside of its § 404(c) Authority

67.   Mingo Logan repeats and re-alleges paragraphs 1 through 65 of this Complaint as if fully set forth herein.

68.   Under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704.  Reviewing courts must "hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

69.   EPA's Proposed Determination for Mingo Logan's Clean Water Act permit, coming three years after the permit's issuance, violates the APA.   The Proposed Determination announces EPA's position that § 404(c) authorizes it to revoke a permit after it has been issued and despite the permittee's full compliance with the terms of the permit and substantial investments in reliance on that permit.  ("EPA has the ability to initiate a Section 404(c) action after permit issuance." 75 Fed. Reg. at 16790-91.)  EPA's action is a final agency action that is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations" because § 404(c) does not authorize EPA to withdraw specification of a disposal site after the Corps has issued the permit.

70.    Section 404(c) of the Clean Water Act states:

(c) Denial or restriction of use of defined areas as disposal sites

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.    Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."

33 U.S.C. § 1344(c).

71.    Nothing in that provision gives EPA authority to veto, revoke or otherwise limit a permit once it has been issued.

72.    EPA's power under § 404(c) is limited solely to the specification of disposal sites.   It allows the Administrator of EPA to "deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect..."    33 U.S.C. § 1344(c).  The specification process occurs *before* issuance of a permit because a permit application must specify where the regulated activities will take place.   Whatever authority § 404(c) bestows on EPA, therefore, must be exercised before the Corps issues a permit.

73.    The legislative history confirms that Congress did not give EPA power to revoke issued permits and that EPA must exercise its authority under § 404(c) *before* a permit is issued, not after.

74.    Mingo Logan is entitled to relief under the APA to protect it from EPA's illegal and unlawful conduct.

75.    EPA's action in publishing notice of its intent to utilize § 404(c) to revoke Mingo Logan's existing Clean Water Act permit is final agency action with regard to whether EPA has the statutory authority to revoke a Corps-issued § 404 permit, and thus to undertake the process that precedes any such revocation.

76.    EPA's action is a definitive assertion of EPA's legal position that it possesses the authority to revoke a permittee's rights under an issued Clean Water Act § 404 permit.  EPA's Proposed Determination asserts that "Section 404(c) . . . authorize[s] EPA to initiate the Section 404(c) process after a permit has been issued."  75 Fed. Reg. at 16797.

77.    Mingo Logan has been directly affected and aggrieved by EPA's action.  The issuance of EPA's § 404(c) Proposed Determination has harmed and will continue to harm Mingo Logan's ability to carry out its mining operations in accord with its § 404 permit.  In announcing its Proposed Determination, EPA has created a new cloud on Mingo Logan's permit and forced Mingo Logan to continue to operate with:

(a)    A higher cost per ton for the coal that is being mined.  Because of the uncertainty caused by EPA's notice, it is economically impractical for Mingo Logan to invest in the infrastructure, equipment and personnel that would allow Mingo Logan to fully mine the coal from Spruce No. 1 as efficiently as planned under the permit.  As a result, Mingo Logan incurs a higher cost per ton to mine the coal that is now being mined at Spruce No. 1.

(b)    A lower level of coal output and revenue.  Because of the uncertainty caused by EPA's notice, it is economically impractical for Mingo Logan to invest in additional infrastructure necessary to mine other areas of the Spruce No. 1 reserves.  Construction of the baseline infrastructure requires at least nine months' lead time.  Every day the § 404(c) notice is pending delays by a corresponding day Mingo Logan's ability to begin mining the remaining

Spruce No. 1 reserves.  As a result, Mingo Logan cannot hire the 250 to 300 employees that it will ultimately hire when it can fully use its permit.  Mingo Logan is also losing revenue because it must use coal from its underground mine at Mountain Laurel, which is a higher quality metallurgical coal that normally would bring higher prices, to fill contracts for steam coal, which brings lower prices, instead of using steam coal from the Spruce No. 1 reserves to fill those existing long term contracts.

(c)    An inability to recover costs for the infrastructure that does exist.  Mingo Logan designed and built its coal processing and train-loading facilities at its nearby Mountain Laurel operation in order to handle the anticipated coal from a fully operational Spruce No. 1 mine in addition to the coal mined and produced at its Mountain Laurel mine.  The costs of that infrastructure cannot be recouped during the delay created by EPA's notice.

(d)    A continued, ongoing lawsuit regarding the original issuance of the permit. The Government has relied on the potential of a § 404(c) notice to convince the district court in the *OVEC* lawsuit to grant multiple extensions of time, and now seeks an indefinite stay based on the actual publication of its § 404(c) notice. EPA's notice is forcing Mingo Logan to incur further delay, fees, and costs in defending against a lawsuit in which the Fourth Circuit has already effectively decided all pleaded issues.

In sum, EPA's § 404(c) notice prevents Mingo Logan from operating as it is entitled to operate under its permit, and directly affects and aggrieves Mingo Logan.

78.    Without the Court's intervention, the harm to Mingo Logan will continue.  Mingo Logan will not be able to recover from EPA the damages it is suffering as a result of EPA's actions that are illegal on their face.

79.   Mingo Logan therefore asks the Court to: (1) declare that EPA's attempt to revoke Mingo Logan's permit is beyond EPA's authority under § 404(c) of the Clean Water Act; and (2) order EPA to withdraw its notice of the impending revocation and to stop attempting to veto Mingo Logan's permit.

**B.     COUNT II:  Nonstatutory Review Claim:  EPA is Acting Outside of its § 404(c) Authority**

80.   Mingo Logan repeats and re-alleges paragraphs 1 through 78 of this Complaint as if fully set forth herein.

81.   Judicial review in the form of non-statutory review is available when an agency acts outside of its statutory authority, "even if a statutory cause of action is lacking." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003).

82.   Nonstatutory review is proper when an agency acts beyond its statutory authority and "the agency's error is patently a misconstruction of the Act, or when the agency has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations omitted).

83.   In publishing notice of its intent to revoke Mingo Logan's permit, EPA patently misconstrued its powers under § 404(c) and disregarded Congress's directive that EPA exercise its power to prohibit or withdraw the specification of a disposal site only before a permit is issued.

84.   Mingo Logan asks the Court to: (1) declare that EPA's attempt to revoke Mingo Logan's permit is beyond EPA's authority under § 404(c) of the Clean Water Act; and (2) order

EPA to withdraw its notice of the impending revocation and to stop attempting to veto Mingo Logan's permit.

## VI.   RELIEF REQUESTED

Mingo Logan requests that the Court:

(1)  Declare that EPA lacks authority under § 404(c) to revoke or veto Mingo Logan's § 404 permit for Spruce No. 1 mine;

(2)  Enjoin any action by EPA to attempt to revoke or veto that permit;

(3)  Order EPA to withdraw its § 404(c) revocation notice;

(4)  Award Mingo Logan's attorney's fees and other costs; and

(5)  Grant such further relief the Court deems appropriate.

April 2, 2010

**Mingo Logan Coal Company, Inc.**

HUNTON & WILLIAMS LLP
Virginia S. Albrecht (D.C. Bar No. 357940)
Deidre G. Duncan (D.C. Bar No. 461548)
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

HUNTON & WILLIAMS LLP
Robert M. Rolfe (Va. Bar No. 15779)
Michael R. Shebelskie (Va. Bar No. 27459)
Matthew A. Fitzgerald (Va. Bar No. 76725)
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
(804) 788-8218 (facsimile)

JACKSON KELLY PLLC
Robert G. McLusky
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000
(304) 340-1130 (facsimile)

*Counsel for Plaintiff*