**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
MINGO LOGAN COAL COMPANY, INC.,)
                                                    )
                  Plaintiff,                        )
                                                    )
           v.                                       )        No. 1:10-CV-00541
                                                    )
UNITED STATES ENVIRONMENTAL     )
PROTECTION AGENCY,                     )
                                                    )
                  Defendant.                        )
_____)

### EPA'S MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and for the reasons set forth in its

accompanying memorandum, the United States Environmental Protection Agency respectfully

moves to dismiss the claims asserted by Plaintiff Mingo Logan Coal Company, Inc., in this

action.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/Kenneth C. Amaditz_____
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
(202) 514-3698 (Amaditz)
Fax: (202) 514-8865
c.j.morris@usdoj.gov
kenneth.amaditz@usdoj.gov

OF COUNSEL:

KARYN WENDOLOWSKI
Office of General Counsel
U.S. EPA
1200 Pennsylvania Ave., N.W.
MC 2355A
Washington, D.C.  20460

STEFANIA SHAMET
Office of Regional Counsel
U.S. EPA Region III
1650 Arch St.
Philadelphia, PA 19103-2029

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
MINGO LOGAN COAL COMPANY, INC.,)
                                                        )
                       Plaintiff,              )
                                                        )
            v.                                  )          No. 1:10-CV-00541
                                                        )
UNITED STATES ENVIRONMENTAL        )
PROTECTION AGENCY,                      )
                                                        )
                       Defendant.           )
_____)


**EPA'S MEMORANDUM IN SUPPORT
OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

I.  STATUTORY AND REGULATORY BACKGROUND...................................................2

    A.  Section 404 Permits Issued by the Corps.................................................................3

    B.  EPA's "Veto" Authority Under Section 404(c).......................................................4

II.  FACTUAL BACKGROUND ..........................................................................................8

    A.  History of the Spruce No. 1 Permit.........................................................................8

    B.  Initiation of EPA's Process to "Veto" the Spruce No. 1 Permit...........................10

    C.  The Proposed Determination ................................................................................11

ARGUMENT .......................................................................................................................13

I.  MINGO LOGAN'S APA CLAIM MUST BE DISMISSED FOR LACK OF
    FINALITY, RIPENESS, AND EXHAUSTION .............................................................14

    A.  The Proposed Determination by the Regional Administrator Is Not
        a Final Agency Action ......................................................................................... 14

    B.  Mingo Logan's APA Claim Is Not Ripe For Review and Must Be
        Dismissed..............................................................................................................22

    C.  Mingo Logan's APA Claim Must Be Dismissed For Failure To
        Exhaust Administrative Remedies........................................................................24

    D.  Absent Final Agency Action, Mingo Logan's Claim Is a Time-Barred
        Facial Challenge to EPA's 1979 Regulations.......................................................25

II.  MINGO'S LOGAN'S "NON-STATUTORY REVIEW" CLAIM IS BASELESS
    AND MUST BE REJECTED ..........................................................................................26

A.      Non-Statutory Review Is Unavailable Here Because Mingo Logan Does
        Not Challenge EPA's Authority Under Section 404(c) to Withdraw the
        Specification of a Disposal Site ..............................................................................28

B.      Mingo Logan Cannot Establish that EPA's Proposed Determination
        Violates a Clear and Unambiguous Directive or Command in the CWA .............29

C.      Denial of Judicial Review at this Time Will Not Deprive Mingo Logan
        of its Ability to Challenge EPA's Section 404(c) Authority upon Final
        Agency Action .......................................................................................................35


CONCLUSION.....................................................................................................................36

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), the United States Environmental Protection Agency ("EPA" or "the Agency") respectfully requests that the Court dismiss the claims asserted by Plaintiff Mingo Logan Coal Company, Inc. ("Mingo Logan").  At issue in this case is EPA's proposed determination to "veto" a Clean Water Act permit that authorizes certain discharges of spoil material in connection with a large "mountaintop mining" project in West Virginia.  Mingo Logan has challenged EPA's action in a Complaint that asserts two counts, both of which must be dismissed.

As we explain below, Mingo Logan's claim under the Administrative Procedure Act ("APA") must be dismissed for three reasons.  First, Mingo Logan has challenged a proposed determination by EPA that is manifestly not "final agency action" subject to judicial review.  Second, Mingo Logan's APA claim is not ripe for review.  Third, Mingo Logan has failed to exhaust its administrative remedies.  Accordingly, Count I of the Complaint is not subject to judicial review and must be dismissed.

Count II fares no better.  There, Mingo Logan asks the Court to grant relief under the extraordinary doctrine of "non-statutory review," based on the allegation that EPA's proposed determination to veto an already-issued permit is ultra vires.  As we show, this claim falls well short of the standard for non-statutory review for three reasons.  First, Mingo Logan has not even alleged any activity by EPA that rises to the level of ultra vires action warranting non-statutory review.  Mingo Logan does not dispute EPA's statutory authority to veto a permit, but rather objects only to when EPA may exercise that authority -- an objection that amounts to nothing more than a garden-variety dispute over statutory interpretation.  Second, Mingo Logan cannot establish that EPA's actions violated a specific and unambiguous statutory directive or

prohibition, as is required for non-statutory review.  On the contrary, the plain language of the

Clean Water Act authorizes EPA to restrict or withdraw a permit whenever EPA finds that

adverse environmental effects will occur, and EPA's interpretation of its authority in long-

standing regulations is reasonable.  Third, non-statutory review is barred here because Mingo

Logan will have the opportunity to assert its claim once EPA takes final agency action.

Therefore, Count II must also be dismissed.

## BACKGROUND

## I.      STATUTORY AND REGULATORY BACKGROUND

The CWA establishes a comprehensive program designed to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To

achieve this goal, the CWA prohibits the discharge of pollutants from point sources into

navigable waters unless consistent with the requirements of the Act.  Id. § 1311(a).  The CWA

defines "navigable waters" as "the waters of the United States, including the territorial seas."  33

U.S.C. § 1362(7).  "Waters of the United States" includes, among other things, all waters which

are currently used, were used in the past, or may be susceptible to use in interstate or foreign

commerce; tributaries of such waters; and wetlands adjacent to such waters.  33 C.F.R. §

328.3(a)(1), (2), (5), (7); 40 C.F.R. § 232.2; see United States v. Riverside Bayview Homes, Inc.,

474 U.S. 121, 131–33 (1985).

The CWA authorizes the discharge of pollutants into waters of the United States under

two permitting programs.  See generally Coeur Alaska, Inc. v. Southeast Alaska Conservation

Council, 129 S. Ct. 2458, 2463 (2009).  Section 404 of the CWA authorizes discharges of

dredged or fill material such as overburden from surface coal mining.  See 33 U.S.C. § 1344; 67

Fed. Reg. 31,129 (May 9, 2002) (definition of fill material); Kentuckians for Commonwealth,

Inc. v. Rivenburgh, 317 F.3d 425, 441-48 (4th Cir. 2003) (upholding Corps' interpretation of

"fill material" to include mining overburden).  Section 404 permits are issued by the Army Corps

of Engineers ("Corps").  Section 402 of the CWA applies to all pollutants other than dredged or

fill material.  33 U.S.C. § 1342.  In West Virginia and other "authorized" states, Section 402

permits are issued by state officials.  See id. § 1342(b)-(c); 47 Fed. Reg. 22,363 (May 24, 1982)

(EPA's approval of West Virginia's permitting program); see generally Nat'l Ass'n of Home

Builders v. Defenders of Wildlife, 551 U.S. 644, 650-51 (2007).

> **A.**     **Section 404 Permits Issued by the Corps**

Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the

Chief of Engineers, to "issue permits . . . for the discharge of dredged or fill material into the

navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); see also 33 C.F.R. § 323.6(a).

By this authority, the Corps regulates discharges of dredged and fill material associated with

surface coal mining and reclamation activities, such as the construction of valley fills, stream

channel diversions, sediment ponds, road crossings, and disposal of coal waste, into waters of the

United States, including primarily ephemeral and intermittent streams and some perennial

streams.  See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 190-91 (4th Cir.

2009), petition for cert. filed, 78 U.S.L.W. 3099 (U.S. Aug. 26, 2009) (No. 09-247).

Section 404(b) of the CWA requires the Corps to "specif[y]" a disposal site for each

permit by applying guidelines developed by EPA.  33 U.S.C. § 1344(b)(1).  These regulations,

which are referred to as the "404(b)(1) Guidelines" and codified at 40 C.F.R. pt. 230, provide

that the Corps must ensure that the proposed fill will not cause significant adverse effects on

human health or welfare, aquatic life, or aquatic ecosystems.  40 C.F.R. § 230.10(c)(1)-(3).

