**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
MINGO LOGAN COAL COMPANY, INC.          )
                                                    )
                    Plaintiff,                      )
                                                    )
            v.                                       )          Case No. 1:10-cv-00541-CKK
                                                    )
UNITED STATES ENVIRONMENTAL         )
PROTECTION AGENCY                           )
                                                    )
                    Defendant.                      )
_____)

**STATEMENT OF POINTS AND AUTHORITIES IN
<u>OPPOSITION TO EPA'S MOTION TO DISMISS</u>**


**\*ORAL ARGUMENT REQUESTED\***

## Table of Contents

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS AND STATUTORY BACKGROUND..............................................3

I.      STATUTORY AND REGULATORY BACKGROUND....................................................3

II.     FACTS .............................................................................................................................6

        A.      The Spruce Permit.................................................................................................6

        B.      The *OVEC* Case ...................................................................................................8

        C.      The Corps's Refusal of EPA's Request to Suspend, Revoke or
                Modify the Permit................................................................................................9

        D.      EPA's Decision to Proceed Under § 404(c) .........................................................10

        E.      Effects of EPA's Decision on Mingo Logan's Business .......................................11

ARGUMENT ...........................................................................................................................12

I.      EPA'S DEFINITIVE CONCLUSION THAT IT HAS AUTHORITY
        UNDER § 404(c) TO REVOKE OR MODIFY A PERMIT AFTER IT
        HAS BEEN ISSUED BY THE CORPS CONSTITUTES FINAL
        AGENCY ACTION..........................................................................................................13

        A.      EPA's Conclusion That It Has Authority to Revoke Mingo
                Logan's Permit Is Definitive..............................................................................14

        B.      EPA's Decision Has Direct and Immediate Effects on Mingo
                Logan's Operations and Affects Mingo Logan's Legal Rights. ...........................20

                1.      EPA Has Used Its Assertion of Authority to Request and
                        Obtain a Stay in *OVEC*. .............................................................................22

                2.      EPA's Assertion of Authority Directly Affects Mingo
                        Logan's Investment and Project Development Choices. ...........................23

                3.      EPA's Actions Have Caused Mingo Logan Tangible
                        Economic Harm. .......................................................................................24

                4.      EPA's Action Curtails Rights of Mingo Logan and Other
                        Permittees..................................................................................................26

II.     MINGO LOGAN'S CLAIM IS RIPE FOR JUDICIAL
        DETERMINATION. ........................................................................................................28

## Table of Contents

Page

A.  Mingo Logan's Claim That EPA Lacks Statutory Authority Is Fit for Judicial Review. ........................................................................29

B.  Postponing Judicial Review Would Impose an Undue Burden on Both Mingo Logan and the Court. ...........................................................30

III.  MINGO LOGAN'S CLAIM DOES NOT REQUIRE FURTHER EXHAUSTION OF ADMINISTRATIVE REMEDIES. ..................................31

IV.  MINGO LOGAN'S CLAIM IS NOT TIME-BARRED. ..................................34

V.  ALTERNATIVELY, MINGO LOGAN'S CLAIM QUALIFIES FOR NON-STATUTORY REVIEW. ........................................................................35

A.  EPA Claims the Authority to Withdraw a § 404 Permit, Which It Clearly and Unambiguously May Not Do. ..........................................................35

1.  The Statutory Language Has But One Reasonable Interpretation. ...................................................................35

2.  Legislative History Confirms That EPA Must Act Before the Permit Is Issued. ...................................................40

3.  No Federal Court Has Ever Held That EPA Has the Authority to Withdraw a § 404 Permit. ....................................41

B.  Without Non-Statutory Review, Mingo Logan Will Be Denied a Meaningful and Adequate Means of Vindicating Its Statutory Rights. .................................................................................42

CONCLUSION ...................................................................................44

Table of Authorities

# FEDERAL CASES

* *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)............................................................14

*Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937 (2009)..................................................25

* *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485 (D.C. Cir. 1983)......................................................................................................20, 32

*Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C. Cir. 1985)............................19, 20

*Atl. States Legal Found. v. EPA*, 325 F.3d 281 (D.C. Cir. 2003)....................................29

* *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000).........14, 15, 16, 17, 21

*Bates v. United States*, 522 U.S. 23 (1997)....................................................................37

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).........................................................25

* *Bennett v. Spear*, 520 U.S. 154 (1997)..............................................................13, 14, 15

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991)....................42, 43

*Bersani v. EPA*, 674 F. Supp. 405 (N.D.N.Y. 1987)......................................................42

*Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999)..........................................6

*Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001)..................................3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).............................................................23

* *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)..............................14, 15, 17, 19, 20

* *City of Alma v. United States*, 744 F.Supp. 1546 (S.D. Ga. 1990)................................42

*Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998)..........................29, 30

* *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 129 S. Ct. 2458 (2009)......................................................................................3, 7, 36, 41

* *CropLife Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003).................................20, 27, 28

* *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988).....................................35, 40

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989)............................................40

Table of Authorities

Page

* *Deltona Corp. v. Alexander*, 682 F.2d 888 (11th Cir. 1982) ...................................33

*Duncan v. Walker*, 533 U.S. 167 (2001)..................................................................37, 39

*E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977)...............................24

* *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980) ...........................................13, 14, 17, 19

*Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487 (D.C. Cir. 1988)....................40

*Heiser v. Woodruff*, 327 U.S. 726 (1946) ...................................................................23

* *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420 (D.C. Cir. 2004)......................14

* *Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 166, AFL-CIO v. Griffin*, 590 F. Supp. 2d 171 (D.D.C. 2008) ...................................35, 42, 43, 44

*Jordan Hosp. v. Leavitt*, 571 F. Supp. 2d 108 (D.D.C. 2008) .................................25, 44

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003) ...........................................................................................................................3

*Linemaster Switch Corp. v. U.S. EPA*, 938 F.2d 1299 (D.C. Cir. 1991) ......................33

*McKart v. United States*, 395 U.S. 185 (1969) ........................................................32, 33

*Minnesota v. Hoffman*, 543 F.2d 1198 (8th Cir. 1976)................................................41

*Mitchell v. Christopher*, 996 F.2d 375 (D.C. Cir. 1993)..............................................33

* *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272 (D.C. Cir. 2005) ..................................................................................... *passim*

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*, 440 F.3d 459 (D.C. Cir. 2006) ...........................................................................................................29

*Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752 (D.C. Cir. 2003) ....................................29

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ..........................................30

*New Hampshire v. Maine*, 532 U.S. 742 (2001)............................................................23

* *Newport Galleria Group v. Deland*, 618 F. Supp. 1179 (D.D.C. 1985)..........17, 18, 20

*Nuclear Energy Inst. v. EPA*, 373 F.3d 11251 (D.C. Cir. 2004) ..................................31

Table of Authorities

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) .....................36, 44

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ....................................................29

* *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ...............2, 3, 4, 8

* *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, Nos. 3:05-0784, 3:06-
    0438, 2009 WL 3014943 (S.D. W. Va. Sept. 15, 2009) .................................................9, 10

* *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, Nos. 3:05-0784, 3:06-
    0438, 2010 WL 1633315 (S.D. W. Va. Apr. 22, 2010) .........................................................9

*PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 11 (D.D.C. 2004) ................................................16

* *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324
    F.3d 726 (D.C. Cir. 2003) .......................................................................................17, 20, 28

*Russo Dev. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J.
    Mar. 16, 1990) .........................................................................................................................42

*Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464 (D.C. Cir. 1995) ......................................16

*USAA Fed. Sav. Bank v. McLaughlin*, 849 F.2d 1505 (D.C. Cir. 1988) ......................................29

*Williams v. Taylor*, 529 U.S. 362 (2000) .....................................................................................39

*Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) ..........................34

## FEDERAL STATUTES AND RULES

5 U.S.C. § 702 ...............................................................................................................................26

5 U.S.C. § 704 ...............................................................................................................................13

30 U.S.C. § 1253 .............................................................................................................................3

30 U.S.C. § 1265(b)(22)(D) ............................................................................................................3

33 U.S.C. § 419 .............................................................................................................................34

33 U.S.C. § 1311(a) .........................................................................................................................4

33 U.S.C. § 1313 .............................................................................................................................4

33 U.S.C. § 1341 .............................................................................................................................4

<u>Table of Authorities</u>

<u>Page</u>

33 U.S.C. § 1341(c) .................................................................................................35, 39

33 U.S.C. § 1342(a) .............................................................................................................3

33 U.S.C. § 1344 .................................................................................................................3

33 U.S.C. § 1344(a) ....................................................................................................4, 37

33 U.S.C. § 1344(b) ..........................................................................................4, 5, 36, 37

33 U.S.C. § 1344(b)(1) .......................................................................................................4

33 U.S.C. § 1344(b)(2) .......................................................................................................4

33 U.S.C. § 1344(c) ...............................................................................................5, 36, 37

33 U.S.C. § 1344(q) ...........................................................................................................4

33 U.S.C. § 1344(p) ........................................................................................2, 4, 24, 43

42 U.S.C. §§ 4321-4370f ....................................................................................................4

42 U.S.C. § 7609 .................................................................................................................5

44 U.S.C. § 1507 ...............................................................................................................23

FED. R. CIV. P. 1 ...............................................................................................................22

## FEDERAL REGULATIONS & ADMINISTRATIVE MATERIALS

33 C.F.R. pt. 205 .........................................................................................................35, 38

33 C.F.R. pt. 230 .................................................................................................................4

33 C.F.R. pt. 325 .................................................................................................................4

33 C.F.R. § 325.1(d)(4) ...................................................................................................4, 37

33 C.F.R. § 325.7 ........................................................................................................2, 6, 9, 27

40 C.F.R. § 122.4(d) ...........................................................................................................7

40 C.F.R. § 122.44 ..............................................................................................................7

<u>Table of Authorities</u>

Page

40 C.F.R. § 123.35 ......................................................................................................7

40 C.F.R. § 123.44 ......................................................................................................7

40 C.F.R. pt. 230 .........................................................................................................4

40 C.F.R. § 230.2 ............................................................................................35, 38, 39

40 C.F.R. pt. 231 ..................................................................................................15, 27

40 C.F.R. § 231.1(a) .................................................................................................38

40 C.F.R. § 231.1(c) .................................................................................................34

40 C.F.R. § 231.2(a) ...........................................................................................34, 38

40 C.F.R. pt. 1504 ......................................................................................................5

44 Fed. Reg. 14,578 (Mar. 13, 1979) .....................................................................15

44 Fed. Reg. 58,076-77 (Oct. 9, 1979) .............................................................15, 33

75 Fed. Reg. 16,788 (Apr. 2, 2010) ..............................................................10, 15, 16

## STATE REGULATIONS

W. Va. Code R. § 14.14.d.4-5 ...................................................................................3

W. Va. Code R. § 14.14.e.5.A ...................................................................................3

W. Va. Code R. § 14.14.g.1.A-B ..............................................................................3

W. Va. Code R. § 14.14.g.9 .......................................................................................3

W. Va. Code R. § 38-2-14.14.a .................................................................................3

## MISCELLANEOUS

"Clean Water Act Section 404(q) Memorandum of Agreement Between the
    Environmental Protection Agency and the Department of the Army" (Aug.
    11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html. .........5

EPA, Press Release, "EPA Proposes Veto of Mine Permit Under the Clean Water
    Act" (Mar. 26, 2010), *available at* http://www.epa.gov/newsroom ..................15

Table of Authorities

Page

H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in* 1 A LEGISLATIVE HISTORY
    OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 893-
    1110 (Jan. 1973)....................................................................................................41

Mingo Logan's Response in Opposition to Corps' Motion to Extend Stay of
    Proceeding, *OVEC v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-784 (S.D.
    W.Va. Apr. 2, 2010)..................................................................................................9

S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in* 2 A LEGISLATIVE HISTORY OF
    THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 1534-
    1723 (Jan. 1973)....................................................................................................41

S. REP. NO. 92-414 (Oct. 28, 1971), *reprinted in* 2 A LEGISLATIVE HISTORY OF
    THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 1419-
    91 (Jan. 1973)........................................................................................................38

Senate Consideration of the Report of the Conference Committee (Oct. 4, 1972),
    *reprinted in* 1 A LEGISLATIVE HISTORY OF THE WATER POLLUTION
    CONTROL ACT AMENDMENTS OF 1972, at 161-339 (Jan. 1973) ................................40, 41

U.S. CONST. art. 1, § 7, cl. 2 ........................................................................................36

4 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1029 at 157-158
    (3d ed. 2002)..........................................................................................................22

## PRELIMINARY STATEMENT

This case presents a purely legal issue.  Mingo Logan Coal Company, Inc. ("Mingo Logan") challenges the Environmental Protection Agency's ("EPA") assertion through its formal Federal Register notice that it has statutory authority pursuant to § 404(c) of the Clean Water Act ("CWA") to take away a permit issued three years ago by the Army Corps of Engineers ("the Corps").  The sole question for the Court to decide is: Does § 404(c) authorize EPA to take any action after a § 404 permit has been issued by the Corps?  Mingo Logan contends that EPA has no such authority because § 404(c) only gives EPA authority over disposal site *specifications*, which necessarily precede the issuance of a permit; it says nothing about *permits*. This question is ready for judicial review.

