# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MINGO LOGAN COAL COMPANY, INC. )
                                     )

          Plaintiff,       )

                )

         v.         )     Case No. 1:10-cv-00541-CKK

                )

UNITED STATES ENVIRONMENTAL   )

PROTECTION AGENCY         )

                )

         Defendant.     )

## AMENDED COMPLAINT

Mingo Logan Coal Company, Inc. ("Mingo Logan"), by counsel, seeks relief from the U.S. Environmental Protection Agency's ("EPA") Final Determination under section 404(c) of the Clean Water Act, through which EPA purports to modify Mingo Logan's section 404 Permit, which was issued by the U.S. Army Corps of Engineers ("Corps") over four years ago. Because EPA has acted without statutory authority and contrary to law, as well as arbitrarily and capriciously, Mingo Logan asks the Court to declare that EPA had no authority to issue the Final Determination, vacate EPA's Final Determination, declare that Mingo Logan's Permit remains valid, and enjoin EPA from acting further under section 404(c) of the Clean Water Act with respect to Mingo Logan's Permit.

## INTRODUCTION

1.    Mingo Logan operates a coal mine in West Virginia known as the Spruce No. 1 Mine. In January 2007, the Corps issued Mingo Logan a Clean Water Act ("CWA") section 404 Permit ("the Permit" or "the 404 Permit"), which authorizes the discharge of dredged and fill material

into portions of Pigeonroost Branch, Oldhouse Branch, the Right Fork of Seng Camp Creek, and adjoining streams, in connection with the Spruce No. 1 project.

2.     An array of State and Federal agencies, including the Corps, EPA, and the West Virginia Department of Environmental Protection ("WVDEP"), studied and evaluated the potential impacts of the Spruce No. 1 project for a decade before the permit was issued.

3.     During that process, Mingo Logan significantly altered the design and scope of the mine, and the Corps imposed extensive mitigation conditions that require Mingo Logan to create, restore, and enhance thousands of feet of existing streams, plant hundreds of thousands of native trees and shrubs, and engage in long-term monitoring to ensure effective environmental mitigation.

4.     On several occasions, EPA consented to the environmental impacts from the 404 Permit, as well as other aspects of the mine that require separate permits.

5.     Ultimately, EPA consented to the issuance of the 404 Permit.

6.      Mingo Logan has complied with the Permit since it was issued.   EPA's Final Determination does not claim otherwise.

7.     In September 2009, more than two years after the Corps issued the Permit, EPA asked the Corps to modify, suspend, or revoke it.

8.     The Corps's decision in response to EPA's request is contained in a letter from Colonel Robert Peterson, District Engineer, Corps, to William Early, Acting Regional Administrator, EPA Region III, dated Sept. 30, 2009, a complete and accurate copy of which is attached as Exhibit A to this Amended Complaint.

9.     The Corps refused to modify, suspend, or revoke the Permit because EPA raised no new information and provided no grounds to modify, suspend, or revoke the Permit.

10.   After the Corps found that there was no basis to modify, suspend, or revoke the Permit, EPA decided to modify the Permit itself.

11.   On April 2, 2010, EPA issued a notice of its "Proposed Determination to Prohibit, Restrict, or Deny the Specification, or the Use for Specification (Including Withdrawal of Specification), of an Area as a Disposal Site; Spruce No. 1 Surface Mine, Logan County, WV," 75 Fed. Reg. 16,788  ("Proposed Determination").

12.   The Proposed Determination claimed that section 404(c) of the Clean Water Act authorizes EPA to modify or revoke Mingo Logan's Permit.

13.   On January 13, 2010, EPA published a "Final Determination of the Assistant Administrator for Water Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, WV" ("Final Determination"), a complete and accurate copy of which is attached as Exhibit B to this Amended Complaint.  *See* Notice of Final Determination, 76 Fed. Reg. 3,126 (Jan. 19, 2011)

14.   In the Final Determination, EPA claims to have modified Mingo Logan's section 404 Permit by revoking the authorization to discharge fill into Pigeonroost Branch and Oldhouse Branch, four years after the Permit was issued by the Corps.

15.   Section 404(c) only authorizes EPA to prohibit or withdraw the specification of a disposal site, and thus "veto" the issuance of a proposed section 404 permit at that site.  Section 404(c) does not authorize EPA to act after a permit has been issued, nor does section 404(c) authorize EPA to modify an issued permit.

16.   EPA's use of section 404(c) to modify an already-issued permit exceeds EPA's statutory authority, and is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law.

17.   In a letter from William C. Early, EPA Acting Regional Administrator, to Col. Robert D. Peterson, Corps Huntington District Engineer, dated October 16, 2009, EPA acknowledged that "EPA has never before used its Section 404(c) authority to review a previously permitted project since Congress enacted the Clean Water Act in 1972."

18.   The Final Determination further claims to unilaterally undo findings made and permits issued by the Corps and the State of West Virginia ("the State"), pursuant to Congress's careful allocation of powers under the Clean Water Act.

19.   EPA's conclusions in the Final Determination rely on impacts that EPA either lacks the statutory authority to consider, or to which EPA has repeatedly consented.  Even if EPA could use section 404(c) to override sections 404(a)-(b), 303, 402, and 401 of the CWA, the factual findings adduced for EPA's action fall well short of EPA's burden under section 404(c).

## JURISDICTION AND VENUE

20.   The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

21.   Venue for this action exists in this Court pursuant to 28 U.S.C. § 1391(e), as the defendant is an agency of the United States and resides in this judicial district.

## PARTIES

22.   Mingo Logan operates the Spruce No. 1 Mine in Logan County, West Virginia.  Mingo Logan is a subsidiary of Arch Coal, Inc.  Arch Coal was named in 2008 to *Forbes*' list of America's Most Trustworthy Companies and recently won an award from the federal Mine Safety and Heath Administration for having the best West Virginia surface mine safety record.

23.   EPA is a federal agency headquartered in the District of Columbia and is the agency that has undertaken the illegal conduct that is the subject of this Amended Complaint.

## STATUTORY FRAMEWORK

24.    To operate the Spruce No. 1 Mine in compliance with State and federal law, Mingo Logan required various permits and associated approvals, each of which governs a particular aspect of the mining process.

### SMCRA Permits

25.    The Surface Mining Control and Reclamation Act ("SMCRA") regulates the overall construction, operation and reclamation of surface coal mines.  30 U.S.C. §§ 1201 *et seq*.

26.    SMCRA and its implementing regulations are a comprehensive mechanism for controlling the environmental impacts of surface coal mining, including the return of excess rock and dirt to the mined area and adjacent hollows.

27.    West Virginia has exclusive authority to issue SMCRA permits on non-federal lands within its borders.

28.    Congress specifically approved fills like those at the Spruce No. 1 Mine when it enacted SMCRA.  *See* 30 U.S.C. § 1265(b)(22); 30 C.F.R. § 816.71-.73.

29.    The West Virginia SMCRA program heavily regulates the placement, minimization and construction of fills like those at the Spruce No. 1 Mine.  *See* W. VA. CODE. R. §§ 38-2-14.14.a; 14.14.d.4-5; 14.14.e.5.A; 14.14.g.1.A-B; 14.14.g.9.

30.    Before the WVDEP may issue a SMCRA permit, it must conduct a "cumulative hydrologic impact assessment" and determine that the mine is designed to minimize disturbance to the hydrologic balance within the permit area and to prevent "material damage" to that balance outside the permit area. W. VA. CODE R. § 38-2-14.5.

**Applicable Water Quality Standards**

31.    CWA section 303 authorizes the States to develop, review and periodically revise water quality standards that apply within their borders.  33 U.S.C. § 1313.

32.    The State's water quality standards are the "applicable" standards under the CWA.

33.    EPA may object when States adopt and periodically review or revise their water quality standards.  If EPA determines that a State's standards are not consistent with the CWA, EPA can direct the State to revise them.  If the State fails to do so, then EPA must promulgate replacement federal standards.  33 U.S.C. § 1313(c)(3)-(4).

34.    The water quality standards at issue in this proceeding were duly adopted by the State of West Virginia.

35.    Before adopting its water quality standards, West Virginia determined that they would be sufficiently protective of fish and wildlife.  *See* 33 U.S.C. § 1313(c)(2)(A).

36.    EPA has reviewed the applicable West Virginia water quality standards each time EPA has had the statutory authority to do so.

37.    EPA has not directed the State to revise its water quality standards and has not promulgated replacement federal standards.

**Section 402 Permits**

38.    Section 402 of the CWA regulates discharges of pollutants (other than the discharge of dredged and fill material) into waters of the United States.  33 U.S.C. § 1342.

