**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                        )
MINGO LOGAN COAL COMPANY, INC.          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Case No. 1:10-cv-00541-ABJ
                                        )
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY                       )
                                        )
        Defendant.                      )
_____ )

## <u>MINGO LOGAN'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56 and LCvR 7(h), Plaintiff Mingo Logan Coal Company,

Inc., (Mingo Logan) by counsel, respectfully moves for summary judgment.  For the reasons set

forth in the accompanying Statement of Points and Authorities and based on the undisputed facts

set forth in the Statement of Material Facts as to Which There Is No Genuine Issue, the Court

should grant Mingo Logan's motion and enter judgment (1) vacating the "Final Determination of

the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act

Concerning the Spruce No. 1 Mine, Logan County, West Virginia," dated January 13, 2011

(Final Determination); (2) declaring that Mingo Logan's permit issued by the U.S. Army Corps

of Engineers pursuant to § 404 of the Clean Water Act, DA Permit No. 199800436-3 (Mingo

Logan's § 404 Permit) remains valid and in full force; and (3) enjoining the United States

Environmental Protection Agency from taking any further action under § 404(c) with respect to

Mingo Logan's § 404 Permit.

Mingo Logan attaches a Proposed Order.

May 27, 2011                               **MINGO LOGAN COAL CO., INC.**


                              _____/s/ Robert M. Rolfe_____

                              Robert M. Rolfe (D.D.C. Bar No. MI0046)
                              Michael R. Shebelskie (Va. Bar No. 27459)
                              George P. Sibley, III (Va. Bar No. 48773)
                              HUNTON & WILLIAMS LLP
                              Riverfront Plaza, East Tower
                              951 East Byrd Street
                              Richmond, VA 23219
                              (804) 788-8200
                              (804) 788-8218 (facsimile)

                              Virginia S. Albrecht (D.C. Bar No. 357940)
                              Deidre G. Duncan (D.C. Bar No. 461548)
                              Matthew D. Melewski (D.C. Bar No. 994459)
                              HUNTON & WILLIAMS LLP
                              1900 K Street, N.W.
                              Washington, D.C. 20006
                              (202) 955-1500
                              (202) 778-2201 (facsimile)

                              Robert G. McLusky
                              JACKSON KELLY PLLC
                              500 Lee Street East, Suite 1600
                              P.O. Box 553
                              Charleston, WV 25322
                              (304) 340-1000
                              (304) 340-1130 (facsimile)

                              _Counsel for Plaintiff_

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| MINGO LOGAN COAL COMPANY, INC.      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | Case No. 1:10-cv-00541-ABJ |
| ) | |
| UNITED STATES ENVIRONMENTAL      ) | |
| PROTECTION AGENCY      ) | |
| ) | |
| Defendant.      ) | |
| _____ ) | |

**STATEMENT OF FACTS MATERIAL TO MINGO**
**LOGAN'S MOTION FOR SUMMARY JUDGMENT**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h)(1), the Court's February 23, 2011, Scheduling and

Procedures Order, and the Court's directives made on the record at the February 23, 2011,[1]

Status Conference, Plaintiff, Mingo Loan Coal Company, Inc. (Mingo Logan), by counsel, states

that the following are the facts material to its motion for summary judgment as to which there is

no genuine issue:

1.      Mingo Logan owns and operates the Spruce No. 1 coal mine (Spruce) in West

Virginia.  To access the coal, Mingo Logan will remove surface rock and soil, and then return the

majority of this surface material to the mined areas and reconstruct the area to its approximate

contour before it was mined.  Some of this "overburden," however, will need to be placed in

hollows or valleys adjacent to the mined areas.  AR010118-19.  These areas are referred to as

"valley fills."  AR008061.

_____

[1] Relevant portions of the transcript of the February 23, 2011, Status Conference are
attached as Exhibit 3.

**The SMCRA Permit**

2.     The construction, operation and reclamation of the mine required a Surface Mining Control and Reclamation Act (SMCRA) permit from the State of West Virginia. *See* 30 U.S.C. §§ 1201, *et seq.*; 30 C.F.R § 948.10; W. Va. Code R 22-3-1 to-32a.

3.     Mingo Logan applied with the West Virginia Department of the Environment (WVDEP) for a SMCRA permit in late 1997. *See* AR008062-63; Spruce No. 1 Mine SMCRA Permit S-5013-97.[2]

4.     The original design for Spruce called for the placement of excess overburden in portions of Pigeonroost Branch, Oldhouse Branch, Right Fork of Seng Camp, and White Oak Branch. EPA Ans. ¶ 97. WVDEP concluded that the design for Spruce complied with SMCRA and thus issued a SMCRA permit on November 4, 1998. *See* Spruce No. 1 Mine SMCRA Permit S-5013-97.

5.     The SMCRA permit imposes a series of terms and conditions, including a materials handling plan that required Mingo Logan to test soil and rock within the project area to prevent the placement of acid and selenium producing materials in the fills or other areas likely to be inundated. *Id.*; AR008063-67.

**The Permitting Process Under CWA § 402**

6.     The design of the mine controls water flow through a series of channels, which direct water downstream through outfalls that encircle the mine. Water that flows through the valley fills is directed into sediment ponds, where it is treated before being discharged through an outfall. *See* AR008078-79.

---

[2] Mingo Logan's SMCRA Permit was not included in the administrative record that EPA has submitted, but EPA agrees that it should have been included. Mingo Logan submitted the

7.     Water discharged from the mine into downstream waters required a permit under section 402 of the Clean Water Act (CWA), called a National Pollutant Discharge Elimination System (NPDES) permit (the 402 Permit).  AR008078-79.

8.     In late 1997, Mingo Logan applied with WVDEP for a NPDES permit under section 402 of the CWA to authorize discharges from these outfalls.  *See* AR008062; AR043101-269; NPDES Permit No. WV1017021.[3]

9.     WVDEP reviewed Mingo Logan's section 402 permit application, prepared a draft permit, and forwarded the proposed permit to EPA as required by section 402(d)(1) on May 1, 1998.  AR008397.

10.     When it was presented with a proposed section 402 permit in 1998, EPA began studying the streams and wildlife at issue, including macroinvertebrate surveys and studies supplied by WVDEP and Mingo Logan.  *See, e.g.*, AR008397; AR008399; AR008402-04.

11.     On June 5, 1998, EPA objected to the proposed permit and filed specific objections on August 4, 1998.  AR008399; AR008402.  Among the reasons for EPA's objections were EPA's concerns relating to the placement of fill into valleys, including Pigeonroost Branch and Oldhouse Branch.  AR008402-04.

12.     EPA ultimately withdrew its objections to the section 402 permit when WVDEP agreed to certain "conditions for withdrawal of the specific objection" imposed by EPA. AR008413-15; AR008427.

---

SMCRA Permit to EPA as Exhibit 2 to its Comments on the Proposed Determination. AR008277.

[3] The entire NPDES Permit and permitting history were not included in the administrative record that EPA has submitted, but EPA agrees that it should have been included. Mingo Logan submitted the entire NPDES Permit to EPA as Exhibit 12 to its Comments on the Proposed Determination.  AR008388.

13.     The first condition was that the discharge of fill material into valleys, including

Pigeonroost Branch and Oldhouse Branch, "must be authorized by a Clean Water Act Section

404 permit."  AR008414.

14.     The second condition was that "[a]ny discharges which would result from any

proposed downstream extensions of valley fills or associated sedimentation ponds must be

applied for, and receive, authorization under Clean Water Act Section 402."  AR008415.

15.     WVDEP issued Mingo Logan a revised permit under section 402 for the outfalls

at Spruce on January 11, 1999.  AR043101-269.

16.     In early 2002, WVDEP sought to modify the section 402 permit to account for a

reconfiguration in the mine plan.  WVDEP sent EPA a draft modified section 402 permit on

April 26, 2002.  AR008434.

17.     EPA objected to WVDEP's proposed modification of the section 402 permit in

early 2002, stating that its own studies of the Spruce Fork watershed, specifically including

Pigeonroost Branch and Oldhouse Branch, suggested that the 402 discharges might have "higher

levels of selenium, sulfates, and conductivity" and the potential to exceed "water quality

standards."  AR008430-35; AR42908-10; AR008086-87.

18.     EPA's studies of the Spruce Fork watershed, specifically including Pigeonroost

Branch and Oldhouse Branch, were prepared for and ultimately included in the Programmatic

Environmental Impact Statement (PEIS) on Mountaintop Mining discussed in Paragraphs 21-24

below.  *See* Draft PEIS, Apps. D and E, *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm; AR008431.

19.     In response to EPA's objection, WVDEP and Mingo Logan agreed to additional

macroinvertebrate sampling, water monitoring, and materials handling practices.  AR008437-38.

4

EPA then withdrew its objection on December 3, 2002, noting that it was "satisfied that steps will be taken to address the issues raised in the objection." AR008440. At this time, the mine configuration contemplated more extensive section 404 discharges than would be approved by the section 404 permit the Corps issued in January 2007 — larger valley fills in Pigeonroost Branch and Oldhouse Branch, as well as 404 discharges into White Oak Branch. AR008431.

20.     WVDEP modified the section 402 permit for Spruce on April 29, 2005, to accommodate the current mine configuration, which reduced the overall size of the mine and avoided impacts to White Oak Branch. AR008081. EPA did not object to the modification. AR008082-03. WVDEP renewed and modified the permit thereafter, again without objection from EPA. AR008087-88.

**EPA's Programmatic Environmental Impact Statement on Mountaintop Mining**

21.     On February 5, 1999, the Corps, EPA, the Office of Surface Mining (OSM), Fish and Wildlife Service (FWS), and WVDEP announced their intent to develop a Programmatic Environmental Impact Statemant (PEIS) in accordance with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA) with the following stated purpose:

> to consider developing agency policies, guidance, and coordinated agency decision-making processes to minimize, to the maximum extent practicable, the adverse environmental effects to waters of the United States and to fish and wildlife resources affected by mountaintop mining operations, and to environmental resources that could be affected by the size and location of excess spoil disposal sites in valley fills.

AR037309.

22.     As part of the development of the PEIS:[4]

---

[4] The entire PEIS was not included in the administrative record that EPA has submitted, but EPA agrees that it should have been included. The Draft and Final PEIS are available at http://www.epa.gov/region3/mtntop/eis2003.htm and http://www.epa.gov/region3/mtntop/eis2005.htm.

a.      EPA specifically studied the habitat in Pigeonroost Branch and Oldhouse Branch, catalogued all mining in the watershed, sampled macroinvertebrates in Pigeonroost Branch and Oldhouse Branch as a means of assessing stream quality, and measured conductivity, pH, temperature, and dissolved oxygen.  Draft PEIS, App. D, USEPA Region III, "A Survey of the Condition of Streams in the Primary Region of Mountaintop Mining/Valley Fill Coal Mining," (Nov. 2000) at 76-94, *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.  In that study, EPA classified Pigeonroost Branch as a "mined" stream.  *Id.* at 65.

b.      EPA separately studied water quality.  Draft PEIS, App. D, USEPA Region III, "A Survey of the Water Quality of Streams in the Primary Region of Mountaintop/Valley Fill Coal Mining October 1999 to January 2001" (Apr. 8, 2002), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.;

c.      EPA performed several studies of macroinvertebrates in Pigeonroost Branch and Oldhouse Branch over the course of several years.  Draft PEIS, App. D, USEPA, Region III, "A Survey of Eight Major Aquatic Insect Orders Associated with Small Headwater Streams Subject to Valley Fills from Mountaintop Mining," *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm; USEPA, Region III, "A Survey of the Condition of Streams in the Primary Region of Mountaintop Mining/Valley Fill Coal Mining" (Nov. 2000), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm;

d.      EPA sampled fish in Pigeonroost Branch and Oldhouse Branch. AR034527;

e.      Habitat in the region was examined.  *See, e.g.*, Draft PEIS, App. D, USEPA Region III, "A Review of Wetland Resources in the Steep Slope Terrain of West

Virginia" (Nov. 8, 2000), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       f.      The abundance of vertebrate species was quantified.  Draft PEIS, App. E,

"Mountaintop Removal Mining/Valley Fill Environmental Impact Statement Technical Study:

Project Report for Terrestrial Studies" (Sept. 2001), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       g.      Bird populations in the Spruce Fork Watershed were surveyed.  Draft

PEIS, App. E, "Mountaintop Removal and Valley-Fill Mining Environmental Impact Study:

Bird Populations Along Edges Report for Terrestrial Studies" (May 10, 2002) at 21, 72,

*available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.; Draft PEIS, App. E,

"Mountaintop Removal Mining/Valley Fill Environmental Impact Statement Technical Study:

Project Report for Terrestrial Studies" (Sep. 2001), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       h.      Soil was analyzed. Draft PEIS, App. E, "Soil Health of Mountaintop

Removal Mines in Southern West Virginia" (Jan. 24, 2001), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       i.      EPA conducted studies of various stream characteristics.  *See, e.g.*, Draft

PEIS, App. D, "Reconnaissance of Stream Geomorphology, Low Streamflow, and Stream

Temperature in the Mountaintop Coal-Mining Region, Southern West Virginia, 1999-2000"

(2001), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       j.      EPA convened a workshop on the value of headwater streams.  Draft

PEIS, App. D, "The Value of Headwater Streams: Results of a Workshop, State College**,**

Pennsylvania, April 13, 1999" (Apr. 2000), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

23.     The Draft PEIS, published in 2003:

a.     Studied salamanders in the region, describing the types and abundance of salamanders species present, noting food web patterns, identifying habitat preferences, and explaining taxonomic patterns before and after mining.  *See, e.g.*, Draft PEIS, § III at A-6, C-9, C-10, C-21-22, D-4, F-9, F-13; § IV at B-3, D-4, *available at* http://www.epa.gov/region3/mtntop/eis2003.htm.

b.     Included as an appendix a 157-page study of terrestrial species, which surveyed the Spruce Fork watershed.  Draft PEIS, App. E, "Mountaintop Removal Mining/Valley Fill Environmental Impact Statement Technical Study:  Project Report for Terrestrial Studies" (Sep. 2001), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.  This study updated twice with additional data that was not previously included.  Draft PEIS, App. E, "Update to the Wood et al. 2001 Terrestrial Studies Report" (Jan. 2002), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.; "Update to the Wood et al. 2001 Terrestrial Studies Report" (Feb. 18, 2002), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.  EPA also reanalyzed the study in a separate document, which specifically evaluated habitat and the Louisiana Waterthrush.  Draft PEIS, App. E, "Appendix A-1:  Changes to the Wood and Edwards 2001 MTMVF Terrestrial Report" (Jan. 2002) *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

c.     Included a comprehensive analysis of fish assemblages in Pigeonroost Branch, Oldhouse Branch, and Spruce Fork.  Draft PEIS, § III.D-15-17, *available at*: http://www.epa.gov/region3/mtntop/eis2003.htm; Draft PEIS, App. D, *available at*

8

http://www.epa.gov/region3/mtntop/eis2003appendices,htm; *see* CH2M Hill, Technical

Evaluation Document: Spruce No Mine, West Virginia (June 2010) § 3.4.[5]

       d.      Included two studies of bird populations in southern West Virginia,

including the Spruce Fork Watershed.  Draft PEIS, App. E, "Mountaintop Removal and Valley-

Fill Environmental Impact Study:  Bird Populations Along Edges Report for Terrestrial Studies"

(May 10, 2002), *available at* http://www.epa.gov/region3/mtntop/eis2003appendices.htm; Draft

PEIS, App. E, "Mountaintop Removal Mining and Valley Fill Environmental Impact Statement

Technical Study:  Project Report for Terrestrial Studies" (Sep. 2001), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

       e.      Studied headwater streams generally, including several statistical analyses

of the impacts of valley fills and mountaintop mining.  The section on "affected environmental

and consequences" is 318 pages long and includes over 40 pages of text on the value of

headwater streams and the impacts to such streams from mountaintop mining.  *See* Draft PEIS, §

III.C-D, *available at* http://www.epa.gov/region3/mtntop/eis2003.htm; Draft PEIS, App. D,

"Ecological Assessment of Streams in the Coal Mining Region of West Virginia Using Data

Collected by the U.S. EPA and Environmental Consulting Firms" (Feb. 2003), *available at*:

http://www.epa.gov/region3/mtntop/eis2003appendices.htm.

     24.      The Final Programmatic EIS, published in October 2005:

       a.      Included almost 400 pages of studies completed after the draft version,

including new and updated studies on headwater streams, macroinvertebrates, salamanders, fish

and birds.  AR037305, *et seq.*; AR037522, *et seq.*; AR037697, *et seq.*  Several of these studies

---

[5] This document was not included in the administrative record that EPA has submitted, but EPA agrees that it should have been included.  Mingo Logan submitted it to EPA as an Appendix to its Comments on the Proposed Determination.  AR008237; AR008793.

evaluated Pigeonroost Branch and Oldhouse Branch specifically.  *See, e.g.*, AR037499;

AR037544-46; AR037751.

        b.      Included over 60 pages of responses by EPA to comments on wildlife,

water resources, habitat, alternatives, cumulative impacts, and mitigation.  AR037321-85.

**The Permitting Process Under CWA Section 404**

      25.     Because those hollows may contain areas regulated under the CWA, Spruce

required a CWA section 404 Permit from the Corps for the "discharge of dredged or fill material

into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).

      26.     Mingo Logan originally applied for its CWA section 404 authorization in 1998

under Nationwide Permit 21.  *See* AR002634-666.

      27.     In January 1999, the Corps concluded that Spruce met the requirements for

Nationwide Permit 21.  AR002747, *et seq.*

      28.     In a letter dated January 21, 1999, EPA concluded: "In consideration of

information in the record for this project, including site-specific data collected by EPA, we

accept that the potential individual and cumulative adverse environmental impacts to waters of

the United States associated with this proposal have been minimized to the extent possible while

maintaining a viable project. . . . We concur that this proposal is consistent with Section 404(e)

of the Clean Water Act and with Nationwide Permit 21."  AR002870-71.

      29.     Before the Corps could issue its final approval under NWP 21, however, a federal

court preliminarily enjoined the approval because of programmatic challenges to Nationwide

Permit 21.  EPA Ans. ¶ 102; *Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999).  The

preliminary injunction did not address the Corps's and EPA's determination that discharges

would have only minimal adverse effects.  *Id.*

30.     On June 18, 1999, Mingo Logan applied to the Corps for an individual permit under section 404(a).  EPA Ans. ¶ 104.  Mingo Logan supplied more hydrologic and macroinvertebrate reports and analysis along with its application for an individual 404 permit. AR003053-54.  The application proposed a mine configuration that would impact 57,755 linear feet of waters of the United States and 2,914 acres of land.  AR003053-54.

31.     As part of its review of Mingo Logan's section 404(a) application, the Corps published notice on February 4, 2000, that it intended to prepare a full EIS for the Spruce project in accordance with NEPA.  AR009064-76; AR009469; EPA Ans ¶ 107.

32.     On March 29, 2005, Mingo Logan submitted a  revised application to the Corps for a permit under section 404(a).  AR020693.  The revised application proposed a mine configuration that reduced permanent impacts to waters of the United States by 17,701 linear feet, deletes all permanent impacts to perennial streams, limited temporary impacts to perennial streams to 825 linear feet, deleted proposed impacts to White Oak Branch, and reduced surface disturbances by 636 acres.  AR020696; AR008087-88; AR020881-83.

33.     As required by CWA section 401, WVDEP scrutinized Mingo Logan's section 404 application to ascertain whether the discharges authorized by the section 404 permit would contribute to a violation of State water quality standards or violate the States anti-degradation regulations.  WVDEP issued a section 401 water quality certification for the Spruce section 404 permit on December 19, 2005.  EPA Ans. ¶ 116.  WVDEP determined that the Spruce No. 1 project would not contribute to a violation of State water quality standards or violate the State's anti-degradation regulations.  AR020924-28.

34.     EPA did not seek review of WVDEP's section 401 certification.  EPA Ans. ¶ 118.

35.     The Corps issued a Draft EIS for the Spruce project on March 31, 2006.  *See* EPA

Ans ¶ 107.  The Draft EIS included:

a.      A 256-page discussion on the "Affected Environment and Environmental Consequences" of Spruce, including analyses of macroinvertebrates, fish, birds, and other wildlife.  AR013124-3380.  Among other things, chapter 3 studied Water Resources, Soils, Vegetations, and Fish and Wildlife Resources.

b.      An evaluation of the impact of filling portions of Pigeonroost Branch and Oldhouse Branch and consideration of studies on the importance and role of headwater streams in the watershed.  AR013209-220; AR045005.

c.      Appendices containing evaluations of macroinvertebrates, surface water runoff, and energy flow, among other things.  AR045373-5661.

d.      An analysis of impacts to macroinvertebrates, including an evaluation of the results of over 100 macroinvertebrate samples collected within and adjacent to the project area over the previous 14 years.  AR013179-3288.  The DEIS concluded that "[d]ue to the lack of water on a consistent basis, existing aquatic communities are mainly limited to benthic macroinvertebrates and attached algae (periphyton) that can persist in intermittent and perennial streams."  AR013288.

e.      A discussion of the results of 15 separate studies of macroinvertebrates from 1990 through 2000, over the course of 84 pages.  AR045005, *et seq.*

f.      An analysis of salamanders likely to occur in the filled areas of Pigeonroost Branch and Oldhouse Branch that concluded that no impacts to rare species were likely to occur.  AR013282-84 ("[s]pecial consideration has been given to salamanders potentially inhabiting the area"); AR034975-76.

g.      A discussion of fish samples at the mine that did not locate any fish in

12

Pigeonroost Branch or Oldhouse Branch, either at the site of or downstream from the 404 discharges.  AR013282.

> h.      An analysis of potential impacts from the mine on neotropical migrant birds and an evaluation of the habitat needs for interior forest birds, such as the Louisiana Waterthrush.  *See* AR013270-87; AR045034; AR045084; AR045094-95.

