## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MINGO LOGAN COAL COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1 :10-cv-00541-ABJ** |
| | ) | |
| **UNITED STATES ENVIROMENTAL** | ) | |
| **PROTECTION AGENCY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## BRIEF OF AMICUS CURIAE THE STATE OF WEST VIRGINIA
## IN SUPPORT OF PLAINIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

STATEMENT OF INTEREST……………………………………………………………1

INTRODUCTION…………………………………………………………………...……2

  I.   Statutory and Regulatory Landscape………………………………………….…….…..2

      A.  The State of West Virginia Is Responsible For Developing Water Quality Standards…………………………………………………………………...……3

      B.  West Virginia Administers Its Section 402 NPDES Program……………………5

      C.  West Virginia Has Primacy Under SMCRA……………………………...…….…6

      D.  The State Issues Section 401 Certifications………………………………….……7

  II.   State Permitting History…………………………………………………………...……8

  III.   The State Opposes EPA's Veto………………………………………….…………10

DISCUSSION……………………………………………………………………14

  I.   EPA's Actions Usurp The State's Authority To Establish And Enforce Its Water Quality Standards………………………………………………………...…………14

  II.   EPA's Actions Nullify The State's NPDES Permit And Its Prior Negotiations With EPA……………………………………………………………………………19

CONCLUSION…………………………………………………...………………21

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Am. Paper Inst., Inc. v. Envtl. Prot. Agency*,
890 F.2d 869, 873 (7th Cir. 1989)……………………………………………………….5, 19

*Am. Paper Inst., Inc. v. Envtl. Prot. Agency*,
996 F.2d 346, 349 (D.C. Cir. 1993)……………………………………………………...4

*Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001)…….…………………………2, 3, 6

*Chevron U.S.A., Inc. v. Hammond*,
726 F.2d 483, 489 (9th Cir. 1984)………………………………………………………...4

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
129 S. Ct. 2458, 2464-65 (2009)………………………………………………………7, 18

*Defenders of Wildlilfe v. Envtl. Prot. Agency*,
415 F.3d 1121, 1124 (10th Cir. 2005)……………………………………………………4

*District of Columbia v. Schramm*,
631 F.2d 854, 860 (D.C. Cir. 1980)………………………………………………………3

*Gen. Motors Corp. v. Envtl. Prot. Agency*,
168 F.3d 1377, 1383 (D.C. Cir. 1999)……………………………………………………4

*Keating v. FERC*,
927 F.2d 616, 622 (D.C. Cir. 1991)…………………………………………….....7, 8, 18

*Nat'l Mining Ass'n v. Jackson*,
___ F. Supp. 2d. ___, 2011 WL 124194, at *1 (D.D.C. 2011)……………………………4

*Nat'l Wildlife Fed'n v. Browner*,
No. 95-1811, 1996 WL 601451 (D.D.C. Oct. 11, 1996)………………………………………2

*North Carolina v. FERC*,
112 F.3d 1175, 1195 (D.C. Cir. 1997)……………………………………………………8

*Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 208 (4th Cir.2009)………………8

*S. Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enforcement, Dep't of the Interior*,
20 F.3d 1418, 1427 (6th Cir. 1994)...……………………………………………………...6

**Statutes:**
30 U.S.C. § 1201 *et seq*.…………………………………………………………………..6

30 U.S.C. §§ 1201(f)……………………...……………………………………………..2, 6

30 U.S.C. § 1253(a)……………………………...……………………………………….6

30 U.S.C. § 1254………………………………………...…………………………….…6

33 U.S.C. § 1251(a)(1);…………………………...………………………………………3

33 U.S.C. § 1251(b)……………………………………………………...2, 3, 5, 19

33 U.S.C. § 1311(b)(2)…………………………………………………...…..5

33 U.S.C. § 1312(a)……………………………...……………………………………….5

33 U.S.C. § 1313……………………………………………………………….4, 14

33 U.S.C. § 1313(a)-(c)…………………………………………………...…..3, 4, 18

33 U.S.C. § 1313(c)(3)-(4)…………………………………………………….4, 18

33 U.S.C. § 1341(a)………………………………………………………...7, 12

33 U.S.C. § 1342(a)……………………………………………………………….5

33 U.S.C. § 1342(b)…………………………………………………..…………5, 6, 19

33 U.S.C. § 1342(c)(1).……………………………………………………...…6

33 U.S.C. § 1342(d)………………………………………………………………3

33 U.S.C. § 1342(d)(2), (4) ……………………...…………………………………6, 21

33 U.S.C. § 1344………………………………………………………………..3

33 U.S.C. § 1344(a) ………………………………………………………………7

33 U.S.C. § 1344(b)…………………………………...………………………………7

33 U.S.C. § 1344(c)……………………………………………………………….7

33 U.S.C. § 1344(q)…………………………………………………………………7

W. Va. Code § 22-3-4…………………………………………………………..6

W. Va. Code § 22-11-2(a). ……………………………………………………...…15

W. Va. Code § 22-11-2(b). ………………………………………………………...…15

W. Va. Code § 22-11-4(a)(16)……………………………………….………...16 n. 8

W. Va. Code § 22-11-7b(a)…………………………………………………16 n. 8

**Regulations:**

30 C.F.R. § 948.10……………………………………………………………...6

33 C.F.R. § 320.4(d)…………………………………………………………7

33 C.F.R. § 325.…………………………………………………………...…5

40 C.F.R. § 123.44………………………………...…………………….…6, 21

40 C.F.R. § 131.4(a)……………………………….……………………3, 14

40 C.F.R. § 230.…………………………………………………………7

W. Va. Code R. § 47-2……………………………………………..…………5, 14

W. Va. Code R. § 47-2-3.2.i.…………………………………………...…5, 14, 15, 18

W. Va. Code R. § 47-2 app. E, tbl. 1……………………………………5, 14

**Legislative Materials:**

W. Va. H.R. Con. Res. 111 (2010 Reg. Session)…………………………………...16

Randy Huffman, acting in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection, and on behalf of the State of West Virginia (collectively "the State of West Virginia"), hereby submits this amicus brief in support of Plaintiff Mingo Logan Coal Company, Inc.'s Motion for Summary Judgment.

### STATEMENT OF INTEREST

When the U.S. Environmental Protection Agency ("EPA") vetoed the Clean Water Act Section 404 permit for the Spruce No. 1 Mine ("Spruce") four years after the U.S. Army Corps of Engineers ("the Corps") issued the permit, it acted in an unprecedented manner that invaded the Corps' authority and harmed the permit holder, Mingo Logan Coal Company ("Mingo Logan"), as described fully in Plaintiff's Statement of Points and Authorities in Support of its Motion for Summary Judgment.  EPA's veto also harmed the State of West Virginia, usurping its primary role under the scheme of cooperative federalism regulating water pollution and mining activities that Congress established in the Clean Water Act and the Surface Mining Control and Reclamation Act ("SMCRA").

The State has regulated Spruce for over fourteen years.  During that time, the State issued numerous permits for Mingo Logan's operations at Spruce, including three Clean Water Act Section 402 National Pollutant Discharge Elimination System ("NPDES") permits and ten modifications to those permits, a SMCRA permit, and a Section 401 water quality certification, all of which certify that Mingo Logan's operations comply with the State's water quality standards and other regulatory requirements.  By vetoing the Section 404 permit, EPA nullified those permitting decisions and ignored the State's water quality standards, which EPA had previously approved.  EPA attempted to override the State's standards by basing its veto in large part on its new water quality standard based on specific conductance.  That standard is the

1

subject of ongoing litigation in this Court—the State of West Virginia and the Commonwealth of Kentucky are among parties who contend that EPA did not follow the Clean Water Act or the Administrative Procedures Act in adopting and implementing that standard. Moreover, the State issued permits for Spruce under its own water quality standards, which do not include a numeric standard for specific conductance. In fact, the State has rejected EPA's conductivity standard in favor of its own properly promulgated narrative water quality standards and monitoring methods, which the State is confident will protect the quality of its waters.

In issuing its veto, EPA also ignored WVDEP and EPA's prior resolution of the same issues upon which EPA's veto now rests. For all of these reasons, and those expressed by Plaintiff and other putative *amici*, this Court should vacate EPA's Section 404(c) action and grant Mingo Logan's motion for summary judgment.

## **INTRODUCTION**

### I.      **Statutory and Regulatory Landscape**

The Clean Water Act and SMCRA create a "delicate balance of federalism" under which the state and federal governments regulate mining and water pollution. *Nat'l Wildlife Fed'n v. Browner*, No. 95-1811, 1996 WL 601451, at *2 (D.D.C. Oct. 11, 1996). That system allows the State to maintain its primary role as protector of its lands and waters. *See* 30 U.S.C. § 1201(f); 33 U.S.C. § 1251(b). As Congress stated in the Clean Water Act

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use . . . of land and water resources, and to consult with the [EPA] Administrator in the exercise of his authority under this Act.

33 U.S.C. § 1251(b). Similarly and subsequently, the Surface Mining Control and Reclamation Act established a system of

> "'cooperative federalism,'" in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the

2

> Interior and State regulatory authority.  Under this scheme, Congress established . . . "'minimum national standards'" for regulating surface coal mining and encouraged the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws implementing these minimum standards, as well as any more stringent . . . standards that they might choose.

*Bragg v. W. Va. Coal Ass'n¸* 248 F.3d 275, 288 (4th Cir. 2001) (citations omitted).

All coal mining operations in West Virginia require a Section 402 NPDES permit and a SMCRA permit issued by the State.  Projects that involve dredge-and-fill activity must obtain Section 404 permits from the Corps and Section 401 certifications from the State.  That statutory scheme is summarized below.

### A.     The State of West Virginia Is Responsible For Developing Water Quality Standards.

The State of West Virginia is primarily responsible for the development of water quality standards under Section 303 of the Clean Water Act.  *See* 33 U.S.C. § 1313(a)-(c); 40 C.F.R. § 131.4(a).  The State takes the lead because it is the primary protector of West Virginia's waters.  *See* 33 U.S.C. § 1313(a)-(c); 40 C.F.R. § 131.4(a).

The Clean Water Act establishes a regulatory regime by which the federal and state governments work together to control water pollution and regulate the discharge of any pollutant into the nation's navigable waters.  EPA plays a limited role in that system.  EPA may object to a NPDES permit, refer a Section 404 permit to the White House Council on Environmental Quality, elevate the level of review for a particular Section 404 permit, or exercise its Section 404(c) authority.  *See* 33 U.S.C. §§ 1251(a)(1), 1342(d), 1344; *Dist. of Columbia v. Schramm*, 631 F.2d 854, 860 (D.C. Cir. 1980).  But "[t]he states remain, under the Clean Water Act, the prime bulwark in the effort to abate water pollution[.]"  *Keating v. FERC.*, 927 F.2d 616, 622 (D.C. Cir. 1991) (internal quotation marks omitted); *see also* 33 U.S.C. § 1251(b) (stating that the Act's "policy" is to "recognize, preserve, and protect the primary responsibilities and rights

of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources"); *Am. Paper Inst., Inc. v. Envtl. Prot. Agency*, 890 F.2d 869, 873 (7th Cir. 1989) (stating that "numerous courts have recognized the primacy of state and local enforcement of water pollution controls as a theme that resounds throughout the history of the Act" (alteration omitted) (internal quotation marks omitted)); *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 489 (9th Cir. 1984) ("Under [the Clean Water Act], the states maintain primary responsibility for abating pollution in their jurisdictions [.]").

The Clean Water Act's emphasis on the primary role of the states is demonstrated by Section 303, which "allocates primary authority for the development of water quality standards to the states." *Nat'l Mining Ass'n v. Jackson*, ___ F. Supp. 2d. ___, 2011 WL 124194, at *1 (D.D.C. 2011) (citing 33 U.S.C. § 1313); *accord Defenders of Wildlife v. Envtl. Prot. Agency*, 415 F.3d 1121, 1124 (10th Cir. 2005); *Gen. Motors Corp. v. Envtl. Prot. Agency*, 168 F.3d 1377, 1383 (D.C. Cir. 1999).   Section 303 requires states to establish water quality standards for waterbodies within their boundaries, and EPA may only "promulgate water quality standards itself [in] limited circumstances."   *Am. Paper Inst., Inc. v. Envtl. Prot. Agency*, 996 F.2d 346, 349 (D.C. Cir. 1993) ("In accord with Congress' intent to cast the states in the featured role in the promulgation of water quality standards, the EPA may step in and promulgate water quality standards itself only in limited circumstances.   It may act only where (1) it determines that a state's proposed new or revised standard does not measure up to [the Clean Water Act] requirements *and* the state refuses to accept EPA-proposed revisions to the standard or (2) a state does not act to promulgate or update a standard but, in the EPA's view, a new or revised standard is necessary to meet [Clean Water Act] muster."); *see also* 33 U.S.C. § 1313(a)-(c), (c)(3)-(4).

The West Virginia Legislature adopted both numeric and narrative water quality standards through the legislative review and adoption process. *See generally* W. Va. Code R. § 47-2; *see also* W. Va. Code R. § 47-2-3.2.i; W. Va. Code R. § 47-2 app. E, tbl. 1. EPA approved those standards pursuant to 33 U.S.C. § 1313. The State's narrative standards predate West Virginia's attainment of primacy over the NPDES program in 1982 and have never before been challenged by EPA. Indeed, in 2009, EPA approved the State's latest changes to its numeric standards. Those numeric standards do not include a standard for conductivity, which the Legislature and WVDEP determined to be an overbroad, generic criterion that does not accurately measure the overall health of an aquatic environment.

**B.      The State of West Virginia Administers Its Section 402 NPDES Program.**

The State plays a primary role under the Clean Water Act in other ways. Since 1982, West Virginia has enjoyed primacy to administer the Section 402 NPDES regulatory program. NPDES permits regulate discharges of pollutants to receiving waters and govern such discharges through the establishment of technology-based limits placed on the constituent make-up of a wastewater discharge, monitoring, reporting, and other requirements. *See* 33 U.S.C. § 1311(b)(2). These permits ensure that discharges of pollutants satisfy the State's applicable water quality standards downstream of the discharge point. *See* 33 U.S.C. §§ 1312(a), 1342(a). In accordance with the Clean Water Act's goal of allocating the "primary responsibilities and rights" for water pollution control to the states, 33 U.S.C. § 1251(b), the Act establishes a system whereby states assume primary administration and enforcement of the NDPES permitting program subject to EPA approval. *See* 33 U.S.C. § 1342(b); *Am. Paper Inst., Inc.*, 890 F.2d at 873-74. Once EPA approves a state program, the state has exclusive authority to implement the NPDES program within its boundaries and EPA suspends its own program. *See* 33 U.S.C. §

5

1342(b), (c)(1).  Because West Virginia has primacy over its NPDES program, EPA has only limited authority to object under specific circumstances to a particular permit.  *See* 33 U.S.C. § 1342(d)(2), (4); 40 C.F.R. § 123.44.  Moreover, the State and EPA are parties to a Memorandum of Agreement governing the circumstances under which EPA may object to a NPDES permit.

Having failed to object to any of the NPDES permits for Mingo Logan's operations, EPA cannot now use Section 404(c) to object to those same discharges and effectively nullify the NPDES permit.[1]

### C.      The State of West Virginia Has Primacy Under SMCRA.

Since 1981, West Virginia also has had primacy to administer its SMCRA program.  *See* 30 C.F.R. § 948.10.  SMCRA regulates the disposal of excess spoil material and refuse from coal mining operations and regulates the environmental impacts of those operations.  *See* 30 U.S.C. § 1201 *et seq*.  Like the Clean Water Act, SMCRA utilizes a "cooperative federalism approach" in regulating coal mining.  *See* 30 U.S.C. §§ 1201(f), 1253; *S. Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enforcement, Dep't of the Interior*, 20 F.3d 1418, 1427 (6th Cir. 1994); *Bragg*, 248 F.3d at 288.  Enacted five years after the Clean Water Act, SMCRA reinforced for the mining industry Congress's overarching policy of granting regulatory primacy to the States.  *See*, *e.g.*, 30 U.S.C. § 1201(f) ("[T]he primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States.").  Because West Virginia has SMCRA primacy under 30 U.S.C. § 1254, it has exclusive authority to issue SMCRA permits for mining operations in the State, *id.* § 1253(a); *see also* W. Va. Code § 22-3-4.

---

[1]       Section 402 governs the discharge of any pollutant while Section 404 governs the issuance of permits for fill material and are applicable only to the footprint of the fill operation.  The two are independent of each other and are not interchangeable.  "[I]f the Corps has authority to issue a permit for a discharge under § 404, then the [NPDES permitting authority] lacks authority to do so under § 402," and vice versa.  *Couer Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458, 2465 (2009).

**D.      The State of West Virginia Issues Section 401 Certifications.**

The State of West Virginia also plays an important (although not primary) role in Section

404 dredge-and-fill permitting.  Section 404 permits are issued by the Corps.  *See* 33 U.S.C. §

1344(a); *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458, 2464-65

(2009).  As Mingo Logan describes more fully in its brief, the Corps issues Section 404 permits

based on the Clean Water Act Section 404(b)(1) Guidelines, 33 U.S.C. § 1344(b), which are

promulgated by EPA in conjunction with the Corps. 40 C.F.R. § 230.   EPA may submit

comments to the Corps during the permitting process, 33 C.F.R. § 325, and may seek elevation

of a permit decision to the Corps' Division and Headquarters levels. 33 U.S.C. § 1344(q).

EPA's authority under Section 404(c) is at issue in this case.  Section 404(c) allows EPA

to

> prohibit the specification (including the withdrawal of specification) of any
> defined area as a disposal site, and . . . to deny or restrict the use of any defined
> area for specification (including the withdrawal of specification) as a disposal site,
> whenever . . .  the discharge of such materials . . . will have an unacceptable
> adverse effect on municipal water supplies, shellfish beds and fishery areas . . . ,
> wildlife, or recreational areas.

33 U.S.C. § 1344(c).  EPA purported to use that authority to veto the Section 404 permit several

years after it was issued by the Corps based on EPA's belated determination that the permit

would have unacceptable adverse effects.

As is relevant to the State's role under the scheme of cooperative federalism, Section 404

permits require Section 401 water quality certifications from the State.   Those certifications

inform the Corps that a particular Section 404 permit is in accordance with the State's water

quality standards.  *See* 33 U.S.C. § 1341(a); 33 C.F.R. § 320.4(d); *Keating*, 927 F.2d at 622

("[Under Section 401(a)(1),] no federal license or permit may be granted in the absence of the

requisite state certification indicating that no state water quality standards will be violated by the

proposed project." (citation omitted)).  "A § 401 certification is considered conclusive, and no

independent analysis [by the Corps] of the certification is required."  *Ohio Valley Envtl. Coal. v.*

*Aracoma Coal Co.*, 556 F.3d 177, 208 (4th Cir. 2009).  Section 401 certifications are yet another

example of the Clean Water Act's emphasis on the states as the primary protectors of water

quality.  *See North Carolina v. FERC*, 112 F.3d 1175, 1195 (D.C. Cir. 1997) ("The 401

certification right is an essential component of the Act's state-oriented regulatory scheme."

(citation omitted)).

## II.  The State Permits Issued For Spruce.

Against that statutory and regulatory background, WVDEP regulated operations at

Spruce for fourteen years.  Spruce is

> the most heavily studied and scrutinized surface mining coal operation in the
> history of a state which has a long history with the coal mining industry.  It has
> previously been through an EIS, litigation before at least two federal trial courts
> and twelve years of continuing scrutiny by [] WVDEP, []EPA, the Corps, and
> other federal agencies.  In addition, it has been examined by the State permitting
> quality control panel comprised of representatives of the environmental
> community, the coal industry, [] WVDEP and the federal Office of Surface
> Mining Reclamation and Enforcement.

Letter from Scott G. Mandirola, Director of Water and Waste Management, WVDEP, to Colonel

Robert Peterson, District Eng'r, U.S. Army Corps of Eng'rs at 3 (Sept. 25, 2009), *attached*

*hereto* as Exhibit A.[2]

The relevant State permitting history for Spruce is as follows.  The State's scrutiny began

in March 1997, when Mingo Logan submitted applications for SMCRA and NPDES permits to

WVDEP.[3]  Since that time, WVDEP has issued three NPDES permits and ten NPDES permit

---

[2]      All of the State's exhibits appear in the Administrative Record.  For ease of reference, they are attached
hereto.

[3]      Those permits were submitted jointly, as one permit package.

modifications for operations at Spruce.  WVDEP also issued Mingo Logan a SMCRA permit and a Section 401 water quality certification for the Corps' Section 404 permit.  By issuing those permits, the State repeatedly has determined that Mingo Logan's operations will not cause or contribute to an excursion from the State's numeric and narrative water quality standards.  Until 2009, WVDEP and EPA worked together to resolve their differences, and EPA did not raise serious obstacles to Mingo Logan's operations.

The NPDES permit for Spruce has been scrutinized and approved by EPA on at least four occasions:  when it was originally issued, when WVDEP issued Modification No. 1 in 2002, and upon the State's reissuance of the NPDES permit in 2005 and again in 2007.  Beginning with the original NPDES permit, EPA has acquiesced in WVDEP's regulation of discharges at Spruce.[4]

WVDEP issued the original NPDES permit in 1999.  Although EPA issued a general objection followed by a specific objection to the original permit, EPA ultimately withdrew its objections.  WVDEP and Mingo Logan agreed to certain permit and mitigation compensation conditions, including the reduction of the extent of the proposed valley fills and phasing of those fills.  WVDEP revised the permit to comply with those conditions, EPA agreed to withdraw its objections, and WVDEP issued the original NPDES permit on January 11, 1999.

In 2002, Mingo Logan applied for a major permit modification ("Modification No. 1"). EPA issued a general objection to the modification on May 24, 2002, followed by a specific objection on July 30, 2002.  EPA objected to Modification No. 1 based on the alleged potential for elevated levels of selenium, sulfates, and conductivity that it claimed was associated with valley fills and that it believed could cause an exceedance of West Virginia's water quality standards.  EPA informed WVDEP that it would withdraw its objection if WVDEP added

---

[4]      WVDEP issued a SMCRA permit for Spruce on November 4, 1998.

several conditions to the permit, including monitoring for selenium, conductivity, and sulfates, benthic sampling, a feasibility study of techniques for handling spoil material and drainage, and conditions related to flow characteristics.  WVDEP agreed to those conditions, with the notable exception of monitoring for conductivity and sulfates.  WVDEP stated that it "ha[d] not proposed specific changes to the permit relating to sulfates or conductivity" but that it "look[ed] forward to continuing its dialogue with EPA concerning evaluation of potential aquatic impacts of those parameters."  Letter from Allyn G. Turner, Dir., Div. of Water Res., W. Virginia Dep't of Envtl. Prot., to Jon M. Capacasa, Acting Dir., Water Prot. Div., U.S. Envtl. Prot. Agency at 2 (Oct. 28, 2002), *attached hereto* as Exhibit B.  EPA replied that it was "satisfied that steps will be taken to address the issues raised in the objection," and withdrew its objection on December 3, 2002, paving the way for WVDEP to issue Modification No. 1.  Letter from Jon M. Capacasa, Acting Dir., Water Prot. Div., U.S. Envtl. Prot. Agency, to Allyn G. Turner, Dir., Div. of Water Res., W. Virginia Dep't of Envtl. Prot. at 1 (Dec. 3, 2002), *attached hereto* as Exhibit C.

