**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                        )
MINGO LOGAN COAL COMPANY, INC.          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )      Case No. 1:10-cv-00541-ABJ
                                        )
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY                       )
                                        )
          Defendant.                    )
_____ )

**REPLY STATEMENT OF POINTS AND AUTHORITIES IN
SUPPORT OF MINGO LOGAN'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**AND**

**<u>RESPONSE TO EPA'S MOTION FOR SUMMARY JUDGMENT</u>**

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT.......................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.      Section 404(c) Does Not Allow EPA to Modify an Issued Permit. ................................ 2

      A.      EPA Ignores Congress's Choice of Words and the Act as a Whole. .................... 2

              1.      Specification of a Disposal Site Occurs Before a Permit Is Issued. ........... 3

              2.      Disposal Sites Existed at the Time the CWA Was Passed........................ 5

              3.      EPA Fails to Interpret § 404(c) in Reference to the Entire Statute. .......... 7

      B.      Dicta Cited by EPA Does Not Control Here. ...................................................... 10

      C.      The Legislative History Confirms Mingo Logan's Reading. .............................. 10

      D.      EPA's Interpretation Is Not Entitled to Deference............................................. 11

II.     EPA Usurps West Virginia's Authority Under §§ 303, 401 and 402.............................. 14

      A.      Downstream Effects Are Regulated by § 402, Not § 404. ................................. 14

      B.      EPA Fails to Demonstrate That "Downstream Effects" Are the Result of §
              404 Discharges. ................................................................................................ 18

      C.      EPA Cannot Use § 404(c) to Supplant State Water Quality Standards. .............. 20

III.    EPA Has Not Explained How Substantial New Information Establishes That the
      § 404 Discharges Will Now Have an Unacceptable Adverse Effect on Wildlife. .......... 22

IV.    EPA Failed to Take Into Account the Permit's Mitigation Conditions. ......................... 26

      A.      EPA Cannot Ignore Mitigation. ........................................................................ 26

      B.      EPA Acted Arbitrarily and Capriciously in Failing to Account for the
              Permit's Mitigation Conditions.......................................................................... 27

V.      EPA's Discussion of the Guidelines Reveals a Flaw Endemic to Its Entire
      Analysis.......................................................................................................................... 30

CONCLUSION ................................................................................................................ 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alameda Water & Sanitation Dist. v. Reilly*, 930 F. Supp. 486 (D. Colo. 1996)........................ 27

*Am. Fed'n of Gov't Employees, Local 2782 v. Fed. Labor Relations Auth.*, 803 F.2d 737 (D.C. Cir. 1986) ............................................................... 7

*Bersani v. U.S. EPA*, 850 F.2d 36 (2d Cir. 1988) ....................................... 30

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ............................ 29

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ......................................... 11

*City of Alma v. United States*, 744 F. Supp. 1546 (S.D. Ga. 1990)............................................. 10

*\*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458 (2009) ................................................................... 1, 15, 16, 18, 22

*Creppel v. U.S. Army Corps of Eng'rs*, Civ. A. No. 77-25, 1988 WL 70103 (E.D. La. June 29, 1988)................................................... 11

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.,* 467 U.S. 51 (1984)............................. 28

*Hoosier Envtl. Council, Inc.  v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953 (S.D. Ind. 2000) ............................................... 10

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) .................................... 17

*James City Cnty. v. EPA*, 12 F.3d 1330 (4th Cir. 1993)........................................10, 21

*James City Cnty. v. EPA*, 955 F.2d 254 (4th Cir. 1992)........................................11, 30

*\*Nat'l Ass'n of Mfrs. v. U.S. Dep't of the Interior*, 134 F.3d 1095 (D.C. Cir. 1998) ....... 1, 8, 9, 13

*Nat'l Ass'n of Recycling Indus., Inc. v. Interstate Commerce Comm'n*, 660 F.2d 795 (D.C. Cir. 1981) .............................................. 7, 17

*New Hampshire  v. Maine*, 532 U.S. 742 (2001) ..................................... 28

*North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008)........................................ 7

*\*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 190 (4th Cir. 2009), *cert. dismissed* 131 S. Ct. 51 (2010) ................................. 19

*Rapaport v. U.S. Dep't of the Treasury,* 59 F.3d 212 (D.C. Cir. 1995) .................................... 12

*Russo Dev. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990) ........................................................................................................ 10

*\*Salleh v. Christopher*, 85 F.3d 689 (D.C. Cir. 1996) ...........................................12, 13

*United States v. Heirs of Boisdoré*, 49 (8 How.) U.S. 113 (1850) ............................... 7

*United States v. Owens*, 54 F.3d 271 (6th Cir. 1995) ................................................ 28

*Vitarelli v. Seaton*, 359 U.S. 535 (1959)................................................................... 29

## FEDERAL STATUTES

5 U.S.C. § 551(4) ...................................................................................................... 29

22 U.S.C. § 4010(a), FSA § 610(a) ........................................................................... 13

22 U.S.C. § 4010(a)(1), FSA § 610(a)(1) ............................................................12, 13

22 U.S.C. § 4010(a)(2), FSA § 610(a)(2) ............................................................12, 13

30 U.S.C. §§ 1201, *et seq.* ......................................................................................... 19

33 U.S.C. § 1313, CWA § 303...............................................................................17, 18

33 U.S.C. § 1313(c), CWA § 303(c) .......................................................................... 22

33 U.S.C. § 1319, CWA § 309...................................................................................... 8

33 U.S.C. § 1319(a), CWA § 309(a) ............................................................................ 8

33 U.S.C. § 1319(a)(3), CWA § 309(a)(3) ................................................................... 8

33 U.S.C. § 1341(b), CWA § 401(b)......................................................................20, 21

33 U.S.C. § 1341(c), CWA § 401(c) ......................................................................... 5, 6

33 U.S.C. § 1342, CWA § 402.............................................. 1, 8, 10, 14, 15, 16, 17, 18, 19, 20

33 U.S.C. § 1342(a)(1), CWA § 402(a)(1) ................................................................. 15

33 U.S.C. § 1342(b)(1)(C), CWA § 402(b)(1)(C) ......................................................... 8

33 U.S.C. § 1342(k), CWA § 402(k).......................................................................... 16

33 U.S.C. § 1344, CWA § 404...................... 1, 2, 4, 6, 7, 8, 11, 14, 15, 16, 17, 18, 19, 22, 26, 28

33 U.S.C. § 1344(a), CWA § 404(a) ........................................................................3, 4, 12, 13

33 U.S.C. § 1344(b), CWA § 404(b)........................................................................3, 4, 12, 13

33 U.S.C. § 1344(b)(1), CWA § 404(b)(1).........................................4, 5, 13, 17, 18, 19, 23, 30

33 U.S.C. § 1344(c), CWA § 404(c) ................................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,
..............................................................14, 16, 17, 18, 19, 20, 21, 22, 23, 26, 27, 28, 30

33 U.S.C. § 1344(e), CWA § 404(e) ....................................................................................... 10

33 U.S.C. § 1344(h)(1)(A)(iii), CWA § 404(h)(1)(A)(iii) ...................................................... 8

33 U.S.C. § 1344(n), CWA § 404(n) ......................................................................................... 8

33 U.S.C. § 1344(p), CWA § 404(p).....................................................................................1, 8, 9

33 U.S.C. § 1344(q), CWA § 404(q).................................................................................1, 5, 8, 9

33 U.S.C. § 1344(s), CWA § 404(s)..................................................................................... 8, 13

## FEDERAL REGULATIONS & ADMINISTRATIVE MATERIALS

33 C.F.R. pt. 205 (1972)........................................................................................................... 6

33 C.F.R. § 205.10 (1972) ........................................................................................................ 6

33 C.F.R. § 323.6(a) ................................................................................................................. 4

33 C.F.R. § 323.6(b) ................................................................................................................. 5

33 C.F.R. § 325.1(d)(4) ............................................................................................................ 4

33 C.F.R. § 325.2(a)(6)............................................................................................................. 4

33 C.F.R. § 325.3(a)(4)............................................................................................................. 4

33 C.F.R. § 325.3(a)(6)............................................................................................................. 4

40 C.F.R. § 122.4(b) ............................................................................................................... 18

40 C.F.R. § 122.4(d) ............................................................................................................... 20

40 C.F.R. § 123.25(a)(1)......................................................................................................... 20

40 C.F.R. § 230.10(a) ............................................................................. 5, 30

40 C.F.R. § 230.10(d) ................................................................................ 27

40 C.F.R. § 230.11(h) ............................................................................16, 19

40 C.F.R. § 230.11(h)(1) .......................................................................16, 19

40 C.F.R. § 230.50 ..................................................................................... 19

40 C.F.R. § 231.2(e) .............................................................................26, 27

44 Fed. Reg. 58,076 (Oct. 9, 1979) ......................................................11, 22

46 Fed. Reg. 10,203 (Feb. 2, 1981) ........................................................... 12

49 Fed. Reg. 39,478 (Oct. 5, 1984) .............................................................. 4

73 Fed. Reg. 19,594 (Apr. 10, 2008) ......................................................28, 29

## MISCELLANEOUS

Admin. Auth. to Construe § 404 of the Fed. Water Pollution Control Act, 43 Op.
    Att'y Gen. 197 (1979) ........................................................................ 11

