# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

MINGO LOGAN COAL COMPANY )
INC., )
  )
              Plaintiff, )
  )
         v. )       Civil Action No. 10-0541 (ABJ)
  )
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, )
  )
            Defendant. )
_____)

## MEMORANDUM OPINION

On January 22, 2007, the Army Corps of Engineers ("Corps") issued a permit to plaintiff

Mingo Logan Coal Company Inc. ("Mingo Logan") pursuant to section 404 of the Clean Water

Act, which authorized Mingo Logan to discharge fill material from its Spruce No. 1 coal mine

into nearby streams, including the Pigeonroost and Oldhouse Branches and their tributaries.

Nearly three years later, defendant U.S. Environmental Protection Agency ("EPA") published a

Final Determination purporting to withdraw the specification of those two streams as disposal

sites and thereby invalidate the permit for those sites.  This attempt to withdraw the specification

of discharge sites after a permit has been issued is unprecedented in the history of the Clean

Water Act.

Mingo Logan brought this suit seeking the Court's declaration that EPA lacks the

authority to modify or revoke Mingo Logan's section 404 permit, that its attempt to modify the

permit was unlawful, and that the permit is still operative.  Am. Compl. [Dkt. # 16] at Count I.

In addition, Mingo Logan asks the Court to vacate EPA's Final Determination on the grounds

that it exceeded the agency's statutory authority under section 404(c) of the Clean Water Act,

and that it was arbitrary, capricious, and not in accordance with law for a number of reasons. *Id.* at Counts II–XIV. The parties have cross-moved for summary judgment.

The Court concludes that EPA exceeded its authority under section 404(c) of the Clean Water Act when it attempted to invalidate an existing permit by withdrawing the specification of certain areas as disposal sites after a permit had been issued by the Corps under section 404(a). Based upon a consideration of the provision in question, the language and structure of the entire statutory scheme, and the legislative history, the Court concludes that the statute does not give EPA the power to render a permit invalid once it has been issued by the Corps. EPA's view of its authority is inconsistent with clear provisions in the statute, which deem compliance with a permit to be compliance with the Act, and with the legislative history of section 404. Indeed, it is the Court's view that it could deem EPA's action to be unlawful without venturing beyond the first step of the analysis called for by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). But it is undeniable that the provision in question is awkwardly written and extremely unclear. So, the Court will go on to rule as well that even if the absence of a clear grant of authority to EPA to invalidate a permit is seen as a gap or ambiguity in the statute, and even if the Court accords the agency some deference, EPA's interpretation of the statute to confer this power on itself is not reasonable. Neither the statute nor the Memorandum of Agreement between EPA and the Corps makes any provision for a post-permit veto, and the agency was completely unable to articulate what the practical consequence of its action would be. Therefore, the Court will grant plaintiff Mingo Logan's motion for summary judgment [Dkt. # 26] and deny defendant's cross-motion [Dkt. # 46].

## BACKGROUND

**A.  Factual Background**

    a.  <u>The Spruce No. 1 Mine permit process</u>

Mingo Logan owns and operates the Spruce No. 1 mountaintop coal mine in Logan County, West Virginia.  Administrative Record ("AR") 10117, 10120–24.  Mountaintop mining involves removing the top of a mountain to recover the coal within it.  AR 10118.  This process generates excess rock, topsoil, and debris ("spoil") that cannot be returned to the mined area.  *Id.* Typically, these materials are deposited in adjacent valleys, creating valley fills.  *Id.*

In accordance with the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201, *et seq.*, Mingo Logan obtained an SMCRA permit from the State of West Virginia for the Spruce No. 1 mine in 1998.[1]  AR 8277.  The original design called for the discharge of spoil in portions of Seng Camp Creek, Pigeonroost Branch and White Oak Branch of Spruce Fork.  AR 8277.021.

Mingo Logan also applied for and obtained a National Pollutant Discharge Elimination System ("NPDES") permit under section 402 of the Clean Water Act ("CWA") from the State of West Virginia.  AR 8062, 43101.  EPA initially opposed the proposed permit, but ultimately withdrew its objections, noting that it would "allow limited mining and discharging during the five-year permit period, averting pending economic hardships from layoffs while requiring mitigation compensation for the limited stream portions filled."  AR 8414–17.  In withdrawing its objections, EPA also stated that:

---

1      The permit was actually obtained by Mingo Logan's predecessor, Hobet Mining, Inc., but since prior ownership is unimportant to the disposition of this case, the Court will refer to Mingo Logan and all prior owners and operators of the Spruce No. 1 mine as "Mingo Logan."  *See* Statement of Points and Authorities in Support of Mingo Logan's Mot. for Summ. J. ("Pl.'s MSJ Mem.") at 4 n.2.

> During the first two years of [Mingo Logan]'s five-year NPDES permit, EPA will join with other federal and state agencies to undertake a comprehensive environmental evaluation of impacts and possible alternatives associated with mountaintop mining and associated valley filling in West Virginia and other mountaintop mining states.  EPA will use the findings from this evaluation in review of any draft NPDES permit which may be applied for by the company for extending its valley fills and associated discharge points.

*Id.*  The NPDES permit was subsequently modified twice.  AR 8081.  As contemplated, EPA conducted a Programmatic Environmental Impact Statement ("PEIS") on Mountaintop Mining, which it finalized in October 2005.

Mingo Logan also applied to the Corps for a CWA section 404 permit, the subject of this action.  AR 2634–66.  Originally, the permit application was submitted under Nationwide Permit 21 and approved by the Army Corps without preparing an Environmental Impact Statement ("EIS").[2]  *See Bragg v. Robertson*, 54 F. Supp. 2d 635, 639–40 (S.D.W.V. 1999).  But, before any mining could take place, a federal court in West Virginia preliminarily enjoined the approval, and the Corps withdrew its nationwide permit authorization.  *Bragg*, 54 F. Supp. 2d 635; Mingo Logan Response to EPA Statement of Undisputed Material Facts ("ML SMF") ¶ 38(e).

Mingo Logan subsequently applied to the Corps for an individual permit, under section 404(a) of the CWA, to discharge material from the Spruce No. 1 Mine into the Right Fork of Seng Camp Creek, Pigeonroost Branch, Oldhouse Branch, and White Oak Branch.  AR 3052–70.  The Corps began the process of developing an EIS for the project.  EPA commented on a preliminary draft EIS in August 2001 and a draft EIS in August 2002, expressing its concerns

---

2       The Nationwide Permit program was available to mining projects that would "cause only minimal adverse effects when performed separately, and w[ould] have only minimal cumulative adverse effect on the environment."  *Bragg v. Robertson*, 54 F. Supp. 2d 635, 637–38 (S.D.W.V. 1999).

about each version, and also noting "the absence of information necessary to fully assess potential adverse environmental impact associated with this project."  AR 19487; *see also* AR 19486–90, 45054–734, 42912–16.  In the letter commenting on the draft EIS, EPA concluded that it "remains committed to working with the Corps, the state, and the applicant to identify and develop an environmentally acceptable project" and "would encourage additional discussions in an effort to clarify and resolve the issues raised in this letter."  AR 19489.  It also stated that "this matter is . . . subject to review under our authorities at CWA [s]ection 404(q) and [s]ection 404(c)."  AR 19489–90.