Accordingly, the Corps considers the impacts of the permitted project on the "aquatic

ecosystem," which means "waters of the United States, including wetlands, that serve as habitat

for interrelated and interacting communities and populations of plants and animals."  40 C.F.R. §

230.3(c).  After considering these impacts, the Corps must make a written determination of the

effects of a proposed activity "on the physical, chemical, and biological components of the

aquatic environment."  Id. § 230.11.  EPA's 404(b)(1) Guidelines are incorporated in the Corps'

regulations.  33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).

### B.   EPA's "Veto" Authority Under Section 404(c)

The Corps' issuance of permits and specification of disposal sites is subject to EPA's

oversight authority under Section 404(c) of the CWA, often referred to as EPA's "veto"

authority.  Section 404(c) provides:

> The [EPA] Administrator is authorized to prohibit the specification (including the
> withdrawal of specification) of any defined area as a disposal site, and he is
> authorized to deny or restrict the use of any defined area for specification
> (including the withdrawal of specification) as a disposal site, whenever he
> determines, after notice and opportunity for public hearings, that the discharge of
> such materials into such area will have an unacceptable adverse effect on
> municipal water supplies, shellfish beds and fishery areas (including spawning
> and breeding areas), wildlife, or recreational areas.  Before making such
> determination, the [EPA] Administrator shall consult with the Secretary [of the
> Army].  The [EPA] Administrator shall set forth in writing and make public his
> findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c).  The "specification" of a disposal site refers to the process by which a

disposal site is specified by a Corps permit.  See Ohio Valley Envtl. Coal. v. U.S. Army Corps of

Eng'rs, Civ. A. Nos. 3:05-0784, 3:06-0438, 2009 WL 3424175, at *1 n.1 (S.D. W. Va. Oct. 21,

2009); 33 U.S.C. § 1344(b) ("each such disposal site shall be specified for each such permit by

the [Corps]").  Because Section 404(c) authorizes EPA to prohibit, withdraw, deny, or restrict the

specification of such disposal sites that would otherwise be authorized by a Section 404 permit,

EPA's authority under Section 404(c) is often designated as the authority to "veto" the permit. E.g., Coeur Alaska, 129 S. Ct. at 2467.

Since the time EPA issued its implementing regulations in 1979, EPA has read Section 404(c) to authorize the Agency to prevent the specification of a disposal site "before a permit is applied for, while an application is pending, or after a permit has been issued."  44 Fed. Reg. 58,076 (Oct. 9, 1979).  As EPA explained at that time, the CWA "on its face clearly allows EPA to act after the Corps has issued a permit; it refers twice to the 'withdrawal of specification,' which clearly refers to action by EPA after the Corps has specified a site (e.g. issued a permit or authorized its own work)."  Id. at 58,077.  Consistent with this interpretation, EPA's regulations define "withdraw specification" to mean "to remove from designation any area already specified as a disposal site by the U.S. Army Corps of Engineers . . . , or any portion of such area."  40 C.F.R. § 231.2(a).  The regulations further provide that the Section 404(c) regulatory process applies "whenever the Administrator is considering whether the specification of any defined area as a disposal site should be prohibited, denied, restricted, or withdrawn" with respect to "all existing, proposed or potential disposal sites[.]"  40 C.F.R. § 231.1(c) (emphasis added).

Before EPA can decide to "veto" a Section 404 permit, the Agency must complete the process set forth in its regulations.  See 40 C.F.R. pt. 231.  That process begins with EPA's Regional Administrator,[1] who may initiate Section 404(c) proceedings if he or she has "reason to believe" that the specification of a disposal site could cause an "unacceptable adverse effect."[2]

---

[1]      EPA has ten regional offices, designated EPA Region I through EPA Region X.  The chief of each regional office is the Regional Administrator.  See http://www.epa.gov/aboutepa/where.html.

[2]      "Unacceptable adverse effect" is defined to mean "impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies
*(continued on next page…)*

40 C.F.R. § 231.3(a).  The Regional Administrator ("RA") must notify the District Engineer, the owner, and the permit applicant that he or she intends to issue a public notice of a proposed determination to prohibit, withdraw, deny or restrict the specification.  Id. § 231.3(a)(1).  The regulations then allow for a minimum 15-day period during which the owner or applicant may seek to demonstrate, to the satisfaction of the RA, that no unacceptable adverse effects will occur.  Id. § 231.3(a)(2).  If such a demonstration is not made, and the District Engineer does not notify the RA that the Corps will take corrective action to prevent the unacceptable adverse effects, then the RA must publish the notice of the RA's proposed determination.  Id. § 231.3(a)(2).  The RA's issuance of such a proposed determination for one of Mingo Logan's mountaintop mining operations[3] is the agency action challenged by Mingo Logan in this case. Compl. ¶¶ 4, 69, 75-79, 83-84.

After the RA publishes the proposed determination, any interested person may submit comments during a 30 to 60-day comment period.  Id. § 231.4(a).  In addition, where the permit holder or applicant requests a hearing, or where there is significant public interest in the proposed determination, the RA may convene a public hearing consistent with the requirements set forth in the regulations.  Id. § 231.4(b)-(g).  After the conclusion of the public comment period, or the public hearing if one is held, the RA must either withdraw the proposed determination or prepare a recommended determination to prohibit, withdraw, deny or restrict the specification.  Id. § 231.5(a).  If the RA prepares a recommended determination, it must be

(including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas."  40 C.F.R. § 231.2(e).

[3]      "Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV," 75 Fed. Reg. 16,788 (Apr. 2, 2010).

"promptly" forwarded along with the administrative record to the EPA Administrator[4] for review.  Id. § 231.5(b).  If the RA decides to withdraw the proposed determination, then the RA must notify the Administrator of the RA's intent to withdraw.  Id. § 231.5(c).  The Administrator has the option to review the RA's proposed withdrawal.  If the Administrator decides against review, then the RA must publish notice of the withdrawal, which "shall constitute final agency action."  Id. § 231.5(c)(1).  However, if the Administrator decides to review the withdrawal, then "final agency action does not occur until the Administrator makes a final determination."  Id. § 231.5(c)(2).

After reviewing the RA's recommendation to prohibit, withdraw, deny or restrict the specification, the Administrator must initiate consultation with the Chief of Engineers, the owner, and the permit applicant (if any), who have 15 days to notify the Administrator of their intent to take corrective action to prevent the unacceptable adverse effects.  Id. § 231.6.  The Administrator must then make a final decision affirming, modifying, or rescinding the RA's recommended determination, and publish notice of that decision in the Federal Register.  Id.  The Administrator's final determination "constitutes final agency action" for the purpose of judicial review.  Id.

---

[4]      The EPA Administrator has delegated this authority to the Assistant Administrator for Water pursuant to EPA Delegation 2-43, sections 1.f. & 2.c.  The delegation is authorized by CWA Section 501(a), which authorizes rulemaking under the CWA, including rules of agency organization, procedure, and practice.  33 U.S.C. § 1361(a).  Accordingly, all references to the Administrator in this context will be references to the Assistant Administrator for Water.

## II.   **FACTUAL BACKGROUND**[5]

### A.   **History of the Spruce No. 1 Permit**

Mingo Logan is a subsidiary of Arch Coal, Inc., and operates the Spruce No. 1 Mine in

Logan County, West Virginia.  Compl. ¶ 11.  The Spruce No. 1 Mine is one of the largest surface

mining projects ever authorized in Appalachia.  75 Fed. Reg. at 16,788.  The project would

impact 2,278 acres of forested land, involve the disposal of more than 100 million cubic yards of

excess spoil material, and result in the placement of spoil into more than seven linear miles of

streams.  See Compl. ¶ 24; 75 Fed. Reg. at 16,791.

The Spruce No. 1 Mine project was authorized by the West Virginia Department of

Environmental Protection pursuant to the state's surface mining program approved under the

Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201-1328.  75 Fed.

Reg. at 16,792.  According to the Draft Environmental Impact Statement, the project as

authorized would entail a variety of coal mining methods, including contour mining along with

auger and/or highwall/thin-seam mining in some areas, and also "mountaintop" mining in some

areas.  75 Fed. Reg. at 16,792.  The Fourth Circuit Court of Appeals has described mountaintop

mining as follows:

> The mountaintop removal method of surface coal mining, pioneered in
> West Virginia, involves the blasting of the soil and rock atop a mountain to
> expose coal deposits below. While mining operations are ongoing, the overburden
> is hauled or pushed into adjacent valleys. This excavated overburden is known as
> "spoil." Once the coal has been extracted, efforts are made to re-contour the
> mountaintop by replacing the removed overburden, but stability concerns limit the
> amount of spoil that can be returned to the area.  In its natural state, the spoil
> material is heavily compacted; once excavated, however, the loosening of the
> rock and soil and incorporation of air causes significant swelling.  As a result,
> large quantities of the blasted material cannot be replaced, and this excess spoil

---

[5]   Solely for the purpose of its Motion to Dismiss, EPA assumes the truth of the facts
alleged in the Complaint.