The permit at issue authorizes Mingo Logan to discharge fill material into specified streams in West Virginia, incident to the operation of the Spruce No. 1 coal mine.  The Corps, which has exclusive authority to issue such fill permits pursuant to CWA § 404, conducted ten years of  environmental review during which it received extensive input from EPA and all other interested parties.  Before the Corps issued the Spruce § 404 permit in early 2007, EPA could have "vetoed" the site specifications that the Corps proposed to include in the permit.  EPA chose not to.  Having acceded then to the Corps's decision to issue the permit, EPA has now changed its mind.  Mingo Logan does not here challenge the reasons why EPA has changed its mind and whether they are supported by fact or within the scope of authority granted by § 404(c) — Mingo Logan will raise its significant factual and statutory scope objections, if necessary, at an appropriate time.  Instead, Mingo Logan here challenges only *whether* EPA has statutory authority to exercise any § 404(c) power *after* the Corps has issued a permit.

EPA wrongly contends that Mingo Logan's claim is not reviewable now.  But the issue presented by Mingo Logan depends on no additional determination of fact or exercise of agency

expertise.  The Court's consideration of this legal issue will not be furthered by additional administrative proceedings.  And EPA's exercise of § 404(c) authority now has immediate legal and business consequences for Mingo Logan.   Numerous decisions of the Supreme Court, the D.C. Circuit and this Court direct that under such circumstances, the Court should not delay review.

The permit the Corps issued to Mingo Logan carries with it certain legal assurances including: (1) Congress's assurance that compliance with a § 404 permit will be deemed compliance with the CWA and thus bar collateral attacks on actions taken in compliance with the permit,  33 U.S.C § 1344(p); (2) the Corps's assurance that a permit will not be revoked or modified without considering, among other things, the permittee's reliance on and investment in the permit, *see* 33 C.F.R. § 325.7; and (3) Congress's assurance that permits issued by the Corps will be reviewed by the courts under the Administrative Procedure Act with deference to the Corps's judgments made during the administrative process.   But EPA's definitive exercise of § 404(c) authority now, three years after the Corps issued the permit, destroys these assurances.

Finally, but importantly, EPA's initiation of the § 404(c) process immediately interferes with Mingo Logan's right to obtain final judgment in litigation challenging its permit in the Southern District of West Virginia.  Mingo Logan has moved for summary judgment based on the Fourth Circuit's decision in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) ("*OVEC*"), but based solely on EPA's unlitigated assertions that § 404(c) authorizes it to act after the permit is issued and that EPA's action could moot the litigation, the United States has persuaded that court to stay its proceedings.  In sum, EPA's assertion of authority has stripped away Mingo Logan's  rights and replaced them with a sea of uncertainty.

There is no reason to delay consideration of this issue.  The Court should hear this case now.

**STATEMENT OF FACTS AND STATUTORY BACKGROUND**

**I.     STATUTORY AND REGULATORY BACKGROUND**

In the Surface Mining Control and Reclamation Act ("SMCRA"), Congress authorized mining procedures that necessitate the discharge of excess surface mining materials (rock) into valleys that may contain streams.  *See* 30 U.S.C. § 1265(b)(22)(D); *OVEC*, 556 F.3d at 186, 190; *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 443 (4th Cir. 2003).  To regulate this process, Congress allocated authority among  States and federal agencies, thereby requiring a series of state and federal permits, each of which serves a specific and separate function.[1]

As part of that regulatory scheme, CWA § 404(a) authorizes the Corps to issue fill permits at specified disposal sites.  33 U.S.C. § 1344.  The Corps's authority is exclusive; EPA does not share it.  *See Coeur Alaska, Inc.*, 129 S.Ct. at 2461-74 (a "two-permit regime is contrary to the statute and the regulations . . . [and] would cause confusion, delay, expense and uncertainty in the permitting process.").

---

[1] SMCRA gave the States "exclusive jurisdiction over the regulation of surface coal mining within [their] boarders." *Bragg v. West Virginia Coal Ass'n*, 248 F. 3d 275, 288 (4th Cir. 2001) (quoting 30 U.S.C. § 1253).  The West Virginia SMCRA program regulates the placement, minimization and construction of valley fills to minimize environmental impacts by ensuring stability, minimizing downstream flooding and ensuring that spoil disposal has minimal impacts on downstream water quality.  *See* W. VA. CODE R. §§ 38-2-14.14.a; 14.14.d.4-5; 14.14.e.5.A; 14.14.g.1.A-B; 14.14.g.9.  SMCRA requires that water from the valley fill areas be directed into sediment ponds, where it is treated and eventually released into waters downstream in accordance with permits issued by the State of West Virginia under CWA § 402, 33 U.S.C. § 1342(a).  The § 402 and § 404 programs are separate and distinct.  EPA Br. at 2; *see also Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 129 S. Ct. 2458, 2467-68 (2009).

Section 404(b) prescribes how the Corps issues permits.  The Corps must first specify a disposal site for the discharge of fill material.  *See* 33 U.S.C. § 1344(b); 33 C.F.R. § 325.1(d)(4) ("If the activity would include the discharge of dredged or fill material into the waters of the United States . . . the application must include the source of the material; the purpose of the discharge, a description of the type, composition and quantity of the material; the method of transportation and disposal of the material; and the location of the disposal site.").  The Corps generally specifies these disposal sites by applying environmental guidelines.  *See* 33 U.S.C. § 1344(b)(1).  Because the Corps's issuance of a § 404 fill permit is a "federal action," the Corps must also assess the propriety of issuing the permit pursuant to the National Environmental Policy Act ("NEPA").  *See* 42 U.S.C. §§ 4321-4370f; 33 C.F.R. pt. 230.  Once the Corps issues this permit, the permittee's discharges pursuant to the permit are deemed in compliance with the CWA.  *See* 33 U.S.C. §§ 1311(a); 1344(p).[2]

Congress carefully prescribed EPA's role in the § 404 permit process.  In conjunction with the Corps, EPA promulgates the guidelines that the Corps applies to specify disposal sites. *See* 33 U.S.C. § 1344(b)(1); 40 C.F.R. pt. 230.  EPA also provides comments to the Corps during the permitting process.  *See* 33 U.S.C. § 1344(a); 33 C.F.R. pt. 325.  If EPA has concerns about a proposed discharge, it may seek elevation of a permit decision to the Division and Headquarters levels of the Corps.  *See* 33 U.S.C. § 1344(q); "Clean Water Act Section 404(q) Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army"

---

[2] States also have a role in the issuance of a § 404 permit.  Section 303 of the CWA empowers the States to establish and enforce water quality standards for waters within the state. *See* 33 U.S.C. § 1313.  Section 401 requires an applicant for a federal permit to obtain a water quality certification from the State, certifying that the discharges at issue will not "cause or contribute to a violation of state water quality standards."  *OVEC*, 556 F.3d at 208; *see* 33 U.S.C. § 1341.  Because the § 404 permit is a federal permit, Mingo Logan had to obtain a water quality certification from the WVDEP.

(Aug. 11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html.  EPA also

reviews and evaluates all environmental impact statements ("EIS") prepared by federal agencies,

and EPA may refer concerns about an agency's compliance with NEPA to the White House

Council on Environmental Quality ("CEQ").  *See* 42 U.S.C. § 7609; 40 C.F.R. pt. 1504.

Finally, § 404(c) authorizes EPA to "veto" a specification of a disposal site that the Corps

proposes to include in a permit.  *See* 33 U.S.C. § 1344(c).

  Section 404(c) of the CWA provides:

> (c) Denial or restriction of use of defined areas as disposal sites
>
> The Administrator is authorized to prohibit the *specification* (including the withdrawal of *specification*) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for *specification* (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

33 U.S.C. § 1344(c) (emphases added).

  Section 404(c) grants EPA no authority over "permits."  The word "permits" does not

appear in § 404(c).  It only grants EPA authority over disposal site "specifications" that the

Corps proposes to include in a § 404 permit.  Evaluation of these specifications necessarily

precedes the issuance of a permit.  *See* 33 U.S.C. § 1344(b) ("[E]ach such disposal site shall be

specified for each such permit by the Secretary.").  Thus, EPA can object to the specifications to

be used in a proposed permit, withdraw the specifications of an existing disposal site to be used

in a proposed permit, and even preclude the use of an existing or proposed disposal site in a

proposed permit.  *Id.*  But once the Corps issues a § 404 permit, EPA's authority under § 404(c)

ceases.  At that point, there are no longer any specifications to veto; the specifications have been

subsumed into the permit.

After the Corps issues a § 404 permit, the Corps's regulations allow the Corps (and only

the Corps) to suspend, modify or revoke the permit.  The Corps must consider, among other

things, the extent of the permittee's compliance with the permit; whether or not circumstances

relating to the authorized activity have changed; any significant objections to the authorized

activity that were not earlier considered; and the extent to which modification, suspension, or

other action would adversely affect plans, investments and actions the permittee has reasonably

made or taken in reliance on the permit.  33 C.F.R. § 325.7.

## II.    FACTS

### A.    The Spruce Permit

The permitting process for Spruce No. 1 began in March 1997, with an application for

§ 404 authorization under the Corps's Nationwide Permit 21.  Compl. ¶ 17.  After the Corps

concluded that the proposed fill activities met the requirements of Nationwide Permit 21,  *id.*

¶¶ 18-19, a court preliminarily enjoined the approval because of programmatic challenges to

Nationwide Permit 21, unrelated to the Corps's determination about the Spruce No. 1 Mine, *see*

*Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999).  Mingo Logan's predecessor then

applied for an individual permit pursuant to CWA § 404(a).  Compl. ¶¶ 20-22.[3]  The Corps's

subsequent review of that permit application lasted seven years, generated an administrative

record that spans tens of thousands of pages, and cost Mingo Logan millions of dollars.  *Id.* ¶ 23;

Ex. A, Affidavit of Robert Shanks ("Shanks Aff.) ¶ 22.[4]

---

[3] In 2005, Mingo Logan replaced Hobet Mining Inc. as the applicant.  Compl. ¶ 22.