39.    A section 402 permit ensures, among other things, that the discharges will comply with applicable effluent limitations and the State's water quality standards.

40.   With regard to the Spruce No. 1 Mine, Mingo Logan's section 402 Permit regulates discharges from the mine site into downstream waters, including outfalls from the sediment ponds at the base of a fill and from other parts of the mine.

41.   West Virginia has exclusive authority to issue section 402 permits.

42.   EPA has authority under section 402(d) to object to a proposed section 402 permit and to prevent the State from issuing the permit.  33 U.S.C. § 1342(d).

43.   If EPA does not object on the grounds specified in the statute, the State may issue the permit, which becomes controlling unless and until reissued, modified or revoked by the State.

**Section 401 Certifications**

44.   Section 401 of the CWA requires that all federal authorizations receive a water quality certification from the State.  33 U.S.C. § 1341.

45.   Before issuing the certification, the State must determine that the federal authorization will comply with the State's effluent limitations, applicable water quality standards, and other appropriate State requirements.

46.   The State may add limitations or monitoring requirements to the 401 certification that the State determines are necessary to ensure compliance with the State's effluent limitations, water quality standards, and other appropriate State requirements.   These limitations or requirements become conditions to the federal authorization requiring a section 401 certification. 33 U.S.C. § 1341(d).

47.   The 401 certification conclusively determines that the federal authorization will comply with the State's effluent limitations, water quality standards, and other appropriate State requirements.

48.   EPA may challenge the State's 401 certification under State procedures.

49.   The State's 401 certification is binding on the Corps.

## Section 404 Permits

50.   Section 404 regulates the discharge or dredged and fill material into waters of the United States.  33 U.S.C. § 1344.

51.   The Corps has exclusive authority to issue permits under CWA section 404.  33 U.S.C. § 1344(a).

52.   Before the Corps may issue a section 404 permit, the Corps must specify a disposal site for the dredged and fill material.

53.   The Corps specifies a disposal site by applying guidelines jointly developed with EPA ("the Guidelines").  33 U.S.C. § 1344(b).

54.   The Corps has the exclusive authority to apply the Guidelines.

55.   If application of the Guidelines alone would prohibit the specification of a disposal site, the Corps may still specify a disposal site in consideration of the economic impact of the site on navigation and anchorage.  33 U.S.C. § 1344(b)(2).

56.   EPA may invoke section 404(q) of the Clean Water Act to "elevate" a proposed permit for further review.  33 U.S.C. § 1344(q).

57.   EPA is also authorized to prohibit or withdraw the specification of a disposal site, and thus "veto" the issuance of a proposed section 404 permit at that site.  33 U.S.C. § 1344(c).

58.   The Corps has authority to enforce the permits it issues, using section 404(s).   33 U.S.C. § 1344(s).

59.   The typical section 404 permit includes many conditions.  Violation of the permit or the permit conditions constitutes a violation of the CWA.  33 U.S.C. § 1311.  Compliance with the permit and the permit conditions constitutes compliance with the CWA.  33 U.S.C. § 1344(p).

60.   The Corps has authority to modify, suspend, or revoke permits it issues under section 404. *See* 33 C.F.R. § 325.7.

61.   The Corps's regulations for modifying, suspending, or revoking a 404 permit require evaluation of five factors: (1) compliance with the terms of the permit; (2) a change in circumstances relating to the authorized activity since the permit was issued; (3) significant permit objections which were not earlier considered; (4) revisions to law; and (5) the extent to which modification, suspension, or revocation would adversely affect plans, investments, and actions taken by the permittee in reliance on the permit.  33 C.F.R. § 325.7(a).

62.   EPA does not have regulations for modifying, suspending, or revoking section 404 permits.

### EPA's Limited Authority Under Section 404(c)

63.   Section 404(c) authorizes EPA to prohibit or withdraw the specification of a disposal site, and thus "veto" the issuance of a proposed section 404 permit at that site.  33 U.S.C. § 1344(c).

64.   To exercise its power under section 404(c), EPA must demonstrate that the discharges to be authorized by the proposed permit into the specified disposal site "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."  33 U.S.C. § 1344(c).

65.   If the Regional Administrator has reason to believe that an unacceptable adverse effect could result, the Regional Administrator shall provide notice to the Corps, the owner of the site, and the applicant.  40 C.F.R. § 231.3(a)(1).

66.   Within 15 days of the notice, if it has not been demonstrated to the Regional Administrator that corrective action will alleviate her concerns, or that the Corps will take

corrective action, the Regional Administrator may publish notice of a Proposed Determination. 40 C.F.R. § 231.3(a)(2).

67.   The Regional Administrator must seek comment on the proposal and hold a public hearing.  40 C.F.R. §§ 231.3, 231.4.

68.   Once the comment period has concluded, the Regional Administrator must either withdraw the Proposed Determination or provide a Recommended Determination to the Administrator of EPA.  40 C.F.R. § 231.5.

69.   Upon receipt of a Recommended Determination, the Administrator must initiate consultation with affected parties, and may affirm, modify, or rescind the Recommended Determination.  40 C.F.R. § 231.6.

70.   In making this determination, the Administrator must "take into account all information available to him."  40 C.F.R. § 231.1.

### HISTORY OF MINGO LOGAN'S SMCRA PERMIT AND 402 PERMIT

71.   In late 1997, Hobet Mining Inc. ("Hobet Mining"), a former affiliate of Mingo Logan, initiated the application processes to obtain a SMCRA permit, a section 402 permit, and a section 404 permit, including the section 401 authorization required for the 404 permit.

72.   The State undertook the detailed permitting process required to issue a SMCRA permit, and opened an extensive public notice and comment process.

73.   The WVDEP issued the SMCRA Permit to Hobet Mining on November 4, 1998.

74.   The SMCRA Permit requires Hobet Mining to return the site to "approximate original contour" ("AOC"), by returning as much of the overburden to the mined area as possible,  and requires Hobet Mining to utilize modern techniques to reforest the site with mixed native hardwoods.

75.     The SMCRA Permit also regulates the placement, minimization and construction of the fills.  It requires the fills to have an extensive underdrain system and to be constructed of durable material in order to assure water flow and stability.

76.     Finally, the SMCRA Permit requires Hobet Mining to test soil and rock within the project area to prevent the placement of acid or selenium producing materials in the fills or other areas likely to be inundated.

77.     Concurrently with WVDEP's review of the SMCRA permit application, the WVDEP also reviewed the application for a section 402 permit for the Spruce No. 1 Mine.

78.     WVDEP determined the permissible concentrations of each type of pollutant that could be discharged from the mine and incorporated appropriate effluent limits into the proposed section 402 permit.

79.     WVDEP could not issue the permit if these limits and conditions did not "ensure compliance with the applicable water quality requirements."  40 C.F.R. §§ 122.4(d).

80.     As part of the review process and its obligations under the CWA, the WVDEP forwarded the proposed section 402 permit to EPA.  *See* 33 U.S.C. § 1342(d)(1); 40 C.F.R. § 123.41.

81.     Pursuant to its authority under section 402, EPA initially objected to the issuance of the proposed section 402 permit on August 4, 1998, and held a public hearing on its objections.  *See* 33 U.S.C. § 1342(d)

82.     After its initial objections were resolved, EPA withdrew its objections by letter of December 23, 1998.

83.   As a condition to EPA's withdrawal of its objections, the WVDEP agreed, among other things, to make EPA's recommendations regarding the placement of fill – which was to be authorized under the section 404 permit – a condition of the WVDEP's section 401 certification.

84.   WVDEP forwarded the new proposed permit to EPA, and EPA acknowledged by letter of January 7, 1999 that WVDEP had met EPA's conditions.   A complete and accurate copy of the letter is attached as Exhibit C to this Amended Complaint.

85.   EPA thereby consented to the State's issuance of the 402 Permit.

86.   The State issued the section 402 Permit to Mingo Logan on January 11, 1999 ("the 402 Permit").

87.   In 2002, the State sought to modify the 402 Permit to reconfigure the mine plan.

88.   EPA initially objected to the proposed 2002 modification of the 402 Permit.   By letter of July 30, 2002, EPA expressed concerns, among other things, that recent studies "indicated impairment of aquatic life and significantly higher levels of selenium, sulfates, and conductivity for streams with valley fills.   The study implies that discharges from sedimentation ponds serving valley fills at the proposed Spruce No. 1 Surface Mine have a potential of causing stream impairment and exceedance of water quality standards."