36.      EPA commented on the proposed Draft EIS on August 12, 2002.  AR042912-16; AR045054-74.

37.      EPA commented on the Draft EIS on June 16, 2006.  AR042912-16; AR045054-74.

38.      EPA commented on the proposed Final EIS in late 2006.  EPA Ans. ¶ 124; AR024619-20; AR023084-3109.[6]

39.      Mingo Logan submitted additional information and analysis, including a revised mitigation plan, after EPA comments on the Draft EIS and the proposed Final EIS.  AR022947-52; AR022962-78; AR022982-3021; AR023370-74; AR023437-3617; AR024427-4511.

40.      The Corps issued the Final EIS on September 22, 2006.  EPA Ans. ¶ 122.  The Final EIS included:

> a.      A discussion regarding EPA's comments on impacts to macroinvertebrates.  AR035088-89.

> b.      Nearly 350 pages of responses to comments.  AR034998-5342.

> c.      Over 50 pages of responses to EPA's comments.  EPA Ans. ¶ 122.; AR035054-5109.

---

[6] The Administrative Record is littered with formal and informal comments from EPA to the Corps during the formulation of the Spruce EIS.  The above-cited comments are merely a sample.

41.     Following the publication of the Final EIS, the Corps and EPA exchanged correspondence, culminating in a final letter from the Corps indicating the Corps's belief that it had satisfied all of EPA's concerns and asking EPA to submit any additional comments if it had any.  *See, e.g.*, AR023022; AR023027; AR023079; AR023083; AR023656; AR024423; AR024618; AR024621; AR024637; AR024643.  EPA did not send any additional comments in response to the Corps's request.

42.     Between September 22, 2006 and January 22, 2007:

a.      EPA did not refer any aspect of the Corps's development of the Final EIS to the White House Council on Environmental Quality.  EPA Ans. ¶ 126; *see* 42 U.S.C. § 7609; 40 C.F.R. pt. 1504.

b.      EPA did not "elevate" consideration of the proposed section 404 permit as allowed by the CWA Section 404(q) Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army (Aug. 11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html.  EPA Ans. ¶ 127.

c.      EPA did not act under section 404(c) to prohibit the specification of disposal sites in the proposed section 404 permit.  EPA Ans. ¶ 127.

d.      EPA wrote to the Corps "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint."  AR023081.

43.     The Corps issued Mingo Logan its section 404 permit for the Spruce project on January 22, 2007.  EPA Ans. ¶ 129; AR025763, *et seq.*

44.     The Corps found that the permit complies with the 404(b)(1) Guidelines, 40 C.F.R. Part 230.  AR024949-57.

45.     The Permit authorizes Mingo Logan to discharge dredged or fill material (excess

overburden) into 8.11 acres of ephemeral and intermittent streams within the mine site.
AR025763.  Those 8.11 acres comprise 0.12 acres of wetland (an abandoned farm pond); 1.83
acres of ephemeral (storm runoff only) streams; 6.13 acres of intermittent (seasonal only)
streams; and 0.034 acres of a perennial (permanently flowing) stream.  *Id.*  The Corps
determined that the impact on the 0.034 acres of perennial stream is temporary.  *Id.*

  46. To compensate for discharges into 39,518 linear feet of streams, the Permit
requires Mingo Logan:

    a. to create 43,565 linear feet of low-gradient intermittent and ephemeral
stream channels ("on-bench channels");

    b. to restore 6,307 linear feet of ephemeral and intermittent stream channels
and 825 feet of perennial stream channels on site;

    c. to create 26,625 linear feet of high-gradient intermittent and ephemeral
stream channels offsite ("connectivity channels");

    d. to enhance 8,772 linear feet of Spruce Fork offsite;

    e. to rehabilitate and enhance 2,500 linear feet of Rockhouse Creek offsite;
and

    f. to create a 50-foot vegetative riparian zone on all of these restored,
enhanced, and created stream channels which will result in over 71 acres of riparian habitat
AR025769.

  47. This mitigation plan incorporated comments from EPA.  AR24622-25.  The
Permit also required monitoring and allows the Corps to impose additional remedial action or
additional mitigation requirements if the mitigation does not prove effective.  AR025770.

  48. The Permit's mitigation requirements were developed based on the Corps's

Regulatory Guidance Letter 02-02 (RGL 02-02) and comply with the 404(b)(1) Guidelines.
AR024951.

     49.    The Permit imposes numerous performance standards to measure whether the
mitigation is achieving desired results.  Special Condition 19; AR025774.  Special Condition 13
requires that the quality of the physical habitat and benthic communities be scored using EPA's
West Virginia Stream Condition Index (WVSCI) and Rapid Bioassessment Protocols (RBP):
"The . . . scores will be compared to pre-mining or baseline conditions or reference reaches.  The
scores, when sampling is conducted during similar seasons, should either be equal to, or greater
than, pre-mining disturbances."  Special Condition 13 at 4; AR025772; *see* Rapid Bioassessment
Protocols for Stream Use and Wadeable Rivers: Periphyton, Benthic Macroinvertebrates, and
Fish (2d ed. 1999) (RBP); A Stream Index for West Virginia Wadeable Streams (revised July 21,
2000) (WVSCI).  The Special Conditions require that any new functional assessment protocol
approved by EPA will be used, along with the other detailed performance standards, to determine
whether stream mitigation is successful.  Special Condition 22; AR025775.  Special Condition
22 provides, in pertinent part: "[EPA] proposes to develop a functional stream assessment that
can be used by regulators . . . . Upon finalizing these stream assessment protocols, the permittee
shall use these tools to assess the success of the proposed mitigation sites."  AR025775.

     50.    Recognizing the uncertainty concerning the success of stream mitigation, the
Special Conditions establish an annual monitoring program over a minimum of 10 years to
evaluate whether the mitigation is satisfying these detailed performance standards.  Special
Condition 15; AR025772-73.  In addition, to account for future development of a functional
assessment protocol for headwater streams, the Special Conditions also mandate that Mingo
Logan monitor and report "any additional approved functional assessment data pertinent to

evaluating the success of the proposed mitigation." Special Condition 15; AR025772.

51.     To ensure compliance with these performance standards, the Special Conditions impose multiple evaluations of mitigation performance and the implementation of adaptive management, contingency plans, corrective actions, remedial measures, and additional mitigation in the event of mitigation failure. Based on the first three years of monitoring reports and onsite evaluation by the Corps, the Corps will determine whether the mitigation has been constructed in accordance with the permit and is functioning as expected. If the mitigation is not developing as expected, Mingo Logan must develop a contingency plan and then must implement corrective actions. Special Condition 18; AR025773-74. These corrective actions can include measures to attain the "proposed functional status" of the mitigated streams and if corrective actions are not appropriate or successful, Special Condition 18 requires the permittee to provide additional approved mitigation. *Id.* In addition, the Corps will perform annual evaluations and an evaluation at the end of 10 years to determine whether the applicable performance standards have been satisfied. Again, if either the annual or final performance standards are not achieved, Mingo Logan will be required to develop and implement remedial actions or additional mitigation. Special Conditions 16-19; AR025773-74.

52.     The Corps found that the mitigation and safeguards imposed by the special conditions complies with the requirements of the Regulatory Guidance Letter 02-02 (RGL 02-02), incorporates a watershed approach, and is sufficient to offset the unavoidable impacts to waters of the United States. AR024950, *et seq*.

53.     The Permit notifies Mingo Logan of the Corps's enforcement powers under 33 C.F.R. §§ 326.4 and 326.5 as well as its authorities under 33 C.F.R. § 325.7 to suspend, modify or revoke the permit. AR025765. The Permit mentions nothing about § 404(c) or any

circumstances under which EPA may suspend, modify or revoke it.  *See* AR025763, *et seq*.

**Challenges to the Section 404 Permit Between 2007 and 2011**

54.     Once the permit was issued, it was immediately embroiled in pending litigation

challenging a number of mountaintop mining permits.  EPA Ans. ¶ 142; *See Ohio Valley Envtl.*

*Coal. v. U.S. Army Corps of Engineers*, No. 3:05-cv-00784 (S.D. W. Va. Jan. 30, 2007)

(Plaintiff's motion for temporary restraining order).  That case ultimately resulted in a Fourth

Circuit decision upholding the challenged permits, EPA Ans. ¶ 143, effectively affirming the

approach the Corps had taken in issuing Mingo Logan's permit. *Ohio Valley Envtl. Coal. v.*

*Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009).  Based on the Fourth Circuit's decision, Mingo

Logan then moved for summary judgment on OVEC's claims challenging the Spruce No. 1

permit.  EPA Ans. ¶ 146.

55.     After Mingo Logan filed its motion for summary judgment to affirm its permit,

EPA asked the Corps to revoke, suspend or modify the permit, claiming concerns about "the

project's potential to degrade downstream water quality."  AR012754.

56.     The Corps asked WVDEP to comment on EPA's request, and WVDEP confirmed

the validity and propriety of the section 401 water quality certification and the section 402

Permit that it had issued.  AR012780.

57.     WVDEP stated that the section 402 permit "for the Spruce no. 1 Mine (No.

WV1017021), which most directly regulates water quality at this location, has been open to

scrutiny by USEPA on at least three occasions previously.  Each time … USEPA allowed permit

approval.  As this permit currently stands, the effluent limitations it establishes are in compliance

with all applicable Total Maximum Daily Loads (TMDLs) and West Virginia's federally

approved antidegradation policy."  AR012799.  WVDEP further described EPA's request that

the Corps suspend the permit as a "retroactive, ad hoc departure[] from existing laws, rules, and guidelines." AR012780.

58.     The Corps considered EPA's request and responded with a 4 page letter, 23 page memorandum for record, and eight exhibits.  AR012781-84; AR012789, *et seq*.

59.     On September 30, 2009, the Corps announced that it would not suspend, revoke or modify the permit.  AR012781-84.

60.     The Corps found that Mingo Logan was complying with the Permit; there had been no change in circumstances; all objections had been fully considered during the decade the permit application was under review and, in the case of EPA's comments in particular, resolved; and there had been no change in the law.  AR012782.

61.     Citing the water quality determinations set forth in WVDEP's September 25, 2009 letter, the Corps concluded that "[We] have no expectation the disposal of fill material in waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water quality standards."  AR012783.

62.     On March 26, 2010, EPA announced that it intended to "veto" the Permit under § 404(c).  AR000004, *et seq*.  EPA published its notice in the Federal Register on April 2, 2010, along with its Proposed Determination.  EPA Ans. ¶ 183; AR000050-70; 75 Fed. Reg. 16,788.

63.     On September 24, 2010, EPA Region III published its Recommended Determination to veto the Spruce permit.  EPA Ans. ¶ 186; AR009888, *et seq*.

64.     In response to the Recommended Determination:

        a.      The Corps reiterated that it had "no basis to take any corrective action regarding the 404 permit [it] issued on January 22, 2007 for discharges associated with the Spruce No. 1 Surface Mine."  AR010659.

b.      WVDEP noted that each of the concerns voiced by EPA was "based on water quality, which is directly regulated by the State water quality standards.  Interpretation and enforcement of such standards is uniquely a State issue."  Randy Huffman, Sec'y, WVDEP, Comments as to Recommended Determination of the U.S. Envtl. Prot. Agency Region III Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia, Docket No. EPA-R03-OW-2009-0985 (Nov. 29, 2010) at 2.[7]

65.      On January 13, 2011, EPA issued its Final Determination (FD), purporting to "withdraw the specification of Pigeonroost Branch, Oldhouse Branch and their tributaries . . . as a disposal site for dredged or fill material in connection with construction of the Spruce No. 1 Surface Mine, as authorized by DA Permit No. 199800436-3 . . . ."  EPA Ans. ¶ 192; AR010108. EPA's action, if upheld, would nullify roughly 88 percent of the total discharge area authorized by the Permit.

**The Spruce No. 1 Mine**

66.      There are 29 outfalls at Spruce that drain surface water from the mine into downstream waters.  CH2M Hill, Technical Evaluation Document: Spruce No Mine, West Virginia (June 2010) at 25; *see also* Ex. 1 to Statement of Points and Authorities In Support of Mingo Logan's Motion for Summary Judgment ("Mingo Logan's MSJ Br.").

67.      Outfalls 002, 004-010, 012, 014-015, 017-027, 029, and 031-033 drain surface runoff from portions of the mine unassociated with the 404 discharges.  CH2M Hill, Technical Evaluation Document: Spruce No Mine, West Virginia (June 2010) at 25-26; *see also* Ex. 1 to Mingo Logan's MSJ Br.

---

[7] This document was not included in the administrative record that EPA has submitted, but EPA agrees that it should have been included.

20

68.     Outfalls 001, 003, and 028 collect water from the valley fills as well as portions of the mine aside from the valley fills.  CH2M Hill, Technical Evaluation Document: Spruce No Mine, West Virginia (June 2010) at 25-26; *see also* Ex. 1 to Mingo Logan's MSJ Br.

69.     Outfall 028 is the discharge from an erosion and sediment control pond – now "existing Pond No. 2" – that was originally constructed in the Right Fork of Seng Camp Creek in the mid-1990s pursuant to Surface Mine Permit S-5070-91 and NPDES (Section 402) Permit No. WV1013289.  During the reissuance of the Spruce No. 1 Mine Section 402 permit on August 7, 2007 (Permit No. WV1017021), Outlet 028 was transferred to the Spruce permit. NPDES Permit No. WV1017021.

70.     Outlet 017 does not discharge water drained from a valley fill, but rather from an active mine site into Pigeonroost Branch.  AR010921-26; AR010688.

71.     There is no evidence in the record that shows that water discharged by Outlet 017 or Outlet 028 is related to the § 404 discharges.  AR010911-26; AR010688-89.

72.     Sampling conducted by Sturm Environmental Services in 2010 found no measurable flow from Valley Fill 1A, which contains the only existing 404 discharge at Spruce. Instead, the water discharged from outlet 028 originated in material and sections of the treatment system associated with a prior mining operation. AR010911-21; AR010688-89.

73.     The permit area for Spruce No. 1 Mine consists of 2,278 acres.  AR013025.

74.     The Dal-Tex Complex encompasses approximately 6,630 acres and includes 11 surface mining permits, 9 underground mining permits, and 11 surface ancillary facilities permits. AR013026.

75.     Portions of the Dal-Tex Complex have been actively mined since the early 1900s. AR013147; AR010891.

76.     Portions of the Dal-Tex Complex were mined prior to the passage of SMCRA. AR013147; AR010891-92.

77.     The majority of the mining activities within the Dal-Tex Complex were undertaken without material handling practices designed to minimize selenium or numeric selenium permit limitations.  AR010893.

78.     The underground mines at Dal-Tex contribute selenium to the watershed. AR010891.

79.     The area around Spruce has been logged many times in the recent past and contains only young to middle-aged forests with "relatively few mature trees."  AR013259;  *See* AR013279 (adding that "the relatively open forest floor that now exists limits the diversity of songbirds that might otherwise occur in the forest."); AR008151-52; CH2MHill, Technical Evaluation Document (June 2010) at 59-61; AR010727-28; AR010143; AR010406.

80.     The reaches of Pigeonroost Branch and Oldhouse Branch at the site of the authorized section 404 discharges are ephemeral and intermittent, not perennial.

81.     The reaches of Pigeonroost Branch and Oldhouse Branch at the site of the authorized section 404 discharges have been classified as ephemeral and intermittent for the duration of the permitting process.  *See* EPA Ans. ¶ 194.

**<u>Water Quality</u>**

82.     The West Virginia Legislature adopted both numeric and narrative water quality standards through the legislative review and adoption process. *See generally* W. VA. CODE R. § 47-2; *see also* W. VA. CODE R. § 47-2-3.2.i.; W. VA. CODE R. § 47-2; App. E, Table 1; *see also* WVDEP, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 26, 2011)

(explaining WVDEP's water quality standards).

83.     West Virginia has established numeric standards for numerous parameters including dissolved aluminum, arsenic, chloride, manganese, zinc and selenium.  WVDEP, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 26, 2011).

84.     The State also adopted narrative standards, which in relevant part prohibit "[a]ny other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." 2 W. VA. CODE R. § 47-2-3.2.i.  WVDEP, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 26, 2011).

85.     EPA approved the numeric and narrative standards pursuant to 33 U.S.C. § 1313. WVDEP, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 26, 2011).

86.     In 2009, EPA approved the State's latest changes to its numeric standards. WVDEP, "Water Quality Standards," *available at* http://www.dep.wv.gov/WWE/Programs/wqs/Pages/default.aspx (last visited May 26, 2011).

87.     West Virginia's numeric water quality standard for selenium includes a numeric chronic water quality criterion of 5 µg/L, and a numeric acute water quality criterion of 10 µg/L. W.VA. CODE 47-2-8 (App. E Table 1 Parameter 8-27).

88.     The section 402 permit for Spruce establishes selenium limitations for outlets 001, 002, 003, and 004 of 4.7 µg/L chronic, and 8.2 µg/L acute.  NPDES Permit No. WV1017021; AR010914.

89.     West Virginia has not adopted a numeric water quality standard for conductivity. Randy Huffman, Sec'y, WVDEP, Comments as to Recommended Determination of the U.S. Envtl. Prot. Agency Region III Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia, Docket No. EPA-R03-OW-2009-0985 (Nov. 29, 2010) at 3.

90.     WVDEP determined that conductivity was "an overbroad, generic criterion" and rejected the use of conductivity as a "stand-alone determinant[] of compliance with the [State's] narrative [water quality] standard." Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i at 3-8 (Aug. 12, 2010).[8]

91.     EPA has not promulgated a water quality criteria for conductivity pursuant to CWA § 304(a). Randy Huffman, Sec'y, WVDEP, Comments as to Recommended Determination of the U.S. Envtl. Prot. Agency Region III Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia, Docket No. EPA-R03-OW-2009-0985 (Nov. 29, 2010) at 3.

92.     Conductivity is not a pollutant or a contaminant.  Conductivity is simply the ability of a solution to carry an electric current at a specific temperature.  AR009934; AR010929; AR010703.  It is also rough measure of ions or TDS in the water, but it does not provide information related to specific constituents in the water.  AR009934; AR010929; AR010703.

93.     The 2009 occurrence of a golden algal bloom in Dunkard Creek is the only known occurrence of a golden algal bloom in West Virginia.  AR010956.

---

[8] This document was excluded from the administrative record submitted to the Court. EPA has agreed to add it to the Administrative Record.

94.     Golden algal blooms are associated with many different stream conditions. CH2MHill, Technical Evaluation Document (June 2010) at 48; AR010172-73.

95.     The EPA monitoring team report found that the water quality conditions at Dunkard Creek included chloride of up to 6,000 mg/L, sulfate of 10,800 mg/L, and conductivity over 25,000 µS/cm in the areas of the bloom.  AR010956-57.

96.     A rise in selenium downstream results from the exposure of selenium containing materials in the mining activities.  AR022798; AR010891-92.

97.     A rise in conductivity results from rainfall or other water sources running across exposed rock and soil, and will result from any land disturbance.  AR010772-23; AR010930-31.

98.     Water quality measurements downstream of the mine reflect impacts from the entire mine and not just the § 404 discharges.  AR010772-23; AR010930-31; AR022798; AR010891-92.

**Wildlife**

99.     Macroinvertebrates including mayflies, stoneflies, and caddisflies are found in the portions of Pigeonroost Branch and Oldhouse Branch to be impacted by the § 404 discharges. AR010165-67.

100.     Macroinvertebrates are found in any water of the United States.  *See* AR010721; AR010134.

101.     Macroinvertebrates will be impacted by any 404 permit issued by the Corps of Engineers for a surface mine operation like Spruce.  *See* AR010721; AR010134.

102.     There are thousands of distinct species of mayfly, stonefly, and caddisfly. AR010943; AR010704.

103.     The species of macroinvertebrates found in the affected portions of Pigeonroost

Branch and Oldhouse Branch are found in White Oak Branch.  AR010136.

104.    EPA states that the species of macroinvertebrates found in the affected portions of Pigeonroost Branch and Oldhouse Branch are not "rare, or endangered."  AR009887.

105.    EPA states that many of the species of macroinvertebrates found in the affected portions of Pigeonroost Branch and Oldhouse Branch are "naturally ubiquitous across the region."  AR009887.

106.    The Final Determination provides no evidence that the species of macroinvertebrates found in the affected portions of Pigeonroost Branch and Oldhouse Branch are found in Spruce Fork or other downstream waters.  AR010103, *et seq.*

107.    Central Appalachia enjoys one of the highest densities of salamanders in the world.  *See* AR010150; Draft PEIS § III at A-6, *available at* http://www.epa.gov/region3/mtntop/eis2003.htm.

108.    Salamanders will be impacted by any 404 permit issued by the Corps of Engineers in Appalachia for a surface mine operation like Spruce.  *See* AR010150; Draft PEIS § III at A-6, *available at* http://www.epa.gov/region3/mtntop/eis2003.htm.

109.    EPA's Science Advisory Board (SAB) has explained that functional impacts on downstream waters due to surface mining are not well understood and have not been adequately studied.  SAB Draft Report: Advisory on EPA's Draft Report on Aquatic Ecosystem Effects of Mountaintop Mining and Valley Fills (11/08/10) at 10 ("data regarding functional endpoints [e.g. impacts on functional aspects of stream ecosystems] specifically related to mining impacts are not well represented in the literature"); 21 ("studies that have directly and effectively quantified [linkages between upstream and downstream] macroinvertebrate communities are scarce"); 21 ("There is uncertainty in the actual magnitude of these energetic linkages . . . [i]f statements

concerning the effects of upstream communities on the structure and productivity of those downstream are made, the EPA should cite studies that have actually demonstrated a material or energetic link."); 21 ("direct measures of ecosystem function impacts due to MTM-VF are few"); 33 (in response to the idea "that the loss of ecosystem function in one or more MTM-VF headwater streams produce a negative telescoping effect on the structure and/or function of larger downstream ecosystems," the SAB panel wrote that "[i]t is suspected that an effect may exist, but the Panel is uncertain of the strength of the literature support for this idea. EPA should conduct an additional review of peer-reviewed literature on this topic").