After the NPDES permit expired, WVDEP reissued the NPDES permit on May 12, 2005. EPA did not comment on or object to the permit.  WVDEP again reissued the permit on August 7, 2007, with no objection from EPA.[5]

On December 19, 2005, WVDEP issued a Section 401 water quality certification to the Corps for Mingo Logan's proposed dredge-and-fill operation.  EPA did not challenge the certification, and after ten years of study and a full Environmental Impact Study, the Corps issued the Section 404 permit on January 22, 2007.  At that time, Mingo Logan began construction at Spruce under its NPDES permit, SMCRA permit, and Section 404 permit. Mingo Logan began to mine coal at the site in 2008.

---

[5]    WVDEP also issued various minor modifications to the permit, which were not required to be submitted to EPA for review.

### III.     The State of West Virginia Opposes EPA's Veto.

Over two years after the Corps issued the permit, EPA "requested" that the Corps exercise its discretionary authority to suspend, revoke or modify the permit under 33 C.F.R. § 325.7.  Letter from William C. Early, Acting Reg'l Adm'r, U.S. Envtl. Prot. Agency, to Colonel Robert Peterson, Dist. Eng'r, U.S. Army Corps of Eng'rs at 1 (Sept. 3, 2009), *attached hereto* as Exhibit D.   EPA claimed that new information and circumstances had arisen to justify reconsideration of the permit.   *Id.*   EPA further claimed that it had concerns relating to fill minimization, potential water quality excursions, significant degradation of aquatic resources, potential significant cumulative impacts, and inadequate compensatory mitigation.  *Id.* at 1-3.

The Corps asked WVDEP to comment on EPA's "request."   WVDEP opposed any adverse action by the Corps because it determined that Mingo Logan's operations would not violate the State's water quality standards.

WVDEP explained

> Consistent with our charge from Congress, [t]he WVDEP takes its responsibilities and rights to review applications for water quality certifications seriously and expects agencies of the federal government to honor them.  In this case, the WVDEP issued a water quality certification . . . .  USEPA has never provided this agency with any information that could lead us to conclude that the certification was deficient, despite claims in its September 3, 2009 letter that "'new information and circumstances have arisen which justify reconsideration of the permit.'"   None of the information mentioned or alluded to in EPA's letter would cause the WVDEP to change the water quality certification that it issued for this project.

Letter from Scott G. Mandirola to Colonel Robert Peterson at 1.  In addition, WVDEP reminded the Corps that the State "uses its surface mining and NPDES permitting programs to ensure compliance with water quality standards."  *Id.* at 2.  WVDEP emphasized that it issued a Section 401 certification and SMCRA and NPDES permits for Spruce.  *Id.*  WVDEP challenged EPA's conclusions regarding the water quality around Spruce, and advised the Corps that EPA's

specific conductance level of 500 µS/cm was based on an unidentified data set.  "To date, the

science has not been established to recommend a national water quality criterion for specific

conductance."  *Id.*  In sum, WVDEP emphasized that the State

> is committed to application of the existing laws, rules and policies to protect the
> environment.  In addition, it undertakes regular reviews of its water quality
> standards and other rules to assure appropriateness.  It does not support
> retroactive, ad hoc departures from existing laws, rules, and regulations.  As
> regulators, operating within the authority of existing rules and laws, such an
> approach is unsupportable and undermines the considerable efforts over the years
> by the WVDEP, Corps and USEPA to develop consistent, predictable and fair
> permitting programs and procedures.

*Id.* at 3.

The Corps declined EPA's "request" and declared that it would not suspend, revoke or

modify the Section 404 permit.  Letter from Colonel Robert Peterson, Dist. Eng'r, U.S. Army

Corps of Eng'rs, to William C. Early, U.S. Envtl. Prot. Agency at 2 (Sept. 30, 2009), *attached*

*hereto* as Exhibit E.  Based on the State's comprehensive monitoring and regulation through the

NPDES permit, the Corps determined that it "ha[d] no expectation that the disposal of fill

materials in waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water

quality standards."  *Id.* at 3.

On March 26, 2010, over three years after the Corps issued the Section 404 permit, EPA

announced that it intended to veto the permit and requested public comment on its proposed

action.  WVDEP commented on June 4, 2010.  WVDEP stated that "USEPA has not described

any valid basis for taking action under section 404(c) in its Proposed Determination.  Indeed,

many of the impacts USEPA's Proposed Determination Describes are upland, not aquatic,

impacts."  Letter from Thomas L. Clarke, Div. of Mining and Reclamation, W. Virginia Dep't of

Envtl. Prot., to Shawn M. Garvin, Reg'l Adm'r, U.S. Envtl. Prot. Agency at 1 (June 4, 2010),

*attached hereto* as Exhibit F.  Moreover, "[m]uch of the potential impacts of the Spruce No. 1

Mine and bases for taking action under section 404(c) are generic. . . . [and] could result from any earth disturbance in the heavily forested lands of West Virginia[.]"   *Id.* at 2.   WVDEP informed EPA that West Virginia does not have a water quality standard for TDS or conductivity and noted that EPA does not have any validly adopted recommended standards for those parameters either.   *Id.*   WVDEP explained that EPA and WVDEP addressed the same concerns in 2002 when WVDEP issued Modification No. 1.   *Id.*   At that time, WVDEP added permit conditions and "USEPA subsequently accepted this response as adequate and withdrew its objection . . . .   As a result, issues about conductivity and water quality standards have already been fully vetted and resolved between USEPA and WVDEP as it relates to this mine."   *Id.*

EPA vetoed the permit on January 13, 2011.   Acting Governor Tomblin reacted strongly, stating that the veto "is devastating to the Southern Coal Fields and our entire state.   The Spruce Number One permit was issued years ago after undergoing a comprehensive permitting process. It is hard to understand how the EPA at this late hour could take such a drastic action." [6]   Press

---

[6]     West Virginia's political representatives uniformly opposed EPA's veto.   Senators Rockefeller and Manchin informed EPA that "[a] veto of the Spruce No. 1 Mine permit is not in the best interests of West Virginia or our Nation."   Press Release, Senators Manchin and Rockefeller Send Letter to EPA Urging the Agency not to Retroactively Veto the Spruce No. 1 Mine Permit (Dec. 20, 2010), *available at* http://manchin.senate.gov /record.cfm?id=330017 (last visited June 15, 2011).   The Senators "publicly opposed the actions EPA has taken in relation to this permit, and . . . disagree[d] with how the Agency has interpreted its authority pursuant to Section 404(c) of the Clean Water Act.   [They] believe[d] it is unwise to place a mining permit under additional scrutiny after it has been rigorously reviewed, lawfully issued and active for over a year."   *Id.*   Similarly, Representative Rahall commented that

[the] recommended veto . . . sets a disturbing precedent for the course of coal mining permitting that will undermine the confidence of investors . . . . [T]his action on a permit that was the subject of over 10 years of environmental negotiations and granted only after many improvements to the mine plan, serves to further undermine any credibility EPA may have had and undercuts long-running efforts to achieve clarity and certainty in the surface coal mining permitting process.

Press Release, Rep. Nick Rahall, EPA Region III's Recommended Veto of Spruce No. 1 Mine (Oct. 15, 2010) *available at* http://www.rahall.house.gov/index.cfm?sectionid=10&sectiontree=5,10&itemid=1723 (last visited June 15, 2011).   Representative Capito called the veto "disturbing," noting that

[t]he Spruce permit is the most scrutinized and fully considered permit in West Virginia's history. The 13-year permitting process included the preparation of a full environmental impact statement. . . . [and] EPA had ample opportunity to review and comment on the mine's decision.   The EPA

Release, Office of the Governor, Governor Tomblin Issues Statement Regarding Spruce No. 1
Mine (Jan. 13, 2011).

<div align="center">**DISCUSSION**</div>

I.     **EPA's Actions Usurp The State's Authority To Establish And Enforce Its Water Quality Standards.**

With this veto, EPA unseats the State of West Virginia from its proper role as the primary
protector of water quality within its borders.  The State established numeric and narrative water
quality standards (which were approved by EPA), issued NPDES and SMCRA permits for
Spruce in accordance with those standards, and certified to the Corps that Mingo Logan's
proposed dredge-and-fill activity would not violate its standards.  EPA impermissibly attempted
to bypass the State when it vetoed the Spruce permit based on a conductivity standard that the
State has not adopted.  EPA also usurped the State's authority when it unilaterally determined
that the discharges from Spruce would violate the State's numeric water quality standard for
selenium and would likely cause a golden algae bloom.  For these reasons, Mingo Logan's
motion for summary judgment must be granted.

The State developed numeric and narrative water quality standards in accordance with
Section 303 of the Clean Water Act.  *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.4(a); W. Va. Code
R. §§ 47-2, 47-2-3.2.i; W. Va. Code R. § 47-2, app. E, tbl. 1; *see also* West Virginia Dep't. of
Envtl. Prot., Water Quality Standards, *available at* http://www.dep.wv.gov/WWE/Programs/wqs/

---

also had the chance to use its veto authority at the time the permit was issued instead of waiting
until production had started.

Press Release, Rep. Shelley Moore Capito, The Role of Coal in the New Energy Age (Apr. 10, 2010), *available at*
http://blogs.wvgazette.com/coaltattoo/2010/04/14/rep-capito-turns-focus-back-on-attacking-epa (last visited June 15,
2011).  Representative McKinley stated that EPA's actions were "appalling" and would jeopardize West Virginia
jobs.  Press Release, Rep. David McKinley, The EPA Has Gone Too Far-This War on Coal Must Stop (Jan. 13,
2011).

Pages/default.aspx (last visited June 15, 2011) (explaining WVDEP's water quality standards).

The West Virginia Legislature

> declared [it] to be the public policy of the state of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.

W. Va. Code § 22-11-2(a). "It is also the public policy of the state of West Virginia that the water resources of this state with respect to the quantity thereof be available for use by all the citizens of the state." *Id.* at § 22-11-2(b). In accordance with that policy, the State established complementary numeric and narrative water quality standards.

The State has numeric standards for parameters such as dissolved aluminum, arsenic, chloride, manganese, selenium, and zinc based on the designated use of the particular water body and a three-tiered antidegradation approach. The State also adopted narrative standards, which in relevant part prohibit "[a]ny other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[7] W. Va. Code R. § 47-2-3.2.i. Those standards have been approved by EPA.

But EPA ignored those standards when it relied on a new EPA-formulated conductivity standard (500 µS/cm) in vetoing the Spruce permit.[8] *See* Letter from William C. Early to

---

[7] WVDEP has defined "significant adverse impact" as "more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge. It is, instead, a material decline in the overall health of an aquatic ecosystem."

[8] That new standard was announced in an Interim Guidance document issued by EPA on April 1, 2010, and which EPA has been using to object to West Virginia NPDES permits. In October 2010, West Virginia sued EPA and the Corps challenging the Interim Guidance and EPA's new conductivity standard. That suit has been consolidated in the District Court for the District of Columbia with similar suits brought by the National Mining Association, the Kentucky Coal Association, and the Commonwealth of Kentucky, among others. It remains pending and is entering the summary judgment phase.

Colonel Robert Peterson at 2.   The State has not adopted a numeric standard for TDS or conductivity, and explicitly rejected the conductivity standard trumpeted by EPA in favor of its own water quality standards and monitoring methods.   In House Concurrent Resolution No. 111, passed unanimously in 2010, the Legislature declared that, "[t]he State of West Virginia has not adopted subcategories of special use to protect a certain species of mayfly but protects the aquatic community consistent with the Legislature's statement of public policy."   W. Va. H.R. Con. Res. 111 (2010 Reg. Session).   The Legislature resolved

> [t]hat the requirements of the narrative criteria are met, when a stream (a) supports a balanced aquatic community that is diverse in species composition; and (b) contains appropriate trophic levels of fish (in streams with sufficient flows to support fish populations); and (c) the aquatic community is not composed only of pollution tolerant species, or the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach (or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present).

*Id.*

WVDEP also rejected EPA's conductivity standard in its NPDES Permitting Guidance and accompanying Justification and Background Document.[9]   *See* West Virginia Dep't. Envtl. Prot., Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards (Aug. 12, 2010), *attached hereto as* Exhibit G; West Virginia Dep't Entl. Prot., Justification and Background for Permitting Guidance (Aug. 12, 2010), *attached hereto* as Exhibit H.   WVDEP determined that conductivity was "an overbroad, generic criterion" and that the more appropriate way to ensure that discharges did not violate the State's water quality standards was to "identif[y] specific pollutants that can be managed through the

---

[9]      The Legislature empowered WVDEP to interpret the West Virginia Water Pollution Control Act and "to promulgate rules and implement water quality standards."   W. Va. Code § 22-11-7b(a); *see also id.* § 22-11-4(a)(16).

inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices ("BMPs") in NPDES permits, where there is reasonable potential to cause or contribute to excursions from water quality criteria."   Justification and Background for Permitting Guidance at 2.  WVDEP explained:

> In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem.  An ecosystem does not exist at a single point, and, accordingly, its health cannot be assessed at a single point.

*Id.* at 3.   "[WV]DEP's data shows that more than a simple conductivity measure is necessary to determine the health of a stream."  *Id.* at 5.  Instead, stream impairment is "affected by many factors:  habitat, other uses of the stream and the surrounding land, other pollutants unrelated to conductivity (e.g. fecal coliform), *inter alia.*"  *Id.*  "Where the only impacts to this component of the ecosystem are diminished numbers of certain genera of mayflies, without evidence that this has had any adverse impact of any significance on the rest of the ecosystem, the State cannot say that there has been a violation of its narrative standard."  *Id.* at 6. WVDEP decided that a more appropriate way to protect stream quality is to determine the specific causative pollutant or pollutants and the concentration or concentrations responsible for impairment when elevated conductivity numbers are present—while conductivity is an indicator that represents a concentration of different dissolved ions, it is not a specific pollutant.  *See id* at 6-7.   In promulgating the Permitting Guidance to assist NPDES permit writers, WVDEP believes that it "is protecting against excursions from its narrative water quality standards by establishing whole effluent toxic ("WET") limits and verifying impacts to a stream (or lack thereof) by requiring an extensive, comprehensive monitoring plan for the entire watershed."  *Id.* at 8.

Accordingly, the State does not have a numeric water quality standard for conductivity. Nor is there any validly promulgated federal standard for that parameter. The Clean Water Act plainly limits EPA's authority to adopt a federal water quality standard to two circumstances, *see* 33 U.S.C. § 1313(a)-(c), (c)(3)-(4), which are not relevant to this case. EPA may not base a Section 404(c) action on a standard that has no legal existence.

EPA also conducted an end-run around the State when it unilaterally determined that discharges from Spruce would violate the State's water quality standard for selenium (5 µg/L). *See* Letter from William C. Early to Colonel Robert Peterson at 2. That determination rests with the State, which certified that the Section 404 permit would not cause or contribute to a violation of its water quality standards, including the standard for selenium. And the State, not EPA, regulates the downstream impacts caused by discharges from operations at Spruce. EPA is not empowered to regulate those same discharges through the 404 permitting process. *See Couer Alaska*, 129 S. Ct. 2468-69. If Mingo Logan were to cause or contribute to an exceedance of the State's selenium standard, the State is the only entity empowered to take appropriate remedial or enforcement action under the Clean Water Act.

Similarly, although EPA claimed that it vetoed the Spruce Permit based on its belief that the discharges from Spruce would create in-stream conditions in or near Spruce Fork favorable to the growth of golden algae, the State's narrative water quality standards sufficiently guard against that possibility—they prohibit "significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." W. Va. Code R. § 47-2-3.2.i.

The State of West Virginia is "the prime bulwark in the effort to abate water pollution," *Keating*, 927 F.2d at 622, and is fully committed to ensuring that no discharges from Spruce violate its water quality standards. Not only can EPA not use Section 404(c) to override the

18

State's authority under the Clean Water Act and SMCRA, but EPA's actions have usurped the State's role and unfairly questioned the State's commitment to regulating mining and controlling water pollution consistent with all applicable laws and regulations. EPA apparently believes that it may veto a Section 404 permit regardless of whether the downstream impacts of an operation comply with the State of West Virginia's water quality standards. That interpretation flies in the face of the applicable congressional scheme of cooperative federalism and plainly violates the Clean Water Act.

## II.   EPA's Actions Nullify The State's NPDES Permit And Its Prior Negotiations With EPA.

EPA's veto effectively and improperly overturns the State's NPDES permit. EPA determined that the very same discharges that the State concluded are in compliance with its water quality standards will somehow cause unacceptable adverse impacts as part of the Corps' Section 404 permit. EPA also utterly ignores EPA and WVDEP's prior resolution of issues identical to those upon which EPA's veto now rests.

EPA's actions override the State's NPDES permitting decisions. As described above, WVDEP has issued three NPDES permits and ten NPDES permit modifications for Spruce beginning in 1999, and has continued to approve Mingo Logan's NPDES permit applications through numerous modifications (both minor and major) and two reissuances. Each time, WVDEP determined that the permitted discharges will not cause or contribute to an excursion from the State's numeric and narrative water quality standards. That responsibility lies wholly with the State under Section 402 because the State has primacy to administer that program. *See* 33 U.S.C. § 1342(b); *see also id.* § 1251(b); *Am. Paper Inst., Inc.*, 890 F.2d at 873-74 ("The legislative history [of the Clean Water Act] is replete with statements recognizing that the states should play the leading role in implementing the NPDES system. In addition, numerous courts

have recognized the primacy of state and local enforcement of water pollution controls as a theme that resounds throughout the history of the Act. Therefore, it seems beyond argument that we should construe the Act to place maximum responsibility for permitting decisions on the states where the EPA has certified a NPDES permitting program." (alteration omitted) (footnote omitted) (internal quotation marks omitted)).

EPA repeatedly consented to WVDEP's permitting decisions. Although EPA twice objected to the NPDES permit, it ultimately withdrew its objections and acquiesced to the permit's issuance. Even more significantly, EPA's objection to Modification No. 1 was based on the same concerns that it now claims to have concerning conductivity, selenium and sulfates. In 2002, EPA informed WVDEP that it would withdraw its objection based on those parameters if WVDEP added several conditions to the permit, including monitoring for selenium, conductivity, and sulfates, benthic sampling, a feasibility study of techniques for handling spoil material and drainage, and conditions related to flow characteristics. In Modification No. 1, WVDEP agreed to those conditions, with the notable exception of monitoring for conductivity and sulfates. WVDEP stated that it "ha[d] not proposed specific changes to the permit relating to sulfates or conductivity" but that it "look[ed] forward to continuing its dialogue with EPA concerning evaluation of potential aquatic impacts of those parameters." Letter from Allyn G. Turner to Jon M. Capacasa at 2. EPA replied that it was "satisfied" and withdrew its objection, allowing WVDEP to issue Modification No. 1. Letter from Jon M. Capacasa to Allyn G. Turner at 1. It is disingenuous for EPA to raise those objections now, not to mention untimely. EPA's veto of the Section 404 permit pulls the rug out from under the State, nullifies the State's measured 402 permitting decisions, and usurps its Section 402 authority. EPA also has created a climate of uncertainty—permit applicants and the Corps will no longer be able to rely on permit

conditions negotiated between EPA and WVDEP.  And in this case, although mining operations continue at Spruce under the NPDES and SMCRA permits, they continue only on a limited basis due to the lack of a 404 permit.  Mingo Logan is prohibited from using additional fills.

EPA may object to a NPDES permit only under limited circumstances prescribed by statute.  *See* 33 U.S.C. § 1342(d)(2), (4); 40 C.F.R. § 123.44.  It cannot use Section 404(c) to effectively veto a NPDES permit or the State's 401 certification.  The State, not EPA, is responsible for ensuring that Mingo Logan complies with the conditions in the NPDES permit and does not violate the State's water quality standards.

## CONCLUSION

The size of the Spruce mining operations is substantial, covering 2278 acres.[10]  West Virginia's regulatory work has been similarly substantial, although not unique, for the Agency, which has thoroughly studied and strictly regulated Spruce for fourteen years.  Indeed, the Spruce site is without question the most studied mining operation in West Virginia's long relationship with coal mining.  It is also one of the largest surface mining operations in the State.  Mingo Logan received all of the necessary permits and began mining coal at that site in 2007, only to be halted two years later by EPA's unprecedented veto of Mingo Logan's Section 404 permit.  EPA should not be allowed to interfere peremptorily with mining at Spruce after the fact.

With its veto, EPA invaded the Corps' authority under the Clean Water Act and harmed Mingo Logan.  But more importantly to the State, EPA usurped the State of West Virginia's rightful place as the primary protector of its waters under the Clean Water Act and the primary regulator of mining under SMCRA.  For those reasons, and for those expressed by Plaintiff and

---

[10]     Although that acreage is substantial, it is important to note that Mingo Logan reduced the acreage by almost a third in an effort to satisfy EPA and the Corps' concerns, that is, from 3113 acres to 2278 acres.

the other putative *amici*, this Court should vacate EPA's Section 404(c) action and grant Mingo

Logan's motion for summary judgment.