CH2M Hill, Technical Evaluation Document:  Spruce No. 1 Mine, West Virginia
    (June 2010) ....................................................................................24, 25

Clean Water Act Section 404(q) Memorandum of Agreement Between the
    Environmental Protection Agency and the Department of the Army (Aug.
    11, 1992), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html.............5, 26, 27

EPA Press Release, EPA Proposes Veto of Mine Permit Under the Clean Water
    Act (Mar. 26, 2010), *available at* http://www.epa.gov/newsroom.................................. 12

H.R. Rep. No. 92-911, 92d Cong. 2d Sess. (Mar. 11, 1972), *reprinted in* 1 A
    LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT
    AMENDMENTS OF 1972 at 810-11 (Jan. 1973) ............................................... 21

Memorandum of Agreement Between the Environmental Protection Agency and
    the Department of the Army Concerning the Determination of Mitigation
    Under the Clean Water Act 404(b)(1) Guidelines (Feb. 6, 1990), *available
    at* http://water.epa.gov/lawsregs/guidance/wetlands/ mitigate.cfm.................................. 23

Senate Consideration of the Report of the Conference Committee (Oct. 4, 1972), *reprinted in* 1 A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 161-339 (Jan. 1973) ....................................... 4

Senate Debate on S. 2770 (Nov. 2, 1971), *reprinted in* 2 A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972, at 1386 (Jan. 1973) ............................................................................................. 6

WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE (2d College Ed. 1986) ............................................................................................. 3, 26

## PRELIMINARY STATEMENT

Section 404(c) must be read in harmony with the Clean Water Act ("CWA" or "Act") as a whole.  But at every turn, EPA reads it in isolation to assert boundless authority that would abrogate or undermine other provisions of the Act.  Instead of honoring Congress's decision to direct EPA's § 404(c) power  to "specifications," EPA ignores the absence of the word "permit" in § 404(c) to wrest substantial § 404 permitting authority from the Corps, creating untenable interagency conflict and effectively nullifying CWA §§ 404(p) and 404(q).  Instead of honoring the distinction between the § 402 and § 404 permitting systems that the Supreme Court emphasized in *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 129 S. Ct. 2458 (2009), EPA creates chaos and uncertainty by subjecting the same discharges to both programs.  And instead of adhering to the CWA's cooperative federalism policy, which Congress implemented by authorizing the States to promulgate and implement water quality standards, EPA claims the authority to disregard Mingo Logan's compliance with State water quality standards and to make up and apply its own standards to countermand the State's water quality and permitting decisions.

This is not how statutes should be interpreted.  Interpretations that "essentially deprive[] one provision of its meaning and effect so that another provision can be read as broadly as its language will permit,  [are] inconsistent with the Congress's intent . . . ."  *Nat'l Ass'n of Mfrs. v. U.S. Dep't of the Interior*, 134 F.3d 1095, 1107 (D.C. Cir. 1998).  Mingo Logan's interpretation of § 404(c) is consonant with the broader CWA.  EPA's is not and should be rejected.[1]

---

[1] EPA's Brief makes myriad tangential arguments that are wrong.  Page limits and discretion preclude Mingo Logan's response to all of them.  But Mingo Logan's lack of response to every point does not indicate its assent.

## ARGUMENT

**I.      Section 404(c) Does Not Allow EPA to Modify an Issued Permit.**

By its plain terms, § 404(c) gives EPA no power over permits.  It refers only to

"specifications" (i.e., "specified disposal sites"), which differ from "permits."  The Corps

specifies disposal sites during the permit process before the permit issues.  Once the Corps issues

a permit, there is no longer a "specification" of a disposal site, but rather a permit that authorizes

the discharge of fill material at a defined location.  That permit is the law as to the discharges it

authorizes.  Indeed, the requirement to obtain permits that authorize discharges subject to

project-specific conditions is the central innovation of the CWA.  Congress would not implicitly

— and through a parenthetical phrase no less — grant EPA the extraordinary power to remove

the core authorization granted by a § 404 permit without using the word "permit."  Once the

Corps issues a permit, EPA cannot use § 404(c) to revoke the permit's discharge authorization.

EPA raises four sets of arguments in response.  First, EPA argues that the phrase,

"withdrawal of specification," which appears in two parenthetical phrases, must mean that EPA

can modify issued permits.  Second, EPA argues that dicta in three district court cases suggests

that the question presented here has been decided.  Third, EPA tries to diminish legislative

history that confirms Congress's intent that EPA would act under § 404(c) before any permit

issues.  And finally, EPA seeks refuge in *Chevron* deference.  EPA is wrong across the board.

**A.      EPA Ignores Congress's Choice of Words and the Act as a Whole.**

EPA attempts to rewrite § 404(c).  "Specification" is not shorthand for "permit."  As

Mingo Logan has explained, "specification" is merely the act of describing a location to put

dredged or fill material.  It occurs either outside the permitting context altogether or as one step

on the way to the issuance of a permit.  Statement of Points & Authorities in Supp. of Mingo

Logan's Mot. for Summ. J. at 11, 23-25 (May 27, 2011) (ECF No. 26) ("ML Br." or "Opening

Brief"). EPA concedes, as it must, that "specification" means something different than "permit," and that the Corps specifies disposal sites in contexts that do not involve permits at all. *See* EPA's Mem. in Supp. of Its Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. at 18-19 (July 25, 2011) (ECF No. 46) ("EPA Br."). Thus, the phrase "withdrawal of specification" has meaning and effect without the need for it to apply in the permit process. EPA argues nonetheless that "withdrawal of specification" must apply in the permit context and give it the power to modify a permit because in the context of permitting, specification only occurs upon the issuance of a permit, and thus there is nothing to "withdraw" until a permit issues. In other words, EPA claims that the absence of any reference to permits in § 404(c) means nothing because, in the permitting context, permits and specifications are the same thing.

### 1.   Specification of a Disposal Site Occurs Before a Permit Is Issued.

Citing §§ 404(a) and (b), EPA baldly asserts that "the plain text of Section 404 makes it clear that the Corps (in the context of an individual permit) specifies a disposal site through the issuance of the permit itself." EPA Br. at 17. But §§ 404(a) and (b) don't say that. Section 404(a) states: "The [Corps] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at *specified disposal sites*," and § 404(b) states that "each such disposal site *shall be specified for each such permit.*" 33 U.S.C. § 1344(a)-(b) (emphases added). By its plain meaning, "specify" means simply "to mention, describe, or define in detail." WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE 1367 (2d College Ed. 1986). Unlike "permit," which means "to allow; consent to," *Id.* at 1060, "specify" does not contemplate authorization to act. Had Congress meant to conflate the description of the site to be authorized as a disposal area with the actual authorization to discharge, Congress would not have said in § 404(b) that "each such disposal site shall be specified *for* each such permit" (emphasis added) — it would have said "in," "through" or "by."

3

Moreover, the structure of §§ 404(a)-(b) contemplates that disposal sites are specified during the permit process, not "*through* the issuance of the permit" as EPA claims (emphasis added).  EPA Br. at 17.  Section 404(a) requires notice and opportunity for public comment before a permit can issue, and for the opportunity for comment to be meaningful, the notice must describe in detail the disposal site.  *See* 33 C.F.R. § 325.3(a)(4) and (6) (requiring public notice to describe the location of the activity and a "plan and elevation drawing showing the general and specific site location and character of all proposed activities").[2]  Section 404(b) requires that disposal sites be specified "though the application of [the § 404(b)(1)] guidelines," and the Corps's regulations require that the Corps apply the 404(b)(1) Guidelines (or "Guidelines") before it can issue a permit.  "[N]o 404 permit can be issued unless compliance with the 404(b)(1) guidelines is demonstrated (i.e., compliance is a prerequisite to issuance)."  49 Fed. Reg. 39,478, 39,479 (Oct. 5, 1984); *see also* 33 C.F.R. § 323.6(a) (stating that the Corps cannot issue a permit unless it first "determines that the proposed discharge would comply with the 404(b)(1) guidelines").  As a final step in the permit process and "prior to final action on the application," the Corps must prepare a Statement of Findings, which sets forth the Corps's determination of compliance (or not) with the 404(b)(1) Guidelines.  33 C.F.R. § 325.2(a)(6). Thus, specification and application of the Guidelines necessarily precede permit issuance.[3]

---

[2] The regulations lay out a process similar to that described by Senator Muskie's explanation that EPA's consideration under § 404(c) "is not duplicative or cumbersome because the permit application transmitted to the Administrator for review will set forth both the site to be used and the content of the matter of the spoil to be disposed."  Senate Consideration of the Report of the Conference Committee (Oct. 4, 1972), *reprinted in* 1 A LEGISLATIVE HISTORY OF THE WATER POLLUTION CONTROL ACT AMENDMENTS OF 1972 at 161,177 (Jan. 1973) ("LEGISLATIVE HISTORY 1972").