In December 2005, the West Virginia Department of Environmental Protection granted state certification for the individual permit based on its determination that the project would not violate state water quality standards or anti-degradation regulations.[3]  AR 20924–28.

In 2006, the Corps published for public comment a revised Draft EIS for the Spruce No. 1 Mine.  ML SMF ¶ 52.  AR 12991–13388.  EPA commented on the draft in June of that year.  AR 8312–29.  The comment letter expressed concern about the impacts of the project, particularly to the Little Coal River watershed.  AR 8313.  However, the letter also noted in several places that the agency was encouraged by the progress that Mingo Logan had made to date, and it voiced optimism that EPA could work with the Corps, federal and state agencies, and Mingo Logan to address its concerns and develop appropriate mitigation plans, as well as a Little Coal River cumulative impact assessment and restoration plan.  *Id.* at 8314–15.

The Corps released the final EIS in September 2006, and EPA again submitted comments by letter.  AR 8330–34, 34962–35342.  The comment letter again included concerns about potential adverse impacts to the Little Coal watershed and gaps in the mitigation plan, but also

---

3      The certification was granted subject to Mingo Logan's compliance with a mitigation agreement.  AR 20925, 20928.

acknowledged Mingo Logan's progress in reducing impacts and EPA's willingness to work with the responsible agencies to resolve its concerns prior to a section 404 permit decision.  AR 8331–32.

The Corps responded to the concerns expressed in EPA's comments to the final EIS.  AR 23657–62, 24637–43.  And through December 2006, representatives from EPA, including William J. Hoffman, Director of the Office of Environmental Programs Environmental Assessment and Innovation Division of the EPA, and from the Corps continued to communicate with one another about the Spruce No. 1 Mine proposal.  AR 23084–109, 23657–62, 24424, 24619–25, 24637–43.  Although the communications establish that EPA had some lingering technical concerns, they also establish that EPA intended to "work together" with the Corps to address them.  AR 23085.  In a November 2, 2006 email to Teresa Spagna of the Corps, Mr. Hoffman expressed that "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint . . . ."  *Id.*

On January 22, 2007, the Corps issued Mingo Logan a section 404 permit for the Spruce project.  AR 25763–77.  The permit authorized Mingo Logan to discharge dredged or fill material into stream segments, including Pigeonroost and Oldhouse Branches, until December 31, 2031. AR 25763–68.  It also bound Mingo Logan to carry out certain post-project stream restoration and compensatory mitigation efforts.  AR 25763, 25769–77.  The permit contained an express notification that "This office [(The Huntington District office of the Army Corps of Engineers)] may reevaluate its decision on this permit at any time the circumstances warrant." AR 25765.  It says nothing about the EPA's authority to withdraw the specification of a discharge site or to modify or revoke the permit.

   b. <u>EPA's "withdrawal" of the Pigeonroost and Oldhouse Branch discharge specifications</u>

On September 3, 2009 – almost two years after the Corps issued the section 404 permit – EPA sent a letter to the Huntington District Office of the Corps, requesting that it "use its discretionary authority provided by 33 CFR 325.7 to suspend, revoke, or modify the permit issued authorizing Mingo Logan Coal Company to discharge dredged and/or fill material into the waters of the United States in conjunction with the construction, operation, and reclamation of the Spruce Fork No. 1 Surface Mine . . . ."[4]  AR 12754.  The letter described what EPA considered to be new information and circumstances that had arisen since the issuance of the permit and that justified its reconsideration.  *Id.*  Specifically, the letter asserted that recent data and analyses had revealed downstream water quality impacts that were not adequately addressed by the permit.  AR 12754–58.

The Corps rejected EPA's request, finding no grounds to suspend, revoke, or modify the permit.  AR 12781–88.

Six months later, on March 26, 2010, EPA published a notice of its proposed determination to withdraw or restrict the specification of Seng Camp Creek, Oldhouse Branch, Pigeonroost Branch, and certain of their tributaries, as disposal sites for fill material.  AR 4.  On September 24, 2010 it published a "Recommended Determination" to withdraw the specification of Oldhouse Branch, Pigeonroost Branch, and certain of its tributaries.  AR 9888–970.  And on January 13, 2011, EPA issued its Final Determination to "withdraw the specification of Pigeonroost Branch, Oldhouse Branch and their tributaries . . . as a disposal site for dredged or

---

4       Although the request was issued two years after the issuance of the permit, Mingo Logan had not yet disposed of any dredged or fill material in the Pigeonroost or Oldhouse sites due to ongoing legal battles.  Tr. at 15, Nov. 30, 2011.  At the time of oral argument in this case, there still had been no disposal of material into those sites.  *Id.*

fill material in connection with the construction of the Spruce No. 1 Surface Mine . . . ."  These branches make up roughly eighty eight percent of the total discharge area authorized by the permit.  EPA Response to Mingo Logan's Statement of Undisputed Material Facts ("EPA SMF") at ¶ 65.

### B.  Procedural Background

Mingo Logan challenged EPA's purported withdrawal in an amended complaint, [Dkt. # 16], filed in this Court on February 28, 2011.  All fourteen Counts arise under the Administrative Procedure Act ("APA").  Before the Court heard oral argument in this matter, it issued a Minute Order explaining that since a ruling on the legality of the post-permit veto could be dispositive of the entire case, it would first hear argument on the question of whether the EPA had the authority under section 404(c) of the Clean Water Act to withdraw its specification of the disposal site after the Corps had already issued a permit under section 404(a) (Count I).  *See* Minute Order, Nov. 28, 2011.  Because the Court finds that EPA exceeded its section 404(c) authority, and it will therefore vacate the Final Determination, it need not reach the remaining Counts.[5]

### STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat

---

5      The remaining counts question whether the agency's determination was otherwise lawful, and whether it was reasonable and supported by the record.

summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.*; *see also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111 (D.C. Cir. 1999). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

The question of whether the EPA exceeded its authority under section 404(c) of the CWA by withdrawing the specification of disposal sites after the Corps had issued a permit authorizing discharge of spoil at those sites is a question of law that the Court may properly decide on summary judgment. The Court is required to analyze an agency's interpretation of a statute by following the two-step procedure set forth in *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." *Id.* at 842-43.   Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), quoting *Chevron*, 467 U.S. at 843 n.9, including an examination of the statute's text, structure, purpose, and legislative history. *Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If the Court concludes that the statute is either silent or ambiguous, the second step of the review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.   Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer." *Id.* at 844.

## A. The first step of the *Chevron* analysis suggests that Congress did not grant EPA the authority it purports to exercise.

EPA's position is that section 404(c) grants it plenary authority to unilaterally modify or revoke a permit that has been duly issued by the Corps – the only permitting agency identified in the statute – and to do so at any time.   This is a stunning power for an agency to arrogate to itself when there is absolutely no mention of it in the statute.   It is not conferred by section 404(c), and it contrary to the language, structure, and legislative history of section 404 as a whole.