("overburden") remains in the valley, creating a "valley fill" that buries intermittent and perennial streams in the process.

Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d at 186; see also 75 Fed. Reg. at 16,791; Compl. ¶¶ 14-16.

In connection with the planned surface coal mining operations authorized by the SMCRA permit, Mingo Logan sought a permit under Section 404 of the CWA to dispose of dredged or fill material, in the form of mining overburden, into waters of the United States.  Compl. ¶¶ 14, 22, 24.  The Corps issued a CWA Section 404 permit to Mingo Logan on January 22, 2007: Department of the Army (DA) Permit No. 199800436-3 (hereinafter "the Spruce No. 1 Permit"). The Section 404 permit authorized the discharge of approximately 19,333 cubic yards of fill material into 39,518 feet of waters of the United States.

That permit was immediately challenged by the Ohio Valley Environmental Coalition ("OVEC"), which had sued the Corps over several other Section 404 permits issued in connection with mountaintop mining operations in West Virginia.  See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs, 2010 WL 1633315, Civ. A. Nos. 3:05-0784, 3:06-0483 at *1 (S.D. W. Va. Apr. 22, 2010); Compl. ¶ 44.  OVEC sought a temporary restraining order to prevent Mingo Logan from discharging fill material as authorized by the Spruce No. 1 Permit. Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs, 2010 WL 1633315, at *1.  However, OVEC later withdrew its motion for  the temporary restraining order, and, in return, "Mingo Logan consented to: (1) limit its mining activities to a specified area, and (2) provide [OVEC] 20 days notice before expanding mining operations outside this specified area."  Id.  "Mingo Logan has been operating under the Spruce No. 1 Permit, in the manner specified [by the agreement between Mingo Logan and OVEC], since that time."  Id.  In July 2009, after the Fourth Circuit issued its ruling in Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, Mingo Logan

moved for summary judgment on OVEC's challenge to the Spruce No. 1 Permit.  Compl. ¶¶ 46-48; <u>Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs</u>, 2010 WL 1633315, at *1.  That motion remains pending.

**B.      Initiation of EPA's Process to "Veto" the Spruce No. 1 Permit**

On September 3, 2009, EPA sent a letter to the Corps asking the Corps to use its discretionary authority to suspend, revoke, or modify the Spruce No. 1 Permit based on new information and circumstances.  Compl. ¶ 54.  By letter dated September 30, 2009, after review of the information that had been submitted, the Corps advised EPA that the permit would not be suspended, revoked, or modified.  <u>Id.</u> ¶ 59.  EPA then initiated the Section 404(c) process by notifying the Corps, by letter dated October 16, 2009, that EPA intended to review the Spruce No. 1 Permit under Section 404(c), and that EPA intended to issue a notice of the Agency's proposed determination to prohibit, deny, restrict, or withdraw the specification.  <u>Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs</u>, 2010 WL 1633315, at *2.  The U.S. District Court for the Southern District of West Virginia stayed the pending case in order to allow EPA to pursue the Section 404(c) process.  EPA and Mingo Logan then entered into discussions to determine whether they could reach agreement on a way to reduce adverse impacts as a result of the Spruce No. 1 Permit.  <u>Id.</u>  Throughout the period of the negotiations, the U.S. District Court for the Southern District of West Virginia extended the stay to allow the negotiations to continue.  Most of the motions, while made by the United States, were not opposed by Mingo Logan.  <u>Id.</u>  Notwithstanding several extensions of the consultation period, the parties were unable to reach agreement.  <u>Id.</u>

On March 26, 2010, the Regional Administrator signed the "Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal

of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County,

WV," 75 Fed. Reg. 16,788 (published Apr. 2, 2010) (hereinafter "the Proposed Determination").

See Compl. ¶ 63.  On April 22, 2010, the U.S. District Court for the Southern District of West

Virginia stayed the litigation in that court until October 22, 2010, to allow time for EPA's

Section 404(c) proceedings.  Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs, 2010 WL

1633315, at *6.  In doing so, the court found that the stay was in the public interest because it

will "allow[] the EPA to properly and fully exercise its statutory authority to review the Spruce

No. 1 Permit" while at the same time "preventing any unacceptable adverse environmental

effects in the interim period."  Id.  The court also noted that the extended stay would "serve[] the

interests of judicial economy and efficiency" because "the § 404(c) review has the potential to

moot this action entirely[.]"  Id.

### C.    The Proposed Determination

EPA Region III published its Proposed Determination for the Spruce No. 1 Permit in the

Federal Register on April 2, 2010.  75 Fed. Reg. 16,788.  In the Proposed Determination, EPA

Region III "request[ed] public comments on its proposal to withdraw or restrict use of Seng

Camp Creek, Pigeonroost Branch, Oldhouse Branch, and certain tributaries to those waters in

Logan County, West Virginia to receive dredged and/or fill material in connection with

construction of the Spruce No. 1 Surface Mine[.]"  Id.

Region III explained that, although EPA prefers to initiate Section 404(c) proceedings

prior to permit issuance, EPA has the authority to do so after permit issuance because "Section

404(c) authorizes EPA to withdraw use of a defined area for specification[.]"  Id. at 16,790-91.

Region III further noted that EPA uses its post-permit authority where the unacceptable impacts

from a project would be serious.  Id. at 16,791.  In this case, Region III issued the Proposed

Determination because of its belief that "construction of Spruce No. 1 Mine as authorized would destroy streams and habitat, cause significant degradation of on-site and downstream water quality, and could therefore result in unacceptable adverse impacts to wildlife and fishery resources." Id. at 16,789. The Proposed Determination sets forth an extensive discussion of those potential impacts. See id. at 16,797-805.

EPA Region III further explained the Proposed Determination was an interim step in the Section 404(c) process, and described the additional steps that would occur prior to a "final determination." Id. at 16,789-90. On this point, the Region explained that

> Ultimately, EPA's process will result in one of three outcomes: (1) EPA could withdraw specification of the site as a disposal site and decide to use its discretion to prohibit any discharges from the project, including the construction of valley fills; (2) EPA could restrict specification of the site as a disposal site and decide the project cannot go forward under the permit as currently issued, but could go forward under a modified permit with more environmentally protective conditions; or (3) EPA could decide the permit as currently issued is sufficiently protective.

Id. at 16,789. Region III then solicited comments on "all issues discussed in" the Proposed Determination, including in particular information regarding impacts to the ecosystem, information about drinking water, information about recreational uses for the project area, information and techniques for potential mitigation, information regarding impacts to human health, and "[w]hether the discharge should be permanently prohibited, allowed as authorized by the Corps, or restricted in time, size or other manner." Id. at 16,807-08. The Proposed Determination closed by noting that "[a]ll comments will be fully considered in reaching a decision to either rescind the proposed determination or forward to EPA Headquarters a recommended determination to prohibit or restrict the discharge of dredged or fill material into Pigeonroost Branch and Oldhouse Branch in connection with construction and operation of Spruce No. 1 Surface Mine." Id. at 16,808.

EPA held a public hearing on the Proposed Determination on May 18, 2010. Approximately 750 people attended and 82 speakers presented testimony, including a representative of Mingo Logan. EPA estimates that it received more than 1,300 comments during the comment period, which closed on June 4, 2010. EPA is now in the process of reviewing those comments.

## ARGUMENT

Mingo Logan's claims are premature and baseless, and must be dismissed. As we demonstrate in Part I below, Mingo Logan's claim under the APA is barred because the EPA action challenged by Mingo Logan – the Proposed Determination – is an interim step in the Section 404(c) process, and is not "final agency action" within the meaning of the APA. Because the Proposed Determination is not a final decision, but rather an interim determination by a subordinate official, Mingo Logan's claim is also not ripe. And because Mingo Logan has filed this challenge prior to the completion of the Section 404(c) administrative process, and Mingo Logan will have the opportunity during the administrative process to bring its concerns before the Agency, Mingo Logan's APA claim must also be dismissed for lack of exhaustion of administrative remedies.