[4] During that process, Mingo Logan voluntarily decreased the proposed scale of its
operation so that it would recover only 75 percent of the site's total coal reserves, cut the excess

Pursuant to this process, the Corps conducted a full environmental impact statement —
the only full EIS ever prepared for an individual surface mine of this type.  Compl. ¶ 28.  The
product of thousands of man-hours of work by at least five state and federal agencies, including
EPA, the March 2006 Draft EIS included more than 1600 pages of analyses and conclusions
about the proposed mine's potential impacts, alternative designs and mitigation conditions.  *Id.*
¶¶ 28-29.  The Corps's Final EIS included 58 pages specifically addressing EPA's comments.
*Id.* ¶ 31.

EPA fully participated in the review of Mingo Logan's individual permit application.  *Id.*
¶ 26.[5]  Although EPA submitted comments in the NEPA process, EPA did not avail itself of any
of its statutory rights to require additional review or block the permit before the Corps issued it.
EPA thereby acquiesced to the Corps's issuance of the permit to Mingo Logan in January 2007.
*Id.* ¶¶ 33-35; *see Coeur Alaska Inc.*, 129 S. Ct. at 2465 ("By declining to exercise its veto, the
EPA in effect deferred to the judgment of the Corps on this point.").  The permit allows Mingo
Logan to place dredged and fill material into 8.11 acres of waters consisting of 0.12 acres of
wetland (an abandoned farm pond); 1.83 acres of ephemeral (storm runoff only) streams; 6.13

---

spoil to less than half as much as the original proposal, and cut the acreage of affected waters of
the United States by more than 30 percent to 8.11 acres.  Compl. ¶¶ 24-25.

[5] West Virginia, through WVDEP, also participated.  *Id.* ¶ 27.  After full scrutiny of
Mingo Logan's permit application in light of West Virginia's Water Quality Standards, WVDEP
granted its water quality certification for the Spruce No. 1 permit  pursuant to CWA § 401.  *Id.*

To issue an NPDES permit to Mingo Logan under CWA § 402, WVDEP also had to
assess the need for technology and water quality-based limits and conditions, and then derive and
apply those limits and conditions to the particular discharges covered by the permit.  *See* 40
C.F.R. §§ 122.44, 123.35.  WVDEP would have been prohibited from issuing the permit if these
limits and conditions could not "ensure compliance with the applicable water quality
requirements."  40 C.F.R. §§ 122.4(d), 123.35.  Likewise, EPA would have had authority to
object to the permit if WVDEP violated this prohibition.  *See* 40 C.F.R. § 123.44.

acres of intermittent (seasonal only) streams, and 0.034 acres of a perennial (permanently flowing) stream that will be impacted temporarily.  Compl. ¶¶ 36-37.

**B.      The *OVEC* Case**

After receiving its § 404 permit, Mingo Logan spent millions of dollars preparing the Spruce No. 1 site and commencing its operations.  *Id.* ¶ 43.  Shortly thereafter, however, the Ohio Valley Environmental Coalition ("OVEC") added Mingo Logan's § 404 permit to others that OVEC had already challenged in the Southern District of West Virginia, and sought a preliminary injunction to halt operations at Spruce No. 1.  To avoid the risk that the Court would not allow any mining to proceed while the litigation was pending, Mingo Logan entered into an agreement with OVEC to limit its mining to certain areas while the district court case remained pending, with the proviso that if Mingo Logan wanted to move into new areas before the case was over it would give OVEC 20 days' notice so OVEC could renew its preliminary injunction motion.  *Id.* ¶ 44; Shanks Aff. ¶ 43 & Ex.1.  Thus far, Mingo Logan has been able to mine less than 10 percent of the coal that its § 404 permit allows.  Compl. ¶ 45;.

The Fourth Circuit eventually upheld the permits that were originally part of the *OVEC* lawsuit.  *See OVEC*, 556 F.3d at 177.  Mingo Logan's permit had been added to the litigation too late to be included in that appeal, but OVEC's challenges to Mingo Logan's permit were the same as those the Fourth Circuit rejected in the appeal.  Compl. ¶¶ 46-47; *OVEC*, 556 F.3d at 177.  Consequently, in July 2009, Mingo Logan moved for summary judgment on the basis of the Fourth Circuit's opinion.  Compl. ¶ 48.

Since Mingo Logan moved for summary judgment, the United States has sought and obtained ten stays or extensions of the deadline for responding to Mingo Logan's motion, on the grounds that EPA was contemplating action under § 404(c).  *Id.* ¶ 49; Shanks Aff. ¶ 44.  After EPA formally exercised its § 404(c) authority, the United States sought and obtained a stay in the

district court case "to allow time for EPA's § 404(c) proceedings."  EPA Br. at 11.  Based on

EPA's unequivocal, but unlitigated, claims of authority, the district court ordered the stay

"because the § 404(c) review has the potential to moot this action entirely."  EPA Br. at 11

(quoting *OVEC v. U.S. Army Corps of Eng'rs*, Nos. 3:05-0784, 3:06-0438, 2010 WL 1633315,

*6 (S.D. W. Va. Apr. 22, 2010)).[6]

### C.    The Corps's Refusal of EPA's Request to Suspend, Revoke or Modify the Permit

On September 3, 2009, EPA asked the Corps to suspend, revoke or modify the permit.

Compl. ¶ 53-54.[7]  The Corps refused.  *Id.* ¶ 59.  The Corps found that none of the five factors to

be considered under 33 C.F.R. § 325.7 warranted suspension of Mingo Logan's permit.  *Id.*

¶¶ 60, 61.  In short, Mingo Logan was in compliance with its permit.  Circumstances had not

changed; nor had the law.  The Corps had considered all permit objections during the decade the

permit application was under review and, in particular, had previously addressed all of EPA's

comments.  *Id.*; *see also OVEC v. U.S. Army Corps of Eng'rs*, Nos. 3:05-0784, 3:06-0438, 2009

---

[6] EPA misleadingly says that Mingo Logan did not oppose "most of the motions" for stay, EPA Br. at 10, but neglects to mention that Mingo Logan did not oppose some of these brief extensions in order to engage in settlement discussions with EPA and to allow EPA time to decide how to proceed.  Mingo Logan did oppose several of EPA's motions, including its first and its final motion for an indefinite stay pending EPA's § 404(c) proceeding.  *See* Mingo Logan's Response in Opposition to Corps' Motion to Extend Stay of Proceeding, *OVEC v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-784 (S.D. W. Va. Apr. 2, 2010).

[7] The Corps invited West Virginia to comment on EPA's request.  WVDEP strongly defended Mingo Logan's permit, confirmed that Mingo Logan's permit meets all water quality standards, *id.* ¶ 55-56, and expressed its frustration: "At some point, a project must be deemed to have been studied enough . . . . *This is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry.*  It has previously been through . . . twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies.  In addition it has been examined by the State permitting quality control panel comprised of representatives of the environmental community, the coal industry, the WVDEP and the federal Office of Surface Mining Reclamation and Enforcement." *Id.* ¶ 57 (emphasis added).

WL 3014943, *2 (S.D. W. Va. Sept. 15, 2009) (finding that "the EPA letter [of Sept. 3] does not provide substantial new information regarding the Spruce No. 1 permit.").

### D.      EPA's Decision to Proceed Under § 404(c)

Despite the Corps's refusal to suspend or revoke the permit, EPA gave notice on March 26, 2010 that it intended to withdraw or modify Mingo Logan's permit and published that notice in the Federal Register on April 2, 2010.  Compl. ¶ 63; Proposed Determination To Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV, 75 Fed. Reg. 16,788 (Apr. 2, 2010) ("Federal Register Notice"); *see also* EPA Br. at 2 (asserting the authority to "restrict or withdraw a *permit*" (emphasis added)).  EPA announced in a contemporaneous press release that it had used its § 404(c) authority just 12 times since 1972 and "*never for a previously permitted project*."  EPA Proposes Veto of Mine Permit under Clean Water Act, March 26, 2010, Press Release ("EPA Press Release") (emphasis added); Compl. ¶ 64.

Nowhere does the Federal Register Notice request comment on EPA's authority to exercise its § 404(c) powers after permit issuance or indicate in any way that EPA's authority to revoke a permit is open to question.   The Federal Register Notice definitively asserts that "EPA has the ability to initiate a Section 404(c) action after permit issuance." 75 Fed. Reg. at 16,790-91.  As evidenced by the words it has chosen to characterize its actions, EPA has finally and unequivocally determined that it believes it has authority to disturb *permits* under § 404(c).  In this action, Mingo Logan challenges only this final assertion of authority to revoke or modify permits.

### E.     Effects of EPA's Decision on Mingo Logan's Business

Mingo Logan spent millions of dollars preparing the Spruce No. 1 site and commencing

operations in reliance on the Permit.  Compl. ¶ 43; Shanks Aff. ¶ 33.  In addition to the legal

rights adversely affected by EPA's proceeding Mingo Logan has suffered direct harm because it

can no longer reasonably rely on the permit in making day-to-day business decisions or long

term investment decisions.  EPA's decision that it may revoke Mingo Logan's permit has created

a new cloud on Mingo Logan's permit and imposed on Mingo Logan costly impediments to its

business.  Mingo Logan cannot practically invest in infrastructure, equipment and personnel that

would allow Mingo Logan to fully and efficiently mine the coal from Spruce No. 1.  Compl.

¶ 77(a); Shanks Aff. ¶ 40-41, 45.  For example, Mingo Logan cannot prudently construct

conveyers that would carry coal from the mountaintop to processing facilities below and instead

must use trucks, which are more costly.  Shanks Aff. ¶ 40.  As a consequence, it incurs a higher

cost per ton to mine the coal that is now being mined at Spruce No. 1.  *Id.*  Mingo Logan also

cannot practically invest in additional infrastructure necessary to mine other areas of the Spruce

No. 1 reserves, and therefore cannot begin mining the remaining Spruce No. 1 reserves and

hiring upwards of 300 additional employees it will need when it can fully use its permit.  Compl.

¶ 77(b); Shanks Aff. ¶ 42.  Mingo Logan also loses revenue because it must use higher value

metallurgical coal from its other mines to fill contracts for lower-priced steam coal instead of

using steam coal from the Spruce No. 1 reserves to fill those existing long term contracts.

Compl. ¶ 77(b); Shanks Aff. ¶¶ 34, 47.  And Mingo Logan cannot recoup the costs of existing

infrastructure, which was designed to handle the anticipated coal from a fully operational Spruce

No. 1 mine in addition to the coal mined and produced at its Mountain Laurel mine.  Compl.

¶ 77(c); Shanks Aff. ¶ 46.  Finally, Mingo Logan cannot obtain a decision on the merits in the

case pending in the Southern District of West Virginia, because the court has stayed the case "to

allow time for EPA's § 404(c) proceedings." Shanks Aff. ¶¶ 43-44.   These impacts are tangible and immediate.

## ARGUMENT

EPA's decision that it has statutory authority to take action with respect to Mingo Logan's permit is final.  Mingo Logan's claim that EPA does not have such statutory authority is ripe.  All of EPA's arguments suggesting that these claims are premature suffer from the same fundamental defects:  EPA has made a definitive decision on the purely legal question of whether it has statutory authority to disturb Mingo Logan's permit after the Corps has issued the permit; the United States has relied on that decision to obtain a stay in the *OVEC* case; and both that stay and EPA's assertion of authority over Mingo Logan's permit have real adverse effects on Mingo Logan's legal rights and its day-to-day business.  As even the cases cited by EPA demonstrate, this is enough to compel review of EPA's statutory authority under § 404(c).  No amount of further proceedings will enhance the Court's ability to decide this issue.