89.   EPA proposed to withdraw its objections if WVDEP agreed to certain conditions regarding monitoring, material handling, and flow related to levels of selenium, sulfates, and conductivity.

90.   WVDEP agreed to EPA's conditions, and EPA withdrew its objection and consented to the modification.   A complete and accurate copy of EPA's withdrawal letter is attached as Exhibit D to this Amended Complaint

91.   WVDEP issued the first modification to the section 402 Permit on June 24, 2003.

92.   WVDEP issued a second modification of the section 402 Permit on April 29, 2005, which reconfigured the mine plan to account for a smaller mine site than had been approved by EPA in 1999 or 2003.

93.   EPA did not object to the second proposed modification of the section 402 Permit.

94.   EPA did not object to two renewals of the section 402 Permit, on May 12, 2004 and August 7, 2007.

95.   The section 402 Permit remains valid and in effect.

## HISTORY OF MINGO LOGAN'S 404 PERMIT

96.   In March 1997, Hobet Mining applied to the Corps for CWA section 404 authorization under Nationwide Permit 21, in connection with operations at the Spruce No. 1 Mine.

97.   The proposed fill operations included discharges of overburden into Pigeonroost Branch, Oldhouse Branch, the Right Fork of Seng Camp Creek, White Oak Branch, and adjoining streams.

98.   In coordination with the contemporaneous section 402 Permit, Hobet agreed to eliminate the planned fill in White Oak Branch and reduce the size of the planned fills in Pigeonroost Branch and Oldhouse Branch.

99.   In January 1999, the Corps concluded that the proposed project met the requirements for Nationwide Permit 21.

100.   EPA participated in the Corps's review and agreed with the Corps that authorization under a Section 404 general permit or Nationwide Permit 21 was proper.

101.   In a letter from Stanley Laskowski, Director of the Environmental Services Division for EPA Region III, to Michael Gheen, Chief of the Regulatory Branch of the Corps's Huntington District, dated January 21, 1999, EPA concluded: "In consideration of information in the record for this project, including site-specific data collected by EPA, we accept that the potential

individual and cumulative adverse environmental impacts to waters of the United States associated with this proposal have been minimized to the extent possible while maintaining a viable project. . . . We concur that this proposal is consistent with Section 404(e) of the Clean Water Act and with Nationwide Permit 21." A complete and accurate copy of the letter is attached as Exhibit E to this Amended Complaint.

102. Before the Corps could issue its final approval for the Spruce No. 1 Mine under Nationwide Permit 21, the United States District Court for the Southern District of West Virginia preliminarily enjoined the use of Nationwide Permit 21. *Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999).

103. The preliminary injunction did not address the Corps's and EPA's determination that the fill-related discharges would have only minimal adverse effect on aquatic resources related to the Spruce No. 1 fill operations. Nonetheless, in the wake of the injunction the Corps withdrew its proffered authorization for the Spruce No. 1 project under Nationwide Permit 21.

104. Hobet Mining then applied to the Corps for an individual permit for the Spruce No. 1 Mine, pursuant to CWA section 404(a), in 1999.

105. Due to a company divestiture in 2005, Mingo Logan replaced Hobet Mining as the applicant during the review process.

106. The Corps conducted a full *de novo* review of the individual permit application. That review lasted over seven years, generated an administrative record that spans tens of thousands of pages, and cost Mingo Logan millions of dollars.

107. In conjunction with its review of Mingo Logan's application, the Corps conducted a full environmental impact statement ("EIS") under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA") — the only full EIS ever prepared for an individual surface

mine in West Virginia. The EIS was comprehensive and exhaustive, and entailed thousands of hours of work by at least five state and federal agencies, including EPA.

108.  Mingo Logan worked cooperatively with the Corps and EPA during that multi-year review and, at the Corps's and EPA's request, significantly decreased the proposed scale of its operation from what the agencies had approved in 1999 and 2003. The initial proposal would have covered 3,113 acres, yielded more than 264 million cubic yards of excess spoil, and allowed Mingo Logan to recover virtually all of the site's accessible coal. In contrast, the project as approved covers only 2,278 acres, cuts the excess spoil to less than half as much as the original proposal, and permits Mingo Logan to recover only 75 percent of the site's total coal reserves. The final site design also cuts the acreage of affected waters of the United States by more than 30 percent, from more than 12 acres to 8.11 acres.

109.  Mingo Logan altered the footprint of its operation to avoid disturbing White Oak Branch.

110.  WVDEP has determined that White Oak Branch is the only reference stream within the Spruce Fork watershed.

111.  WVDEP has determined that Pigeonroost Branch, Oldhouse Branch, and the Right Fork of Seng Camp Creek do not qualify as reference streams or outstanding national resource waters.

112.  Mingo Logan also agreed to additional compensatory mitigation such as stream creation, restoration, and enhancement, in amounts well beyond what EPA and the Corps had previously concluded were sufficient in connection with the earlier permit application.

113.  Mingo Logan further agreed to more stringent water quality requirements than called for in its existing 402 Permit, as well as additional conditions related to water quality.

114.  EPA participated in the review of Mingo Logan's individual 404 Permit application. As part of that review, EPA commented on Mingo Logan's reports, analyses, and data, and provided the Corps with additional data bearing on the potential effects of Mingo Logan's proposed operations.

115.  WVDEP also participated in the 404 Permit process.

116.  After scrutinizing Mingo Logan's permit application in light of, among other things, West Virginia's water quality standards and a Cumulative Hydrologic Impact Assessment, WVDEP issued a section 401 water quality certification for the Spruce No. 1 Permit on December 19, 2005.

117.  WVDEP determined that the Spruce No. 1 project would not contribute to a violation of State water quality standards or violate the State's anti-degradation regulations.

118.  EPA did not seek review of WVDEP's 401 certification.

119.  The Draft EIS, published in March 2006, included more than 1600 pages of summaries, reports, comments, exhibits, appendices, and conclusions about the proposed mine's potential impacts on mineral resources, groundwater, surface water, wetlands, soils, vegetation, fish, wildlife, cultural resources, air quality, recreation, the economy, noise, scenery, hazardous materials, public health, and environmental justice.

120.  With regard to water quality, the Draft EIS concluded that "Overall, it would be anticipated that the Spruce No. 1 mine would only contribute minimally to cumulative impacts on surface water quality," and added that "a net gain of waters of the U.S., including wetlands, would occur as a result of past, present, and reasonably foreseeable future actions" at the Spruce No. 1 site.

121.  EPA commented on the Draft EIS in a letter dated June 16, 2006.

122.  The Corps considered and addressed EPA's comments in the Final EIS, which was released in September 2006.  The Final EIS included 58 pages specifically addressing EPA's comments on the Draft EIS.

123.  Following the publication of the Final EIS, the Corps and EPA exchanged correspondence, culminating in a final letter from the Corps that addressed EPA's concerns and requested any additional comments from EPA.

124.  EPA did not send any additional comments in response to the Corps's request.

125.  If, as of December 2006, EPA had unresolved concerns regarding the Corps's proposal to issue the Permit, EPA had several statutory and regulatory means either to block the issuance of the Permit or to require additional review.  EPA did not invoke any of those remedies.

126.  During the Permit review process, EPA could have, but did not, use section 309 of the Clean Air Act to challenge the Corps's EIS by referring it to the White House Council on Environmental Quality.  *See* 42 U.S.C. § 7609; 40 C.F.R. pt. 1504.

127.  EPA had the opportunity to use section 404(q) of the Clean Water Act to "elevate" the proposed 404 Permit for further review, or could have used its authority under section 404(c) to prohibit, deny, restrict, or withdraw the disposal site specifications identified in the permitting process.  But EPA did not exercise either of these authorities.

128.  By not invoking any of the pre-issuance statutory avenues provided by Congress, EPA deferred to the judgment of the Corps and allowed the Corps to issue the Permit.

**The 404 Permit**

129.  The Corps issued the section 404 Permit to Mingo Logan in January 2007, authorizing Mingo Logan to discharge dredged and fill material—namely, excess overburden—into 8.11 acres of waters of the United States.

130.  The Corps determined that those 8.11 acres comprise 0.12 acres of wetland (an abandoned farm pond); 1.83 acres of ephemeral (storm runoff only) streams; 6.13 acres of intermittent (seasonal only) streams; and 0.034 acres of a perennial (permanently flowing) stream.

131.  The Corps determined that the impact on the 0.034 acres of perennial stream is temporary.

132.  The Permit requires extensive on-site and off-site mitigation, including the creation, restoration, and enhancement of more than 15 acres of perennial and intermittent streams, riparian areas, and wetlands.  Successful completion of all elements of the mitigation plan is a requirement of the Permit.