110.    No fish have ever been observed in the portions of Pigeonroost Branch and Oldhouse Branch within the footprint of the § 404 discharges.  AR010140-41; AR010150-51.

111.    No Louisiana Waterthrush has ever been observed at the Spruce mine site.

112.    The Louisiana Waterthrush prefers as its habitat mature interior forests with perennial streams.  AR013279; AR008149-51; CH2MHill, Technical Evaluation Document (June 2010) at 61.  (citing Cornell University Cornell University. 2010b. Birds in Forested Landscapes, Louisiana Waterthrush (*Seiurus motacilla*)), *available at* http://www.birds.cornell.edu/bfl/speciesaccts/louwat.html.

113.    The Terrestrial Study Report in the Draft Programmatic EIS states that the Louisiana Waterthrush "is found in large tracts of mature forest."  Draft PEIS, App. E, "Mountaintop Removal Mining/Valley Fill Environmental Impact Statement Technical Study: Project Report for Terrestrial Studies" at 36 (Sept. 2001), *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm; *see also* Draft PEIS, App. E, "Appendix A-1:  Changes to the Wood and Edwards 2001 MTMVF Terrestrial Report" at A-4 (Jan. 2002) *available at*: http://www.epa.gov/region3/mtntop/eis2003appendices.htm (same).

114.    The Final Determination states that the Louisiana Waterthrush prefers "perennial headwater streams flowing through closed-canopy forest."  AR010143.

May 27, 2011                                              **MINGO LOGAN COAL CO., INC.**


                                   _____/s/ Robert M. Rolfe_____

                                   Robert M. Rolfe (D.D.C. Bar No. MI0046)
                                   Michael R. Shebelskie (Va. Bar No. 27459)
                                   George P. Sibley, III (Va. Bar No. 48773)
                                   HUNTON & WILLIAMS LLP
                                   Riverfront Plaza, East Tower
                                   951 East Byrd Street
                                   Richmond, VA 23219
                                   (804) 788-8200
                                   (804) 788-8218 (facsimile)

                                   Virginia S. Albrecht (D.C. Bar No. 357940)
                                   Deidre G. Duncan (D.C. Bar No. 461548)
                                   Matthew D. Melewski (D.C. Bar No. 994459)
                                   HUNTON & WILLIAMS LLP
                                   1900 K Street, N.W.
                                   Washington, D.C. 20006
                                   (202) 955-1500
                                   (202) 778-2201 (facsimile)

                                   Robert G. McLusky
                                   JACKSON KELLY PLLC
                                   500 Lee Street East, Suite 1600
                                   P.O. Box 553
                                   Charleston, WV 25322
                                   (304) 340-1000
                                   (304) 340-1130 (facsimile)

                                   *Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

————————————————————— )
                                                              )
MINGO LOGAN COAL COMPANY, INC.           )
                                                              )
              Plaintiff,                                      )
                                                              )
              v.                                              )          Case No. 1:10-cv-00541-ABJ
                                                              )
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY                              )
                                                              )
              Defendant.                                   )
————————————————————— )

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF MINGO LOGAN'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**\*ORAL ARGUMENT REQUESTED\***

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 3

I.      The Permitting Process for Spruce ....................................................................... 4

II.     The Terms of the § 404 Permit ............................................................................. 8

III.    EPA Tries to Revoke the § 404 Permit ................................................................ 9

STANDARD OF REVIEW ............................................................................................. 10

ARGUMENT .................................................................................................................. 11

I.      EPA's Action Is Contrary to Law Because EPA Lacks Legal Authority Under §
        404(c) to Modify an Issued Permit. .................................................................... 11

        A.      Section 404(c)'s Unambiguous Terms Give EPA No Power to Revoke or
                Modify an Issued Permit. ......................................................................... 11

                1.      Section 404(c) Addresses Only Specifications, Not Permits. ................. 11

                2.      Historical Context of the 1972 CWA Amendments Makes Clear
                        That the Corps, Not EPA, Has Authority over § 404 Permits. ............... 14

                3.      Congress's Limitation of EPA's § 404(c) Power to the Pre-Permit
                        Period Comports With Other Key Provisions of the CWA. .................... 18

                4.      Legislative History Confirms That Congress Did Not Intend to
                        Give EPA Far-Reaching Power to Modify or Revoke Issued
                        Permits. ...................................................................................................... 21

                5.      Specifications and Permits Are Fundamentally Different. ...................... 23

                6.      This Case Presents An Issue of First Impression and the Cases
                        EPA Cites Do Not Address A Post-Permit Exercise of § 404(c). ........... 25

        B.      EPA Is Entitled to No Deference and Mingo Logan's Construction of
                § 404(c) Is Clearly Preferable. ................................................................ 26

II.     Even If Timely, EPA's Action Under § 404(c) Is Unlawful. ............................. 27

        A.      EPA Unlawfully Bases Its Final Determination on "Downstream
                Impacts." .................................................................................................... 28

i

1.   EPA Usurps West Virginia's Regulatory Authority Under § 402 and SMCRA. ............................................................................... 29

2.   EPA Cannot Use § 404(c) to Substitute Its Own Judgment for West Virginia's Water Quality Standards. ............................................. 35

B.   FD § V.C. Fails to Meet EPA's Burden to Demonstrate That the 404 Discharges Will Cause Unacceptable Adverse Effects to Wildlife. .................... 39

1.   EPA Extensively Studied and Long Understood the Impacts of Filling Portions of Pigeonroost Branch and Oldhouse Branch and Has Failed to Establish That There is Substantial New Information........ 40

2.   EPA Must Raise Substantial Information That Was Not Previously Reviewed That Demonstrates Unacceptable Impacts............................ 43

3.   The FD Fails to Demonstrate That the § 404 Discharges Will Cause Unacceptable Adverse Impacts to Wildlife. ................................ 49

4.   EPA Has Failed to Consider the Permit's Mitigation Conditions. ........... 53

C.   EPA Cannot Second-Guess the Corps's Application of the § 404(b)(1) Guidelines Years After the Fact. ........................................................ 58

CONCLUSION ............................................................................................. 60

REQUEST FOR ORAL ARGUMENT ................................................................. 60

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alaska Clean Water Alliance v. Clarke*, No. C96-1762R, 1997 WL 446499 (W.D.
Wash. July 8, 1997) ................................................................................................ 36

*Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1
(D.D.C. 2007) ........................................................................................................ 44

*Am. Bar Ass'n v. FTC*, 430 F.3d 457 (D.C. Cir. 2005) ......................................... 26, 27

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7 (D.D.C.
2001) ...................................................................................................................... 45

*Bell Atl. Tel. Co. v. FCC*, 131 F.3d 1044 (D.C. Cir. 1997) ...................................... 11

*\*Bersani v. U.S. EPA*, 674 F. Supp. 405 (N.D.N.Y. 1987), *aff'd* 850 F.2d 36 (2d
Cir. 1988) .............................................................................................................. 59

*\*Bersani v. U.S. EPA*, 850 F.2d 36 (2d Cir. 1988) ...................................... 28, 59, 60

*Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999) ...................................... 6

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ......................... 44

*Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678 (D.C. Cir. 1982) ............. 54

*C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569 (11th Cir. 1988) ................................... 54

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ......... 11

*City of Albuquerque v. Browner*, 865 F. Supp. 733 (D.N.M. 1993) ......................... 36

*City of Alma v. United States*, 744 F. Supp. 1546 (S.D. Ga. 1990) ........................... 25

*\*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458
(2009) ............................................................................................ 16, 20, 25, 31, 32

*Coeur D'Alene Lake v. Kiebert*, 790 F. Supp. 998 (D. Idaho 1992) ......................... 19

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ........................................... 56

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................................. 13

*EPA v. California ex. rel. State Water Res. Control Bd.*, 426 U.S. 200 (1976) .......... 14

*Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) ......................... 54

*Grant Thornton, LLP v. Office of Comptroller of the Currency*, 514 F.3d 1328
(D.C. Cir. 2008) ........................................................................................................ 26

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979) ....................................... 11

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ................... 15

*Investment Co. Inst. v. Conover*, 790 F.2d 925 (D.C. Cir. 1986) ............................................... 26

*James City Cnty. v. U.S. EPA*, 758 F. Supp. 348 (E.D. Va. 1990), *aff'd in part* 955
F.2d 254 (4th Cir. 1992) ........................................................................................... 59

*James City Cnty. v. U.S. EPA*, 955 F.2d 254 (4th Cir. 1992) ................................................ 33, 59

*Jicarilla Apache Nation v. U.S. Dept. of the Interior*, 613 F.3d 1112 (D.C. Cir.
2010) ......................................................................................................................... 44

*Lake Erie Alliance for the Prot. of the Coastal Corridor v. U.S. Army Corps of
Eng'rs*, 526 F. Supp. 1063 (W.D. Pa. 1981) ....................................................... 37

*\*Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) ............................................................. 14

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ...................................................... 45, 47

*Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003) ........................................... 10

*Mobil Oil Corp. v. Kelley*, 426 F. Supp. 230 (S.D. Ala. 1976) ................................................ 37

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789 (D.C. Cir. 2010) ................................................ 56

*\*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
(1983) ................................................................................................................. 29, 44

*Mun. Auth. of the Borough of St. Marys v. U.S. EPA*, 945 F.2d 67 (3d Cir. 1991) .................... 30

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ........................... 30

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) .................................... 49

*Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004) ................. 45, 47

*\*Nat'l Mining Ass'n v. Jackson*, No. 1:10-cv-1220-RBW, 2011 WL 124194
(D.D.C. Jan. 14, 2011) ................................................................................ 16, 18, 25, 38

*Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977) ............................... 15

*Natural Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104 (D.C. Cir. 1987) ........................... 15

*New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103 (D.D.C. 2010) ..................... 26

*\*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 190 (4th Cir.
    2009), *cert. dismissed* 131 S. Ct. 51 (2010) ............................3, 9, 28, 34, 54, 55, 56, 57

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-00784 (S.D.
    W. Va. filed Sept. 22, 2005) ........................................................................................ 9

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 479 F. Supp. 2d 607 (S.D.
    W. Va. 2007) ............................................................................................................... 56

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-00784, 2009
    WL 3014943 (S.D. W. Va. Sept. 15, 2009) ............................................................... 49

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, Nos. 07-1355 et al., 2007
    WL 4626521 (4th Cir. Nov. 14, 2007)....................................................................... 56

*O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225 (5th Cir. 2007) ....................................... 54

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F. 3d 255 (4th
    Cir. 2001) .................................................................................................................... 15

*\*Rapaport v. U.S. Dep't of the Treasury, Office of Thrift Supervision*, 59 F.3d 212
    (D.C. Cir. 1995)........................................................................................................... 26

*Russo Dev. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J.
    Mar. 16, 1990) ............................................................................................................. 25

*S. Co. Servs., Inc. v. FCC*, 313 F.3d 574 (D.C. Cir. 2002)........................................................ 26

*S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370 (2006) ............................................... 13

*Sierra Club v. Wagner*, 555 F.3d 21 (1st Cir. 2009) ................................................................. 54

*S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004)........................... 54

*United States v. Mango*, 199 F.3d 85 (2d Cir. 1999) ............................................................... 34

*United States v. Union Pac. R.R. Co.*, 91 U.S. 72 (1875)........................................................... 14

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......................................................13, 19

*Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737 (D.C. Cir. 1986) ................................. 44

## FEDERAL STATUTES AND RULES

5 U.S.C. § 706(2)(A) ...................................................................................................... 10

30 U.S.C. § 1201 *et seq.* ................................................................................................. 4

30 U.S.C. § 1265(b)(22) ................................................................................................. 4

33 U.S.C. § 401 .............................................................................................................. 16

33 U.S.C. § 403 .............................................................................................................. 16

33 U.S.C. § 419 .............................................................................................................. 16

33 U.S.C. § 1251 *et seq.* ................................................................................................ 15

33 U.S.C. § 1311 ............................................................................................................ 14

33 U.S.C. § 1311(a) ....................................................................................................... 14

33 U.S.C. § 1312 ............................................................................................................ 14

33 U.S.C. § 1313(c) ................................................................................................... 35, 36

33 U.S.C. § 1313(c)(2)(A) ............................................................................................. 38

33 U.S.C. § 1313(c)(3) ................................................................................................... 36

33 U.S.C. § 1313(c)(4) ................................................................................................... 36

33 U.S.C. § 1314 ............................................................................................................ 35

33 U.S.C. § 1314(a)(1) ................................................................................................... 35

33 U.S.C. § 1316 ............................................................................................................ 14

33 U.S.C. § 1317 ............................................................................................................ 14

33 U.S.C. § 1328(a) ....................................................................................................... 14

33 U.S.C. § 1341 ............................................................................................................ 36

33 U.S.C. § 1341(a)(1) ................................................................................................... 36

33 U.S.C. § 1341(c) .................................................................................................. 24

33 U.S.C. § 1342(a) .................................................................................................. 14

33 U.S.C. § 1342(c)(1) .............................................................................................. 30

33 U.S.C. § 1342(d)(1) ........................................................................................... 5, 30

33 U.S.C. § 1342(d)(2) .............................................................................................. 30

33 U.S.C. § 1342(d)(4) .............................................................................................. 30

33 U.S.C. § 1342(k) ............................................................................................. 15, 18

33 U.S.C. § 1344 ................................................................................................. 12, 13

33 U.S.C. § 1344(a) .............................................................................. 4, 14, 16, 17, 28

33 U.S.C. § 1344(b) .................................................................................................. 17

33 U.S.C. § 1344(b)(1) ........................................................................................ 17, 59

33 U.S.C. § 1344(c) ............................................................................................... 2, 28

33 U.S.C. § 1344(e) .................................................................................................... 6

33 U.S.C. § 1344(p) .......................................................................................... 15, 18, 19

33 U.S.C. § 1344(q) ............................................................................................. 17, 20

33 U.S.C. § 1344(s) ............................................................................................. 17, 19

33 U.S.C. § 1362(7) .................................................................................................. 28

42 U.S.C. § 4321 *et seq.* ............................................................................................ 4

42 U.S.C. § 7609 ........................................................................................................ 7

Pub. L. No. 92-500, 86 Stat. 816 (1972) ................................................................... 15

FED. R. CIV. P. 56 .................................................................................................... 10

## STATE STATUTES

W. VA. CODE 47-30-5.16 ........................................................................................... 30

## FEDERAL REGULATIONS & ADMINISTRATIVE MATERIALS

30 C.F.R. § 816.71 ................................................................................................................ 4

30 C.F.R. § 816.72 ................................................................................................................ 4

30 C.F.R. § 816.73 ................................................................................................................ 4

33 C.F.R. pt. 205 (1972) ..................................................................................................... 23

33 C.F.R. § 209.120(d)(8) (1972) ...................................................................................... 16

33 C.F.R. § 209.120(d)(11) (1972) .................................................................................... 16

33 C.F.R. pt. 325 ................................................................................................................ 17

*33 C.F.R. § 325.7 ........................................................................ 8, 9, 17, 19, 20, 49

33 C.F.R. § 326.4 ................................................................................................................. 8

33 C.F.R. § 326.5 ................................................................................................................. 8

33 C.F.R. § 336.1(a) ........................................................................................................... 23

33 C.F.R. § 336.1(b)(5) ...................................................................................................... 23

40 C.F.R. § 122.2 ............................................................................................................... 30

40 C.F.R. § 122.4 ............................................................................................................... 32

40 C.F.R. § 122.62 ............................................................................................................. 30

40 C.F.R. § 122.62(a) ......................................................................................................... 30

40 C.F.R. § 123.25 ............................................................................................................. 32

40 C.F.R. § 123.41 .......................................................................................................... 5, 30

40 C.F.R. § 123.44(b)(2) .................................................................................................... 30

40 C.F.R. § 123.44(e) ......................................................................................................... 30

40 C.F.R. § 123.44(h) ......................................................................................................... 30

40 C.F.R. § 124.5 ........................................................................................................... 30, 31

40 C.F.R. § 124.55(e) ............................................................................................... 37

40 C.F.R. § 131.4 ...................................................................................................... 35

40 C.F.R. § 131.5 ...................................................................................................... 36

40 C.F.R. § 131.21 .................................................................................................36, 37

40 C.F.R. § 131.21(d) ............................................................................................... 38

40 C.F.R. § 131.21(e) ............................................................................................... 36

40 C.F.R. pt. 230 ....................................................................................................... 17

40 C.F.R. § 230.2 ...................................................................................................... 24

40 C.F.R. § 230.3(q) .................................................................................................. 57

40 C.F.R. § 230.11(h) ............................................................................................... 32

40 C.F.R. pt. 231 ....................................................................................................... 19

40 C.F.R. § 231.2(e) .................................................................................................. 49

40 C.F.R. § 231.7 ...................................................................................................... 17

40 C.F.R. § 1502.9(c) ............................................................................................... 45

40 C.F.R. pt. 1504 ..................................................................................................... 7

44 Fed. Reg. 32,854 (June 7, 1979).....................................................................15, 31

*44 Fed. Reg. 58,076 (Oct. 9, 1979) ...........................................................17, 19, 28, 44

45 Fed. Reg. 85,336 (Dec. 24, 1980)........................................................................ 28

48 Fed. Reg. 51,400 (Nov. 8, 1983) ......................................................................... 36

*49 Fed. Reg. 37,998 (Sept. 26, 1984) ...........................................................15, 31, 35, 38

72 Fed. Reg. 11,092 (Mar. 12, 2007) ....................................................................... 58

75 Fed. Reg. 16,788 (Apr. 2, 2010)........................................................................... 52

**MISCELLANEOUS**

Administration Testimony, Hearings on H.R. 11896, Committee on Public Works,
U.S. House of Representatives (Dec. 7, 1972), *reprinted in* 2 A
LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT
AMENDMENTS OF 1972 at 1111, 1186, 1205 (Jan. 1973) ............................................... 21

*Clean Water Act Section 404(q) Memorandum of Agreement Between the
Environmental Protection Agency and the Department of the Army (Aug.
11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html........ 7, 17, 21, 59

EPA's Mem. in Supp. of Its Mot. to Dismiss (Dkt. No. 9), *Mingo Logan Coal Co.,
Inc. v. U.S. EPA*, No. 1:10-cv-00541-ABJ (D.D.C. June 7, 2010)............................13, 23

EPA's Reply Mem. in Supp. of Its Mot. to Dismiss (Dkt. No. 11), *Mingo Logan
Coal Co., Inc. v. U.S. EPA*, No. 1:10-cv-00541-ABJ (D.D.C. July 6, 2010).................. 23

H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in* 1 A LEGISLATIVE HISTORY
OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 893-
1110 (Jan. 1973) ...........................................................................................17, 44, 50

S. 2770, 92d Cong., 1st Sess. (1971), *reprinted in* 2 A LEGISLATIVE HISTORY OF
THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 1534-
1723 (Jan. 1973) ....................................................................................................... 17

Senate Consideration of the Report of the Conference Committee (Oct. 4, 1972),
*reprinted in* 1 A LEGISLATIVE HISTORY OF THE WATER POLLUTION
CONTROL ACT AMENDMENTS OF 1972 at 161-339 (Jan. 1973) ..........................21, 22, 43

Senate Debate on S. 2770 (Nov. 2, 1971), *reprinted in* 2 A LEGISLATIVE HISTORY
OF THE WATER POLLLUTION CONTROL ACT AMENDMENTS OF 1972, at
1386 (Jan. 1973) ....................................................................................................... 24

Senate Debate, Clean Water Act of 1977 -- Conference Report (Dec. 15, 1977),
*reprinted in* 3 A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF
1977, at 425, 531 (Oct. 1978).................................................................................... 21

S. REP. NO. 95-370, 95th Cong. 1st Sess. (July 28, 1997), *reprinted in* 4 A
LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977, at 633, 713
(Oct. 1978).................................................................................................................. 21

Webster's Third New International Dictionary of the English Language
Unabridged (1993).................................................................................................. 49

## PRELIMINARY STATEMENT

In this case, the U.S. Environmental Protection Agency (EPA) purports to drastically modify a permit the U.S. Army Corps of Engineers (the Corps) issued Mingo Logan Coal Company (Mingo Logan) more than four years after the Corps issued it. But EPA lacks statutory authority to modify the permit. And its justification for acting usurps the authority of the Corps and the State of West Virginia and violates the Clean Water Act (CWA or Act) in myriad respects. EPA's action must not stand.

In January 2007, after ten years of study, the Corps granted Mingo Logan a permit under CWA § 404 (Permit) that authorized the discharge of dredged or fill material into certain reaches of Pigeonroost Branch, Oldhouse Branch and Seng Camp Creek at the Spruce No. 1 coal mine in West Virginia (Spruce). During those ten years, dozens of state and federal regulators performed roles carefully prescribed in numerous environmental laws. Congress gave EPA a carefully delineated role to play in each of these processes. EPA could have objected at various points, and even prohibited the specification of disposal sites, thereby blocking the issuance of the Corps's permit. But EPA did none of these things. So the Corps issued the Permit, and Mingo Logan has operated in compliance with the Permit ever since.

Yet now, over four years later, EPA — in an unprecedented action — attempts to modify the central terms of the Corps's § 404 permit by eliminating the authority to discharge fill into Pigeonroost Branch and Oldhouse Branch — reducing by nearly 88 percent Mingo Logan's operations at Spruce. EPA attempts this action even though the Corps has concluded that modification of the Permit is not justified. EPA's supposed authority for this power is CWA § 404(c), which authorizes EPA "to prohibit the *specification* (including the withdrawal of specification) of any defined area as a disposal site, and . . . to deny or restrict the use of any

1

defined area for *specification* (including the withdrawal of specification) as a disposal site. . . ." 33 U.S.C. § 1344(c) (emphases added).  But section 404(c) never mentions "permits."

Section 404(c) cannot be read as EPA reads it here.  Congress gave the Corps, not EPA, final authority to issue, oversee and enforce § 404 permits.  While EPA plays an important role in the formulation of § 404 permits, that role ends once a permit issues.  Allowing EPA perpetual and unrestricted license to modify a permit after its issuance — even when the agency issuing the permit has concluded that it should not be modified — would destroy the certainty that the permit is intended to provide and upset Congress's allocation of regulatory authority among the Corps, the State and EPA.  Congress did not give EPA such unbridled power.  EPA's action should be set aside for this reason alone.  (Count I of the Amended Complaint).