        Respectfully submitted by

        Randy Huffman, in his official capacity as Cabinet Secretary of the
        West Virginia Department of Environmental Protection, and on
        behalf of the State of West Virginia

        By Counsel

                /s/ Michael L. Murphy
                Michael L. Murphy, No. 480163
                Gregory Y. Porter, No. 458603
                BAILEY & GLASSER, LLP
                209 Capitol Street
                Charleston, WV 25301
                (304) 345-6555

Dated:  June 23, 2011

**ATTACHMENT 1**



west virginia department of environmental protection

Division of Water and Waste Management
601 57th Street SE
Charleston, WV 25304
Phone: 304-926-0495
Fax:    304-926-0497

Joe Manchin III, Governor
Randy C. Huffman, Cabinet Secretary
www.wvdep.org

September 25, 2009

Colonel Robert Peterson
District Engineer
Huntington District
U.S. Army Corps of Engineers
502 Eighth Street
Huntington, West Virginia 25701-2070

Re:   **EPA Comment and Objection Letter**
      **PN 199800436-3; Mingo Logan Coal Company; Spruce No. 1 Surface Mine**
      **Little Coal River Drainage in Logan County, West Virginia**

Dear Colonel Peterson:

The West Virginia Department of Environmental Protection (WVDEP) thanks you for this opportunity to respond to the comments the United States Environmental Protection Agency, Region 3 (USEPA) made on the above referenced project in its September 3, 2009 letter to you.

One of the primary concerns USEPA expressed is with water quality. As you are aware, the WVDEP is required to issue or deny a water quality certification for each permit sought from the Corps. Congress expressly delegated that function to the states in Section 401(a) of the Clean Water Act. It did so because, as Congress stated in the opening section of the Clean Water Act: "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities of States . . . to plan the development and use of land and water resources. . . ." 33 U.S.C. § 1251(b).

Consistent with our charge from Congress, The WVDEP takes its responsibilities and rights to review applications for water quality certifications seriously and expects agencies of the federal government to honor them. In this case, the WVDEP issued a water quality certification on December 19, 2005, and to my knowledge, USEPA has never provided this agency with any information that could lead us to conclude that the certification was deficient, despite claims in its September 3, 2009 letter that "new information and circumstances have arisen which justify reconsideration of the permit." None of the information mentioned or alluded to in EPA's letter would cause the WVDEP to change the water quality certification that it issued for this project.

Promoting a healthy environment.

EXHIBIT

tables

A

Colonel Robert Peterson
September 25, 2009
Page 2 of 3

In addition to its program for Section 401 certifications, the WVDEP uses its surface mining and NPDES permitting programs to ensure compliance with water quality standards. The NPDES permit for the Spruce no. 1 Mine (No. WV1017021), which most directly regulates water quality at this location, has been open to scrutiny by USEPA on at least three occasions previously. Each time, at initial permit issuance, in Modification 1, and at the first reissuance of this permit, USEPA allowed permit approval. As this permit currently stands, the effluent limitations it establishes are in compliance with all applicable Total Maximum Daily Loads (TMDLs) and West Virginia's federally approved antidegradation policy. As part of the WVDEP's examination of the application for a surface mine permit for this operation, the WVDEP's hydrogeologist concluded that this mining operation had been designed so as to prevent material damage to the hydrologic balance. Thus far, this prediction made prior to permit issuance has been borne out in the operation of this mine. There has been just one sample which has exceeded the applicable effluent limitations (aluminum) at one outlet, to date. All sampling has shown the Spruce No. 1 Mine to be in compliance with all other parameters at all other outlets.

Part of USEPA's comments appear to be based on a misunderstanding of the prevailing water quality in the area of the Spruce No. 1 Mine. USEPA's letter to you recites its understanding that, "[b]oth Spruce Fork and the Little Coal River have approved total maximum daily loads (TMDLs) for iron, aluminum, selenium (Spruce Fork TMDL), pH, sediment and fecal coliform bacteria. . . . Seng Camp Creek is listed on the CWA 303(d) list as biologically impaired." To be clear, the only impairment listed in the USEPA-approved TMDL for the Little Coal River is fecal coliform. No metals are listed, nor does this TMDL establish any wasteload allocations for metals to be assigned to permits that have outlets discharging directly into the Little Coal River. The only impairments listed in the USEPA-approved TMDL for Spruce Fork are total iron and fecal coliform. The only impairment listed in the USEPA-approved 2008 303d list for Seng Camp Creek is iron. This creek has never been 303d listed for biologic impairment. USEPA has obviously confused Seng Camp Creek with Seng Creek. Seng Creek has been 303d listed for biologic impairment, but is in another county (Boone) in another drainage (Big Coal River) and is not affected by discharges from this mine. Further WVDEP's most recent West Virginia Stream Condition Index (WVCSCI) data contradicts EPA's assertion of a poor biologic condition in Spruce Fork. Again, as stated above, the USEPA-scrutinized NPDES permit for the Spruce No. 1 Mine is in compliance with all applicable TMDLs and the permittee has generally complied with this permit, according to the WVDEP's records.

The USEPA's letter makes reference to a specific conductance level of 500 uS/cm as if this has some established regulatory significance. This value is based on an unidentified data set and lacks a regulatory nexus. EPA's National Recommended Water Quality Criteria 2006, has no recommended water criteria for freshwater aquatic life for specific conductance, nor does this document contain any recommended water quality criteria for freshwater aquatic life for dissolved solids. To date, the science has not been established to recommend a national water quality criterion for specific conductance.

EPA also raises concerns as to whether "[a]dditional valley fill techniques such as further backstacking material on-site where appropriate, inclusion of sidehill fills with stream relocation, or other design modifications . . . " might result in further avoidance or minimization of the

Colonel Robert Peterson
September 25, 2009
Page 3 of 3

extent of stream being filled. Two observations are warranted on this point. First, previous scrutiny of the various permits for the Spruce Fork No. 1 Mine by USEPA and others over the last twelve years has resulted in a reduction of the permitted acreage by over eight hundred acres with a correspondingly substantial decrease in the length of stream to be filled. Second, the AOC plus formula was used to establish the volume and the location of the toes of the fills. Years ago USEPA agreed that application of this formula was a means of fill optimization acceptable to it. While wordsmiths may quibble over whether optimization is equivalent to minimization in the English language, the WVDEP believes that in the practical world of surface coal mining in Appalachia, the two are, indeed, equivalent and that, with the application of the AOC plus formula to this mining operation, the extent of the fills associated with it have been minimized as much as is practicable.

A last point I would like to make concerns the USEPA's opinion that an additional environmental impact statement (EIS) under the National Environmental Policy Act (NEPA) should be prepared for this operation. At some point, a project must be deemed to have been studied enough to meet NEPA's requirements. This is the most heavily studied and scrutinized surface mining coal operation in the history of a state which has long history with the coal mining industry. It has previously been through an EIS, litigation before at least two federal trial courts and twelve years of continuing scrutiny by the WVDEP, USEPA, the Corps and other federal agencies. In addition, it has been examined by the State permitting quality control panel comprised of representatives of the environmental community, the coal industry, the WVDEP and the federal Office of Surface Mining Reclamation and Enforcement.

The WVDEP is committed to application of the existing laws, rules and policies to protect the environment. In addition, it undertakes regular reviews of its water quality standards and other rules to assure appropriateness. It does not support retroactive, ad hoc departures from existing laws, rules and guidelines. As regulators, operating within the authority of existing rules and laws, such an approach is unsupportable and undermines the considerable efforts over the years by the WVDEP, Corps and USEPA to develop consistent, predictable and fair permitting programs and procedures.

Thank you for the opportunity to provide comments and information relating to the USEPA's expressed concerns on these projects. Please feel free to contact me with any comments or questions you may have.

Sincerely,

Scott G. Mandirola
Acting Director

SGM/pw

cc:    Ginger Mullins, USACOE

## ATTACHMENT 3



f Water Resources
l Greenbrier Street
Charleston, WV 25311-1088
Telephone Number: (304) 558-2107
Fax Number: (304) 558-5905

# West Virginia Department of Environmental Protection

Bob Wise
Governor

Michael O. Callaghan
Cabinet Secretary

October 28, 2002

**VIA FAX & U.S. MAIL**
Mr. Jon M. Capacasa, Acting Director
Water Protection Division
U. S. Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA 19103

Re: **Draft NPDES Permit No. WV1017021**
   **Modification No.1**
   **Hobet Mining, Inc.**
   **Spruce No.1 Surface Mine**

Dear Mr. Capacasa:

   The West Virginia Department of Environmental Protection's (EPA) Division of Water Resources (DWR) has reviewed the specific objections to the above-referenced permit as set forth in your July 30, 2002, letter. In an effort to satisfy EPA's objections, the DWR has set forth below its proposed additions to the permit. The DWR will forward a revised draft NPDES Permit incorporating the proposed changes by adding Condition No.16, and revising Conditions 3, 5, 6, 13 & 15.[1] Note that Conditions 9, 10, and 11 have also been updated to reflect the applicant's mining plan included in the permit package submitted to EPA on May 1, 2002.

   <u>Permit Monitoring Conditions</u>

   Conditions Nos. 3 and 13 have been revised to address the addition of monitoring for Selenium to Outlets 001, 002, 003 & 004 serving Pond Nos.2, 3, 4 & 5 below Valley Fills in Oldhouse Branch, Pigeonroost Branch, and White Oak Branch. Selenium will also be added to In-stream Monitoring Stations DWOB (Downstream in White Oak Branch), DOB (Downstream in Oldhouse Branch), DPB (Downstream in Pigeonroost Branch), USF (Upstream of operation in Spruce Fork) and DSF (Downstream of operation in Spruce Fork).

---

[1] These conditions are found on pages 14A – 14D of the draft NPDES Permit.

RECEIVED

 West Virginia Department
of Environmental Protection

"Promoting a healthy environment."



EXHIBIT
B

Page 2
Jon Capacasa
October 28, 2002

Biological Monitoring

Benthic sampling conducted after January 2003 will be conducted in accordance with EPA's Interim Chemical/Biological Monitoring Protocol for Coal Mining Permit Applications, dated January 19, 2000. This revision is reflected in Condition No. 5.

Feasibility Study

Condition No.16 has been added to address the concern over the possibility of high selenium content in certain strata and the feasibility to special handle such material during mining.

Flow Characteristics

Condition No.15 has been revised to include the fills and ponds in both White Oak Branch and the unnamed tributary in Pigeonroost Branch to the conditions requiring that the flow characteristics downstream from the sediment control ponds approximate the pre-mining conditions to the maximum extent feasible.

Please note that the DWR has not proposed specific changes to the permit relating to sulfates or conductivity. The DWR, however, looks forward to continuing its dialogue with EPA concerning evaluation of potential aquatic impacts of those parameters.

I trust the information and proposed permit changes satisfy your concerns and objections. If you have any questions, please feel free to contact me at (304) 558-2107.

Sincerely,

Allyn G. Turner, Director
Division of Water Resources

Enclosure (no encl. w/ fax copy)
Cc:   Butch Borth, NPDES Permit Coordinator
      John McDaniel, Environmental Manager, Hobet Mining, Inc.

**ATTACHMENT 4**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

DEC 0 3 2002

Ms. Allyn G. Turner, Director
Division of Water Resources
West Virginia Department of Environmental Protection
1201 Greenbrier Street
Charleston, WV 25311

Dear Ms. Turner:

On July 30, 2002, the Environmental Protection Agency issued a specific objection to National Pollutant Discharge Elimination System (NPDES) Draft Permit No. WV1017021, Modification No.1, for Hobet Mining's proposed Spruce No.1 Surface Mine. This letter is notification of our withdrawal of the objection.

We are satisfied that steps will be taken to address the issues raised in the objection, based on the revised NPDES permit submitted on October 28, 2002, and our recent discussions with you and staff members of the West Virginia Department of Environmental Protection (WVDEP). We appreciate your cooperation in resolving our concerns and look forward to working with you and WVDEP staff members on other environmental matters of mutual concern.

If you have any questions concerning this letter, please contact me or have your staff contact Mr. Dan Sweeney at (215) 814-5731 or sweeney.dan@epa.gov.

Sincerely,

Jon M. Capacasa, Acting Director
Water Protection Division

cc:    John McDaniel, Hobet Mining
        Ken Politan, WVDEP

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

**EXHIBIT**

C

tabbies



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

SEP   3 2009

Colonel Robert Peterson
District Engineer
U.S. Army Corps of Engineers, Huntington District
502 Eighth Street
Huntington, West Virginia 25701-2070

Re: PN 199800436-3; Mingo Logan Coal Company; Spruce No. 1 Surface Mine

Dear Colonel Peterson:

The U.S. Environmental Protection Agency (EPA) requests that the Huntington District use its discretionary authority provided by 33 CFR 325.7 to suspend, revoke or modify the permit issued authorizing Mingo Logan Coal Company to discharge dredged and/or fill material into waters of the United States in conjunction with the construction, operation, and reclamation of the Spruce Fork No. 1 Surface Mine located in Logan County, West Virginia. The project as permitted encompasses approximately 2,278 acres with six valley fills and associated sediment control structures directly impacting 10, 630 linear feet of ephemeral stream channels, 32,491 linear feet of intermittent stream channels, 825 linear feet of perennial channels and 0.12 acres of wetland within tributaries to Spruce Fork of the Little Coal River. EPA believes that reevaluation of the circumstances and conditions of the permit is in the public interest.

Since issuance of the permit in January 2007, new information and circumstances have arisen which justify reconsideration of the permit. Based upon prior research and confirmed in 2008 by research conducted by EPA, we are concerned data were available and was not evaluated as part of the review for the 2007 permit which is directly relevant to the Corps determination of whether or not the project would comply with the requirements of the Clean Water Act (CWA) and the National Environmental Policy Act (NEPA). In particular, we are concerned about the project's potential to degrade downstream water quality, and to cause or contribute to potential excursions of West Virginia's narrative water quality standards. Also, there is additional information which demonstrates the project's potential contribution to cumulative impacts within the Coal River Watershed. Additional valley fill minimization techniques such as further backstacking material on-site where appropriate, inclusion of sidehill fills with stream relocations, or other design modifications to ameliorate water quality impacts need serious consideration for the Mingo Logan Coal Company facility. Scientific and field observations strongly suggest that compensatory mitigation measures heretofore accepted by the U. S. Army Corps of Engineers, such as on-site stream creation, may not result in functional replacement with specific observable performance criteria.

♻ *Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*



Recent data and analyses have revealed that downstream water quality impacts have not been adequately addressed by the permit especially in light of clear evidence that effluent from valley fill sedimentation ponds is very likely to elevate conductivity and thus negatively affect healthy aquatic communities. The Little Coal River watershed contains the largest number of impaired stream miles in the Central Appalachian Ecoregion in West Virginia. Both Spruce Fork and the Little Coal River have approved total maximum daily loads (TMDLs) for iron, aluminum, selenium (Spruce Fork TMDL), pH, sediment and fecal coliform bacteria. The TMDLs identified mining as a source for many of these impairments and this project will likely discharge these same pollutants into these watersheds. The Spuce Fork watershed has 26 impaired streams, including Seng Camp Creek. Seng Camp Creek is listed on the CWA 303(d) list as biologically impaired. Both Pigeonroost Branch and Oldhouse Branch are not listed for water quality impairments and may be providing clean freshwater dilution to Spruce Fork which has measured conductivity readings above 500 μS/cm. This should be considered in a re-evaluation of the permit. West Virginia Stream Condition Index scores indicate that the stream is already in poor condition.

The CWA Section 404(b)(1) Guidelines (230.10(b)(1)) state that "no discharge of dredged or fill material shall be permitted if it causes or contributes, after consideration of disposal site dilution and dispersion, to violation of any applicable State water quality standard." In addition, the Guidelines prohibit any discharge of dredged or fill material which would cause or contribute to significant degradation of the aquatic ecosystem, with special emphasis placed on the persistence and permanence of effects, both individually and cumulatively. The Final Environmental Impact Statement (EIS) for this project states, that "[A]n increase in total dissolved solids is expected in the early stages of the project when clearing and filling of each valley fill site begins. This temporary increase would be expected to return to pre-mining conditions as areas are regraded and revegetated." The scientific literature as well as many State watershed reports have consistently shown that this assertion is not technically supportable. These studies and reports indicate that surface mining with valley fills in Central Appalachia is strongly related to downstream biological impairment. They also show that surface mining impacts on aquatic life are strongly correlated with ionic strength (conductivity) in the Central Appalachian stream networks. This increase in conductivity impairs aquatic life use, is persistent over time, and cannot be easily mitigated or removed from stream channels.

EPA is concerned that the permit decision document and the EIS prepared pursuant to NEPA do not reflect the data and analyses included in the studies referenced above and attached, and their implications regarding water quality impacts associated with surface coal mining. These studies together with information currently available regarding impairments of streams within the Spruce No. 1 mine project area strongly suggest that further water quality degradation and water quality exceedences may occur as a result of new mining activities at Spruce No. 1 Mine. EPA also believes that this project's consistency with the data and assumptions underlying the existing TMDLs approved in 2006 requires further investigation. Based on information available, EPA is concerned about the likelihood that the project may cause or contribute to a violation of the State's water quality standards or antidegradation policy.

As stated above, the Guidelines require consideration of impacts individually and cumulatively. There is new evidence of potential significant cumulative impacts within the sub-

watershed, and even within the larger 8-digit HUC sub-basin, due to mining activities. In addition to historic and ongoing mining, there are 11 additional mining projects proposed within the Coal River Sub-basin. These include four pending projects under consideration within the enhanced coordination review process established in the *Memorandum of Understanding Among the U.S. Department of the Army, U.S. Department of the Interior, and the U.S. Environmental Protection Agency Implementing the Interagency Action Plan on Appalachian Surface Coal Mining* signed June 11, 2009. Furthermore, there are six other permits which have been issued by the Corps, but for which work has not yet commenced due to ongoing litigation, and one new proposal issued on Public Notice. These 11 additional proposed projects in the Coal River Sub-basin, if constructed as proposed, would impact approximately 33.7 miles (178,122 linear feet) of stream channels. Given the past, present, and proposed future mining activities within the Coal River Sub-basin, EPA believes that a more comprehensive and robust cumulative impacts analysis should be undertaken consistent with the requirements of the Guidelines and NEPA.

In light of these potential significant cumulative impacts to the watershed and latest information about water quality impacts associated with surface mining with valley fill operations, the mitigation plan should be re-evaluated to ensure that we are achieving functional replacement of the lost aquatic resources. The mitigation plan included the creation of on-site stream channels through the use of sediment ditches. EPA has consistently objected to the use of these ditches as compensation for lost headwater stream channels. These channels are often only evaluated for success utilizing structural performance criteria and not incorporating biological and chemical performance criteria to ensure success. Without monitoring to ensure restored or created streams provide chemical, physical and ecological functional replacement for streams being destroyed by mining activities, these channels will only serve as a conduit for pollutants from the site to downstream waters. It is unlikely that the proposal as permitted will achieve functional replacement.

Given our concerns regarding this project in light of potential water quality excursions, significant degradation of aquatic resources and inadequate mitigation, EPA recommends that the Corps use it discretionary authority provided by 33 CFR 325.7 to suspend, revoke or modify the permit after re-evaluating the project to ensure protection of the aquatic communities on site and downstream. In addition, we believe that because of the new information and circumstances the COE should prepare a supplemental EIS under CFR 1502.9(c)(1)(ii).

Should you have any questions please feel free to contact me, or have your staff contact Mr. Jeffrey Lapp, Associate Director, Office of Environmental Programs, at 215-814-2717 or by email at lapp.jeffrey@epa.gov.

Sincerely,

William C. Early
Acting Regional Administrator

Enclosure

## Literature Citations

Bryant, G., S. McPhilliamy, and H. Childers. 2002. A Survey of the Water Quality of Streams in the Primary Region of Mountaintop / Valley Fill Coal Mining. Mountaintop Mining/Valley Fill Programmatic Environmental Impact Statement. USEPA Region 3. Wheeling, WV

Fulk, F., B. Autrey, J. Hutchens, J. Gerritsen, J. Burton, C. Cresswell and B. Jessup. 2003. Ecological assessment of streams in the coal mining region of West Virginia using data collected by the U.S. EPA and environmental consulting firms. U.S. Environmental Protection Agency, National Exposure Research Laboratory, Cincinnati, OH.

Green, J., M. Passmore, and H. Childers. 2000. A survey of the condition of streams in the primary region of mountaintop mining/valley fill coal mining. Mountaintop Mining/Valley Fill Programmatic Environmental Impact Statement. U.S. Environmental Protection Agency, Region III. Wheeling, WV. http://www.epa.gov/region3/mtntop/index.htm

Hartman K.J., M.D. Kaller, J.W. Howell and J.A. Sweka. 2005. How much do valley fills influence headwater streams? Hydrobiologia 532: 91–102.

Howard, H.S., B. Berrang, M. Flexner, G. Pond, S. Call. 2000. Kentucky mountaintop mining benthic macroinvertebrate survey. October 2001. U.S. Environmental Protection Agency, Science and Ecosystem Support Division, Ecological Assessment Branch, Athens, Georgia.

Merricks, T.C., D.S. Cherry, C.E. Zipper, R.J. Currie, T.W. Valenti. 2007. Coal mine hollow fill and settling pond influences on headwater streams in southern West Virginia, USA. Environmental Monitoring and Assessment 129:359-378.

Paybins, K.S., Messinger, Terence, Eychaner, J.H., Chambers, D.B., and Kozar, M.D., 2000, Water Quality in the Kanawha–New River Basin West Virginia, Virginia, and North Carolina, 1996–98: U.S. Geological Survey Circular 1204, 32 p., on-line at http://pubs.water.usgs.gov/circ1204/

Pond, G.J. 2004. Effects of surface mining and residential land use on headwater stream biotic integrity in the eastern Kentucky coalfield region. Kentucky Department for Environmental Protection, Division of Water, Frankfort, Ky. http://www.water.ky.gov/NR/rdonlyres/ED76CE4E-F46A-4509-8937-1A5DA40F3838/0/coal_mining1.pdf and http://www.water.ky.gov/NR/rdonlyres/5EE3130F-8837-4B9F-8638-42BD0E015925/0/coal_mining2.pdf

U.S. Geological Survey. 2001a. Benthic invertebrate communities and their responses to selected environmental factors in the Kanawha River Basin, West Virginia, Virginia, and North Carolina. Water-Resources Investigations Report 01-4021.