[3] Indeed, a key goal of the § 404 permitting process is to identify "the least environmentally damaging practicable alternative" ("LEDPA") location for the discharge of dredged and fill material.  Toward that end, the application and the public notice are both required to identify proposed disposal site locations.  33 C.F.R. § 325.1(d)(4), 325.3(a)(6), and

One example of a pre-permit process that gives EPA multiple opportunities to review (and "withdraw") Corps-specified disposal sites is the EPA-Corps Memorandum of Agreement required by § 404(q).  Clean Water Act Section 404(q) Memorandum of Agreement Between the EPA and the Dep't of the Army (Aug. 11, 1992) ("404(q) MOA"), *available at* http://www.epa.gov/wetlands/regs/dispmoa.html.  The 404(q) MOA lays out an extensive coordination process during which EPA can review the Corps's Statement of Findings/Record of Decision (including the Corps's 404(b)(1) Guidelines analysis) prepared in support of the permit. If EPA remains concerned, it can either request elevation of its concerns, 404(q) MOA at Part IV ¶¶ 3(d), (f), or initiate § 404(c) proceedings.  Tellingly, the Corps regulations governing the final steps in the permitting process describe EPA 404(c) action at this stage as providing notice of an intent to "prohibit *or withdraw* the specification."  *See* 33 C.F.R. § 323.6(b) (emphasis added). If EPA takes this step, the Corps holds the proposed permit decision in abeyance. *Id.*; 404(q) MOA at Part IV ¶¶ 3(d)-(e).  Thus, contrary to EPA's claim here, there is a specification to be "withdrawn" before the permit has been issued.

Specification does not occur "through" permit issuance, as EPA would have it, but rather as part of the permit process, and EPA has multiple opportunities to "withdraw" that specification before any permit actually issues.

### 2.   Disposal Sites Existed at the Time the CWA Was Passed.

As Mingo Logan has explained, the law in place when  Congress passed the CWA in 1972 sheds additional light on Congress's intent behind the two parenthetical phrases in § 404(c).  ML Br. at 23-24.  Congress was aware in 1972 that the Corps specified sites for the disposal of dredged material as part of its civil works activities, and in § 401(c), Congress

---

the Corps is required by the 404(b)(1) Guidelines to conduct a rigorous analysis of alternative locations in order to identify the LEDPA.  40 C.F.R. § 230.10(a).

specifically allowed areas that had already been designated to continue to be used as disposal

sites going forward. *See* 33 U.S.C. § 1341(c) (authorizing the Corps to "permit the use of spoil

disposal areas under [its] jurisdiction by Federal licensees or permittees."). But the existence of

these sites created a potential gap in § 404(c)'s coverage because those specifications could no

longer be "prohibited" or "denied." By noting parenthetically that the power to "prohibit" the

specification of certain disposal sites included the power to "withdraw[ ] specification,"

Congress closed that gap. It made clear that EPA going forward could withdraw those areas

specified as disposal sites, including sites that had been designated before § 404(c) was enacted.

In response, EPA argues first that the Corps's pre-existing disposal areas are not

"specified disposal sites" because § 401(c) describes these sites as "spoil disposal areas." EPA

Br. at 19. But this is no distinction at all. The "spoil" that can be discharged in these areas is

"dredged and fill material." *See, e.g.,* 33 C.F.R. § 205.10 (1972) (describing material that could

be discharged into specified disposal areas). And the legislative history refutes EPA's attempted

distinction. When introducing what would become § 404, Sen. Ellender explained that the

"specified disposal sites" included "open water disposal areas" and "dyked disposal areas" that

the Corps already was maintaining. Senate Debate on S. 2770 (Nov. 2, 1971), *reprinted in* 2

LEGISLATIVE HISTORY at 1386; *see* ML Br. at 24 n.17. The areas referenced by Sen. Ellender are

the spoil disposal areas maintained by the Corps and mentioned in CWA § 401. *See* 33 C.F.R.

pt. 205 (1972); 33 U.S.C. § 1341(c). Equally important, EPA has conceded that § 404(c) applies

to disposal sites specified outside the permitting process, such as those pre-dating § 404's

permitting program. *See* EPA's Mot. to Dismiss Reply Br. at 21 (July 6, 2010) (ECF No. 11).

EPA next argues that Mingo Logan's reading would give the word "specification" two

distinct meanings within § 404(c). Not so. "Specification" means the same thing throughout

§ 404(c) — i.e., the "definition in detail" of a site that could be authorized as a disposal area for the discharge of dredged and fill material. But, contrary to EPA's argument, "specification" does not mean "permit." Once the permit issues, there is no longer a "specification," there is a permit with terms and conditions, and § 404(c) does not authorize EPA to withdraw that permit.

EPA's argument also wrongly assumes that "withdrawn" must have meaning in the permitting context. While all statutory language must have some meaning, each word need not apply to every conceivable application of the statute. It suffices that, as EPA has previously conceded, "withdraw" has meaning with respect to disposal sites that pre-existed § 404(c)'s enactment or otherwise exist outside the 404 permitting context.

### 3.   EPA Fails to Interpret § 404(c) in Reference to the Entire Statute.

Each time EPA's argument conflicts with other provisions of the CWA, EPA blithely observes that the text of § 404(c) itself does not constrain EPA's power to act. *See, e.g.,* EPA Br. at 25-26 ("Congress imposed no time limitation on EPA's exercise of its Section 404(c) authority . . . [so] Section 404(c) gives EPA broad authority to decide when to act . . . ."). But EPA cannot simply infer authority from Congressional silence. Nor can it turn a blind eye to the rest of the statute. "Lest EPA forget, it is a creature of statute, and has only those authorities conferred upon it by Congress; if there is no statute conferring authority, a federal agency has none." *North Carolina v. EPA*, 531 F.3d 896, 922 (D.C. Cir. 2008) (internal quotations omitted).

A single statutory provision must be interpreted in light of the statute as a whole.[4] Yet

---

[4] *United States v. Heirs of Boisdoré*, 49 (8 How.) U.S. 113, 122 (1850) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *see also Am. Fed'n of Gov't Employees, Local 2782 v. Fed. Labor Relations Auth.*, 803 F.2d 737, 740 (D.C. Cir. 1986) ("[S]tatutes or regulations are to be read as a whole, with each part or section ... construed in connection with every other part or section." (internal quotations omitted)); *Nat'l Ass'n of Recycling Indus., Inc. v. Interstate Commerce Comm'n*, 660 F.2d 795, 799 (D.C. Cir. 1981) (rejecting statutory interpretation that "ignores the requirement that every statute must be viewed

EPA's reading of § 404(c) runs roughshod over key structural and textual features of the CWA. At the most fundamental level, EPA's reading obliterates the choice Congress made to give the permitting authority with all of its attributes to the Corps, not EPA.  *See* ML Br. at 15-18.  Rather than effect Congress's compromise that gives the Corps overall responsibility over the permitting program while giving EPA a significant but carefully prescribed role in the pre-permit evaluation of alternative disposal sites, EPA would arrogate to itself one of the key powers belonging to a permitting authority — the power to modify or revoke a permit.[5]  EPA's encroachment on the Corps's prerogative could not be more plain.  EPA asked the Corps to modify or revoke the Permit; the Corps said no; EPA nevertheless is attempting to do so on its own.

EPA's interpretation also tramples on provisions like §§ 404(q) and 404(p) that are intended to give permits certainty and finality.  *See* ML Br. at 18-21.  EPA's boundless reading renders illusory the finality that the § 404(q) process is meant to achieve, and it destroys the certainty that provisions like § 404(p) are intended to provide permit holders.

EPA glosses over these problems in its Brief.  As for § 404(q), EPA points to the absence

---

in its entirety so that each part has a sensible and intelligent effect harmonious with the whole"); *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1107 ("[A]n interpretation [that] essentially deprives one provision of its meaning and effect so that another provision can be read as broadly as its language will permit,  is inconsistent with the Congress's intent . . . .").

[5] EPA argues that both EPA and the Corps can enforce violations of § 404 permits, EPA Br. at 22-23, but it neglects to mention that its authority is limited to § 404 permits issued "by a State."  33 U.S.C. § 1319(a)(3).  In 1977, Congress enacted § 404(s) to give the Corps authority for enforcement against violators of § 404 permits issued by the Corps and amended § 309 to give EPA enforcement authority over § 404 permits *issued by a State. Id.* § 1319(a). At the same time, Congress enacted § 404(n), which preserved EPA's authority under § 309 to take enforcement action for discharges of dredged and fill material without a permit.  EPA's argument that § 404(n) "preserves" enforcement authority over Corps-issued permits cannot be reconciled with the plain language of §§ 309 and 404(s).  Indeed, Congress fully recognized that the power to issue permits must carry with it the power to modify or terminate those permits. For this reason, it required a State seeking permitting authority under either § 402 or § 404 to demonstrate that it had authority to terminate or modify the permit.  33 U.S.C. § 1342(b)(1)(C), 1344(h)(1)(A)(iii).

of any time limitation in the text of § 404(c).  EPA Br. at 25-26.  But this ignores Congress's goal of timely resolution of disagreements among regulatory agencies before permit issuance and § 404(q)'s explicit direction that permit "decision[s] . . will be made not later than" 90 days after public notice.  If EPA can opt not to invoke these procedures, as it opted here, and then voice wholesale disagreements years after permit issuance, Congress's objective would be thwarted completely.  Section 404(q) cannot be deprived of its meaning so that § 404(c) can be interpreted "as broadly as its language will permit."  *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1107-08.