### a. The statutory provision does not clearly grant EPA the authority to exercise a post-permit veto.

The statute vests the full authority to issue permits for discharges into navigable waters with the Corps.   Section 404(a) provides that "[t]he Secretary may issue permits . . . at specified disposal sites."   33 U.S.C. §1344(a) (2006).   And section 404(b) provides:   "each such disposal site shall be specified for each such permit by the Secretary [of the Army]."   33 U.S.C. §1344(b).   So, a permit can be issued only for a "specified" site, and it is up to the Corps to do the

specifying, although that exercise must be undertaken through the application of guidelines developed by the EPA in conjunction with the Corps. *Id.* But the statute does give EPA the opportunity to derail the process and "prohibit" the specification of an area as a disposal site if it determines that the discharge would have certain "unacceptable" environmental consequences. 33 U.S.C. §1344(c).

The EPA rests its case on this section, which is entitled, "Denial or restriction of use of defined areas as disposal sites." The provision states:

> The [EPA] Administrator  is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearing, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . , wildlife, or recreational areas.  Before making such determination, the Administrator shall consult with the Secretary [of the Army].

*Id.* According to the EPA, this provision, and in particular, its use of the word "whenever" means that the EPA is permitted to withdraw its assent to a disposal site *at any time*, even if the agency did not exercise its authority to prohibit or deny the specification at the outset, and a permit has already been issued.  This reading does not exactly leap off the page.

Putting aside the parenthetical phrases for the moment, the straightforward portions of the provision authorize the EPA to "prohibit" the specification of any defined area as a disposal site or to "deny or restrict" the use of any defined area for specification as a disposal site.  *Id.*  Since a permit can only be issued by the Corps for a "speci*fied*" (note the past tense) site, the act of prohibiting a specification, or denying the use of an area for specification, eliminates the necessary foundation for the issuance of a permit.  33 U.S.C. § 1344(a) (emphasis added).  Thus, the clear import of the provision, as all of the parties agree, is that Congress gave EPA the right

to step in and veto the use of certain disposal sites at the start, thereby blocking the issuance of permits for those sites.

But the parentheticals muddy the waters.  They are so poorly written that it is difficult to ascertain what it is that they are supposed to modify.   What does "[t]he Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area" mean? 33 U.S.C. § 1344(c).  Does it mean that the EPA is authorized to prohibit the specification and that it is also authorized *to prohibit* the withdrawal of specification?  That interpretation of "including" would make sense grammatically since "specification" and "withdrawal" are both nouns that could be included among the objects of the verb "prohibit." *Id.*  But it is not clear why Congress would find it advisable to give the EPA the right to bar the Corps from *withdrawing* a specification.  So does the sentence mean that the EPA is authorized to prohibit the specification of a site and that this *authorization* includes the authority to withdraw a specification?  That may be what Congress had in mind, although the concept was expressed in a clumsy way, and there is no legislative history that expressly illuminates the provision.  Moreover, this reading does not make a great deal of sense since under the statute, EPA doesn't "specify" in the first place – it is only empowered to prohibit or decline to prohibit the Corps from doing so.  *See* 33 U.S.C. §1344(b) ("Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit *by the Secretary* [of the Army] . . . .); 33 U.S.C. § 1344(c) ("The Administrator [of the EPA] is authorized to prohibit the

specification . . . ."). So it is not clear how the EPA could "withdraw" a decision it has not made.[6]

The awkwardly worded provision also raises another more troubling textual issue. If the parentheticals mean that the EPA can withdraw a specification, can it do so after a permit has already been issued? Does the use of the word "whenever" signify that this could occur at any time whatsoever and therefore embrace the concept of nullifying a valid permit? The Court thinks not. The provision certainly does not clearly state that the EPA can withdraw its consent at any time, or whenever it sees fit, or even just "whenever." It says that the EPA Administrator can prohibit – with that strange parenthetical – the Army's specification of a site "whenever he determines . . . that the discharge . . . will have an unacceptable adverse effect . . . ." Using "whenever" as a conjunction in this manner may be intended simply to convey the meaning that the EPA may act "at such time as" it makes the necessary determination – in other words, that the determination is the predicate for the action.[7]

But even if, as EPA argues, the use of "whenever" indicates that the EPA can assert its section 404(c) authority at any time that it makes the necessary determination, the provision still

---

6    The only interpretation of the provision that would actually make sense is that Congress intended the term "withdraw" to pertain to specifications that were already in existence in 1972, at the time section 404(c) was enacted. In its memorandum, Mingo Logan explains that before 1972, the Corps designated a number of disposal sites for the discharge of material under the River and Harbors Act. *See* Pl.'s MSJ Mem. at 23, citing 33 C.F.R. pt. 205 (1972). As part of the 1972 amendments, Congress enacted section 401(c), which reaffirmed the Corps' authority over those disposal sites and authorized it to use those sites in its section 404 permit system. Thus, the term "withdraw" could be read as simply giving EPA the authority to withdraw the specification of those sites that it had never been given the opportunity to review before the Corps could lock them in under section 404 permits. *Id.* at 23–25.

7    *See* "*whenever*," Merriam-Webster Dictionary, *available at* http://merriam-webster.com/dictionary/whenever (defining "whenever" as "at any or every time that" and providing examples including, "We'll begin the meeting *whenever* the boss gets here.").

does not go so far as to confer the express authority to undermine an existing permit.  As plaintiff

notes, whatever section 404(c) means, it only talks about prohibiting, restricting, or withdrawing

a *specification*, and it does not give EPA any role in connection with permits.[8]  Congress utilized

both terms throughout the statute, so it must be assumed that Congress understood the difference

between the two terms and that its choices have meaning.  *See Burlington N. & Santa Fe Ry. Co.*

*v. White*, 548 U.S. 53, 62–63 (2006) ("We normally presume that, where words differ as they

differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

(internal quotation marks and citations omitted).  EPA responds by claiming that it did not

---

8      EPA argues in its papers that the word "withdrawal" would be rendered meaningless by
an interpretation that deprives it of the authority to reverse a specification after a permit has been
issued because "specification" under 404(b) only occurs when a permit is issued.  EPA's Mem.
in Support of its Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s MSJ Mem.")
at 16–20.  And at the hearing, EPA insisted that specification is not a separate process:  "Mingo
Logan's kind of making that up.  It is only specified through the issuance of a permit. That's
when it happens."  Tr. at 43, Nov. 30, 2011.  The agency also expresses the view that specifying
a site is the same thing as issuing a permit in the preamble to its regulations.  *See* Def.'s MSJ
Mem. at 5, citing 44 Fed. Reg. 58,076, 58, 077 (Oct. 9, 1979) (codified in 40 C.F.R. § 231.1(a)
("[The statute] refers twice to the 'withdrawal of specification' which clearly refers to action by
EPA after the Corps has specified a site [*e.g. issued a permit* or authorized its own work.]")
(emphasis added).  But EPA's attempt to conflate specification with permitting ignores the fact
that the statute uses the two separate terms distinctly when it defines the roles to be played by the
two separate agencies in separate subsections of the CWA.  *See* 33 U.S.C. §1344(a) ("The
Secretary [of the Army] may issue permits . . . for the discharge of dredged or fill material . . . at
specified disposal sites."); (b) ("each such disposal site shall be specified for each such permit by
the Secretary . . . ."); and (c) ("The Administrator [of EPA] is authorized to prohibit the
specification . . . of any defined area as a disposal site . . . .").  And EPA's position ignores
certain of its own regulations, which specifically contemplate exercising 404(c) authority even
prior to the issuance of a permit.  *See* 40 C.F.R. § 231.3.  It also ignores the fact that as it has
previously recognized, specifications can exist independent of section 404(a) permits.  *See* AR
10578–79 ("For purposes of section 404(c), the term 'specification' is necessarily broader than
the term 'permit' because there are situations in which a discharge is authorized but a permit
issued by the Corps is not required.");  Def.'s Reply Mem. in Supp. of Mot. to Dismiss [Dkt. #
11] at 21 (explaining that one reason why Congress may have directed EPA's authority to the
specification of disposal sites is that "Congress intended EPA's [s]ection 404(c) authority to
apply not only to specified disposal sites in permits, but also to sites that the Corps specifies for
disposal outside of the permitting context . . . ."), citing 33 U.S.C. § 1344(r), 40 C.F.R. §
230.2(a); Def.'s MSJ Mem. at 18–19 (same).