In Part II below, we show that Mingo Logan's "non-statutory" review claim is also fatally flawed. As an initial matter, Mingo Logan's claim fails to meet the pleading requirements for non-statutory review, because Mingo Logan has not challenged EPA's statutory authority to act, but instead has identified only a "garden-variety" dispute over statutory interpretation. Even if Mingo Logan had met that requirement, however, its claim would still fall well short of warranting non-statutory review because Mingo Logan has failed to establish that EPA violated an unambiguous statutory directive. Moreover, because Mingo Logan will have the opportunity

to challenge EPA's interpretation of the CWA once the Section 404(c) process is completed,

non-statutory review is not an available remedy.

## I.    MINGO LOGAN'S APA CLAIM MUST BE DISMISSED FOR LACK OF FINALITY, RIPENESS, AND EXHAUSTION

### A.    The Proposed Determination by the Regional Administrator Is Not a Final Agency Action.

Mingo Logan's first claim alleges that EPA Region III's Proposed Determination

violated the APA.  The APA limits judicial review to "final agency action for which there is no

other adequate remedy in a court."  5 U.S.C. § 704; see Norton v. Southern Utah Wilderness

Alliance, 542 U.S. 55, 61-62 (2004) ("the 'agency action' complained of must be "'final agency

action.'") (quoting 5 U.S.C. § 704); Trudeau v. Federal Trade Comm'n, 456 F.3d 178, 188 (D.C.

Cir. 2006) ("'§ 704 limits causes of action under the APA' to 'final agency action.'") (quoting

Ctr. for Auto Safety v. Nat'l Hwy. Traffic Safety Admin., 452 F.3d 798, 805 (D.C. Cir. 2006)).

The "final agency action" requirement is a "threshold question[]" that determines whether

judicial review is available.  Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13,

18 (D.C. Cir. 2006).[6]

The Supreme Court has explained that, with regard to finality, "[t]he core question is

whether the agency has completed its decisionmaking process, and whether the result of that

process is one that will directly affect the parties."  Franklin v. Massachusetts, 505 U.S. 788, 797

(1992).  If an agency decision "does not itself adversely affect complainant but only affects his

rights adversely on the contingency of future administrative action," then it is not final.

Rochester Tel. Corp. v. United States, 307 U.S. 125, 130 (1939).  Two conditions must be

---

[6]    The D.C. Circuit has held that the lack of "final agency action" in a suit under the APA does not deprive the court of jurisdiction, but rather results in a failure to state a cause of action. Trudeau v. Federal Trade Comm'n, 456 F.3d at 188-89.

satisfied for agency action to be "final."  See Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

"First, the action must mark the 'consummation' of the agency's decisionmaking process" and

"must not be of a merely tentative or interlocutory nature."  Id. (quoting Chicago & S. Air Lines,

Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)).  Second, the agency action "must be

one by which 'rights or obligations have been determined,' or from which 'legal consequences

will flow.'"  Id. at 178 (quoting Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget

Transatlantic, 400 U.S. 62, 71 (1970)).

Consistent with these established principles, this Court has previously held that EPA's

initiation of Section 404(c) proceedings under the CWA is not final agency action.  In Newport

Galleria Group v. Deland, 618 F. Supp. 1179 (D.D.C. 1985), the Corps had provided notice of its

intent to issue a CWA Section 404 permit in connection with the construction of a shopping

mall.  EPA's Regional Administrator then advised the Corps and the property developers that the

Agency was initiating a Section 404(c) proceeding and, thus, was suspending issuance of the

permit.  The property developers filed suit to enjoin EPA from taking further action under

Section 404(c), arguing that EPA was acting beyond its authority.   Id. at 1181.

The court rejected the challenge finding, inter alia, that the Regional Administrator's

commencement of Section 404(c) proceedings was not final agency action.  Id. at 1185.  In

reaching its ruling, the court noted that "EPA has simply initiated an investigation; it has made

no final determinations, but, rather, has begun the process that will lead to such decisions."  Id.

The commencement of 404(c) proceedings "'merely represents a judgment that the matter is

worth looking into,'" and the developers' rights were not fixed nor was their permit denied.  Id.

(quoting 44 Fed. Reg. 58,078).  The court concluded that "[j]udicial review at this stage of the

proceedings is therefore improper."  Id.

By the same token, EPA Region III's issuance of the Proposed Determination here is not "final agency action" subject to review under the <u>Bennett</u> test or <u>Newport Galleria Group</u>. The Regional Administrator has initiated the Section 404(c) process, provided notification to the Corps and Mingo Logan, <u>see</u> 40 C.F.R. § 231.3(a)(1), published notice of the Proposed Determination in the <u>Federal Register</u>, <u>see id.</u> § 231.3(a)(2), solicited public comment, and convened a public hearing, <u>see id.</u> § 231.4. Thus, all that EPA's Proposed Determination represents is that the Regional Administrator "ha[d] reason to believe" that the Spruce No. 1 Permit could result in adverse environmental effects, <u>see id.</u> § 231.3(a), and that Mingo Logan had not "demonstrated to the satisfaction of the Regional Administrator" that no adverse environmental effects would occur, <u>see id.</u> § 231.3(a).

Several critical steps have yet to occur, including:  the Regional Administrator's decision either to withdraw the Proposed Determination or make a recommended determination; review of that decision by the Assistant Administrator for Water at EPA Headquarters; and a final determination by the EPA Administrator.  <u>Id.</u> §§ 231.4, 231.5(a)-(c),  231.6; <u>see</u> <u>also</u> 75 Fed. Reg. at 16,790.  As Region III explained in the Proposed Determination, the result of this Section 404(c) process could be one of three options:  withdrawal of the specified disposal area, which would effectively rescind the permit; restriction of the disposal area, which would effectively modify the permit; or a decision by EPA that the current permit is sufficiently protective.  <u>Id.</u> at 16,789

It follows that the Proposed Determination is not final agency action within the meaning of the APA.  Because the Proposed Determination is only a preliminary finding by a subordinate official, and EPA's regulations require several additional steps before the Agency makes its ultimate determination, the Proposed Determination does not mark the "consummation" of

EPA's Section 404(c) decision-making process.  See Bennett v. Spear, 520 U.S. at 177-78; see also Franklin v. Massachusetts, 505 U.S. at 797 ("An agency action is not final if it is only 'the ruling of a subordinate official' . . . .") (citation omitted); DRG Funding Corp. v. Secretary of HUD, 76 F.3d 1212, 1215 (D.C. Cir. 1996) (until the agency completes the review process required by its regulations, "any intermediate decision in the review procedure is necessarily 'tentative, provisional, or contingent,' . . . and therefore nonfinal") (citation omitted).

Moreover, until the Section 404(c) process is completed and EPA makes a final determination, Mingo Logan's permit is not legally affected, its rights are not fixed, and no legal obligations are imposed upon it.  See Bennett v. Spear, 520 U.S. at 177-78; Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005) ("if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.").  Accordingly, for finality purposes, Mingo Logan is in essentially the same position as were the developers in Newport Galleria Group, and it must await a final decision by EPA before seeking review.  See Bersani v. EPA, 850 F.2d 36, 40 (2d Cir. 1988) (the Administrator's "decision to affirm, modify or rescind the [Regional Administrator's] recommendation is the final determination of EPA for purposes of judicial review").  The Court should therefore dismiss Mingo Logan's APA claim for lack of finality.

Dismissal for lack of finality would also be consistent with EPA's regulations, which specify when "final agency action" occurs in the Section 404(c) process.  If the Regional Administrator decides to withdraw a proposed determination, and the Administrator decides not to review the withdrawal, then the Regional Administrator must give public notice of the withdrawal, which "shall constitute final agency action." 40 C.F.R. § 231.5(c)(1).  Alternatively, where the Regional Administrator makes a recommended determination to the Administrator (or

the Administrator decides to review the Regional Administrator's withdrawal of a proposed determination), then the Administrator's "final determination constitutes final agency action[.]" Id. § 231.6; see also id. § 231.5(c)(2).  Thus, under EPA's regulations, a proposed determination by a Regional Administrator is not final agency action.  Although "not decisive," EPA's characterization of its own action "is entitled to respect in a finality analysis."  Nat'l Ass'n of Home Builders v. Norton, 415 F.3d at 14.

Mingo Logan acknowledges, as it must, that the Proposed Determination is not EPA's final word on the Section 404(c) process.  See Compl. ¶ 79 (referring to EPA's "attempt" to veto the permit and requesting that the Court order EPA to "stop attempting to veto" the permit).  Nevertheless, Mingo Logan apparently seeks to carve out an exception to the Bennett v. Spear finality test on the ground that the Proposed Determination, though interim, expresses a "definitive assertion of EPA's legal position" that "Section 404(c) . . . authorize[s] EPA to initiate the Section 404(c) process after a permit has been issued."  Compl. ¶ 76 (quoting 75 Fed. Reg. at 16,797); see also Compl. ¶ 75 ("EPA's action in publishing notice of its intent . . . is final agency action with regard to whether EPA has the statutory authority to revoke a Corps-issued § 404 permit, and thus to undertake the process that precedes any such revocation.").