As established in Part I below, EPA has unequivocally decided that § 404(c) grants it the authority to revoke Corps-issued permits.  This presents a pure legal issue that will not be aided by further factual development or agency expertise.  EPA's assertion of authority has altered Mingo Logan's legal rights with respect to the permit and has affected Mingo Logan's business operations.  By convincing the Southern District of West Virginia not to rule on Mingo Logan's summary judgment motion, EPA has affected Mingo Logan's rights in that proceeding.  As well, EPA's assertion of § 404(c) authority has destroyed the attendant legal assurances that would otherwise flow from that permit and provide the stable legal framework for the conduct of Mingo Logan's business.  EPA's decision is therefore final agency action subject to review under the APA.

Part II establishes that Mingo Logan's claim is ripe because the issue presented is both fit for immediate judicial consideration and withholding review will impose continued hardships on Mingo Logan.  Part III establishes that the doctrine of exhaustion does not apply because EPA has definitively decided this pure legal issue of statutory authority and further administrative proceedings would be futile.

Part IV addresses EPA's argument that Mingo Logan presents a time-barred facial challenge to EPA's regulations.  Very simply, Mingo Logan presents no such challenge because Mingo Logan challenges EPA's *statutory* authority.  In any event, there is no EPA regulation authorizing EPA to withdraw a *permit* as opposed to a site *specification*.  Even if such a regulation existed, Mingo Logan's prompt claim that such regulation exceeded EPA's statutory authority would not be time barred, as the very cases cited by EPA establish.

Finally, Part V establishes that Mingo Logan has a valid claim for non-statutory review, although this is redundant in light of Mingo Logan's APA claim.  If the Court should rely on non-statutory review, it is apparent that EPA has exceeded its authority and traduced a clear statutory directive.  And should this Court deny Mingo Logan relief on its APA claim, non-statutory review is needed to ensure that Mingo Logan has a meaningful and adequate means of vindicating its statutory rights.

## I.   EPA'S DEFINITIVE CONCLUSION THAT IT HAS AUTHORITY UNDER § 404(c) TO REVOKE OR MODIFY A PERMIT AFTER IT HAS BEEN ISSUED BY THE CORPS CONSTITUTES FINAL AGENCY ACTION.

The APA empowers district courts to review "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  In general, agency action is deemed final when it satisfies two conditions.  "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).  The action must be "definitive."  *FTC v. Standard Oil*

*Co.*, 449 U.S. 232, 239 (1980).  "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178. Stated differently, the action must have a "direct and immediate . . . effect on the day-to-day business" of the party challenging the action.  *Standard Oil*, 449 U.S. at 239 (internal citation omitted).

Determining whether agency action is final is fact-specific and not amenable to bright-line rules.  "The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The D.C. Circuit's "precedent announces no self-implementing, bright-line rule in this regard; the finality inquiry is a 'pragmatic and 'flexible' one."  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) ("*NAHB*") (citing *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-36 (D.C. Cir. 1986)).

EPA's decision that it has statutory authority to revoke Mingo Logan's permit under § 404(c) as manifest in EPA's publication of its Federal Register Notice is definitive and causes direct and immediate consequences.

## A.   EPA's Conclusion That It Has Authority to Revoke Mingo Logan's Permit Is Definitive.

The D.C. Circuit has repeatedly held that an agency's interpretation of its authority to act can constitute definitive final action.  *See, e.g., Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000) (concluding that EPA's interpretation of governing law was sufficiently definitive); *Ciba-Geigy*, 801 F.2d at 437-38 (same); *NAHB*, 417 F.3d at 1279, 1282 (same); *see also, e.g., Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) ("*IEDA*") (noting that agency's interpretation of law was sufficiently definitive and was not "subject to change").  Legal determinations that reflect the culmination — or "crystallization" —

14

of an agency's view of its authority are indicative of the finality required by the rule.  Thus, "a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action within APA § 704's meaning."  *Barrick*, 215 F.3d at 49; *see also Ciba-Geigy*, 801 F.2d at 435 n.7.

EPA's action here unquestionably reflects the crystallization of EPA's view of its authority under section 404(c).  Although EPA noted in the 1979 preamble to proposed regulations establishing procedures for implementing section 404(c) that it believed it had the power to act after a permit had been issued, it did not include such power in the regulations themselves.  *See* 44 Fed. Reg. 14,578 (March 13, 1979); 44 Fed. Reg. 58,076, 58,077 (October 9, 1979).  Indeed, EPA's § 404(c) regulations say nothing about revoking or modifying permits in any way.  *See* 40 C.F.R. pt. 231.  As EPA acknowledges, it has never used this purported authority under § 404(c) to review an already-issued permit.  *See* EPA, Press Release, "EPA Proposes Veto of Mine Permit Under the Clean Water Act" (Mar. 26, 2010) ("EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and *never* for a previously permitted project.") (emphasis added) *available at* http://www.epa.gov/newsroom (hereinafter "EPA Press Release").  EPA's publication of the Federal Register Notice, however, is an exercise of that authority now.  *See* 75 Fed. Reg. 16,788.  By April 2, 2010, in other words, EPA's view as to its authority had unquestionably "crystallized" into final agency action.  *See Barrick*, 215 F.3d at 49, *Ciba-Geigy*, 801 F.2d at 435 n.7

EPA's assertion through its formal Federal Register Notice that it has statutory authority pursuant to § 404(c) to revoke or modify Mingo Logan's permit is not tentative or interlocutory.  *See Bennett*, 520 U.S. at 178.  Indeed, EPA could not publish the Federal Register Notice without first determining that it had legal authority to take action as to Mingo Logan's permit.

*See* 44 U.S.C. § 1507 ("The publication in the Federal Register of a document creates a rebuttable presumption . . . that it was duly issued, prescribed, or promulgated). The fact that Region III has acted on behalf of EPA is of no consequence, because publication both affirms and is contingent on EPA's conclusion that it has authority under § 404(c) to disturb permits. *See, e.g., PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 11 (D.D.C. 2004) (whether an action was taken by a subordinate official is not determinative for purposes of final agency action); *Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 472-73 (D.D.C. 1995) (same). The publication of the Federal Register Notice thus represents the "consummation of the agency's decisionmaking process" for purposes of the APA. *Barrick*, 215 F.3d at 48.

As a matter of common sense, EPA would not squander its resources on this proceeding if EPA had not decided that it has the statutory authority to revoke or modify the permit. Equally important, however, are EPA's repeated definitive assertions of such authority. First, EPA's Federal Register Notice definitively asserts EPA's authority to revoke or modify a permit. 75 Fed. Reg. at 16,790-91 ("EPA has the ability to initiate a Section 404(c) action after permit issuance."). Nowhere does the Federal Register Notice ask for comment about whether EPA has statutory authority to act at this time, despite EPA's listing of numerous factual questions about which it has solicited comment. *See* Federal Register Notice, 75 Fed. Reg. at 16,807-08. Second, the United States in *OVEC* has represented to the court, through ten requests for extensions or stays that have extended that case more than a year that EPA has authority to act to revoke the permit under § 404(c). Third, EPA's Brief in this Court repeatedly asserts that § 404(c) grants this authority to EPA. *See, e.g.,* EPA Br. at 2 ("the plain language of the Clean Water Act authorizes EPA to restrict or withdraw a permit"); 5 ("EPA can decide to "veto a Section 404 permit"); 32 ("Section 404(c) authorizes EPA to veto a Corps permit after

issuance"). Contrary to EPA's arguments in support of its Motion, EPA's view of its authority is no preliminary, half-baked action by an underling.[8]

Nor does EPA's determination here depend on future factual determinations by the agency. It is purely legal. Nothing that will happen in any subsequent administrative proceeding "would bring the issues into greater focus or assist in determining them." *Barrick*, 215 F.3d at 49. This is not a situation where the determination is "subject to further agency consideration or possible modification." *Ciba-Geigy*, 801 F.2d at 437. There is no adjudicative process by which EPA will reconsider or refine its view of its authority under section 404(c). *Cf., e.g., Standard Oil*, 449 U.S. at 241; *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Newport Galleria Group v. Deland*, 618 F. Supp. 1179, 1181-82 (D.D.C. 1985). Moreover, although EPA claims that the Federal Register Notice "is not EPA's final word on the Section 404(c) process," EPA Br. at 18, the notice itself makes clear that EPA's legal determination that § 404(c) authorizes it to revoke or modify Mingo Logan's § 404 permit is final. *See, e.g.,* EPA Br. at 1, 2, 5, 32 (affirming EPA's authority to revoke or modify Mingo Logan's § 404 permit).

The cases on which EPA chiefly relies reinforce the conclusion that EPA's claimed authority to revoke or modify a permit is final agency action. In *Newport Galleria Group*, unlike here, the Corps had not yet issued a permit, and EPA sought only to "veto" site specifications that the Corps proposed to include in a permit. 618 F. Supp. at 1181. Also unlike Mingo Logan's challenge here, the plaintiff developer challenged the *reasons* for EPA's proceeding under § 404(c), alleging that EPA could not "have any reason to believe that any adverse effect

---

[8] In fact, lawyers from EPA's Office of General Counsel attended the negotiation sessions to which EPA's Brief refers. EPA Br. at 10. At several of those meetings, Mingo Logan pointed out the illegality of any § 404(c) proceeding post-permit. Shanks Aff. ¶ 35.

could possibly result from its project." *Id.* The court found this specific claim unreviewable, but only after deciding the developer's additional claim that EPA lacked *legal authority* to initiate 404(c) proceedings to prevent the Corps from including site specifications in a permit. *Id.* at 1182. As to the latter, the Court reviewed the claims about EPA's legal authority and concluded that "the RA's commencement of section 404(c) proceedings was legal and proper" because the developer was "unable to point to any statutory language or legislative history in support of its claim" that EPA lacked legal authority. *Id.* at 1182, 1185.

Mingo Logan, by contrast, challenges only EPA's *legal authority* — the issue that the Court in *Newport Galleria Group* found reviewable — and unlike the *Newport Galleria* plaintiff identifies unequivocal statutory language and legislative history to support its claim. In other words, Mingo Logan does not here challenge the *reasons* why EPA initiated this action; Mingo Logan challenges EPA's *legal authority* to do so at all, whatever the reasons. Contrary to EPA's intimations, the court in *Newport Galleria Group* specifically recognized this critical distinction and reviewed the statutory authority claim. *Id.* at 1185 ("Having concluded that the RA's commencement of section 404(c) proceedings was legal and proper, it follows that the action is neither final nor reviewable."). Thus, *Newport Galleria Group* actually supports Mingo Logan's argument that this Court may consider now whether EPA has *legal authority* to carry out a § 404(c) action on this issued permit.

The Supreme Court's decision in *Standard Oil*, on which the court in *Newport Galleria Group* relied, is no different. There, the Federal Trade Commission had initiating proceedings to determine whether Standard Oil Company of California ("SoCal") had violated section 5 of the FTC Act in connection with gasoline shortages in 1973. As in *Newport Galleria Group*, and unlike Mingo Logan's complaint, SoCal challenged the *reasons* the FTC began the proceeding,

alleging that the FTC did not "have a reason to believe that SoCal was violating the Act." *Standard Oil*, 449 U.S. at 235.  SoCal did not challenge FTC's *legal authority* to issue complaints and initiate proceedings to determine violations of the Act, which is the proper analogy to what Mingo Logan seeks here.  Moreover, as the Court noted, a full adjudicatory proceeding would consider whether SoCal was, in fact, violating the Act.  "Thus, the averment of reason to believe is a prerequisite to a definitive agency position on the question whether SoCal violated the Act, but itself is a determination only that adjudicatory proceedings will commence."  *Id.* at 241.  In contrast, Mingo Logan challenges a definitive agency position — i.e., EPA's position that it has  legal authority to exercise § 404(c) authority over an issued permit.