133.  The re-vegetation plan required by the Permit calls for the planting of hundreds of trees and shrubs per acre, along with long-term monitoring to ensure an 80 percent survival rate. During the monitoring period, the permittee is also required to seek out and remove invasive plant species that may encroach on the project area.

134.  The Permit additionally requires Mingo Logan to perform environmental monitoring for a minimum of ten years after completion of the mitigation plans to ensure the effectiveness of the mitigation measures, and to perform additional mitigation measures in the event that any of the required mitigation fails to meet the Permit's performance standards.

135.  The Permit describes the circumstances under which the Corps can reevaluate its permit decision and suspend, modify or revoke the permit.  The Permit states that the Corps may reevaluate the decision to grant the Permit if Mingo Logan does not comply with the Permit, if the application information proves to be false, incomplete or inaccurate, or if the Corps is presented with significant new information.  The Permit adds that such a reevaluation may result

in the use of the Corps's power to suspend, modify or revoke the Permit pursuant to 33 C.F.R. § 325.7, or the Corps's enforcement power contained in 33 C.F.R. § 326.4 and 326.5

136.  The Permit does not mention any circumstances under which EPA may suspend, modify or revoke the permit.

137.  The Permit does not mention EPA or section 404(c).

138.  In issuing the Permit, the Corps expressly found that the proposed project complied with the 404(b)(1) Guidelines.  The Corps specifically found, among other things, that the project is the least environmentally damaging practicable alternative, that it will not violate applicable water quality standards, and that it will not contribute to significant degradation of waters of the United States.

139.  The Corps made these findings regarding compliance with the 404(b)(1) Guidelines pursuant to its exclusive authority under the CWA, applying regulations that the Corps and EPA jointly developed to evaluate Clean Water Act section 404 permit applications.  *See* 33 U.S.C. § 1344(b).

140.  The Corps also applied its public interest review regulations and determined that the public interest weighs in favor of issuance of the Permit.

### Events Since the Corps Issued the 404 Permit

141.  After receiving its Permit, Mingo Logan spent millions of dollars preparing the site and commencing construction and operations.

142.  Just as operations were getting underway, the Ohio Valley Environmental Coalition ("OVEC") added Mingo Logan's Permit to others OVEC had already challenged in the United States District Court for the Southern District of West Virginia.  *See OVEC v. U.S. Army Corps of Engineers*, No. 3:05-cv-00784 (S.D. W. Va.).

143.  The Fourth Circuit eventually upheld the permits that were originally part of the OVEC lawsuit, *OVEC v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), *cert. dismissed*, 131 S.Ct. 51 (2009), but Mingo Logan's Permit had been added to the litigation too late to be included in that appeal.

144.  OVEC's challenges to Mingo Logan's Permit were the same as those the Fourth Circuit rejected in the appeal.  *Id.*

145.  Pursuant to an agreement with OVEC, Mingo Logan has constructed portions of the Spruce No. 1 Mine, including work in the Right Fork of Seng Camp Creek, during the pendency of OVEC's lawsuit.

146.  In July 2009, Mingo Logan moved for summary judgment in the Southern District of West Virginia on the basis of the Fourth Circuit's opinion.

147.  Since Mingo Logan filed its motion for summary judgment in the *OVEC* action, the United States has sought and obtained repeated stays of the deadline for responding to that motion, based on EPA's threat to begin, and ultimately beginning, the 404(c) process.

**The Corps's Refusal to Modify, Suspend, or Revoke the 404 Permit**

148.  In September 2009, shortly after Mingo Logan moved for summary judgment, EPA asked the Corps to modify, suspend, or revoke the Permit.

149.  On September 3, 2009, EPA sent a letter to the Corps formally requesting that the Corps "use its discretionary authority provided by 33 C.F.R. § 325.7 to suspend, revoke, or modify" Mingo Logan's Permit.

150.  In response to the Corps's invitation, WVDEP commented on EPA's letter in a September 25, 2009 letter from Scott Mandirola, Acting Director, Office of Water and Waste, WVDEP, to Colonel Robert Peterson, District Engineer, Corps, a complete and accurate copy of which is attached as Exhibit F to this Amended Complaint.

151. WVDEP's September 25, 2009 letter, among other things, confirmed that Mingo Logan's Permit meets all applicable water quality standards.

152. WVDEP stated that the Permit "for the Spruce no. 1 Mine (No. WV1017021), which most directly regulates water quality at this location, has been open to scrutiny by USEPA on at least three occasions previously.  Each time . . . USEPA allowed permit approval.  As this permit currently stands, the effluent limitations it establishes are in compliance with all applicable Total Maximum Daily Loads (TMDLs) and West Virginia's federally approved antidegradation policy."  Exhibit F at 2.

153.  WVDEP strongly defended Mingo Logan's Permit and expressed frustration with EPA's sudden change of heart.

154. WVDEP's letter stated that "[a]t some point, a project must be deemed to have been studied enough to meet NEPA's requirements. ***This is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry.***  It has previously been through . . . twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies.  In addition, it has been examined by the State permitting quality control panel comprised of representatives of the environmental community, the coal industry, the WVDEP and the federal Office of Surface Mining Reclamation and Enforcement."  Exhibit F at 3 (emphasis added).

155. WVDEP's letter affirmed that it "undertakes regular reviews of its water quality standards and other rules to ensure appropriateness" and described EPA's request that the Corps modify, suspend, or revoke the Permit as a "retroactive, ad hoc departure[] from existing laws, rules, and guidelines." Exhibit F at 3.

156.  On September 30, 2009, the Corps refused EPA's request to modify, suspend, or revoke the Permit.

157.  The Corps's decision (Exhibit A to this Amended Complaint), considered the five factors specified in 33 C.F.R. § 325.7 and found that none of those factors warranted modification, suspension, or revocation of Mingo Logan's Permit.

158.  Specifically, the Corps found that Mingo Logan was in compliance with its Permit, that there had been no change in circumstances, and that all permit objections had been considered by the Corps during the time the Permit application was under review and, in the case of EPA's comments in particular, resolved.  There had been no change in the law.

159.  In addition to its letter attached as Exhibit A to this Amended Complaint, the Corps memorialized its decision in a September 30, 2009 Memorandum for Record, a complete and accurate copy of which is attached as Exhibit G to this Amended Complaint.

160.  The Memorandum for Record stated that "USEPA neither points to any new facts or circumstances nor identifies any significant permit objections which were not earlier considered." Exhibit G at 22.

161.  The Corps addressed the issues raised by EPA in EPA's September 3, 2009 letter, including fill minimization, water quality and conductivity, cumulative impacts, and compensatory mitigation, and determined that they did not warrant modification, suspension, or revocation.  With regard to water quality issues, the Corps noted that "in a letter dated 25 September 2009, the WVDEP stated the effluent limitations established in the Spruce No. 1 Mine NPDES permit are in compliance with all applicable TMDLs and West Virginia's federally approved anti-degradation policy.  [We] have no expectation the disposal of fill material in

waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water quality standards." Exhibit A at 3.

162. Despite the Corps's determination that no grounds exist for modifying, suspending, or revoking the Permit, EPA gave notice on March 26, 2010 that pursuant to CWA section 404(c), EPA intended to modify or revoke Mingo Logan's Permit by "withdraw[ing] or restrict[ing] use of Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch, and certain tributaries to those waters in Logan County, West Virginia to receive dredged and/or fill material in connection with construction of the Spruce No. 1 Surface Mine." 75 Fed. Reg. 16,788 (Apr. 2, 2010).

163. EPA's press release accompanying its March 26 notice declared that "EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and never for a previously permitted project."

**EPA Announces New Standards for Section 402 and 404 Permits**

164. Also in March 2010, EPA released drafts of two reports, titled "The Effects of Mountaintop Mines and Valley Fills on Aquatic Ecosystems of the Central Appalachian Coalfields," *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=215267 ("MTM/VF Report"), and "A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams" ("the Benchmark"), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=220171.

165. The MTM/VF Report lists purported effects on wildlife, water quality and the aquatic ecosystem, many of which are bases for the Final Determination.

166. The Benchmark establishes a conductivity limit for proposed 404 and 402 permits of 500 μS/cm (micro Siemens per centimeter), which is an essential component of the Final Determination.