Even if § 404(c) authorizes EPA to act four years after a permit has been issued, the scope of EPA's authority is limited and its burden is exacting.  Section 404(c) does not authorize EPA to consider impacts from discharges authorized by CWA § 402 permits.  (Count V).  These § 402 discharges are regulated by the West Virginia Department of Environmental Protection (WVDEP) under the separate and distinct § 402 permitting program.  But EPA bases its action in large degree on impacts from § 402 discharges.  And § 404(c) certainly does not allow EPA to base a § 404(c) veto decision on its own *ad hoc* water quality criteria.  West Virginia's water quality standards govern permitting decisions under the CWA.  But EPA ignores the applicable standards in favor of its own newly-conceived water quality criteria for conductivity (Count VI), selenium (Count VII) and water quality parameters associated with the formation of golden algae (Count VIII).  And EPA does not establish that any of these unlawful ad hoc standards will be violated by the permitted § 404 discharges, rather than from other mining activity that EPA has no authority to address under § 404(c).  (Count X).

Even as to those impacts that EPA can lawfully consider under § 404(c), EPA has the burden to prove that the § 404 discharges will have an "unacceptable adverse effect" on wildlife. And if EPA has the power to act at all after a permit issues, it only can do so based on "substantial new information" that demonstrates such "unacceptable adverse effects."  But EPA identifies no substantial new information.  It instead relies on impacts exhaustively studied during the permitting process.  (Counts II, III).  Nor does EPA establish that these impacts are "unacceptable" — to the contrary, they are either routine (salamanders, macroinvertebrates) or nonexistent (fish, Louisiana Waterthrush).  (Count XI).  EPA also fails to consider the Permit's mitigation requirements, which will ensure that any effects are not unacceptable.  Instead, EPA wrongly second-guesses the Corps's mitigation assessments even after the United States successfully defended the Corps's mitigation reasoning in the Fourth Circuit.  (Count XIV). Perhaps in an attempt to divert attention from the weaknesses of its actual bases for acting, EPA throws in a discussion of the § 404(b)(1) Guidelines (Guidelines), but disclaims any reliance on that discussion.  And for good reason: not only does EPA lack authority to apply the Guidelines to modify a permit after it has been issued, EPA fails to meet its burden of establishing any non-compliance with the Guidelines.  (Counts XIII and IX).

For each of these reasons, Mingo Logan is entitled to summary judgment.

## FACTUAL  BACKGROUND

In the mining process used at Spruce to extract coal, soil and rock (called "spoil" or "overburden") are removed to expose coal deposits beneath.  When coal extraction ends, some of that overburden is used to recontour the terrain.  But excess overburden must be placed in most instances in adjacent hollows.  *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 190 (4th Cir. 2009), *cert. dismissed* 131 S. Ct. 51 (2010) (*OVEC*) (describing surface mining

methods); AR010118-19.[1]  These hollows may contain intermittent and perennial streams, which

can qualify as "navigable waters" regulated by the CWA.  As a result, Mingo Logan had to

obtain a permit from the Corps under CWA § 404 for the "discharge of dredged or fill material

into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).

The Corps issued a Permit for Spruce in January 2007, the last of several permits in a

decade-long process involving a host of State and federal regulators under an intricate array of

environmental laws.  WVDEP issued permits under the Surface Mining Control and Reclamation

Act (SMCRA) and CWA § 402, and issued the water quality certification under CWA § 401

required for the Corps to issue the § 404 permit.  The Corps analyzed the project under CWA

§ 404 and prepared a full environmental impact statement (EIS) under the National Environ-

mental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (NEPA).  EPA was involved every step of the way.

## I.     The Permitting Process for Spruce

*West Virginia Issues Mingo Logan a SMCRA Permit.*   SMCRA regulates the overall

construction, operation and reclamation of surface coal mines.  30 U.S.C. §§ 1201 *et seq.*

SMCRA provides a comprehensive mechanism for controlling the environmental impacts of

surface coal mining, including the ultimate return of excess rock and dirt to the mined area and

adjacent hollows.  Importantly, SMCRA specifically approves the methods that Mingo Logan

employs at Spruce.  *See* 30 U.S.C. § 1265(b)(22); 30 C.F.R. §§ 816.71-73.  West Virginia has

exclusive authority to issue SMCRA permits on non-federal lands within its borders.  After a

thorough review and an extensive public comment process, WVDEP granted Mingo Logan its

SMCRA permit on November 4, 1998.[2]  Among other things, the SMCRA permit requires

---

[1] Citations to the Administrative Record are referenced as AR_____.

[2] The Permit was actually issued to Mingo Logan's predecessor, Hobet Mining, Inc.
Because this distinction is unimportant in this case, this brief refers only to "Mingo Logan."

Mingo Logan to test soil and rock at the mine to prevent the placement of acid or selenium

producing materials in the fills.  Spruce No. 1 Mine SMCRA Permit S-5013-97; Statement of

Material Facts (Facts) ¶ 5.[3]

***EPA Consents to WVDEP Issuance of a § 402 Permit Allowing Discharges From***

***Outfalls at Spruce***.  Spruce also required a permit under CWA § 402.  In accordance with

SMCRA, the Spruce design included an extensive flow control scheme in which water is

channeled from the mine and discharged through regulated outfalls into downstream waters.  The

discharges from the outfalls are governed by § 402, and WVDEP is responsible for issuing CWA

§ 402 permits.  Before it could issue a § 402 permit for Spruce, WVDEP had to ensure, among

other things, that the discharges and their downstream effects would comply with applicable

effluent limitations and West Virginia's water quality standards.

Mingo Logan first applied for a § 402 permit in 1997.  NPDES Permit No. WV1017021;

Facts ¶ 8.  WVDEP reviewed the application and forwarded the proposed permit to EPA.

AR008397.  *See* 33 U.S.C. § 1342(d)(1); 40 C.F.R. § 123.41.  EPA objected to the § 402 permit,

AR008404, but withdrew its objections when WVDEP agreed to incorporate EPA's conditions

regarding reductions in the size and number of valley fills, mitigation, and minimization of

environmental impacts.  AR008413-15; Facts ¶¶ 12-14.  Thus, with EPA's consent, AR008427,

WVDEP issued the § 402 permit on January 11, 1999.  AR043101-269.

---

[3] Mingo Logan's SMCRA Permit is one of several documents that was not included in
the administrative record that EPA has submitted, but that EPA agrees should have been
included.  *See* Ex. 1, Letter from R. Rolfe to K. Amaditz (May 20, 2011).  As to documents that
fall into this category that Mingo Logan cites in this brief, Mingo Logan provides a narrative
description of the document in the accompanying Statement of Facts and will cite in this brief to
the appropriate paragraph in the Statement of Facts.  After a supplemental record is prepared and
submitted, Mingo Logan will submit a revised brief that contains citations to the precise page in
the record where the cited document appears.

When WVDEP sought to modify the 402 permit three years later, EPA objected, noting that recent studies "indicated impairment of aquatic life and significantly higher levels of selenium, sulfates, and conductivity" in streams downstream of similar mining operations. AR42908-10.  EPA withdrew its objections when WVDEP agreed to impose conditions related to levels of selenium, sulfates, and conductivity.  AR008437-38; AR008440.  The § 402 permit was thereafter modified and renewed several times without objection by EPA.

*The Corps Issues the § 404 Permit Authorizing Mingo Logan to Discharge Dredged or Fill Material into Pigeonroost Branch and Oldhouse Branch.*  Mingo Logan originally applied for its § 404 authorization in 1998 under Nationwide Permit 21.  AR002635-66.  In January 1999, the Corps concluded that Spruce met the requirements for Nationwide Permit 21. AR002746-2833.  EPA concurred, noting that the project was consistent with Section 404(e) of the CWA — i.e., the proposed fills would "cause only minimal adverse environmental effects." 33 U.S.C. § 1344(e); AR002870-71.  Before the Corps could issue its final approval, however, a federal court preliminarily enjoined the approval because of programmatic challenges to Nationwide Permit 21.  *Bragg v. Robertson*, 54 F. Supp. 2d 635 (S.D. W. Va. 1999).  The preliminary injunction did not address the Corps's and EPA's determination that discharges would have only minimal adverse effects.

So Mingo Logan started over.  In 1999, it applied for an individual permit under § 404(a). AR003052-70.  The Corps conducted a full *de novo* review of the application, including the preparation of a full EIS in accordance with NEPA.  The process took over seven years, generated an administrative record that spans tens of thousands of pages, and cost Mingo Logan millions of dollars.  Throughout that multi-year review, Mingo Logan worked cooperatively with the Corps and EPA.  Mingo Logan significantly decreased the proposed scale of its operation,

reduced the acreage of affected streams by more than 30 percent, and agreed to additional compensatory mitigation, including stream creation, restoration, and enhancement, in amounts well beyond what EPA and the Corps had previously concluded were sufficient.

The Corps issued a 1600-page Draft EIS in March 2006, which concluded that Spruce "would only contribute minimally to cumulative impacts on surface water quality."[4]  AR012991, *et seq.*; AR012997-98.  EPA commented on the proposed Draft EIS, the published Draft EIS, the proposed Final EIS, and the published Final EIS.  The Final EIS Corps devoted 58 pages to EPA's comments and resolved each of EPA's concerns.

WVDEP also participated in the § 404 process.  After scrutinizing Mingo Logan's permit application in light of, among other things, West Virginia's water quality standards, WVDEP certified under CWA § 401 that the discharges authorized by the § 404 permit would not contribute to a violation of State water quality standards or violate the State's anti-degradation regulations.  EPA did not challenge WVDEP's § 401 certification.

During this exhaustive process, EPA could have, but did not, (a) challenge the Corps's EIS by referring it to the White House Council on Environmental Quality, *see* 42 U.S.C. § 7609; 40 C.F.R. pt. 1504; (b) "elevate" the proposed Permit for further review pursuant to CWA § 404(q)[5]; or (c) act under § 404(c) to prohibit, deny, or restrict the disposal site specifications

---

[4] The Draft EIS concluded that "Overall, it would be anticipated that the Spruce No. 1 Mine would only contribute minimally to cumulative impacts on surface water quality," and added that "a net gain of waters of the U.S., including wetlands, would occur as a result of past, present, and reasonably foreseeable future actions" at Spruce.  AR012997-98.

[5] Clean Water Act Section 404(q) Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army (Aug. 11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html (404(q) MOA).

identified in the permitting process.[6]  EPA did nothing and thus deferred to the Corps's judgment

to issue the Permit in January 2007.

## II.      The Terms of the § 404 Permit

The Permit authorizes Mingo Logan to discharge dredged or fill material (excess

overburden) into 8.11 acres of ephemeral and intermittent streams within the mine site.

AR025763.  Those 8.11 acres comprise 0.12 acres of wetland; 1.83 acres of ephemeral streams;

6.13 acres of intermittent streams; and 0.034 acres of a perennial stream.  *Id.*  The Corps

determined that the impact on the 0.034 acres of perennial stream is temporary.  *Id.*

The Permit requires extensive on-site and off-site mitigation.  To compensate for

discharges into the affected streams, the Corps required Mingo Logan to create tens of thousands

of feet (more than 2:1 ratio) of replacement streams, to restore thousands of feet of streams

onsite, to enhance thousands of feet of Spruce Fork offsite, to rehabilitate and enhance 2,500

linear feet of Rockhouse Creek offsite; and to create a 50-foot vegetative riparian zone on all of

these restored, enhanced, and created stream channels which will result in over 71 acres of

riparian habitat.  AR025769.  This mitigation plan incorporated comments from EPA.

AR24622-25.  The Permit also required monitoring and allows the Corps to impose additional

requirements if the Corps determines it necessary.  AR025770.

The Permit notifies Mingo Logan of the Corps's enforcement powers under 33 C.F.R.

§§ 326.4 and 326.5 as well as its authorities under 33 C.F.R. § 325.7 to suspend, modify or

revoke the permit.  AR025765.  Significantly, the Permit mentions nothing about § 404(c) or any

circumstances under which EPA may suspend, modify or revoke it.

---

[6] On November 2, 2006, EPA informed the Corps that "we have no intention of taking
our Spruce Mine concerns any further from a Section 404 standpoint."  AR023085.

### III.   EPA Tries to Revoke the § 404 Permit

Once issued, the Permit was immediately embroiled in pending litigation challenging

other surface mining permits.  *See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No.

3:05-cv-00784 (S.D. W. Va. filed Sep. 22, 2005) (Plaintiff's motion for temporary restraining

order).  The Fourth Circuit upheld the other challenged permits, effectively affirming the Corps's

approach in issuing Mingo Logan's Permit.  *OVEC*, 556 F.3d at 217.  After Mingo Logan then

moved for summary judgment based on the Fourth Circuit's decision, EPA asked the Corps to

revoke, suspend or modify the Permit, claiming concerns about "the project's potential to

degrade downstream water quality."  AR012754.

Invited to comment on EPA's request, WVDEP confirmed the validity and propriety of

its § 401 water quality certification and the § 402 permit that it had issued.  Observing that EPA

had fully participated in the permitting process, WVDEP described EPA's request as a

"retroactive, ad hoc departure[] from existing laws, rules, and guidelines."  AR012780.

On September 30, 2009, the Corps announced that it would not suspend, revoke or

modify the Permit.  AR012781-84.  The Corps found that none of the five factors to be

considered under 33 C.F.R. § 325.7 warranted action.  AR012782.  Among other things, Mingo

Logan was complying with the Permit and there had been no new information or change in

circumstances or law.  *Id.*

EPA then took matters into its own hands.  On March 26, 2010, EPA announced that it

intended to "veto" the Permit under § 404(c).  AR000004, *et seq.*  EPA published its notice in the

*Federal Register* on April 2, 2010, along with its Proposed Determination.  AR000050-70.

The Corps and WVDEP remained steadfast in support of the Permit.  In response to

EPA's Recommended Determination, the Corps reiterated that it had "no basis to take any

corrective action regarding the 404 permit [it] issued" for Spruce.  AR010659.  WVDEP noted

that each of EPA's concerns was "based on water quality" regulated by the State water quality

standards, the interpretation and enforcement of which "is uniquely a State issue."  WVDEP

Nov. 29, 2010, Comments as to Recommended Determination, at 2; Facts ¶ 64.  WVDEP

explained that EPA was making up new standards wholly outside the provisions of the CWA.

*Id.*

Nonetheless, on January 13, 2011, EPA issued its Final Determination (FD), purporting

to "withdraw the specification of Pigeonroost Branch, Oldhouse Branch and their tributaries . . .

as a disposal site for dredged or fill material in connection with construction of the Spruce No. 1

Surface Mine, as authorized by DA Permit No. 199800436-3 . . . ."  AR010108.  EPA bases its

decision on its findings (a) that there will be unacceptable adverse effects at the fill discharge

sites, FD § V.C., AR010148-52; and (b) that there will be unacceptable adverse effects

downstream from the fill discharge sites, FD § V.D., AR010152-75.  EPA also contends that the

permitted activities will not comply with the § 404(b)(1) Guidelines, FD § V.E., AR010176-92,

despite the Corps's findings to the contrary.  EPA's action, if upheld, would nullify roughly 88

percent of the total discharge area authorized by the Permit, effectively prohibiting further

mining.

## STANDARD OF REVIEW

Summary judgment will be granted if one of the moving parties is entitled to judgment as

a matter of law, and there are no genuine issues of material fact.  FED. R. CIV. P. 56.  Under the

Administrative Procedure Act (APA), agency action can be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A).  Summary judgment is an appropriate way to dispose of claims involving review of

an administrative record, especially the threshold question of whether the agency has the

authority to act.  *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003).

**ARGUMENT**

I.      **EPA's Action Is Contrary to Law Because EPA Lacks Legal Authority Under §
        404(c) to Modify an Issued Permit.**

        EPA's FD fundamentally alters the Permit.  But § 404(c) gives EPA no authority over

permits.  Section 404(c) authorizes EPA to prohibit the "specification" of "disposal sites."

Specification occurs either before a permit issues or in situations that do not involve permits at

all.  Section 404(c) does not mention "permits."  The text of § 404(c), the historical context of

the 1972 CWA amendments, the language and structure of the CWA as a whole, and legislative

history all confirm that EPA cannot revoke or modify § 404 permits.

        A.      **Section 404(c)'s Unambiguous Terms Give EPA No Power to Revoke or
                Modify an Issued Permit.**

        To determine the scope of EPA's authority under § 404(c), the Court first looks to the

text of the statutory provision.  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.

837, 843 n.9 (1984).  The Court applies the "traditional tools of statutory construction,"

including the text and structure of the statute, and its legislative history, if appropriate, to

determine if the statute unambiguously expresses Congress's intent.  *Id.*; *see also Bell Atl. Tel.

Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).  If the intent of Congress is clear, that is the

end of the matter.  *Chevron*, 467 U.S. at 842-43.  Here, Congress's intent is clear.

                1.      **Section 404(c) Addresses Only Specifications, Not Permits.**

        "[T]he starting point in any case involving the meaning of a statute[ ] is the language of

the statute itself."  *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210 (1979).

Section 404 states:

                **(a)  Discharge into navigable waters at specified disposal sites**

                The Secretary [of the Army] may issue permits, after notice and
                opportunity for public hearings for the discharge of dredged or fill
                material into the navigable waters at specified disposal sites.

**(b)  Specification for disposal sites**

Subject to subsection (c) of this section, each disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator [of EPA], in conjunction with the Secretary . . . and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

**(c) Denial or restriction of use of defined areas as disposal sites**

The Administrator is authorized to prohibit the *specification* (including the withdrawal of *specification*) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for *specification* (including the withdrawal of *specification*) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary.

33 U.S.C. § 1344 (emphases added).

As the text makes plain, Congress gave the Corps power over permits.  The Corps — not EPA — issues permits authorizing the discharge of fill material at specified disposal sites. EPA's role under § 404(c) is much narrower.  Before issuing a permit, the Corps must specify the disposal sites for the permit, and § 404(c) authorizes EPA to "prohibit the specification" of those sites.  But § 404(c) gives EPA power only as to disposal site "specifications," which differ from permits (*see infra* Section I.A.5.).  Nothing in § 404(c) says that EPA can alter a permit after the Corps issues it.  Indeed, § 404(c) does not include the word "permit" at all.

The absence of the word "permit" in § 404(c) contrasts sharply with other parts of § 404. For example, § 404(a) gives the Corps the power to "issue *permits,*" § 404(b) tells the Corps how to specify the disposal site to be used in "each such *permit,*" § 404(p) provides that "[c]ompliance with a *permit* issued pursuant to this section . . . shall be deemed compliance"

with the CWA, and § 404(s) empowers the Corps to take enforcement actions upon "violation of any condition or limitation set forth in a *permit*."  33 U.S.C. § 1344 (emphasis added).  This repeated use of "permit" throughout § 404 is not accidental.  It is the *permit* that both authorizes the permit-holder's activity and governs the permit-holder's conduct.  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Duncan v. Walker*, 533 U.S. 167, 173-74 (2001) (internal quotations omitted); *see also S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 384 (2006) ("[W]hen Congress fine-tunes its statutory definitions, it tends to do so with a purpose in mind.").

EPA's assertion of perpetual power to modify or revoke § 404 permits is based solely on two parenthetical phrases that mention the "withdrawal of specification."  EPA contends that by using the word "withdrawal", "[one] must . . . presume that Congress intended to give EPA the authority to 'take back' a specification *or permit* that was previously 'granted.'"  EPA's Mem. in Supp. of Its Mot. to Dismiss (Dkt. No. 9) at 31-32 (emphasis added).

But the text of § 404(c) does not mention "permits."  The notion that Congress would grant EPA the extraordinary power to revoke permits through two parentheticals that do not even contain the key word, simply does not comport with fundamental principles of statutory interpretation.  "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  But that is exactly what EPA's interpretation would do.

### 2.    Historical Context of the 1972 CWA Amendments Makes Clear That the Corps, Not EPA, Has Authority over § 404 Permits.

Congress's intent to limit EPA's authority in § 404(c) to "specifications" is further made clear when the 1972 CWA amendments — which included the addition of § 404(c) — are viewed in historical context.  "'[C]ourts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.'"  *See Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979) (quoting *United States v. Union Pac. R.R. Co.*, 91 U.S. 72, 79 (1875)).  Two features of the 1972 CWA amendments show that Congress never intended § 404(c) to give EPA any power over issued permits:  (1) Congress's decision to make permits the regulatory centerpiece of its new water quality regime; and (2) Congress's decision to give the Corps, not EPA, authority to permit the discharge of dredged or fill material.

*The Basic Structure of the CWA — All Discharges From Point Sources Are Prohibited, Except as Authorized by a "Permit."*  The CWA's conceptual foundation is its sweeping premise that any discharge of pollutants from point sources to navigable waters is unlawful, unless made pursuant to a *permit* that incorporates conditions and limitations imposed by CWA §§ 301, 302, 306 and 307.  33 U.S.C. §§ 1311, 1312, 1316, 1317.  *See* 33 U.S.C. §§ 1311(a), 1342(a), 1344(a) and 1328(a).  Earlier water quality acts instead focused on whether a given discharge negatively impacted water quality.[7]  But this framework proved unworkable, primarily because it included no mechanism to enforce the adoption of water quality standards, let alone compliance with those standards.[8]

---

[7] *See generally EPA v. California ex. rel. State Water Res. Control Bd.*, 426 U.S. 200, 202 (1976) (describing pre-1972 regime).