West Virginia Department of Environmental Protection (WV DEP). 2007. West Virginia Integrated Water Quality Monitoring and Assessment Report 2006. Charleston, WV. http://www.wvdep.org/item.cfm?ssid=11&ss1id=720

West Virginia Department of Environmental Protection (WV DEP). 2008. West Virginia Integrated Water Quality Monitoring and Assessment Report 2008. Charleston, WV. http://www.wvdep.org/Docs/16495_WV_2008_IR_Supplements_Complete_Version_EPA_Approved.pdf

C. R. Ziegler, G.W. Suter II, B.J. Kefford, K.A. Schofield and G.J. Pond. 2007. Common
Candidate Cause: Ionic Strength. In: U.S. EPA Causal Analysis and Diagnosis
Decision Information System.
http://cfpub.epa.gov/caddis/candidate.cfm?section=138&step=24&parent_section
=132


WVDEP Watershed Reports.  For Examples (these are not all the reports available):

WVDEP.  2007.  Tug Fork Watershed: A Summary of the Watershed Assessment
Section's 1998
and 2003 Monitoring Efforts. Charleston, WV
http://www.wvdep.org/Docs/13229_Tug_printed_June_2007.pdf
WVDEP. 1997.  An Ecological Assessment of the Elk River Watershed.  Charleston,
WV.
http://www.wvdep.org/Docs/474_EAoftheElkRvrWatershed.pdf
WVDEP. 1997.  An Ecological Assessment of the Coal River Watershed.  Charleston,
WV.
http://www.wvdep.org/Docs/5094_Coal%20Eco%20Assessment.pdf
WVDEP. 1997. An Ecological Assessment of the Upper kanawha River Watershed.
Charleston,
WV. http://www.wvdep.org/Docs/529_upperkanrpt.pdf
WVDEP 303(d) lists.  http://www.wvdep.org/item.cfm?ssid=11&sslid=720
WVDEP TMDL Reports.  For Example:
Total Maximum Daily Loads for Selected Streams in the Gauley River
Watershed, West Virginia.  2008.  Prepared for:West Virginia Department of
Environmental Protection Division of Water and Waste Management Watershed
Branch, TMDL Section Prepared by: Water Resources and TMDL Center Tetra
Tech, Inc. 405 Capitol Street, Suite 608 Charleston, WV 25301
http://www.wvdep.org/Docs/14836_Final_Gauley_Final_TMDL_Report_03_27_
08.pdf
including specific watershed appendices, for example, Twentymile Creek:
http://www.wvdep.org/Docs/14842_Final_Twentymile_Appendix_09_11_07.pdf

FILE COPY

DEPARTMENT OF THE ARMY
HUNTINGTON DISTRICT, CORPS OF ENGINEERS
502 EIGHTH STREET
HUNTINGTON, WEST VIRGINIA 25701-2070

SEP 30 2009

Reply to
Attention of:

Operations and Readiness Division
Regulatory Branch
199800436-3

Mr. William C. Early
Acting Regional Administrator
United States Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, Pennsylvania 19103-2029

Dear Mr. Early:

This is in response to your letter dated September 3, 2009 concerning Mingo Logan Coal Company's (Mingo Logan) approved Section 404 Clean Water Act Individual Permit (IP) for discharges of dredged or fill material into waters of the United States in association with activities incidental to the construction, operation and reclamation of the Spruce No. 1 Mine located approximately two miles northeast of Blair, Logan County, West Virginia.

As you may be aware, the decision to issue the permit followed extensive coordination with your agency for nearly 10 years concerning the project's scope, alternatives and compensatory mitigation and included the preparation of an Environmental Impact Statement and Record of Decision. After Mingo Logan commenced operations, a challenge to the permit was initiated by Ohio Valley Environmental Coalition in late January 2007 and Mingo Logan agreed to restrict the scope of its mining operations while the Fourth Circuit considered the appeal of the U.S. District Court's (S.D. WV) ruling of 23 March 2007. Mingo Logan has conducted filling activities, constructed sediment ponds and conducted mining operations in an agreed upon manner since early 2007.

You have requested that I use my discretionary authority provided by 33 CFR 325.7 to suspend, revoke or modify the IP because your agency has stated that new information and circumstances have arisen which justify reconsideration of the IP. Your agency's concerns relate to (1) fill minimization, (2) potential water quality excursions, (3) significant degradation of aquatic resources, (4) potential significant cumulative impacts, and (5) inadequate compensatory mitigation. Your agency contends that data from prior research and confirmed by your agency in 2008 were available and were not evaluated as part of the review of the permit application for the Spruce No. 1 Mine. Your agency's comments have been addressed by my Regulatory Branch.

Printed on Recycled Paper

EXHIBIT
tabbies
E

2

The factors to be considered for modification, suspension or revocation of DA permits under 33 C.F.R. § 325.7 include: the extent of the permittee's compliance with the terms of its permit; whether circumstances relating to the authorized activity have changed since the permit was issued; significant permit objections which were not earlier considered; revisions to law; and the extent to which permit suspension, revocation or modification would adversely affect plans, investments and actions the permittee has reasonably taken in reliance on the permit. As discussed in further detail below, I conclude there are no factors that currently compel me to consider permit suspension, modification or revocation.

## 1. Fill Minimization

Your letter recommends consideration of additional valley fill minimization techniques by Mingo Logan to ameliorate water quality impacts. Mingo Logan did consider various alternatives during feasibility studies for the Spruce No. 1 Mine. The permitted mine design utilized the AOC-plus and bottom-up construction techniques. These techniques, along with an approved toxic material handling plan, should ameliorate water quality impacts. Accordingly, I have determined that Mingo Logan will not be required to consider additional valley fill minimization techniques.

## 2. and 3. Water Quality Excursions and Significant Degradation

Your letter expresses concerns about the project's potential to increase conductivity, degrade downstream water quality and cause or contribute to potential excursions of WV's narrative water quality standards. Both the USACE and state permits require sampling and analysis of Total Dissolved Solids (TDS), specific conductance and various metals as discussed below.

WVDEP's surface mining program requires the submission of pre-mining data as part of a prediction of hydrologic consequences of proposed mining. Those regulations require baseline monitoring for TDS and specific conductance (38 WV CSR 2-3.22.b.2). During mining, Section U of the Surface Mining Permit issued for the Spruce No. 1 Mine mandates Mingo Logan comply with the water monitoring plan. That plan requires quarterly monitoring at 11 in-stream locations for TDS, specific conductance and various metals. Likewise, Special Condition No. 13 of the USACE permit requires Mingo Logan to monitor benthic communities in mitigation areas using EPA's Rapid Bioassessment Protocol (RBP) for Use in Streams and Wadeable Rivers. Section 5.1.10 of the RBP requires conductivity sampling. Special Condition No. 14 of the USACE permit also requires water chemistry sampling in those same areas using EPA's "Interim Chemical/Biological Monitoring Protocols for Coal Mining Permit Applications."

Further, under the State's National Pollutant Discharge Elimination System (NPDES) program, the WVDEP can: require such additional information as it might need to enforce its program (WV Code 22-11-4); issue orders to enforce its water quality standards and NPDES permits (WV Code 22-11-6 and -11); and modify permits or issue emergency orders to reduce or control discharges where there has been a change in circumstances or a public emergency (WV Code 22-1-112, -15 and -19). In the application of its NPDES program to the Coal River watershed, the WVDEP assessed stream uses in the Coal River watershed and that assessment included the impacts of ionic toxicity on benthic communities. The WVDEP developed and issued a Total Maximum Daily Load (TMDL) establishing allowable permit limits for discharges in the watershed with the potential to cause biological impairment as a result of ionic toxicity. The WVDEP claims additional authority under the terms of its surface mining program to

3

regulate impacts of conductivity on aquatic life. See WV Code 22-3-13(b)(1) (addressing disturbances to the hydrologic balance and toxic discharges) and 38 WV CSR 2-3-22.i (discussing WVDEP's authority to require remedial activities) and -14.5 (prohibiting material damage to the hydrologic balance and requiring compliance with effluent limits and water quality standards).

On December 19, 2005, the WVDEP granted the water quality certification pursuant to Section 401 of the Clean Water Act. The NPDES permit modification was approved by the WVDEP on April 29, 2005. WVDEP assigns water quality-based effluent limitations in its NPDES permits in accordance with all applicable State requirements, including the anti-degradation implementation rule. Specifically, Mingo Logan's NPDES permit (Permit No. WV1017021) was expressly addressed in assessing and allocating discharges into the Spruce Fork of the Little Coal River (See, e.g., Coal River TMDL, Metal Allocations Spreadsheet). The USACE in its NEPA and Section 404(b)(1) Guidelines evaluation for the Spruce No.1 Mine permit application independently evaluated potential water quality impacts based upon an extensive review of various parts of the Surface Mine Application, including Section J (Probable Hydrologic Consequences, Surface Baseline Water Quality data), surface and ground water monitoring plans, Surface Water Runoff Analysis, Material Handling Plan, drainage control plan, the Cumulative Hydrologic Impact Assessment, baseline benthic and water quality data, water quality data from adjacent sites, minimization and construction techniques and concluded the Spruce No. 1 Mine will not result cause or contribute to significant degradation. Your agency's comments on water quality are not considered new information that would warrant re-visiting this issue. Further, in a letter dated 25 September 2009, the WVDEP stated the effluent limitations established in the Spruce No. 1 Mine NPDES permit are in compliance with all applicable TMDLs and West Virginia's federally approved anti-degradation policy. I have no expectation the disposal of fill material in waters of the U.S. at the Spruce No. 1 Mine will violate any applicable State water quality standards.

4. Cumulative Impacts

In response to your concerns over cumulative impacts, the USACE has thoroughly considered the cumulative impacts of mining in the Coal River watershed as documented in the FEIS/ROD. The USACE considered all available resources, i.e. state's Cumulative Hydrologic Impact Assessment, GIS mapping layers, pending state and Federal mining applications, current water quality conditions) pertaining to past, present and reasonably foreseeable future projects during the development of the cumulative impact analysis for the project. For each USACE project evaluation, the cumulative impact analysis includes an evaluation of (1) present conditions and probable future conditions if fill activity is not allowed; (2) the direct and indirect effects that fill activity would have on those conditions; and (3) how fill activity would interact with past or future impacts from other activity in the area. There is no compelling information that indicates the authorized mining would contribute to significant degradation of the aquatic environment. Pending mining applications will be carefully evaluated on a case by case basis. I have determined no further cumulative impact analysis is warranted.

4

## 5. Compensatory Mitigation

In response to your concerns over inadequate compensatory mitigation, while the approved mitigation plan does include the establishment of stream channels on the mine bench, this is only one component of the plan. The overall mitigation plan will provide a ratio of approximately 2:1, including additional components addressing restoration and enhancement of streams and riparian zones, and use of restrictive covenants.

Special Conditions 12, 13, 14 and 15 of the approved permit requires assessments of physical habitat, benthic communities and water quality in the created, enhanced and restored mitigation stream channels. Following submittal of the 10-year monitoring report, if required performance has not been met, the monitoring period may be extended and/or Mingo Logan may be required to revise the existing mitigation site or identify new potential mitigation(s). The proposed mitigation work plan was developed in accordance with the USACE mitigation guidelines, incorporates a watershed approach, and is based on ecological lift. I have determined that no further mitigation or modifications to the approved compensatory mitigation plan are warranted.

Based on the information provided during the review of the subject project and development of the EIS, and evaluating compliance with 40 CFR 230.10, I have determined there were no other practicable alternatives that would have less impacts on the aquatic environment, the proposed discharge would not be expected to cause or contribute to violations of applicable state water quality standards or significant degradation of the environment, and all appropriate steps were taken to minimize potential adverse impacts. Further, the WVDEP has advised the District that Spruce No. 1 Mine is currently in compliance with their existing authorizations for the mine. Therefore, I have determined that no additional evaluation of the project's effects on the environment are warranted, the permit will not be suspended, modified or revoked, and a supplemental EIS will not be prepared.

Finally, I am mindful of your agency's concerns and appreciate the efforts you are making to improve the environmental review of pending applications for surface coal mining activities. Your staff is very helpful and they are providing excellent support to the District's Regulatory staff to provide a more rigorous review of applications in the coal fields. I look forward to continued collaboration as we work closely with your agency on all projects. If you have any questions, please contact me at 304-399-5395.

Sincerely,

Robert D. Peterson
Colonel, Corps of Engineers
District Engineer

30 September 2009

CELRH-OR-FE

MEMORANDUM FOR RECORD

SUBJECT: Evaluation of Comments Submitted by the United States Environmental Protection Agency regarding Spruce No. 1 Mine Clean Water Act Section 404 Individual Permit in Logan County, West Virginia.

1. **Summary:** On 22 January 2007, an individual Department of the Army (DA) permit was issued to Mingo Logan Coal Company (Mingo Logan) authorizing the discharge of fill material in conjunction with surface coal mining activities near Blair, West Virginia (Logan County). Subsequent to issuance of the permit, litigation was initiated by Ohio Valley Environmental Coalition (OVEC) in late January 2007. Following nearly two years of litigation (during which time a specified amount of mining proceeded under the DA permit in accordance with an agreement by the parties), a Fourth Circuit ruling on 13 February 2009 apparently resolved the remaining issues and Mingo Logan initiated actions to have the injunction lifted. Lifting of the injunction would allow Mingo Logan to proceed with all mining authorized under the DA permit. However, prior to lifting of the injunction, in a letter dated 3 September 2009 to Col. Robert Peterson, LRH Commander, Region 5 of the U.S. Environmental Protection Agency stated that new information and circumstances have arisen which justify reconsideration of the permit. USEPA requested that the district use its authority under 33 CFR 325.7 to suspend, revoke or modify the permit. The following information provides background about processing of the original permit proposal, preparation of NEPA documentation, litigation history, evaluation of the information provided by EPA in its' letter, and the LRH determination regarding USEPA's request.

2. **Permit Application Background:** Mingo Logan originally proposed to impact 57,755 linear feet of waters of the United States (U.S.) and 2,914 acres of land to recover 51.53 million tons of bituminous coal reserves. The proposal was advertised by Public Notice Number 199800436 on 29 June 1999. On 10 October 2005, Mingo Logan submitted a revised Department of the Army (DA) permit application to the U.S. Army Corps of Engineers (USACE) to construct, operate and reclaim the re-configured Spruce No. 1 Mine in Logan County, West Virginia. Mingo Logan revised the configuration of their proposed mine plan in accordance with the requirements of the West Virginia Department of Environmental Protection (WVDEP) Final Approximate Original Contour (AOC) Guidance Document, developed in accordance with the U.S. District Court Bragg vs. Robertson Consent Decree, reduced permanent impacts to waters of the U.S. by 17,701 linear feet, deleted all permanent impacts to perennial streams, limited temporary impacts to perennial streams to 825 linear feet, deleted proposed impacts to White Oak Branch (a presumptive Tier 2.5 stream), reduced surface disturbances by 636 acres, reduced coal extraction by 10.62 millions tons, and eliminated the use of a dragline to reduce the amount of unreclaimed disturbed acres during mining. On 12 October 2005, the USACE issued Public Notice 199800436-3 for the revised project.

2

3. **Project Location:** The mine site is located approximately two miles northeast of Blair, in the East District of Logan County, West Virginia. The proposed project will result in disturbances to the Right Fork of Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch and several of their unnamed tributaries. The streams on-site exhibit surface water connections to Spruce Fork of the Little Coal River, a traditionally navigable (Section 10) water of the U.S.

4. **NEPA Process:** On 4 February 2000, the USACE published a Notice of Intent to prepare an Environmental Impact Statement (EIS) in the *Federal Register*. On 12 April 2001, the USACE distributed a public notice to adjacent landowners and other interested parties, informing the public of the proposed project and of an upcoming scoping meeting. The USACE also published advertisements in local newspapers informing the public of the scoping meeting. On 2 May 2001, at the Chief Logan State Park, in Logan, West Virginia, the USACE conducted an EIS public scoping meeting for the purpose of providing additional information on the project to the interested public and soliciting information from the public on issues that should be addressed in the EIS. A court reporter was present at the scoping meeting to record the oral comments. Twenty-five individuals presented comments at the scoping meeting and a total of 12 additional comments were received following the scoping meeting. As indicated above, on 12 October 2005, the USACE issued Public Notice 199800436-3 for the reconfigured and modified proposed project. On 14 December 2005, the USACE via a public notice advised the public that comments would be accepted through public notice comment period and continue through the 10th day following the public hearing. This public notice included a Guidebook to explain what topics would be discussed in the Draft EIS and where the discussions could be found. Also, a goal of this guidebook was to help the public understand its role in reviewing the document and providing feedback to the USACE. On 31 March 2006, the USACE published a Notice of Availability (NOA) of the Draft EIS in the *Federal Register*, issued the Draft EIS, and distributed the Draft EIS to all interested parties available through direct mailings, providing copies to local libraries, courthouses, and at the Huntington District office, as well as on Compact Disc (CD) by request. The USACE initially established a 45-day comment period for the Draft EIS, and subsequently extended the comment period for 16 additional days based on requests from the U.S. Environmental Protection Agency (USEPA). Also announced in the 31 March 2006 *Federal Register* NOA was notice for a formal public hearing. The USACE held the formal public hearing on 1 May 2006 to solicit comments on the Draft EIS. A court reporter was present at the meeting to record oral comments. Sixty-five individuals attended the formal public hearing with twenty-five persons presenting oral comment, and a total of 122 additional comments (64 support form letters, 5 opposition letters from environmental organizations, 44 opposition form letters, 3 agency comment letters, 4 clearance letters from tribal governments, and 1 clearance letter from the Division of Highways) were received prior to the close of the comment period for the Draft EIS. All comments (letters and testimony) were reviewed and, in accordance with the NEPA, substantive comments were addressed in the Final EIS (Copies of the comments received were provided in Attachment 1 of the Final EIS; response to comments were included in Chapter 2 of the Final EIS). Substantive comments (including those provided by USEPA) that affected elements of the EIS were incorporated into the Final EIS. On 22 September 2006, the USACE published a NOA of the Final EIS in the *Federal Register*, issued the Final EIS, and distributed the Final EIS to all interested parties available through direct mailings, providing copies to local libraries, courthouses, and at the Huntington District office, on CD by request, as well as the Huntington District website (FileMarshal) to allow for improved

and expedited access. In the *Federal Register* Notice, the USACE established a 30-day comment period for the Final EIS. The comment period was subsequently extended for an additional 30 days based on a request from an organization. A *Federal Register* Notice was issued on 23 October 2006 advertising the 30-day comment extension. A total of 161 comments were received prior to the close of the extended comment period. In a letter dated 30 November 2006 (Attachment 1), USEPA noted the improvement and enhancements to the revised Compensatory Mitigation Plan (CMP), including the 10-year adaptive management and long-term monitoring plan.

5. **Permit Issuance:** The Record of Decision (ROD) was signed and IP issued on 22 January 2007. The IP authorized:

- Discharge (temporary) of approximately 576.6 cubic yards of dredged and/or fill material into 165 linear feet of perennial stream and 1,185 linear feet of intermittent stream channel to construct sediment control structures.
- Discharge (permanent) of approximately 1,703 cubic yards of dredged and/or fill material into 2,161 linear feet of intermittent stream segments and 3,675 linear feet of ephemeral stream segments of the 1st unnamed right tributary of the Right Fork of Seng Camp Creek; Pigeonroost Branch and its 2nd unnamed left tributary, 4th unnamed right tributary, 1st unnamed left tributary of the 4th unnamed right tributary, 3rd unnamed right tributary, 1st unnamed left and right tributaries of the 3rd unnamed right tributary; Oldhouse Branch and its 1st unnamed left and right forks to facilitate the recovery of coal reserves underlying the stream beds.
- Discharge (permanent) of approximately 16.698 cubic yards of dredged and/or fill material into 24,023 linear feet of intermittent stream channels, 6,955 linear feet of ephemeral stream channels, and 0.12 acre of emergent wetlands to construct valley fill disposal sites underdrain system.
- Discharge (temporary) of approximately 358 cubic yards of fill material into 1,329 linear feet of Pigeonroost Branch and its 1st unnamed left intermittent and 2nd unnamed right intermittent tributaries to construct an office and warehouse area.
- Discharge (permanent) of fill material into 6,307 linear feet of ephemeral and intermittent stream channels and 825 linear feet of temporarily affected by sediment control and coal removal, 8,772 linear feet (11.3114 acres) of Spruce Fork, and 2,500 linear feet (3.2719 acres) of Rockhouse Creek to implement the proposed compensatory mitigation work plan.

Conditions of the permit require Mingo Logan to perform compensatory mitigation to offset impacts associated with the IP. The mitigation includes over 88,000 linear feet of stream mitigation (restoration, enhancement and creation) and creation of 0.48 acre of wetlands.

6. **Litigation Background:** After Mingo Logan commenced operations, a challenge to the permit was initiated by Ohio Valley Environmental Coalition (OVEC) in late January 2007. Agreements were reached between the parties that allowed Mingo Logan to proceed with a restricted scope of its mining operations while the Fourth Circuit considered the appeal of the Southern District of West Virginia Court's ruling of 23 March 2007. Mingo Logan has conducted filling activities, constructed ponds and conducted mining operations in a constrained

4

manner since early 2007. On 13 February 2009, the 4th Circuit overturned the District Court's ruling. Following nearly two years of litigation (during which time a specified amount of mining proceeded under the DA permit in accordance with an agreement by the parties), a Fourth Circuit ruling on 13 February 2009 apparently resolved remaining issues and Mingo Logan initiated actions to have the injunction lifted. Lifting of the injunction would allow Mingo Logan to proceed with all mining authorized under the DA permit..

7. **USEPA 3 September 2009 Request:** In a letter dated 3 September 2009 (Attachment 2), USEPA requested the District Engineer use his **discretionary authority** provided by 33 CFR 325.7 to suspend, revoke or modify the permit claiming new information and circumstances have arisen which justify reconsideration of the permit. The USEPA concerns relate to (1) fill minimization, (2) potential water quality excursions, (3) significant degradation of aquatic resources, (4) potential significant cumulative impacts, and (5) inadequate compensatory mitigation. :

8. **Analysis of Issues Raised by EPA:** To allow a more informed analysis of issues raised by EPA, copies of the EPA letter were provided to Arch Coal (parent company of Mingo Logan) and the WVDEP for review and comment. Comments were received from Arch Coal (Attachment 3) and WVDEP (Attachment 4) and were considered in the district's evaluation of EPA's request. A point by point analysis of EPA's stated concerns follows below:

*Concern #1. The USEPA contends that data from prior research as well as research conducted by USEPA in 2008 were available and were not evaluated as part of the review of the permit application for the Spruce No. 1 Mine.*

The USEPA does not suggest that either new data or the record of Mingo Logan's on-going operations warrant any action by the USACE. Instead, it contends that "[b]ased on prior research and confirmed in 2008 by research conducted by USEPA, we are concerned data were available and was not evaluated as part of the review for the 2007 permit." USEPA Letter, p. 1. USEPA's objections have already been addressed by the USACE or other programs, some of which USEPA oversees, such as Section 402 and 401 of the CWA. USEPA does not identify the 2008 prior research or its subject matter. A review of the bibliography attached to USEPA's letter does not reveal any research conducted by them in 2008. It is assumed the research that USEPA references is the July 2008 Pond et. al.Study titled "Downstream effects of mountaintop coal mining: comparing biological conditions using family-and genus-level macroinvertebrate bioassessment tools" (Pond Study). The study sampled 18 sites during 2006/2007, with one site representing the water quality for the 18 sites. The study contains no new circumstances or information that the USACE has not previously considered. That study relies on the makeup of aquatic insects to evaluate stream health. That study also sought to demonstrate that the use of family-level aquatic insect indices for measuring stream impacts, such as the West Virginia Stream Condition Index ("WVSCI"), might be less sensitive than the use of genus-level indices. The authors created the "Genus-Level Index of Most Probable Stream Status" ("GLIMPSS"). Pond, et al. noted, however, that "results were consistent whether family-level or genus-level data were used," that "[t]he GLIMPSS and WVSCI were strongly correlated, and both [indices] generally agreed . . . and "[a]ssessment ratings based on [the two different indices were in agreement 81% of the time. . . ." Pond, et al. Abstract, pp. 722 & 729. The USEPA also stated in

their conclusions that conductivity is responsible for depressed index scores and is inconsistent with some toxicity studies (p. 726), that the index scores at one site (Stanley Fork) actually improved despite "substantial" increases in conductivity (p. 724), and that "habitat quality" (as opposed to conductivity) did explain some variance in the metrics (p. 725). Finally, the USEPA stated that their index did not include caddisflies, which are used by many biological indices for measuring stream health, because caddisflies frequently flourish downstream of coal mines. It is unknown why the authors removed caddisflies from their index.