As to the pervasive uncertainty that EPA inflicts on § 404 permits, EPA similarly misses the point.  EPA indisputably reads § 404(c) to authorize it to modify a permit in circumstances where the Corps's regulations would not.  *See* EPA Br. at 17 n.13.  But EPA ignores this patent conflict.  Instead, EPA constructs a straw man by suggesting that Mingo Logan has argued that § 404(p) prohibits EPA's action under § 404(c).  That is not Mingo Logan's point.  Section 404(p) shows Congress's expectation that compliant permit holders should be able to rely on the terms of their permit.  EPA's reading of § 404(c) puts compliant permit holders forever in apprehension that a change of wind at EPA will wipe out the investments the permit holder has made in reliance on the permit.  That result is anathema to the system Congress intended.  That § 404(p) does not mention § 404(c) does not indicate Congress's intent that EPA can use § 404(c) to abrogate permit certainty granted in § 404(p).  If anything, by not mentioning § 404(c) in § 404(p) Congress indicated that it never intended for EPA to invoke § 404(c) to modify or revoke existing permits.[6]

---

[6] EPA also argues that Mingo Logan's reading cannot be right because if EPA can only act on a specification before a permit has been issued, then EPA's § 404(c) authority would not apply to nationwide permits.  EPA Br. at 18 n.14.  But nationwide permits involve no "specifications of disposal site."  Rather, they authorize discharges for categories of activities that will cause only "minimal adverse environmental effects" either individually or cumulatively.

**B.      Dicta Cited by EPA Does Not Control Here.**

EPA wrongly states that three courts have "consider[ed] specifically whether Section

404(c) authorizes EPA to act after issuance of a Corps permit."  EPA Br. at 14-16.  As Mingo

Logan explained in its Opening Brief, none of those cases involved an attempt by EPA to modify

an existing permit.[7]

**C.      The Legislative History Confirms Mingo Logan's Reading.**

EPA's discussion of the exhaustive legislative history is notable for what it lacks.  EPA

has identified nothing that suggests Congress intended to give EPA the extraordinary power to

modify § 404 permits issued by the Corps.  If Congress so intended, one would expect to see

some mention of it in the legislative history, especially given Congress's careful consideration of

the respective roles of the Corps and EPA, and its decision to confer § 404 permitting authority

on the Corps rather than EPA.  In contrast, as Mingo Logan has explained, Senator Muskie's

presentation of the final version of the legislation — the most direct and relevant discussion of

EPA's power under § 404(c) — shows that Congress expected EPA to act expeditiously under §

404(c) before a permit issues.  *See* ML Br. at 21-22.

---

33 U.S.C. § 1344(e).  They cannot, therefore, involve the "unacceptable adverse effect[s]" that
§ 404(c) addresses.

[7] In *City of Alma v. United States*, 744 F. Supp. 1546, 1553 (S.D. Ga. 1990), the Corps
permit had been declared invalid years before EPA's action and EPA exercised § 404(c) to veto a
proposed new permit. In *Russo Dev. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859
(D.N.J. Mar. 16, 1990), the court considered whether EPA could veto a proposed permit to
authorize a fill that already had occurred without a permit (an "after-the-fact" permit).  And in
*Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 971 (S.D. Ind.
2000), the court mentioned § 404(c) in but a single sentence addressing the evidentiary
significance of EPA comments concerning a proposed permit.

EPA also relies throughout its brief on stray language in *James City County v. EPA*, 12
F.3d 1330 (4th Cir. 1993) regarding the breadth of EPA's power under § 404(c).  But *James City
County* did not involve a post-permit veto or an intervening discharge regulated under § 402.

EPA does not dispute that Senator Muskie expected that EPA would act under § 404(c) prior to the issuance of a permit.  And as EPA acknowledges, as a chief sponsor and drafter of the CWA, Senator Muskie's contemporaneous understanding of the CWA's provisions is powerful evidence of Congressional intent that is routinely cited as the most reliable summary of EPA's role in § 404.  Indeed, three of the authorities EPA cites rely on it.  *See* 43 Op. Att'y Gen. 197, 199-200 (1979) (saying that"[t]he EPA responsibilities [under Section 404] were perhaps best summarized by Senator Muskie"); *James City Cnty. v. EPA*, 955 F.2d 254, 261 (4th Cir. 1992) (same); *Creppel v. U.S. Army Corps of Eng'rs*, Civ. A. No. 77-25, 1988 WL 70103, *7 (E.D. La. June 29, 1988) (same).

EPA nonetheless tries to diminish the significance of Senator Muskie's explanation of § 404(c).  EPA argues that the remarks of a single legislator are not controlling.  EPA Br. at 26. But even if Senator Muskie were just another "single legislator," that does not mean such statements would be irrelevant, just that they would be less persuasive *if* there were more powerful forms of legislative history that provided conflicting evidence of legislative intent.  *See Chrysler Corp. v. Brown,* 441 U.S. 281, 311 (1979).  But EPA has identified no contrary legislative history.

### D.  EPA's Interpretation Is Not Entitled to Deference.

EPA invokes *Chevron* deference based on the preamble to its 1979 regulations.  *See* EPA Br. at 5 (citing 44 Fed. Reg. 58,076 (Oct. 9, 1979)).  But EPA derides that preamble later in its brief as simply a non-binding policy statement.  EPA Br. at 38 n.31.  Having backed away from the adoption of a regulation purporting to claim post-permit authority under § 404(c), EPA's invocation of deference rests on a shaky foundation.  And contrary to EPA's argument, EPA has

never before tried to modify an existing permit under § 404(c).[8]

But even if EPA had a regulation purporting to authorize the use of § 404(c) after permit issuance, EPA wrongly invokes *Chevron* deference.  The Court would defer to EPA only if the statute were ambiguous and the agency's interpretation were reasonable.  But EPA flunks both tests.  And even if EPA could satisfy these two threshold requirements, deference would still be inappropriate because *Chevron* deference does not apply where two agencies are charged with administering a single statute.  *Rapaport v. U.S. Dep't of the Treasury,* 59 F.3d 212, 216-17 (D.C. Cir. 1995).  This rule is acutely important where one agency's reading of one provision in a statute would encroach on the authority of another agency in another provision in the statute.  *See Salleh v. Christopher*, 85 F.3d 689, 691-92 (D.C. Cir. 1996).

EPA argues that this rule does not apply here, because the Corps has authority in §§ 404(a)-(b), while EPA has authority under § 404(c).  But the fact that Congress gave the Corps and EPA authorities in different subsections does not allow EPA to disregard or undermine the authority Congress gave the Corps instead of EPA.  *See Salleh*, 85 F.3d at 692.

*Salleh* is remarkably similar to the case here.  There, § 610(a)(1) of the Foreign Service Act gave the Secretary of State the power to separate employees from the foreign service.  *Id.* at 690-91.  Viewed in isolation, the Secretary's power was plenary.  *Id.* at 691.  But § 610(a)(2)

---

[8] EPA wrongly contends that it has previously used § 404(c)  to "withdraw a specification in a Section 404 permit."  EPA Br. at 29 (citing 46 Fed. Reg. 10,203 (Feb. 2, 1981).  But the North Miami veto that EPA cites involved a *proposed* permit that would have replaced an existing permit that the permit holder was violating.  EPA did not act to revoke or modify the existing permit, but acted on the proposal to replace that permit with a new permit.   As EPA itself proclaimed when announcing its proposed veto of the Spruce No. 1 Mine Permit, its action here is truly unprecedented.  *See* EPA Press Release, EPA Proposes Veto of Mine Permit Under the Clean Water Act (Mar. 26, 2010) ("EPA has used its Clean Water Act veto authority in just 12 circumstances since 1972 and *never* for a previously permitted project.") (emphasis added) *available at* http://www.epa.gov/newsroom.

provided that career employees not be separated until cause for separation is established at a hearing before the Foreign Service Grievance Board. *Id.* (quoting 22 U.S.C. § 4010(a)(2)).  The Secretary interpreted § 610(a)(1), the terms of which did not limit the Secretary's authority, to allow the Secretary to override a Board determination that cause had not been established.  The Secretary sought *Chevron* deference, because he was interpreting § 610(a)(1) alone, which only gives power to the Secretary.  *Id.*  The D.C. Circuit declined to defer and observed that "both the Secretary and the Board have been delegated authority under two sequential provisions of § 610(a).  To determine their respective authority, the whole section must be interpreted."  *Id.* at 692.

Deference under Chevron is improper here for the same reason.  As in *Salleh*, two agencies have been granted authority in sequential subsections of the same statute.  Just as the Secretary could not interpret § 610(a)(1) at the expense of the Board's authority under § 610(a)(2), EPA cannot interpret § 404(c) expansively at the expense of the Corps's power over permits in §§ 404(a)-(b) and (s).  *See also Nat'l Ass'n of Mfrs.*, 134 F.3d at 1107-08.