withdraw a permit, it only did what it is authorized to do under 404(c): withdraw a specification. EPA's Reply Mem. in Support of its Mot. for Summ. J. ("Def.'s MSJ Reply") at 9.  But that innocent pose is entirely disingenuous since EPA also insists that its action absolutely had the legal effect of invalidating Mingo Logan's permit for the streams that are no longer specified. Tr. at 45–47, Nov. 30, 2011.  EPA cannot have it both ways.

There is no question that the sole provision relied upon by EPA does not expressly authorize it to exercise the power it purported to exercise here, so the case cannot be resolved in EPA's favor on *Chevron* I grounds.  At best, the text is ambiguous.  But in determining at this stage whether the statute clearly prohibits the agency action or whether Congress deliberately left a gap for the agency to fill, the Court must consider not only the provision in question, but also the statutory structure as a whole, and the legislation's purpose and history.  *Bell Atlantic Tel. Cos.*, 131 F.3d at 1047; *see also United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations omitted).  This analysis also favors plaintiff because EPA's reading of section 404(c) conflicts with other clearer provisions.

      b.  <u>The statute as a whole does not confer authority on EPA to invalidate an existing permit</u>**.**

As soon as the Court moves beyond the garbled language of section 404(c), the ambiguity begins to dissipate.  As a review of the statute makes clear, and as other courts have observed, the permit is the centerpiece of the regulatory regime established by the Clean Water Act.

The Clean Water Act was passed in 1972 to restore and maintain the chemical, physical, and biological integrity of the nation's waters . . . . In order to achieve these goals, Section 301 of the Act makes the discharge of any pollutant into navigable waters unlawful unless authorized in accordance with specified sections of the Act.

The specified sections of the Act are Sections 402 and 404. Section 402 establishes the National Pollutant Discharge Elimination System ("NPDES") under which the Administrator of the Environmental Protection Agency ("EPA") may issue permits authorizing the discharge of pollutants. Once a Section 402 permit has been issued, the permittee's obligation to comply with the regulatory scheme is determined by reference to the terms and conditions of the permit . . . .

Section 404 of the Clean Water Act allows the Secretary of the Army Corps of Engineers to issue permits, after notice and opportunity for public hearing, for the discharge of dredged or fill material into navigable waters at specified disposal sites. *Here again, once a Section 404 permit has been issued, the permittee's obligation to comply with the regulatory scheme of the Clean Water Act is determined by referring to the terms and conditions of the Section 404 permit.*

*Coeur D'Alene Lake v. Kiebert*, 790 F.Supp. 998, 1007–08 (D. Idaho 1992) (internal statutory citations omitted) (emphasis added). In short, the Clean Water Act deems any discharges made without a permit to be unlawful, but it also expressly provides that discharges made pursuant to a permit are lawful. 33 U.S.C. § 1344(p); *Natural Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

Plaintiff argues that it should be able to rely upon a valid permit issued by the Corps and that EPA's interpretation runs counter to the unambiguous Congressional directive embodied in section 404(p). Tr. at 14, Nov. 30, 2011. The Court agrees. Indeed, the fact that EPA's interpretation cannot be squared with the statutory scheme became abundantly clear at the hearing, when the EPA groped for a way to articulate how its purported retroactive veto of EPA's specification of certain disposal sites would affect plaintiff's existing permit to discharge in those very sites.

THE COURT:  Mingo Logan has a permit.  Can they walk out tomorrow and discharge in Pigeonroost Branch?

COUNSEL FOR EPA:  No.

THE COURT:  Why not?

COUNSEL FOR EPA:  EPA 404(c) authority authorizes it to withdraw specifications whenever it makes its determination. . . .  I grant you that the effect of that, the practical effect of that, would be that the company would no longer be able to operate under the permit . . . .

THE COURT:  They have a permit that says this permit is final until it's suspended or revoked.  There's a missing step here.  Why can't they walk out tomorrow and dump fill in those sites?  You say, we've withdrawn the specification, but the permit exists.

Is the Corps required now to revoke or modify the permit in light of your determination?

COUNSEL FOR EPA:  I don't think they need to take that extra step.  EPA's withdrawal of that specified site has been final.  It has been made. . . .

THE COURT:  So everybody with a permit has to on a daily basis compare their permit to your list of specified sites?  They can't do what they've been permitted to do by the United States? . . .  Where does it say in the statute that they can't dump tomorrow?

COUNSEL FOR EPA:  Well, they can only dump, even according to their permit, in areas that are specified.

THE COURT:  No.  The permit doesn't say that.  The statute says you can only issue a permit for areas that are specified.  The permit says you can go to Stream A, B, C.[9]

---

9       EPA's assertion that plaintiff "can only dump, even according to the permit, in areas that are specified," is not borne out by a review of the permit itself.  Tr. at 47, Nov. 30, 2011.  It is true that a permit can only be *issued* for specified areas, but the issued permit does not make reference to "specification."  Department of the Army Permit No. 199800436-3, issued to the Mingo Logan Coal Company on January 22, 2007, expressly authorizes the mining company to place dredged and fill material from the Spruce No. 1 mine into specific waterways:  the Right Fork of Seng Camp Creek, Pigeonroost Branch and certain ones of its tributaries, and Oldhouse Branch and certain ones of its tributaries.  AR 25763–77.  The permit states that the Corps could reevaluate its decision and initiate suspension, modification, or revocation of the permit pursuant to the procedures set forth in 33 C.F.R 325.7, but it does not indicate that the EPA has the authority to modify or invalidate it in any way.  AR 25763–77.

So, does the Corps have to do something tomorrow to give effect to your order, and where is that in the statute?

COUNSEL FOR EPA:  No, I don't think that they would need to do that.  The permit authorizes – the permit is very specific about what you may dispose of and where you may dispose of it.  And when EPA takes away the specification and says you cannot dispose of it in these particular places, they can't –

THE COURT:  Doesn't that mean somebody has to modify the permit?

COUNSEL FOR EPA:  That I think happens.  Maybe it would be appropriate to go back and do that, but I don't think it has to.  I think it would be self-implementing when EPA exercises its 404(c) authority.

THE COURT:  So they do it and then you bring an enforcement action against them.  And you come into court and they say, Judge, we didn't violate the permit.  404(p).  And you say, well, there's this other piece of paper.  It's from us.