However, both the Supreme Court and the D.C. Circuit have rejected the argument that the finality requirement can be set aside where there is a challenge to the agency's authority to regulate.  The Supreme Court addressed the issue in FTC v. Standard Oil Co. of California, where the Standard Oil Company of California ("SoCal") filed suit under the APA to challenge the authority of the Federal Trade Commission ("FTC") to issue an administrative complaint against SoCal.  449 U.S. 232, 234 (1980).  The administrative complaint alleged that the agency had "reason to believe" that SoCal had engaged in unfair competition.  Id.  The Supreme Court

rejected SoCal's challenge, finding that the FTC's complaint was not "final agency action."  Id. at 239.  Under the governing statute, SoCal had the ability to challenge the complaint before an administrative law judge and appeal that decision to the full Commission.  In the event that the Commission issued a cease-and-desist order, SoCal could challenge that order, and the legal authority for the underlying administrative complaint, in federal court.  Id. at 241, 245.  The Court thus concluded that the FTC complaint was "not a definitive statement of position" but instead "represent[ed] a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings."  Id. at 241.

The Court further emphasized that the benefits of requiring finality outweighed any burdens on SoCal.  Whereas the administrative complaint had "no legal force or practical effect upon SoCal's daily business other than the disruptions that accompany any major litigation," judicial review of the FTC's complaint would interfere with the proper functioning of the agency and burden the courts.  Id. at 242-43.  In particular, judicial intervention would "den[y] the agency an opportunity to correct its own mistakes and to apply its expertise," and lead to "piecemeal review" that might have proven to be unnecessary.  Id. at 242.

The D.C. Circuit dismissed a similar challenge in Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n, 324 F.3d 726 (D.C. Cir. 2003).  In Reliable Automatic Sprinkler, the Consumer Product Safety Commission ("CPSC") sent a letter to a sprinkler manufacturer stating the CPSC's intent to make a preliminary determination that the manufacturer's sprinkler heads posed a hazard to consumers.  Id. at 730.  The manufacturer then filed suit seeking a declaratory judgment that the CPSC did not have regulatory jurisdiction over the manufacturer's sprinklers because they were not consumer products.  Id.  The manufacturer acknowledged that there had been no final agency action with respect to whether its product

posed a hazard.  Id. at 731.  However, the manufacturer asserted that because it was challenging

the CPSC's underlying statutory authority, as opposed to the substance of the agency's decision,

the agency's preliminary actions were "sufficiently final to warrant judicial review of the

agency's jurisdiction[.]"  Id.

The D.C. Circuit rejected the manufacturer's argument.  Id.  The court first explained that

the CPSC's activity merely amounted to an investigation and a statement of intent to take action.

Although the investigation "assume[d] for now that [the agency] has jurisdiction to regulate the

sprinkler heads," the CPSC had "not yet made any determination or issued any order imposing

any obligation on [the manufacturer], denying any right of [the manufacturer], or fixing any legal

relationship."  Id. at 731-32.  Accordingly, the agency's actions had not created any legal

consequences or compelled the manufacturer to do anything other than choose between

voluntary compliance and defending itself in an administrative hearing, which are the

"consequences [that] attach to any parties who are the subjects of Government investigations and

believe that the relevant law does not apply to them."  Id. at 732.  Allowing interlocutory review

in these circumstances, the court found, would undermine the purposes of the finality

requirement.  "The interest in postponing review is powerful when the agency position is

tentative.  Judicial review at that stage improperly intrudes into the agency's decisionmaking

process.  It also squanders judicial resources since the challenging party still enjoys an

opportunity to convince the agency to change its mind."  Id. at 733 (quoting Ciba-Geigy Corp. v.

EPA, 801 F.2d 430, 436 (D.C. Cir. 1986)).

Furthermore, the court explained, no "special rule" applies "when a litigant challenges

the agency's authority to regulate rather than the merits of an agency's act of regulation,"

because the "policy undergirding the finality requirement 'is no less applicable to piecemeal

appeals on issues of statutory authority than to piecemeal appeals on other points.'" Id. at 732-33 (quoting Aluminum Co. of Am. v. United States, 790 F.2d 938, 942 (D.C. Cir. 1986)). Because the manufacturer would have the opportunity during the administrative process to convince the CPSC that it lacked regulatory authority, "it makes no sense for a court to intervene." Id. at 733.  The court thus concluded that the manufacturer's claim was barred for lack of final agency action.  Id. at 735.

The reasoning of the Supreme Court in SoCal and the D.C. Circuit in Reliable Automatic Sprinkler is equally applicable here.  As with the agency action at issue in those cases, EPA Region III's Proposed Determination is an interlocutory step in an investigatory process that has not yet resulted in final action by EPA.  See Newport Galleria Group, 618 F. Supp. at 1185. Also like the agency actions in SoCal and Reliable Automatic Sprinkler, the Proposed Determination does not draw any final conclusions, deny any rights, impose any legal obligations, or fix any legal relationships.  Mingo Logan, like the subjects of the investigations in SoCal and Reliable Automatic Sprinkler, faces no practical effects other than the disruption of the administrative process itself, during which Mingo Logan can attempt to convince EPA of its view of the law.  Thus, "it makes no sense for a court to intervene." Reliable Automatic Sprinkler, 324 F.3d at 733.  Moreover, it is of no consequence that Mingo Logan seeks to challenge EPA's statutory authority under Section 404(c), because there is no "special rule" that exempts such challenges from the finality requirement.  Id. at 732-33.  As SoCal and Reliable Automatic Sprinkler make clear, the policies underlying the finality doctrine require courts to reject piecemeal appeals of administrative proceedings, regardless of the grounds of the appeal. Accordingly, the Court must reject Mingo Logan's APA claim for lack of finality.

**B.**     **Mingo Logan's APA Claim Is Not Ripe For Review and Must Be Dismissed.**

Although the absence of "final agency action," standing alone, bars Mingo Logan's claim

under the APA, that claim may also be dismissed as unripe.  The purpose of the ripeness

requirement is "to prevent the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements over administrative policies, and also to protect

the agencies from judicial interference until an administrative decision has been formalized and

its effects felt in a concrete way by the challenging parties."  Abbott Labs v. Gardner, 387 U.S.

136, 148-49 (1967).  In applying the ripeness doctrine, courts consider two basic factors:  "the

fitness of the issues for judicial decision" and "the hardship to the parties of withholding court

consideration."  Id. at 149; accord Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998).

Under this analysis, Mingo Logan's claim is unripe.

Mingo Logan's claim first fails the fitness test.  To assess whether a case presents issues

fit for judicial decision, courts consider "whether the issue 'is purely legal, whether consideration

of the issue would benefit from a more concrete setting, and whether the agency's action is

sufficiently final'."  Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1204 (D.C. Cir.

1998) (citation omitted).  In addition, the subject agency action must be a definitive statement of

the agency's position, as opposed to the mere "ruling of a subordinate official."  Abbott Labs v.

Gardner, 387 U.S. at 151.  Although the statutory authority question raised by Mingo Logan's

Complaint appears to be "purely legal," it fails every other consideration of the fitness prong.

Most importantly, the Proposed Determination is not a final action by EPA.  As the D.C. Circuit

has explained, purely legal issues are unfit for review in the absence of final agency action,

because such final agency action is a "'crucial prerequisit[e]' to ripeness."  Nevada v. Dep't of

Energy, 457 F.3d 78, 85 (D.C. Cir. 2006) (quoting Sprint Corp. v. FCC, 331 F.3d 952, 956 (D.C.

Cir. 2003)).  Moreover, the Proposed Determination is not the EPA's final word on the issue, but instead represents the proposed findings of a "subordinate official," i.e., the Regional Administrator.  Finally, consideration of the issue raised by Mingo Logan would benefit from a more concrete setting because, until EPA makes a final determination, the Court cannot know whether the Agency will uphold the current permit (which would moot the challenge), withdraw the disposal specification, prohibit the specification, or restrict it -- all of which present different issues for judicial review.  For all these reasons, Mingo Logan's APA claim is not fit for review at this time.