EPA's reliance on *Reliable Sprinkler* is similarly misplaced.  There, Reliable argued that its sprinkler heads were not subject to CPSC's authority because they were not "consumer products" within the meaning of the statute.  But the court declined review because the determination whether the sprinkler heads were consumer products was a factual question that required the exercise of agency expertise and because the administrative proceeding provided a formal opportunity for Reliable to litigate that factual issue.  Here, by contrast, Mingo Logan's challenge does not involve a factual question — it is purely legal — and EPA's § 404(c) process does not provide an opportunity to litigate the legal issue.  Indeed, EPA's Federal Register Notice solicited public comment on numerous technical and factual issues, but not on the legal question of EPA's statutory authority, reinforcing the conclusion that, for EPA at least, its statutory authority is not an open question.

Moreover, *Reliable Sprinkler* bolstered its decision by distinguishing three cases that are exactly on point with Mingo Logan's complaint.  In *Ciba-Geigy*, 801 F.2d 430, *Atl. Richfield Co.*

*v. U.S. Dep't of Energy*, 769 F.2d 771 (D.C. Cir. 1985), and *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485 (D.C. Cir. 1983), the agency actions challenged were "strictly legal issue[s] for which factual development and agency expertise were unnecessary." *Reliable Sprinkler*, 324 F.3d at 735.  Reliable's challenge was "not a purely legal" issue and involved "no unequivocal statement of the agency's position."  *Id.* at 734.  Rather, Reliable challenged the application of this statutory authority, which "would clearly involve the resolution of factual issues and the creation of a record," and which could be resolved or finally determined in the "hearing [that] would take place in due course should the Commission decide to pursue enforcement."  *Id.*

Mingo Logan's challenge thus relies on a distinction between an agency's legal authority and the propriety of exercising that authority that the D.C. Circuit and this Court have long recognized.  Purely legal challenges to an agency's statutory authority are final and ripe, *see, e.g.*, *Atl. Richfield Co.*, 769 F.2d at 782; *Athlone Industries, Inc.*, 707 F.2d at 1489, whereas challenges to the reasons for, or proper exercise of, that authority are not, *see Reliable Sprinkler*, 324 F.3d at 733-35; *Newport Galleria Group*, 618 F. Supp at 1186.

### B.    EPA's Decision Has Direct and Immediate Effects on Mingo Logan's Operations and Affects Mingo Logan's Legal Rights.

Because "the finality inquiry is a 'pragmatic' and 'flexible' one,"  *NAHB*, 417 F.3d at 1279 (quoting *Ciba-Geigy*, 801 F.3d at 435-36), the types of effects deemed sufficiently "direct and immediate" to confer finality are quite varied.  The D.C. Circuit has found, for example, that an EPA directive that proscribed EPA's consideration of third-party human test data to evaluate a pesticide's effects had sufficient impact on regulated parties to constitute final agency action, even though EPA had not invoked it against any pesticide applicant.  *CropLife Am. v. EPA*, 329 F.3d 876, 881-83 (D.C. Cir. 2003).  The D.C. Circuit also has found that EPA's legal

determination that chemicals found in waste rock from metal mining facilities did not qualify for

the "de minimis exception" in 40 C.F.R. § 372.38(a) constituted final agency action, even though

EPA had not even begun any enforcement action against any regulated entity.  *Barrick*, 215 F.3d

at 47-49.  In both of these cases, the court concluded that the agency's action had direct and

immediate impact on the plaintiffs, even though the agency had not yet taken direct action

against any regulated entity.

The D.C. Circuit in *NAHB* faced a situation similar to that facing Mingo Logan and found

sufficient legal and practical effects to compel judicial review of the agency's action.  In that

case, home builders challenged the Corps's statutory authority to impose new conditions in a

nationwide permit ("NWP") under CWA § 404.  Before the modification, the builders could

have proceeded under the NWP without further regulatory proceedings; the modifications

prevented that.  Parties intervening on the side of the Corps argued that the Corps's decision was

not final agency action, because home builders could simply modify their practices to comply

with the new NWPs or apply for an individual permit.  *NAHB*, 417 F.3d at 1279.  The Court

rejected that argument:

> The NWPs are not a definitive, but otherwise idle, statement of
> agency policy—they carry easily-identifiable legal consequences
> for the appellants and other would-be dischargers.
>
> . . .
>
> The Corps' NWPs create legal rights and impose binding
> obligations insofar as they authorize certain discharges of dredged
> and fill material into navigable waters without any detailed,
> project-specific review by the Corps' engineers. . . . .  The 'direct
> and immediate' consequence of these authorizations for the
> appellants' "day-to-day business" is not hard to understand: While
> some builders can discharge immediately, others cannot.  If
> appellants' planned activities do not meet the applicable NWP's
> conditions and thresholds, they have two options.  They can either
> put their projects on hold and run the Corps' individual-permit
> gauntlet or modify the projects to meet the conditions.  ***Either
> way, through increased delay or project modification, the NWPs***

> *directly affect the investment and project development choices of those whose activities are subject to the CWA.*

*Id.* at 1279-80 (emphasis added).

The impact on Mingo Logan of EPA's proceeding here easily meets the threshold established by these cases.  First, going even beyond the agency actions challenged in *CropLife*, *Barrick* and *NAHB*, EPA here has taken affirmative steps specifically directed at Mingo Logan's operations.  Acting through the Corps under the "Unitary Executive" doctrine, EPA has relied on initiation of its § 404(c) proceeding to bring the *OVEC* litigation to a standstill on the verge of that Court's likely ruling that the Corps lawfully issued the permit to Mingo Logan.  Second, as a practical matter, EPA's determination has made it impossible for Mingo Logan to expand its operation at Spruce No. 1 to achieve the scale economies necessary to economically mine coal at the site.  EPA's action has thus directly affected Mingo Logan's "investment and project development choices."   This assertion of authority disrupts the permanence of all § 404 permits, and thereby negatively impacts Mingo Logan's investment and project development choices.  And finally, EPA's legal determination effectively reverses the deference that a court grants to a permit and deprives Mingo Logan of the right to have the investments it made in reliance on the permit taken into consideration before the permit can be revoked.

### 1.  EPA Has Used Its Assertion of Authority to Request and Obtain a Stay in *OVEC*.

One immediate effect of EPA's action here is EPA's citation of its purported statutory authority to bring the *OVEC* litigation to a halt, thereby depriving Mingo Logan of its right to have that litigation dismissed.  As explained above, the OVEC litigation should have proceeded apace following the Fourth Circuit's ruling and culminated in the court's granting Mingo Logan's July 2009 motion for summary judgment based on the Fourth Circuit's *OVEC* decision.  But having announced that it intended to take the unprecedented action to revoke or modify

Mingo Logan's permit, the United States successfully moved to stay the OVEC litigation, relying on the initiation of its § 404(c) proceeding.

That stay deprives Mingo Logan of its right to a "speedy" resolution of OVEC's claims against it. FED. R. CIV. P. 1.[9]  The stay abrogated Mingo Logan's rights "opposing [OVEC's] claims and defenses to demonstrate in the manner provided by [Rule 56], prior to trial, that the claims and defenses have no factual basis." *Celotex Corp. v. Catrett*, 477 U. S. 317, 327 (1986); *see Heiser v. Woodruff,* 327 U.S. 726, 733 (1946) (noting "the generally recognized public policy that there must be some end to litigation").[10]

In sum, by arrogating to itself the power to "veto" permits under section 404(c), EPA has substantially impacted Mingo Logan's rights in the OVEC litigation and its right to rely on the permit itself in conducting its business.   This alone suffices to support this Court's immediate review.  But there is more as discussed below.

> ## 2.      EPA's Assertion of Authority Directly Affects Mingo Logan's Investment and Project Development Choices.

EPA's claimed authority over permits, made final through the publication of the Federal Register Notice, changes the legal implications of a § 404 permit as well as the permit's assurances of legal rights to Mingo Logan.  EPA's ability to revoke or otherwise modify a § 404 permit, notwithstanding the Corps's exclusive authority, will cause Mingo Logan additional

---

[9] Under Rule 1, a speedy resolution is on the same plane as a just resolution.  4 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1029 at 157-158 (3d ed. 2002).

[10] In fact, having relied on its authority to revoke Mingo Logan's permit in order to persuade the Southern District of West Virginia that the *OVEC* case against Mingo Logan may become moot and deprive Mingo of its right to have the case dismissed, EPA should be judicially estopped from now contending that it has made no final determination that it has such authority.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

delay as it modifies its business model to account for this additional regulatory uncertainty. Mingo Logan may also have to modify future projects on the basis that a second agency can disrupt the permit it relies on, using a different standard.  This added uncertainty may make it more expensive for Mingo Logan to borrow money or make other investments.  Thus, the effect of this claimed authority is much like the effect from changing NWPs in *NAHB*, only here it also specifically traduces a related statutory provision.

Congress intended that permit holders enjoy confidence that if they comply with their permits, they may conduct their business operations in reliance on the permit.  Congress promulgated this assurance in § 404(p), which states:

> Compliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title.

33 U.S.C. § 1344(p).  This provision gives finality and certainty to permit holders.  *See E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977) (discussing the parallel provision in Section 402).  Yet, EPA's initiation of this § 404(c) proceeding obliterates this assurance.  If EPA can withdraw a permit at any point in the future *even if* the permit holder complies with the permit, then the assurances of § 404(p) ring completely hollow.  EPA's exercise of § 404(c) authority now deprives Mingo Logan of this statutorily prescribed assurance.

### 3.    EPA's Actions Have Caused Mingo Logan Tangible Economic Harm.

As alleged in the Complaint[11] — and supported for purposes of EPA's ripeness argument by the Affidavit of Robert Shanks[12] — Mingo Logan suffers at least three very real impacts on its day to day operations as a result of EPA's determination that it has the authority to revoke Mingo Logan's § 404 permit and Mingo Logan's concomitant inability to have the West Virginia District Court decide Mingo Logan's summary judgment motion.  Described in more detail above, *see supra* at 11-12, Mingo Logan cannot prudently invest in additional infrastructure, equipment or employees that would allow it to operate its mine as allowed by the § 404 permit.  Such expansion would obviously allow Mingo Logan to mine more coal and sell it for more profit.  It also would allow Mingo Logan to fill existing steam coal contract commitments with Spruce No. 1 coal, rather than coal from the nearby Mountain Laurel underground mine which may be sold at a higher price as metallurgical coal.  Additionally, Mingo Logan's currently curtailed mining operations are less efficient resulting both in a higher cost per ton for the coal that is being mined and in an inability to recover sunk costs for existing infrastructure it built in anticipation of mining the full site in accordance with the § 404 permit.

---

[11] As EPA notes, the alleged lack of final agency action does not deprive the Court of jurisdiction but would result in a failure to state a cause of action.  EPA Br. p. 14 n. 6.  Accordingly, the Court must take as true plausible allegations in the Complaint regarding the harm to Mingo Logan resulting from EPA's determination that it § 404(c) empowers it to revoke or modify Mingo Logan's permit.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S. Ct. 1937, 1949 (2009).  EPA does not challenge the plausibility of any allegation in the Complaint.

[12] The Court may rely on allegations in the Complaint in considering whether plaintiff has met its burden to establish subject matter jurisdiction, but it may scrutinize those allegations more closely in considering a 12(b)(1) motion than when considering a 12(b)(6) motion. *Jordan Hosp. v. Leavitt*, 571 F. Supp. 2d 108, 113 (D.D.C. 2008). The Court may also consider material other than the allegations of the complaint in ruling on a 12(b)(1) motion. *Id.* at n.1.