167. The MTM/VF Report and the Benchmark are labeled "DRAFT DO NOT CITE OR QUOTE and state: "*This document is a draft for review purposes only and does not constitute Agency policy.*"

168. EPA later established a public review and comment period for the MTM/VF Report and the Benchmark, and referred them to a panel of EPA's Science Advisory Board ("SAB") for review.

169. The SAB Panel is charged with reviewing the MTM/VF Report and the Benchmark and providing advice to EPA on the scientific adequacy, suitability, and appropriateness of the reports.

170. The SAB panel has met, solicited input, and issued two draft reports.

171. The SAB Panel has expressed concerns with the scientific bases of the MTM/VF Report and the Benchmark, identified scientific weaknesses in claims made, and recommended further study on the MTM/VF Report and the Benchmark.

172. The SAB panel has not issued a final report on the MTM/VF Report and the Benchmark.

173.  The Benchmark has not been finalized.

174. Even if final, the Benchmark does not override State water quality standards.

175. On April 1, 2010, EPA also released a series of documents titled "Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (Apr. 1, 2010) (the "Guidance")                              *available*                              *at* http://www.epa.gov/Wetlands/guidance/pdf/appalachian_mtntop_mining_detailed.pdf.

176. Among other things, the Guidance attempts to establish a region-wide water quality standard for conductivity on the basis of the Benchmark.

177. The Guidance further directs EPA regional offices to include the conductivity Benchmark in its review of permits proposed under CWA sections 402 and 404.

178. The National Mining Association ("NMA") recently brought an action to challenge the Guidance and the Benchmark, as well as other mining-specific processes recently adopted by EPA.

179. On January 14, 2010, the District Court for the District of Columbia held that NMA was likely to prevail on its claim that EPA, in establishing the Guidance and the 500 µS/cm Benchmark for conductivity, exceeded its statutory authority under sections 303, 402 and 404 of the CWA. *Nat'l Mining Ass'n v. Jackson*, No. 1:10-cv-1220-RBW, 2011 WL 124194, at *2 (D.D.C. Jan. 14, 2011).

180. The WVDEP evaluated the science behind the Benchmark in establishing permitting guidance for West Virginia's narrative water quality standards. WVDEP, Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i (Aug. 12, 2010) ("Justification").

181. The WVDEP described the science underlying the Benchmark as "flawed" and stated that conductivity could not be a "stand-alone determinant[] of compliance with the [State's] narrative [water quality] standard." Justification at 3.

182. Specifically, WVDEP evaluated the Benchmark limit of 500 µS/cm, and concluded that "reliance on the single surrogate of specific conductance to implement and/or enforce the State's narrative water quality standards is improper. . . . EPA's proposed limits are too narrowly

focused on a single parameter and single aquatic species to determine the health of the impacted watershed." Justification at 7.

**EPA Attempts to Modify Mingo Logan's 404 Permit**

183.  On April 2, 2010, one day after releasing the Guidance, EPA published its "Proposed Determination" in the Federal Register.  75 Fed. Reg. 16,788.

184.  The Proposed Determination sought to modify Mingo Logan's 404 permit by "withdraw[ing] or restrict[ing] use of Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch."

185.  Mingo Logan submitted extensive comments in response to the Proposed Determination.

186.  On September 24, 2010, EPA Region III forwarded a "Recommended Determination" to EPA Headquarters, recommending that EPA modify the Spruce No. 1 Permit by revoking the Permit's authorization to discharge fill into Pigeonroost Branch and Oldhouse Branch.

187.  The Recommended Determination largely repeated the claims made in the Proposed Determination, without responding to Mingo Logan's comments, but removed Seng Camp Creek from consideration in the section 404(c) proceeding.

188.  Mingo Logan again submitted extensive comments to EPA regarding the Recommended Determination.

189.  In response to the Recommended Determination, the Corps reiterated its position that it had "no basis to take any corrective action regarding the 404 permit [it] issued on January 22, 2007 for discharges associated with the Spruce No. 1 Surface Mine." A complete and accurate copy of the letter is attached as Exhibit H to this Amended Complaint.

190.  WVDEP also submitted comments to EPA regarding the Recommended Determination, a complete and accurate copy of which is attached as Exhibit I to this Amended Complaint.

WVDEP noted that the issues raised by EPA were "based on water quality, which is directly regulated by the State water quality standards.  Interpretation and enforcement of such standards is uniquely a State issue."  Exhibit I at 2.

191.  WVDEP also criticized EPA's reliance on conductivity:  "A huge fallacy with the Recommended Determination is its reliance on levels of specific conductance, as if this has some sort of lawful regulatory significance.  To be clear, specific conductance is not a State (or even federally recommended) water quality standard.  References to limits for conductivity are both regulatorily unsound and practically unnecessary.  . . . [P]olicy makers at both the State and federal levels — with input from the citizens whose interests they represent — should debate and decide appropriate levels of impacts, in the bright light of public involvement and scrutiny."  Exhibit I at 3.

## THE FINAL DETERMINATION

192.  On January 13, 2010, EPA published its "Final Determination," pursuant to CWA section 404(c), claiming to modify Mingo Logan's section 404 Permit by revoking the Permit's authorization to discharge fill into Pigeonroost Branch and Oldhouse Branch.   The Final Determination concludes, as the justification for EPA's action, that the authorized discharges into Pigeonroost Branch and Oldhouse Branch "will have unacceptable adverse effects on wildlife."  Exhibit B at 6.

### The Final Determination Wrongly Claims That Pigeonroost Branch and Oldhouse Branch Are Uniquely High Quality Streams

193.  The Final Determination claims that Pigeonroost Branch and Oldhouse Branch are misclassified in the section 404 Permit.

194.  The classifications of Pigeonroost Branch and Oldhouse Branch have been known to EPA throughout the permitting process.

195. The impacts to Pigeonroost Branch and Oldhouse Branch authorized in the section 404 Permit have been known to EPA throughout the permitting process.

196. The fills in Pigeonroost Branch and Oldhouse Branch that are authorized in the section 404 Permit are smaller than those approved by EPA in 1999 and 2003.

197. WVDEP has determined that Pigeonroost Branch and Oldhouse Branch do not qualify as reference streams or outstanding national resource waters.

198. Pigeonroost Branch and Oldhouse Branch have not been designated as aquatic resources of national importance.

199. The Final Determination's conclusion that Pigeonroost Branch and Oldhouse Branch represent uniquely high quality streams fails to account for several important factors.

**The Final Determination Wrongly Claims That the Authorized Discharges Will Cause Unacceptable Adverse Effects to Wildlife**

200. The Final Determination also concludes that the discharges authorized by the 404 Permit will cause unacceptable adverse effects on wildlife.

201. The Final Determination asserts three bases for its conclusion that the discharges will have unacceptable adverse effects on wildlife: (a) that the discharges will cause unacceptable adverse impacts on wildlife at the site of the discharges authorized by the 404 Permit; (b) that the discharges will lead to changes in conductivity and selenium in downstream waters, which, in turn, will cause unacceptable adverse impacts on wildlife downstream of the discharges authorized by the 404 Permit; and (c) that the 404 Permit does not comply with the 404(b)(1) Guidelines, and that this "provides support and confirmation of the conclusion that the impacts are unacceptable."

202. None of these three bases is supported by law or the record.

**The Final Determination Wrongly Claims That the Authorized Discharges Will Cause Unacceptable Adverse Effects to Wildlife at the Site of the Fill**

203.   In the section addressing impacts on wildlife at the site of the discharges authorized by the Permit, the Final Determination purports to identify impacts to macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush.

204.   The impacts to macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush authorized in the section 404 permit have been known to EPA throughout the permitting process.

205.   The Final Determination fails to identify any new information regarding the nature of these impacts.

206.   The Final Determination fails to establish that the section 404 discharges will cause unacceptable adverse effects to wildlife at the site of the discharges.

207.   The Final Determination's claims regarding impacts to wildlife at the site of the fill either refer to species that have never been located at the site of the fill, overestimate the number of wildlife species at the site of the fill, overstate the expected impacts to wildlife at the site of the fill, misrepresent the scientific support for impacts at the site of the fill, or fail to consider important factors.

208.   The Final Determination does not explain what the alleged loss of the macroinvertebrates, salamanders, fish, or Louisiana Waterthrush at the site of the fill means for these species in the watershed or the region.

**The Final Determination Wrongly Claims That the Authorized Discharges Will Cause Unacceptable Adverse Effects to Wildlife Downstream of the Fill**

209.   In the section addressing impacts in downstream waters, the Final Determination claims that the discharges will lead to changes in conductivity, selenium, and the likelihood of golden algae in downstream waters, which, in turn, will cause unacceptable adverse impacts on wildlife downstream of the discharges authorized by the 404 Permit.