[8] "[I]t was often difficult to formulate precise water quality standards and even more difficult to prove that a particular operator's discharge reduced water quality below these

The 1972 CWA Amendments changed all that.[9]   Section 301(a) of the Act "established a default regime of strict liability."  *Piney Run*, 268 F.3d at 265.   All discharges are illegal unless made in compliance with one of the Act's exceptions.   And the primary exceptions involved "permits" issued under *either* § 402 *or* § 404.  *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 489 (1987).   Once issued, a permit establishes definitively the CWA requirements applicable to the covered activity for the term of the permit.   By complying with its permit, the permit holder complies with the CWA.   33 U.S.C. § 1342(k); 33 U.S.C. § 1344(p).  *Natural Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

CWA permits remain the law as to the covered discharges even if regulatory standards later change.   "In general, permits are not modified to incorporate changes made in regulations during the term of the permit.   This is to provide some measure of certainty to both the permittees and the Agency during the term of the permits."  *See* National Pollutant Discharge Elimination System Permit Regulations, 49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984).   Thus, "permit terms and conditions remain enforceable unless and until they are modified, revoked, or judicially or administratively stayed."   National Pollutant Discharge Elimination System; Revision of Regulations, 44 Fed. Reg. 32,854, 32,869 (June 7, 1979).   EPA itself has cautioned that "any attempt to apply limitations or standards which were not in effect at the time of permit issuance constitutes unauthorized overreaching by the permit issuing authority."  *Id*.

**Congress Authorized the Corps to Issue § 404 Permits for the Discharge of Dredged or Fill Material.**   Having established discharge permits as the CWA's central regulatory

standards."  *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 264 (4th Cir. 2001).

[9]  *See* Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816 (1972) (codified as amended at 33 U.S.C. §§ 1251 *et seq.*).

mechanism, Congress then established two distinct permitting programs:  § 404, which governs

the discharge of "dredged or fill material", and § 402, which regulates non-fill related discharges

of pollutants.  *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458, 2474

(2009).  Section 404 authorizes only the Corps to "issue permits . . . for the discharge of dredged

or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); *see*

*Coeur Alaska*, 129 S. Ct. at 2464-65 (describing the Corps's authority under § 404); *Nat'l*

*Mining Ass'n v. Jackson*, No. 1:10-cv-1220-RBW, 2011 WL 124194, at *1 (D.D.C. Jan. 14,

2011) ("The Corps has sole authority to issue Section 404 permits.").

Congress made the Corps responsible for § 404 permits because the Corps's

responsibilities for maintaining the nation's navigable waterways had given it long experience

with regulating dredge and fill activities and disposing of dredged spoil in navigable waters.[10]

The application for any permit under this previous regime required the Corps to review the

impact on water quality at a proposed disposal site for any dredged spoil.  *See* 33 C.F.R.

§§ 209.120(d)(8); 209.120(d)(11) (1972).  So by 1972, the Corps had well-established

jurisdiction over dredging in navigable waters and the associated discharge of dredged spoil,

including broad authority to specify sites for disposal of dredged material.  After considerable

debate about whether dredge or fill activities should be regulated along with other pollutants

under § 402 (and subject to the program overseen by EPA), Congress concluded that the Corps

should retain that responsibility and have exclusive authority over § 404 permits that would

govern the discharge of dredged or fill material.[11]

---

[10] *See* Rivers and Harbors Acts of 1890 and 1899, 33 U.S.C. §§ 401, 403, and 1905
Rivers and Harbors Act, 33 U.S.C. § 419.

[11] Congress rejected a version of the legislation that would have treated dredged and fill
material the same as any other pollutant.  The Senate version of the Act, S. 2770, 92d Cong., 1st
Sess. (1971), *reprinted in* 2 A Legislative History Of The Water Pollution Control Act

Consistent with this fundamental decision, Congress empowered the Corps to issue individual § 404 permits for discharges of dredged or fill material at specified disposal sites. 33 U.S.C. § 1344(a). In issuing those permits, the Corps specifies disposal sites for the permits based on the Corps's application of the § 404(b)(1) Guidelines. 33 U.S.C. § 1344(b). The Corps, not EPA, enforces compliance with permit terms. 33 U.S.C. § 1344(s). And concomitant with the power to issue and enforce § 404 permits is the power to decide whether those permits should be modified, suspended or revoked after they are issued. 33 C.F.R.§ 325.7; *see also* 44 Fed. Reg. 58,076, 58,077-78 (Oct. 9, 1979) (EPA final rule rejects proposed version of 40 C.F.R. § 231.7 that would have claimed authority to suspend permits because EPA doubted it had the authority to suspend permits).

In contrast, Congress gave EPA only a limited role under § 404 and carefully prescribed the timing and substance of EPA's involvement. In conjunction with the Corps, EPA promulgates the guidelines that the Corps applies to specify disposal sites. *See* 33 U.S.C. § 1344(b)(1); 40 C.F.R. pt. 230. EPA also provides comments to the Corps during the permitting process. *See* 33 C.F.R. pt. 325. If EPA has concerns that a proposed discharge will have "substantial and unacceptable" impacts to an "aquatic resource of national importance," EPA may seek elevation of a permit decision to the Division and Headquarters levels of the Corps. *See* 33 U.S.C. § 1344(q); 404(q) MOA. But the Corps "is *solely responsible* for making final permit decisions pursuant to . . . Section 404(a) . . . including final determinations of compliance

---

AMENDMENTS OF 1972 at 1534-1723 (Jan. 1973) (LEGISLATIVE HISTORY 1972), treated the discharge of dredged or fill material the same as the discharge of every other pollutant, all of which would have been governed by the proposed § 402, making EPA the responsible permitting authority. *Id.* at 1685-92. The House version, by contrast, kept authority over dredged and fill material with the Corps. *See* H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in* 1 LEGISLATIVE HISTORY 1972 at 893-1110. The House's version ultimately prevailed.

with the Corps permit regulations, [and] the Section 404(b)(1) Guidelines . . . ."  404(q) MOA at 1 (emphasis added).

In sum, Congress in 1972 (a) established permits as the CWA's central regulatory mechanism; (b) created a separate permitting regime in § 404 governing the discharge of dredged and fill material; (c) gave the Corps authority to issue and enforce 404 permits; and (d) gave EPA only a limited role in the § 404 program.  Viewed in this historical context, it is inconceivable that Congress intended to give EPA plenary authority through § 404(c) to overrule the Corps's permitting actions years after a permit has issued.

### 3.    Congress's Limitation of EPA's § 404(c) Power to the Pre-Permit Period Comports With Other Key Provisions of the CWA.

Congress's intent to restrict EPA's role under § 404(c) to the pre-permit period is confirmed by the CWA as a whole.  As Judge Walton of this Court recently observed, "Congress intended the EPA to have a limited role in the issuance of Section 404 permits, and . . . nothing in Section 404 . . . gives the EPA the authorization to develop a new evaluation or permitting process which expands its role."  *Nat'l Mining Ass'n*, 2011 WL 124194, at *10.  Allowing EPA to revoke or modify an issued 404 permit at any time after a permit issues — and overrule the Corps's decisions both to issue the permit and not to revoke or modify it — undermines other CWA provisions.

*Section 404(p).*  As discussed above, Congress's central policy innovation in the CWA was to require dischargers to obtain permits but then to assure them, through §§ 402(k) and 402(p) that if they comply with the permit, they will comply with the CWA.  *See* 33 U.S.C. §§ 1342(k), 1344(p).[12]  If the permittee violates the permit, the Corps may pursue administrative

---

[12] "[O]nce a Section 404 permit has been issued, the permittee's obligation to comply with the regulatory scheme of the Clean Water Act is determined by referring to the terms and

or civil enforcement.  33 U.S.C. § 1344(s).  Or, if "considerations of the public interest" warrant such action, the Corps may take administrative action to modify, suspend or revoke a permit.  33 C.F.R. § 325.7.  But absent such permit violations or public interest considerations, the permittee can rely on the permit shield of 404(p).

EPA does not claim that Mingo Logan has failed to comply with its Permit.  Under 404(p) Mingo Logan should be able to rely on its Permit to continue its lawful operations. Moreover, the Corps rejected EPA's request to suspend, modify or revoke the Permit because under 33 C.F.R. § 325.7, there are no grounds to do so.  So the Permit remains operative.  Until that Permit is actually modified *by the Corps*, § 404(p) says that Mingo Logan can discharge in accordance with its terms without violating the Act.[13]

Yet the FD purports to prohibit Mingo Logan from operating in accordance with the Permit and destroys the permit shield of § 404(p).  Instead of the certainty that Congress intended, perpetual uncertainty would result.  Congress would not blow a gaping hole in § 404(p) by allowing an agency that is not even charged with enforcing the permit to drastically alter the permit without any claim of noncompliance with the permit's terms and on grounds not contained in the permit itself.  *See Whitman*, 531 U.S. at 468.

Moreover, EPA's arrogation of power in this way creates a direct conflict with the Corps's regulations governing the modification, suspension or revocation of § 404 permits. *Compare* 33 C.F.R. § 325.7 and 40 C.F.R. pt. 231.  The Corps's regulations identify five factors relevant to whether to take the extraordinary step of modifying a permit:

---

conditions of the Section 404 permit." *Coeur D'Alene Lake v. Kiebert*, 790 F. Supp. 998, 1007-08 (D. Idaho 1992) (citing 33 U.S.C. § 1344(p)).

[13] For precisely this reason, EPA rejected a version of its regulation governing the emergency exercise of § 404(c) authority that would have given EPA the authority to suspend the permit itself.  44 Fed. Reg. at 58,077-78.

[1] *the extent of the permittee's compliance with the terms and conditions of the permit*;

[2] whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions;

[3] any significant objections to the authorized activity which were not earlier considered;

[4] revisions to applicable statutory and/or regulatory authorities; and

[5] *the extent to which modification, suspension, or other action would adversely affect plans investments and actions the permittee has reasonably made or taken in reliance on the permit.*

33 C.F.R. § 325.7 (emphases added).  EPA's interpretation would allow it to override a permit without regard to the permittee's compliance with the permit or the economic consequences of EPA's action.

In sum, the Corps and § 404(p) say Mingo Logan may lawfully operate under its permit, and EPA says it may not.  This is precisely the type of confusion that the Supreme Court condemned in *Coeur Alaska*.  There, the Court considered whether the CWA authorized both EPA and the Corps to regulate discharges of mine tailings into a lake.  The Court rejected that reading of the Act and stated that a "two-permit regime would cause confusion, delay, expense and uncertainty in the permitting process."  129 S. Ct. at 2474.  The Court clearly delineated the separate roles performed by EPA and the Corps.  EPA cannot circumvent this separation and create perpetual confusion.

**Section 404(q).**  EPA's interpretation also undermines the purpose of § 404(q), which requires the Corps and EPA to enter into agreements to minimize duplication and delays in permit issuance and commands that such agreements assure "a decision with respect to an application for a permit under [§ 404(a)] will be made *not later than the ninetieth day after the date the notice for such application is published*" under § 404(a).  33 U.S.C. § 1344(q) (emphasis

20

added).[14]  This statutory requirement would be meaningless if EPA could simply wait until the

permit issues and then invoke § 404(c) to modify the issued permit.[15]  EPA has agreed that its

comments to the Corps regarding compliance with the § 404(b)(1) Guidelines "will be submitted

within the time frames established in this agreement and applicable regulation."  404(q) MOA at

1-2.  The MOA's interpretation of § 404(q) is illusory if EPA can simply wait until the permit

issues and then unilaterally impose its own judgment.

        In short, § 404(q) gives the agencies 90 days to resolve disagreements before the permit

issues, while EPA's reading of § 404(c) would allow EPA unilaterally to act on these

disagreements throughout the life of the permit.  Congress would not take such care to protect

permit applicants from interagency battles, only to obliterate that protection in § 404(c).

>    **4.    Legislative History Confirms That Congress Did Not Intend to Give
>           EPA Far-Reaching Power to Modify or Revoke Issued Permits.**

        The Court need not consider legislative history because the statute's language is clear and

EPA's position conflicts with other parts of the CWA.  But the legislative history confirms that

Congress intended EPA to act under § 404(c), if at all, prior to permit issuance.

        The most direct and relevant legislative history appears in Senator Edmund S. Muskie's

statement on the floor of the Senate.  *See* Senate Consideration of the Report of the Conference

---

        [14] Section 404(q) was enacted in 1977 as a response to widespread and significant
permitting delays that were occurring under the 1972 provisions.  *See, e.g.*, S. REP. NO. 95-370,
95th Cong. 1st Sess. (July 28, 1977), *reprinted in* 4 A LEGISLATIVE HISTORY OF THE CLEAN
WATER ACT OF 1977 at 633, 713 (Oct. 1978) (LEGISLATIVE HISTORY 1977).  Congress was thus
focused on accelerating interagency coordination during permit review and reducing "redtape
and delay."  *See* Senate Debate, Clean Water Act of 1977 - Conf. Rpt. (Dec. 15, 1977), *reprinted
in* 3 LEGISLATIVE HISTORY 1977 at 425, 531.

        [15] As EPA Administrator Ruckelshaus recognized, public policy favors an assurance that
there will be "a cut-off point regarding any possible review of newly issued permits."
Administration Testimony, Hearings on H.R. 11896, Committee on Public Works, U.S. House of
Representatives (Dec. 7, 1972), *reprinted in* 2 LEGISLATIVE HISTORY 1972 at 1111, 1186, 1205
(statement of EPA Adm'r William D. Ruckelshaus).

Committee (Oct. 4, 1972), *reprinted in* 1 LEGISLATIVE HISTORY 1972 at 161-339.  Senator

Muskie was Chairman of the Senate Subcommittee on Air and Water Pollution, chief sponsor of

the 1972 Amendments and leader of the Senate delegation in the Conference Committee.  In his

presentation of the Report of the Committee of Conference, Sen. Muskie addressed the

compromise adopting the House bill giving permitting authority for the discharge of dredged and

fill material to the Corps, rather than EPA.  He then noted that EPA would retain certain

authority under § 404(c), which he explained as follows:

> *[P]rior to the issuance of any permit* to dispose of spoil, the
> Administrator must determine that the material to be disposed of
> will not adversely affect municipal water supplies, shellfish beds,
> and fishery areas (including spawning and breeding areas), wildlife
> or recreational areas in the specified site.  *Should the Administrator
> so determine, no permit may issue.*

*Id.* at 177 (emphases added).  Sen. Muskie explained that:

> The conferees were uniquely aware of the process by which the
> dredge and fill permits are presently handled and did not wish to
> create a burdensome bureaucracy in light of the fact that a system
> to issue permits already existed.  At the same time, the Committee
> did not believe there could be any justification for permitting the
> Secretary of the Army to make determination[s] as to the
> environmental implications of either the site to be selected or the
> specific spoil to be disposed of in a site.  Thus, the Conferees
> agreed that the Administrator of the Environmental Protection
> Agency should have the veto over the selection of the site for
> dredged spoil disposal and over any specific spoil to be disposed of
> in any selected site.
>
> The decision is not duplicative or cumbersome *because the permit
> application transmitted to the Administrator for review* will set
> forth both the site *to be used* and the content of the matter of the
> spoil to be disposed.  The Conferees expect the Administrator *to be
> expeditious* in his determination as to whether a site is acceptable
> or if specific spoil material can be disposed of at such site.

*Id.* (emphases added).  In short, Congress intended for EPA to act under § 404(c) expeditiously

and *during the application stage*, not after the permit issued.

### 5.    Specifications and Permits Are Fundamentally Different.

EPA attempts to get around the statutory language by contending that "unless the term 'withdrawal' encompasses EPA's authority to take back a specification that was already permitted, the term would have no meaning that is not duplicated by the terms "prohibit," "deny," and "restrict." EPA's Mem. in Supp. of Its Mot. to Dismiss (Dkt. No. 9) at 32. But EPA is wrong. As EPA itself admits, "specifications" and "permits" are two different things. "For purposes of Section 404(c), the term 'specification' is necessarily broader than the term 'permit' because there are situations in which a discharge is authorized but a permit issued by the Corps is not required." AR010578-79.[16] So there is no dispute that "specification" is something different than a permit, and that the "specifications" exist in contexts outside of the 404 permitting process. EPA may prohibit or withdraw "specifications." It has no power over permits themselves.

Historical context again shows that Congress's decision to limit EPA's power in § 404(c) to specifications was no accident. When Congress enacted § 404(c), it would have treated permits and disposal site specifications as conceptually distinct. In its pre-1972 regulations governing the disposal of dredged spoil under the River and Harbors Act, the Corps designated a number of disposal sites for the discharge of material. *See* 33 C.F.R. pt. 205 (1972). These existing sites were located throughout the country, including New York Harbor, Chesapeake Bay, the Great Lakes, certain rivers and harbors, and approaches to seaports off both coasts. Each specified disposal site had separate provisions and requirements for dumping. *Id.*

---

[16] *See also* EPA's Reply Mem. in Supp. of Its Mot. to Dismiss (Dkt. No. 11) at 21: "[I]t is clear that Congress intended EPA's Section 404(c) authority to apply not only to specified disposal sites in permits, but also to sites that the Corps specifies for disposal outside of the permitting context, including sites used by the Corps' in connection with federal dredging projects, for which there is no permit." (Citing 33 C.F.R. § 336.1(a), (b)(5)).

Congress thus understood in 1972 that these specified disposal sites existed wholly apart from § 404 permits.[17]   Indeed, it enacted § 401(c) of the 1972 amendments to authorize the Corps to "permit the use of spoil disposal areas under [its] jurisdiction by Federal licensees or permittees." *See* 33 U.S.C. § 1341(c).  This reaffirmed the Corps's authority over the disposal sites then in use and authorized the Corps to use those sites in its § 404 permitting program.  Accordingly, some "specifications" existed independently of permits.  They were "on the shelf" for the Corps to use in a § 404 permit, and they existed even if the Corps never issued a § 404 permit that authorized the discharge of dredged or fill material at those specified sites.[18]

The distinction between "permits" and "specifications" within the regulatory scheme in place when § 404 was enacted explains why Congress included the parenthetical phrase "(including the withdrawal of specification)" in two places in § 404(c).  Congress made clear that EPA not only could act prospectively with respect to areas proposed to be specified as disposal sites in § 404 permits, but also could act to "withdraw" specifications that already existed apart from the permits.  Inclusion of the word "withdrawal" ensured that EPA had authority over all "specifications."  And so long as the specification in question is not incorporated into a valid permit, EPA can "withdraw" that specification whenever it chooses. But once a permit issues, the rules change.  Modifying, suspending or restricting the specification at this point means

_____

[17] When he introduced the first version what would become section 404, Senator Ellender made clear that "specified disposal sites" referred to "open water disposal areas" and "diked disposal areas" that the Corps maintained independently of the § 404 program.  Senate Debate on S. 2770 (Nov. 2, 1971), *reprinted in* 2 LEGISLATIVE HISTORY 1972 at 1386.

[18] Indeed, EPA's own regulations establishing guidelines for specifications under § 404(b)(1) explain that specified disposal sites exist apart from the permitting process.  In 40 C.F.R. § 230.2, EPA identifies five sources for specifications including (1) the Corps's regulatory program under CWA §§ 404(a) and (e); (2) the Corps's civil works program; (3) permit programs of States approved by EPA under CWA §§ 404(g) and (h); (4) statewide dredged or fill material regulatory programs approved under CWA §§ 208(b)(4)(B) and (C); and (5) federal construction projects which meet criteria specified in CWA § 404(r).  *See* AR010578-79.  Several of these sources have nothing to do with permits issued under § 404(a).

modifying the permit itself.  If Congress intended to give EPA the authority to modify "permits" in § 404(c), Congress would have said so explicitly.

### 6.   This Case Presents An Issue of First Impression and the Cases EPA Cites Do Not Address A Post-Permit Exercise of § 404(c).

No case has considered whether EPA may act under § 404(c) after the Corps issues a permit.  Likely, this is because EPA has never before attempted to do so.

Although EPA relies on dicta in two district court decisions from 1990 to support its authority to act, AR010578, neither case holds that EPA has authority to act under § 404(c) after the permit issues.  In *City of Alma v. United States*, 744 F. Supp. 1546, 1553 (S.D. Ga. 1990), EPA sought to "veto" the specification of a disposal site for a *proposed* § 404 permit.  *Id*. at 1553.  A previous permit had been invalidated, the Corps had proposed a new permit, and the veto was directed at the proposed permit.  *Id.* at 1558-60.  The issue of whether EPA could withdraw a previously issued permit was not before the court, so any language that EPA cites to that effect is purely dicta.  In *Russo Dev. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990), the petitioner had sought a so-called "after-the-fact" permit as to land that the petitioner had already filled.  EPA vetoed the *proposed* (albeit after-the-fact) permit, not an existing permit, and thus any statements as to EPA's claimed authority to withdraw an existing permit are also dicta.

Indeed, dicta in more recent cases suggest that an exercise of § 404(c) authority necessarily precedes permit issuance.  *See, e.g., Coeur Alaska Inc.*, 129 S. Ct. at 2465 ("By declining to exercise its veto, the EPA in effect deferred to the judgment of the Corps . . . [to issue the permit].");  *Nat'l Mining Ass'n*, 2011 WL 124194, at *1 n.3 (noting that § 404(c) gives EPA the power "to prevent the Corps from authorizing certain disposal sites" and that "[t]o

25

exercise its authority . . . EPA must determine . . . that certain unacceptable environmental

effects would occur if the disposal site were approved by the Corps and granted a permit.")

    **B.**    **EPA Is Entitled to No Deference and Mingo Logan's Construction of § 404(c) Is Clearly Preferable.**

    Even if the Court finds § 404(c) to be ambiguous, the Court should not defer to EPA's

interpretation of § 404(c) because § 404 delegates power to both the Corps (primary power) and

EPA (limited authority).  "In this Circuit, where multiple agencies are charged with

administering a statute, a single agency's interpretation is generally not entitled to *Chevron*

deference; instead, the court must review the agency's interpretation *de novo*."  *New Life*

*Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 122-23 (D.D.C. 2010) (citing *Grant*

*Thornton, LLP v. Office of Comptroller of the Currency*, 514 F.3d 1328, 1331 (D.C. Cir. 2008)).

The alternative "would lay the groundwork for a regulatory regime in which either the same

statute is interpreted differently by the several agencies or the one agency that happens to reach

the courthouse first is allowed to fix the meaning of the text for all."  *Rapaport v. U.S. Dep't of*

*the Treasury, Office of Thrift Supervision*, 59 F.3d 212, 216-17 (D.C. Cir. 1995).  This rule

applies especially here, where EPA would wrest final permitting authority from the Corps and

modify the Permit despite the Corps's express refusal to do so.