The WVSCI was developed by Tetra Tech in 2000 at the request of WVDEP to rate the condition of all streams in West Virginia. GLIMPSS appears to yield lower scores than the WVSCI for stream segments below valley fills by placing more emphasis on conditions known to exist below valley fills. Thus, GLIMPSS does not represent the discovery of new information, but rather a new method for evaluating previously considered information. The conditions the Pond Study examined—the shift in benthic populations and the reduction of mayflies below some valley fills—were discussed by the parties' experts in the *Aracoma* case, 479 F. Supp. 2d at 638, and by the USACE in the Administrative Record. Both USEPA and Appalachian Center for the Economy and Environment (ACEE) submitted comments on the alleged impact of valley fills on aquatic resources (AR, Doc. 467, FEIS pp. 2-94 to -98 (USEPA Comments); *id.* at 2-182 (ACEE's comments regarding downstream impacts to mayflies). These comments, which are the same as those contained in USEPA's Letter, were addressed by the USACE. AR, Doc 572, ROD Appendix A, pp. 109-115, dated 22 January 2007.

Huntington District's evaluation of the Pond Study is summarized below.

- The study states that there is disagreement between regulators, regulated community, and researchers regarding severity of impairment from valley fills and which analyses should be used to quantify these impairments.
- Site selection process was unclear. The study did not provide background/historic information about the watersheds and why those particular watersheds were chosen for sampling -- the study did not provide ages of valley fills, information regarding pre-Surface Mining Control and Reclamation Act (SMCRA) mining practices, logging, sewer, etc.
- While Pond et al. contended that the WVSCI was not as sensitive a tool as the GLIMPSS in assessing impacts from low and medium levels of mine disturbance, the methodology for discerning differences in "low, medium and high" levels of mine disturbance was imprecise. The study did not correlate their scores with the number or length of valley fills or areal extent of mining in a watershed (*see* pp. 719-20 and 727 of the Pond Study). Instead, the study relied on conductivity as a measure of mining intensity. Without correlating the study results to fills (as opposed to upland disturbances unregulated under the § 404 program), the GLIMPSS provides no advantage over the WVSCI for predicting impacts of fills.
- Overall, the study focuses on one parameter (conductivity) as an indicator of mining disturbance. Conductivity ranges were assigned as low, medium and high categories of mining disturbance and the study leads to broad generalizations that may not be well supported. The study assumed upfront that high conductivities indicated mining disturbances (p. 718 of the Pond Study). The paper concedes that it was not possible to

accurately determine the amount of disturbance in a watershed, thereby diminishing the value of the study tool. Because the USEPA did not have enough data (e.g. SO4 data, accurate land-use data, etc.), the study used conductivity as an indicator of mining disturbance. The study did not clearly delineate why/how the three categories of Pond conductivity levels to indicate impairment were determined (p. 719-20 of the Pond Study).

- Monthly water quality data were available for 19 of the 37 sites and correlations between water quality and multi-metric and individual metrics were limited in their ability to support robust inferences. Of 18 sites sampled in 2006/2007, only one water quality sample was obtained to represent the 18 sites (p. 719 of the Pond Study).
- WVSCI requires sampling to the family level and is accepted by WVDEP and USEPA has repeatedly advised that the State should use the WVSCI to determine the condition of macroinvertebrate communities.
- GLIMPSS requires sampling to the genus level and is not currently required by WVDEP (pp. 718-19 of the Pond Study); It is also a draft measurement tool and not a stand alone determinant of compliance with the narrative water quality standard.
- The biological sampling (GLIMPSS) eliminated the more tolerant species of mayflies which lowers the stream's scores and increase the likelihood of an impairment determination; the GLIMPSS does not rely on the same set of matrices on which the WVSCI relies. The study discounted an order of mayfly that is widely accepted to use in biological monitoring tools and is indicative of biological health.
- The WVDEP requires the use of WVSCI, which requires two seasons of sampling. GLIMPSS requires one season of sampling.
- The study used a subset of the RBP physical habitat metrics. The USACE recommends that the full set of 10 habitat parameters be used to generate a fair and balanced assessment of the habitat quality of the subject channels.
- Sampling was conducted downstream of ponds at some sites with existing sediment ponds – it is well known that macroinvertebrate diversity is lost while the ponds are in place. When ponds are removed, macroinvertebrate diversity is expected to increase.
- Studies[1] have been conducted that indicate stream channels with high conductivities do support diverse macro-invertebrate communities.
- Consideration is recommended that the reductions of sensitive mayfly species may not be a result of high conductivity but may be a result of sediment ponds and/or loss of habitat (riparian buffer, detritus, in-stream habitat features, etc.) or a combination of multiple factors. A full RBP analysis would help to determine habitat condition.

Of the six sites referenced in the 2008 Pond Study, five were located within proximity of the project area and were incorporated, evaluated and documented in the Spruce EIS, which was a complete NEPA review. The sixth site is a location sampled in 2007 after the issuance of the DA permit and was not evaluated.

---

[1] Hartman et al (2005) How much do valley fills influence headwater streams?; Randy Maggard (2009) "The Effects of Specific Conductance of Water on the Benthic Macroinvertebrate Community Downstream of Coal Mining Activities"; and REI Consultants APPENDIX D: PREDICTIVE MODELING DATA of the Compensatory Mitigation Plan for the Nellis Surface Mine in Boone County, West Virginia

7

The USEPA stated concerns about the project's potential to degrade downstream water quality and cause or contribute to potential excursions of WV's narrative water quality standards.   On 19 December 2005, the WVDEP granted the water quality certification pursuant to Section 401 of the CWA for the Preferred Alternative.  The National Pollutant Discharge Elimination System (NPDES) permit modification associated with Mingo Logan's revised Preferred Alternative was approved by the WVDEP on 29 April 2005.  The proposed project would not violate the toxic effluent standards under Section 307 of the CWA based on information provided in the Mingo Logan's Surface Mine Application (SMA).  It is not expected the disposal of fill material at the Spruce No. 1 Mine will violate any applicable State water quality standards.

Mingo Logan has developed a surface water control plan and a monitoring plan for the proposed project that was approved by WVDEP.  Monitoring of surface waters for the project would include baseline water sampling performed in preparation of the Spruce No. 1 Mine SMA, in addition to proposed during- and post-mining monitoring required under the SMCRA permit. Mingo Logan is also subject to monitoring requirements under the NPDES permit issued for the project, including in-stream sites as well as on-bench discharges from permitted outlets. In addition, regulatory processes are required that involve the USACE and WVDEP in the review of permit applications and related control measures for surface drainage, discharge, and water quality. The applicability of specific water quality standards and detailed approaches to compliance would be determined during these processes. Compliance monitoring and reporting would be conducted during operations and for a subsequent period extending through Phase II bond release, which is typically a duration of at least five years. Review of the permits and practices is conducted every five years as part of the continuing regulatory program conducted by WVDEP.

In a letter (Attachment 5) dated 10 July 2009, the WVDEP indicated:

- The USEPA has departed from the permitting protocols/agreements, which were entered into by the USACE, USEPA and WVDEP during the development of the Programmatic EIS for Mining/Valley Fills.
- WVDEP assigns water quality-based effluent limitations in its NPDES permits in accordance with all applicable State requirements, including the anti-degradation implementation rule.
- The WVDEP cannot say that there has been a violation of its narrative standard when the only impacts to the biological component of the aquatic ecosystem are diminished numbers of certain genera of mayflies, without evidence that this has had any adverse impact of any significance on the rest of the ecosystem.

In a letter (Attachment 4) dated 25 September 2009, the WVDEP stated:

- "USEPA has never provided…information that could lead us to conclude that the certification was deficient…";
- "None of the information…in the USEPA's letter would cause the WVDEP to change the water quality certification…";
- "…the effluent limitations it establishes are in compliance with all applicable TMDLs and West Virginia's federally approved antidegradation policy";

- "…this mining operation had been designed so as to prevent material damage to the hydrologic balance";
- "All sampling has shown the Spruce No. 1 Mine to be in compliance with all other parameters at all other outlets";
- "…with the application of the AOC plus formula…the extent of fills associated with it have been minimized as much as practicable";
- "…the only impairment listed in the USEPA-approved TMDL for the Little Coal River is fecal coliform. No metals are listed…The only impairments listed…for Spruce Fork is fecal coliform. No metals are listed…The only impairment listed…for Seng Camp Creek is iron. This creek has never been 303d listed for biological impairment…USEPA has obviously confuse Seng Camp Creek with Seng Creek…in another county (Boone) in another drainage … and is not affected by discharges from this mine. Further WVDEP's most recent West Virginia Stream Condition Index…data contradicts USEPA's assertion of a poor biologic condition in Spruce Fork….USEPA-scrutinized NPDES permit for the Spruce No. 1 Mine is in compliance with all applicable TMDLs and the permittee has generally complied with this permit, according to the WVDEP's records."
- "The USEPA letter makes reference to a specific conductance level of 500 S/cm as if this has some established regulatory significance. This value is based on an unidentified data set and lacks a regulatory nexus…To date, the science has not been established to recommend a national water quality criterion for specific conductance";

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

***Concern #2.*** *The USEPA recommended additional valley fill minimization techniques should be considered by Mingo Logan to ameliorate water quality impacts.*

Mingo Logan considered various alternatives during feasibility studies for the Spruce No. 1 Mine Preferred Alternative. In addition, the USACE identified potential alternatives to the Spruce No. 1 Mine Preferred Alternative based on issues identified during the scoping process and project evaluation. The alternatives considered included alternatives to constructing and operating the Spruce No. 1 Mine as proposed under Mingo Logan's Preferred Alternative that involved alternate locations for mineral extraction (see Section 2.4.1 of the EIS); and alternate plans for constructing, operating, and reclaiming the Spruce No. 1 Mine (other mining methods and configurations) itself (see Section 2.4.2 of the EIS).

Alternative 7 proposes to conduct mountaintop mining of the seams overlying and including the Middle Coalburg coal seam in the western portion of the proposed project area. In the eastern portion of the proposed project area, mountaintop mining would be limited to those seams including and overlying the Upper Stockton seam, with auger and/or highwall/thin-seam mining utilized to recover the Middle Coalburg seam. In addition, the Buffalo B seam would be contour mined with augering and/or highwall/thin-seam mining within the designated valley fill areas only. The Middle Coalburg and Buffalo B would be augered and/or highwall/thin-seam mined in both the up-dip and down-dip directions.

9

By redesigning the mine plan as described under Alternative 7, Mingo Logan reduced permanent impacts to stream channels by 17,701 linear feet. Notably, Alternative 7 avoided and would not impact White Oak Branch, and it represents an approximate seven percent (7%) reduction in the acreage impacted within the mainstem of Pigeonroost Branch, as compared to the originally proposed project (Alternative 2). Alternative 7 would also disturb the fewest acres per ton of marketable coal (AD/MT of 55.68) of the two alternatives carried forward. Compared to the originally proposed project (Alternative 2), Mingo Logan PA represents a twenty-seven percent (27%) reduction in the overall acreage of land disturbance (2,278 acres vs. 3,113 acres, respectively) and a twenty-five percent (25%) reduction of the recoverable reserve base. In addition, by not utilizing a dragline, the Alternative 7 operations would not require construction of a large access road along the Right Fork of Seng Camp Creek, thereby resulting in less disturbance. When considering the two practicable alternatives, Alternative 7 in combination with on-site disposal of excess overburden, was determined to be the Least Environmentally Damaging Practicable Alternative.

Alternative 7 was designed to minimize, to the extent practicable, impacts to waters of the U.S. by optimizing overburden placement. This was achieved by adhering to the AOC/Fill Optimization Process developed by the WVDEP and Office of Surface Mining. In a letter (Attachment 6) dated 6 March 2000, the USEPA stated "...use of the AOC process will demonstrate that a mining company applicant for SMCRA and Clean Water Act 402 permits and for Clean Water Act 404 authorization has optimized spoil placement to the extent practicable. Accordingly, once it has been established that the mine plan meets the other requirements of the Clean Water Act, operators should not be required to place more spoil on the mining bench or on top of valley fills that is required by the optimization plan contained in the AOC Process Guidance." The Final AOC/Fill Optimization Process Guidance Document is an extensive document detailing the proper procedure for valley fill design; however, the primary objectives and requirements of the procedure are to:

1. Develop a volumetric model that:

   a) Determines the maximum volume of overburden that can be returned to the area of mineral removal in a configuration that is stable, controls drainage, and prevents stream sedimentation.
   b) Determines the remaining volume that can be placed in excess overburden storage areas. The AOC Model requires that the excess overburden disposal fill be raised to an elevation above the lowest seam to be mined. This requirement results in additional backfill volume returned to the mined area, reducing the volume of excess overburden volume to be placed in the valley fills. This requirement is demonstrated by Figure 2-1, in the Guidance Document.

2. Evaluate each potential valley fill site within the proposed project area to achieve the most efficient placement of excess overburden. Each valley fill is evaluated to determine its excess overburden capacity per specified length.

10

3. Allocate or assign the total volume of excess overburden to the valley fills in descending order based on each valley fill's relative efficiency. Relative efficiency is determined by cubic yards of material storage per foot. The result is the optimum placement of excess overburden in terms of cubic yards per acre of Excess Spoil Disposal Area.

4. Develop the final regrade configuration and excess overburden storage areas for the Mine Plan such that the final configuration does not exceed the Excess Spoil Disposal Acreage plus the acreage allowance developed in the AOC/ ESDA Model.

Only those excess materials not used to return the mining bench to AOC were proposed to be placed in proposed disposal sites. The backstack areas as proposed would accommodate 390 million cubic yards. Of this, 72 million cubic yards consist of additional backfill material under the AOC+ formula. That material will be placed above the deck of what would have been the case with a traditional valley fill and will have the effect of reducing the amount of overburden in waters of the U.S. by 39 percent. Per the permit's approved overburden handling design, the Spruce No. 1 Surface Mine proposes to ultimately return eighty percent (80%) of total swelled overburden material back to the mining bench. The average for approved AOC+ permits is approximately seventy percent (70%) being returned to the mine bench and thirty percent (30%) being placed in excess disposal sites (valley fills). Generally, the flatter the pre-mining terrain, the higher the percentage that can be returned to the bench becomes. Conversely, as terrain becomes steeper and ridgelines narrow, this percentage decreases. Mingo Logan valley fill optimization design was approved by the WVDEP and sealed by a professional mining engineer.

Mingo Logan evaluated hauling fill material off-site to the regraded Old Hickory operation located in the Beech Creek watershed as a possible alternative to construction of valley fills. This option would require construction of a 109-foot wide haulage route across the Pigeonroost Branch and Spruce Fork valleys that would accommodate two-way traffic due to the operating requirements of the equipment and the steep terrain. This route would be located in close proximity of local residents along these valley floors and would result in one-way haulage distances of over 40,000 feet (7.57 miles). In addition to this distance, the haulage equipment would be required to consistently traverse adverse grades of ten percent (10%). These factors would result in an additional trucking requirement of seven to eight (7-8) times the number of haulage units, additional capital investment and development costs, operating costs, and would exceed the real market value of the recovered reserves, while generating an additional 9.07 million cubic yards of excess overburden that would require storage. The operating costs and increased expenditure of fossil fuels to operate the trucks required to transport this fill material render this alternative impracticable from an environmental and cost/benefit standpoint. Mingo Logan also evaluated hauling fill material off-site to an adjacent permitted area in Seng Camp Creek controlled by Mingo Logan and to existing pre-SMCRA mining areas in close proximity to the proposed project, as well as on-site to contour mining benches. Mingo Logan controls the Mountain Laurel Complex which includes adjacent existing permitted areas (WVDEP Permits U-5031-97 and O-5016-04) located in the Seng Camp Creek watershed, north of the proposed project area. WVDEP Permit U-5031-97 is for underground mining of the Alma and Cedar Grove coal seams and construction of the Cardinal Preparation Plant and railroad loadout and WVDEP Permit O-5016-04 is for the Daniel Hollow Coarse Refuse Facility in the same area. Disposal of excess spoil from the proposed project on WVDEP Permits U-5031-97

and O-5016-04 would interfere with the planned activities on these permits and would violate WVDEP permit regulations that prohibit placement of excess spoil from one permit onto another unless the receiving permit is specifically designed for that purpose, which WVDEP Permits U-5031-97 and O-5016-04 were not.

Candidate drainages immediately adjacent to the proposed project area were analyzed for slope sufficiency and stability. Valley fill locations were then determined using the "ESDA Bank" Analysis procedure specified in the WVDEP Final AOC/Fill Optimization Process Guidance Document developed by WVDEP and OSM to optimize AOC reclamation and minimize excess overburden from mountaintop mining jobs.

To minimize individual and cumulative impacts on the aquatic environment and ameliorate water quality impacts, the following practices are incorporated into the valley fill design and construction process for the proposed project:

- Site selection was limited to areas in the uppermost portions of the watersheds previously impacted by both pre- and post-SMCRA mining activities and timbering operations. Mingo Logan also specifically revised the permit configuration to avoid direct impacts to White Oak Branch, a presumed Tier 2.5 stream. Under Alternative 7, Mingo Logan will utilize the existing infrastructure at the Cardinal Preparation Plant Facility and Unit Train Loadout Facility located at the mouth of Seng Camp Creek for coal shipment.

- The use of smaller equipment under Alternative 7, as opposed to the dragline proposed in Alternatives 2 and 3, will produce a reduction in temporary land disturbance acreages during any given phase. In addition, by not utilizing a dragline, the Alternative 7 operations will not require construction of a large access road along the Right Fork of Seng Camp Creek, thereby resulting in less surface disturbance.

- The fill material was tested and meets the SMCRA definition of durable material which does not slake in water to produce soil sized particles. This is expected to minimize the potential pluming effect and sedimentation.

- Material that has been identified as potentially acid producing will not be placed in the fills. A special handling plan, approved by the WVDEP, for segregating this material will be implemented to avoid adversely affecting water quality.

- Efficient overburden handling practices, sediment control structures, regrading and revegetation will prevent the development of acid/toxic mine drainage. Chemical agents will be utilized in the event that acid/toxic mine drainage does develop. Any materials encountered with the potential to produce acid/toxic mine drainage will be separated and placed between four feet of non-toxic, noncombustible, impervious material. This material will not be placed in a natural watercourse.

• Materials not suitable for blending will be segregated during the mining process and isolated within the backstack areas. Material to be isolated will be buried as quickly possible to minimize exposure to weathering elements. The excess carbonate-rich rocks in the overburden will be anticipated to minimize the potential for this material to produce acid water and adversely effect revegetation during- and after-mining.

• During construction, temporary sediment control structures will be employed to minimize TSS and turbidity. Full factor sediment control structures will be constructed and there will be no proposed disturbance downstream of the ponds. NPDES permit requirements will indicate when and if excess suspended solids are being discharged and maintenance is needed.

• The "bottom-up method" will be used to construct the proposed valley fills. This method develops the toe of the fill as soon as practicable. As soon as access to the toe is developed the bottom benches of the fill are established and vegetated. Excess spoil disposal will commence at the head of the hollow and proceed downstream to the final toe. Then the remaining benches are completed in this bottom up fashion until the crest is completed. While using this method may take several months to reach the toe, face reclamation and vegetation occur at a much more accelerated pace than typical single or multiple lift construction methods. Also, this technique creates an abundance of sediment control sites, in addition to the in-place drainage control pond near the proposed toe of the fill, further minimizing sediment loads on the streams.

• Ground and surface water monitoring will be conducted during the life of the operation. Discharges from the surface water control system will be monitored by Mingo Logan as required by the approved NPDES permit conditions to control the quality of water released to local drainages. Water quality and flow parameters to be monitored at the outfalls include flow, total suspended solids, total iron, total dissolved solids, aluminum, selenium, manganese, and pH. Additional monitoring will occur in both receiving drainages below the outfall points to satisfy the requirements of the Section 401 and 402 permits. This monitoring will include quarterly and annual sampling for a broader suite of physical and chemical parameters. If any water quality and/or quantity problems develop, appropriate measures will be taken to correct the situation.

The analysis performed during review of the permit application adequately addressed this issue. The comments made by the USEPA concerning avoidance and minimization were considered at length in discussions with both the USACE and USEPA through out the CWA/NEPA process. There is no new information presented by USEPA that was not adequately considered and addressed.