Despite EPA's contention that there is no conflict between its authority and the Corps's, EPA plainly attempts to overturn the Corps's decisions to issue the permit and not to modify it.  The Corps issued a § 404 permit based on its determination that the permitted fill met all statutory requirements and complies with the 404(b)(1) Guidelines. The Corps also rejected EPA's request to suspend, modify or revoke the Permit, finding that EPA's reasons (essentially the same as those in the Final Determination ("FD")) provided no basis to do so. EPA now would nullify both Corps's decisions.  The Corps found the mitigation conditions in the Permit adequate; EPA now says otherwise.  And the Corps expressly reaffirmed all of its permitting judgments when it rejected EPA's 2009 request to revoke the Permit.  Each of the Corps's

judgments made in issuing the Permit and then deciding not to suspend, modify or revoke the Permit are final and entitled to deference.  But EPA gives the Corps no deference and instead claims that the Court must defer to EPA's 404(c) decision.  In sum, the facts here starkly show the conflicting claims of authority under § 404 and why EPA should get no deference.

At the end of the day, EPA's attempted refuge in deference evades fundamental questions about the structure of § 404:  Would Congress have selected the Corps as the permit issuer and then given EPA unbridled authority to overturn the Corps's permit until the last shovelful of fill is deposited?  Would Congress have established procedures for timely EPA participation in the permit process and then allowed EPA to ignore those procedures and to overturn a permit at any time after its issuance?  Would Congress have created certainty for permittees that comply with permit terms and then, without mentioning the permit in § 404(c), allow EPA to invoke that subsection to take away the permit despite the permittee's compliance with the permit's terms?  In each instance, the answer must be "no."

## II.    EPA Usurps West Virginia's Authority Under §§ 303, 401 and 402.

According to EPA, it does not matter that CWA § 402 directly regulates the discharge of pollutants into downstream waters and, therefore, the downstream impacts on which EPA bases its FD.  *See, e.g.*, EPA Br. at 49.  Even though it would be constrained from acting under § 402, EPA argues that it can skirt those constraints and concurrently regulate the discharges as a "secondary effect" under § 404.  EPA is wrong.[9]

### A.    Downstream Effects Are Regulated by § 402, Not § 404.

All water that passes over or through the permitted valley fills is collected in one of three

_____

[9] EPA wrongly asserts that Mingo Logan does not challenge the facts and science on which EPA relies.  EPA Br. at 42.  As indicated throughout Mingo Logan's comments in the administrative record Mingo Logan vigorously disputes EPA's factual assertions and scientific conclusions but has chosen to focus its limited pages on EPA's lack of legal authority.

sediment ponds. Any pollutants that leach from the valley fills must be collected in and treated

by the sediment ponds.[10]   In turn, water cannot be discharged legally from those ponds without

an appropriate WVDEP-issued § 402 permit.  The following diagram illustrates the basic

configuration of a valley fill and associated sediment pond:



Section 404 permits do not regulate discharges of selenium or total dissolved solids ("TDS");

they only apply where the pollutant is "dredged or fill material."  *See* 33 U.S.C. § 1342(a)(1);

*Coeur Alaska*, 129 S. Ct. at 2467 (emphasizing that where the substance discharged is "dredge or

fill material," it is governed by § 404, while all other point source discharges of "pollutants" are

governed by § 402).  WVDEP issued a § 402 permit in 1999, and has modified and re-issued it

several times since.  *See* ML Br. at 5-6.  That permit sets forth the requirements that WVDEP

imposed to govern discharges from Mingo Logan's sediment ponds to Spruce Fork.[11]  When

EPA contends that water quality downstream of the Spruce No. 1 Mine's sediment ponds would

---

[10] Exhibit 2 to Mingo Logan's Opening Brief (ECF No. 26-2) shows the location of the valley fills and the sediment ponds.  That depiction did not include a channel that diverts water from a tributary of Pigeonroost Branch so that it flows into Pigeonroost Branch upstream of outfall 001.  Attached as Exhibit 4 is a corrected version of the depiction.

[11] EPA attempts to evade this problem by conjuring a second effect it calls the "loss of freshwater dilution."  EPA Br. at 50.  But this is simply another way of characterizing the discharges governed by the § 402 permit.  The quantity of water that is discharged downstream from the sediment ponds is as great if not greater than the quantity that would be discharged in the absence of the valley fills.  *See* AR010081.  So the same amount of water will flow downstream; the only variable is the level of contaminants that water will contain.  The higher the levels of contaminants, the less the dilutive effect.  This can be characterized as an increase of contaminants or the loss of dilution.  But either way, the effect is the same, and it is controlled by the 402 permit.

be "unacceptable" due to levels of selenium or TDS, what EPA really is saying is that the effluent limitations in the § 402 permit are not strict enough — a collateral attack on the § 402 permit that undermines the certainty that § 402(k) is meant to provide.

EPA does not dispute that the § 402 permit regulates discharges from the sediment ponds, or that WVDEP has decided whether and how to regulate any selenium or TDS that those discharges may contain.  Instead, EPA argues that it can simultaneously and independently regulate these same discharges under § 404(c) by characterizing them as a "secondary effect" of the authorized § 404 discharges.  EPA Br. at 42 (citing 40 C.F.R. § 230.11(h)).[12]  Contrary to EPA's argument, the Supreme Court *did* reject such a two-permit regime in *Coeur Alaska* as "contrary to the statute and the regulations."  *Coeur Alaska*, 129 S. Ct. at 2474.

According to EPA, *Coeur Alaska* is inapposite because the issue there was whether a discharge of fill material required both a § 402 and § 404 permit, and EPA is not making that argument here.  But this narrow reading ignores what is at stake here and the reasons the Court reached its holding in *Coeur Alaska*.  Here the issue is whether the same discharges from the sediment ponds that are already regulated by WVDEP under § 402 may also be regulated by EPA under § 404.  The Ninth Circuit found no problem with this overlap.  *Id.* at 2466.  The Supreme Court disagreed, and specifically rejected the notion that both permitting programs could govern a single discharge.  A contrary result "would cause confusion, delay, expense, and uncertainty in the permitting process."  *Id.* at 2474.

The same confusion, delay, expense and uncertainty would result if, as EPA argues, the discharges from the sediment ponds, which are unquestionably regulated by WVDEP under

---

[12] As noted below, EPA's own regulations state that secondary effects "shall be considered *prior to the time final section 404 action is taken* by permitting authorities."  40 C.F.R. § 230.11(h)(1) (emphasis added).

§ 402, are simultaneously subject to regulation by the Corps and EPA under § 404.  Discharges

authorized pursuant to § 402 could later be "vetoed" as "unacceptable" in the context of § 404.

As Mingo Logan explained in its Opening Brief, Congress and the Supreme Court rejected such

a clash of regulatory authorities, with its resulting unacceptable consequences.  "Congress

intended to establish 'clear and identifiable' discharge standards."  *Int'l Paper Co. v. Ouellette*,

479 U.S. 481, 496 (1987).  "It is unlikely — to say the least — that Congress intended to

establish . . . a chaotic regulatory structure" that would allow the very same discharges to be

treated as acceptable under § 402 and unacceptable under § 404.  *Id.* at 497.[13]

Notwithstanding these clear directives, EPA contends that "[t]he broader structure of the

CWA" allows simultaneous regulation of discharges under both § 402 and § 404.  EPA Br. at 43.

But EPA flatly ignores the havoc that its interpretation wreaks on the statute's § 402 program

and the § 303 program for promulgating and revising water quality standards.  EPA makes no

attempt to resolve the patent conflicts that its position creates between § 404(c) and these other

sections.  Mingo Logan's interpretation avoids these conflicts and should be adopted for that

reason alone.  *See Nat'l Ass'n of Recycling Indus., Inc.*, 600 F.2d at 799.

Moreover, the provisions that EPA cites do not actually confirm EPA's position.  EPA

first cites § 401 and its requirement that States must certify that discharges authorized by

federally-issued permits will comply with "applicable provisions" of the CWA.  EPA notes that

some of those provisions, such as § 306 (addressing performance standards), are "typically

regulated through section 402 permits."  EPA Br. at 43-44.  EPA argues that this shows Congress

---

[13] EPA misleadingly relies on cases where EPA based a § 404(c) veto on water quality impacts caused by § 404 discharges, *see* EPA Br. at 43, but fails to observe that in each of those cases, unlike here, there was no intervening § 402 permit between the § 404 fill discharge and the downstream receiving water.  Neither the 404(b)(1) Guidelines nor the cases on which EPA relies say that a single discharge of pollutants from the sediment ponds can be governed by both § 404 and § 402.

intended for downstream water quality impacts to be considered under § 404(c), even if they already are regulated under § 402.  But EPA neglects to note that § 401 applies not only to § 404 permits, but to *all* federally-issued permits, including EPA-issued (as opposed to State-issued) § 402 permits.  *See* 40 C.F.R. § 122.4(b) (noting that EPA cannot issue a § 402 permit without first obtaining a § 401 certification).  So § 401 quite naturally includes some provisions that are applicable in the § 402 context, but not necessarily in the § 404 context, and vice versa.[14]  That unexceptional feature of § 401 in no way suggests that § 404 can be used to regulate discharges that are squarely governed by § 402.