Aren't you conceding that there's an ambiguity inherent in the statute between the authority that you're seeking and 404(p)?

COUNSEL FOR EPA:  I don't see any ambiguity in the statute with respect to the authority of the EPA to withdraw the specification after the permit is issued. . . .

THE COURT:  . . . But . . . what are they supposed to do tomorrow?  And if your exercise of that power essentially undermined the finality of the Corps' exercise of their power in 404(a), wouldn't it have been essential for Congress to say that?

***

There's this huge gap.  I mean, you looked at me very blankly when I said what is Mingo Logan supposed to do tomorrow.

Tr. 45–49, 63, Nov. 30, 2011.  Counsel's comments that "maybe" it would be appropriate to modify the permit, and that "I think" the invalidation of the permit would be self-implementing were indicative of the absence of a firm foundation for EPA's position.  The idea that a permit – and in particular, a permit *which EPA refused to suspend or modify* – will simply evaporate upon EPA's say-so is at odds with the exclusive permitting authority accorded the Corps in section 404(a) and the legal protection Congress declared that a permit would provide in section 404(p).

Plaintiff also suggests that EPA's interpretation of section 404(c) is inconsistent with section 404(q), entitled "Minimization of duplication, needless paperwork, and delays in issuance; agreements."  33 U.S.C. § 1344(q).  That section called for EPA and the Corps to work out agreements promptly after the legislation was enacted "to minimize, to the maximum extent practicable, . . . delays in the issuance of permits under this section," and "to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section."  *Id.*  EPA's claim that the statute contemplates that a permit is never really final is not easily squared with Congress's clear desire to limit duplication and delay so that commerce would not be disrupted more than necessary.  What would be the point of insisting upon expedition in granting permits if a permit isn't worth the paper it's printed on and commerce could be interrupted at any time?

Thus, a review of section 404 in its entirety suggests that EPA's action is invalid.

      c.   <u>The legislative history of the Clean Water Act does not support EPA's claimed power.</u>

The first step of the *Chevron* analysis also includes a review of the legislative history, but the parties have provided the Court with very little to go on.  As EPA points out, plaintiff has cited only one excerpt from a statement by only one Senator:

> … *[P]rior to the issuance of any permit* to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies … [etc.]. Should the Administrator so determine, no permit may issue.

*Senate Consideration of the Report of the Conference Committee* ("Senate Consideration"), s. 2770, 93rd Cong. 1st Sess., Oct. 4, 1972, *reprinted in* 1 *Legislative History of the Water Pollution Control Act Amendments of 1972*, at 177 (1973) (emphasis added).  But, as plaintiffs point out,

the speaker, Senator Edmund Muskie, was the Senator who played the most significant role in the passage of the legislation, the statement is quite clear, and EPA has not directed the Court to any legislative statements to the contrary.  The Court finds that Senator Muskie's comments are instructive, and furthermore, that its own review of the legislative history as a whole suggests that EPA's position is inconsistent with what Congress had in mind.

On October 4, 1972, Senator Muskie submitted the conference report on the Federal Water Pollution Control Act Amendments of 1972 to his colleagues on the Senate Floor.

> I have been a Member of the Senate for 13 years, and I have never before participated in a conference which has consumed so many hours, been so arduous in its deliberations, or demanded so much attention to detail from the members. The difficulty in reaching agreement on this legislation has been matched only by the gravity of the problems with which it seeks to cope.

*Id.* at 161.  Senator Muskie included a detailed discussion of each of the significant provisions in the bill, including section 404, in his prepared remarks to be made part of the record, and he observed:

> I do this because the complexities of the individual provisions are such that the legislative history will be important to those charged with the responsibility for administering the program. At the same time, however, I would like to call attention to the fact that we have tried in this legislation not to leave the final evaluation of the bill to legislative history, but instead to write into law as clearly as possible the intent of the Congress.

*Id.* at 163-64.  These statements reinforce the Court's view that there must be clear statutory authority for the power the EPA purports to exercise here.

It is true that Senator Muskie emphasized that the fundamental purpose of the legislation was to restore and protect the nation's waterways.  *See, e.g.*, *id.* at 161, 164 ("Our planet is beset with a cancer which threatens our very existence and which will not respond to the kind of treatment that has been prescribed in the past. . . .  Can we afford clean water?  Can we afford rivers and lakes and streams and oceans which continue to make possible life on this planet? . . .

Those questions were never asked as we destroyed the waters of our Nation, and they deserve no answers as we finally move to restore and renew them."). And with respect to section 404 in particular, his submission emphasized: "[T]he Committee expects the Administrator and the Secretary to move expeditiously to end the process of dumping dredged spoil in water – to limit to the greatest extent possible the disposal of dredged spoil in the navigable inland waters of the United States . . . ." *Id.* at 177–78. But Senator Muskie also reminded the chamber that there were "three essential elements" to the legislation: "[u]niformity, finality, and enforceability." *Id.* at 162.

A review of the detailed description of section 404 made part of the record reveals that EPA's interpretation is inconsistent with the clear scheme of shared responsibility that was carefully established when the House and Senate versions of the bill were harmonized by the Conference Committee.

> A major difference between the Senate bill and the House amendment related to the issue of dredging. The Senate Committee had reported a bill which treated the disposal of dredged spoil like any other pollutant. . . . The House bill not only established a different set of criteria to determine the environmental effects of dredged spoil disposal but also designated the Secretary of the Army rather than the Administrator of the Environmental Protection Agency as the permit issuing authority. The Conference agreement follows those aspects of the House bill with related to the Secretary of the Army's regulatory authority. However, consistent with the Senate provision, the Administrator . . . has three clear responsibilities and authorities.
>
> First, the Administrator has both responsibility and authority for failure to obtain a Section 404 permit or comply with the condition thereon. . . .
>
> Second, the Environmental Protection Agency must determine whether or not a site to be used for the disposal of dredged spoil is acceptable when judged against the criteria established for fresh and ocean waters. . . .
>
> Third, prior to the issuance of any permit to dispose of spoil, the Administrator must determine that the material to be disposed of will not adversely affect municipal water supplies, shellfish beds and fishery areas . . . ,

> wildlife, or recreational areas in the specified site.  Should the Administrator so determine, no permit may issue.

*Id.* at 177.  This excerpt from the legislative history demonstrates that the final bill was the product of a compromise between the Senate, which had lodged authority with EPA, and the House, which insisted upon the primacy of the Corps when dealing with dredged material.  The record expressly states that EPA's 404(c) veto authority will be exercised prior to the issuance of a permit, and it also reflects the Conferees' understanding that EPA's responsibilities were to be limited to those specifically assigned.  As another court in this district has noted:

> [W]hile it is true that the EPA does have some role to play in the Section 404 permitting process, the carving out of limited circumstances for EPA involvement in the issuance of Section 404 permits appears to be a statutory ceiling on that involvement. . . .  The statute is not ambiguous, as it establishes the Corps as the principal player in the permitting process, and then specifies certain roles for the EPA to play in that process.  Thus, if a responsibility involving the permitting process has not been delegated to the EPA by Congress, that function is vested in the Corps as the permitting authority.