Mingo Logan's claim also fails the hardship test because EPA's Proposed Determination is a tentative decision that does not subject Mingo Logan to "adverse effects of a strictly legal kind[.]"  Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 809 (2003) (quoting Ohio Forestry Ass'n, 523 U.S. at 733).  As with the regulation that the Supreme Court found to be unripe in Nat'l Park Hospitality Ass'n, the Proposed Determination "do[es] not command anyone to do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or obligations."  Id. (quoting Ohio Forestry Ass'n., 523 U.S. at 733).  It follows that the Proposed Determination does not present the type of hardship that warrants judicial review at this time.  See DRG Funding Corp. v. Sec'y of HUD, 76 F.3d at 1215 ("[C]laims of hardship 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative decisions.'") (citation omitted).  Nor does Mingo Logan's further participation in the Section 404(c) process constitute sufficient hardship to make its claims ripe for review.  See Nuclear Energy Inst. v. EPA, 373 F.3d 1251, 1313 (D.C. Cir. 2004).  Accordingly, Mingo Logan's APA claim must be dismissed.

C.      **Mingo Logan's APA Claim Must Be Dismissed For Failure To Exhaust Administrative Remedies.**

In addition to finality and ripeness, Mingo Logan's claim should also be dismissed on exhaustion grounds.  The doctrine of administrative exhaustion requires a party aggrieved by the agency action to exhaust available administrative remedies prior to seeking judicial relief.  See McKart v. United States, 395 U.S. 185, 193 (1969).  The purpose of the exhaustion doctrine, in general, is to afford agencies the "opportunity to apply their expertise" and "correct their own errors without judicial intervention," and to "discourage 'frequent and deliberate flouting of administrative processes.'"  Comm. of Blind Vendors of D.C. v. District of Columbia, 28 F.3d 130, 133 (D.C. Cir. 1994) (quoting McKart, 395 U.S. at 194-95).  The doctrine likewise promotes "[c]ertain very practical notions of judicial efficiency," by obviating the need for judicial review when a complaining party is successful in the administrative process.  See McKart, 395 U.S. at 195.

In this case, Mingo Logan has failed to exhaust its administrative remedies.  Instead of waiting until EPA completed the Section 404(c) proceedings, Mingo Logan chose to file suit after EPA's Regional Administrator issued his Proposed Determination.  By doing so, Mingo Logan has failed to avail itself of several opportunities to convince EPA not to exercise its authority under Section 404(c) of the CWA.  Specifically, Mingo Logan filed suit prior to the close of the public comment period on the Proposed Determination and even before the public hearing was conducted.  See 40 C.F.R. § 231.4.  In addition, in the event that the Regional Administrator decides to make a recommended determination to EPA Headquarters, Mingo Logan would also have an opportunity to consult with the Administrator prior to a final determination.  See id. § 231.6 (requiring the Administrator to "initiate consultation with the . . . owner of record, and . . . the applicant" within 30 days after reviewing the recommendations of

the Regional Administrator).  Until Mingo Logan has exhausted these remedies available in the

Section 404(c) proceeding, it cannot seek judicial review.

It makes no difference that Mingo Logan seeks to challenge EPA's regulatory jurisdiction

to exercise its Section 404(c) authority after a permit has been issued.  Although the D.C. Circuit

has recognized an exception to the exhaustion requirement for "challenges that concern the very

composition or 'constitution' of an agency," that exception does not encompass challenges to the

scope of an agency's regulatory jurisdiction.  Mitchell v. Christopher, 996 F.2d 375, 378-79

(D.C. Cir. 1993); see also Deltona Corp. v. Alexander, 682 F.2d 888, 893 (11th Cir. 1982)

(observing that exhaustion of administrative remedies is particularly important where a challenge

to an agency's jurisdiction is raised since "the agency ordinarily should be given the first

opportunity to consider a challenge to its jurisdiction").  Instead, "jurisdictional questions [must]

be put to agencies before they are brought" to the courts.  Mitchell, 996 F.2d at 379 (citation

omitted); see also Linemaster Switch Corp. v. EPA, 938 F.2d 1299, 1309 (D.C. Cir. 1991)

("excusing petitioners' failure to present statutory challenges to federal agencies for initial

resolution, . . . would infringe on agencies' rightful role in statutory construction under the

Chevron framework.").  Mingo Logan's APA claim must therefore be dismissed on exhaustion

grounds.

> **D.**     **Absent Final Agency Action, Mingo Logan's Claim Is a Time-Barred Facial**
> **Challenge to EPA's 1979 Regulations.**

Given the absence of final agency action here, Mingo Logan's APA claim amounts to an

untimely facial challenge to EPA's 1979 regulations, which, as described supra, allow EPA to

commence Section 404(c) proceedings either before or after the issuance of a Section 404

permit.  See 40 C.F.R. §§ 231.1(c), 231.2(a); 44 Fed. Reg. at 58,077.  Because EPA has not

taken a final action to apply those regulations to Mingo Logan, the company is effectively

challenging EPA's regulations on their face, and that challenge is time-barred.  See 28 U.S.C. §

2401(a) ("every civil action commenced against the United States shall be barred unless the

complaint is filed within six years after the right of action first accrues"); Dunn-McCampbell

Royalty Interest, Inc. v. Nat'l Park Serv., 112 F.3d 1283, 1287 (5th Cir. 1997) ("It is possible,

however, to challenge a regulation after the limitations period has expired, provided that the

ground for the challenge is that the issuing agency exceeded its constitutional or statutory

authority. To sustain such a challenge, however, the claimant must show some direct, final

agency action involving the particular plaintiff within six years of filing suit."); P & V Enters. v.

U.S. Army Corps of Eng'rs, 466 F. Supp. 2d 134, 141-43 (D.D.C. 2006) ("facial challenges to

agency regulations, like any other civil action filed against the United States, are subject to §

2401(a)'s six-year limitations period"), aff'd, 516 F.3d 1021 (D.C. Cir. 2008).

## II.     MINGO LOGAN'S "NON-STATUTORY REVIEW" CLAIM IS BASELESS AND MUST BE REJECTED

"Non-statutory review" is "a narrow doctrine allowing plaintiffs to bring claims under the

Court's federal question jurisdiction when an agency acts ultra vires."  Int'l Ass'n of Machinists

& Aerospace Workers, Dist. Lodge 166, AFL-CIO v. Griffin, 590 F. Supp. 171, 174 (D.D.C.

2008) (Kollar-Kotelly, J.) (hereinafter "IAMAW").  Under this doctrine, "review may be had

only when the agency's error is 'patently a misconstruction of the Act,'" when "the agency has

'disregarded a specific and unambiguous statutory directive,'" or "when the agency has 'violated

some specific command' of a statute."  Griffith v. Fed. Labor Relations Auth., 842 F.2d 487, 493

(D.C. Cir. 1988) (citations omitted).  The doctrine of non-statutory review "is intended to be

'extremely limited [in] scope,'" IAMAW, 590 F. Supp. 2d. at 175 (quoting Griffith, 842 F.2d at

493), and thus is designed solely to address an agency error that is "so extreme that one may

view it as jurisdictional or nearly so," Nyunt v. Chairman, Broadcasting Bd. of Governors, 589

F.3d 445, 449 (D.C. Cir. 2009) (quoting <u>Griffith</u>, 842 F.2d at 493); <u>accord</u> <u>IAMAW</u>, 590 F.

Supp. 2d at 175.[7]

      To obtain non-statutory review, a plaintiff must establish both prongs of a two-part test.

First, the plaintiff must show that the agency "plainly act[ed] 'in excess of its delegated powers

and contrary to a specific prohibition in the' statute that is 'clear and mandatory[.]'" <u>Nyunt</u>, 589

F. 3d at 449 (quoting <u>Leedom</u>, 358 U.S. 184, 188 (1958).  Second, the plaintiff must show that

the absence of judicial review "would wholly deprive [the plaintiff] of a meaningful and

adequate means of vindicating [the plaintiff's] statutory rights." <u>IAMAW</u>, 590 F. Supp. 2d at

175 (citing <u>Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.</u>, 502 U.S. 32, 43

(1991)).  Put differently, the plaintiff must establish that "there is no alternative procedure for

review of the statutory claim." <u>Nyunt</u>, 589 F.3d at 449.  In light of the "nearly insurmountable"

showing required to obtain non-statutory review, <u>IAMAW</u>, 590 F. Supp. 2d at 175 (quoting <u>U.S.</u>

<u>Dep't of Justice v. Fed. Labor Relations Auth.</u>, 981 F.2d 1339, 1343 (D.C. Cir. 1993)), the D.C.

Circuit has described such a claim as "essentially a Hail Mary pass" that "rarely succeeds,"

<u>Nyunt</u>, 589 F.3d at 449.