Like the aggrieved parties in *NAHB*, Mingo Logan's "investment and project development choices" have been sharply affected by EPA's action. Mingo Logan can abandon any plans to expand its operation or proceed with expansion without any assurance that the Government will take into consideration Mingo Logan's reliance costs. Either way, its project development choices have been impacted.[13]

> **4.     EPA's Action Curtails Rights of Mingo Logan and Other Permittees.**

EPA's action also sharply curtails the rights of Mingo Logan — and every other recipient of a permit under CWA § 404 — with respect to the circumstances under which a lawfully-issued permit can be revoked or otherwise disturbed. EPA's decision deprives Mingo Logan of the assurance that the Corps's various judgments made in granting the permit will be afforded significant deference in any challenge to the permit. In fact, EPA's assertion of authority essentially allows EPA to override the judicial review by the Fourth Circuit even though the judiciary has sole authority to review agency action under the APA. *See* 5 U.S.C. § 702. EPA has decided that it can revoke the Corps's decision, regardless of any judicial review of the Corps's permitting decision and without any constraints that apply to judicial review (e.g., deference, the "arbitrary and capricious" standard).

---

[13] EPA mentions that Mingo Logan voluntarily agreed to limit its mining activities in response to OVEC's motion for temporary restraining order. EPA Br. at 9. To avoid the risk that the Court would not allow any mining to proceed pending a decision on the merits, in January 2007, Mingo Logan "agreed [with OVEC] temporarily to limit [its] activities." *See* Order of 2/1/07 (Doc. No. 257). Mingo Logan agreed, *pending the resolution of OVEC's claims against the Spruce No. 1 Permit*, to restrict the area of its operations unless it first gave OVEC 20 days notice of its intention to move into new areas so that OVEC could seek preliminary injunctive relief. *See id.* This agreement will terminate with the termination of the District Court litigation. Mingo Logan has moved for summary judgment, which would terminate the litigation and thus the agreement, but the District Court has stayed the case based on EPA's representation that the 404(c) action could moot the case. EPA's representations to the court are based on the unadjudicated assumption that EPA has the authority to revoke or modify Mingo Logan's permit.

Indeed, EPA's Brief wrongly puts the burden on Mingo Logan to justify its permit.  EPA

argues that nothing has yet happened except that the Regional Administrator has asserted that

"*Mingo Logan had not 'demonstrated to the satisfaction of the Regional Administrator' that no*

*adverse environmental effect would occur.*"  EPA Br. at 16 (emphasis added).  EPA squarely

rejects Mingo Logan's ability to rely on its permit and the judicial deference to be afforded the

Corps's decision.   EPA cannot in good conscience contend that this view does not immediately

affect Mingo Logan's rights under its § 404 permit.

Moreover, prior to EPA's definitive announcement of its perceived veto authority, the

Corps, as issuer of the permit, was the only entity authorized to revoke a permit and then only for

specified reasons.  Critically, the Corps must consider "plans, investments and actions the

permittee has reasonably taken in reliance on the permit" before revoking, suspending or

modifying a permit.  33 C.F.R. § 325.7.  So the Corps must balance any factors arguably

justifying permit revocation against the permittee's substantial investments made in reliance on

the permit.  But EPA will not consider these reliance costs under its newly-announced authority

under CWA § 404(c).  *See* 40 C.F.R. pt. 231.  In other words, EPA has fundamentally altered the

rules of the game; it has created a new binding framework with respect to revocation of permits.

*See CropLife*, 329 F.3d at 881.  Its action "directly affect[s] the investment and project

development choices of those whose activities are subject to the CWA."  *NAHB*, 417 F.3d at

1280.  The investment choices that a permittee makes in connection with a permit are substantial.

They include costs related to the initial development of a project concept, engaging in the

regulatory process, implementing mitigation measures required under a permit, substantial front-

end infrastructure development and obligations under various supply contracts in reliance on the

availability of coal to be mined under the permit.  Suffice it to say, a mine operator would be

much less willing to incur these costs if the Government can revoke a permit without even considering them.

In this regard, the effect on permittees resembles the effect on the pesticide manufacturers in *CropLife*.  There, the EPA announced that it would no longer consider third-party human testing data in evaluating pesticide registration applications.  *See CropLife*, 329 F.3d at 879. Such studies previously could be considered by EPA in evaluating safety tolerances for pesticides.  *Id.* at 879-80.  The EPA's directive did not impose specific obligation on pesticide manufacturers — it only imposed restrictions (i.e., no consideration of human test data) on EPA itself.  But this did not mitigate in the Court's mind the effect on CropLife members for purposes of finality analysis:

> The disputed directive concretely injures petitioners, because it unambiguously precludes the agency's consideration of all third-party human studies, i.e., studies that petitioners previously have been permitted to use to verify the safety of their products.

*Id.* at 884.  Stated differently, the challenged action denied rights to Petitioners going forward by prohibiting the Government from considering factors favorable to the regulated entities that previously would have been considered.

This is precisely the situation that Mingo Logan faces here.  EPA's determination that it can act under section 404(c) with respect to issued permits under 40 C.F.R. pt. 231 means that the Government can revoke a permit without considering factors favorable to regulated entities — i.e., plans and investments made in reliance on the permit.  Under *CropLife*, this curtailment of a party's rights is the type of "direct and immediate effect" indicative of final agency action. *Cf., e.g., Reliable Sprinkler*, 324 F.3d at 731.

II.     **MINGO LOGAN'S CLAIM IS RIPE FOR JUDICIAL DETERMINATION.**

Ripeness is the constitutional counterpart to the final agency action rule. *NAHB*, 417 F.3d at 1281.  The two doctrines focus on "the dual concerns of prematurity of judicial intervention in agency proceses and the proper and principled exercise of judicial power." *USAA Fed. Sav. Bank v. McLaughlin*, 849 F.2d 1505, 1508 (D.C. Cir. 1988).  Ripeness has two components:  (1) "fitness of the issues for judicial review"; and (2) "the hardship to the parties of withholding court consideration."  *NAHB*, 417 F.3d at 1281; *see Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).  Mingo Logan's claim easily satisfies both.

A.      **Mingo Logan's Claim That EPA Lacks Statutory Authority Is Fit for Judicial Review.**

To determine "fitness for review," the Court must decide "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*, 440 F.3d 459, 463 (D.C. Cir. 2006) (citations and quotations omitted) ("*NAHB II*").  Issues that are purely legal are presumptively reviewable.  *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003).  Facial challenges to agency action, such as challenges to the agency's statutory authority to act, are deemed purely legal issues.  *NAHB*, 417 F.3d at 1282 (citing *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)).

As explained above, this case presents an issue that is purely legal.  Either § 404(c) gives EPA the power to veto issued permits or it does not.  This issue will not be refined by further regulatory process.

The two cases on which EPA relies do not compel, or even support, a different conclusion.  In *Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998), the court faced a challenge to an EPA rule of "credible evidence" that arguably had wide-ranging

effects on testing for Clean Air Act compliance.  As the D.C. Circuit noted, "[n]othing in the rule itself defines or limits the possible kinds of evidence encompassed within the phrase 'credible evidence'" and the rule could apply to "various kinds of information."  *Id.* at 1202.  Although the rule was final, the D.C. Circuit said it was not fit for review in the abstract because "[j]udicial resolution of these issues would benefit significantly from having 'the scope of the controversy . . reduced to more manageable proportions and its factual components fleshed out, by some concrete action applying the regulation to [petitioners'] situation in a fashion that harms or threatens to harm' them."  *Id.* at 1205.  That situation differs vastly from the single, specific and narrowly defined threshold legal issue presented in this case.

So, too, did the situation in *Nevada v. Dep't of Energy*, 457 F.3d. 78 (D.C. Cir. 2006), where the State of Nevada challenged both the record of decision and environmental impact statement for the Yucca Mountain nuclear waste repository as arbitrary and capricious, and incomplete, respectively.  The court held those obviously complex factual claims not fit for review because DOE had not yet adopted any final plan, and the challenged documents discussed many alternatives that "might" or "could" possibly be implemented.  *Id.* at 84-85.  To the extent that EPA cites the case simply for the proposition that without final agency action, a claim cannot be ripe, then EPA adds nothing to its position because Mingo Logan has demonstrated that EPA's determination that it has authority to revoke Mingo Logan's permit is final agency action.  In any event, the sole statutory authority issue presented to this Court by Mingo Logan is a far cry from the issues presented in *Nevada* that would require that court's consideration of complex factual questions not yet decided by the agency.

**B.      Postponing Judicial Review Would Impose an Undue Burden on Both Mingo Logan and the Court.**

As explained above, Mingo Logan will suffer direct and immediate harm if the Court does not adjudicate this issue now.  Mingo Logan's inability to have the *OVEC* case resolved and its inability to rely on its § 404 permit with the attendant economic harm are real.  And the Court may suffer, too, because any issues presented to it will be infinitely more complex if the Court waits.  The EPA proceedings now underway will generate a huge administrative record — the Corps's EIS alone was over 1600 pages — that will likely present myriad substantive issues as well as the difficult issue of whose conclusions — the Corps's or EPA's — will be entitled to deference.  Indeed, given the intense interest in this issue not only in the mining industry but among all industrial dischargers — the Court can take judicial notice of the numerous comments filed in response to EPA's Federal Register Notice — the Court must surely anticipate a huge expenditure of resources, not only of the parties, but by other interested persons, all of which may be unnecessary and wasteful if the Court agrees that EPA has no statutory authority to proceed.

Contrary to EPA's contention, EPA Br. at 23, Mingo Logan has demonstrated that EPA's decision to proceed is not that of a subordinate official and does have real, immediate substantive impacts on Mingo Logan.  Mingo Logan does not rely solely on the burden of further participation in the § 404(c) proceeding — as explained above, litigation and administrative costs are far from the primary harm to Mingo Logan.  Therefore this case differs from *Nuclear Energy Inst. v. EPA*, 373 F.3d 11251, 1313 (D.C. Cir. 2004) cited by EPA.  *See* EPA Br. at 23.  There, the D.C. Circuit noted that Nevada would feel no concrete effect from the challenged EIS "until it is used to support some other final decision of DOE or NRC."  *Id.*  Among other things, that is exactly what has happened to Mingo Logan; EPA has used its initiation of the § 404(c)

proceeding to obtain a stay in *OVEC*, thereby preventing Mingo Logan from having OVEC's claims against it dismissed.

## III.    MINGO LOGAN'S CLAIM DOES NOT REQUIRE FURTHER EXHAUSTION OF ADMINISTRATIVE REMEDIES.

To provide agencies the opportunity to apply their expertise, to aid any eventual judicial review, and to prevent unnecessary recourse to the judiciary, courts generally require parties challenging agency action to first "exhaust" their administrative remedies before seeking judicial review. *See Athlone Indus.*, 707 F.2d at 1488-89 (citing *McKart v. United States*, 395 U.S. 185, 193-95 (1969)). Equally well recognized, however, is that "the doctrine of exhaustion is not inflexible," and that when "the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied." *Athlone* at 1488 (internal quotations omitted); *McKart*, 395 U.S. at 200-01.

Mingo Logan's challenge to EPA's statutory authority to revoke Mingo Logan's CWA § 404 permit presents a purely legal issue that does not require and will not benefit from any further administrative review, which would plainly be futile. In such circumstances, this Circuit has repeatedly held that administrative remedies need not be exhausted.

In *Athlone Indus.*, Athlone challenged the agency's authority to initiate a proceeding to impose a penalty for Athlone's alleged violation of § 19(a) of the Consumer Product Safety Act. 707 F.2d at 1487. The D.C. Circuit held that the doctrine of administrative exhaustion did not apply to the issue of the CPSC's statutory authority to assess civil penalties in an administrative proceeding. *Id.* at 1488-89. In support of its conclusion, the Circuit Court noted that the Supreme Court in *McKart* had held that "when the issue presented is one of statutory interpretation judicial review would not be significantly aided by an additional administrative decision." *Id.* at 1489 n.24. In other words, when a claim is "solely one of statutory

interpretation," no further administrative decision would aid judicial review.  *McKart*, 395 U.S. at 197-98.