210.  The Final Determination fails to establish that the section 404 discharges will cause changes in conductivity, selenium, and the likelihood of golden algae in downstream waters such that these changes will have unacceptable adverse effects on wildlife downstream of the discharges authorized by the 404 Permit.

211.  Impacts to water quality and wildlife downstream of the discharges authorized by the 404 Permit are regulated under sections 303, 402 and 401 of the CWA.

212.  The Final Determination does not allege that there has been any violation of applicable water quality standards, nor does the Final Determination predict that any such violation will occur.

213.  The Final Determination's claims regarding changes in conductivity, selenium, and the likelihood of golden algae either override determinations made pursuant to other provisions of the CWA, rely on legally inapplicable water quality limits, rely on impacts from activities not regulated by CWA section 404, overstate the expected changes in conductivity, selenium, and the likelihood of golden algae, misrepresent the scientific support for impacts related to the expected changes, or fail to consider important factors.

214.  The Final Determination's claims regarding impacts to wildlife downstream of the discharges authorized by the 404 Permit either refer to species that are not found downstream, overestimate the number of wildlife species found downstream, or overstate the expected impacts to wildlife downstream of the discharges authorized by the 404 Permit.

**The Final Determination Wrongly Claims That the Section 404 Permit Fails to Comply with the 404(b)(1) Guidelines**

215.  In the section addressing the 404(b)(1) Guidelines, the Final Determination asserts claims regarding alternatives, significant degradation, cumulative effects, secondary effects, and mitigation.

30

216. Compliance with the 404(b)(1) Guidelines is determined by the Corps, pursuant to section 404(b)(1).

217. The Final Determination's claims regarding alternatives, significant degradation, cumulative effects, secondary effects, and mitigation either override determinations made pursuant to other provisions of the CWA, rely on legally inapplicable water quality limits, rely on impacts from activities not regulated by CWA section 404, overstate the expected changes in conductivity, selenium, and the likelihood of golden algae, misrepresent the scientific support for impacts related to the expected changes, or fail to consider important factors.

218. The Final Determination does not establish how its claims regarding alternatives, significant degradation, cumulative effects, secondary effects, and mitigation, lead to the legal conclusion that the 404 discharges will cause an unacceptable adverse effect on wildlife.

219. The Final Determination gives no weight to the lawful and appropriate mitigation required by the 404 Permit.

## COUNT I: Administrative Procedure Act
### The Final Determination Exceeds EPA's Section 404(c) Authority by Claiming to Modify The Permit After It Was Issued by the Corps

220. Mingo Logan repeats and re-alleges paragraphs 1 through 219 of this Amended Complaint as if fully set forth in this Count I.

221. Section 404(c) of the CWA states:

(c) Denial or restriction of use of defined areas as disposal sites

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.   Before making such determination, the Administrator shall consult with the Secretary.   The

Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection."

33 U.S.C. § 1344(c).

222.  EPA's Final Determination purports to exercise authority under section 404(c) after the Corps has issued a permit and purports to modify Mingo Logan's section 404 Permit.

223.  Section 404(c) does not authorize EPA to act after the Corps has issued a section 404 permit, or to modify, revoke, or otherwise limit section 404 permits.

224.  EPA's Final Determination violates the APA because EPA's action is in excess of EPA's statutory authority and is otherwise not in accordance with law.

## COUNT II: Administrative Procedure Act
### The Final Determination Violates A Limitation in the Regulatory Preamble EPA Claims Authorizes It to Act After a Permit Has Been Issued

225.  Mingo Logan repeats and re-alleges paragraphs 1 through 224 of this Amended Complaint as if fully set forth in this Count II.

226.  In the Final Determination, EPA asserts that the preamble to the final section 404(c) implementing regulations provides EPA with the authority to exercise its section 404(c) authority after a permit has been issued.

227.  Section 404(c) grants EPA no authority to act pursuant to section 404(c) after the Corps has issued a permit, and EPA's regulatory preamble does not provide EPA with such authority.

228.  Alternatively, assuming arguendo that the preamble authorizes EPA to exercise its section 404(c) authority after the Corps issues a permit, the Final Determination fails to meet the requirement in the preamble that EPA must raise substantial new information.

229.  The preamble declares that "it would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit proceeding, or where the matters at issue were resolved to EPA's satisfaction during the permit

proceeding, unless substantial new information is first brought to the Agency's attention after issuance." 44 Fed. Reg., 58,075, 58,077 (Oct. 9, 1979).

230.  The substance of the grounds relied on in the Final Determination were reviewed by EPA during the 404 or 402 permit proceedings, during the adoption of the States' water quality standards, or were otherwise known to EPA prior to or during the 404 permit proceeding.

231.  As a result, the Final Determination is in excess of EPA's statutory authority, and is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

**COUNT III: Administrative Procedure Act**
**EPA Previously Reviewed and Approved the Effects That Form the Basis of the Final Determination**

232.  Mingo Logan repeats and re-alleges paragraphs 1 through 231 of this Amended Complaint as if fully set forth in this Count III.

233.  After participating in the 404 Permit proceeding, EPA elected not to pursue any of the statutory or regulatory options to challenge the EIS or to "elevate" or "veto" the Permit, and thereby consented to the issuance of the Permit.

234.  EPA reviewed and approved the State's water quality standards, which are the applicable standards for purposes of the CWA section 402 Permit and the section 401 certification.

235.  EPA consented to the issuance of the CWA section 402 Permit, authorizing discharges into downstream water from the mine site, in 1999, and consented to the first modification of the section 402 Permit in 2002.

236.  EPA also consented to a subsequent modification, and two renewals of the 402 Permit.

237.  The Final Determination relies on grounds that EPA reviewed during the 404 or 402 permit proceedings, during the adoption of the State's water quality standards, or were otherwise known to EPA during the 404 Permit proceeding.

238.  The Final Determination relies on impacts to which EPA had consented, in some cases numerous times, going back as far back as 1999.

239.  The Final Determination neither finds nor alleges any violation of the Permit.

240.  EPA's reliance on the impacts it had previously approved as a basis for the Final Determination is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## COUNT IV: Administrative Procedure Act
### EPA Has Denied Mingo Logan a Meaningful Hearing and Meaningful Opportunity to Comment

241.  Mingo Logan repeats and re-alleges paragraphs 1 through 240 of this Amended Complaint as if fully set forth in this Count IV.

242.  The CWA and APA require EPA to provide Mingo Logan with a meaningful opportunity to comment and afford Mingo Logan a meaningful hearing on the Proposed and Recommended Determinations.

243.  The Final Determination relies on legal and factual claims that were not presented in the Proposed or Recommended Determinations.

244.  The Final Determination relies on legal and factual claims that the Recommended Determination claimed were "not part of the basis for [EPA's] conclusion that the impacts would be likely to have an unacceptable adverse effect."

245.  As a result, Mingo Logan was deprived of a meaningful opportunity to comment on many of the critical findings and reasons underlying the Final Determination.

246.  EPA's failure to disclose many of its findings and reasons also deprived Mingo Logan of a meaningful hearing on the Proposed or Recommended Determinations.

247.  The Final Determination is therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

**COUNT V: Administrative Procedure Act**
**The Final Determination's Reliance on Impacts Regulated Under CWA Sections 303, 401**
**and 402 Exceeds the Scope of EPA's Authority Under Section 404(c)**

248. Mingo Logan repeats and re-alleges paragraphs 1 through 247 of this Amended Complaint as if fully set forth in this Count V.

249. The findings in Part V.D. of the Final Determination and portions of Part V.E. of the Final Determination state that the Spruce No. 1 Mine will have unacceptable adverse effects on water quality and wildlife downstream of the 404 discharges.

250. Water quality and wildlife downstream of the 404 discharges are regulated by CWA sections 303, 401, and 402.

251. CWA section 404(c) gives EPA no authority to regulate downstream effects permitted and approved by the State pursuant to CWA sections 303, 401, and 402.

252. When the State adopted numeric and narrative water quality standards pursuant to the State's authority under CWA section 303, the State determined that the numeric and narrative water quality standards would be sufficiently protective of fish and wildlife.

253. When the State issued the 402 Permit, the State evaluated the impacts of the mine on downstream water quality and wildlife, and included effluent limitations in the 402 Permit that were required by the CWA.

254. The State evaluated the impact of the permitted 404 discharges on water quality and other factors and approved them pursuant to a CWA section 401 certification, which affirmed that the 404 discharges will comply with the State's effluent limitations, water quality standards, and other appropriate State requirements.