    Even in those instances where a single agency is charged with administering the statute,

the Court may defer only to a reasonable agency interpretation.  *See S. Co. Servs., Inc. v. FCC*,

313 F.3d 574, 579 (D.C. Cir. 2002).  "Obviously, the court must not simply 'rubber stamp' the

agency interpretation or transform deference into 'judicial inertia.'"  *Investment Co. Inst. v.*

*Conover*, 790 F.2d 925, 935 (D.C. Cir. 1986).  An agency interpretation that would

fundamentally revise the statutory scheme created by Congress is not "reasonable" and thus is

not entitled to deference.  *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005).

For the many reasons discussed throughout this brief, EPA's proffered interpretation of § 404(c) runs counter to the express language, the statutory permitting scheme, the statutory goal of giving a permittee certainty, and Congress's allocation of responsibility to the States and to the Corps.  It creates untenable tension between the authority vested in the Corps and that claimed by EPA — all to the detriment of the permit holder.  In other words, to accept EPA's interpretation, the Court "would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence."  *Id.* at 469.

Mingo Logan's interpretation, in contrast, gives effect to Congress's choice to give the Corps alone power over § 404 permits.  It harmonizes § 404(c) with other provisions in § 404 and it comports with the legislative history.  The Court should rule that EPA's power under § 404(c) ends once the Corps issues a permit and enter summary judgment in favor of Mingo Logan on Count I.  If the Court agrees, it need not read further.

## II.      Even If Timely, EPA's Action Under § 404(c) Is Unlawful.

Section 404(c) is not a skeleton key that unlocks the door to unbridled authority to address impacts that are governed by other sections of the CWA.  Even when timely exercised, EPA cannot use § 404(c) to promulgate its own water quality standards or to regulate water quality impacts governed by § 402 and regulated by the State of West Virginia.  Likewise, § 404(c) does not allow EPA to regulate surface mining generally at a mine like Spruce.  Instead, Congress commanded EPA to act only where a § 404 discharge will result in an "unacceptable adverse effect" — i.e., not routine or minor — on specific enumerated resources.  And if *arguendo* EPA has *any* power under § 404(c) after a permit issues, even EPA acknowledges that "it would be inappropriate to use [section] 404(c) after issuance of a permit . . . unless *substantial*

27

*new information is first brought to the Agency's attention after issuance.*"  44 Fed. Reg. at 58,077 (emphasis added).

Not only must EPA act within these limitations, EPA bears the burden to establish that it meets the requirements of § 404(c).  *Bersani v. U.S. EPA*, 850 F.2d 36, 40 (2d Cir. 1988) ("The burden of proving that the discharge [of fill material] will have an 'unacceptable adverse effect' is on EPA.").[19]  As described below, EPA has failed to meet its burden.

### A.      EPA Unlawfully Bases Its Final Determination on "Downstream Impacts."

The § 404 permit required for a surface mine like Spruce is only a small piece of a much larger regulatory puzzle.  Section 404 only governs the discharge of dredged or fill material.  33 U.S.C. §§ 1344(a), 1362(7); *see OVEC*, 556 F.3d at 194.  And Congress authorized EPA to act under § 404(c) only where EPA can demonstrate that the discharge of dredged or fill material into waters of the United States "will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas."  33 U.S.C. § 1344(c).  Section 404 does not govern surface mining generally, provide for the promulgation of water quality standards, or govern discharges into downstream waters from the outfalls that are regulated by the § 402 permit.  But as demonstrated below, FD § V.D. unlawfully attempts to do all of these things.

In FD § V.D., EPA bases its § 404(c) action on alleged effects downstream of the mine that will result, if at all, from effluent discharges that are regulated exclusively under § 402.  EPA specifically relies on its view of potential levels of selenium and total dissolved solids (TDS) which EPA purports to measure using an *ad hoc* conductivity criterion), as well as water

---

[19] *See also* 45 Fed. Reg. 85,336, 85,338 (Dec. 24, 1980) (noting that the EPA Administrator "does have the burden to justify his action" under 404(c)); 44 Fed. Reg. at 58,080 ("EPA [has] the responsibility of establishing a basis for any subsequent determination of unacceptable adverse effects" on the 404(c) listed resources).

quality parameters associated with the formation of golden algal blooms, even though EPA does not contend that any of these effects will violate West Virginia's water quality standards. AR010153; AR010284-85.

Each of these impacts results from discharges regulated by WVDEP under § 402 and each was considered during the § 402 permitting process. EPA cannot use § 404(c) to usurp WVDEP's authority to regulate these discharges. To the extent water quality is considered under § 404, Congress expressly made the States responsible under § 401 to certify that proposed § 404 discharges will comply with the State water quality standards. WVDEP issued that certification for the § 404 discharges at Spruce, and EPA did not challenge it. Even worse, EPA does not even apply the water quality standards that West Virginia promulgated pursuant to section 303 of the CWA and that govern CWA permitting decisions. EPA instead contends that West Virginia's standards do not matter and that EPA can apply its own ad hoc standards. AR010153; AR010290-91.

EPA's reliance in FD § V.D. on factors and standards that are beyond its purview under § 404(c) makes its FD arbitrary, capricious and contrary to law. *See Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider."). For each of the following independent reasons, EPA has breached the limits on its § 404(c) power and the Court should grant summary judgment on Counts V, VI, VII, VIII, X and XII of the Amended Complaint.

### 1.  EPA Usurps West Virginia's Regulatory Authority Under § 402 and SMCRA.

***The States Exercise Primary Authority Under Section 402.*** Section 404(c) grants EPA no license to regulate impacts from discharges governed by § 402. Congress instead granted the

States primary regulatory authority to permit § 402 discharges.  *See, e.g., Mun. Auth. of the Borough of St. Marys v. U.S. EPA*, 945 F.2d 67, 68, 71 (3d Cir. 1991).  Once West Virginia's permitting program was approved in 1982, EPA had to suspend its own program.  *See* 33 U.S.C. § 1342(c)(1); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007). Thereafter, West Virginia has had exclusive authority to implement the NPDES program within its boundaries.

Congress carefully prescribed (and limited) EPA's role in the State's § 402 permitting process.  The State must send EPA a copy of each permit application received and a statement of actions the State plans to take, including any draft permit.  33 U.S.C. § 1342(d)(1); 40 C.F.R. § 123.41.  Under § 402(d)(2), EPA can object in writing within 90 days.  33 U.S.C. § 1342(d)(2); *see also* 40 C.F.R. § 123.44(b)(2).  If EPA objects, the State may request a public hearing.  33 U.S.C. § 1342(d)(4); 40 C.F.R. § 123.44(e).  If EPA does not withdraw its objection and the State does not cure the problem to EPA's satisfaction within 30 days of the hearing or 90 days of EPA's objection, EPA may take over the process.  33 U.S.C. § 1342(d)(4); 40 C.F.R. § 123.44(h).  If none of this happens, the State may issue the permit.

In keeping with the CWA's delegation provisions, only the agency issuing the § 402 permit can modify it.[20]  When a State issues the permit, as WVDEP did in this case, EPA cannot modify it.  *See* 40 C.F.R. §§ 122.62, 124.5.  EPA can only request that the State do so.  Further, modification is only allowed in limited circumstances.  *See* 40 C.F.R. § 122.62(a); W. VA. CODE § 47-30-5.16.  Importantly, permits generally should *not* be modified during the term of a permit. EPA has acknowledged that "any attempt to apply limitations or standards which were not in

---

[20] Where there is a state approved program, the regulations vest the authority to make decisions relating to modification in the "Director."  *See* 40 C.F.R. §§ 122.62, 124.5.  Pursuant to 40 C.F.R. § 122.2, the term "Director" "normally means the State Director" "where there is an approved State program."

effect at the time of permit issuance constitutes unauthorized overreaching by the permit issuing

authority." 44 Fed. Reg. at 32,869; *see also* 49 Fed. Reg. at 38,045 ("In general, permits are not

modified to incorporate changes made in regulations during the term of the permit.  This is to

provide some measure of certainty to both the permittees and the Agency during the term of the

permit.").

     ***EPA Cannot Use § 404(c) to Address Impacts Regulated Under § 402.***  The permitting

regimes under §§ 402 and 404 are mutually exclusive.  *See Coeur Alaska, Inc.*, 129 S. Ct. at

2467; *see* Facts ¶¶ 12-14.  In *Coeur Alaska*, the Supreme Court considered a mine plan that

called for mining slurry to be discharged into a lake (which had been regulated under § 404) and

for water from that lake to be discharged downstream (which had been regulated under § 402).

The question before the Court was whether the mining slurry discharge into the lake was also

subject to § 402.  The Court held that it was not, explaining that the mining slurry was "fill"

regulated under § 404, and therefore was excluded from regulation under § 402.  Addressing

whether the discharge could be governed by both § 402 and § 404, the Court explained that "a

two-permit regime is contrary to the statute and the regulations . . . *A two-permit regime would

cause confusion, delay, expense, and uncertainty in the permitting process*."  *Id.* at 2474

(emphasis added).  Thus, the Supreme Court read the CWA as setting clear boundaries between

the two permitting regimes.  *Id.* at 2467-68 ("Section 402 thus forbids the EPA from exercising

permitting authority that is 'provided [to the Corps] in' § 404.").

     The same situation arises under EPA's FD.  Whereas in *Coeur Alaska* EPA was urged to

regulate § 404 discharges under § 402, here EPA attempts to regulate § 402 discharges under §

404.  The need for separation between the two programs is just as clear.  The levels of selenium,

TDS and water quality parameters (TDS, nutrient levels, and high pH) associated with the

growth of golden algae that EPA contends will result in unacceptable adverse effects to wildlife were thoroughly evaluated during the § 402 permitting process.  In 2002, when WVDEP proposed to modify the § 402 permit for Spruce, EPA objected, noting that recent studies "indicated impairment of aquatic life and significantly higher levels of *selenium*, sulfates, and *conductivity* for streams with valley fills," thereby raising concerns about Spruce.  AR042908-10 (emphasis added).  But EPA withdrew these objections after WVDEP agreed to add selenium monitoring to all of the outfalls covered by the § 402 permit and to add spoil handling measures as a condition of the § 402 permit.  AR019597; AR008437-38.[21]

Having failed to object to the § 402 permit that WVDEP ultimately issued, EPA cannot now deploy § 404(c) to effectively extend the Congressionally-imposed time limits under § 402(d) and unilaterally wrest § 402 authority from West Virginia.  Section V.D. of the FD violates the separation between §§ 402 and 404 identified in *Coeur Alaska* and leads to the very confusion and uncertainty that the Supreme Court sought to avoid.  Because discharges from the outfalls at the site are regulated by Mingo Logan's § 402 permit, those discharges cannot be regulated under § 404, and cannot form the basis for EPA's FD under § 404(c).

EPA cannot evade the statutory scheme and *Coeur Alaska* by characterizing the § 402 discharges from sediment ponds and other permitted outfalls as "secondary effects" of the 404 discharges.  AR010573.  First, 40 C.F.R. § 230.11(h), which EPA cites, states that, while secondary effects may be considered by the Corps in specifying sites, those effects "shall be

---

[21] WVDEP issued the modified § 402 permit in 2003, further modified the permit in 2005, and renewed and modified the permit thereafter, each time without objection from EPA. The current permit incorporates limits and conditions that WVDEP deemed necessary.  In accordance with 40 C.F.R. § 122.4 (and 40 C.F.R. § 123.25), WVDEP could not have issued the permit had it determined that the permitted discharges would *not* meet the requirements of the CWA.  EPA could have used its review authority under § 402(d) to raise objections.  Or, if it was not satisfied with the State's response to any objections, EPA could have taken over the permitting process under § 402(d)(4).  *See supra* at 30.

considered *prior to the time final section 404 action is taken* by permitting authorities."
(emphasis added).[22]   Second, and more important, § 230.11(h) does not purport to authorize EPA
to regulate § 402 discharges under § 404.  It would be one thing if the "secondary effects" EPA
identifies were not already regulated by § 402, but it is another thing entirely when they are.  *Cf.*
*James City Cnty. v. U.S. EPA*, 955 F.2d 254, 257-58 (4th Cir. 1992).  Under *Coeur Alaska*, EPA
cannot use § 404(c) to intrude on WVDEP's authority over § 402 discharges from the outfalls at
the site.[23]

   *EPA Does Not Prove That the Alleged Effects Result From the 404 Discharges, Rather*
*Than Other Sources.*  The need for separation between the §§ 402 and 404 discharges is made
more obvious by EPA's burden under § 404(c).  EPA must demonstrate that the alleged
unacceptable adverse effects result from the permitted § 404 discharges that EPA seeks to
prohibit.  Yet, EPA makes no attempt to establish that the increased contaminant loads result
from those discharges.

   The 2,278 acre mine site is drained by 29 outfalls that discharge into several downstream
waters.  Facts ¶¶ 66-68, 73.  Only three of those outfalls drain sediment ponds that receive water

---

   [22] Section 230.11(h) is part of the § 404(b)(1) Guidelines, which do not apply after the
Corps has issued a § 404 permit. *See infra* Section II.C.

   [23] EPA's contention that "secondary downstream effects from placement of the valley
fills will arise not only from export of pollutants from the valley fills [i.e., through water
discharged from outfalls permitted by WVDEP under the section 402 permit] but also from
removal of Pigeonroost Branch and Oldhouse Branch as sources of freshwater dilution to
downstream waters," AR010573, is a sleight of hand.  The export of pollutants and "reduced
dilutive effect" are simply two ways of describing the same process.  Either way, the water
coming out of the discharge point has the same level of contaminants.  As the level of
contaminants in the contributing stream rises, the contributing stream dilutes the level of
contaminants in the receiving stream less and less.  Stripped of its circular logic, EPA focuses
only on the water discharged from the outfalls, which is regulated by § 402 and which *Coeur*
*Alaska* does not allow EPA to regulate under § 404(c).

from the 8.11 acres of § 404 discharges.[24]   The other 26 outfalls drain water that is not associated

with the § 404 discharges, and even the three outfalls that drain sediment ponds drain water from

throughout the mine.  Facts ¶¶ 67-68.  In other words, water quality downstream reflects activity

at the entire mine, and § 404 discharges are but a small fraction of that activity.  EPA's

consideration of downstream water quality thus relies on impacts that are *solely* regulated under

the § 402 permit and SMCRA, which EPA may not consider.[25]

Section 404 does not give EPA the power to regulate surface mines in general.  SMCRA

does that job.  In *OVEC*, the district court concluded that the Corps, in issuing § 404 permits for

surface mines like Spruce, should have considered the environmental impact of entire mines, not

just the § 404 discharges.  The Fourth Circuit reversed, explaining:

> The Corps's jurisdiction under CWA § 404 is limited to the narrow
> issue of the filling of jurisdictional waters.  To say that the Corps
> has a level of control and responsibility over the entire *valley* fill
> project . . . is to effectively read out of the equation the elaborate,
> congressionally mandated schema for the permitting of surface
> mining operations prescribed by SMCRA.

556 F.3d at 195.  Even though § 404 permits are pre-requisites to constructing valley fills, "it is

WVDEP, and not the Corps, that has 'control and responsibility' over all aspects of the valley fill

---

[24] *See* Facts ¶¶ 44, 65-67.  This total includes the discharges into Right Fork of Seng
Camp, which is not subject to the FD.  The total acreage of 404 discharges at Pigeonroost Branch
and Oldhouse Branch is thus less, and there are only *two* outfalls associated with sediment ponds
in those watersheds.  *Id.* ¶ 67.

[25] EPA's problem is demonstrated by the map attached to this brief as Exhibit 2, which
shows the location of the outfalls in relation to the valley fills.  This map summarizes key
features found in the map accompanying the most recent § 402 permit.  *See* During Mining
Drainage Map, Spruce No. 1 Mine, NPDES Permit WV1017021, Modification No. 8 (2008) (to
be added to the record).

projects beyond the filling of jurisdictional waters." *Id.* at 197.[26]  If the Corps cannot use § 404

to extend its reach into areas carved out for the States in SMCRA, EPA cannot use its much

narrower power under § 404(c) to do the same.

>  **2.     EPA Cannot Use § 404(c) to Substitute Its Own Judgment for West Virginia's Water Quality Standards.**

FD § V.D. is undermined yet further by EPA's application of its own *ad hoc* water

quality judgments and not the standards that West Virginia has duly promulgated and that govern

the permitting decisions at issue here.  EPA maintains that it need not be constrained by the

State's water quality standards or the State's water quality certification under § 401.  AR010571.

EPA is wrong.  State water quality standards are conclusive and define what is

"acceptable" within the context of CWA permitting decisions.  WVDEP has concluded that the

permitted § 404 discharges will not violate West Virginia's water quality standards.  EPA cannot

now second-guess that judgment.  Nor can EPA use the unacceptable adverse effects standard as

a pretext to make up its own standards.  If it wants to change the standards, it must follow the

process laid out by Congress.  And even if it did so, it could not then apply those new standards

change the requirements of an existing permit.  As EPA itself has acknowledged, this would

eviscerate the certainty that permits are intended to provide.  49 Fed. Reg. at 38,045.

*Congress Authorized the States — not EPA — to Promulgate, Interpret and Apply*

*Water Quality Standards.*  CWA § 303 gives States the authority to establish and revise water

quality standards.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.4.  Congress limited EPA's role.  EPA

may recommend "criteria for water quality" for States to consider when formulating their own

water quality standards.  *See* 33 U.S.C. § 1314.  But these recommended criteria do not bind the

---

[26] *See also United States v. Mango*, 199 F.3d 85, 93 n.7 (2d Cir. 1999) (rejecting the argument that § 404 allowed the Corps to regulate an entire project, merely because that project involved § 404 discharges).

States and are not independently enforceable.  33 U.S.C. § 1314(a)(1).  *See, e.g., City of*

*Albuquerque v. Browner*, 865 F. Supp. 733, 738 (D.N.M. 1993) ("States are free to draw upon

EPA's recommended water quality criteria, but are equally free to use other criteria for which

they have sound scientific support.").

　　　EPA also can object to a State's proposed water quality standards.  33 U.S.C. § 1313(c).

If EPA determines that a State's standards do not meet applicable statutory requirements, then

EPA must so inform the State within 90 days of the State's submission.  40 C.F.R. § 131.5; 40

C.F.R. § 131.21.  If the State does not cure the problem within 90 days of EPA's notice, then

EPA must establish replacement federal standards.  33 U.S.C. § 1313(c)(3)-(4).  But for the most

part, the States promulgate water quality standards with EPA's review and approval, and this was

the case with respect to the water quality standards relevant to Spruce.

　　　State water quality standards adopted through these procedures govern CWA permitting

decisions.  *See* 40 C.F.R. § 131.21; *Alaska Clean Water Alliance v. Clarke*, No. C96-1762R,

1997 WL 446499 (W.D. Wash. July 8, 1997); *see also* 48 Fed. Reg. 51,400, 51,403 (Nov. 8,

1983) (codifying EPA's water quality standards regulation).  The 404(b)(1) Guidelines require

the Corps to consider only state water quality standards in effect at the time of permit issuance,

which remain "applicable" until they are replaced through the procedures set forth in CWA

§ 303.  40 C.F.R. § 131.21(e).

　　　The States' primary role is further manifest in Congress's  requirement that the States

certify that all proposed § 404 discharges will meet State water quality standards.  33 U.S.C. §

1341.[27]  "[C]ertification under Section 401 is set up as an exclusive prerogative of the [S]tate."

---

[27] "Any applicant for a Federal . . . permit to conduct any activity . . . which may result in
any discharge into the navigable waters, shall provide the licensing or permitting agency a
certification *from the State* in which the discharge originates . . . that any such discharge will

*Mobil Oil Corp. v. Kelley*, 426 F. Supp. 230, 234-235 (S.D. Ala. 1976); s*ee also Lake Erie Alliance for the Prot. of the Coastal Corridor v. U.S. Army Corps of Eng'rs*, 526 F. Supp. 1063, 1074 (W.D. Pa. 1981).  Nothing empowers EPA to overturn a State's § 401 certification on a specific project.  If EPA believes a State certification is improper, EPA's exclusive recourse is to seek review under applicable State procedures.  *See* 40 C.F.R. § 124.55(e) (providing that review and appeals of State certification are governed by the applicable State's procedures).

   ***EPA Wrongly Seeks to Apply Its Own Ad Hoc Water Quality Standards.***  EPA candidly acknowledges that Mingo Logan's permitted discharges will not violate applicable water quality standards.  "To be clear, EPA's conclusion that the Spruce 1 mine as authorized would cause unacceptable adverse effects on wildlife is not dependent on a conclusion that West Virginia's water quality standards will be violated at or downstream of the site."  AR010571.  In other words, contrary to the CWA and EPA's own regulation stating that State water quality standards govern decisions under the CWA, *see* 40 C.F.R. § 131.21, EPA argues that it may ignore those standards under § 404(c).  Under this view, EPA does not care that permitted discharges will not result in a violation of West Virginia's standards for selenium or that West Virginia does not deem it sound or necessary to promulgate a standard for conductivity.  According to EPA, it may develop and apply its own criteria, separate and apart from State water quality standards to deem downstream levels "unacceptable."

   If EPA is correct, then State water quality standards and the State's 401 certification of compliance with those standards have no purpose in the context of 404 permits.  This is not how the CWA works.  State water quality standards define what water quality impacts are

---

comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title."  33 U.S.C. § 1341(a)(1) (emphasis added).

"acceptable." Section 303(c)(2)(A) specifically requires that these standards must protect

wildlife:

> Such standards shall be such as to protect the public health or
> welfare, enhance the quality of water and serve the purposes of this
> [Act]. Such standards shall be established taking into consideration
> their use and value for public water supplies, propagation of fish
> and wildlife, recreational purposes, and agricultural, industrial, and
> other purposes, and also taking into consideration their use and
> value for navigation.