*Concern #3. Recent data and analyses have revealed that downstream water quality impacts have not been adequately addressed especially in light of clear evidence that effluent from valley fill sedimentation ponds is very likely to elevate conductivity and thus negatively affect healthy aquatic communities. The Little Coal River contains the largest number of impaired stream miles in the Central Appalachian Ecoregion in WV. Both Spruce Fork and Little Coal River have approved TMDLs for iron, aluminum, selenium (Spruce Fork), pH, sediment and fecal*

*coliform bacteria. The TMDLs identified mining as a source of many of these impairments and this project will likely discharge these same pollutants into these watersheds. The Spruce Fork watershed has 26 impaired streams, including Seng Camp Creek. Seng Camp Creek is listed on the CWA 303(d) list as biologically impaired. Both Pigeonroost and Oldhouse Branch are listed for water quality impairments and may be providing clean freshwater dilution to Spruce Fork which has measured conductivity readings above 500 µS/cm. This should be considered in a re-evaluation of the permit. WVSCI indicates that the stream is already in poor condition.*

These assertions are neither new nor do they warrant further review by the USACE. Additionally, Seng Camp Creek does not appear on the 303(d) list as biologically impaired. Seng Creek, which is located in the Big Coal River watershed, not the Little Coal River, does appear on the 303(d) list for biological impairment. Seng Creek is situated in Boone County and is very remote from the Spruce operation which is in Logan County. At the time the EIS was prepared, the presumptive list (three hundred ninety-four [394] streams) did not include any of the streams within Mingo Logan's revised Preferred Alternative project area (WVDEP, 2005). Under Alternatives 2, 3, and 6, White Oak Branch of Spruce Fork would be directly impacted. Alternative 7 was designed to avoid direct impacts to White Oak Branch while maintaining adherence to the project purpose and AOC/Fill Optimization Process requirements.

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

*Concern #4. The CWA Section 404(b)(1) Guidelines state that "no discharge of dredged or fill material shall be permitted if it causes or contributes, after consideration of disposal site dilution and dispersion, to violation of any applicable State water quality standards." In addition, the Guidelines prohibit any discharge of dredged or fill material which would cause or contribute to significant degradation of the aquatic ecosystem, with special emphasis placed on the persistence and permanence of effects, both individually and cumulatively.*

The factors found at 40 C.F.R. 230.10 (a-d) were considered by the USACE both individually and cumulatively as part of the 404(b)(1) Guidelines evaluation incorporated into the project's permit evaluation and decision document. Findings of significant degradation related to the proposed discharge were based upon appropriate factual determinations, evaluations and tests required by the Guidelines. In compliance with 40 CFR 230.12 (c), it was demonstrated that the proposed discharge would not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystem of concern.

Based upon the technical physical, chemical and biological evaluations and factual determinations made a part of the Section 404(b)(1) Guidelines analysis incorporated as Appendix B to the EIS, it has been determined that the proposed project will not discharge pollutants resulting in significant adverse effects on: 1) human health or welfare; 2) life stages of aquatic life and other wildlife dependent on aquatic ecosystems; 3) aquatic ecosystem diversity, productivity, and stability; or 4) recreational, aesthetic, and economic values. The proposed discharge resulting from the proposed project complies with the CWA Section 404(b)(1)

guidelines, including the employment of Mingo Logan's proposed mitigation measures and the appropriate and practicable measures to minimize pollution or adverse effects to the affected ecosystem.

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

*Concern #5. The Final EIS for this project states that "An increase in total dissolved solids is expected in the early stages of the project when clearing and filling of each valley fill site begins. This temporary increase would be expected to return to pre-mining conditions as areas are regraded and revegetated." The scientific literature as well as many State watershed reports have consistently shown that this assertion is not technically supportable. These studies and reports indicate that surface mining with valley fills in Central Appalachia is strongly related to downstream biological impairment. The studies also show that surface mining impacts on aquatic life are strongly correlated with ionic strength (conductivity) in the Central Appalachian stream networks. This increase in conductivity impairs aquatic life use, is persistent over time, and cannot be easily mitigated or removed from stream channels.*

While USEPA desires the USACE to revisit water quality issues, compliance with water quality standards is the province of the WVDEP's "certification" process undertaken pursuant to Section 401 of the CWA. 33 U.S.C. § 1341(a). That certification is binding on the USACE. *See* 33 C.F.R. § 320.4(d); *see also OVEC v. Aracoma*, 556 F.3d 177, 208 (4th Cir. 2009) ("A § 401 certification is considered conclusive, and no independent analysis of the certification is required."). In the 2008 joint Mitigation Rule, the USACE and USEPA addressed a comment that the rule did not provide sufficient guidance to ensure that the USACE will protect water quality. The agencies jointly responded that "[w]ater quality standards are more appropriately addressed under section 401 of the CWA." 73 Fed. Reg., 19594, 19627 (10 April 2008). Additionally, the USACE is aware of other studies that have resulted in different conclusions that those in the Pond Study. These studies include:

- Hartman et al (2005) How much do valley fills influence headwater streams?
- Randy Maggard (2009) "The Effects of Specific Conductance of Water on the Benthic Macroinvertebrate Community Downstream of Coal Mining Activities"
- REI Consultants APPENDIX D: PREDICTIVE MODELING DATA of the Compensatory Mitigation Plan for the Nellis Surface Mine in Boone County, West Virginia

Although the USEPA did not provide the USACE with other water quality information prior to the IP decision, the USACE, in its Section 404(b)(1) Guidelines evaluation, conducted an independent review of baseline water quality data from the SMCRA and NPDES permit applications along with the Baseline Water Quality sites, which are used to calculate NPDES effluent limits in accordance with the State's anti-degradation policy, to determine if the operation would be expected to violate water quality standards. Additional water quality sampling data conducted in the vicinity of the existing Dal-Tex Complex was also reviewed and is summarized in Appendix C and Appendix E of the ROD. Additionally, the USACE reviewed

benthic data in proximity of the operation to determine the effect of the adjacent operations on pollution tolerant aquatic species. This data was summarized in Appendix K of the EIS. Bottom-up construction techniques, sequencing and a material handling plan were incorporated into the approved SMCRA permit and these measures are expected to ameliorate water quality impacts.

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

*Concern #6. USEPA is concerned that the permit decision and the EIS prepared pursuant to NEPA do not reflect the data and analyses included in the studies referenced above and attached, and their implications regarding water quality impacts associated with surface coal mining. These studies together with information currently available regarding impairments of streams within the project areas strongly suggest that further water quality degradation and water quality exceedences may occur as a result of new mining at the Spruce No. 1 Mine. Based on information available, the project's consistency with the data and assumptions underlying the existing TMDLs approved in 2006 requires further investigation. The USEPA is concerned that the project may cause or contribute to a violation of the State's water quality standards or anti-degradation policy.*

The surface mining of coal and associated activities, is regulated by various federal and state laws including, but not limited to, the SMCRA, the State of WV requirements governing Water Quality Standards, requirements governing the state NPDES program, the CWA 404 program, and the state 401 WQC. Each of these major programs has a protection from water quality degradation component. The State of West Virginia regulates all surface mining operations. W.Va. Code §22-3 et. seq. The State of West Virginia administers the "requirements of programs under the federal SMCRA. . . ." W.Va. Code §22-3-2(c)(5). The WVDEP has approved the SMA and issued an Article 3 Permit in accordance with the SMCRA and implementing West Virginia Mining Reclamation Regulations.

WVDEP's surface mining program requires the submission of pre-mining data as part of a prediction of hydrologic consequences of proposed mining. Those regulations require baseline monitoring for TDS and specific conductance. 38 WV CSR 2-3.22.b.2. During mining, Section U of the Surface Mining Permit issued for the Spruce No. 1 Mine mandates that Mingo Logan comply with the water monitoring plan. That plan requires quarterly monitoring at 11 in-stream locations for TDS, specific conductance and various metals. Likewise, Special Condition No. 13 of the IP requires Mingo Logan to monitor benthic communities in mitigation areas using USEPA's RBP for Use in Streams and Wadeable Rivers. Section 5.1.10 of the RBP requires conductivity sampling. The IP Special Condition No. 14 also requires water chemistry sampling in those same areas using the USEPA's "Interim Chemical/Biological Monitoring Protocols for Coal Mining Permit Applications." Paragraph III.A of that protocol recommends analyses for both TDS and conductivity.

All dispersion of mining-related waters is regulated under the NPDES program. SMCRA permits require all drainage from areas disturbed by surface mining to pass through a sediment

control structure, and discharges from those structures are all considered point sources covered by NPDES permits issued pursuant to Section 402 of the CWA. Sedimentation control systems "shall be designed, constructed, located, maintained, and used . . . in such a manner as to minimize adverse hydrologic impacts in the permit and adjacent areas, to prevent material damage outside the permit area and to assure safety to the public." *Id.* These "sediment control or other water retention structures . . . shall . . . [c]omply with applicable State and Federal water quality standards and meet effluent limitations as specified in an NPDES permit for all discharges." W.Va. C.S.R. §38-2-5-4-(b). This adds another layer of regulatory protection.

The WVDEP has approved the NPDES Permit and Section 401 Water Quality Certification Applications in accordance with Section 402 and 401 of the CWA respectively. The CWA allows USEPA to review draft NPDES permits and to object to any that fall outside of the requirements of the CWA. USEPA did not object to Mingo Logan's modified permit application (Alternative 7). Further, TMDLs have been developed for discharges into the Coal River watershed, which includes the Little Coal River and the streams receiving drainage from the project. The TMDL addresses the issue USEPA raises. TMDLs are developed for the express purpose of determining the "amount of a pollutant from point, non-point, and natural background sources . . . which may be discharged to a water quality-limited waterbody." *See* USEPA's Decision Rationale, TMDL for Selected Streams in the Coal River Watershed, West Virginia (9/26/06), ¶ 1, p. 1. The Coal River watershed TMDL addressed both "biological impairment" and impairment for metals, pH and fecal coliform. USEPA's Decision Rationale, ¶ II, p. 2. With respect to "biological impairment," the TMDL addressed the following as potential stressors: metals toxicity, pH toxicity, sedimentation, organic enrichment and "ionic toxicity." TMDL for Selected Streams in the Coal River Watershed, Final Approved Report, ¶ 6, pp. 31-33 (Sept. 2006). For streams suffering metals or biological impairment, the TMDL calculated an allowable "waste load allocation" for all permitted mining operations. *Id.*, ¶¶ 6.4 & 7.5.1, pp. 32 & 51. The TMDL allocated allowable discharges to the existing and planned mines in the Coal River watershed, including the Spruce No. 1 Mine. The TMDL itself proves that there are no issues concerning water quality standards not already addressed. These allowable loads, which are used for NPDES permits, are designed to ensure applicable water quality standards are met. Mingo Logan's NPDES permit (Permit No. WV1017021) was expressly addressed in assessing and allocating discharges into the Spruce Fork of the Little Coal River. *See, e.g.,* Coal River TMDL, Metal Allocations Spreadsheet.

Compliance with water quality standards is the responsibility of the WVDEP certification process undertaken pursuant to Section 401 of the CWA. That certification is binding on the USACE. 33 CFR 320.4(d). The policy of the State of West Virginia is to "maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, and other aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development." W.Va. C.S.R. §47-2-1.1. The USEPA has requested the USACE consider other water quality issues (i.e. conductivity). The USACE in its NEPA and Section 404(b)(1) Guidelines evaluation for the Spruce No.1 Mine permit application independently evaluated various parts of the SMA, including Section J (Probable Hydrologic Consequences, Surface Baseline Water Quality data), surface and ground water monitoring plans, Surface Water Runoff

Analysis, Material Handling Plan, drainage control plan, the CHIA, baseline benthic and water quality data, water quality data from adjacent sites, minimization and construction techniques and concluded the Spruce No. 1 Mine will not result cause or contribute to significant degradation. The USEPA's recent 3 September 2009 comments on water quality are not considered new information that would warrant re-visiting this issue. Further, in a letter (Attachment 4) dated 25 September 2009, the WVDEP stated the effluent limitations established in the Spruce No. 1 Mine NPDES permit are in compliance with all applicable TMDLs and West Virginia's federally approved anti-degradation policy.

Downstream waters are protected by the State assuring "water quality standards provide for the attainments of the water quality standards of downstream waters." W.Va. C.S.R. §47-2-b.1.c. The WVDEP implements "the State's water quality anti-degradation policy. . . ." W.Va. C.S.R. § 60-5-1.1. "[T]he State's antidegradation policy requires that existing uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." W.Va. C.S.R. § 60-5-3.1. "The Secretary, in conducting an antidegradation review, must determine the existing uses of the receiving water body associated with the proposed activity." W.Va. C.S.R. § 60-5-3.3. "[T]he agency will determine which level of protection (i.e. "tier") applies to the receiving water body. . . ." W.Va. C.S.R. § 60-5-3.5. West Virginia's Antidegradation procedures provide that it is the policy of the State of West Virginia that the waters of the state shall be maintained and protected for Tier 2 Protection as the "existing high quality waters of the state must be maintained at their existing high quality unless it is determined . . . [i]f limited degradation is allowed, it shall not result in injury or interference with existing stream water uses or in violation of state or federal water quality criteria that describes the base levels necessary to sustain the national water quality goal uses of protection and propagation of fish, shellfish and wildlife and recreating in and on the water." W.Va. C.S.R § 47-2-4.1.b.

Further, under the State's NPDES program, the WVDEP can: require such additional information as it might need to enforce its program (WV Code 22-11-4); issue order to enforce its water quality standards and NPDES permits (WV Code 22-11-6 and -11); modify permits or issue emergency orders to reduce or control discharges where there has been a change in circumstances or a public emergency (WV Code 22-1-112, -15 and -19). In the application of its NPDES program to the Coal River watershed, the WVDEP assessed stream uses in the Coal River watershed, an assessment which included the impacts of ionic toxicity on benthic communities. The WVDEP then issued a Total Maximum Daily Load (TMDL) establishing allowable permit limits for discharges in the watershed with the potential to cause biological impairment as a result of ionic toxicity. USEPA has approved that TMDL. In a letter (Attachment 4) dated 25 September 2009, the WVDEP stated "...the only impairment listed in the USEPA-approved TMDL for the Little Coal River is fecal coliform. No metals are listed...The only impairments listed...for Spruce Fork are total iron and fecal coliform. The only impairment listed ...for Seng Camp Creek is iron. This creek has never been 303d listed for biological impairment...USEPA has obviously confused Seng Camp Creek with Seng Creek...in another county (Boone) in another drainage ... and is not affected by discharges from this mine. Further WVDEP's most recent West Virginia Stream Condition Index...data contradicts USEPA's assertion of a poor biologic condition in Spruce Fork....USEPA-scrutinized NPDES permit for the Spruce No. 1 Mine is in compliance with all applicable TMDLs and the permittee has generally complied with this permit, according to the WVDEP's records."

WVDEP claims additional authority under the terms of its surface mining program to regulate impacts of conductivity on aquatic life. See WV Code 22-3-13(b)(1) (addressing disturbances to the hydrologic balance and toxic discharges) and 38 WV CSR 2-3-22.i (discussing WVDEP's authority to require remedial activities) and -14.5 (prohibiting material damage to the hydrologic balance and requiring compliance with effluent limits and water quality standards).

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

**Concern #7.** *There is new evidence of potential significant cumulative impacts within the sub-watershed and even within the larger 8-digit HUC sub-basin due to mining activities. There are 11 additional mining projects proposed within the Coal River watershed. These include four pending projects under consideration within the enhanced coordination review process. There are six other permits which have been issued by the USACE, but for which work has not yet commenced due to ongoing litigation, and one new proposal issued on Public Notice. These 11 additional projects in the Coal River sub-basin, if constructed as proposed, would impact approximately 33.7 miles of stream channels. Given the past, present and proposed future mining activities within the Coal River sub-basin, USEPA believes that a more comprehensive and robust cumulative impacts analysis should be undertaken consistent with the requirements of the Guidelines and NEPA.*

USEPA's concerns were addressed during the NEPA process. The USACE has thoroughly considered the cumulative impacts of mining in the Coal River watershed. USEPA's letter notes that newer permits are being issued and reviewed and should be evaluated as cumulative impacts. The fact that later development occurs does not warrant a constant re-review of cumulative impacts. Instead, the appropriate place to review the "current" cumulative impacts is in the permit review and NEPA document associated with those new projects. WVDEP's water programs are designed to take such impacts into consideration in later permits.

Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States associated with the proposed project in combination with past, present and future projects were predicted to the extent reasonable and practical. In accordance with the CEQ guidance (1997), in evaluating the proposal, the boundaries of the area subject to the USACE consideration of individual and cumulative adverse effects were limited to the "waters of the United States" within the Coal River (8-digit), Spruce Fork (10-digit), and the headwaters of Spruce Fork (12-digit) watersheds as established by the National Resources Conservation Service Draft Hydrologic Units and obtained from the WV GIS Technical Center Website (http://wvgis.wvu.edu). A hydrologic impact analysis was completed to assess the impacts to surface waters at various scales of analysis. This analysis calculated the acreage within the Coal River, the Spruce Fork, and the headwaters of Spruce Fork watersheds that are covered by permitted surface mines and the length of streams that intersect valley fills or permitted surface mines. Data used in the 2007 IP analysis were collected from the WVDEP website (http://gis.wvdep.org/) (last updated on 16 February 2006), pending coal surface mine permits from WVDEP website (http://www.wvdep.org) (last updated August 2006), and the USACE

knowledge of previous authorized and pending projects. The USACE considered all available resources pertaining to past, present and reasonably foreseeable future projects during the development of the cumulative impact analysis for the project. For each project authorized or proposed to be authorized by the USACE, the cumulative impact analyses include an evaluation of (1) present conditions and probable future conditions if fill activity is not allowed; (2) the direct and indirect effects that fill activity would have on those conditions; and (3) how fill activity would interact with past or future impacts from other activity in the area.

West Virginia's NPDES and water quality standards programs, approved by USEPA and applicable to mining operations, prevent cumulative water quality impacts by capping the concentrations for pollutants that can be discharged. Before issuing new NPDES permits, WVDEP requires baseline water quality data from all streams to which a mine will discharge. *See* WVCSR § 60-5-3.4. WVDEP then limits the concentrations of each of these substances that can be discharged so that the in-stream concentrations of the regulated substances do not exceed the cap established by USEPA-approved State water quality standards. *Id.*, § 4.1; 47-2-4.1. The higher the pre-mining in-stream concentration of a regulated substance, the lower the limit imposed on the discharger. For new discharges, where existing in-stream water quality is better than required by the State water quality standards, WVDEP generally limits the discharge concentration of regulated substances to a level that will not use up more than 10 percent of the remaining capacity of the stream to assimilate—an even tighter regulation of potential cumulative impacts. WVCSR §§ 60-5-5.61.b and .c; 5.7 and 5.8. Where pre-mining concentrations of substances exceed water quality standards, WVDEP cannot issue a permit for concentrations higher than those allowed in-stream. WVCSR § 6—5-4.7. For those streams, WVDEP has developed and continues to develop TMDL limits to achieve water quality standards. See 33 U.S.C. §1313(d). This analysis leads in each case to a CWA Section 401 certification to the effect that the proposed activity will not cause a violation of water quality standards. Finally, in order to issue SMCRA permits, the WVDEP must prepare an assessment of the probable cumulative impact of all anticipated mining on the hydrologic balance in the area of the mine and make a finding that the proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area. WV Code §22-3-18(b)(3). The Cumulative Hydrologic Impact Assessment issued for the Spruce Mine concluded that it would not cause material damage to the hydrologic balance on a cumulative basis.

The analysis performed during review of the permit application adequately addressed this issue. No information has been provided that changes the results of the CIA. There is no new information presented by USEPA that was not adequately considered and addressed. No further cumulative impact analysis is warranted.

*Concern #8. In light of these potential significant cumulative impacts to the watershed and latest information about water quality impacts associated with surface mining with valley fill operations, the mitigation plan should be re-evaluated to ensure achievement of functional replacement of lost aquatic resources. The mitigation plan included the creation of on-site stream channels through the use of sediment ditches. These channels are often only evaluated for success using structure performance criteria and not incorporating biological and chemical performance criteria to ensure success. Without monitoring to ensure restored or created streams provide chemical, physical or ecological functional replacement of streams being*

*destroyed by mining activities, these channels will only serve as a conduit for pollutants from the site to downstream waters.*

The establishment of stream channels on the mine bench is only one component of the CMP. Mingo Logan's CMP includes the following components:

   a. Restoration of the 6,307 linear feet of intermittent stream channels and 825 linear feet of perennial stream channel on a 1:1 linear footage basis and 8.19 acres of associated riparian areas where erosion protection zone and drainage control construction has resulted in the impoundment of fill material and sediment laden water during the life of the mine;

   b. Creation of approximately 43,565 linear feet (9.88 acres) of low-gradient intermittent and ephemeral stream channel at the Spruce No. 1 Mine and establishment of 50 acres of riparian area consisting of native non-invasive herbaceous, shrub and tree species and established surface water connections to tributaries systems thereby providing on-site mitigation on a 1.18:1 linear footage basis. Of this linear footage, 21,538 feet (4.71 acres) would be ephemeral, while 22,027 feet (5.17 acres) would be intermittent. This revision constitutes provision of 40 percent more stream mitigation on-site than originally proposed;

   c. Through provision of direct surface drainage issuing from created outfalls, development of approximately 26,625 linear feet (0.61 acre) of high-gradient intermittent (11,330 linear feet/0.26 acre) and ephemeral (15,295 linear feet/0.35 acre) stream channels. This channel development would provide stream mitigation on a 0.72:1 linear footage basis;

   d. Enhancement of approximately 8,772 linear feet of perennial stream channel on a 1:1 linear footage basis and 10.07 acres of riparian area along Spruce Fork;

   e. Creation of 0.48 acre of wetlands on-site on a 4:1 acreage basis;

   f. Rehabilitation and enhancement of approximately 2,500 linear feet of intermittent stream channel on a 0.31:1 linear footage basis and 2.87 acres of riparian area along Rockhouse Creek upstream of an existing public access lake; and,

   g. Protection of all mitigation stream channels in the amount of 88,594 linear feet of stream channels (overall 2.02:1 linear footage basis), approximately 71.1 acres of associated riparian areas, and 0.48 acres of wetland via a "Declaration of Restrictive Covenants."

On 17 November 2006, a copy of Mingo Logan's revised CMP as summarized above was provided to the resource agencies, including USEPA for review. In response to the CMP, the USEPA stated in a letter (Attachment 1) dated 30 November 2006 that

*We appreciate your influence in negotiating improvements and enhancements to the previously submitted plan. We continue our interest in working with the District in developing a stream functional assessment protocol. Although that protocol is not yet available, the 10-year adaptive management and long-term monitoring plan provides opportunities to apply and assess such a protocol. The monitoring plan provides opportunities to apply and assess such a protocol. The standards of protocol scores, stream hydrology/morphology and adequacy of in-stream and riparian habitat will be very useful when determining if the goals of the mitigation plan are achieved.*

Additionally, the Fourth Circuit upheld the USACE's acceptance of on-site stream creation, which is similar to the stream creation included in Mingo Logan's Spruce No. 1 Mine CMP and authorized in the subject IP, as acceptable mitigation for impacts. USEPA's letter claims that it has consistently objected to the use of stream creation for mitigation. However, in a letter dated 23 July 2004 (Attachment 7), EPA suggested the practice of using sediment control structures on the down-dip end of reclaimed mine sites to the USACE in connection with the Laxare permit affirmed by the Fourth Circuit in the *Aracoma* case. *See* Laxare AR, Tab 36, p. 2 (July 2004 letter from USEPA to USACE suggesting use of channels on down-dip side of basal seam); *see also* Mingo Logan AR, Doc. 467, FEIS, p. 2-20 (referencing USEPA's advocacy in other projects of stream creation on down-dip end of mine site); and AR, Doc. 572, ROD, App. A, p. 16 (USACE' response to USEPA comment explaining that Mingo Logan would develop intermittent channels on the down-dip end of mine to ensure flow).