EPA also points to § 404(b)(1), where Congress directed EPA and the Corps to develop guidelines "based upon criteria comparable to the criteria" established under § 403.  EPA contends that the § 403 requirement that pollutant dispersal and the ramifications of fill disposal on the wider ecosystem be considered in the context of ocean dumping "reflects Congress'[s] concern with effects beyond the specific disposal site."  EPA Br. at 44.  Mingo Logan agrees.  But as EPA notes in the very next sentence, § 404(b)(1) says nothing about whether a single discharge can be regulated under both § 402 and § 404.  Here, Congress's concern with water quality downstream of Spruce is addressed by the comprehensive programs for promulgating water quality standards (§ 303) and for ensuring that discharges of pollutants comply with those standards and other CWA requirements (§ 402).  Under *Coeur Alaska*, the mechanism for ensuring water quality downstream of the sediment ponds is § 402, not § 404.

### B.   EPA Fails to Demonstrate That "Downstream Effects" Are the Result of § 404 Discharges.

Of the 29 outfalls that drain runoff from the Spruce No. 1 Mine site, only three receive

---

[14] Indeed, one of the express holdings of *Coeur Alaska* is that § 306 new source performance standards do not apply to § 404 discharges.  *Coeur Alaska*, 129 S. Ct. at 2473.

water from the § 404 valley fills at issue here.   The other 26 drain water that does not touch those fills.   EPA bears the burden of demonstrating that the § 404 discharges — not other aspects of the same mine *that are not caused by the § 404 fill discharges* — will cause unacceptable adverse effects.   But EPA's FD makes no attempt to distinguish effects attributable to water from the valley fills.

EPA calls these other discharges "secondary effects."   EPA Br. at 51 (citing 40 C.F.R. § 230.11(h)).   But EPA cannot rely on alleged secondary effects because the regulation on which EPA relies requires that "[i]nformation about secondary effects on aquatic ecosystems shall be considered *prior to the time final section 404 action is taken by permitting authorities*."   40 C.F.R. § 230.11(h)(1) (emphasis added).   Moreover, the discharges from these non-fill areas are regulated by West Virginia under both the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.* ("SMCRA") and § 402.   ML Br. at 33-35.   To assume that the entire mine falls within the ambit of § 404 "is to effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by SMCRA."   *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009), *cert. dismissed*, 131 S. Ct. 51 (2010) ("*OVEC*").[15]

---

[15] EPA unpersuasively attempts to distinguish *OVEC*.  First, EPA argues that the Fourth Circuit only deemed upland areas outside the ambit of § 404, while EPA focuses here on the aquatic ecosystem.  EPA Br. at 51-52.  This is not a fair characterization because the Fourth Circuit rejected OVEC's contention that § 404 required the Corps to consider "the entire valley fill project."  *OVEC*, 556 F.3d at 194-95.  Moreover, the mine areas that EPA seeks to regulate through § 404 here are upgradient of or unrelated to the fill.  *See* Exhibit 4.  Second, EPA argues that it has broader authority under § 404 than the Corps, because EPA can consider impacts on resources, such as "municipal water supplies," beyond the site of the fill.  EPA Br. at 43.  But the 404(b)(1) Guidelines also require the Corps to consider such factors *before* issuing a permit. *See, e.g.,* 40 C.F.R. § 230.50 (explaining how the Corps must consider municipal water supplies).  And any EPA authority to consider downstream effects under § 404(c) is confined to situations involving no intervening § 402 discharge permit.

### C.      EPA Cannot Use § 404(c) to Supplant State Water Quality Standards.

EPA does not contend that any alleged discharges of selenium or TDS into downstream waters  will violate West Virginia's water quality standards.  Were it otherwise, then WVDEP could not have issued the § 402 permit or made the § 401 certification.[16]  EPA likewise does not dispute that West Virginia's water quality standards dictate what is "acceptable" in terms of water quality and govern permitting decisions under the CWA.  Nor does EPA dispute that these standards take into consideration each of the resources that EPA considers under § 404(c).  *See* ML Br. at 35-37.  Instead, EPA urges that compliance with applicable State water quality standards is of no moment in a § 404(c) action, as the governing standard is "unacceptable adverse effects," and EPA can unilaterally determine what is acceptable for purposes of water quality in the § 404(c) context.  But as Mingo Logan has explained, § 404(c) does not authorize EPA to make up new water quality requirements in contravention of other provisions of the Act.

EPA makes three arguments that do not address the fundamental problem that Mingo Logan has identified.  First, EPA contends that state water quality standards are a floor and not a ceiling, and that § 401(b) "does not 'limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements.'"  EPA Br. at 53 (quoting 33 U.S.C. § 1341(b)).  Yet nothing in this provision empowers a federal agency to make up new "applicable water quality requirements."[17]  Section 401(b) simply authorizes additional conditions to ensure compliance with properly issued

---

[16] *See* 40 C.F.R. §§ 122.4(d), 123.25(a)(1).  The amicus brief submitted by various environmental groups (ECF No. 60) excoriates West Virginia's performance in enforcing its water quality standards.  Even if these criticisms were valid — and they are not — such problems would not excuse EPA from following the exclusive statutory procedure for addressing them.  *See* ML Br. at 35-37.

[17] As Mingo Logan has explained, "applicable water quality requirements" are the State requirements, the interpretation of which lies with the States. ML Br. at 35.

"applicable water quality requirements."

Moreover, by reading § 401(b) to give EPA the power to second-guess West Virginia's water quality determinations, EPA reaches a result that Congress specifically intended to avoid. The House Report on the CWA explained that this provision was not intended to give EPA the power to independently review State certification decisions:

> Subsection (b) provides that nothing in this section is to be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with applicable water quality requirements. The Administrator is also directed to provide technical assistance to carry out the purposes of this Act.
>
> The Committee notes that a similar provision in the 1970 Act has been interpreted to provide authority to the Administrator to independently review all State certifications. This was not the Committee's intent. The Administrator may perform services of a technical nature, such as furnishing information or commenting on methods to comply with limitations, standards, regulations, requirements or criteria, but only upon request of a State, interstate agency, or Federal agency.

H.R. REP. NO. 92-911 (Mar. 11, 1972), *reprinted in* 1 LEGISLATIVE HISTORY at 810-11.

Second, EPA suggests in passing that Mingo Logan's interpretation of the effect of the § 401(a) certification "would all but eviscerate Section 404(c)." EPA Br. at 54. Not so. EPA can properly exercise its authority in a wide range of circumstances that do not intrude on the State's authority to set water quality standards. For example, EPA's action in *James City Cnty.* was not based on a judgment about water quality. *See James City Cnty.*, 12 F.3d at 1337.

Finally, EPA argues that it can apply its own ad hoc water quality criteria because "nothing in the CWA or its implementing regulations makes compliance or non-compliance with water quality standards a precondition for EPA's exercise of its 'veto' authority." EPA Br. at 54. This is simply incorrect for the reasons discussed above and in Mingo Logan's Opening Brief. *See* ML Br. at 35-39. Again, EPA does not explain why Congress would have established an

elaborate process for establishing and enforcing water quality standards in which the States are given primacy, and then without mentioning water quality standards in § 404(c), give EPA carte blanche to override those standards and make up new ones without following the procedures required in § 303(c).

III.     **EPA Has Not Explained How Substantial New Information Establishes That the § 404 Discharges Will Now Have an Unacceptable Adverse Effect on Wildlife.**

EPA evaluated the impacts of the § 404 discharges for over a decade.  ML Br. at 40-49. That review culminated with its November 2, 2006 notice that "[EPA has] no intention of taking [its] Spruce Mine concerns any further from a Section 404 standpoint"  AR023081.  At that point, EPA deferred to the Corps's judgment.  *See Coeur Alaska*, 129 S. Ct. at 2465.

In the same preamble that EPA cites to stake out its authority to act after a permit has issued, *see* EPA Br. at 5, 29, EPA recognized that such action could not be based on matters considered by EPA and resolved to its satisfaction during the permit proceeding, "unless *substantial new information* is *first* brought to the Agency's attention after issuance."  44 Fed. Reg. at 58,077 (emphases added).  Eschewing any pretense of consistency, EPA dismisses this requirement of its preamble as a mere "policy statement."  EPA cannot have it both ways.  If, contrary to Mingo Logan's contention, the preamble justifies EPA's post-permit action, EPA must meet the burden that preamble sets forth.  And regardless of the preamble, EPA must articulate, based on the administrative record, a rational basis for changing its position after the Corps issued the Permit.  EPA fails both of these requirements.  It has neither identified "substantial new information" nor explained how any such information specifically justifies its action here.  Instead, EPA merely cites the FD's conclusions, without justifying them by reference to and explanation of the record.