*Nat'l Mining Ass'n v. Jackson*, -- F. Supp. 2d --, 2011 WL 4600718, at *5 (D.D.C. Oct. 6, 2011).

> Senator Muskie's transmittal of the Conference Committee report goes on:

> The Conferees were uniquely aware of the process by which the dredge and fill permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed.[10] At the same time, the Committee did not believe there could be any justification for permitting the Secretary of the Army to make determinations as to the environmental implications of either the site to be selected or the specific spoil to be disposed of in a site.  Thus, the Conferees agreed that the Administrator . . . should have a veto over the selection of the site for dredged spoil disposal and over any specific spoil to be disposed of in any selected site.

> The decision is not duplicative or cumbersome because the permit application transmitted to the Administrator for review will set forth both the site

---

10      This excerpt supports Mingo Logan's interpretation that the term "withdrawal" in Section 404(c) refers to specifications of discharge sites that were in place prior to Congress's adoption of the section 404 permitting scheme because it shows that Congress was aware that there was already a permitting system for disposing of material discharges in place.  *See supra* note 6.

to be used and the content of the matter of the spoil to be disposed. The Conferees expect the Administrator to be expeditious in his determination as to whether a site is acceptable or if specific spoil material can be disposed of at such site.

*Senate Consideration*, at 177.

So, while EPA is correct that Congress expected it to fulfill its unique role as the steward of the environment when carrying out its functions under section 404, it is also clear from the forward looking language in the legislative history that Congress anticipated that EPA would act before a permit was issued, and indeed, that it would not unnecessarily slow down the process while doing so. In sum, the Court finds nothing in the legislative history of the amendments that would show an intent by Congress to confer permit revocation authority on the Administrator of EPA, and EPA's assumption of that authority runs counter to what Congress did express about how the regulatory scheme would be administered.

> d. The case law cited by EPA is not controlling or persuasive.

Finally, EPA asserts that three courts have already concluded that section 404(c) authorizes it to withdraw a specification after the Corps issues a section 404 permit. *See* Def.'s MSJ Mem. at 14–16, citing *City of Alma v. United States*, 744 F. Supp. 1546 (S.D. Ga. 1990); *Russo Devel. Corp. v. Reilly*, No. 87-3916, 1990 U.S. Dist. LEXIS 15859 (D.N.J. Mar. 16, 1990); *Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953 (S.D. Ind. 2000). But those decisions are not binding on this Court, and, more importantly, their statements about EPA's post-permit authority were simply dicta. Those courts were not presented with the question that is before this Court, and they did not purport to address it.

In *City of Alma*, a permit had been issued for the disposal of fill material from the proposed construction of an artificial lake, and EPA subsequently invoked its section 404(c) authority to prohibit the specification of the site. Plaintiffs argued that EPA had violated its own

regulations for the exercise of 404(c) authority, pointing to policy statements contained in the preamble to those regulations.  In particular, the plaintiffs complained that EPA was constrained by statements of its policy to not interpose objections after it had previously acceded to the designation of the site and a permit had already been issued.  744 F. Supp. at 1558–59.  But, as the court pointed out, another court had invalided the permit in the meantime, and EPA's action was in response to the Corps' specification of the site for a *new* permit.  *Id.* at 1559.  The court did observe that EPA's regulations claimed the authority to withdraw a specification even after a permit had been issued, *id.* at 1559–60, but the agency's power to do so in general was not contested by the parties, and the court's statement in dicta was made without the benefit of the full analysis that *Chevron* requires.  *Id.*  Since at bottom, the case involved a section 404(c) challenge to a specification at a time when there was no valid, operative permit, it does not govern here.

Similarly, the *Hoosier* and *Russo* courts' statements regarding EPA's power to withdraw a specification after a permit is issued were mere dicta, and not based on a thorough analysis of the authority delegated by Congress in the CWA.  In *Russo*, the Court was presented with the question whether EPA could veto a specification when a landowner had already converted the land in question into a disposal site.  1990 U.S. Dist. LEXIS 15859, at *3.  Although the court read section 404(c) as granting EPA the authority to withdraw a specification after the Corps has issued a permit, the Corps had not yet issued a section 404 permit in the case before it.  Rather, EPA was seeking to withdraw the specification *before* the section 404(b) was actually issued.

The *Hoosier* court was also presented with a different question than the one before this Court:  it considered whether an environmental assessment conducted by the Army Corps had failed to address certain indirect effects of a development project, rendering it legally deficient.

105 F. Supp. 2d at 971.  In rejecting that argument, the court found inapposite a letter from the EPA, dated two months after a section 404 permit had been issued, which raised the Corps' failure to examine indirect effects.  *Id.*  The court determined that EPA wrote the letter under the false impression that the permit had not yet been issued, and so the court found it "difficult to read the EPA's letter as condemning the [Corps'] review as 'legally deficient,' especially when the EPA took no subsequent action to overrule or otherwise challenge the [Corps'] decision," such as exercising its section 404(c) veto authority.  *Id.*  Again, while it may have assumed the existence of such a power, the court did not squarely consider whether EPA actually would have had the authority to exercise its 404(c) authority after a permit had been issued because that was not the situation before it.

For all of the reasons set forth above, the Court is of the view that EPA's position is inconsistent with the statute as a whole, and that its action could be deemed to be unlawful at the first step of the *Chevron* analysis.  But the Court acknowledges that there is some language in section 404(c) itself that could be considered to be sufficiently ambiguous to require the Court to go on to the second step, and therefore, it will review EPA's interpretation under that standard as well.

**B.  EPA's interpretation of the statute is not reasonable and does not survive scrutiny under *Chevron* step two.**

a.  The level of deference to be accorded when a statute is jointly administered by two agencies.

Under *Chevron* step two, an agency's interpretation of a statute that it administers is generally entitled to substantial deference, such that the court should uphold it as long as it is "reasonable."  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998).  But when more than one agency is tasked with administering the statute, the determination of how much

deference the court owes any one of those agencies is not so straightforward.  In *Collins v. National Transp. Safety Board*, 351 F.3d 1246 (D.C. Cir. 2003), the D.C. Circuit set out three different types of shared enforcement schemes:

- For generic statutes like the APA, FOIA, and FACA, the broadly sprawling applicability undermines any basis for deference, and courts must therefore review interpretative questions de novo;

- For statutes like the FDIA, where the agencies have specialized enforcement responsibilities but their authority potentially overlaps – thus creating risks of inconsistency or uncertainty – de novo review may also be necessary;

- For statutes where expert enforcement agencies have mutually exclusive authority over separate sets of regulated persons, the above concerns do not work against application of *Chevron* deference.