      Here, Mingo Logan's "Hail Mary pass" falls far short of the standard for non-statutory

review, as we demonstrate below.  As an initial matter, Mingo Logan has not even alleged the

type of agency action that could merit non-statutory review -- <u>i.e.</u>, an error so extreme that it

amounted to lawless agency action.  Instead, Mingo Logan accepts that Section 404(c) of the

CWA authorizes EPA to veto the specification of disposal areas, though Mingo Logan contends

that this authority does not extend to specifications in permits that have already been issued by

---

[7]     The non-statutory review doctrine "is often called '<u>Leedom</u> jurisdiction' or the '<u>Kyne</u> exception' after the leading case approving its application[.]"  <u>IAMAW</u>, 590 F. Supp. 2d at 174 (citing <u>Leedom v. Kyne</u>, 358 U.S. 184 (1958)).

the Corps.  Mingo Logan has thus alleged what amounts to a routine dispute over statutory

interpretation and, as a result, its claim of <u>ultra</u> <u>vires</u> action is insufficient on its face.

But even if Mingo Logan's claim could clear that hurdle, it would still fail to meet the

two-part test to obtain non-statutory review.  First, Mingo Logan cannot establish that EPA's

actions are plainly in excess of the Agency's CWA authority, because the statute does not

unambiguously preclude EPA from exercising its veto authority after a permit has been issued.

Second, denying judicial review now will not wholly deprive Mingo Logan of any statutory

rights it may have because Mingo Logan can challenge EPA's Section 404(c) veto authority via

an APA suit once EPA takes final agency action.

**A.      Non-Statutory Review Is Unavailable Here Because Mingo Logan Does Not Challenge EPA's Authority Under Section 404(c) to Withdraw the Specification of a Disposal Site.**

Mingo Logan's attempt to obtain non-statutory review fails at the outset because the

company has failed to identify any error by EPA that was "so extreme that one may view [it] as

jurisdictional or nearly so."  <u>IAMAW</u>, 590 F. Supp. 2d at 175 (citation omitted); <u>see also</u> <u>Hunter</u>

<u>v. F.E.R.C.</u>, 527 F. Supp. 2d 9, 17 n.6 (D.D.C. 2007) (an <u>ultra</u> <u>vires</u> claim requires a showing that

the agency acted in "'brazen defiance' of its statutory authority") (quoting <u>Philip Morris, Inc. v.</u>

<u>Block</u>, 755 F.2d 368, 369-70 (4th Cir. 1985)).

The plain language of Section 404(c) authorizes EPA to withdraw or restrict specified

disposal sites and to initiate Section 404(c) proceedings when considering such a withdrawal or

restriction.  <u>See</u> 33 U.S.C. § 1344(c).  Mingo Logan does not dispute that EPA has such

authority, but instead takes issue with EPA's use of that authority after a permit has been issued

by the Corps.  Mingo Logan's objection as to <u>when</u> EPA may exercise its veto authority is

simply a "[g]arden-variety" dispute over statutory interpretation that does not give rise to the

extraordinary remedy of non-statutory review.  See Griffith, 842 F.2d at 493 ("Garden-variety

errors of law or fact are not enough."); Dart v. United States, 848 F.2d 217, 231 (D.C. Cir. 1988)

("an agency action allegedly 'in excess of authority'" must be more than "a dispute over

statutory interpretation"); Jordan Hosp. v. Leavitt, 571 F. Supp. 2d 108, 117 (D.D.C. 2008) (non-

statutory review does not extend to situations where the agency has "arguably taken too

expansive an interpretation of a governing statute").  Because the objection raised by Mingo

Logan questions not the existence of EPA's authority, but rather the timing of EPA's exercise of

that authority, Count II of Mingo Logan's Complaint falls short of stating even a threshold claim

for non-statutory review.

## B.   Mingo Logan Cannot Establish that EPA's Proposed Determination Violates a Clear and Unambiguous Directive or Command in the CWA.

Even if the allegations in the Complaint were sufficient to bring Mingo Logan's claim

within the realm of non-statutory review, the claim must nevertheless be rejected because Mingo

Logan cannot establish that EPA's action here was plainly "'in excess of its delegated powers

and contrary to a specific prohibition in the' statute that is 'clear and mandatory[.]'"  Nyunt, 589

F.3d at 449 (quoting Leedom, 358 U.S. at 188).  To meet this standard, Mingo Logan would

need to show that EPA "violated 'a specific and unambiguous statutory directive.'"  Nat'l Air

Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. IMpasses Panel, 437 F.3d 1256, 1264 (D.C.

Cir. 2006) (quoting United Food & Commercial Workers, Local 400 v. NLRB, 694 F.2d 276,

278 (D.C. Cir. 1982)); accord Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth.,

283 F.3d 339, 344 (D.C. Cir. 2002) (there must be a "clear violation" of "an unambiguous

statutory provision").

In its attempt to find such a specific and unambiguous directive or prohibition within

Section 404 of the CWA, Mingo Logan contends that "EPA patently misconstrued its powers

under § 404(c) and disregarded Congress's directive that EPA exercise its power to prohibit or withdraw the specification of a disposal site only before a permit is issued."  Compl. ¶ 83. Mingo Logan argues that "[n]othing in [Section 404(c)] gives EPA authority to veto, revoke or otherwise limit a permit once it has been issued."  Compl. ¶ 71.  In Mingo Logan's view,"[t]he specification process occurs before issuance of a permit because a permit application must specify where the regulated activities will take place."  Id. ¶ 76.  "Whatever authority § 404(c) bestows on EPA, therefore, must be exercised before the Corps issues a permit."  Id.

Mingo Logan is mistaken on all counts.  First, Mingo Logan's theory that the "specification process" occurs when the permit applicant identifies the area where regulated activities will take place is defeated by the plain language of CWA Section 404(b), which provides that "[s]ubject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary [of the Army.]"  33 U.S.C. § 1344(b) (emphasis added). Thus, there is no "specification" of the disposal area until determined by the Corps.  The identification of a proposed disposal area in a permit application is only a request by the applicant for the Corps to approve that proposed disposal site.

Second, there is no textual support in Section 404(c) for Mingo Logan's contention that Congress directed EPA to exercise its veto authority only before a permit is issued.  Indeed, Section 404(c) places no limitation at all on when EPA may exercise its veto authority, except to say that EPA's determination must occur "after notice and opportunity for public hearings" and after consultation with the Secretary of the Army, both of which are steps that EPA initiates.  33 U.S.C. § 1344(c).  Aside from those prerequisites, the plain language of Section 404(c) authorizes the Administrator to prohibit, withdraw, deny, or restrict the specification or use of any disposal site "whenever" the Administrator determines that such specification would have

adverse environmental effects.  Id.  Thus, Section 404(c) cannot be read to impose the type of

"specific prohibition" required for non-statutory review.  See Nyunt, 589 F.3d at 449.

Third, there is no basis for Mingo Logan's contention that EPA "patently misconstrued

its powers under Section 404(c)."  Compl. ¶ 83.  As noted, Mingo Logan can only prevail on its

claim if it can show that the underlying statute is unambiguous, i.e., it "is subject to only one

reasonable interpretation."   IAMAW, 590 F. Supp. 2d at 178; accord Nat'l Air Traffic

Controllers Ass'n AFL-CIO, 437 F.3d at 1264.  The problem for Mingo Logan is that if Section

404(c) is subject to only one reasonable interpretation, then it is the interpretation adopted by

EPA.  As we demonstrate below, EPA's interpretation of its authority under Section 404(c) is, at

a minimum, a permissible reading of the statute.  Accordingly, non-statutory review is

unavailable.

Far from circumscribing when EPA can exercise its veto authority, the plain language of

Section 404(c) authorizes EPA to use its veto authority at any time when the disposal of fill or

dredged material may pose adverse environmental consequences.  Section 404(c) not only

authorizes EPA to "prohibit" and "deny" such specification of disposal sites – terms largely of

prospective application[8] – it also authorizes EPA's "withdrawal" of a specification – a term

purely of retrospective application.  "Withdrawal" means "the act of taking back or away

something that has been granted or possessed."  Webster's Ninth New Collegiate Dictionary

1355 (1990) (emphasis added).  "[C]ourts must presume that a legislature says in a statute what it

means and means in a statute what it says there."  Connecticut Nat'l Bank v. Germain, 503 U.S.