In its attempt to muddy the waters, EPA relies on *Mitchell v. Christopher*, 996 F.2d 375 (D.C. Cir. 1993) and *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299 (D.C. Cir. 1991).   Neither opinion refers at all to "administrative exhaustion."  Both cases deal with the doctrine of *waiver*, not administrative exhaustion.  In each case the petitioner had failed to raise a statutory argument in an earlier proceeding, but argued that the Court should excuse this failure.  That is not the situation here.

*Deltona Corp. v. Alexander*, 682 F.2d 888 (11th Cir. 1982) is no more help to EPA. There the issue was how much of a particular project area was wetlands, rather than uplands, and therefore within the Corps's CWA § 404 jurisdiction.  *Id.* at 892-93.  The Court held that the Corps should have the first opportunity to determine the facts, which were critical to the jurisdictional issue of whether the affected area was wetlands.  *Id.* at 893.  The issue Mingo Logan presents neither requires nor benefits from any factual determination.  Moreover, the Court was careful to point out that Deltona was not challenging the Corps's statutory authority over the lands *per se*, *id.* at 892, nor the legality of the § 404 permitting scheme, *id.* at 894.  In contrast, Mingo Logan claims that EPA does not have any authority over § 404 permits, and that EPA's action pursuant to § 404(c) is *ultra vires*.  *Deltona* distinguished such claims as one of the "numerous exceptions" to the exhaustion rule, and further stated that exhaustion is not "required when it would be futile because the claim clearly will be denied."  *Id.* at 893.

EPA confusingly claims that  "Mingo Logan has failed to avail itself of several opportunities to convince EPA not to exercise its authority under Section 404(c) of the CWA." EPA Br. at 24.  This statement both confuses the claim actually advanced by Mingo Logan and

demonstrates that further administrative proceedings would be futile.  Mingo Logan does not

here challenge whether EPA *should* exercise its 404(c) authority.  Rather, Mingo Logan claims

that EPA *does not have* that authority at all.  Moreover, during settlement discussions with EPA

following EPA's initial notice, Mingo Logan presented its claim that EPA had no authority to

proceed against an issued permit.  Shanks Aff. ¶¶ 35-36.  EPA plainly rejected that argument and

here implicitly concedes that further administrative review would be futile.

When EPA writes that Mingo Logan might convince it "not to exercise its authority

under Section 404(c)," EPA assumes that it has that authority.  Nothing in EPA's Brief suggests

that EPA is open to the argument that it does not possess this authority.

## IV.      MINGO LOGAN'S CLAIM IS NOT TIME-BARRED.

EPA's argument that Mingo Logan's action is a time-barred challenge to an EPA

regulation fails for two simple reasons.

First, Mingo Logan does not challenge an EPA regulation.  As discussed above, no EPA

regulation purports to give EPA the authority to revoke a permit issued by the Corps.  The

regulations cited by EPA, 40 C.F.R.§ 231.1(c) and 231.2(a), do not use the term "permit."

Like § 404(c), they address only site specifications.[14]

---

[14] Finding nothing in the statute or the regulations to support its argument that 404(c)
authority may be exercised after a permit is issued, EPA resorts to preamble language.  EPA Br.
at 25.  But the preamble language is mere assertion, unsupported by any authority or other
discussion it its reasoning, and contrary to the plain language of the statute and the governing
regulations.  Where EPA's regulations say nothing about permits, EPA's preamble cannot give it
the authority to act here.  *See Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53
(D.C. Cir. 1999) ("[L]anguage in the preamble of a regulation is not controlling over the
language of the regulation itself," but "it may serve as a source of evidence concerning
contemporaneous agency intent.").
  EPA also emphasizes that its regulation allows withdrawal of specification for an existing
disposal site.  EPA Br. at 5.  But this regulation says nothing about withdrawal of a *permit*, and
the reference to existing disposal site is easily understood within the context of site
specifications.  When Congress enacted the CWA, the Corps had already specified a number of
disposal sites.  Pursuant to § 4 of the Rivers and Harbors Act, 33 U.S.C. § 419, the Secretary of

Second, Mingo Logan presents a challenge to EPA's authority as applied to Mingo Logan. EPA concedes, as it must, that Mingo Logan may bring an as-applied challenge more than six years after EPA promulgated the regulation. EPA Br. at 26. EPA says only that such a challenge must involve some direct, final agency action involving the particular plaintiff within six years. *Id.* Mingo Logan has established that EPA's determination that it has the authority to initiate a proceeding to revoke an existing permit is final agency action and that action is certainly direct. And EPA certainly cannot accuse Mingo Logan of waiting too long after EPA's announcement to file this action.

## V.    ALTERNATIVELY, MINGO LOGAN'S CLAIM QUALIFIES FOR NON-STATUTORY REVIEW.

If the Court denies Mingo Logan's claim under the APA, the Court nonetheless has the power to hear Mingo Logan's claim under non-statutory review. Non-statutory review allows plaintiffs to bring claims under the Court's federal question jurisdiction when an agency action is *ultra vires*. *Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 166, AFL-CIO v. Griffin*, 590 F. Supp. 2d 171, 174 (D.D.C. 2008) (hereinafter "*IAMAW*"). Judicial review is favored when an agency is charged with acting beyond its authority. *See id.* at 175; *Dart v. United States*, 848 F.2d 217, 221-22 (D.C. Cir. 1988).

A court may exercise non-statutory review (1) when an agency plainly acts beyond its delegated powers contrary to a clear and mandatory statutory prohibition; and (2) when denial of

---

the Army had already promulgated dumping grounds regulations that listed different specified disposal sites, which were used for the discharge of dredged spoil and other pollutants, under the authority of the Corps of Engineers. *See* 33 C.F.R. pt. 205 (1972). The authority to maintain these specified disposal sites was continued in the 1972 amendments, which authorized the Secretary of the Army to "permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees." *See* 33 U.S.C. § 1341(c); *see also* 40 C.F.R. § 230.2 (2009) (providing that specified disposal sites may be created under the Corps's authority in § 404, in the Corps's civil works program, in state permit programs, in statewide dredged or fill material regulatory programs, and under federal construction projects that fall under CWA § 404(r)).

judicial review would deprive the plaintiff of a meaningful and adequate means of vindicating its statutory rights. *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009); *IAMAW*, 590 F. Supp. 2d at 176.  Mingo Logan meets both requirements.

### A.     EPA Claims the Authority to Withdraw a § 404 Permit, Which It Clearly and Unambiguously May Not Do.

#### 1.     The Statutory Language Has But One Reasonable Interpretation.

EPA wrongly claims that "Mingo Logan has not challenged EPA's statutory authority to act" and characterizes Mingo Logan's claim as a "routine" and "garden-variety dispute over statutory interpretation."  EPA Br. at 13, 28 (internal quotations omitted).  To the contrary, Mingo Logan specifically challenges EPA's statutory authority to act, because there is no statutory support for EPA's claimed authority.

The plain language of § 404 gives only the Corps authority over permits.  *See* 33 U.S.C. § 1344(c); *Coeur Alaska, Inc.*, 129 S.Ct. at 2467-68.  EPA's § 404(c) authority is limited to a "veto" over the disposal site specifications that the Corps "specifie[s] for each such permit."  *See* 33 U.S.C. §§ 1344(b)-(c).  As the text of the statute makes clear, the Corps specifies each disposal site before it issues each § 404 permit.  *See* 33 U.S.C. § 1344(b).  Just as the President has the authority to veto "bills" before they become "law," *see* U.S. CONST. art. 1, § 7, cl. 2, EPA has the authority to veto "specifications" before they are incorporated into a "permit."  This is the extent of EPA's § 404(c) authority, and no amount of inventive characterization can change that fact.  By seeking to veto a *permit*, EPA violates an unambiguous statutory directive.  *See* EPA Br. at 13.

EPA misleadingly argues that § 404(c) does not limit when EPA may exercise its "veto authority."  *See* EPA Br. at 5, 27.  This argument obscures the authority that EPA actually claims.  EPA does not merely claim that it can "veto" *specifications* at any time; rather, EPA

claims that it can "veto" Mingo Logan's § 404 *permit* at any time.  *See* EPA Br. at 1, 2, 5 ,10, 32.

Section 404(c) discusses only "specifications," and it is well settled that when Congress includes

particular language in one section of a statute, but omits it in another, it is presumed that

Congress acted intentionally.  *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 173-74 (2001); *Bates v.

United States*, 522 U.S. 23, 29-30 (1997).  Because EPA's authority is limited to

"specifications," it therefore does not extend to "permits."  Moreover, because § 404(c) is limited

to "specifications,"  the section unequivocally directs *when* EPA may act, because specifications

and the specification process necessarily precede the issuance of a permits.

EPA can find no comfort in the word "whenever."  EPA Br. at 31.  As is evident from the

plain language, "whenever" in the statute means that EPA can exercise its § 404(c) authority

each time EPA makes the requisite determination.  33 U.S.C. § 1344(c) ("The Administrator is

authorized . . . whenever he determines . . . ").  The statute does not say that EPA may act at any

time, or that EPA may "determine" at any time, but rather limits EPA's authority to act to those

occasions in which it has made the requisite determination.  And EPA may only make that

determination with regard to "specifications."

The plain language of § 404(a) allows the Corps to issue permits for disposal only at

"specified disposal sites," and § 404(b) directs the Corps to specify a disposal site for each such

permit.  33 U.S.C. § 1344(a)-(b).  Because a permit can only be issued after the disposal site

specifications have been determined by the Corps,[15] this process of specification necessarily

---

[15] Those specifications include the selection of the disposal site, the type of material to be
deposited at that disposal site, the amount of such material to be deposited, as well as other
aspects of the proposed discharge at the proposed disposal site.  *See, e.g.*, 33 C.F.R. §
325.1(d)(4) ("If the activity would include the discharge of dredged or fill material into the
waters of the United States . . . the application must include the source of the material; the
purpose of the discharge, a description of the type, composition and quantity of the material; the
method of transportation and disposal of the material; and the location of the disposal site.").

precedes the issuance of a permit.  Thus, EPA's authority to "veto" those specifications must also precede the issuance of a permit.

EPA also wrongly argues that the only "specification" for EPA to "withdraw" is one that has been previously included in a § 404 permit.  *See* EPA Br. at 30 ("there is no "specification" of the disposal area until determined by the Corps"); 32 ("withdrawal" has no meaning unless EPA can revoke a permit).  EPA further argues that it should be able to assume the authority to withdraw a permit because otherwise "withdrawal" would have no meaning.  EPA Br. at 32.  To the contrary, nothing in § 404 indicates that a specification only exists when it is included in a permit.

Rather, as Section 404(b) makes clear, "specifications" clearly exist apart from the permits.  EPA's own regulations explain that specified disposal sites pre-exist the permitting process.  *See* 40 C.F.R. §230.2 (describing several possible origins of "specified" disposal sites); *see also* 40 C.F.R. § 231.1(a) (authorizing EPA to prohibit specification for "existing" disposal sites); 40 C.F.R. § 231.2(a) (explaining that "withdraw specification" means to remove designation of a previously specified disposal site).  Moreover, until 1977, the Corps had dumping grounds regulations that listed different specified disposal sites used for the discharge of dredged spoil and other pollutants, under the authority of the Corps.  *See* 33 C.F.R. pt. 205 (1972).[16]  Each specified disposal site had "specifications" as to the type and amount of material that could be disposed of, and the times and conditions that such material could be deposited at those sites.  *Id*.  Section 401(c), which was passed in 1972 with the portions of § 404 at issue in

---

[16] Sections 404(a)-(c) of the CWA were passed in 1972, when the Corps's dumping ground regulations were in effect.  There is substantial legislative history demonstrating that Congress was keenly aware of existing permitting programs, including the Corps's procedures regarding permitting for dredging and the maintenance of specified disposal sites.  *See, e.g.*, S. REP. NO. 92-414 (Oct. 28, 1971), *reprinted* in 2 A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT OF 1972 at 1419-91 (Jan. 1973) (hereinafter" LEGISLATIVE HISTORY).

this action, continued the authority to maintain these specified disposal sites.[17]  Thus, § 404(c)'s

reference to "withdraw" simply allows EPA to withdraw existing specifications and those

predetermined by the Corps.