255. EPA consented to all of these determinations, and has no authority under section 404(c) to overturn them now.

256.  For these reasons, Part V.D. of the Final Determination and the portions of Part V.E. of the Final Determination that rely on impacts regulated under CWA sections 303, 401 and 402, violate the APA because EPA's claims are in excess of EPA's statutory authority and are otherwise not in accordance with law.

## COUNT VI: Administrative Procedure Act
### The Final Determination's Reliance on the Conductivity Benchmark and Guidance Exceeds the Scope of EPA's Authority Under Section 404(c)

257.  Mingo Logan repeats and re-alleges paragraphs 1 through 256 of this Amended Complaint as if fully set forth in this Count VI.

258.  The Final Determination does not allege that the discharges authorized by the section 404 permit have or will cause a violation of West Virginia's water quality standards.

259.  Impacts from the authorized discharges that comply with the State's water quality standards cannot be considered an unacceptable adverse impact pursuant to section 404(c).

260.  The Final Determination contends that section 404(c) authorizes EPA to override and impose more stringent limits and criteria on water quality than imposed by the State's decisions under CWA sections 303, 401, and 402.

261.  In effect, EPA's Final Determination claims that section 404(c) authorizes EPA to create and enforce a parallel water quality scheme, and impose it on the State, the Corps, and section 404 permittees.

262.  The State of West Virginia has adopted a narrative water quality standard that considers conductivity.

263.  West Virginia has exclusive authority to enforce the State's narrative water quality standard.

264.  The State has explicitly rejected the use of conductivity as a stand-alone metric for interpreting its narrative water quality standard.

265. The State of West Virginia has not adopted a numeric water quality standard for conductivity.

266. EPA has approved West Virginia's existing water quality standards for conductivity, and has not proposed replacement standards under CWA section 303.

267. EPA has not promulgated a numeric conductivity criterion under CWA section 304.

268. The Final Determination claims that the authorized discharges will violate the conductivity Benchmark, which is an *ad hoc* conductivity limit of 500 µS/cm.

269. The Benchmark is essentially a rule, but was not adopted pursuant to the notice and comment requirements of the APA. *See* 5 U.S.C § 706; *See also Nat'l Mining Ass'n v. Jackson*, No. 1:10-cv-1220-RBW, 2011 WL 124194, at *2 (D.D.C. Jan. 14, 2011). Accordingly, the Benchmark was adopted in violation of the APA.

270. Through the Final Determination, EPA is seeking to apply the conductivity Benchmark to a Permit that was issued four years prior to its publication. Therefore, even if the conductivity Benchmark was adopted lawfully, which Mingo Logan denies, EPA is attempting to apply this regulation retroactively to Mingo Logan's 404 Permit and 402 Permit.

271. EPA has not followed any of the statutory procedures to lawfully adopt a water quality standard for conductivity, and EPA's enforcement of the *ad hoc* conductivity limit seeks to override West Virginia's statutorily prescribed water quality determinations.

272. Section 404(c) confers no authority on EPA to circumvent or override the statutory procedures to lawfully adopt a water quality standard for conductivity.

273. The sections of the Final Determination that rely on findings regarding conductivity are therefore in excess of EPA's statutory authority and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## COUNT VII: Administrative Procedure Act
### The Final Determination's Reliance on an *Ad Hoc* Selenium Limit Exceeds the Scope of EPA's Authority Under Section 404(c)

274. Mingo Logan repeats and re-alleges paragraphs 1 through 273 of this Amended Complaint as if fully set forth in this Count VII.

275. West Virginia has a numeric water quality standard for selenium.

276. West Virginia has exclusive authority to enforce the State's numeric water quality standard for selenium.

277. EPA does not allege that the 404 discharges will violate the State's numeric water quality standard for selenium.

278. The Final Determination claims to rely on impacts from selenium even though EPA does not allege that downstream levels of selenium will exceed West Virginia's numeric water quality standard.

279. In effect, the Final Determination claims the authority to impose an *ad hoc* numeric water quality standard for selenium through the 404(c) process, which is more stringent than applicable effluent limitations and water quality standards.

280. EPA has not disapproved of West Virginia's existing water quality standards for selenium or proposed replacement standards under CWA section 303.

281. EPA has not promulgated a new numeric selenium criterion under CWA section 304.

282. EPA has therefore not followed any of the statutory procedures to lawfully adopt a new water quality standard for selenium, and EPA's enforcement of the more stringent *ad hoc* selenium limit seeks to override West Virginia's statutorily prescribed water quality standards and determinations.

283. Section 404(c) confers no authority on EPA to circumvent or override the statutory procedures to lawfully adopt a new water quality standard for selenium.

284. The sections of the Final Determination that rely on findings regarding selenium are therefore in excess of EPA's statutory authority and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## COUNT VIII: Administrative Procedure Act
### The Final Determination's Reliance on *Ad Hoc* Limits for the Metrics Associated with Golden Algae Exceeds the Scope of EPA's Authority Under Section 404(c)

285. Mingo Logan repeats and re-alleges paragraphs 1 through 284 of this Amended Complaint as if fully set forth in this Count VIII.

286. Golden algae is associated with water quality metrics including salinity, conductivity, nutrient levels, temperature, pH, among many other factors.

287. These water quality metrics are subject to the State's water quality standards.

288. EPA has no authority under section 404(c) to enforce the State's water quality standards for these water quality metrics.

289. EPA does not allege that the 404 discharges will violate the State's water quality standards for these water quality metrics.

290. The Final Determination claims to rely on impacts from these water quality metrics even though EPA does not allege that downstream levels of these water quality metrics will violate West Virginia's water quality standards.

291. In effect, the Final Determination claims the authority to impose *ad hoc* water quality standards for these water quality metrics through the 404(c) process, which are more stringent than applicable effluent limitations and water quality standards.

292. EPA has not disapproved of West Virginia's existing water quality standards for these water quality metrics, or proposed replacement standards under CWA section 303.

293. EPA has not promulgated a new numeric criterion for these water quality metrics under CWA section 304.

294. EPA has therefore not followed any of the statutory procedures to lawfully adopt a new water quality standard for these metrics, and EPA's enforcement of the *ad hoc* limit seeks to override West Virginia's statutorily prescribed water quality standards and determinations.

295. Section 404(c) confers no authority on EPA to circumvent or override the statutory procedures to lawfully adopt a water quality standard for these metrics.

296. The sections of the Final Determination that rely on findings regarding the water quality metrics associated with golden algae are therefore in excess of EPA's statutory authority and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

### COUNT IX: Administrative Procedure Act
**The Final Determination's Attempt to Enforce Compliance With the 404(b)(1) Guidelines Exceeds the Scope of EPA's Authority Under Section 404(c)**

297. Mingo Logan repeats and re-alleges paragraphs 1 through 296 of this Amended Complaint as if fully set forth in this Count IX.

298. Part V.E. of the Final Determination is based on EPA's claim that the Spruce No. 1 Mine will violate the CWA section 404(b)(1) Guidelines ("the Guidelines") with respect to (a) alternatives; (b) significant degradation; (c) cumulative effects; (d) secondary effects; and (e) mitigation.

299. The Corps has exclusive authority to apply the Guidelines, pursuant to section 404(b).

300. The Corps considered and applied the Guidelines when it issued the 404 Permit and expressly determined that the Permit would comply with the Guidelines.

301. EPA consented to the Corps's determinations that Mingo Logan's Permit would comply with the Guidelines when it consented to the issuance of the Permit.

302. Under these circumstances, section 404(c) grants EPA no authority to apply or enforce the Guidelines, or override the Corps's final determination that the Permit would comply with the Guidelines.

303.  Part V.E. of the Final Determination therefore violates the APA because EPA's claims are in excess of EPA's statutory authority and are otherwise not in accordance with law.

**COUNT X: Administrative Procedure Act**
**The Final Determination Relies on Impacts That Will Result From Activities Other Than the Discharges Authorized Under Section 404**

304.  Mingo Logan repeats and re-alleges paragraphs 1 through 303 of this Amended Complaint as if fully set forth in this Count X.

305.  CWA section 404(c) only authorizes EPA to act if it determines that the discharge of dredged or fill material authorized by the 404 Permit will have an unacceptable adverse effect on one of the resources enumerated in section 404(c).

306.  EPA must base its determination on those section 404 discharges, and has no authority under section 404(c) to regulate effects from other mining impacts.

307.  Parts V.D. and V.E. of the Final Determination rely on other mining impacts to reach the conclusions stated therein.