*See* 33 U.S.C. § 1313(c)(2)(A). And EPA's own regulations make clear that State-promulgated

water quality standards "must be used when . . . evaluating proposed discharges of dredged or fill

material under § 404." 40 C.F.R. § 131.21(d). As WVDEP emphasized repeatedly in objecting

to EPA's action here:

> EPA [cannot] carve the term "unacceptable adverse impact" out of
> the overall context of the Clean Water Act and give its meaning an
> application completely distinct from that of State water quality
> standards. [West Virginia's] properly promulgated water quality
> standards are, in fact, the measurements by which both
> "unacceptable adverse impacts" and "significant loss of or damage
> to" are defined.

WVDEP Nov. 29, 2010, Comments as to Recommended Determination, at 2; Facts ¶ 64.

Judge Walton recently reached the same conclusion. In holding that a challenge by the

National Mining Association to EPA's attempt to apply its own 500 µS/cm conductivity limit to

permitting decisions under CWA §§ 402 and 404 would likely succeed on the merits, he ruled:

> [I]t seems clear that with the implementation of the Guidance
> Memorandum the EPA has encroached upon the role carved out
> for the [S]tates under the . . . Act by setting region-wide
> conductivity standards. In short, the EPA has modified the Section
> 404 permitting scheme, authority not granted to it under the . . .
> Act, and has similarly taken an expansive role beyond what was
> afforded to it in determining Section 303 Water Quality Standards.

*Nat'l Mining Ass'n*, 2011 WL 124194, at *10.  If EPA lacks authority to apply its new conductivity limit prospectively, it certainly lacks the power to apply it retroactively.  *See* 49 Fed. Reg. at 38,045.

In short, the States determine water quality standards and those standards govern CWA permitting decisions.  Nothing in § 404(c) empowers EPA to impose *ad-hoc* requirements on a permittee that simply override or ignore the State's water quality judgments.

### B.  FD § V.C. Fails to Meet EPA's Burden to Demonstrate That the 404 Discharges Will Cause Unacceptable Adverse Effects to Wildlife.

Stripped of its unlawful reliance on § 402 impacts and ad hoc water quality standards, EPA must justify its FD based on impacts from the 404 discharges.  In Section V.C., EPA attempts to meet this burden based on impacts to four types of wildlife — macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush — allegedly resulting from § 404 discharges into portions of Pigeonroost Branch and Oldhouse Branch.  AR010148-52.  EPA fails to meet its burden for three reasons.  First, EPA studied and reviewed these same impacts for over a decade and allowed the Corps to issue a permit for them in 2007, in effect finding them acceptable.  Assuming *arguendo* it has authority to act now under § 404(c), EPA must provide substantial new information that was not previously considered and explain why this new information supports its about-face.  EPA has not done so.  Second, the impacts identified are simply not significant.  They are either fundamentally routine in the § 404 program or focus on wildlife that EPA cannot even demonstrate exists at the site of the § 404 discharges.  Third, EPA fails to consider the Permit's extensive mitigation requirements.  Instead, EPA inappropriately criticizes the Corps's mitigation judgments, which the United States successfully defended before the Fourth Circuit, and ignores the Permit's requirement that if the mitigation plan proves ineffective, the Corps can order remedial action or additional mitigation.  Because EPA has

failed to carry its burden in Section V.C., the Court should enter summary judgment in favor of

Mingo Logan on Counts II, III and XI of the Amended Complaint.

> **1.     EPA Extensively Studied and Long Understood the Impacts of Filling Portions of Pigeonroost Branch and Oldhouse Branch and Has Failed to Establish That There is Substantial New Information.**

When EPA first proposed to modify or revoke Mingo Logan's Permit in 2009, WVDEP

observed that:

> [the Spruce No. 1 mine] is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry.  It has previously been through . . . twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies.

AR012780.  This is no overstatement.  EPA has reviewed the impacts to Pigeonroost Branch and

Oldhouse Branch since at least 1998.

When presented with the proposed § 402 permit in 1998, EPA began studying the

streams and wildlife at issue, including macroinvertebrate surveys and studies supplied by

WVDEP and Mingo Logan.  AR008397; AR008399; AR008402-04.  As discussed above, EPA

initially objected but withdrew its objections after Mingo Logan and the Corps submitted

additional information to EPA, reduced the size of some § 404 discharges and eliminated others

entirely.  Mingo Logan satisfied EPA's condition that Mingo Logan demonstrate that the § 404

discharges would not have a significant impact on the environment and establish that the "stream

reaches proposed to be covered by valley fills do not include unique aquatic life or habitat."

AR008403-04; AR008427; AR002870-71.  And when WVDEP proposed to modify the § 402

permit in 2002, EPA again objected, but withdrew its objections when West Virginia and Mingo

Logan agreed to additional macroinvertebrate sampling, water monitoring, and materials

handling practices.  AR008430-35; AR008437-38; AR008440.

EPA further evaluated the streams and impacted wildlife in response to the Corps's proposal to issue a § 404 nationwide permit.  AR002870.  After EPA required additional assessments of the macroinvertebrate assemblages in Pigeonroost Branch and Oldhouse Branch. AR002870, EPA concurred that the impacts to Pigeonroost and Oldhouse had been minimized to an acceptable level.  AR002871.

But these evaluations proved to be just the tip of the iceberg.  EPA prepared a Programmatic EIS (PEIS) on Mountaintop Mining that studied Pigeonroost Branch and Oldhouse Branch extensively.  AR037305, *et seq.*[28]  Among other things, EPA specifically studied the habitat in Pigeonroost Branch and Oldhouse Branch, catalogued all mining in the watershed, sampled macroinvertebrates in Pigeonroost Branch and Oldhouse Branch as a means of assessing stream quality, and measured conductivity, pH, temperature, and dissolved oxygen.[29]  AR028862-79.  EPA also separately studied water quality, Facts ¶ 22, studied macroinvertebrates in Pigeonroost Branch and Oldhouse Branch over the course of several years, AR034719, *et seq.*; AR028780, *et seq.*; AR037522, *et seq.*, and sampled fish in Pigeonroost Branch and Oldhouse Branch.  AR034527.  Habitat in the region was examined, Facts ¶ 22, the abundance of vertebrate species was quantified, AR041129, *et seq.*, bird populations in the Spruce Fork Watershed were surveyed, AR027116, *et seq.*; AR041129, *et seq.*, and soil was analyzed, Facts ¶ 22.  The PEIS studied salamanders extensively, Facts ¶ 23, and included a 157-page study of terrestrial species, which surveyed the Spruce Fork watershed.  AR041129, *et seq.* The Draft PEIS also included a comprehensive analysis of fish assemblages in Pigeonroost

---

[28] The components and Appendices of the Draft and Final PEIS will be added to the record. *See supra* n.3.  They are available at http://www.epa.gov/region3/mtntop/eis2003.htm and http://www.epa.gov/region3/mtntop/eis2005.htm.  Non-record cites to these documents can be found in the Statement of Facts at ¶¶ 21-24.

[29] In that study, EPA classified Pigeonroost Branch as a "mined" stream.  AR028850.

Branch, Oldhouse Branch and Spruce Fork, Facts ¶ 23, and two extensive studies of bird populations in southern West Virginia, including the Spruce Fork Watershed.  AR027116, *et seq.*; AR041129, *et seq.*  Among the species studied was the Louisiana Waterthrush.  AR027140; AR027184.  And EPA reanalyzed (and twice updated) the study of terrestrial species, which included salamanders and the Louisiana Waterthrush.  Facts ¶ 23.

EPA also studied headwater streams generally, Facts ¶ 23, including statistical analyses of the impacts of valley fills and surface mining, AR028264, *et seq.*, studied various stream characteristics, AR030400; Facts ¶ 22, and convened a workshop on the value of headwater streams, Facts ¶ 22.  The Final PEIS included almost 400 pages of new and updated studies on headwater streams, macroinvertebrates, salamanders, fish and birds.[30]  AR037305, *et seq.*; AR037522, *et seq.; AR037697, et seq.*  For more than 60 pages EPA responded to comments on wildlife, water resources, habitat, alternatives, cumulative impacts, and mitigation.  AR037321-85.

At the same time, the Corps prepared a separate EIS specifically devoted to the Spruce § 404 permit application.[31]  AR034962, *et seq.*; Facts ¶ 35.  The Draft EIS included 256 pages on the "Affected Environment and Environmental Consequences" of Spruce, including analyses of macroinvertebrates fish, birds, and other wildlife.  AR013124-3380.  The Draft EIS also evaluated the impact of filling portions of Pigeonroost Branch and Oldhouse Branch and considered studies on the importance of headwater streams in the watershed.  AR013209-220; AR045005, *et seq.*  Appended to the Draft EIS were extensive evaluations of macroinvertebrates, surface water runoff, and energy flow, among other things.  AR045373-5661.

---

[30] Several of these studies evaluated Pigeonroost Branch and Oldhouse Branch specifically.  *See, e.g.*, AR037499; AR037544-46; AR037751.

[31] *See* Facts ¶¶ 35-40.

The Draft EIS evaluated the results of over 100 macroinvertebrate samples collected within and adjacent to the project area over the previous 14 years and the results of 15 separate studies of macroinvertebrates from 1990 through 2000.  AR013179-3288; AR045005, *et seq.* The Draft EIS evaluated impacts on salamanders and concluded that no impacts to rare species were likely to occur.  AR013282-84; AR034975-76.  Fish were sampled, but none were located in Pigeonroost Branch and Oldhouse Branch.  AR013282.  And the Draft EIS analyzed the Permit's effect on neotropical migrant birds, including interior forest birds such as the Louisiana Waterthrush.  AR013269-87; AR045034; AR045084; AR045094-95.  EPA provided substantial comments on the Draft EIS, AR042912-16; AR045054-74, the published DEIS, AR022791, and the proposed FEIS, AR024619-20; AR023084-3109.  The final EIS contained more than 50 pages of responses to EPA's comments.  AR035054-5109.  Mingo Logan submitted additional information and analysis, as well as a revised mitigation plan.  AR022946-52; AR022961-78; AR022981-3021; AR023369-74; AR023436-3617; AR024426-4511. EPA took no further action, stating that "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint," AR023081, and allowed the Permit to issue, thus deeming the impacts acceptable.

### 2.    EPA Must Raise Substantial Information That Was Not Previously Reviewed That Demonstrates Unacceptable Impacts.

EPA now claims that these known and evaluated impacts are unacceptable under § 404(c).  Yet even EPA has recognized in the preamble to its § 404(c) regulations that:

> [I]t would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit proceeding, or where the matters at issue were resolved to EPA's satisfaction during the permit proceeding, unless substantial new information is first brought to the Agency's attention after issuance.

44 Fed. Reg. at 58,077.  EPA thus acknowledges that it cannot reverse its own previous decision not to exercise § 404(c),[32] based on matters that were previously considered.  Instead, EPA must establish that there is substantial new information to meet its burden under 404(c).

Additionally, the APA's requirement of reasoned decisionmaking obligates EPA to evaluate the permitting record and explain why the information on which it now relies is new and significant, how it differs from what the Corps and EPA knew when the Permit was issued, and why the new information independently justifies EPA's most recent legal conclusions.  *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 42 ("an agency changing its course . . . is obligated to supply a reasoned analysis for the change"); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 745 (D.C. Cir. 1986).  EPA cannot simply change its mind and claim that impacts it previously determined to be acceptable are now *un*acceptable.  *See Jicarilla Apache Nation v. U.S. Dept. of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) ("[r]easoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent").  Without substantial new information to justify its decision and an explanation of what is new and how it independently justifies the Final Determination, EPA's u-turn is an archetype of arbitrary and capricious decision-making.

EPA's regulations do not explain what new information might be sufficiently "substantial" to justify modifying a four-year-old permit issued after a decade of multiple agency

---

[32] Allowing the Corps to issue the Permit was EPA's final agency action determining that the 404 discharges would not cause an unacceptable adverse effect on wildlife.  *See Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 8-10 (D.D.C. 2007); *see also* 1 LEGISLATIVE HISTORY 1972 at 177 ("prior to the issuance of any permit to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies, shellfish beds, and fishery areas (including spawning and breeding areas), wildlife or recreational areas in the specified site.").

reviews.  And no court has interpreted this "standard."  But the Council on Environmental

Quality (CEQ) imposes a similar requirement in its NEPA regulations that provides good

guidance for the Court.[33]

Specifically, the CEQ's NEPA regulations require the preparation of a supplemental

environmental impact statement (SEIS) when "[t]here are *significant new circumstances* or

information relevant to environmental concerns and bearing on the proposed action or its

impacts."  40 C.F.R. § 1502.9(c) (emphasis added).  Courts have interpreted this standard to

require new information "sufficient to show that the remaining action will 'affect the quality of

the human environment' in a significant manner or to a significant extent not already

considered."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989).  The new

information must "provide[ ] a *seriously* different picture of the environmental landscape."  *See*

*Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (emphasis

in original).  EPA's post-permit FD must meet a similar threshold.

EPA has failed to meet this burden.  At no point does the FD even purport to present new

information about the impacts at the Spruce mine site from the § 404 discharges.[34]  Instead, the

FD characterizes its new information as related to "the importance of headwater streams; a

---

[33] NEPA is linked closely with the CWA — for example, many fundamental NEPA
concepts appear in the 404(b)(1) Guidelines — so an analogy between the two is apt.

[34] Although the extent to which EPA based its FD on significant new information may be
a critical issue in this action, EPA has failed to include much of the previously available
information in the record, and has admitted that it did not review or rely on it.  In response to
Mingo Logan's request that EPA include in the administrative record all research included in the
permitting record for Spruce, as well as the scientific studies that Mingo Logan identified in its
comments, EPA has refused to include the research included in the EIS, and approximately 53
documents referenced in Mingo Logan's Comments, because EPA says that it did not consider
and rely on such documents.  Ex. 1 at 2.  "[A] complete administrative record should include all
materials that 'might have influenced the agency's decision,' and not merely those on which the
agency relied in its final decision."  *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 143 F.
Supp. 2d 7, 12 (D.D.C. 2001).  Mingo Logan will pursue this issue, if necessary after it sees
EPA's response to this summary judgment motion.

growing concern about the adverse ecological effects of mountaintop removal mining,

specifically with regard to the effects of elevated levels of total dissolved solids discharged by

mining operations on downstream aquatic ecosystems; and concerns that impacted streams

cannot easily be recreated or replaced." AR010110.  Although EPA obliquely references "nearly

100 articles and studies developed since the time" the Permit was issued," AR010122,[35] EPA

explains that these new articles relate to headwater streams generally, water quality changes from

increases in conductivity and selenium, and mitigation.  But EPA does not explain how these

new studies relate to the wildlife impacts described in Section V.C.  AR010110; AR010122.

The three articles on headwaters provide no new information whatsoever.  AR010122

(citing Meyer et al. 2007, Freeman et al. 2007 and Wipfli et al. 2007).  These generalized review

articles instead analyze previously known information and provide no new information about

Pigeonroost Branch and Oldhouse Branch.  AR028159; AR031468; AR041101.[36]  EPA

extensively evaluated the role headwater streams play in the ecosystem in the Spruce EIS and in

its own Programmatic EIS, Facts ¶¶ 22-23, 35, concluding that "[h]eadwater streams are

generally important ecologically because they contain . . . diverse invertebrate assemblages . . .

[and] also provide organic energy that is critical to fish and other aquatic species throughout the

entire river."  AR037310.  The FD reflects no "seriously different picture of the environmental

---

[35] The FD and appendices only actually cite 68 references dated 2007 or later.  Of those, 7 are database entries, 5 are personal communications, and 12 are review articles that just synthesize previously known information.  If one ignores studies of water quality and species that do not form a basis for the FD, there are less than 20 studies that are even arguably relevant to the 404 discharges.

[36] EPA also misrepresents what these studies – all submitted to the same journal in February 2006 – concluded.  None shows that "destruction or modification of headwater streams . . . affect[s] the integrity of downstream waters."  AR010122.  Meyer et al. 2007 reviewed past research on the biodiversity of headwater streams; Freeman et al. 2007 reviewed past research on the role of headwater streams in a watershed; and Wipfli et al. 2007 developed a conceptual model of materials flow.  AR028159; AR031468; AR041101. None demonstrates negative impact of filling portions of ephemeral and intermittent headwater streams.

landscape." *See Nat'l Comm. for the New River*, 373 F.3d at 1330; *see also Or. Natural Res. Council*, 490 U.S. at 374.

More importantly, EPA does not even claim that it has new information about the effects of the permitted discharges at the site.  Nor can it so claim, for these effects have been known and studied extensively as discussed above.  Although EPA identifies impacts to macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush as a basis for its FD, EPA repeatedly sampled, studied, surveyed, reviewed, and analyzed such impacts during the permitting proceedings, the Programmatic EIS, and the site specific EIS.  The FD provides no new information about these impacts, let alone "substantial new information."

Specifically, the FD provides no new information whatsoever regarding macroinvertebrates at the site of the fill.[37]  EPA also knew all of the information on salamanders before the Corps issued the Permit.[38]  EPA cites only one post-2006 study, for the contention that "[i]t is not expected that stream salamanders will return to the site."  AR010150.[39]  But the

---

[37] AR010134-37; AR010149 (citing studies dated before 2007).  The FD refers to West Virginia's list of rare, threatened and endangered species, dated 2007, but since EPA does not allege that any rare, threatened or endangered macroinvertebrates will be impacted by the 404 discharges, this reference is not relevant.  AR010134.  Appendix 2 to the FD references studies published after the Permit was issued, but only in the context of impacts from the 402 discharges into downstream waters.  AR010205.  EPA does not argue that these studies are relevant to the impact of the 404 discharges, *see* AR010134-37, AR010149.  Moreover, as Appendix 2 makes clear, these studies simply repeat and confirm effects that were heavily studied and well known when the Permit was issued.  AR010205 (citing studies from 2000 (2), 2001 (2), 2004, and 2005 for the same propositions as studies published after the permit was issued).

[38] AR010138-140 (citing studies published between 1975 and 2005); AR010150 (citing studies published in 2003 and 2004).

[39] The salamander section also refers to two "personal communication[s]" after January 2007 for the proposition that "the salamander communities in individual headwater systems behave essentially as isolated populations because there is limited interaction (immigration and emigration) with communities in adjacent watersheds."  AR010150.  EPA cites no studies to support this claim, and does not explain how this unsupported claim, if true, renders the loss of salamanders significant.  Moreover, these documents are not contained in the administrative record and thus cannot be relied on by EPA.

recolonization behavior of salamanders was well known when the Permit was issued,[40] and more critically, is irrelevant here because nothing in the Corps's Record of Decision, the Permit itself, or the numerous related studies depends on salamanders returning to the site of the § 404 discharges.[41]

The FD also provides no new information regarding impacts to fish or the Louisiana Waterthrush, because no fish or Louisiana Waterthrush has ever been observed at the site of the § 404 discharges. None of the fish-related information in the FD is relevant here, because fish have only been observed *downstream* of the 404 discharges. The only "new" information regarding the Louisiana Waterthrush is a claim that the area from southeastern New York to northern Alabama "is thought to support as much as 45 percent of the Louisiana Waterthrush's breeding population." AR010143. The fact that nearly the entire eastern seaboard of the United States may contain 45 percent of the breeding area for a single species is not relevant to the 404 discharges into less than 8 acres of Pigeonroost Branch and Oldhouse Branch.[42]

---

[40] *See, e.g.*, AR033274 ("most salamander species require several decades to return to predisturbance levels"); AR037668 ("Salamanders colonize new ponds more slowly because they do not disperse as readily as frogs").

[41] Even if this claim were relevant, EPA misrepresents the graduate student thesis on which it relies. Gingerich 2009 compared un-restored perimeter channels that were often dry to reference streams. AR028504-05. None of this data relates to whether salamanders will return to the site of the 404 discharges. Further, Gingerich actually found that "[o]verall density was not statistically different between perimeter channels and reference sites." AR028552.

[42] The FD cites one 2008 study for the contention that "[t]he Waterthrush is particularly vulnerable to degradation of water quality and aquatic insect communities." AR010151 (citing Mulvihill et al. 2008). EPA does not mention that the study evaluated *acidification*, AR032081, whereas EPA concedes that discharges from Spruce are expected to be *alkaline*, AR010162; AR010173; AR013166. Moreover, a 2006 study is cited for the same proposition, *id.* (citing Mattsson and Cooper 2006) and EPA does not contend that Mulvihill et al. 2008 provides any new information. Ultimately, neither study demonstrates that the Louisiana Waterthrush inhabits, or is likely to inhabit, the area surrounding the 404 discharges.

Significantly, the Corps, WVDEP, and even the Southern District of West Virginia agree with Mingo Logan that EPA is not relying on new information.  The Corps's response to EPA's request to modify, suspend, or revoke the Permit stated that "USEPA neither points to any new facts or circumstances nor identifies any significant permit objections which were not earlier considered."[43]  In response to the Recommended Determination, WVDEP stated that EPA claimed only "emerging science" (conductivity) as new information, but that the science that EPA "now claims to be 'emerging' is, in fact, a resurrection of science that has existed for years."  WVDEP Nov. 29, 2010, Comments as to Recommended Determination, at 2, 4 n.3; Facts ¶ 64.  Even the federal district court in the *OVEC* litigation observed that the issues raised by EPA are not new.[44]  These agencies and tribunals are right.

> **3.      The FD Fails to Demonstrate That the § 404 Discharges Will Cause Unacceptable Adverse Impacts to Wildlife.**

Even if the FD relied on substantial new information, EPA must still demonstrate that the 404 discharges will cause *unacceptable* adverse effects to wildlife.  EPA defines "unacceptable adverse effect" as an impact that "is likely to result in . . . *significant* loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas."  40 C.F.R. § 231.2(e) (emphasis added).  EPA must therefore establish that alleged adverse effects on wildlife will be "significant," which means "full of import," "important," "weighty," and "consequential."  *See* Webster's Third New International Dictionary Of The English Language Unabridged 2116 (1993); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 846 (9th Cir. 2003) (observing that the commonly understood meaning of "significant" is "'important'").