EPA's letter criticizes the USACE permit for not requiring biological and chemical monitoring provisions and performance criteria to measure the success of mitigation. However, Special Conditions 12, 13, 14 and 15 (Attachment 8) of the approved IP require assessments of physical habitat, benthic communities and water quality in the created, enhanced and restored mitigation stream channels. Mingo Logan, per Special Condition 13, is required to submit with each annual monitoring report completed USEPA RBP forms, Bank Erosion Hazard Index forms and USEPA Environmental Monitoring and Applications Programs Visual Riparian Estimate forms, benthic macroinvertebrate and physical and chemical water quality data and any additional approved functional assessment data pertinent to evaluating the success of the proposed mitigation for a minimum period of 10 years. As required under Special Condition 13, the WVSCI and RBP scores will be compared to pre-mining or baseline conditions or reference reaches. The scores, when sampling is conducted during similar seasons, should either be equal to, or greater than, pre-mining disturbances indicating aquatic habitat and water quality are steady or improving for aquatic diversity and at the level of ecological performance determined by the USACE with input from other Federal and state resource agencies.

Mingo Logan's responsibility to complete the required compensatory mitigation will not be considered fulfilled until they have provided documentation supporting mitigation success and have received written verification from the USACE that areas within the mitigation area intended to become:

a. waters of the U.S. meet the definition of waters of the U.S. under the Regulatory Program regulations applicable on the date of the permit;
b. waters of the U.S. are functioning as the intended type of waters of the U.S. and at the

level of ecological performance prescribed in the mitigation plan; and

c. buffer and riparian zones and other areas integral to the enhancement of the aquatic ecosystem are functioning as the intended type of ecosystem component and at the level of ecological performance prescribed in the mitigation plan.

If annual performance criteria are not met for all or any portion of the stream mitigation projects in any year, or if the final success criteria are not met, Mingo Logan is required to prepare an analysis of the cause(s) of failure and, if determined necessary by the USACE, propose remedial actions for approval. Following submittal of the 10-year monitoring report, if required performance has not been met, the monitoring period may be extended and/or Mingo Logan may be required to revise the existing mitigation site or identify new potential mitigation(s). Additionally, Mingo Logan has posted a performance bond in the amount of $1,545,560.00 payable to the West Virginia Stream Restoration Fund. This bond would become payable in the event Mingo Logan fails to comply with the terms and conditions set forth in their approved WVDEP Mitigation and Compensation Agreement.

The analysis performed during review of the permit application adequately addressed this issue. There is no new information presented by USEPA that was not adequately considered and addressed.

9.  **Conclusion**: The factors to be considered for modification, suspension or revocation of DA permits under 33 C.F.R. § 325.7 include: the extent of the permittee's compliance with the terms of its permit; whether circumstances relating to the authorized activity have changed since the permit was issued; significant permit objections which were not earlier considered; revisions to law; and the extent to which permit suspension, revocation or modification would adversely affect plans, investments and actions the permittee has reasonably taken in reliance on the permit.

USEPA does not claim or suggest that Mingo Logan has failed to comply with its permit in any way. While USEPA's letter claims that "new information and circumstances have arisen which justify reconsideration," the USACE does not concur with that determination. USEPA neither points to any new facts or circumstances nor identifies any significant permit objections which were not earlier considered.

It has been determined that Mingo Logan will not be required to consider additional valley fill minimization techniques because impacts to on-site aquatic resources have been avoided and minimized to the maximum extent practicable. In summary, runoff from the proposed Spruce No. 1 Mine must, pursuant to the above rules, which are enforced by agency inspection, pass through a sediment control system and comply with applicable State and Federal water quality standards upon discharging from such system. The WVDEP has advised the existing 401 and 402 authorizations are currently in compliance with required terms and conditions. Therefore, it has been determined the project is not expected to cause or contribute to a violation of the State's water quality standards or anti-degradation policy.

Based upon a review of the information provided during the review of the subject project and development of the EIS, the USACE in evaluating compliance with 40 CFR 230.10 determined there were no other practicable alternatives that would have less impacts on the aquatic

23

environment, the proposed discharge would not be expected to cause or contribute to violations of applicable state water quality standards or significant degradation of the environment, and all appropriate steps were taken to minimize potential adverse impacts. The USACE has determined that no additional evaluation of the project's effects on the environment are warranted, the permit will not be suspended, modified or revoked, and a supplemental EIS will not be prepared.

ROBERT D. PETERSON
Colonel, Corps of Engineer
Commanding



west virginia department of environmental protection

Division of Mining and Reclamation
601 57th Street SE
Charleston, WV 25304
304-926-0490

Joe Manchin III, Governor
Randy Huffman, Cabinet Secretary
dep.wv.gov

June 4, 2010

Shawn M. Garvin
Regional Administrator
United States Environmental Protection Agency, Region III
16540 Arch Street
Philadelphia, PA 19103-2029

RE:   EPA-RO3-OW-2009-0985
Spruce No. 1 Surface Mine

Dear Mr. Garvin:

The West Virginia Department of Environmental Protection (WVDEP) thanks you for
the opportunity to comment on the United States Environmental Protection Agency's (USEPA's)
proposed determination for a possible veto of the decision of the Army Corps of Engineers to
approve a fill permit under section 404 of the Clean Water Act for the Spruce No. 1 Surface
Mine in Logan County, West Virginia. The WVDEP administers the NPDES, Clean Water Act
section 401 and Surface Mining Programs in West Virginia. You should note that WVDEP
earlier provided comments to the Corps of Engineers in response to USEPA's letter of September
3, 2009 requesting that the Corps suspend or revoke Mingo Logan Coal Company's 404 permit
for the Spruce No. 1 Mine. We include a copy of that letter as Attachment A. In addition, we
submit the following comments.

A USEPA veto under section 404(c) must be based on an "unacceptable adverse effect"
to municipal water supplies, shellfish beds, fisheries, wildlife or recreational areas. According to
USEPA's definition of "unacceptable adverse effect", there must be "significant degradation of
municipal water supplies or significant loss of or damage to fisheries, shellfishing, or wildlife
habitat or recreation areas." 40 CFR 231.2(a). USEPA has not described any valid basis for
taking action under section 404(c) in its Proposed Determination. Indeed, many of the impacts
USEPA's Proposed Determination describes are upland, not aquatic, impacts. Deforestation,
impacts on bats, birds, terrestrial salamanders and the environmental justice concerns identified
by USEPA do not support its proposed action under the legal standards that apply. When
examining issues that legitimately may be considered in a section 404(c) action, such as impacts
on fisheries, it is worth noting that EPA 's study by Fulks et al (2003) for the Programmatic EIS
on mountaintop mining could find no adverse impacts from valley fills to fish populations in

Promoting a healthy environment.

EXHIBIT
F
tabbies

Shawn M. Garvin
Page Two
June 4, 2010

larger watersheds (over 10 sq km) such as Spruce Fork. In fact, site MT 40 from that study was in Spruce Fork and downstream of many historic valley fills. The fish metrics used by EPA in the study showed scores at that site consistent with unmined and area reference streams.

Much of the potential impacts of the Spruce No. 1 Mine and bases for taking action under section 404(c) USEPA describes in its Proposed Determination are generic. Rather than basing its proposed veto of the Spruce No. 1 section 404 permit on impacts that are specific to the Spruce No. 1 Mine, most of the impacts the USEPA describes could result from any earth disturbance in the heavily forested lands of West Virginia, whether it be from construction, mountaintop mining or any other form of mining. If USEPA finds such impacts to be unacceptable, USEPA may be indicating that any development of property of any scale in the State is likewise unacceptable. The WVDEP does not believe the Congress, in enacting section 404(c), intended to give USEPA the authority to make land use decisions like this for the states.

The WVDEP understands the primary basis of USEPA's proposed section 404(c) action is the impact on the aquatic ecosystem, and particularly upon the composition of benthic macroinvertebrates in the aquatic ecosystem from discharges of total dissolved solids (TDS) resulting in higher instream conductivity levels. USEPA contends that the Corps of Engineers did not adequately take this impact and these discharges into account in their permitting actions for the Spruce No. 1 Mine. A first response to this contention is that West Virginia does not have a water quality standard for TDS or conductivity nor does USEPA have any validly adopted recommended water quality standard for these parameters. Second, USEPA's contention that these impacts have not been considered is wrong. WVDEP and USEPA directly addressed the possibility of adverse impacts on the aquatic ecosystem in the NPDES permitting for the Spruce No. 1 Mine. In 2002, USEPA objected to a draft of Modification No. 1 to the NPDES permit for the mine. That letter, dated July 30, 2002, claimed that recent studies "indicated impairment of aquatic life and significantly higher levels of selenium, sulfates and conductivity for streams with valley fills." This is precisely the same claim that USEPA advanced in its letter of September 3, 2009 to the Corps concerning the Spruce No. 1 permit. USEPA advised WVDEP in 2002 that it would withdraw its NPDES permit objection if the WVDEP met four conditions. The WVDEP's response letter of October 28, 2002 advised USEPA of four proposed permit conditions to address USEPA's concerns. USEPA subsequently accepted this response as adequate and withdrew its objection by letter of December 3, 2003. As a result, issues about conductivity and water quality standards have already been fully vetted and resolved between USEPA and WVDEP as it relates to this mine. Copies of the July 30, 2002, October, 28, 2002, and December 3, 2003 letters are attached as Attachments 2, 3 and 4.

USEPA's Proposed Determination's statement that "[r]ecent NPDES discharge monitoring reports show that the constructed portion of the Spruce No. 1 project is discharging selenium at levels that exceed West Virginia's numeric water quality standard is misleading. Out of all of the monitoring results for this NPDES permit for the last five years, there have been two occasions when an outlet on this permit exceeded the numeric water quality standard for selenium of 5 ug/l: in December, 2008, the selenium discharging at outlet 28 was 5.7 ug/l and in January, 2009 the discharging at the same outlet was 9.8 ug/l. On both of these occasions, the selenium concentration at the instream monitoring point that is downstream of outlet 28 was

Shawn M. Garvin
Page Three
June 4, 2010

within the water quality standard.   The only excursions from the selenium water quality standard reported in connection with this NPDES permit have been at instream monitoring points that are *upstream* of the Spruce No. 1 discharges.

    For the reasons stated above and in the attachments, the WVDEP believes that USEPA's proposed veto of the section 404 permit for the Spruce No.1 Mine is not appropriate under the circumstances of the Spruce No. 1 Mine.  Nor is it consistent with the legitimate extent of USEPA's authority under section 404(c).

    Thank you for the opportunity to provide comments.  Please feel free to contact me with any comments or questions you may have.

                                        Sincerely,

                                        Thomas L. Clarke



RELEASE DATE: AUGUST 12, 2010
REVISED: AUGUST 18, 2010

## west virginia department of environmental protection

# Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i

## INTRODUCTION

The purpose of this Permitting Guidance ("Guidance") is to assist West Virginia Department of Environmental Protection ("DEP") permit writers in developing site-specific National Pollutant Discharge Elimination System ("NPDES") permit conditions for surface coal mining operations using a holistic watershed management approach through the use of biological and chemical monitoring, whole effluent toxicity ("WET") testing, and the development of Aquatic Ecosystem Protection Plans ("AEPP") and, where necessary, Adaptive Management Plans ("AMP") to protect the State's narrative water quality standards. These standards are found in West Virginia's *Code of State Rules*, which states, in pertinent part, "No significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[1] These new procedures shall take effect immediately.[2]

This Guidance does not apply to outlets that are primarily precipitation induced, or for which the activities associated with those outlets have been substantially completed.[3]

## REASONABLE POTENTIAL ANALYSIS

In deciding which permit conditions to include in a permit, the first thing a permit writer must do is perform a reasonable potential analysis and document the same in the Statement of Basis for the permit. If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in its AEPP, that it does not have reasonable potential ("RP") to cause or contribute to an excursion above the narrative criteria, the permit writer should treat new or expanded discharges as if they have RP and include WET limits in the permit, in accordance with 40 C.F.R. § 122.44(d)(1)(v).

At permit reissuance, DEP will use all valid and representative data to determine, on a case-by-case basis, whether an existing discharge causes, has the reasonable potential to cause, or contributes to an excursion from the narrative water quality criteria. Where DEP concludes that an existing outlet has RP, the permit will include WET limits. In cases where insufficient data is available to make a determination of RP upon permit reissuance, the permit writer will place WET monitoring requirements and triggers in the permit in order to determine RP (or lack of

---

[1] 47 C.S.R. 2 § 3.2.i
[2] In light of the changing nature of the policy concerns addressed herein, this document is intended to be dynamic and will likely be modified in the future as technology and best management practices develop and improve.
[3] The term "substantially complete" shall mean that the operation is past the point when measures that could be undertaken under either an AEPP or an AMP could be effective in reducing the operation's impact on the aquatic ecosystem.

EXHIBIT

tabbies®

6

RP). If the monitoring shows RP, the permit writer will reopen the permit to include WET limits.

## PERMIT CONDITIONS

If the applicant has RP, the permit writer should use best professional judgment to establish permit terms and conditions and determine whether the proposed control measures are sufficient to protect the narrative water quality standards. The permit writer should, depending on the type of permit being issued, establish the following conditions in the permit, each of which is discussed more completely below:

### New and Expanded Discharge Permits

- WET Limits
- Chemical Monitoring
- In-Stream Biological Monitoring
- Aquatic Ecosystem Protection Plan (AEPP)
- Adaptive Management Plan (AMP), if necessary
- Reopener Clause

### Permits at Reissuance

- WET Monitoring
- Chemical Monitoring
- In-Stream Biological Monitoring
- Aquatic Ecosystem Protection Plann (AEPP)
- Adaptive Management Plan (AMP), if necessary
- Reopener Clause

## NEW AND EXPANDED DISCHARGE PERMITS

This Guidance does not apply to outlets that are primarily precipitation induced.

### WET Limits

If the applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in its AEPP, that it does not have RP, the permit writer should treat new and expanded mining discharges as if they have RP and include WET limits in the permit, as prescribed by 40 C.S.R. § 122.44(d)(1)(v).

The permit writer shall establish WET limits using all applicable rules and guidance, including the EPA's 1991 *Technical Support Document for Water Quality-based Toxics Control* ("TSD").[4] To develop the WET limits, the permit writer shall consider the in-stream waste concentration of the effluent in the immediate receiving stream and calculate it so as to result in no greater than 1.0 chronic toxicity unit ($TU_c$) and 0.3 acute toxicity unit ($TU_a$) at the edge of the appropriate mixing zones, where applicable.

---

[4] EPA/505/2-90-001 PB91-127415

The permittee is required to perform WET testing quarterly. The TSD requires use of the most sensitive available surrogate organism (ceriodaphnia dubia) for chronic toxicity testing of effluents. DEP requires TDS, conductivity, sulfate, and bicarbonate analyses for each aliquot used in WET testing.

If WET testing shows noncompliance with the specified limitations prescribed in the permit, the permittee shall resample and test the effluent within 30 days. If the second test shows compliance, the permittee shall continue WET testing in accordance with the permit requirements. However, if the second test shows noncompliance, the permittee must, within 60 days, submit an AMP (as more fully described below) identifying actions it will take to achieve compliance with the WET discharge limitations. If WET testing shows noncompliance with the specified limitations prescribed in the permit, but the aquatic ecosystem remains healthy (as evidenced by acceptable data retrieved at the biological monitoring stations), the DEP shall reevaluate the WET limits placed in the permit to assure that such limits take into consideration the appropriate dilution factors, mixing, and the effects of the discharge on the downstream monitoring stations.

## Chemical Monitoring

In addition to what is required for monitoring associated with the protection of numeric standards, the permit will require twice-per-month effluent monitoring for TDS, specific conductance, sulfate, alkalinity, pH, calcium, magnesium, sodium, and potassium upon commencing the permitted activity. The same sampling suite is required for all established biological assessment stations ("BAS"), as described below. The results of concurrent monitoring of WET, dissolved ions, and biological conditions will provide a wealth of information to guide future decisions and possible refinements to this Guidance.

## In-Stream Biological Monitoring

The permit will require the maintenance of acceptable ecosystem health in waters of the State. Biological monitoring will be required prior to, and then regularly over the life of, the permitted activity. An applicant must submit a monitoring plan for agency approval that proposes in-stream BAS that allow a holistic assessment of the aquatic ecosystem and a determination of the impacts of the permitted activity.

The applicant should work with the permit writer and the DEP biologist to establish a monitoring strategy with the most appropriate monitoring locations for a holistic evaluation of the aquatic ecosystem. All biologic sampling shall be done in accordance with the West Virginia Division of Natural Resources' scientific collection permit and DEP's West Virginia Stream Condition Index ("WVSCI") protocol. The applicant shall submit to DEP for approval a monitoring plan that is consistent with WVDEP's Watershed Assessment Branch 2009 Standard Operating Procedures, Chapter 4,[5] which must include the following:

---

[5] http://www.dep.wv.gov/WWE/watershed/wqmonitoring/Documents/SOP%20Doc/WAB%20SOP.pdf

- An in-stream BAS shall be located at the first appropriate riffle/run habitat downstream of each new outlet in a perennial stream segment. Ideally, the BAS will be located such that future impacts to the stream are attributable solely to the permitted activity.
- Additional stations should be situated on a site-specific basis, but generally should be located upstream and downstream of the confluence of the immediate receiving stream and the stream into which it drains, which allows the aquatic ecosystem's health to be assessed in its entirety.
- If the first available location for a BAS is potentially influenced by other watershed activities and stressors, then a clear link between the permit controls and biological conditions at the station may not be possible. Those scenarios will require baseline documentation of the other potential stressors and tracking of watershed activities over time. The applicant will also have to submit a monitoring plan in accordance with the provisions set forth in "Chemical Monitoring" above.
- Additional monitoring stations may be designated further upstream or downstream at points that are useful in determining the entire aquatic ecosystem's health. Such stations may be beneficial in identifying actions the applicant can take to improve the overall health of the aquatic ecosystem.
- The plan should include chemical and biological monitoring at the BAS prior to the start of the permitted activity.

If the agency finds the condition of the aquatic ecosystem at the assessment stations prior to initiation of the permitted activity to be satisfactory, taking into account all potentially applicable criteria, then the acceptable future biological condition is a WVSCI score greater than or equal to the WVSCI value representing the 5th percentile of reference (currently 68.0). If the agency finds the condition of the aquatic ecosystem at the assessment stations is less than satisfactory, taking into account all potentially applicable criteria, then the applicant shall identify existing conditions within the watershed that may be contributing to the problem. If a TMDL addressing biological impairment for ionic stress is not in effect, a WVSCI score greater than or equal to the baseline value would represent an acceptable future condition.

However, permit writers should be aware that a single point in a stream may not represent the overall health of the aquatic ecosystem. WVSCI is a tool to be used as a primary indicator of stream health, but not the sole criteria; if the WVSCI score suggests a potential problem, DEP shall conduct an assessment of the health of the aquatic ecosystem as a whole. In determining whether a lower WVSCI score represents an unacceptable condition, the DEP will utilize best professional judgment in a manner comparable to the discretion it exercises in listing streams as biologically impaired pursuant to § 303(d) of the Clean Water Act, including a holistic examination of the health of the aquatic ecosystem.

## Aquatic Ecosystem Protection Plan (AEPP)

New and expanded discharge permit applications shall include an AEPP for agency review and approval, and the permit writer shall use the control measures outlined therein as part of his or her RP analysis, as outlined more fully above. The permittee shall use

the measures outlined in its AEPP as a means of maintaining the health of the aquatic ecosystem and complying with the State's narrative water quality standards.

An AEPP describes control measures the applicant will implement to achieve WET limitations and minimize adverse biological impacts to the aquatic ecosystem surrounding the permitted activity. The plan should also include controls designed to lower the magnitude of pollutant loading associated with mining activities. If the agency cannot conclude that the proposed measures are reasonably expected to result in compliance, then the permit will not be issued. The applicant should consider all appropriate options when selecting and implementing control measures. Where an initial AEPP fails to achieve WET compliance and acceptable ecosystem conditions, the applicant must amend its AEPP to include additional measures that enable it to comply with WET limits.

The applicant can implement any of a number of controls in an attempt to protect the aquatic ecosystem and to reduce or minimize the ionic strength in the stream. Some examples of control measures that may be included in the AEPP include, but are not limited to, the following:

- Test overburden to determine the material that contains sulfur or other ionic strength-bearing material, so it can be isolated through material handling;
- Minimize the amount of area disturbed at one time;
- Minimize stormwater contact with pulverized material;
- Increase stream buffer zones;
- Minimize fill areas;
- Mine down-dip instead of up-dip;
- Cap fills and spoil so as to minimize pass-through of rain water;
- Revegetate any disturbed areas to minimize runoff;
- Develop a plan to reduce or prevent ionic stress;
- If necessary, conduct TRE/TRI pursuant to EPA's TSD;
- Segregate weathered rock and return to surface;
- Expedite reclamation;
- Enhance riparian plantings;
- Limit the number of active fills;
- Restore natural streams.

Because many of the controls outlined in the AEPP are related to best management practices, they will need to be addressed in the mining permit issued pursuant to the *West Virginia Surface Coal Mining & Reclamation Act* ("Article 3 permit"). The AEPP must be included as an attachment to the NPDES permit application to allow for agency review and evaluation.

## Adaptive Management Plan (AMP)

A "new and expanded discharge" permittee shall submit an AMP to DEP within 60 days of failing two WET tests in a 30-day period. An AMP is more than merely monitoring activities and occasionally changing them; it involves exploring alternative ways to meet environmental objectives, predicting the outcomes of alternatives based on the current

state of knowledge, implementing one or more of these alternatives, monitoring to learn about the impacts of management actions, and then using the results to update knowledge and adjust management actions.[6]  For purposes of this Guidance, the AMP outlines the measures the permittee will take to achieve the chronic toxicity permit limitations (1.0 $TU_c$). This plan shall include, at a minimum, a thorough review of the AEPP to determine what, if any, changes can be made to the control measures outlined therein that will bring the permittee back into compliance with its WET limits.