EPA, the Corps, and other federal and state agencies studied extensively impacts to

macroinvertebrates, salamanders, fish and birds.  ML Br. at 40-49; Statement of Facts Material to

Mingo Logan's Mot. for Summ. J. As To Which There Is No Genuine Issue ¶¶ 6-53 (May 27,

2011) (ECF No. 26) ("ML SOF").  Yet, neither the FD nor EPA's brief identifies what EPA has

learned about impacts to these species —EPA's stated basis for acting under § 404(c) — since

the issuance of the Permit.  ML Br. at 47-49; EPA Br. at 38-41.[18]  Instead, EPA merely cites to

the reference list from the FD and notes that it contains over 100 articles dated after January

2007.  EPA Br. at 38-40.  That bald reference does not establish that any of the articles contain

substantial new relevant information.  Absent such justification EPA's FD is arbitrary and

capricious.  *See* ML Br. at 44.

 The limited evidence that EPA *does* cite on the direct impacts is meager and does not

establish a significant loss that the aquatic ecosystem cannot afford.

 ***Louisiana Waterthrush.***  EPA does not contend that the Louisiana Waterthrush has ever

been located in the project area.  EPA Br. at 36.  The bird's absence from the permit area renders

EPA's conclusion that the fill will result in a significant loss of Louisiana Waterthrush arbitrary

and capricious.  EPA cannot simply speculate that one day Louisiana Waterthrush may want to

---

[18] The only arguably new information identified in EPA's brief regarding direct impacts is information allegedly gained after Permit issuance about the difficulty of mitigation through stream creation.  *See* EPA Br. at 41.  But this information cannot justify EPA's exercise of § 404(c) because EPA says that the alleged inadequacy of mitigation is not an essential consideration and not legally relevant to the FD.  *Id.* at 55.  Moreover, as evidenced by longstanding EPA policy and its comments during the Permit process, EPA knew about the uncertainty of success with stream creation before Permit issuance.  Mem. of Agreement Between the EPA and the Dep't of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines, at 4 (Feb. 6, 1990), *available at* http://water.epa.gov/lawsregs/guidance/wetlands/mitigate.cfm; AR022796.  The Corps addressed that uncertainty by writing a condition into the permit that reserved to itself broad authority to require more mitigation in the event of mitigation failure, and to keep requiring additional mitigation until the Corps is fully satisfied that all impacts have been successfully mitigated.

reside in the fill area.[19]

*Fish.* EPA does not establish that fish live in the permitted fill area. Instead, EPA cites a study that located fish *downstream* of the filled areas and a report that Mingo Logan provided *to show that there are no fish in the permitted fill area*. EPA Br. at 36; AR010460 (citing Stauffer and Ferrari 2002 and Decota 2008-09).[20] The Corps concluded that there were no fish in the area to be filled in the environmental impact statement ("EIS") for the 404 permit.[21] EPA determined that there were no fish in the project area in the Programmatic EIS for Mountaintop Mining.[22] And sampling completed in 2008 and 2009 by Decota Consulting Co., Inc. confirmed that there are no fish in the area to be filled.[23] Thus, EPA's claim that there are fish in the permitted fill

---

[19] Moreover, Mingo Logan has explained (with cites to the record) that the Louisiana Waterthrush inhabits mature forests near perennial streams, unlike the permitted fill areas (which explains why none has ever been seen there). ML Br. at 53. In response, EPA recites conclusory statements from an appendix to the FD *with reference only to a U.S. Fish & Wildlife Service communication that is not in the record*. EPA Br. at 36.

[20] *See* CH2M Hill, Technical Evaluation Document: Spruce No. 1 Mine, West Virginia (June 2010) ("CH2M Hill") at 31 ("The PSU fish survey did not include . . any intermittent or ephemeral stream reaches representative of the proposed VF [valley fill] areas of the Spruce Mine."); 37 ("The surveyed stations on Oldhouse Branch and Pigeonroost Branch [used by Stauffer and Ferrari] were located downstream from the proposed Spruce Mine VFs"); 41 ("All of the stream sites surveyed [by Decota 2008-09] were located downstream from proposed VFs, where flows were persistent enough to support fish"). AR008237; AR008793.

[21] AR013282 ("[n]o fish species . . . were identified . . . within waters of the proposed project area."); AR013288 ("No fish were identified during studies within the project area").

[22] The study prepared by EPA for the Programmatic EIS, Stauffer and Ferrari 2002, looked for fish in Pigeonroost Branch and Oldhouse Branch in 1999 and 2000. AR034558. The authors found no fish in Oldhouse Branch. AR034568 (PSU Station 24); AR034574-75 (same); AR034621 (same). They did locate two species of fish in Pigeonroost Branch, but they sampled fish far downstream of the permitted fill area at EPA station number MT-45. AR034568; AR034558 (describing the sample site as "downstream of security gate").

[23] Decota located two species of fish in Oldhouse Branch, but the sampling site was located well below the outfalls of the sedimentation ponds that drain the permitted fill area. CH2M Hill at 41, 42. Decota also located several species of fish in Pigeonroost Branch, but as CH2M Hill explained, each of these sample sites was downstream of the sedimentation ponds. *Id.* at 41. Each time Decota sampled a tributary of Pigeonroost Branch that falls within the permitted fill area, they found no fish. *Id.* at 41 ("No fish were collected in either 2008 or 2009

area, is not supported by the administrative record. And even if the five species of fish the cited

studies identify had been found in the fill area, EPA does not explain how the loss of an area

transited by those fish would result in significant loss to Spruce Fork's admittedly robust fish

population.  AR009947.

*Macroinvertebrates and salamanders.*  Finally, with respect to impacts to

macroinvertebrates and salamanders — impacts known by EPA for over a decade — EPA fails

to explain what new *and different* information has come to its attention.  EPA Br. at 34.  To

Mingo Logan's argument that EPA's assertions regarding food webs are conjectural, EPA

responds only that it included a cartoon picture of several animals found in the watershed, and

cited a review of research from 2005 and a theoretical paper from 1980, neither of which studied

stream disruptions or fills of any type or presented any original data whatsoever.  *Id.* at 35;

AR026602-03; AR010205; AR038950.  As to salamanders, EPA explains that it cited a research

review from *2004* that did not present original data, let alone study the impact of salamander loss

on the food web, and merely discusses salamander roles in the ecosystem.  EPA Br. at 35 n.30;

AR027729, *et seq.*[24]

Unable to demonstrate substantial new information or unacceptable adverse effects on

the wildlife that form the basis of the FD, EPA attempts to justify its decision on other grounds,

such as impacts to "84 taxa of macroinvertebrates and up to 46 species of reptiles and

amphibians and four species of crayfish."  EPA Br. at 34.  But the FD does not rely on impact to

reptiles or crayfish.  AR010149-51.  Nor does the FD explain how the loss of 84 taxa of

---

in the small tributary of Pigeonroost Branch (Station F-5), which is most representative of the . . .
streams that may be impacted by the discharge of fill material"); 42 ("No fish").

[24] The two quotes relied on by EPA are not conclusions from that review, but derive
entirely from different studies dated 1968, 1975, 1994, 1987, 1983 (2) and 1998.  *Compare* EPA
Br. at 35 n.30 *with* AR027745.

macroinvertebrates will affect the ecosystem in light of the existence of many of the same taxa in

nearby White Oak Branch, especially since the presence of these taxa in the fill area now has not

resulted in comparable levels of diversity in Spruce Fork.  AR010209

     *Habitat.* In a last ditch effort, EPA focuses on the habitat allegedly impacted by the § 404

discharges.  EPA Br. at 33.  But this too fails to justify the FD.  The FD relies on language in

§ 404(c) requiring EPA to demonstrate that the authorized discharges will cause an unacceptable

adverse effect to "wildlife."   AR010148.  EPA cannot rely on impact to habitat without showing

that the loss of such habitat results in a significant loss of wildlife.  By definition, "habitat" is

"the region where a plant or animal naturally grows or lives."  WEBSTER'S at 627.  In other

words, habitat cannot be dissociated from the existence of the wildlife it supports and the

importance of that wildlife to the watershed or region.  Thus, unless EPA can demonstrate that

the wildlife that formed the basis of the FD (macroinvertebrates, salamanders, fish, Louisiana

Waterthrush) exist in the permitted fill area, and that the loss of such wildlife will be

"significant" in the watershed or region, *see* 40 C.F.R. § 231.2(e), EPA has failed to meet its

burden under § 404(c).

     In sum, EPA's failure to demonstrate substantial new information establishing

unacceptable adverse effects to wildlife renders the FD arbitrary and capricious.