*Id.* at 1253.  In *Collins*, the Court found that the Coast Guard's interpretation of a maritime safety treaty called COLREGS – which was enforced by the Coast Guard against pilots operating U.S.-flagged vessels, the Navy against Naval officers, and various state maritime commissions against pilots of foreign-flagged vessels – was entitled to some deference, but that interpretive uniformity across the agencies was also important.  *Id.*

EPA directs the Court to *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 122–23 (D.D.C. 2010), in which another court in this district explained that there is "some support" for the argument that the exception to *Chevron* deference that arises where multiple agencies are charged with administering a statute would not apply "where the text has carved out an area more clearly the domain of one agency over another."  *Id.*; *see* Def.'s MSJ Mem. at 30. The agency argues that section 404(c) is an area more clearly the domain of EPA than the Corps because it authorizes only EPA to act.  But section 404(c) involves both EPA and the Corps, as it calls for consultation between the two agencies.  Moreover, the *Chevron* step one analysis that the Court must engage in involves the interpretation of the entire statute, not just section 404(c), and the administration of section 404 as a whole is plainly entrusted to both agencies.  The Corps

is assigned the authority to issue permits under 404(a); the Corps specifies the disposal sites under 404(b), but it must utilize jointly developed guidelines; and the EPA can veto a specification under 404(c), but only after consultation with the Corps.  Thus, this regulatory regime seems to fit squarely into the second *Collins* category.[11]  *Collins*, 351 F.3d at 1252.

Accordingly, the Court could conclude that de novo review is called for and that EPA is entitled to no deference at all.  *See Salleh v. Christopher*, 85 F.3d 689, 691 (D.C. Cir. 1996) (no deference to the Secretary of State's interpretation of the Foreign Service Act where one provision grants the Secretary the power to discharge employees and another gives the Grievance Board the authority to hear and decide grounds for discharge); *see also Grant Thornton, LLP v. Office of Comptroller of the Currency*, 514 F.3d 1328, 1331 (D.C. Cir. 2008) (OCC's interpretation of FIRREA is reviewed de novo because multiple agencies administer the act).  But instead, the Court will follow *Collins*, which accorded some level of deference to the Coast Guard's interpretation because of its expertise in regulating maritime safety – the matter at issue.  *Collins*, 351 F.3d at 1253–54.  The *Collins* court found that "even if *Chevron* deference is not called for," the Coast Guard was entitled to *Skidmore* deference, which the court defined as "obviously less than *Chevron*," but a "non-trivial boost."  *Id.* at 1253-54.  Yet, even according EPA this level of deference, the Court finds EPA's interpretation to be unreasonable.

---

11      Counsel for the government insists that there is no disagreement between EPA and the Corps about the scope of EPA's authority, but it is notable that before EPA undertook the challenged effort under section 404(c), it followed the Corps' procedures, asked the Corps to modify the permit, and was turned down.  *See* AR 12754–56 (request by EPA), 12,781–84 (Corps denial of EPA's request).  EPA's decision to then move to withdraw the specification has the air of a disappointed player's threat to take his ball and go home when he didn't get to pitch.  Because EPA's interpretation of the statute is grounded in its difference of opinion with another agency charged with implementing the statute, and it is the other agency that has been accorded the sole statutory authority to issue and enforce  permits, *see* 33 U.S.C. § 1344(a) and (s), and that has the sole authority to revoke or modify a permit, *see* 33 C.F.R. § 325.7, the situation seems to fall well within in the category of cases where the agency's interpretation should not be entitled to *Chevron* deference.

b.  <u>What is the interpretation that EPA is advancing, to which some deference is due?</u>

In 1979, EPA promulgated regulations establishing the procedures it would follow when invoking section 404(c) to prevent the discharge of material at particular sites. In its introduction to those regulations, the agency asserted: "[S]ection 404(c) authority may be exercised before a permit is applied for, while an application is pending, or after a permit has been issued."  44 Fed. Reg. 58,076, 58076 (Oct. 9, 1979), codified at 40 C.F.R. pt. 231.[12]  But in the same preamble to the published regulations, EPA also assured worried commenters:  "EPA agrees with the suggestion that it would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit processing, or where the matters at issue were resolved to EPA's satisfaction during the permit proceeding, unless substantial new information is first brought to the Agency's attention after issuance."  *Id.*

---

[12]     Interestingly, although the summary in the Federal Register emphatically sets out EPA's position that it "clearly" has the authority to withdraw a specification after a permit had been issued, *see* 44 Fed. Reg. at 58077 ("The statute on its face clearly allows EPA to act after the Corps has issued a permit; it refers twice to the 'withdrawal of specification' which clearly refers to action by EPA after the Corps has specified a site [*e.g.* issued a permit or authorized its own work.]"), there is only one regulation that explicitly refers to the time period after a permit has been issued:  the emergency procedure provision.  *See* 40 C.F.R §231.7.  This regulation makes no mention of section 404(c), but it permits the agency to ask the Corps to suspend the permit or to invoke its emergency powers under section 504 when a discharge presents an imminent danger of irreparable harm.  *Id.*  The rest of the provisions simply talk about the prohibition, restriction, or withdrawal of a specification in general, and they do not explain how that could be accomplished in the time period after a permit has been issued any more than the statute does. *See* 40 C.F.R. §231.1 *et. seq.*  Even EPA's own definition of "withdraw specification" does not make any explicit reference to permits.  *See* 40 C.F.R. § 231.2(a) ("Withdraw specification means to remove from designation any area already specified as a disposal site by the U.S. Army Corps of Engineers or by a state which has assumed the section 404 program, or any portion of such area.").

at 58077.[13]   And in the course of the ensuing thirty-plus years, the agency has never before invoked its 404(c) powers to review a permit that had been previously duly issued by the Corps. AR 11907.[14]

So, in order to determine whether EPA's interpretation of the statutory provision is reasonable for *Chevron* II purposes, the Court finds it necessary to clarify what that interpretation might be.  At the hearing, the Court inquired whether it was the agency's position that it had the authority under the statute to veto a specification at any time, or whether it was simply advancing the position that it had the authority to do so when significant new information, which was not available to the agency when the permit application was reviewed, alters the environmental calculus.  The Court posed this question several times, and EPA made it clear that the preamble to the regulations was simply a policy statement, and that the agency expected the Court to accord deference to a broad interpretation of agency authority:

---

[13]   This was the provision relied upon by the plaintiff in *City of Alma*, 744 F. Supp. at 1559. EPA went to some length in the preamble to allay commenters' objections to a post-permit veto. It explained:  "[O]ne can anticipate that there will be circumstances where it may be necessary to act after issuance in order to carry out EPA's responsibilities under the Clean Water Act.  For example, new information may come to EPA's attention; there may be new scientific discoveries; or in very rare instances, EPA may not receive actual notice of the Corps' intent to issue a permit in advance of issuance.  While these are the most likely occasions necessitating 404(c) action after issuance, EPA does not wish to unwittingly restrict action in other appropriate circumstances."  *Id.*

[14]   EPA cites the Final Determination of the Administrator Concerning the North Miami Landfill Site for the proposition that its interpretation has "been used to support EPA's exercise of its Section 404(c) authority to withdraw a specification in a Section 404 permit," Def.'s MSJ Mem. at 29, but that determination was actually in response to an application to modify the section 404 permit in question, and the site that EPA "withdrew" was both specified in the existing permit and also proposed to be specified in the new modified permit, *see* EPA, Final Determination of the EPA's Administrator Concerning the North Miami Landfill Site Pursuant to Section 404(c) of the Clean Water Act (1981), *summarized in* 46 Fed. Reg. 10,203, 10, 203–04 (Feb. 2, 1981); *see also* Def.'s MSJ Reply at 27 n.21; Brief of *Amici Curiae* The Chamber of Commerce of the United States *et al.* [Dkt. # 50] at 6 n.4.  EPA does not point to any other instances where it has invoked its section 404(c) authority to withdraw a specification in a duly issued section 404 permit.