249, 253-54 (1992).  Here, Congress chose to employ the word "withdrawal" – twice.  The Court

---

[8]      "Prohibit" means "to forbid by authority" or "to prevent from doing something."
Webster's Ninth New Collegiate Dictionary 940 (1990).  "Deny" means, in the definition most
appropriate to the permitting context, "to refuse to grant."  Id. at 340.

must therefore presume that Congress intended to give EPA the authority to "take back" a specification or permit that was previously "granted."  Moreover, unless the term "withdrawal" encompasses EPA's authority to take back a specification that was already permitted, the term would have no meaning that is not duplicated by the terms "prohibit," "deny," and "restrict." [9] See Babbitt v. Sweet Home Ch. of Communities for a Great Oregon, 515 U.S. 687, 697-98 (1995) (rejecting narrow interpretation of the term "harm" in the Endangered Species Act that would have rendered the term superfluous).  It follows that EPA's interpretation of its Section 404(c) authority is, at a minimum, permissible.  Consequently, Section 404(c) cannot serve as the unambiguous statutory restriction necessary for Mingo Logan's non-statutory review claim.

Further undermining Mingo Logan's attempt to establish a "specific and unambiguous" directive or prohibition is that the only two district courts to have considered the issue have stated that Section 404(c) authorizes EPA to veto a Corps permit after issuance.[10]  In City of Alma v. United States, 744 F. Supp. 1546, 1553 (S.D. Ga. 1990), the Corps issued a notice of intent to issue a Section 404 permit for mitigation work associated with the Lake Alma project, which had received a Section 404 permit seven years earlier.  The permit for the Lake Alma

---

[9]     The term "restrict" means "to confine within bounds."  Webster's Ninth New Collegiate Dictionary 1006.  In the context of Section 404(c), it is most naturally read to mean imposing a limitation on a specified disposal site without prohibiting, denying, or withdrawing the specification or permit.  Although it is possible to interpret "restrict" as an action EPA must undertake before a permit is issued, Congress' use of the term "withdrawal" authorizes EPA to take back a specification that has already been granted.  In light of that authority, "restrict" can reasonably be interpreted as authorizing EPA to impose a limitation on a disposal site that has already been specified through a Section 404 permit.

[10]     Several courts have stated that EPA has the authority to veto a permit issued by the Corps, though those decisions did not specify whether they were referring to a final Corps permit as opposed to a proposed permit.  See Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d at 443 ("[w]hen a permit is issued by the Corps under § 404 . . . EPA can veto the Corps' permit."); Bersani v. EPA, 850 F.2d at 40 ("EPA has the authority under § 404(c) to veto any permit granted by the Corps.").

project was challenged in federal court and ultimately overturned, though there was some dispute as to whether the permit had been invalidated.  Id. at 1552-53, 1559.  In response to the proposed mitigation permit, EPA issued a final determination under Section 404(c) to veto the use of Lake Alma as a disposal site for dredged and fill material.  Id. at 1554.  Plaintiffs challenged EPA's action on various grounds, including a claim that EPA's veto of an existing permit was arbitrary and capricious because it contravened EPA's regulatory policy.  Id. at 1554, 1558-60.  In this regard, Plaintiffs pointed to the preamble to EPA's 1979 implementing regulations for the Section 404(c) process, where EPA had stated that "it would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit proceeding, or where the matters at issue were resolved to EPA's satisfaction during the permit proceeding, unless substantial new information is first brought to the Agency's attention after issuance."  Id. at 1559 (quoting 44 Fed. Reg. 58,077 (1979)).

The court rejected the challenge.  Although the court found that the Lake Alma project permit had been invalidated and, thus, EPA reasonably concluded that its preamble language was not applicable, the court also found that EPA had reasonably interpreted Section 404(c) to authorize the initiation of veto proceedings "at any time, including after a permit has been issued."  Id. at 1559.  The court explained that EPA's interpretation was consistent with the language of Section 404(c), "which grants the Agency the power to act 'whenever' it determines that a discharge will have unacceptable adverse effects."  Id. (quoting 33 U.S.C. § 1344(c)).  Thus, the court concluded that "EPA's regulations permitting section 404(c) action after permit issuance, and its action pursuant to them, are consistent with the intent of Congress expressed in the CWA."  Id. at 1559-60.

Another court has upheld EPA's authority under Section 404(c) to veto a permit after filling activity has already taken place. In <u>Russo Devel. Corp. v. Reilly</u>, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990), the Corps proposed to issue an after-the-fact permit under Section 404 to authorize the filling of wetlands that had already occurred on a portion of the plaintiff's property. <u>Id.</u> at *2. After EPA vetoed the proposed permit, the plaintiff challenged EPA's veto, arguing, among other things, that EPA lacked authority to veto a proposed permit after filling activity had occurred. <u>Id.</u> at *3. The court upheld EPA's veto as consistent with the language of the CWA. <u>Id.</u> at *5. In doing so, the court noted that the CWA "authoriz[es] . . . EPA to withdraw specification after the Army Corps of Engineers has issued a permit[.]" <u>Id.</u> at *5-6. The court explained that if EPA could not use its section 404(c) authority after a permit has been issued, then EPA would be unable to exercise its oversight authority because compliance with a CWA permit is generally deemed to be compliance with the CWA. <u>Id.</u> at *6-7 (citing 33 U.S.C. § 1344(p)).

In light of the foregoing, EPA's interpretation of the CWA, as reflected in its long-standing regulations and as stated in the Proposed Determination, is at least a permissible reading of the statute. Accordingly, there is no basis for Mingo Logan's claim that the CWA unambiguously precludes EPA from exercising its Section 404(c) authority after a permit is issued. Nor is there any basis for Mingo Logan's assertion that EPA "patently misconstrued" the CWA. Compl. ¶ 83. Mingo Logan's non-statutory review claim must be dismissed.[11]

---

[11]     Mingo Logan's Complaint also contends that legislative history supports its interpretation of the CWA. However, legislative history is irrelevant to the Court's inquiry. Non-statutory review is only appropriate when the agency disregards or violates a statutory command or prohibition that is unambiguous. <u>Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Ser. IMpasses Panel</u>, 437 F.3d at 1264; <u>IAMAW</u>, 590 F. Supp. 2d at 178. Because "[l]egislative history is irrelevant to the interpretation of an unambiguous statute," <u>Davis v. Michigan Dep't of</u>
*(continued on next page...)*

**C.**      **Denial of Judicial Review at this Time Will Not Deprive Mingo Logan of its Ability to Challenge EPA's Section 404(c) Authority upon Final Agency Action.**

Even if Mingo Logan had established the type of statutory violation required to obtain non-statutory review, the Company's claim would still fail because it cannot show that "the denial of judicial review would wholly deprive [it] of a meaningful and adequate means of vindicating [its] statutory rights." IAMAW, 590 F. Supp. 2d at 175 (citing Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc., 502 U.S. at 43).

Non-statutory review is impermissible when the plaintiff will have an "unquestioned right to review" of the contested agency action. MCorp. Fin., 502 U.S. at 43-44. Here, Mingo Logan will have such a right once EPA completes the Section 404(c) proceedings for the Spruce No. 1 permit. At that point, Mingo Logan can challenge EPA's final determination pursuant to the APA. Under the APA, Mingo Logan can challenge EPA's final action as being beyond the Agency's statutory authority, see 5 U.S.C. § 706(2), and Mingo Logan can seek review of any "preliminary, procedural, or intermediate agency action" that is not reviewable now, see id. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). Because Mingo Logan has access to an "alternative procedure for review of [its] statutory claim," Nyunt, 589 F.3d at 449, the Court must reject Mingo Logan's attempt to obtain non-statutory review, see, e.g., IAMAW, 590 F. Supp. 2d at 178; Jordan Hosp. v. Leavitt, 571 F. Supp. 2d at 117-18.

---

Treasury, 489 U.S. 803, 808-09 n.3 (1989), legislative history cannot aid Mingo Logan's attempt to obtain non-statutory review.

## <u>CONCLUSION</u>

For the reasons set forth above, EPA respectfully requests that the Court dismiss the

Complaint and enter judgment in favor of EPA.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/Kenneth C. Amaditz
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, DC  20026-3986
(202) 616-7554 (Morris)
(202) 514-3698 (Amaditz)
Fax: (202) 514-8865
c.j.morris@usdoj.gov
kenneth.amaditz@usdoj.gov

OF COUNSEL:

KARYN WENDOLOWSKI
Office of General Counsel
U.S. EPA
1200 Pennsylvania Ave., N.W.
MC 2355A
Washington, D.C.  20460

STEFANIA SHAMET
Office of Regional Counsel
U.S. EPA Region III
1650 Arch St.
Philadelphia, PA 19103-2029

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2010, I caused a copy of the foregoing document to be served on counsel of record via the Court's CM/ECF system.

<u>s/Kenneth C. Amaditz</u>