If, as EPA repeatedly contends, the "specification" only occurs through the issuance of a

permit, then *specification* is not given a distinct meaning from *permit*.[18]  However, every word of

the statute must be given effect.  *See, e.g.*, *Duncan*, 533 U.S. at 173-74; *Williams v. Taylor*, 529

U.S. 362, 404 (2000).  EPA's "interpretation" of § 404(c) conflates these terms, does violence to

Congress's choice of words, and ignores the fact that all authority over permits is given to the

Corps. Thus, even if EPA were correct that "Mingo Logan can only prevail on its claim if it can

show that the underlying statute is unambiguous, i.e., it "is subject to only one reasonable

---

[17] Section 401(c) authorizes the Corps to "permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees."  *See* 33 U.S.C. § 1341(c). These defined areas are "specified" for use as disposal sites by the Corps, *see* 40 C.F.R. §230.2, and § 404(c) authorizes EPA to "withdraw[]" their specification for use as a disposal site.  Congress knew that the Corps had specified disposal sites outside the context of the permitting process, and subsequently authorized EPA to withdraw, deny or restrict the use of these areas for specification in a permit.

[18] For example, EPA says that "the 'specification' of a disposal site refers to the process by which a disposal site is specified by a Corps permit."  EPA Br. at 4.  But EPA's own website contains documents that reflect EPA's view that it can exercise its authority over a specification even before a permit application has been submitted:

> "Veto Authority"
>
> Under Section 404(c), EPA may exercise a veto over the specification by the Corps or by a state of a site for the discharge of dredged or fill material.  EPA may also prohibit or otherwise restrict the specification of a site under Section 404(c) with regard to any existing or potential disposal site ***before a permit application has been submitted to or approved by the Corps*** or a state.  In effect, Section 404(c) authority may be exercised before a permit is applied for, while an application is pending, or after a permit has been issued.

*See* http://www.epa.gov/wetlands/pdf/404c.pdf (emphasis added).

interpretation," *see* EPA Br. at 31, EPA has utterly failed to present a second "*reasonable*

interpretation."  As such, Mingo Logan has clearly met this element of non-statutory review.

> ### 2.   Legislative History Confirms That EPA Must Act Before the Permit Is Issued. [19]

The legislative history of § 404(c) confirms that it does not authorize EPA to disturb an

existing permit.  Every aspect of the legislative history demonstrates that Congress intended EPA

to have authority over only specifications, and that this authority could be exercised only before

the issuance of a permit.

The most direct and relevant piece of legislative history appears in Senator Edmund S.

Muskie's statement on the floor of the Senate, while he presented the Report of the Committee of

Conference to the Senate for passage.  *See* Senate Consideration of the Report of the Conference

Committee (Oct. 4, 1972), *reprinted in* 1 LEGISLATIVE HISTORY at 161-339.  As then Chairman

of the Senate Subcommittee on Air and Water Pollution, where the 1972 Clean Water Act

Amendments originated, and as chief sponsor of the 1972 Amendments and leader of the Senate

delegation in the Conference Committee, Sen. Muskie's statements may be more authoritative

than any other source.  In his presentation of the Report of the Committee of Conference, Sen.

Muskie stated, with respect the Section 404(c):

> *[P]rior to the issuance of any permit to dispose of spoil*, the
> Administrator must determine that the material to be disposed of

---

[19] EPA makes a half-hearted suggestion that the Court may not review legislative history under non-statutory review.  EPA Br. at 34-35 n.11.  EPA cites only *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989), which did not involve non-statutory review and in any event does not support EPA's argument  In response to Michigan's argument that legislative history supported a statutory reading different from the Court's, the Court stated the elementary point that legislative history cannot *contravene* a statute that is otherwise unambiguous.  Here, however, Mingo Logan offers legislative history to confirm the statute's unambiguous intent.  EPA's argument also runs afoul of many D.C. Circuit cases that have reviewed legislative history under non-statutory review.  *See, e.g.*, *Dart*, 848 F.2d at 225-30; *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 491-92 (D.C. Cir. 1988).

> will not adversely affect municipal water supplies, shellfish beds, and fishery areas (including spawning and breeding areas), wildlife or recreational areas in the specified site.   ***Should the Administrator so determine, no permit may issue.***

*Id.* Sen. Muskie added that:

> Thus, the Conferees agreed that the Administrator of the Environmental Protection Agency should have the veto over the selection of the site for dredged spoil disposal and over any specific spoil to be disposed of in any selected site.
>
> The decision is not duplicative or cumbersome *because the permit application transmitted to the Administrator for review* will set forth both the site *to be used* and the content of the matter of the spoil to be disposed.  The Conferees expect the Administrator *to be expeditious* in his determination as to whether a site is acceptable or if specific spoil material can be disposed of at such site."

*Id*. (emphasis added).

Neither the Senate nor House bill, nor any draft of § 404 considered by the Conference Committee contemplated the authority now claimed by EPA to veto a permit three years after its issuance.  *See, e.g.*, S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in* 2 Legislative History at 1534-1723; H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in* 1 Legislative History at 893-1110.  Indeed, nothing in the legislative history suggests any intention that EPA have perpetual authority under § 404(c) to disrupt a § 404 permit after issuance.

### 3.    No Federal Court Has Ever Held That EPA Has the Authority to Withdraw a § 404 Permit.

Contrary to EPA's argument, no federal court has held that "Section 404(c) authorizes EPA to veto a Corps permit after issuance."  EPA Br. At 32.  In fact, several federal courts have come to the conclusion that EPA's authority under § 404(c) ceases once a permit is issued.  *See Coeur Alaska, Inc.*, 129 S. Ct. at 2465 (explaining that when EPA declines to exercise its veto and the Corps issues a permit, "the EPA in effect defer[s] to the judgment of the Corps on this point.");  *Minnesota v. Hoffman*, 543 F.2d 1198, 1205 (8th Cir. 1976) (describing EPA's veto

power as "limited" and reiterating Sen. Muskie's explanation that the veto exists "prior to the issuance of any permit to dispose of soil"); *Bersani v. EPA*, 674 F. Supp. 405, 416 (N.D.N.Y. 1987) (same).

EPA's reliance on *City of Alma v. United States*, 744 F. Supp. 1546 (S.D. Ga. 1990) and *Russo Devel. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990) is misplaced.  In *City of Alma*, EPA sought to "veto" the specification of a disposal site for a *proposed* § 404 permit.  744 F. Supp. at 1553.  A previous permit had been invalidated, and the Corps had proposed a new permit.  *Id.* at 1558-60.  The issue of whether EPA could withdraw a previously issued permit was not before the court, and thus any language that EPA to that effect is purely dicta.[20]  In *Russo*, the petitioner had sought a so-called "after-the-fact" permit as to land that the petitioner had already filled.  EPA vetoed the proposed permit, not an existing permit, and thus any statements as to EPA's claimed authority to withdraw an existing permit are also dicta.[21]  1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990).

**B.      Without Non-Statutory Review, Mingo Logan Will Be Denied a Meaningful and Adequate Means of Vindicating Its Statutory Rights.**

Contrary to EPA's conclusory analysis, the pertinent question is not whether APA review subsequent to the 404(c) process will provide Mingo Logan with some right to review.  The relevant standard is whether Mingo Logan will have an "unquestioned right to review" that is "meaningful and adequate."  *See Board of Governors of Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 43-44 (1991); *IAMAW*, 590 F. Supp. 2d at 175.  It does not suffice

---

[20] The *City of Alma* court, like EPA, relied on the word "whenever."  As explained above, "whenever" does not expand EPA's authority, but limits its exercise to the requisite determination.  Thus, *City of Alma* provides only weak dicta.

[21] The dicta in both cases was curt and did not consider the legislative history, which is conclusive.

that review *is possible* at the end of the 404(c) process.  Such review must assure Mingo Logan a means to vindicate all of its rights.

As the attached affidavit makes clear, Mingo Logan seeks judicial review now because EPA's claimed authority will have a cascading effect on related statutory rights and regulatory expectations, sorely interfering with Mingo Logan's day to day business.  Shanks Aff. ¶¶ 38-47. EPA's claimed authority would establish a perpetual authority to unilaterally revoke permits, thereby changing the terms of all § 404 permits and the legal rights of permittees, and altering the effect of § 404(p), which deems all actions taken pursuant to § 404 permits to be in compliance with the CWA.  *See* 33 U.S.C. § 1344(p).  EPA's action will also alter the regulatory expectations and business models of all permittees by imposing the uncertainty created by the risk that EPA will at any time in the future try to take away a permit without having any of the constraints imposed by the Corps's regulation or judicial review.  The only "meaningful and adequate" review is one that occurs immediately.

The cases on which EPA relies are clearly distinguishable.  In *MCorp Fin.*, the Supreme Court relied on the fact that the statute at issue both precluded judicial review at that stage of the administrative process, and explicitly provided for review in the Court of Appeals at a different stage.  *MCorp Fin.*, 502 U.S. at 38-39.  By contrast, Mingo Logan's action is neither implicitly or explicitly forbidden by the CWA, and the CWA provides no other avenue for review.

In *IAMAW,* this Court rested its decision on two factors, neither of which is present in this case.  590 F. Supp. 2d at 173-74.  First, the Court determined that the plaintiffs could obtain the relief sought through the administrative process.  *Id.* at 176.  By contrast, Mingo Logan has no administrative remedy for the immediate effects of EPA's claimed authority over permits.

Second, the *IAMAW* plaintiffs, unlike Mingo Logan, could not even identify a statutory provision that had been violated.  *Id.* at 177.

Finally, in both *Nyunt* and *Jordan Hosp.*, the plaintiffs had other administrative remedies available, and could not identify a clear and specific statutory mandate that had been violated. *Nyunt*, 589 F.3d at 447-49;  *Jordan Hosp.*, 571 F. Supp. 2d at 117-18.  None of these cases resembles the case at bar.

## CONCLUSION

EPA's decision that it may revoke Mingo Logan's § 404 permit is final; further agency action will advance no one's interests, except those who wish for delay.  Mingo Logan's claim that EPA has no authority cries out for resolution now in order to avoid financial harm and uncertainty to Mingo Logan and all permittees, unwarranted delay in resolving the *OVEC* case, complete regulatory chaos and the unnecessary expenditure of resources.  For all the reasons discussed above, the Court should deny EPA's motion to dismiss.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(f), Mingo Logan requests that the Court hear oral argument on EPA's motion.

June 23, 2010                              **MINGO LOGAN COAL CO., INC.**


/s/ Robert M. Rolfe_____

Robert M. Rolfe (Va. Bar No. 15779)
Michael R. Shebelskie (Va. Bar No. 27459)
George P. Sibley, III (Va. Bar No. 48773)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
(804) 788-8218 (facsimile)

Virginia S. Albrecht (D.C. Bar No. 357940)
Deidre G. Duncan (D.C. Bar No. 461548)
Matthew D. Melewski
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

Robert G. McLusky
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000
(304) 340-1130 (facsimile)

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2010, the foregoing Statement of Points and Authorities in Opposition to EPA's Motion to Dismiss was served on counsel of record through the Court's electronic case/filing/case management (ECF/CM) system.


/s/ Robert M. Rolfe_____
Robert M. Rolfe