308.  Even if EPA were able to base its section 404(c) action on downstream discharges or *ad hoc* water quality limits, as claimed in Parts V.D. and V.E. of the Final Determination, which Mingo Logan denies, the impacts claimed in those sections rely on effects from other mining impacts.

309.  Parts V.D. and V.E. of the Final Determination therefore rely on factors that Congress did not intend EPA to consider pursuant to section 404(c).

310.  Parts V.D. and V.E. of the Final Determination violate the APA because EPA's claims are in excess of EPA's statutory authority and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

**COUNT XI: Administrative Procedure Act**
**The Final Determination Fails to Establish Unacceptable Adverse Effects to Wildlife From the 404 Discharges at the Site of the Fill**

311.  Mingo Logan repeats and re-alleges paragraphs 1 through 310 of this Amended Complaint as if fully set forth in this Count XI.

312.  Part V.C. of the Final Determination is based on EPA's claim that the discharges authorized by the 404 Permit will have unacceptable adverse effects at the site of the fill on (a) macroinvertebrates, (b) salamanders, (c) fish, and (d) the Louisiana Waterthrush.

313.  In order to exercise its section 404(c) authority, EPA must demonstrate an unacceptable adverse impact to municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.  Section 404(c) is expressly limited to these resources.

314.  The Final Determination makes no finding that the discharges authorized by the 404 Permit will have any effect on a municipal water supply, a recreational area, a shellfish bed or a fishery area.

315.  EPA also failed to engage in reasoned decision-making because the Final Determination fails to explain how its findings regarding macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush support the conclusion of law that the 404 discharges will cause a significant loss to one of those species within the overall aquatic ecosystem, the watershed, or the region.

316.  The Final Determination's claims regarding macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush, fail to demonstrate unacceptable adverse effects to wildlife and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

317.  Part V.C. of the Final Determination is based on impacts that Congress did not intend EPA to consider; impacts that EPA has repeatedly approved; impacts to common species that

have been approved by EPA for decades; impacts that are necessary to the 404 permitting program; and impacts that run counter to the evidence before EPA. As a result, Part V.C.'s conclusion that the 404 discharges will cause unacceptable adverse effects to wildlife is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## COUNT XII: Administrative Procedure Act
### EPA Has Failed to Demonstrate that the Authorized Discharges Will Have an Unacceptable Adverse Impact on Any 404(c) Resources Downstream

318. Mingo Logan repeats and re-alleges paragraphs 1 through 317 of this Amended Complaint as if fully set forth in this Count XII.

319. Even if EPA were able to lawfully base its section 404(c) action on downstream discharges, *ad hoc* water quality limits, or impacts from other mining activity, as asserted in Parts V.D. and V.E. of the Final Determination, all of which Mingo Logan denies, the impacts claimed in those sections fail to meet EPA's burden under section 404(c).

320. The Final Determination's claims regarding selenium, conductivity, and the metrics associated with golden algae fail to demonstrate unacceptable adverse effects to wildlife, and are therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

321. The Final Determination's claim that the Dal-Tex complex is useful for predicting selenium, conductivity, and macroinvertebrate levels at the Spruce No. 1 Mine is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

322. EPA has failed to explain in the Final Determination how the loss of the macroinvertebrates attributable to the authorized discharges will result in a significant loss of or unacceptable adverse effect on macroinvertebrates in Spruce Fork or other downstream waters.

323. EPA also failed to engage in reasoned decision-making because the Final Determination fails to explain how the facts found about macroinvertebrates, fish, and other wildlife downstream support the conclusion of law that the 404 discharges will cause a

significant loss to one of those species within the overall aquatic ecosystem, the watershed, or the region.

324.  Parts V.D. and V.E. of the Final Determination are therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

## COUNT XIII: Administrative Procedure Act
### EPA Has Failed to Demonstrate that the Authorized Discharges Will Have an Unacceptable Adverse Impact According to the 404(b)(1) Guidelines

325.  Mingo Logan repeats and re-alleges paragraphs 1 through 324 of this Amended Complaint as if fully set forth in this Count XIII.

326.  Even if EPA can consider alternatives pursuant to its section 404(c) authority, which Mingo Logan denies, EPA bears the burden of demonstrating that a practicable alternative exists.

327.  The Final Determination does not identify any practicable alternative that would not have unacceptable adverse effects on wildlife or that would comply with the 404(b)(1) Guidelines.

328.  The Final Determination does not explain how the existence of a practicable alternative, which Mingo Logan denies and EPA fails to identify, would cause the authorized discharges to result in a significant loss of or an unacceptable adverse effect on wildlife.

329.  Even if EPA could enforce the 404(b)(1) Guidelines, which Mingo Logan denies, the Final Determination's conclusion that the 404 discharges will result in "significant degradation" simply repeats the findings made in Parts V.C. and V.D. of the Final Determination, and is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

330.  Even if EPA could enforce the 404(b)(1) Guidelines, which Mingo Logan denies, EPA has failed to demonstrate that cumulative impacts from the discharges authorized under the 404 Permit and from other proposed or issued permits for other applicants will cause unacceptable adverse impacts to 404(c) resources.

331.  Even if EPA could enforce the 404(b)(1) Guidelines, which Mingo Logan denies, EPA has failed to explain how significant degradation, cumulative impacts, and secondary impacts demonstrate unacceptable adverse effects to wildlife.

332.  Part V.E. of the Final Determination is therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

**COUNT XIV: Administrative Procedure Act**
**EPA Has Failed to Demonstrate That Any Unacceptable Adverse Effect on 404(c)**
**Resources Will Not Be Mitigated**

333.  Mingo Logan repeats and re-alleges paragraphs 1 through 332 of this Amended Complaint as if fully set forth in this Count XIV.

334.  In determining whether the 404 discharges will have unacceptable adverse impacts on wildlife, EPA must consider not only the impacts of the 404 discharges, but also the mitigation measures, monitoring, remedial action, and adaptive management (together referred to as "mitigation") imposed by the Permit.

335.  EPA has failed to demonstrate that the mitigation imposed by the Permit is unacceptable, or that it will not prevent the discharges authorized under the 404 Permit from causing unacceptable adverse effects to the resources enumerated in section 404(c).

336.  EPA has failed to take account of the Corps's permitting action, including the numerous Permit conditions, which assure full compensatory mitigation.

337.  The required mitigation is entirely consistent with applicable regulatory requirements.

338.  The Corps performed "practicable" functional assessments consistent with applicable law and its decision not to perform a hypothetical and unexplained functional assessment does not render the authorized impacts to be adverse or unacceptable.

339.  EPA's finding that stream creation has not been demonstrated to be successful ignored the applicable law and the entirety of the Permit.

340.  The classification of the streams at issue has been known to EPA for years before the Permit was issued, and EPA never objected to the classification during the permitting process.

341.  The standard for stream classification advanced in the Final Determination is not adequately explained, has not been adopted in accordance with applicable procedures, and is impermissibly retroactive.

342.  The Final Determination fails to explain why the mitigation imposed by the Permit does not satisfy the new standard for stream classification advanced in the Final Determination.

343.  EPA's findings regarding mitigation are therefore arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

**RELIEF REQUESTED**

Based on the averments above, Mingo Logan requests that the Court:

(1) Declare that EPA lacks authority under section 404(c) to modify or revoke Mingo Logan's section 404 Permit for Spruce No. 1 Mine;

(2) Declare that EPA's attempt to modify Mingo Logan's Permit is unlawful;

(3) Declare that the Final Determination does not satisfy EPA's burden under section 404(c) and therefore set aside and vacate the Final Determination;

(4) Declare that Mingo Logan's 404 Permit is operative;

(5) Order EPA to rescind the Final Determination;

(6) Enjoin EPA from taking further action under 404(c) with respect to the Permit;

(7) Award Mingo Logan's attorney's fees and other costs; and

(8) Grant such further relief the Court deems appropriate.

February 28, 2011

**MINGO LOGAN COAL COMPANY, INC.**

/s/ Robert M. Rolfe

Robert M. Rolfe (D.D.C. No. MI0046; Va. Bar No. 15779)
Michael R. Shebelskie (Va. Bar No. 27459)
George P. Sibley, III (Va. Bar No. 48773)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
(804) 788-8218 (facsimile)

Virginia S. Albrecht (D.C. Bar No. 357940)
Deidre G. Duncan (D.C. Bar No. 461548)
Matthew D. Melewski (D.C. Bar No. 994459)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

Robert G. McLusky
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000
(304) 340-1130 (facsimile)

*Counsel for Plaintiff*