_____

[43] AR012810 (refusing to suspend the Permit because the Corp's regulations, 33 C.F.R. § 325.7, require, among other things, that new circumstances or objections be raised).

[44] *See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-00784, 2009 WL 3014943, at *2 (S.D. W. Va. Sep. 15, 2009) ("...the EPA letter [of September 3, 2009] does not provide substantial new information regarding the Spruce No. 1 permit.").

EPA cannot meet its burden through speculation or conjecture.  It can act only when it concludes that authorized discharges "will have" unacceptable adverse effects on specific resources.  Nor can EPA act on the basis of impacts that are routine in the context of § 404 discharges.  Section 404(c) grants EPA a very limited power, listing only specific resources, which Congress regularly referred to as "critical areas."[45]  If EPA could base its action on routine impacts, EPA could bring the 404 permitting program to a halt and effectively nullify the Corps's authority to issue permits.

The FD falls well short of meeting EPA's burden.  As explained below, the impacts to macroinvertebrates and salamanders are utterly routine in the region, and impacts to fish and the Louisiana Waterthrush are entirely speculative.

*Macroinvertebrates.*  Macroinvertebrates are found in any water of the United States and are likely to be impacted by *any* 404 permit issued by the Corps.  Facts ¶¶ 99-105.  EPA has not identified any rare, endangered or threatened macroinvertebrates that will be impacted and never explains how the loss of macroinvertebrates at the site of the fill differs from the thousands of other permits that fill streams that contain macroinvertebrates.  AR010149.  Nor does the FD quantify the loss of macroinvertebrates or compare the losses to the number of species in other reaches of Pigeonroost Branch and Oldhouse Branch, neighboring streams, or the regional community.  The FD thus provides no basis on which to conclude that the loss of macroinvertebrates will be "significant."

---

[45] For example, the original House bill referred to these areas only generically as "critical areas."  *See* H.R. 11896, 92d Cong., 2d Sess. (1971), *reprinted in* 1 LEGISLATIVE HISTORY 1972 at 893, 1064 ("The Secretary [of the Army] may issue no permit for discharge of dredged or fill material which would violate the designation of [EPA], found necessary to protect *critical areas*") (emphasis added).

Instead, EPA offers conclusory, unsupported, arguments for why the unquantified loss of macroinvertebrates might be "significant." EPA claims that the loss of macroinvertebrates will "impact regional native biodiversity." AR010149. EPA provides no citations to support this argument, however, and does not explain what it means to "impact regional native biodiversity."[46] EPA has only shown that several species of macroinvertebrates inhabit Pigeonroost Branch and Oldhouse Branch. AR010136-38. EPA concedes that these species "are naturally ubiquitous across the region, not rare, or endangered," AR009887, and never explains how the loss of these species in the fill area — which only constitutes a portion of these two ephemeral and intermittent streams — will affect the populations of these species in the region or diminish regional diversity.[47]

*Salamanders.* Central Appalachia enjoys one of the highest densities of salamanders in the world. Consequently salamanders will be impacted by almost any 404 permit in the region. AR010150; Facts ¶¶ 107-08. As with macroinvertebrates, the FD does not identify any rare, endangered or threatened salamanders that will be impacted, does not quantify the number of common salamanders that will be impacted, and does not compare the losses against the

---

[46] In fact, the only relevant evidence in the FD suggests that the loss of macroinvertebrates will have *no* effect on regional biodiversity. First, EPA concedes that these species are ubiquitous in the region and exist in the very next stream, White Oak Branch. AR009887; AR010136. Second, Pigeonroost Branch and Oldhouse Branch are not contributing macroinvertebrate diversity to downstream regions. AR010209. The FD provides no evidence that the sensitive macroinvertebrate species that are found in Pigeonroost Branch and Oldhouse Branch exist in Spruce Fork or elsewhere downstream.

[47] EPA also claims that the loss of macroinvertebrates "will *likely* affect food webs and the processing and transfer of energy and nutrients downstream." AR010149; AR010151 (emphasis added). But this is conjecture. The FD cites no studies to support its speculation and does not explain how the loss of these species in the fill areas will be "significant." AR010149. And EPA's own Scientific Advisory Board explained that functional impacts on downstream waters are not well understood and have not been adequately studied. *See* Facts ¶ 109.

surrounding community.[48]  In short, EPA never explains how the routine loss of common salamanders at the site of the fill differs from thousands of other permits impacting salamanders. Nor does EPA explain how a discrete loss of salamanders from portions of two streams in a region with more salamanders than almost anywhere else in the world will be "significant."

At most, the FD provides a few obtuse claims for why the loss of salamanders will be "significant."  For example, EPA claims that the loss of salamanders "will have broader food web implications, as they also serve as prey for numerous terrestrial and aquatic species found" at Spruce.  AR010150-51.  However, the FD cites no study showing that the loss of salamanders will have any effect on the food web.  The one literature review EPA cites, Davic and Welsh 2004, presents no original data, and does not analyze food web effects from salamander loss. AR027729.

***Fish.***  There are no fish at the site of the § 404 discharges.  All five fish species identified by EPA as inhabiting Pigeonroost Branch and Oldhouse Branch were found *downstream* of the site of the 404 discharges.  With one exception, every study cited by EPA surveyed areas of Pigeonroost Branch and Oldhouse Branch outside the footprint of the 404 discharges. AR010140-41; AR010150-51.  And the one exception, which looked for fish in a portion of the fill area, did not find any.  Thus, the record provides no evidence that the streams at the site of the § 404 discharges support any fish whatsoever.

---

[48] EPA's Proposed Determination contended that over 20 million salamanders would be present.  *See* 75 Fed. Reg. 16,788, 16,799 (Apr. 2, 2010).  The Recommended Determination reduced this estimate to 200,000.  AR009945-46.  The FD contains no estimate of total salamanders present, and relies instead on an unpublished Ph.D. dissertation that only studied salamanders in perennial streams.  AR010150 (citing Williams 2003); AR041001-03.  The relevant portions of Pigeonroost Branch and Oldhouse Branch are ephemeral and intermittent.  In sum, EPA does not even provide a basis for determining the number of salamanders at the site of the fill, making it impossible to determine whether the loss is significant.

*Louisiana Waterthrush.*  Despite the extensive evaluation described above, no Louisiana Waterthrush has ever been observed at the site of the authorized § 404 discharges.[49]  The absence of Louisiana Waterthrush at Spruce is not surprising because the mine (including the fill areas in Pigeonroost and Branch), does not contain habitat preferred by the Louisiana Waterthrush — i.e., intact, mature interior forests with perennial streams.  AR010143.[50]  The site of the discharges contains neither.  The area around Spruce has been logged many times in the past and, as the Draft EIS explained, contains only young to middle-aged forests with "relatively few mature trees."  AR013279.  And moreover, the reaches of Pigeonroost Branch and Oldhouse Branch at the site of the § 404 discharges are ephemeral and intermittent, not perennial.[51]  Thus, the FD establishes no impact on the Louisiana Waterthrush at all, let alone a significant impact.

In sum, EPA has failed to demonstrate that impacts at the site of the fill will result in a "significant" impact on any of the wildlife listed in the FD.

### 4.    EPA Has Failed to Consider the Permit's Mitigation Conditions.

The FD is deficient for yet another reason — EPA has not considered the Permit's compensatory mitigation conditions in determining whether the permitted discharges will have an unacceptable adverse effect.  The Corps decided that those mitigation requirements sufficiently mitigated the effects of the permitted activity, yet EPA contends that it need not consider them.  AR010186.  This position defies logic, especially where the Permit requires

---

[49] The Louisiana Waterthrush is not listed as endangered or threatened, nor is it listed as a Bird of Conservation Concern in the Northeast region or nationally.  AR010143.

[50] The Programmatic EIS states that the Waterthrush prefers "large tracts of mature forest" and the Final Determination states that the Waterthrush prefers "perennial headwater streams flowing through closed-canopy forest."  Facts at ¶ 107-10.

[51] EPA has not previously questioned the Corps's classification of these streams as ephemeral and intermittent.  EPA's post hoc position conflicts with the Corps' authoritative determination, comes far too late, and is wrong for many other reasons.  *See infra* at 55-57.

monitoring to ensure the mitigation conditions are actually working and requires implementation of remedial measures or additional mitigation if they are not. *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682  (D.C. Cir. 1982). (internal citations and quotations omitted) (holding under NEPA that if "the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed . . .").[52]   Indeed, "[h]istorically, EPA frequently has evaluated whether mitigation will offset effects to an acceptable level in connection with Section 404(c) actions, and that evaluation has been found appropriate by the courts." AR010405.

Importantly, the Corps imposed robust mitigation requirements, performance standards, and remedial actions that assure that full compensatory mitigation will be achieved.  These requirements comply with all legal requirements for compensatory mitigation and were developed based on the Corps's Regulatory Guidance Letter 02-02 (RGL 02-02), which at the time was the most detailed guidance on compensatory mitigation and the only guidance that addressed stream mitigation.  AR024958; *see OVEC*, 556 F.3d at 203-04 (relying on RGL 02-02 as the appropriate measure for determining the adequacy of stream compensation).[53]  Among other things, the Permit requires Mingo Logan (1) to create two feet of stream replacement for every foot of stream into which it could discharge; (2) to monitor mitigation and report annually

---

[52] *See also, e.g., Sierra Club v. Wagner*, 555 F.3d 21, 29 (1st Cir. 2009); *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 227 (5th Cir. 2007); *C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569, 1570 (11th Cir. 1988); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 979 (9th Cir. 1985); *S. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 105 (D.D.C. 2004).

[53] As affirmed in the Record of Decision, the Corps mitigation conditions are also consistent with the more general provisions of Section 230.10(d) of the Guidelines.  AR024950 *et seq.*

for 10 years on the success of those efforts; and (3) to measure the functional performance of the mitigation requiring, among other things, that the mitigated streams meet the pre-mining conditions of the impacted streams based on two assessment techniques developed by EPA (the so-called RBP and WVSCI).[54]  If the mitigation plan does not function  as expected, the Permit allows the Corps to change the mitigation plan and require Mingo Logan to implement corrective actions.[55]

Perhaps in an effort to rationalize its failure to consider the Permit's mitigation requirements, FD § V.E. — on which EPA says it does not rely and on which EPA cannot lawfully rely, *see infra,* section II.C.— presents three broad challenges to the Permit's mitigation conditions.  First, EPA challenges the adequacy of the functional assessment used to assess stream impacts and determine mitigation success.  AR010188-90.  Second, EPA claims that the Corps misclassified the relevant streams, thereby undermining the compensatory mitigation.  *Id.* Third, EPA argues that the Permit's required stream creation will not successfully replace the impacted resources.  AR010190-91.  None of these arguments has merit.  But EPA should not even be heard to make them, because EPA's arguments are nearly identical to arguments raised by environmental groups in *OVEC*, where the United States successfully defended the stream mitigation measures employed in the § 404 permits for four similar surface mines.  *OVEC*, 556 F.3d at 197.  Having successfully asserted before the Fourth Circuit that the types of mitigation measures at issue for the Spruce Permit lawfully comply with the 404(b)(1) Guidelines, the United States is judicially estopped from claiming that these same mitigation measures do not comply with the Guidelines.

---

[54] Rapid Bioassessment Protocols for Use in Streams and Wadeable Rivers:  Periphyton, Benthic Macroinvertebrates, and Fish (2d ed. 1999) (RBP); A Stream Index for West Virginia Wadeable Streams (Jul. 21, 2000) (WVSCI).

[55] For details regarding these conditions, *see* Facts ¶¶ 45-52.

"Courts may invoke judicial estoppel '[w]here a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position.'" *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 792 (D.C. Cir. 2010) (quoting *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010)). In *OVEC*, the plaintiffs challenged the mitigation imposed by the four permits at issue for many reasons, including: (1) that the mitigation violated the § 404(b)(1) Guidelines because the Corps relied on two EPA-developed protocols (the RBP and the WVSCI) that did not assess stream function; (2) that stream creation, through on-bench drainages in some cases, was not demonstrated to be effective and could not constitute adequate mitigation; and (3) that because the Corps inadequately identified the impacts associated with the filling of headwater streams, the permits' compensatory mitigation measures would not adequately replicate the functions of the impacted streams. *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,* 479 F. Supp. 2d 607, 642-43, 646-47 (S.D. W. Va. 2007).

The United States disputed each of these contentions. Fed. Appellant's Opening Br., *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, Nos. 07-1355 et al., 2007 WL 4626521, at *35-36, 43-44, 47-48 (4th Cir. Nov. 14, 2007). The Fourth Circuit agreed with the United States and upheld the mitigation measures, which are essentially the same, in the relevant particulars, as those required by the Spruce Permit. *See OVEC*, 556 F.3d at 205. The Fourth Circuit held that the RBP and WVSCI are appropriate surrogates for the assessment of function, that stream creation is an acceptable form of mitigation, that in-kind stream replacement is not required, and that the assessments used by the Corps and the mitigation imposed by the Corps were "appropriate and practicable" under the Guidelines. *Id.* at 200-06. The United States cannot contend that these measures are inadequate.

But even absent judicial estoppel, the logic of the Government's arguments and the Fourth Circuit's decision in *OVEC* apply just the same.  First, EPA fails to explain how the Permit's mitigation measures do not meet the "practicable and appropriate" standard of the 404(b)(1) Guidelines.[56]  The only "available" and "practicable" assessments in existence at the time the Permit was issued were the RBP and the WVSCI, and the Corps used them to assess stream impacts and as metrics for some of the performance standards.  The Fourth Circuit held that the RBP and WVSCI operate as surrogates for assessing stream function and fully comply with the Guidelines because they were then the only "available" and thus "practicable" methodologies for stream impact assessment.  *OVEC*, 556 F.3d at 198.  Moreover, if a better functional assessment methodology is later developed, Special Condition 22 of the Permit dictates that it be used to judge the success of mitigation.

Second, EPA argues that many of the streams at Spruce have been misclassified as ephemeral or intermittent instead of perennial, and that this misclassification undermines the Permit's mitigation essentially because perennial streams only can be mitigated through in-kind replacement with new perennial streams.  AR010188.  But "[n]othing in the Corps' CWA guidance requires that only in-kind, on-site mitigation measures be used."  *OVEC*, 556 F.3d at 204.  So stream classification is not dispositive of the adequacy of the mitigation.  In fact, EPA concedes that "the impacts to the wildlife in those [impacted] streams and downstream from those streams are the same regardless of the scientific classification of those streams."  AR010513.[57]

---

[56] "Practicable" means "*available* and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.3(q) (emphasis added).

[57] EPA's stream classification red-herring should fail for numerous other reasons as well.  First, EPA's definition conflicts with that of the Corps, which defines a "perennial" stream as

Third, EPA devotes three subsections to criticizing stream creation, AR010187-191, but stream creation was an acceptable and judicially approved form of mitigation when the Corps issued the Permit.  But even if stream creation arguably may not mitigate impacts at the site, the Permit itself provides a solution through its monitoring and remedial requirements if the mitigation plan fails to succeed.

### C.     EPA Cannot Second-Guess the Corps's Application of the § 404(b)(1) Guidelines Years After the Fact.

FD § V.E. unlawfully purports to judge the Corps's application of the 404(b)(1) Guidelines four years too late, and fails to meet EPA's burden in any event.  In relevant part, the Corps concluded that (a) there is no practicable alternative to the permitted activity that would have less adverse impact on the aquatic ecosystem; (b) that the discharges would not contribute to "significant degradation" of waters of the United States; (c) that there was "minimal potential for short or long-term environmental effects" related to cumulative or secondary effects; and (d) that Mingo Logan's proposed compensatory mitigation plan satisfied the Guidelines.  When in the fall of 2009, EPA raised these Guidelines issues in asking the Corps to modify the Permit, the Corps confirmed the validity of its earlier judgments.  The FD reevaluates and seeks to reverse these determinations by imposing its own post facto judgments.  AR010178-192.

---

having "flowing water year-round during a typical year."  72 Fed. Reg. 11,092, 11,197 (Mar. 12, 2007).  But EPA uses "indicator biota requiring at least a 6 month life cycle" to determine whether a stream is "perennial," AR010188, without explaining how biota requiring a 6-month life cycle is indicative of flowing water year round.  Second, EPA has used two different grounds for classifying stream segments as perennial.  For Oldhouse, EPA apparently used a drainage area criterion.  But for the middle fork of Pigeonroost, where drainage area would not support a perennial classification, EPA instead used the presence of some unnamed indicator biota.  AR010238.  Such flip-flopping does not satisfy EPA's significant post-permit burden under § 404(c).  Third, many of the replacement streams likely will have drainage areas whose acreages exceed the threshold for perennial streams espoused by EPA, and these mitigation streams are more than twice the length of impacted streams EPA would reclassify as perennial.  AR010245, AR010188.

EPA all but admits that it cannot base action under § 404(c) on its own de novo post-permit application of the Guidelines, as the FD repeatedly disavows any independent reliance on the Guidelines.  At every turn in § V.E., EPA avows that it does not actually base its determination on alleged non-compliance with the Guidelines.[58]  As a result, EPA's musings about the 404(b)(1) Guidelines are irrelevant and should be disregarded.

EPA's reticence to base the FD on application of the Guidelines is well-founded.  EPA cannot rely on the Guidelines after the Corps has issued the Permit.  Section 404(b)(1) directs the Corps — not EPA — to apply the Guidelines.  33 U.S.C. § 1344(b)(1).  The statute gives EPA no authority to apply them itself after the Corps has issued a permit.  In fact, § 404(c) does not mention the Guidelines at all.

In fact, the 404(q) MOA requires EPA to submit its comments regarding the Corps's application of the Guidelines before the permit issues.  404(q) MOA at 2.  It is one thing for the Corps to entertain EPA's views when the Corps itself is applying the Guidelines to determine whether to issue a permit.  It is something else entirely for EPA to use the Guidelines after the Corps has acted.[59]

Additionally, EPA's three conclusions in FD § V.E. are defective.  As to the effectiveness of the Permit's mitigation conditions, EPA's conclusions fail for the reasons discussed above in

---

[58] For example, EPA says that its discussion of the supposed availability of alternatives "does not depend on the presence or absence" of such alternatives.  AR010177.  And before critiquing the mitigation plan, EPA explains that "EPA does not need to determine that mitigation is somehow flawed or insufficient."  AR010186.

[59] The only cases squarely addressing EPA's use of the Guidelines in the 404(c) context involves EPA's use of the Guidelines before the Corps issued a permit.  *See James City Cnty. v. U.S. EPA*, 758 F. Supp. 348, 350 (E.D. Va. 1990), *aff'd in part* 955 F.2d 254 (4th Cir. 1992); *Bersani v. U.S. EPA*, 674 F. Supp. 405, 417 (N.D.N.Y. 1987), *aff'd* 850 F.2d 36 (2d Cir. 1988).  In *Bersani*, the district court recognized the legislative history of § 404, which enumerated one of EPA's responsibilities under § 404 as determining "prior to the issuance of any permit to dispose of spoil" whether the disposal will have any of the effects enumerated in § 404(c).  *Id.* at 416-17.

Section II.B.4.  And as to the availability of alternatives, EPA has failed to carry its burden because EPA never says what those alternatives are.  It instead wrongly suggests that Mingo Logan has the burden of demonstrating the availability of alternatives and has failed to carry that burden.  AR010177.  Yet EPA bears that burden, not Mingo Logan.  *Bersani*, 850 F.2d at 40.[60]

Either because EPA has not actually relied on FD § V.E. or because its findings violate the APA, the Court should grant summary judgment on Counts IX and XIII.

## CONCLUSION

For the reasons discussed above, the Court should grant Mingo Logan's motion for summary judgment and enter judgment vacating EPA's FD in its entirety, declaring that Mingo Logan's permit remains valid and in full force, and enjoining EPA from taking any further action under § 404(c) with respect to Mingo Logan's § 404 permit.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(f), Mingo Logan requests that the Court hear oral argument on EPA's motion.

---

[60] EPA stated cumulative effects would not be a basis for its determination and thus did not afford Mingo Logan a meaningful opportunity to comment on this consideration. AR009958.  EPA's assertions regarding significant degradation and secondary effects simply reiterate its claims in FD §§ V.C. and V.D. in different terms.

May 27, 2011                         **MINGO LOGAN COAL CO., INC.**


_____/s/ Robert M. Rolfe_____

Robert M. Rolfe (D.D.C. Bar No. MI0046)
Michael R. Shebelskie (Va. Bar No. 27459)
George P. Sibley, III (Va. Bar No. 48773)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
(804) 788-8218 (facsimile)

Virginia S. Albrecht (D.C. Bar No. 357940)
Deidre G. Duncan (D.C. Bar No. 461548)
Matthew D. Melewski (D.C. Bar No. 994459)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

Robert G. McLusky
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000
(304) 340-1130 (facsimile)

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____  )
                                           )
MINGO LOGAN COAL COMPANY, INC.             )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )        Case No. 1:10-cv-00541-ABJ
                                           )
UNITED STATES ENVIRONMENTAL                )
PROTECTION AGENCY                          )
                                           )
        Defendant.                         )
                                           )
_____  )

## CERTIFICATE OF SERVICE

        I hereby certify that on May 27, 2011, the foregoing Mingo Logan Motion for Summary

Judgment, Statement of Facts Material to Mingo Logan's Motion for Summary Judgment as to

Which There is No Genuine Issue, Statement of Points and Authorities in Support of Mingo

Logan's Motion for Summary Judgment, Exhibits 1 through 3, and Proposed Order were served

on counsel of record through the Court's electronic case filing/case management (ECF/CM)

system.

                                   _____/s/ Robert M. Rolfe_____

                                   Robert M. Rolfe (Va. Bar No. 15779)
                                   HUNTON & WILLIAMS LLP
                                   Riverfront Plaza, East Tower
                                   951 East Byrd Street
                                   Richmond, VA 23219
                                   (804) 788-8200
                                   (804) 788-8218 (facsimile)

                                   *Counsel for Plaintiff*