The permittee may also implement a Toxicity Reduction Evaluation (TRE)/Toxicity Identification Evaluation (TIE)[7] plan to obtain compliance with final effluent limits or triggers for chronic toxicity. The purpose of a TRE is to investigate the causes and to identify corrective actions for difficult effluent toxicity problems.[8] A TRE is a site-specific study conducted in a stepwise process to narrow the search for effective control measures for effluent toxicity. TREs are designed to identify the causative agents of effluent toxicity, isolate the sources of the toxicity, evaluate the effectiveness of toxicity control options, and then confirm the reduction in effluent toxicity.  The ultimate objective of a TRE is for the permittee to achieve the limits or requirements for effluent toxicity contained in the permit and thereby attain the water quality standards for the receiving waters.[9]

A TIE is a set of procedures to identify the specific chemicals responsible for effluent toxicity, and TIE methods are an integral part of the protocols for TREs. TIE procedures are performed in three phases: characterization, identification, and confirmation. In each phase, the permittee shall use aquatic organism toxicity tests to track toxicity at each step of the procedure. In most cases, these are abbreviated or shortened toxicity tests.

If the TRE/TIE identifies toxic pollutants that can be regulated through the use of numeric limits, the permit writer shall put a numeric limit for those pollutants in the permit, in accordance with 47 C.S.R. 2 § 9 and 40 C.F.R. § 122.44(d)(1)(vi)(A). If the TRE/TIE does not identify toxic pollutants that can be regulated through the use of numeric limits, the WET limits shall remain in the permit.

## Reopener Clause

The permit will contain an explicit reopener clause allowing DEP to modify or revoke the permit if prescribed controls do not attain and maintain applicable water quality standards.  The permittee may also request that the permit be reopened if, after a sufficient amount of data has been collected, the agency determines that RP does not exist, and the permittee can request an adjustment to its monitoring activities through a modification of the permit.

---

[6]  *See*, U.S. Department of the Interior's *Technical Guide: Adaptive Management*
[7]  Although TRE/TIE is briefly outlined in this document, permit writers and permittees shall refer to EPA's TSD and the guidance documents listed therein for specific direction on how to conduct these evaluations.
[8]  EPA's TSD, p. 114
[9]  Id.

PERMITS AT REISSUANCE

These permit conditions ~~are only to be established for~~ <u>do not apply to</u> outlets that are primarily precipitation induced or for which the activities associated with the outlets are substantially complete at the time of reissuance.  If the agency determines at the time of reissuance that permitted outlets have not been constructed, the requirements outlined in "New and Expanded Discharge Permits" above will apply.  Otherwise, DEP will establish the following permit conditions:

### Wet Monitoring and Limits

Where there is not sufficient WET, chemical, and/or biological assessment data to perform a reasonable potential analysis at permit reissuance, the permit writer will assign WET monitoring to determine reasonable potential to cause or contribute to an excursion above the narrative criteria, as prescribed by 40 C.F.R. § 122.44(d)(1)(ii).

The permit writer will establish WET monitoring triggers using all applicable rules and guidance, including EPA's TSD.  In developing the WET trigger, the permit writer will consider the in-stream waste concentration of the effluent in the immediate receiving stream and calculate it so as to result in no greater than 1.0 chronic toxicity unit ($TU_c$) and 0.3 acute toxicity unit ($TU_a$) at the edge of the appropriate mixing zones, where applicable.

The permittee is required to perform WET monitoring quarterly.  The TSD requires use of the most sensitive available surrogate organism (ceriodaphnia dubia) for chronic toxicity testing of effluents.  DEP requires TDS, conductivity, sulfate, and bicarbonate analyses for each aliquot used in WET testing.

If WET monitoring shows an exceedance of the specified triggers prescribed in the permit, the permittee shall resample and test the effluent within 30 days.  If the second test shows compliance, the permittee shall continue WET monitoring in accordance with the permit requirements.  However, if the second test shows an exceedance, the permittee must, within 60 days, submit an AMP identifying actions it will take to achieve compliance with the WET triggers.   The permittee must also submit a permit modification to place WET limits in the permit.

### Chemical Monitoring

The permit will require enhanced effluent and receiving water monitoring of dissolved ions for permits upon reissuance.

The permit will require twice-per-month effluent monitoring for TDS, specific conductance, sulfate, alkalinity, pH, calcium, magnesium, sodium, and potassium.  The same sampling suite is required for all established stream monitoring stations.  The results of concurrent monitoring of WET and dissolved ions testing at the discharge and in-stream monitoring locations will provide a wealth of information to guide future decisions and possible refinements to this protocol.

7

## In-Stream Biological Monitoring

The permit will require the maintenance of acceptable ecosystem health in waters of the State. DEP will require in-stream biological monitoring regularly over the remaining life of the permitted activity. The permittee must submit a monitoring plan for agency approval that proposes in-stream BAS that allow a holistic assessment of the aquatic ecosystem and a determination of the impacts of the permitted activity. To that end, biological monitoring as discussed above may be applied as appropriate.

## Adaptive Management Plan (AMP)

A permittee with a reissued permit shall submit an AMP to DEP within 60 days of exceeding two WET triggers in a 30-day period. The AMP shall include appropriate control measures as outlined in "Aquatic Ecosystem Protection Plan" above that are designed to obtain compliance with WET triggers, maintain the health of the aquatic ecosystem, and comply with the State's narrative water quality standards. If the WET testing results continue to exceed the established permit trigger(s), then the permittee has exhibited a reasonable potential to cause or contribute to an excursion above West Virginia's narrative water quality standards (specifically, 47 C.S.R. 2 §§ 3.2.e and 3.2.i), and the permit writer will reopen the permit to impose WET limits. Alternatively, the AMP may allow the permittee to conduct TRE/TIE (as outlined above), in an effort to identify toxic pollutants that can be regulated through the imposition of numeric limits in the permit.

## Reopener Clause

The permit will contain an explicit reopener clause allowing DEP to modify or revoke the permit if prescribed controls do not attain and maintain applicable water quality standards. The permittee may also request that the permit be reopened if, after a sufficient amount of data has been collected, the agency determines that RP does not exist, and the permittee can request an adjustment to its monitoring activities through a modification of the permit.

REFERENCES

EPA's *Policy on the Use of Biological Assessments and Criteria in the Water Quality Program* (May 1991)

EPA's *Technical Support Document for Water Quality-based Toxics Control*, EPA/505/2-90-001 (March 1991)

EPA's *NPDES Permit Writers' Manual*, EPA-833-B-96-003

8

Release Date: August 12, 2010



west virginia department of environmental protection

## Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i

PURPOSE

The West Virginia Department of Environmental Protection ("DEP") adopts this Justification and Background for its "Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards" (the "Guidance"). The Guidance is intended to facilitate compliance with applicable statutory and regulatory requirements and to provide reasonable means of effectuating the intent of the narrative criteria, as well as to enforce the mandate of the Clean Water Act ("CWA") that every permit contain effluent limitations that reflect the practicable pollution reduction a state can achieve.[1]

The Guidance was developed in accordance with the West Virginia Water Pollution Control Act ("WVWPCA"), which states that "the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development."[2]

As it must, the Guidance also recognizes the intent of the West Virginia Legislature, which has formally resolved as follows:

- That any interpretation and implementation of West Virginia's narrative water quality standards is the responsibility of the West Virginia Department of Environmental Protection;
- That the requirements of the narrative criteria are met when a stream (a) supports a balanced aquatic community that is diverse in species composition; and (b) contains appropriate trophic levels of fish (in streams with sufficient flows to support fish populations); and (c) the aquatic community is not composed only of pollution tolerant species or

---

[1]  *American Paper Institute, Inc. v. United States Environmental Protection Agency*, 996 F.2d 346, 349 (D.C. Cir., 1993)
[2]  W. Va. Code § 22-11-2(a).

Promoting a healthy environment.



EXHIBIT

H

the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach (or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present); and

- That interpretation of West Virginia's narrative water quality standards must faithfully balance the protection of the environment with the need to maintain and expand opportunities for employment, agriculture, and industry as set forth in the Legislature's statement of public policy as contained in the West Virginia Water Pollution Control Act.[3]

## BACKGROUND

West Virginia has had primacy of the NPDES program since 1982 and has narrative water quality standards that predate its NPDES primacy. These criteria are found in West Virginia's *Code of State Rules*, which states, in pertinent part, "No significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed."[4]

In light of its goals to advance, wherever attainable, water quality that provides for recreation and the protection and propagation of fish, shellfish, and wildlife,[5] and to assure that surface mining operations are conducted so as to protect the environment,[6] DEP reviewed its NPDES permitting and compliance assessment protocols vis-à-vis West Virginia's narrative water quality standards and solicited public comment regarding these issues. As a result, DEP adopts the Guidance, which describes the procedures DEP will implement in the development of NPDES permits for the coal mining industry. These new procedures shall take effect immediately. In light of the changing nature of the policy concerns addressed herein, this document is intended to be dynamic and will likely be modified in the future as technology and best management practices develop and improve.

While DEP appreciates EPA's recent effort to assist the states in interpreting their various narrative water quality standards, DEP finds that the Guidance is the more appropriate approach for West Virginia for several reasons. First, it involves subject matter uniquely within DEP's expertise and special knowledge. Further, while this document specifically addresses concerns related to the mining industry, it is designed to be adapted in the future to address all discharges to water bodies that will cause, or that have the reasonable potential to cause or contribute to, excursions from water quality standards. Finally, it does not use an overbroad, generic criterion (i.e. conductivity) to set unattainable limits, but instead identifies specific pollutants that can be managed through the inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices ("BMPs") in NPDES permits, where there is reasonable potential to cause or contribute to excursions from water quality criteria. If the

---

[3]  H.C.R. 111 (2010 Regular Session).
[4]  47 C.S.R. 2 § 3.2.i
[5]  *See* 33 U.S.C. § 1251(a)(2)
[6]  *See* 30 U.S.C. § 1202(d)

2

applicant cannot demonstrate, by means of its chemical and biological monitoring and the control measures outlined in the plans it will submit with its application, that it does not have reasonable potential ("RP") to cause or contribute to an excursion above the narrative criteria, the permit writer should treat new or expanded discharges as if they have RP and include WET limits in the permit, in accordance with 40 C.F.R.  § 122.44(d)(1)(v).  Alternatively, if the operator identifies toxic pollutants that can be regulated through the use of numeric limits, DEP will put a regulatory control number for those pollutants in the operator's permit.

PROTECTION OF THE AQUATIC ECOSYSTEM

As stated above, the narrative water quality criteria set out in 47 C.S.R. 2 § 3.2.i prohibits the introduction of wastes that cause significant adverse impact to the chemical, physical, hydrologic or biological components of aquatic ecosystems. These criteria are valid components of West Virginia water quality standards that have been properly promulgated by the West Virginia Legislature and approved by the EPA.  The phrase "significant adverse impact" is not defined in the CWA or the WVWPCA, the regulations promulgated thereunder or in any literature or guidance published by the EPA.  DEP has determined that "significant adverse impact" is more than a change in the numbers or makeup of the benthic macroinvertebrate community in a segment of a water body downstream from a point source discharge.  It is, instead, a material decline in the overall health of an aquatic ecosystem.[7]  A goal of the CWA and the WVWPCA is to protect the aquatic ecosystem as a whole; it is a holistic standard that requires a holistic approach to ecosystem assessment.  In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem.  An ecosystem does not exist at a single point and, accordingly, its health cannot be assessed at a single point.

The Pond-Passmore Study, upon which EPA relied in the development of its guidance on this subject, concludes that West Virginia's narrative standard is violated by surface coal mining operations based on the Study's application of two biologic assessment tools, the West Virginia Stream Condition Index ("WVSCI") and the draft Genus Level Index of Most Probable Stream Status ("GLIMPSS"), to samples of benthic macroinvertibrate life taken from these streams. This conclusion is flawed for two reasons. First, West Virginia does not use the draft GLIMPSS in its assessment of the biologic health of State streams.  Second, these tools are just that – tools. They are not stand-alone determinants of compliance with the narrative standard.  Any application of these assessment tools in determining compliance with the narrative standard must faithfully apply the language of the standard itself, which prohibits significant adverse impacts on the chemical, physical, hydrologic or biological components of the aquatic ecosystem.  Thus, DEP's Guidance follows long-standing EPA guidance, which indicates that biosurveys cannot fully characterize an entire aquatic community and its many attributes, and accordingly suggests that "State standards should contain biological criteria that consider various components (e.g.

_____

[7]  An aquatic ecosystem is a dynamic complex of plant, animal, and microorganism communities and their non-living environment interacting as a functional unit within water. *See*, Coweeta Long Term Ecological Research "Glossary of Terms."

3

algae, invertebrates, fish) and attributes (measures of structure and/or function) of the larger aquatic community."[8]

Through implementation of the Guidance, DEP continues its existing practice of using WVSCI in addition to consideration of other factors affecting the aquatic ecosystem to enforce its narrative water quality standards. By way of background, WVSCI was developed for EPA by national experts to assess biological integrity in West Virginia's waterways through "careful measurement of the natural aquatic ecosystem and its constituent biological communities,"[9] including the evaluation of benthic macroinvertebrate communities. It was specifically designed for assessment of the biological component of the 47 C.S.R. 2 § 3.2.i narrative criteria and has been used as a tool in developing the Impaired Streams List ("303(d) List") and the TMDLs resulting therefrom for almost a decade.[10] WVSCI acknowledges that "[i]t is the responsibility of West Virginia's [Department] of Environmental Protection to maintain and protect the ecosystem health of the state's waters[,]" and "[i]n keeping with the Clean Water Act and technical guidance from USEPA, DEP developed water quality standards for the protection of ecosystem health."[11]

DEP's Guidance is the appropriate methodology for implementing West Virginia's narrative water quality standards, because it is consistent with the Federal Regulations regarding establishing limitations, standards, and other permit conditions for NPDES programs, and it incorporates a holistic approach to ecosystem assessment and protection. The CWA's implementing regulations require WET testing and limits when the State finds that a discharge has RP to cause or contribute to excursions from water quality standards.

> [W]hen the permitting authority determines . . . that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative criterion within an applicable State water quality standard, the permit must contain effluent limits for whole effluent toxicity. Limits on whole effluent toxicity are not necessary where the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit . . . that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards.[12]

WET testing allows flexibility where appropriate (e.g. allowing time to collect additional data for RP determination to supplement limited data sets) and is consistent with DEP's policy that

---

[8] EPA's *Policy on the Use of Biological Assessments and Criteria in the Water Quality Program* (May 1991) ("1991 Policy")
[9] A Stream Condition Index for West Virginia Wadeable Streams, March 28, 2000 (Rev. July 21, 2000) ("Stream Condition Index").
[10] However, a stand-alone WVSCI score has never been the sole determinant of compliance or non-compliance with the narrative standard. This is because WVSCI scores are influenced by many factors (e.g. habitat, geology, and pH).
[11] Stream Condition Index
[12] 40 C.F.R. § 122.44(d)(1)(v)

permittees develop robust monitoring plans with the intention of identifying any causative pollutants and adjusting their methods of operation so that those problems may be remedied before the aquatic community suffers a significant breakdown.

WVSCI considers various components (e.g. algae, invertebrates, fish) and attributes (measures of structure and/or function) of the larger aquatic community. "Because biological integrity is a strong indicator of overall ecological integrity, it can serve as both a meaningful goal and a useful measure of environmental status. . . ."[13]   Based on the 5th percentile of reference values, the current WVSCI score that indicates the integrity of a benthic macroinvertebrate community in West Virginia's wadeable streams is 68.0. The threshold for inclusion on the 303(d) List has historically been 60.6. That value subtracts a precision estimate from the 5th percentile of reference values, and its historical use was intended to take into account sampling error and to aid DEP in allocating its resources so as to avoid misclassifying non-impaired waters as impaired. WVSCI and its application in the 303(d) listing process are consistent with methodologies implemented to assess protection of aquatic ecosystems by all of West Virginia's neighboring states.

## CAUSATIVE POLLUTANTS / PROTECTIVE THRESHOLDS

EPA has recently set a numeric limit on conductivity at 500 µS/cm, finding that conductivity levels below 300 µS/cm generally will not cause a water quality standard violation and that in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts that may rise to the level of exceedances of narrative state water quality standards.[14] However, DEP's data shows that more than a simple conductivity measurement is necessary to determine the health of a stream. As proof that a number for specific conductance is an inappropriate gauge, FIGURE 1 below illustrates that a stream can have a low level of specific conductance and a WVSCI score firmly within the range for impairment; conversely, a stream can have a high level of specific conductance and a WVSCI score that indicates the stream is above the threshold for impairment. WVSCI scores are affected by many factors: habitat, other uses of the stream and the surrounding land, other pollutants unrelated to conductivity (e.g. fecal coliform), *inter alia*. Certain stream reaches simply cannot attain a "good" WVSCI score because of those factors.

---

[13]  1991 Policy

[14]  EPA's *Detailed Guidance: Improving EPA's Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order* (April 1, 2010) ("April 1 Memo")



The Pond-Passmore Study found a shift in the benthic macroinvertibrate community downstream from mining activity, but did not otherwise correlate this finding with any significant or adverse impairment of the ecosystem. Where the only impacts to this component of the ecosystem are diminished numbers of certain genera of mayflies, without evidence that this has had any adverse impact of any significance on the rest of the ecosystem, the State cannot say that there has been a violation of its narrative standard. Various scientific studies and evaluations performed by DEP indicate that lowered biological condition is associated with increased ionic strength, but scientists remain less than certain about the specific causative pollutant(s) and the concentration(s) responsible for impairment. Additional uncertainty is present in correlative studies, because the effects of increased ionic strength cannot be completely distinguished from the effects of other stressors that often co-occur (e.g. organic enrichment, sedimentation). In fact, most available information attempts to relate biological condition to a surrogate parameter, such as specific conductance.

Because conductivity represents the combined concentrations of all different dissolved ions, each with potential varying toxic effects, regulation solely via an indicator such as specific conductance is not the best way to protect against excursions from narrative standards. For example, the elevated dissolved pollutants most commonly associated with mining discharges are sulfate and bicarbonate alkalinity. EPA has not published national recommended aquatic life protection criteria for those pollutants. Similarly, chloride, for which West Virginia has adopted EPA's recommended numeric aquatic life protection water quality criteria, may also be present in some cases. But because chloride seldom exists in the absence of sulfates or alkalinity, singular control of chloride cannot be expected to resolve all ionic stress.

DEP has performed a correlative evaluation of benthic condition and specific conductance. This evaluation suggests that native aquatic life is protected at various values and ranges of specific conductance. This finding supports the basic scientific principle that correlation is not cause and effect. Even though the DEP evaluation applied various filters to the

6

evaluated dataset to address complicating factors listed above, the biological condition of a stream may be different from the condition predicted by specific conductance. In situations such as these, where DEP has determined that it is infeasible to calculate a numeric effluent limit to implement a narrative water quality standard, DEP will include in the permit appropriate WET limits and BMPs to control or abate the discharge of pollutants, in accordance with 40 C.F.R. § 122.44(k)(3).

DEP routinely identifies biological stressors when developing TMDLs for biologically impaired waters. Stressor identification employs a strength-of-evidence approach that considers multiple information sources. Researchers evaluate water quality monitoring data, physical habitat data, field notes, and the composition of the biological assemblage concurrently to identify significant stressors. DEP's most recent stressor identification protocols, as used in the EPA-approved TMDL process, include the guidelines shown in FIGURE 2 below for evaluating water chemistry to determine if ionic strength is a significant stressor:

| Candidate Cause | Parameter | Elimination (Rule out stressors at these thresholds) | Strength of Evidence (Evidence for each Candidate Cause as stressor) |
|---|---|---|---|
| | | Elimination Threshold | Candidate Stressor Thresholds |
| 4. Ionic strength | Conductivity | < 326.9 umhos | Consider as independent stressor in non-acidic, non-AMD streams, when conductivity values met threshold ranges and sulfates and chloride violate conditions listed as follows. <br> >1533          Definite Stressor <br> 1075-1532.9   Likely stressor <br> 767-1074.9    Possible stressor <br> 517-766.9     Weak stressor <br> 327-516.9     Equivocal or No Trend |
| | Sulfates | < 56.9 mg/l | >417          Definite Stressor <br> 290-416.9     Likely stressor <br> 202-289.9     Possible stressor <br> 120-201.9     Weak stressor <br> 57-119.9      Equivocal or No Trend |
| | Chloride | < 60 mg/l | >230.0        Definite Stressor <br> 160.1-229.9   Likely stressor <br> 125.1-160     Possible stressor <br> 80.1-125.0    Weak stressor <br> 60.1-80.0     Equivocal or No Trend |

Based on FIGURE 2, it is clear the EPA limits of 300 – 500 µS/cm established in the April 1 Memo are far more stringent than what it has long approved for West Virginia's TMDL process. As shown above, conductivity in the 300 – 500µS/cm range is "Equivocal or No Trend" as a stressor. Conductivity does not even become a "Likely Stressor" of a stream under this EPA-approved approach until it reaches three to five times these limits: 1075-1532.9 µS/cm. This is additional support for the State's conclusion that reliance on the single surrogate of specific conductance to implement and/or enforce the State's narrative water quality standards is improper. It also demonstrates that EPA's proposed limits are too narrowly focused on a single parameter and single aquatic species to determine the health of the impacted watershed.

Only the West Virginia Legislature can adopt a numeric water quality standard for conductivity (or any other pollutant); DEP has no authority to immediately or unilaterally

implement numeric standards. Through adoption of H.C.R. 111, the West Virginia Legislature has given DEP direction as to how it should implement its narrative water quality standards. Even if the Legislature does adopt a numeric standard for conductivity, DEP cannot implement it until after it is approved by the EPA. Based on the loose and questionable causal relationship between conductivity and stream impairment, it remains unclear whether EPA would approve such a numeric limit. EPA's duly promulgated regulation endorses establishment of WET limits where, as here, a state is unable to use a limit for a surrogate parameter. DEP can implement new permitting controls based on the agency's best professional judgment of actions necessary to protect the State's waters using its narrative criteria, with follow-up monitoring and contingencies for unsatisfactory outcomes. Thus, DEP is protecting against excursions from its narrative water quality standards by establishing WET limits and verifying impacts to a stream (or lack thereof) by requiring an extensive, comprehensive monitoring plan for the entire watershed.