**IV.**    **EPA Failed to Take Into Account the Permit's Mitigation Conditions.**

     **A.**    **EPA Cannot Ignore Mitigation.**

     EPA claims that it need not consider compensatory mitigation, maintaining that Mingo

Logan does not contest EPA's interpretation of § 404(c).  EPA Br. at 55.  This is simply untrue:

Mingo Logan contests any interpretation of § 404(c) that allows EPA to disregard the positive

effects of the Permit's mitigation conditions when evaluating whether the permitted discharges

will have an unacceptable adverse effect.  In the § 404(q) MOA, for example, EPA has

interpreted "unacceptable adverse effects" to require consideration of mitigation. The MOA adopts a standard comparable to the standard for § 404(c), which requires a determination of whether the "net loss (*i.e., after considering mitigation*) from the project (i.e., within the scope of impacts being evaluated by the Corps), will result in unacceptable adverse effects." 404(q) MOA Part IV ¶ 1 (emphasis added). Similarly, EPA's regulations on § 404(c) direct it to consider relevant portions of the Guidelines, which include provisions on compensatory mitigation. 40 C.F.R. §§ 231.2(e), 230.10(d). Thus, the benefits as well as the impacts must be evaluated in determining "unacceptable adverse effects." EPA's position that it may consider only the authorized impacts of the Permit and ignore the benefits obtained through the Permit's mitigation conditions is inconsistent with EPA's historical practice, inconsistent with analogous case law, and illogical.[25]

**B.      EPA Acted Arbitrarily and Capriciously in Failing to Account for the Permit's Mitigation Conditions.**

The Permit includes mitigation conditions that require performance standards based on the existing functional assessment methodologies (*i.e.*, the Rapid Bioassessment Protocols and West Virginia Stream Condition Index) and any *future* functional assessment methodology, and that require remedial action or additional mitigation if stream creation or any other aspect of the mitigation proves unsuccessful. The Corps determined that these safeguards sufficiently offset the unavoidable impacts to the waters of the United States. *See* AR04950 *et seq.* And the

---

[25] *See* ML Br. at 54. In response, EPA inappropriately relies on *Alameda Water & Sanitation Dist. v. Reilly*, 930 F. Supp. 486, 490 (D. Colo. 1996). But in that case, EPA *did* consider mitigation and found that "the resources which would be lost were so valuable that the project's impacts, *even factoring in the proposed mitigation*, were unacceptable." *Id.* at 490 (emphasis added). The court considered whether EPA should consider less damaging practicable alternatives to the proposed project before considering compensatory mitigation. This advisory opinion (the court had already determined that the plaintiffs lacked standing) does not apply here because the FD does not rely on the alternatives analysis, and in any event, the court did not rule that EPA need not consider the effects of mitigation in making a determination under § 404(c).

Government successfully defended these functional assessment methodologies and the acceptability of stream creation in the *OVEC* litigation, and therefore should be judicially estopped from attacking them here.  *See* ML Br. at 56-58.

Rather than contesting the inconsistency between its positions in *OVEC* and here, the United States seeks to excuse its conduct.  It argues that its inconsistency is acceptable because § 404 anticipates conflicting decisions by EPA and the Corps.  EPA Br. at 56.  But it is only EPA's unreasonable interpretation of § 404(c) that leads to such a result.  Next, it argues the government "may not be estopped on the same terms as any other litigant."  EPA Br. at 56.  But it relies on *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984), which addresses equitable, rather than judicial estoppel.  Judicial estoppel is appropriate where the government "conducts what appears to be a knowing assault upon the integrity of the judicial system."  *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (internal citations and quotations omitted).  No party — not even the Government — can trifle with the courts.[26]

EPA's principal argument is that the Government's about-face reflects a "change in public policy" or a "change in facts essential to the prior judgment," citing the Corps-EPA 2008 mitigation rule and its preamble.  EPA Br. at 56-57; 73 Fed. Reg. 19,594 (Apr. 10, 2008).  Not only does this contention conflict with the Corps's view of the mitigation rule when it reaffirmed the propriety of the Permit in 2009 after adoption of the 2008 mitigation rule, EPA's contention is unlawful.  By applying this "change in public policy" to a previously issued permit, EPA is applying the mitigation rule retroactively.  Thus, the application of this rule and its policy to the mitigation conditions in the Spruce Permit was not only a violation of the Administrative

---

[26] The Government argues further that judicial estoppel does not apply here because it "would compromise a governmental interest in enforcing the law."  EPA Br. at 56 (citing *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001)).  However, enforcement is not at issue here because there is no claim of any permit violation.

Procedure Act's requirement that regulations must only be given "future effect"[27] but it was also a violation of the terms of the rule itself[28] — an independent act of "arbitrary and capricious" conduct.  *See Vitarelli v. Seaton*, 359 U.S. 535, 540 (1959).  An unlawful retroactive application of the mitigation rule cannot justify avoidance of judicial estoppel.

Further, EPA does not explain why the Permit's conditions requiring functional assessment methodologies as performance standards and requiring remedial mitigation measures do not suffice.[29]   To the extent a new functional assessment methodology is developed in the future with improved assessment of a stream's functions, the Permit conditions require its use to determine the success of mitigation.  It is arbitrary for EPA to ignore these Permit conditions. Even if *arguendo* stream creation will not adequately mitigate the effects of the fills, the Permit requires Mingo Logan to perform remedial action or additional and new mitigation.   *See* ML Br. at 54-55; ML SOF ¶¶ 45-52. Additional mitigation can take the form of rehabilitation, enhancement or preservation, all of which EPA acknowledged in the mitigation rule are accepted forms of stream mitigation.  *See* 73 Fed. Reg. at 19,597.  By failing to take account of Permit conditions that address EPA's concerns, EPA has failed to address an obviously relevant factor — the Permit itself — and has arbitrarily failed to determine whether beneficial mitigation

---

[27] 5 U.S.C. § 551(4); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 218 (1988).

[28] The 2008 Rule explicitly states that it "will apply to permit applications received *after* the effective date of this rule" and that "[p]ermit applications received prior to the effective date will be processed in accordance with the previous compensatory mitigation guidance."  73 Fed. Reg. at 19,608 (emphasis added).

[29] EPA's discussion of alleged misclassification of the streams is a red herring.  EPA admits that stream function, not the type of resource, determines the mitigation's adequacy.  EPA Br. at 58 ("This issue is not . . . the type of mitigation measures, but rather the failure of the mitigation to compensate for lost streams.").  Mingo Logan agrees that the key factor is whether newly-created streams will replace the functions of the streams impacted.  For Spruce No. 1 Mine, the Corps measured stream functions using the available assessment tools and any future functional assessment methodology, and the Permit's performance standards are geared to achieve full functional replacement, as determined by these methodologies.

29

requirements render the Permit's overall impacts acceptable.

## V.     EPA's Discussion of the Guidelines Reveals a Flaw Endemic to Its Entire Analysis.

EPA cannot second-guess the Corps's application of the 404(b)(1) Guidelines after a permit has been issued.  *See* ML Br. at 59-60.  EPA gives no persuasive reason why the Court should pay any attention to the FD's discussion of the Guidelines, on which EPA admittedly did not base the FD.

But in its discussion about the Guidelines, EPA engages in a sleight of hand that typifies the disregard for the statute and case law that permeates EPA's entire brief.  EPA asserts that in order to avoid EPA's exercise of § 404(c), *Mingo Logan* had the burden to establish that the Corps satisfied the Guidelines in issuing the Permit, and specifically had the burden to negate the existence of other unmentioned practicable alternatives.  EPA Br. at 60.[30]  To exercise § 404(c), however, the burden is on EPA, not Mingo Logan.  *James City Cnty.*, 955 F.2d at 259 (holding that EPA has the burden on alternatives); *Bersani v. U.S. EPA*, 850 F.2d 36, 40 (2d Cir. 1988).

## CONCLUSION

For the reasons discussed above, the Court should grant Mingo Logan's motion for summary judgment, deny EPA's motion for summary judgment, and enter judgment vacating EPA's FD in its entirety.  The Court should declare that Mingo Logan's Permit remains valid and in full force, and enjoin EPA from taking any further action under § 404(c) with respect to Mingo Logan's § 404 Permit.

---

[30] EPA's sole cite to support this astounding argument is 40 C.F.R. § 230.10(a), which places the burden on a permit *applicant* to satisfy the Guidelines in order to have the Corps issue a permit.  But Mingo Logan does not seek a permit; it has one. The Corps has already determined that there are no practicable alternatives that would have fewer effects on the environment. Mingo Logan has already met its burden.

September 6, 2011                         **MINGO LOGAN COAL CO., INC.**

_____/s/ Robert M. Rolfe_____

Robert M. Rolfe (D.D.C. Bar No. MI0046)
Michael R. Shebelskie (Va. Bar No. 27459)
George P. Sibley, III (Va. Bar No. 48773)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
(804) 788-8218 (facsimile)

Virginia S. Albrecht (D.C. Bar No. 357940)
Deidre G. Duncan (D.C. Bar No. 461548)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 955-1500
(202) 778-2201 (facsimile)

Robert G. McLusky
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000
(304) 340-1130 (facsimile)

_Counsel for Plaintiff_

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                        )
MINGO LOGAN COAL COMPANY, INC.          )
                                        )
         Plaintiff,                     )
                                        )
         v.                             )         Case No. 1:10-cv-00541-ABJ
                                        )
UNITED STATES ENVIRONMENTAL             )
PROTECTION AGENCY                       )
                                        )
         Defendant.                     )
_____ )

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2011, the foregoing Reply Statement of Points and

Authorities in Support of Mingo Logan's Motion for Summary Judgment and Response to

EPA's Motion for Summary Judgment, Exhibit 4, Mingo Logan's Response to EPA's Statement

of Facts, and Proposed Order were served on counsel of record through the Court's electronic

case filing/case management (ECF/CM) system.


<u>/s/ Robert M. Rolfe</u>

Robert M. Rolfe (D.D.C. Bar No. MI0046)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219
(804) 788-8200
(804) 788-8218 (facsimile)

*Counsel for Plaintiff*