THE COURT: . . . I want to know, is the preamble part of the interpretation of the statute that you are asking me to deem reasonable or isn't it? Are you saying that you have unlimited authority to withdraw post permit or are you saying that your interpretation of the statute is that you have the authority to withdraw post permit based on new information? What is your position?

COUNSEL FOR EPA: I'll answer as clearly as I can. I think the statute and regs do not provide that limitation.

Tr. at 67; *see also* Tr. at 56 – 58; 67 – 68; and 74, Nov. 30, 2011.  Therefore, the Court must decide whether EPA's reading of the statute to permit post permit revocation without limitation is reasonable.[15]

c.  EPA's interpretation of section 404(c) is not reasonable, even if it receives some deference.

Since EPA is one of two agencies entrusted with the implementation of the Clean Water Act, and there are aspects of the regulatory regime committed solely to its expert discretion, the Court has concluded that EPA's interpretation of the statute is entitled to some, non-trivial quantum of respect, although it need not receive full *Chevron* II deference.  But even if the Court accords the agency some deference, it finds EPA's position to be unreasonable.[16]

---

[15]    EPA asked the Court to go on and find its revocation reasonable *in this case* because it was based on new scientific information (which plaintiff disputes), *see* United States' Post-Hearing Brief [Dkt. # 79]; Pl.'s Opp. to Def.'s Post-Hearing Brief [Dkt. # 82], but to do so would turn the inquiry on its head.  The Court does not get to consider whether the agency's exercise of a power was arbitrary and capricious under the APA if under *Chevron*, the agency did not have the power to act in the first place.  And any review of the reasonableness of EPA's action in this case would have to take into account the fact that EPA participated fully in the ten year, exhaustive process that preceded the issuance of the permit here in which EPA ultimately stated that it did not intend to exercise its 404(c) authority.  The permit was issued, and nothing had even been discharged into the streams when EPA claimed that the new studies supported a finding that the downstream water quality consequences – which plaintiff and amicus West Virginia argue EPA could not even consider under the statute – would be unacceptable.

[16]    The Court notes that the question of statutory interpretation at issue is not one that is informed by the agency's particular area of expertise in any event.

First and foremost, EPA's interpretation fails because it is illogical and impractical.  EPA claims that it is not revoking a permit – something it does not have the authority to do – because it is only withdrawing a specification.  Yet EPA simultaneously insists that its withdrawal of the specification effectively nullifies the permit.  To explain how this would be accomplished in the absence of any statutory provision or even any regulation that details the effect that EPA's belated action would have on an existing permit, EPA resorts to magical thinking.  It posits a scenario involving the automatic self-destruction of a written permit issued by an entirely separate federal agency after years of study and consideration.  Poof!  Not only is this non-revocation revocation logistically complicated, but the possibility that it could happen would leave permittees in the untenable position of being unable to rely upon the sole statutory touchstone for measuring their Clean Water Act compliance:  the permit.

It is further unreasonable to sow a lack of certainty into a system that was expressly intended to provide finality.  Indeed, this concern prompted a number of amici to take up their pens and submit briefs to the Court.  They argued that eliminating finality from the permitting process would have a significant economic impact on the construction industry, the mining industry, and other "aggregate operators," because lenders and investors would be less willing to extend credit and capital if every construction project involving waterways could be subject to an open-ended risk of cancellation.  *See* Brief of *Amicus Curiae* The National Stone, Sand and Gravel Association in Supp. of Pl. Mingo Logan Coal Co., Inc. [Dkt. # 51] at 5–13; Brief of *Amici Curiae* the Chamber of Commerce of the United States *et al.* in Support of Pl. [Dkt. # 50] at 7–14.  EPA brushed these objections away by characterizing them as hyperbole, Tr. at 66, but even if the gloomy prophesies are somewhat overstated, the concerns the amici raise supply additional grounds for a finding EPA's interpretation to be unreasonable.

After all, EPA itself has given voice to the importance of finality, and it has acknowledged that the statute vests final authority in the Corps.  The Memorandum of Agreement between EPA and the Department of the Army ("MOA"), *available at* http://water.epa.gov/lawsregs/guidance/wetlands/dispmoa.cfm, that was developed pursuant to section 404(q), begins with a definitive declaration:  "The Army Corps of Engineers is solely responsible for making final permit decisions pursuant to Section 10, Section 404(a), and Section 102, including final determinations of compliance with the Corps permit regulations [and] the Section 404(b)(1) Guidelines . . . ."  If there is any set of rules that should be subject to deference it would be those embodied in the MOA:  Congress specifically directed the two agencies to work together to devise procedures that would implement section 404 and minimize unnecessary delay, and the MOA was the result.  The fact that this document says absolutely nothing about a post-permit veto by EPA, and that it references Army regulations that specifically allow EPA to petition the Corps to rescind or modify a permit, but are themselves silent about the possibility of post-permit veto by EPA, *see* 33 C.F.R. pts. 320–330, is another factor leading the Court to conclude that EPA's position is unreasonable.

Furthermore, that portion of the MOA that does address EPA's exercise of its 404(c) veto authority expressly contemplates that the agency would act before the Corps issues a permit:

> The EPA reserves the right to proceed with Section 404(c).  To assist the EPA in reaching a decision whether to exercise its Section 404(c) authority, the District Engineer will provide EPA a copy of the Statement of Findings/Record of Decision prepared in support of a permit decision after the ASA (CW) review.  The permit shall not be issued during a period of 10 calendar days after such notice unless it contains a condition that no activity may take place pursuant to the permit until such 10th day, or if the EPA has initiated a Section 404(c) proceeding during such 10 day period, until the Section 404(c) proceedings is concluded and subject to the final determination in such proceeding.

MOA § IV(3)(h).

EPA pointed the court to its own regulations, then, instead of the MOA.  The regulations do not explicitly address the post-permit issue, but they were published with a preamble that states that the agency has the power to withdraw a specification before, during, or after the permit process.  44 Fed. Reg. at 58076.  EPA argued that the Court should find that interpretation to be reasonable because, after all, the regulations were the result of the notice and comment process.  Tr. at 54.  But that argument was not persuasive because EPA insisted at the same time that other statements in the preamble – in particular, those responding to commenters' concerns about the legality and fairness of a post-permit veto – were simply policy guidelines that did not tie its hands.  Why would the fact that the interpretation survived notice and comment be meaningful if the agency's specific response to those comments is not considered to be part of the interpretation?

Based upon all of the facts and circumstances set forth above, the Court cannot find that EPA's interpretation of section 404(c), extending its veto authority indefinitely after a permit has been issued, is reasonable.

**CONCLUSION**

Because the Court finds that EPA exceeded its authority under section 404(c) of the

Clean Water Act by issuing its Final Determination on January 13, 2010, purporting to modify

Mingo Logan's section 404 permit by revoking the permit's authorization to discharge fill into

Pigeonroost Branch and Oldhouse Branch and their tributaries, the Court will grant plaintiff's

motion for summary judgment [Dkt. # 26] and deny defendant's cross-motion [Dkt. # 46].  A

separate Order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 23, 2012