# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ————————————————— )  |  |  |
| MINGO LOGAN COAL COMPANY INC., | ) ) | |
|  | ) | |
| Plaintiff, | ) ) | |
|  | ) | |
| v. | ) | Civil Action No. 10-0541 (ABJ) |
|  | ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, | ) ) | |
|  | ) | |
| Defendant. | ) | |
| ————————————————— ) | | |

## MEMORANDUM OPINION

In 2010, plaintiff Mingo Logan Coal Company, Inc. filed this lawsuit, challenging the Environmental Protection Agency's ("EPA") decision to withdraw its specification of two locations designated in Mingo Logan's Clean Water Act permit as disposal sites for the fill material generated by the operation of the Spruce No. 1 Mine in West Virginia. *See* Am. Compl. [Dkt. # 16]. Mingo Logan claimed that EPA exceeded its statutory authority under section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(c) (2012), because it rescinded the specification of the disposal sites after the section 404 permit had already been issued by the Army Corps of Engineers ("the Corps") (Count I). It also alleged that EPA's decision to veto the specifications was arbitrary and capricious and therefore in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq*. (2012) (Counts II–XIV).[1] Am. Compl. ¶¶ 225–343.

---

1      Mingo Logan did not address the merits of count IV in its motion for summary judgment, and it informed the Court at the motions hearing that it does not plan to pursue that count. Mot. Hr'g Tr. ("July 30 Hr'g Tr.") at 50 (July 30, 2014).

On March 23, 2013, the Court granted summary judgment in favor of Mingo Logan, finding that EPA did not have the authority under section 404(c) to act after a permit had been issued, and that under the CWA, only the Corps had the power to revoke or modify a valid permit. *Mingo Logan Coal Co. v. EPA*, 850 F. Supp. 2d 133 (D.D.C. 2012). EPA appealed, and the D.C. Circuit held that EPA did have the authority to rescind a specification even after the permit to discharge was in hand. *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 1540 (2014). The Court of Appeals then remanded the case for consideration of Mingo Logan's remaining APA counts, *id.* at 616, and the parties' cross-motions for summary judgment on those issues are now ripe for determination. Pl.'s Mot. for Summ. J. [Dkt. # 26]; Pl.'s Statement of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [Dkt. # 26]; Def.'s Mot. for Summ. J. [Dkt. # 46]; Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. & in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 46].

Because the Court finds that the decision set forth and explained in the *Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia* ("Final Determination"), AR010103–201, was reasonable, supported by the record, and based on considerations within the agency's purview, it will grant EPA's motion for summary judgment and deny Mingo Logan's motion for summary judgment.

## BACKGROUND

### I. Statutory Background

The Clean Water Act ("CWA"), is the primary federal statute that seeks to regulate water pollution. 33 U.S.C. § 1251 *et seq.* It provides for the creation and enforcement of water quality standards and establishes an extensive permit and licensing scheme to regulate the discharge of pollutants into the nation's waterways. *Id.* § 1251(a)–(b). Most pertinent to this case are

sections 401, 402, and 404, which together govern the issuance of permits for the discharge of pollutants.

## A. Section 401.

Under section 401 of the CWA, a permit applicant that seeks to "conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters," must "provide the . . . permitting agency a certification from the [s]tate in which the discharge originates or will originate" that certifies that the discharge under the applied-for permit is consistent with the state's water quality standards. *Id.* § 1341(a). States may either issue the certification, or they may waive the requirement by failing or refusing to act within a reasonable period of time after receipt of a request. *Id.* Section 303 of the CWA gives the states the authority to establish the water quality standards on which they base the section 401 certifications. *Id.* § 1313(c).

## B. Section 402.

Section 402 authorizes the Administrator of EPA ("Administrator") to issue a permit for the discharge of any pollutant, except for the dredged and fill material covered by section 404. *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 266 (2009), quoting 33 U.S.C. § 1342(a). It also provides that if a state seeks to "administer its own permit program for discharges into navigable waters within its jurisdiction," the state "may submit to the Administrator a full and complete description of the program it proposes to establish and administer under [s]tate law." 33 U.S.C. § 1342(b). If the Administrator approves the proposed program, the state assumes the responsibility for issuing section 402 permits that comply with the CWA. *Id.* § 1342(c)(1). West Virginia applied for and was approved to administer the section 402 permit regime within its territory. *See* 47 Fed. Reg. 22,363 (May 24, 1982).

A state administering its own section 402 permit program must send the Administrator "a copy of each permit application received . . . and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such [s]tate." 33 U.S.C. § 1342(d)(1). The Administrator then has ninety days to object to permits that do not meet CWA standards, and if that occurs, the state must submit a revised permit within thirty days. *Id.* § 1342(d)(2), (d)(4). If EPA's objections are not resolved, the Administrator assumes responsibility of the permitting process. *Id.* § 1342(d)(4). Once a section 402 permit has been issued, it may only be modified by the entity that issued the permit. 40 C.F.R. §§ 122.2, 122.62, 124.5(c). West Virginia issued Mingo Logan's section 402 permit in this case.

## C. Section 404.

Section 404 of the CWA deals specifically with the discharge of dredged or fill material, and under that section, it is the Army Corps of Engineers ("Corps") that is authorized to issue permits for the discharge of that material. 33 U.S.C. § 1344(a) ("The Secretary [of the Army] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.").

But Congress assigned EPA a significant role to play in the section 404 permitting process as well. First, while a "disposal site shall be specified for each such permit" by the Corps, *id.* § 1344(b), that decision must be made after assessing the environmental consequences by applying the guidelines developed by EPA in conjunction with the Corps pursuant to section 404(b)(1) ("section 404(b)(1) Guidelines"). *Id.*; *see also Coeur Alaska*, 557 U.S. at 269. Those guidelines are published at 40 C.F.R. § 230.1 *et seq.*, and they are based upon the criteria for

determining the degradation of waters set forth in section 403(c) of the CWA.[2]  *See* 33 U.S.C. § 1343(c).

After the Corps conducts its analysis under the section 404(b)(1) Guidelines, it publishes its written determination of the anticipated "effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11.  Depending on the comments received and whether additional study is deemed to be necessary, the Corps may publish a series of these determinations.  Ultimately, the decision to issue or deny a section 404 permit rests with the Corps, *see* 33 U.S.C. § 1344(a); it is only the Corps that exercises the authority to modify or revoke a permit, *see id.* § 1344(e)(2); and compliance with a section 404 permit is deemed to be compliance with the CWA.  *Id.* § 1344(p).

But the statute also assigns EPA a second role that gives rise to this case.  Section 404(c) grants EPA the authority to "veto" a decision made by the Corps to specify a particular disposal

---

2       Section 1343(c)(1) provides:

> The Administrator shall . . .  promulgate guidelines for determining the degradation of the waters of the territorial seas, the contiguous zone, and the oceans, which shall include:  (A) the effect of disposal of pollutants on human health or welfare, including but not limited to plankton, fish, shellfish, wildlife, shorelines, and beaches; (B) the effect of disposal of pollutants on marine life including the transfer, concentration, and dispersal of pollutants or their byproducts through biological, physical, and chemical processes; changes in marine ecosystem diversity, productivity, and stability; and species and community population changes; (C) the effect of disposal, of pollutants on esthetic, recreation, and economic values; (D) the persistence and permanence of the effects of disposal of pollutants; (E) the effect of the disposal at varying rates, of particular volumes and concentrations of pollutants; (F) other possible locations and methods of disposal or recycling of pollutants including land-based alternatives; and (G) the effect on alternate uses of the oceans, such as mineral exploitation and scientific study.

33 U.S.C. § 1343(c)(1).

site in a permit. *Id.* § 1344(c); *see also* 40 C.F.R. § 1504.1(b). Specifically, section 404(c) provides that:

> The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and . . . deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

33 U.S.C. § 1344(c). Accordingly, "whenever [the Administrator] determines that the discharge of [dredged and/or fill] materials . . . will have an unacceptable adverse effect," the Administrator must take the following steps to exercise its veto authority:

> (1) The Regional Administrator publishes a "proposed determination[] to prohibit or withdraw the specification of a defined area as a disposal site, or to deny, restrict or withdraw the use of any defined area for the discharge of any particular dredged or fill material;"

> (2) The Regional Administrator issues "recommendation to the Administrator for determination as the specification of a defined area as a disposal site;" and

> (3) The Administrator publishes its "final determination to affirm, modify or rescind the recommended determination after consultation with the Chief of Engineers or with the [s]tate."

40 C.F.R. § 231.1(a)–(b).

This veto authority may be exercised before or after the Corps issues a permit. *Mingo Logan*, 714 F.3d at 616. EPA's regulations outline the procedures to be followed for the publication of a proposed determination, a comment period, and an opportunity for public hearings. *See* 40 C.F.R. §§ 231.3–231.6. The Administrator then makes the final decision regarding the specification, and the decision is published in the Federal Register. *Id.* § 231.6. The Final Determination constitutes final agency action for purposes of judicial review. *Id.*

## II.    Factual Background[3]

Plaintiff Mingo Logan "operates a coal mine in West Virginia known as the Spruce No. 1 Mine." Am. Compl. ¶ 1. The Spruce No. 1 Mine is "among the largest individual surface mines ever authorized in West Virginia," and if "fully constructed, the project [would] disturb approximately 2,278 acres (about 3.5 square miles) and bury approximately 7.48 miles of streams beneath 110 million cubic yards of excess spoil."[4] AR010108.

In order to operate the Spruce No. 1 Mine, Mingo Logan was required to obtain several permits.[5] Mingo Logan's predecessor[6] initiated the application process in 1998. Ultimately, the company obtained a CWA section 402 permit from West Virginia, which allowed the discharge of water from several sediment ponds through outfalls into streams around the mining project. AR008062, 043101. EPA initially opposed West Virginia's decision to issue the section 402 permit, but it withdrew its objections after Mingo Logan agreed to certain conditions, including

---

3       The facts were previously set forth in the Court's March 23, 2012 Memorandum Opinion and are incorporated by reference. *See Mingo Logan*, 850 F. Supp. 2d at 134–38.

4       The process of mountaintop mining, which involves the removal of the top of a mountain to recover coal within it, produces excess rock, topsoil, and debris ("spoil"). AR010118. Because of structural concerns and the fact that the spoil expands in size – a concept referred to as "swell" – all of the spoil cannot be placed back into the mine or on top of the mountain. *Id.* Instead, it is typically placed in valleys that are adjacent to the mine, which creates what are known as "valley fills." *Id.*

5       Mingo Logan also obtained a Surface Mining Control and Reclamation Act ("SMRCA"), 30 U.S.C. § 1201 *et seq.* (2012), permit from West Virginia. That permit allowed Mingo Logan to discharge spoil into the Seng Camp Creek, the Pigeonroost Branch, and the White Oak Branch of Spruce Fork. AR008277.021.

6       Mingo Logan's predecessor, Hobet Mining, Inc., obtained the SCMRA permit and then Mingo Logan took over operations. Because prior ownership does not influence the outcome of this action, the Court will refer to Mingo Logan and prior owners of the Spruce No. 1 Mine as "Mingo Logan." *See* Pl.'s Mot. at 4 n.2.

mitigation compensation for any effects caused by the sediment pond discharges. AR008414–17.

Mingo Logan also submitted an application to the Corps to obtain a CWA section 404 permit to discharge dredged or fill material into the Right Fork of Seng Camp Creek as well as the Pigeonroost Branch, Oldhouse Branch, and White Oak Branch streams.[7] AR003052–70. The application was subject to review by the appropriate agencies for approximately ten years, and the following events took place during that period:

- In 2002, the Corps issued a draft Environmental Impact Statement ("EIS"), evaluating the Spruce No. 1 Mine project and the requested section 404 permit. AR010120.

- In 2002, EPA sent a letter to the Corps in response to the draft EIS. *Id.*; *see also* AR019485–90. EPA noted that its review of the EIS "found gaps in the analyses of the mine and related adverse environmental impacts," and it "recommended additional evaluation to support the analysis of less environmentally damaging alternatives." AR010120; *see also* AR019489. More specifically, EPA noted that it "was particularly concerned by the lack of information regarding the nature and extent of impacts to the high quality streams that would be buried under valley fills." AR010120; *see also* AR019489.

- In 2005, Mingo Logan took over operations of the Spruce No. 1 Mine, and it applied for and obtained a section 401 certification from West Virginia. AR020924–28. West Virginia granted the certification – subject to Mingo Logan's compliance with a mitigation agreement – after it concluded that Mingo Logan's proposed discharge of dredged or fill material complied with its water quality standards. *Id.*

- In 2006, the Corps issued a revised draft EIS for public comment, and EPA once again expressed its concerns about the impacts of the project in a comment letter. AR012991–013388; *see also* AR008312–29. Specifically, EPA expressed the following concerns: (1) the "potential adverse impacts to water quality (specifically, the potential to discharge selenium and the known association of similar mining operations with degradation of downstream aquatic communities);" (2) "uncertainties regarding the proposed mitigation;" (3) "the need for additional analysis of potential environmental justice issues;" and (4) "the lack of a study related to the cumulative effects of multiple mining operations within the Little Coal River watershed." AR010120–21; *see also* AR008312–29.

---

[7] Hobet Mining originally applied for a nationwide permit in 1998, which the Corps tendered and then withdrew. AR010120. Hobet Mining then notified the Corps that it planned to apply for an individual section 404 permit. *Id.*

- On September 22, 2006, the Corps issued a final EIS, and EPA again submitted a comment letter that expressed concerns about the adverse impacts and gaps in Mingo Logan's mitigation plan, noting that many of EPA's concerns had not been adequately addressed. AR010121; *see also* AR034962–035342, 083330–34.

- In December 2006, representatives from the Corps and EPA continued to communicate and work together concerning the Spruce No. 1 Mine project. AR023084–109, 023657–62, 024424, 024619–25, 024637–43.

- On January 22, 2007 – after over ten years of study – the Corps issued Mingo Logan a section 404 permit, despite EPA's lingering concerns. AR025763–77.

Almost immediately after the section 404 permit issued, "a number of environmental groups, represented by Ohio Valley Environmental Coalition, filed a complaint against the Corps . . . challenging its decision to issue the permit." AR010121. Mingo Logan reached an agreement with the environmental groups who were the plaintiffs in that litigation, and in early 2007, it commenced limited operations at Spruce No. 1 Mine despite the ongoing litigation. *Id.*

Then, on September 3, 2009, approximately two and half years after the Corps issued Mingo Logan a section 404 permit, EPA asked the Corps to use its discretion under 33 C.F.R. § 325.7 to suspend, revoke, or modify Mingo Logan's section 404 permit. AR010123; *see also* AR012754–58. In its letter, EPA asserted that recent data and analyses had revealed downstream water quality impacts that were not adequately addressed by the permit. AR012754–58; *see also* AR010123.

The Corps rejected EPA's request. AR012781–88.

In response, the Regional Administrator of EPA Region III proposed to invoke the agency's authority under section 404(c), and on April 2, 2010, EPA published a Proposed Determination to withdraw the specification of Oldhouse Branch and Pigeonroost Branch as disposal sites in Mingo Logan's section 404 permit. AR010111; *see also* AR000004–8. EPA held a public hearing, and it received more than 100 oral comments and more than 50,000

written comments, both in support of and in opposition to the Proposed Determination. AR010111; *see also* AR000004–8. On September 24, 2010, EPA Region III published a Recommended Determination to withdraw the specification of Pigeonroost Branch and Oldhouse Branch. AR010111; *see also* AR009888–970.

Pursuant to its regulations and after receipt of the Proposed Determination, EPA Headquarters gave all interested parties – including Mingo Logan and the owners of the mineral rights linked to the Spruce No. 1 Mine – an opportunity to present any corrective actions that might be taken to avoid the need for revocation of the specification of the disposal sites. AR010124–25. After reviewing the responses, *see* AR010125–27, EPA determined that it was necessary to exercise its veto authority under CWA section 404(c), and on January 13, 2011, it issued its Final Determination purporting to "withdraw the specification of Pigeonroost Branch, Oldhouse Branch and their tributaries . . . as a disposal site for dredged or fill material in connection with construction of the Spruce No. 1 Surface Mine."[8] AR010103–201.

In the Final Determination, EPA provided two alternative bases on which it rested its decision to revoke the specified disposal sites: (1) the direct impacts that the fill would have on wildlife within the footprint of the fill, as discussed in section V.C.; and (2) the impacts on wildlife downstream from the footprint of the fill and sediment ponds, as described in section V.D. AR010148–75.

---

[8]     The Final Determination also prohibited future section 404 permits from specifying either Pigeonroost Branch or Oldhouse Branch or their tributaries as disposal sites. AR010108.

### III.    Procedural Background

Mingo Logan filed this case in response to EPA's Final Determination.[9]  *See* Am. Compl. In the fourteen-count amended complaint, Mingo Logan alleged:  (1) that EPA lacked statutory authority under section 404(c) to withdraw a site specification after the Corps issued a permit (Count I); and (2) that the Final Determination was arbitrary, capricious, or otherwise not in accordance with the law in violation of the APA (Counts II–XIV).  *Id.* ¶¶ 220–343.

On March 23, 2012, this Court granted Mingo Logan's motion for summary judgment on Count I and denied EPA's cross-motion for summary judgment, holding that EPA did not have statutory authority to withdraw a site specification once the Corps issued a permit.  *See Mingo Logan*, 850 F. Supp. 2d at 134.  On appeal, the D.C. Circuit held that EPA may exercise its section 404(c) veto authority after a permit has issued, and it remanded the case for consideration of Mingo Logan's remaining counts.  *See Mingo Logan*, 714 F.3d at 616.

### STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in cases involving review of agency action under the APA, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record.  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).  Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the

---

9       The withdrawal of the specification also prohibits the discharge of dredged or fill material into the tributaries of Pigeonroost Branch and Oldhouse Branch.  *See* AR010108.  For ease of reference, however, the Court will refer to both the streams and their tributaries as "Pigeonroost Branch" or "Oldhouse Branch."

agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5.U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law." *Id.* § 706(2)(D). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted).

## ANALYSIS

At this juncture, the Court must determine whether EPA's determination that the discharges authorized by Mingo Logan's section 404 permit would cause unacceptable adverse effects was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see also James City Cnty., Va. v. EPA*, 12 F.3d 1330, 1337 n.4 (4th Cir. 1993) (noting that the standard of review for section 404 is whether EPA's decision was "arbitrary and capricious"). Mingo Logan's arguments that the revocation decision violates the standard set forth in section 706 of the APA fall into two categories: (I) those that attack the sufficiency of the conclusion in section V.C. of the Final Determination that the discharges into

Pigeonroost Branch and Oldhouse Branch would have unacceptable adverse effects on the wildlife within the footprint of the fill; and (II) those that attack the conclusion in section V.D. of the Final Determination that the proposed discharges will have an unacceptable adverse effect on wildlife downstream from the fill.[10]

To resolve Mingo Logan's APA challenge to the Final Determination, the Court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43, quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

> Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider any important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* In conducting its review, the Court should not "rubber-stamp the agency decision;" it must instead "engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'"

---

10    According to Mingo Logan, the case presents the following sub-issues:

(a) Whether EPA shows with substantial new information unacceptable adverse effects resulting from direct impacts of discharge from the fill;

(b) Whether section 404(c) gives EPA authority to base its Final Determination on downstream impacts arising from discharges governed by section 402;

(c) Whether section 404(c) authorizes EPA to apply its own water quality standards when determining unacceptable adverse effects downstream;

(d) Whether EPA is required to consider Mingo Logan's mitigation plan when evaluating unacceptable adverse effects; and

(e) Whether EPA is permitted to consider section 404(b)(1) Guidelines when evaluating unacceptable adverse effects.

Pl.'s Supplemental Br. in Supp. of Pl.'s Mot. ("Pl.'s Supp.") at 1–3, 10 [Dkt. # 99].

*Ethyl Corp. v. EPA*, 541 F.2d 1, 34–35 (D.C. Cir. 1976), quoting *Citizens to Preserve Overton Park*, 401 U.S. at 415. At the same time, "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Bowman Transp.*, 419 U.S. at 285, quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416 (internal quotation marks omitted). Applying that standard here, the Court finds that EPA provided a reasonable explanation for its decision to withdraw the specification of Pigeonroost Branch and Oldhouse Branch as disposal sites, and therefore, the Court must defer to the agency's expertise and find that EPA is entitled to judgment as a matter of law.

I.  **EPA's decision to revoke the specification of Pigeonroost Branch and Oldhouse Branch as disposal sites was reasonable and supported by section V.C. of the Final Determination.**

In section V.C. of the Final Determination, EPA explained that the discharge of fill material into Pigeonroost Branch and Oldhouse Branch would cause "unacceptable adverse impacts to wildlife and wildlife habitat, including the naturally occurring macroinvertebrate community, salamander and other herpetofauna, fish, and water-dependent birds."[11] Def.'s Statement of Facts ¶ 23 [Dkt. # 46-1], citing AR010109, 010147–75. It noted that the discharge of the fill would "bury" Pigeonroost Branch and Oldhouse Branch; eradicate the wildlife living in those streams; eliminate habitat for wildlife depending on these streams; and adversely impact wildlife within the watershed. *Id.* ¶¶ 24–25; *see also* AR010149. The ultimate result would be "[t]he destruction of 6.6 miles of high quality stream habitat." *Id.* ¶ 25 (alteration in original), quoting AR010149 (internal quotation marks omitted). EPA therefore concluded that the direct

---

11  Macroinvertebrates – such as mollusks, crayfish, flatworms, and aquatic insects – are bottom-dwelling organisms that have no backbone and are large enough to be seen without a microscope. Def.'s Mot. at 32 n.27.

effects of the discharges within the footprint of the valley fills would have unacceptable adverse consequences that necessitated a veto of the specifications of Pigeonroost Branch and Oldhouse Branch as disposal sites.

Mingo Logan challenges that conclusion, arguing that section V.C. cannot support the Final Determination for three reasons. First, Mingo Logan contends that EPA must demonstrate that there is substantial new information showing that the fill sites would have unacceptable adverse effects in order to act after a permit has been issued, and that EPA has not met its burden to come forward with substantial new information in this case. Pl.'s Mot. at 40–53; Pl.'s Reply Statement of P. & A. in Supp. of Pl.'s Mot. ("Pl.'s Reply") at 22 [Dkt. # 64]; Pl.'s Supplemental Br. in Supp. of Pl.'s Mot. ("Pl.'s Supp.") at 3, 8–10 [Dkt. # 99]. Second, Mingo Logan claims that even if EPA did rely on substantial new information, section V.C. cannot support the Final Determination because EPA failed to demonstrate that Mingo Logan's section 404 discharges would actually result in *unacceptable* adverse effects to wildlife within the footprint of the fill site. Pl.'s Mot. at 49–53; Pl.'s Reply at 23–25; Pl.'s Supp. at 10. And third, Mingo Logan contends that section V.C. cannot support the Final Determination because EPA was required to consider the anticipated results of the mitigation requirements set out in the permit, but it failed

to do so here.[12]  Pl.'s Mot. at 53–58; Pl.'s Reply at 26–29; Pl.'s Supp. at 3, 10.

### A. EPA does not need substantial new information to exercise its veto authority in this case.

Mingo Logan's central argument is that if EPA is permitted to withdraw a specification after the Corps has issued a section 404 permit, it can only do so based upon substantial new information.  Pl.'s Mot. at 43–44; Pl.'s Supp. at 3, 8–9.  Mingo Logan maintains that since none of the information that EPA set forth in the Final Determination is new – let alone "substantial" – the Court should invalidate the Final Determination and enter judgment in favor of Mingo Logan as a matter of law.  The Court disagrees and it finds that substantial new information was not needed in this case.

The text of section 404(c) is silent on the issue of whether EPA must have substantial new information when exercising its veto authority after a permit issues.  *Cf. Newport Galleria*

---

12     Mingo Logan also argues that section V.C. of the Final Determination is arbitrary and capricious because EPA revisited the section 404(b)(1) Guidelines applied by the Corps when the Corps decided to issue the section 404 permit, and EPA cannot second-guess the Corps' guidelines conclusion.  Pl.'s Mot. at 58–59.  Mingo Logan further contends that even if EPA is permitted to consider the section 404(b)(1) Guidelines, its analysis of those guidelines cannot support the Final Determination because EPA has expressly disavowed reliance on section V.E., which is where the discussion of the guidelines is located, as a basis for its decision.  *Id.* at 59.

The agency's consideration of the guidelines, then, is not a reason to overturn its conclusion.  As Mingo Logan points out, the guidelines discussion does not form an independent basis on which the Final Determination rests.  Furthermore, EPA's own regulations require it to consider the relevant portions of the guidelines when deciding whether a discharge will have an unacceptable adverse effect, 40 C.F.R. § 231.2(e); 44 Fed. Reg. at 58,076 ("The section 404(b)(1) guidelines provide the substantive criteria by which the acceptability of a proposed discharge is to be judged."); *see also Newport Galleria Grp. v. Deland*, 618 F. Supp. 1179, 1183 (D.D.C. 1985) ("Section 404(c) would be a curious veto power, indeed, if . . . courts could prevent the EPA from reviewing those very findings upon which the Corps based its decision to issue the permit."), and section 404(c) instructs that EPA may – and should – second-guess the Corps and make its own determination regarding the acceptability of proposed section 404 discharges.  *See* 33 U.S.C. § 1344(c); *Mingo Logan*, 714 F.3d at 610, quoting 33 U.S.C. § 1344(b) (alterations in original) ("The Secretary's authority to specify a disposal site is expressly made '[s]ubject to subsection (c) of [section 404].'"); *Newport Galleria Grp.*, 618 F. Supp. at 1184 (noting that, "if the section 404(c) veto is to have any meaning at all, the EPA must be able to disagree with the Corps' conclusions").

*Grp. v. Deland*, 618 F. Supp. 1179, 1182 (D.D.C. 1985) (noting that "the statute sets out no threshold requirements for the *initiation* of section 404(c) proceedings whatsoever"). That section provides:

> The Administrator is authorized to prohibit the specification (including the withdrawal of a specification) of any defined area as a disposal site, . . . whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary [of the Army Corps of Engineers]. The Administrator shall set forth in writing and make public his findings and reasons for making any determination under this subsection.

33 U.S.C. § 1344(c). And in its opinion in this case, the D.C. Circuit highlighted the legislature's use of the word "whenever," concluding that "Congress granted EPA a broad environmental 'backstop' authority" over the Corps' designation of a discharge site that could be exercised "at *any* time." 714 F.3d at 612–13 (emphasis in original). Although the Court of Appeals decided only that there is no temporal limit on the exercise of EPA's veto authority, and it left it to this Court to decide if there is some substantive limit, *see id.*, the emphasis the court placed on "Congress's intent to confer on EPA a broad veto power," *id.* at 613, sends a strong message here.[13] *See also James City Cnty.*, 12 F.3d at 1336 (explaining that EPA's section 404(c) "authority to veto to protect the environment is practically unadorned").

---

13      The Court is not unsympathetic to the concerns voiced by Mingo Logan, the State of West Virginia, and the amici about the importance of finality in a permitting process, and those concerns, in part, underlay the Court's determination that EPA's interpretation of section 404(c) as authorizing it to act after a permit issued was not reasonable at the second level of the analysis set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Mingo Logan*, 850 F. Supp. 2d at 152. But that battle has already been fought and lost, and this Court is not free to take up the issue again.

Mingo Logan recognizes that there is no language expressly limiting EPA's post-permit authority to be found in section 404(c).[14] But it points to the preamble with which EPA introduced its 1979 section 404(c) regulations as well as the APA's prohibition on arbitrary and capricious conduct as support for its claims that EPA must have substantial new information if it seeks to exercise its veto power after the Corps has issued the permit. Pl.'s Mot. at 43–44; Pl.'s Reply at 22; Pl.'s Supp. at 3, 8–9. But these sources do not restrict the agency's authority under the statute.

When EPA issued its own regulations for the implementation of the CWA, it offered the public the following assurances in the preamble to the rules:

> EPA agrees with the suggestion that it would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit proceeding, or where the matters at issue were resolved to EPA's satisfaction during the permit proceeding, unless substantial new information is brought to the Agency's attention after issuance.

44 Fed. Reg. 58,076, 58,077 (Oct. 9, 1979). And EPA specifically pointed to this statement of policy in the earlier proceedings in this case when it argued that the Court should defer to EPA's interpretation of section 404(c) to authorize post-permit revocation of the specification of a disposal site. *See* Def.'s Mot. at 37; *see also* Mot. Hr'g Tr. at 67 (November 30, 2011) (counsel for EPA discussing the substantial new information requirement in the preamble: "I think the statute and the regulations do not provide that limitation. However, EPA's policy adopts that limitation and EPA has, in fact, complied with that policy in the past and in this case."). As a

---

14 Mingo Logan does object to the Court's reliance on the D.C. Circuit's opinion in this case as support for the ultimate conclusion that substantial new information is not required. July 30 Hr'g Tr. at 9. The Court notes, however, that it is not adopting a position that the Court of Appeal's opinion is dispositive of the issue before the Court now, but that the reasoning and language employed by the D.C. Circuit provides helpful guidance that this Court should not ignore.

result, one could conclude that there are equitable grounds to find that the policy statement should be enforced in this case.

But in the preamble, EPA stated that it would be constrained by the requirement of substantial new information in the future if it sought to act after a permit had been issued but it had raised no objections during the permit application process, or its objections had been resolved to its satisfaction during that process.[15] And neither of those situations are present here.

The record is replete with EPA's expressions of concern regarding Mingo Logan's application for a section 404 permit to operate the Spruce No. 1 Mine. *See, e.g.*, AR008321–29, 010120–21, 012991–013388, 019485–90, 023084–109, 023657–62, 024424, 024619–25, 024637–43, 034962–035342, 008330–34; *see also* Def.'s Mot. at 38; Def.'s Supplemental Mem. in Supp. of Def.'s Mot. ("Def.'s Supp.") at 9 n.6 [Dkt. # 101]. These objections persisted throughout the application process, and even after the Corps devoted more than fifty pages of its final EIS to responding to concerns raised by EPA, EPA sent yet another letter to the Corps that reiterated its continuing misgivings about Mingo Logan's plans to discharge fill material. AR010121, 034962–035342, 008330–34; *see also* Def.'s Mot. at 38; Def.'s Supp. at 9 n.6. Thus, the Court cannot conclude that Mingo Logan's permit passed through the process "without objections" from EPA.

The Court also cannot conclude – as Mingo Logan urges – that EPA's concerns were resolved to its satisfaction prior to the issuance of the section 404 permit by the Corps. As

---

15    The fact that EPA did not intend for substantial new information to be required in all cases where it acts after a permit issues is evidenced not only in the "substantial new information" policy quoted above, but other parts of the preamble as well. For example, after listing two situations where EPA obtained new information and therefore needed to act after a permit issued, EPA went on to say that "[w]hile these are the most likely occasions necessitating 404(c) action after issuance, EPA does not wish to unwittingly restrict action in other appropriate circumstances." 44 Fed. Reg. at 58,077.

counsel for Mingo Logan continuously argued at the motions hearing, EPA "raised every concern that they now raise" in the Final Determination during the permit review process. Mot. Hr'g Tr. ("July 30 Hr'g Tr.") at 14–15 (July 30, 2014); *see also* AR010103–201, 012754–58, 022792–809, 023068–71 (documents raising EPA's concerns). But Mingo Logan does not point to anything in the record that reflects that EPA – as opposed to the Corps – was satisfied that those concerns had been addressed.[16] Thus, EPA's policy statement in the 1979 preamble is not implicated in this case, and it cannot serve as the basis for requiring EPA to have substantial new information in its Final Determination.

Moreover, the APA and general principles of administrative law do not justify requiring EPA to demonstrate that the Final Determination is based on substantial new information. Although the Court agrees that in some cases it might be arbitrary and capricious for an agency to look at the same information it looked at four years before and come to a completely different conclusion, *see, e.g.*, *State Farm*, 463 U.S. at 42 ("[A]n agency changing its course . . . is obligated to supply a reasoned analysis for the change . . . ."), this is not one of those cases.

Although Mingo Logan characterizes the events here as an about-face, EPA did not drastically change its position when it issued the Final Determination in 2011. As demonstrated above, EPA was concerned about Mingo Logan's proposed section 404 discharges from day one, and those same concerns supply the grounds for the Final Determination. *See* AR010103–201, 012754–758, 022792–809, 023068–071; *see also* July 30 Hr'g Tr. at 20 (counsel for Mingo Logan: "They have the same concerns. They recognized that the issues are out there."); *id.* at 30

---

16    Mingo Logan relies on an email sent by William J. Hoffman, Director of the Office of Environmental Programs Environmental Assessment and Innovation Division near the end of 2006 to argue that EPA's concerns were resolved before the permit issued. Pl.'s Mot. at 43. But as the Court explains below, Mingo Logan's heavy reliance on that email is misplaced.

("[T]here's nothing new with respect to mitigation at all."). EPA has therefore maintained a consistent position over the last twelve years.

Mingo Logan points to an email that an EPA official sent to the Corps near the end of the permit application process. In it, William J. Hoffman, Director of the EPA Office of Environmental Programs Environmental Assessment and Innovation Division, said that EPA had "no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint." Email from Hoffman, AR023085. Although the agency's decision to exercise its veto authority in 2011 after it declined to do so in 2007 can be viewed as a change in position that fairly requires some explanation, it is not so drastic a change as to require a heightened standard of scrutiny, such as the "substantial new information" test that Mingo Logan proposes here. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) ("[O]ur opinion in *State Farm* neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance."); *see also id.* at 519 ("[T]he fact that an agency had a prior stance does not alone prevent it from changing its view or create a higher hurdle for doing so."); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (explaining that *FCC v. Fox Television Stations, Inc.* "dispenses with the petitioners' complaint that the Amended Renovation Rule merely revisits old evidence and arguments, rather than adduces 'new data' or experience").

First, nothing in section 404(c) requires EPA to issue a formal declaration that it will or will not exercise its veto authority prior to the issuance of a permit, and the Corps is not required to wait for EPA to announce a decision to decline to exercise its section 404(c) authority before it may issue a permit under section 404(a). *See* 33 U.S.C. § 1344; *see also* July 30 Hr'g Tr. at 92 (counsel for environmental amici: "[T]here are points for communication, but there is no point

at which . . . EPA has to say whether it is or is not going to exercise its [section 404(c)] authority. And the Corps doesn't have to wait for that"). Instead, section 404(c) contains permissive, discretionary language – "[t]he Administrator is authorized . . . *whenever*," 33 U.S.C. § 1344(c) (emphasis added) – that when viewed in connection with the D.C. Circuit's characterization of the veto authority as "broad," *Mingo Logan*, 714 F.3d at 612–13, demonstrates that EPA's failure to block Mingo Logan's permit application before January 2007 cannot be characterized as a prior agreement or finding by EPA that the permitted discharges would not have unacceptable adverse effects. Declining to take a position when nothing requires the agency to take a position cannot serve as the foundation for an argument that the agency changed course when it took an official position for the first time.[17] *See Fox*, 556 U.S. at 514–15 ("Treating failures to act and rescissions of prior action differently for purposes of the standard of review makes good sense, and has basis in the text of the statute, which likewise treats the two separately.").

Moreover, EPA's "decision" not to act in 2007 is distinguishable from the sorts of reversals that have prompted closer scrutiny in other cases. The 2007 communication cited by Mingo Logan was merely an informal email, as opposed to a formal rulemaking or decision based on formal process, and it simply informed the Corps of agency inaction at that time, as opposed to a plan for affirmative steps. *See Fox*, 556 U.S. at 514, quoting *State Farm*, 463 U.S. at 42 (explaining that in *State Farm* the agency had revoked a prior regulation and that the Court in that case noted that only those types of actions require "'a reasoned analysis for the change beyond that which may be required when an agency *does not act* in the first instance'"); *State*

---

17      In fact, the 1979 preamble to EPA's section 404(c) implementing regulations demonstrate that EPA was under the impression that it was not required to state that it would not exercise its section 404(c) authority before the Corps may issue a section 404 permit. "Such a requirement goes beyond the needs of section 404(c), since some of EPA's objections to permits are based on grounds that are outside the scope of section 404(c)." 44 Fed. Reg. at 58,082.

*Farm*, 463 U.S. at 41 ("[R]evocation of an extant regulation is substantially different than a failure to act."). As a result, the principles of administrative law do not justify the imposition of heightened scrutiny, and EPA's explanation in section V.C. for its revocation decision is all that is required.[18]

The Supreme Court's dicta in *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council* – that "[b]y declining to exercise its veto, the EPA in effect deferred to the judgment of the Corps," 557 U.S. at 269 – does not change that conclusion. Neither the facts of *Coeur Alaska* nor the question before the Court implicated EPA's section 404(c) authority. *See id.* at 261. Moreover, the Court's use of the word "defer" supports the conclusion that EPA's failure to exercise its veto prior to the issuance of the permit was not a definitive statement approving the permit or a substantive finding about its environmental effects. One can defer to another, while still not entirely agreeing with their judgment. This reading of the Supreme Court's *Coeur Alaska* statement is more consistent with the overall structure of section 404 – which gives EPA authority to overrule the Corps, *see* 33 U.S.C. § 1344(c) – and the D.C. Circuit's conclusion that the veto authority can be lawfully exercised after the permit has issued. *See Mingo Logan*, 714 F.3d at 609.

Mingo Logan's reliance on *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs* ("*Alliance I*"), 515 F. Supp. 2d 1 (D.D.C. 2007), as support for its argument that EPA changed positions in 2011 and that its decision should be subject to heightened scrutiny is also misplaced. *See* Pl.'s Mot. at 44 n.32. Although that court found under the facts of that case that EPA's decision to forego the exercise of its veto authority was a final decision for purposes of the APA

_____

18      Moreover, EPA did provide a detailed explanation for its formal decision to exercise its veto authority in 2011, which is set forth in the ninety-nine page Final Determination. As a result, EPA's conduct complies with the requirements set forth in all of the administrative law cases that Mingo Logan cites. *See* Pl.'s Mot. at 44 (collecting cases).

and was therefore subject to judicial review, *Alliance I*, 515 F. Supp. 2d at 8–9, that decision pre-dated the opinion of the Court of Appeals in this case, and in any event, it does not automatically follow that a later veto will reflect a change in position in every case.

In sum, EPA's decision in 2011 to veto the Corps' specification of Pigeonroost Branch and Oldhouse Branch as disposal sites was not an abrupt or unexplained "about-face" from an earlier decision. The record demonstrates that EPA harbored consistent misgivings throughout the permit application process, and those concerns ultimately led it to exercise its authority. *See generally* AR010103–201 (Final Determination, explaining that the concerns that underlie the decision to revoke the specification were raised during the permit application process). Thus, the principles of administrative law laid out in "change in policy" cases are not implicated here,[19] and the Court finds that EPA need not justify its revocation decision with on substantial new

---

[19] At bottom, Mingo Logan's arguments related to the "change in policy" cases simply restate its contention that EPA should not have the statutory authority to revoke the specification of a disposal site after the Corps issues a permit. July 30 Hr'g Tr. at 19 ("[W]e went through a lot of this last time . . . that the regulated community needs finality . . . ."); *id.* at 96–97 ("Congress didn't intend us to have a situation where the regulated community was going to be just subject to the whims of politicians."). But that position was foreclosed by the D.C. Circuit, and as it now stands, EPA has the authority to act "whenever." Although Mingo Logan correctly points out that "whenever" must be read in a manner that will not render it arbitrary and capricious, it is not necessary for the Court to impose a requirement that EPA have substantial new information to avoid an arbitrary and capricious result in this case, and it is not up to the Court to modify the terms of a piece of legislation, even if that modification would be beneficial as a matter of policy. Without precedent or other legal authority to do so, the Court cannot "fix" what Mingo Logan believes to be bad legislative policy.

information in this case.[20]

**B. EPA is entitled to deference with respect to its conclusion that the section 404 discharges would have unacceptable adverse effects on the wildlife within the fill site.**

Mingo Logan next argues that section V.C. of the Final Determination cannot support EPA's decision to revoke the specification of Pigeonroost Branch and Oldhouse Branch as disposal sites in its section 404 permit because EPA did not demonstrate that the discharge of dredged or fill material into those streams would cause "unacceptable" adverse effects to wildlife. Pl.'s Mot. at 49. According to Mingo Logan, the effects identified are either "utterly

---

20    To the extent that substantial new information is required to support a post-permit veto, the Court finds that EPA satisfied that standard. On July 23, 2014, the Court ordered EPA to file a supplemental notice, listing the new information it relied on in both section V.C. and section V.D. of the Final Determination. July 23, 2014 Minute Order. EPA's response to that order satisfies this Court that EPA relied on substantial new information to justify the Final Determination. *See* Notice of Substantial New Information [Dkt. # 104].

Although Mingo Logan continues to argue that the information is not "new" because it relates to the concerns that EPA also raised when the application was pending, *see* July 30 Hr'g Tr. 28–31; *see also* Pl.'s Mot. at 40–43; Pl.'s Reply at 22; Pl.'s Supp. at 3, 10, that argument ignores the fact that scientific knowledge can expand and evolve, building upon itself to form an understanding that may not have been fully developed before.

Similarly, the Court declines to adopt Mingo Logan's narrow approach to the new information, which argues that the new information should be rejected because it relates to mitigation and to the effects on the wildlife within the footprint of the fill that are discussed in section V.C. *See* Pl.'s Mot. at 46–47; Pl.'s Reply at 23 n.18, 25. As the Court finds below, in cases where a section 404 permit expressly includes mitigation requirements, it would be arbitrary and capricious for EPA to act without considering those mitigation measures when conducting its unacceptable adverse effects analysis. *See infra* section I.C. As a result, even though the Final Determination's discussion of mitigation appeared in section V.E. and EPA disavowed reliance on that section as an independent basis for its decision, it nonetheless commented that its conclusion that the mitigation requirements in Mingo Logan's section 404 permit were inadequate supported its conclusion that the effects on the wildlife discussed in section V.C. were unacceptable. *See* AR010176, 010185–92. The new studies cited regarding mitigation are therefore relevant to the conclusions contained in section V.C.

And finally, the Court rejects Mingo Logan's contention that whether new information is substantial should be analyzed by looking at the number of new studies instead of the implications of those studies. *See* Pl.'s Mot. at 46–47 & n.35. As a result, even if the only new information that relates to the impacts described in section V.C. derives from one study that indicates that salamanders will not return to fill sites, the Court must defer to EPA's judgment that this new information is sufficiently substantial to tip the balance.

routine" because they occur any time fill is placed in a stream or "entirely speculative." *Id.* at 50; *see also* Pl.'s Reply at 25; Pl.'s Supp. at 10.

EPA's authority to veto the specification of a disposal site under section 404(c) is triggered "whenever [the Administrator] determines . . . that the [proposed] discharge[s] of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c). The statute does not define what would constitute an "unacceptable adverse effect," *see id.*, but EPA's section 404(c) implementing regulations explain that the phrase "means impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e). The 1979 preamble to those regulations adds that "[t]he term 'unacceptable' in EPA's view refers to the significance of the adverse effect – e.g. is it a large impact and is it one that the aquatic and wetland ecosystem cannot afford." 44 Fed. Reg. at 58,078.

Here, EPA explained in section V.C. of the Final Determination that the proposed discharges of dredged and fill material into Pigeonroost Branch and Oldhouse Branch would have unacceptable adverse effects on the wildlife itself within the footprint of the proposed fill site – specifically salamanders, macroinvertebrates, fish, and the Louisiana Waterthrush – as well as on the habitat that wildlife needs to survive. AR010149–52; *see also* Def.'s Mot. at 33 (arguing that Mingo Logan ignores that the Final Determination also addressed how discharges would cause a "loss of habitat, which is a critical factor under EPA's regulations"). It explained that the proposed discharges would destroy "'6.6 miles of high quality stream habitat,' which

represents 5.6 percent of the total stream length in the Headwaters Spruce Fork sub-watershed 'where there is little remaining high quality stream habitat,'" and that destruction of this habitat would cause "'a loss of regional biodiversity and the broader ecosystem functions'" that the otherwise diverse wildlife would have provided if their habitat was not destroyed. Def.'s Mot. at 32, quoting AR010149. EPA explained that even if the burial of wildlife may be deemed to be acceptable in some other location, the eradication of wildlife within the 6.6 miles of affected streams here was unacceptable because Pigeonroost Branch and Oldhouse Branch are occupied by such a large number and wide variety of species, AR010151–52 ("Within the streams and riparian areas of the project area, over 84 taxa of macroinvertebrates are documented to exist, as well as up to 46 species of reptiles and amphibians, 4 species of crayfish, 5 species of fish and at least one water-dependent bird species."), and the "streams are some of the last, rare and important high quality streams in the watershed." AR010152. The agency also pointed to the sheer size of the proposed fills, AR010149, and to the fact that in its judgment, the mitigation measures called for in the section 404 permit would not effectively offset the adverse effects of the discharges.[21] AR010180–92. When viewed in combination, these considerations prompted EPA to conclude that the eradication of the wildlife and habitat within the footprint of the proposed disposal sites was unacceptable because "the overall impact of the [proposed section 404] discharges 'is one the aquatic ecosystem cannot afford.'" Def.'s Mot. at 32, quoting AR0101052.

_____

[21] As noted above, the Court declines to read the sections of the Final Determination in isolation as Mingo Logan suggests. *See supra* note 20. As a result, even though section V.C. does not explicitly mention EPA's concerns that the proposed mitigation measures are inadequate, the Court finds that EPA's discussion of those measures in section V.E., which the Final Determination states "provide[] support and confirmation of the conclusion that the impacts [of the proposed discharges] are unacceptable," AR010176, is properly considered when deciding whether EPA has demonstrated that there are unacceptable adverse effects within the footprint of the fill.

At the outset, the Court must recognize that EPA's analysis of the effects of the section 404 discharges and its conclusion that those effects are unacceptable are entitled to deference. *Fox*, 556 U.S. at 513–14 (citations omitted) ("We have made clear . . . that 'a court is not to substitute its judgment for that of the agency,' and should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"); *Bowman Transp., Inc.*, 419 U.S. at 285; *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs* ("*Alliance II*"), 606 F. Supp. 2d 121, 127 (D.D.C. 2009) ("[W]hen an agency's action relies on scientific and technical information touching upon the agency's area of expertise, a court is particularly deferential."). Congress entrusted EPA with the task of protecting the environment, and the Court should not substitute its judgment for EPA's. As long as EPA's conclusion that discharge of dredged and fill material would have an unacceptable adverse effect on wildlife within the fill site is reasonable and supported by the record, the Court must defer and the Final Determination is valid. *State Farm*, 463 U.S. at 43; *Alliance II*, 606 F. Supp. 2d at 127, quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416 ("The court must . . . conduct a 'searching and careful' review of the record to establish that the agency's decision is rational and based on consideration of all relevant factors.").

Applying those principles here, the Court finds that EPA's discussion in section V.C. demonstrates that it "examine[d] the relevant data," and it "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). As a result, EPA's conclusion in section V.C. that the proposed section 404 discharges would have unacceptable adverse effects on the wildlife is reasonable and supported by the record, *see* AR010149–52, and section V.C. therefore supports the Final Determination.

Mingo Logan's arguments do not warrant a contrary conclusion. First, its contention that the eradication of wildlife within in a fill site is "routine" because it occurs whenever fill material is discharged into the water and is an effect that Congress approved when it found that the discharge of fill was permissible under the CWA and SCMRA, July 30 Hr'g Tr. at 26, does not demonstrate that EPA's decision here was unreasonable. First, that argument ignores the fact that Congress built the environmental effect veto right into the same statute. And second, section V.C. lists several grounds – such as the fact that Pigeonroost Branch and Oldhouse Branch are some of the last, least-disturbed high-quality streams in the subwatershed and the sheer magnitude of the project[22] – that adequately explain why EPA is adopting a difference stance here than it might take in another case. *See* AR010114 (noting that EPA did not revoke the specification of the third disposal site because some of the discharges had already occurred, and because the stream resources there had a higher historic and ongoing human disturbance than Pigeonroost and Oldhouse Branches); AR010115 (noting that construction of the mine will bury almost all of Oldhouse Branch and most of Pigeonroost Branch).

Mingo Logan's second ground for why the Court should find EPA's conclusion in section V.C. to be unreasonable – that it is entirely speculative – fares no better. *See* Pl.'s Mot. at 51–53; Pl.'s Reply at 23–24. The parties dispute whether certain fish live within the fill site, and they both point to different studies to support their positions. *See* Pl.'s Mot. at 51–52; Pl.'s Reply at 24; Def.'s Mot. at 35–36; Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply")

_____

22     Mingo Logan argues that EPA's description of the streams as being some of the "least-disturbed" ones in the subwatershed refers "to the pureness of the water, . . . and the fact that it's going to contribute downstream," not to the sorts of potential adverse effects to wildlife to which section 404(c) pertains. July 30 Hr'g Tr. at 33. But that point ignores that section V.C. mentions the high-quality status of Pigeonroost Branch and Oldhouse Branch when explaining why the proposed discharges into those streams would cause unacceptable adverse effects to wildlife within the footprint of the fill. *See* AR010149–52.

at 11–12 [Dkt # 72].    But this is precisely the type of dispute that courts are supposed to avoid under the principles of administrative law; where there are questions of science, such as which study deserves more credence than another, the agency is entitled to deference.  *State Farm*, 463 U.S. at 43 (explaining that the Court "is not to substitute its judgment for that of the agency"); *Alliance II*, 606 F. Supp. 2d at 127–28, quoting *Occidental Eng'g Co.*, 753 F.2d at 769–70 ("[I]t is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'").  As a result, the Court cannot find that EPA's conclusions in section V.C. are unreasonable even though Mingo Logan advances some studies that support a contrary position.[23]  *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009), quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When presented with conflicting evidence, courts must generally defer to the agency evaluation because 'an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Alameda Water & Sanitation Dist. v. Reilly*, 930 F. Supp. 486, 493 (D. Colo. 1996) ("It is important in this regard to

---

23    The parties also disagree about whether the proposed discharges would have an unacceptable adverse effect on the Louisiana Waterthrush.  Mingo Logan argues that any effect on that species of bird is entirely speculative because they have never been spotted in the area of the fill site.  Pl.'s Mot. at 53; Pl.'s Reply at 23.  EPA agrees that the birds have not yet been seen in the area, but nonetheless argues that the fill would negatively impact the species because it would destroy the bird's preferred habitat.  Def.'s Mot. at 36; Def.'s Reply at 12.  Although EPA is entitled to deference on its belief that the discharges will affect the habitat of Louisiana Waterthrush, EPA's reliance on those effects dances close to the line of what is reasonable:  if that species of bird has never been spotted in that area, it seems highly unlikely that the loss of potential habitat could rise to the level of an "unacceptable adverse effect."  The Court need not decide that question, however, because the validity of section V.C. and the Final Determination does not turn on a finding that EPA's consideration of the Louisiana Waterthrush was reasonable; even putting that species aside, EPA points to significant impacts upon a wide range of species that are known to inhabit the area.

recognize the limitations on this court's authority in an APA review. The plaintiffs have made a strong case that their substitutions are adequate but they have not presented a sufficient showing to require a finding that the contrary analysis made by the EPA was arbitrary and capricious."). Moreover, EPA relies on other studies concerning salamanders and other species beyond the disputed fish. *See, e.g.*, Notice of Substantial New Information [Dkt. # 104].

Finally, there is no support for the argument that EPA cannot rest the Final Determination on a loss of habitat. Pl.'s Reply at 26. EPA's regulations define "unacceptable adverse effects" to require the agency to consider the overall impact on the aquatic ecosystem, not just the particular species of wildlife that will be destroyed by the placement of the fill. And the regulations specifically state that EPA should consider effects on habitat. *See* 40 C.F.R. § 231.2(e) (defining unacceptable adverse effects to include "impact[s] on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to . . . wildlife habitat"). Section 404(c) does not define "unacceptable adverse effects," and as the implementing agency, it was within the purview of EPA to define that phrase. *See* 33 U.S.C. § 1344(c); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (citation and footnote omitted) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed by this Court . . . ."). Mingo Logan does not challenge the definition as unreasonable or contrary to the statute, and the Court finds it to be a reasonable construction of the statute. As a result, the Court must defer to EPA's decision that an analysis of whether a discharge will have unacceptable adverse effects on the environment requires not only a focused assessment of how individual species will be affected, but also a consideration of the larger picture: the relationship between the destruction

of habitat and the wildlife that depends on that habitat. *Natural Res. Def. Council v. EPA*, 706 F.3d 428, 431 (D.C. Cir. 2013), quoting *Chevron*, 467 U.S. at 843 ("If the 'statute is silent or ambiguous with respect to the specific issue,' . . . we move to the second step and defer to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'"). And EPA cited several studies to support its contention that the destruction of habitat in conjunction with the loss of wildlife within the footprint of the fill was something that the ecosystem could not afford. *See* AR010149–52. The Court therefore finds that EPA has met its burden to show its determination that the proposed section 404 discharges would have unacceptable adverse effects on wildlife within the footprint of the fill sites was reasonable.

**C. EPA considered the mitigation requirements in Mingo Logan's section 404 permit and its conclusion that they were insufficient is entitled to deference.**

Mingo Logan's final challenge to section V.C. is that EPA is required to consider the mitigation requirements imposed by the permit when conducting its section 404(c) adverse effects analysis, and that EPA was judicially estopped from challenging the sufficiency of the mitigation measures in place here. Pl.'s Mot. at 53–68; Pl.'s Reply at 26–29; Pl.'s Supp. at 3, 10. Mingo Logan also argues that, to the extent that EPA is not judicially estopped from questioning the adequacy of the mitigation requirements in the permit, EPA's evaluation of those measures was flawed. Pl.'s Mot. at 57–58; Pl.'s Reply at 27–29.

The Court agrees that EPA was bound to consider the mitigation requirements in Mingo Logan's section 404 permit in this case. In *State Farm*, the Supreme Court explained that an agency's action is arbitrary and capricious if it fails to take into account "an important aspect of the problem." 463 U.S. at 43. And EPA's own regulation instructs that, "[i]n evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines," 40 C.F.R. § 231.2(e), which specifically includes consideration of

potential mitigation. *See, e.g.*, 40 C.F.R. § 230.1 *et seq.* Where EPA acts after a permit issues and the permit itself includes mitigation measures, then mitigation becomes an important aspect of the discharge issue, and the provisions in the permit dealing with mitigation are plainly relevant to EPA's analysis of the impact of the discharges. Accordingly, EPA was required to consider the mitigation requirements in Mingo Logan's section 404 permit when deciding whether the proposed discharges would have unacceptable adverse effects.[24]

But the record reveals that EPA did in fact consider the permit's mitigation requirements in the Final Determination, and it found them insufficient to overcome the unacceptable adverse effects denoted in section V.C (and section V.D.). *See* AR010185–92. EPA provided a detailed explanation for why it believed the mitigation to be insufficient, which shows that it considered relevant data and linked its conclusions to the facts in the record. *See* AR010188–91; *see also infra* note 26. EPA's conclusion regarding Mingo Logan's mitigation measures, which turns on scientific predictions within EPA's expertise, is therefore entitled to deference. *See Amoco Oil Co. v. EPA*, 501 F.2d 722, 741 (D.C. Cir. 1974) ("Where [EPA's] regulations turn . . . on predictions dealing with matters on the frontiers of scientific knowledge, we will demand adequate reasons and explanations but not 'findings' of the sort familiar from the world of adjudication.").

Mingo Logan's remaining arguments do not alter that conclusion. First, Mingo Logan contends that because the United States defended similar mitigation requirements in *Ohio Valley*

---

24    Mingo Logan's section 404 permit includes on-site and off-site in kind mitigation measures. AR010186. The on-site compensation includes restoring "7,132 linear feet of stream segments temporarily impacted by the sediment ponds, and creat[ing] 43,565 linear feet of on-bench stream channel within the project area," whereas off-site compensation includes stream enhancements to Spruce Fork and Rockhouse Creek "through a combination of physical, aquatic habitat, and stream stabilization improvement." *Id.*; *see also* Pl.'s Mot. at 54–58 & n.54. The permit also allows the Corps to modify the mitigation requirements if the plan is ineffective. AR010186; *see also* Pl.'s Mot. at 55.

*Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d at 177, EPA is judicially estopped from challenging the adequacy of those requirements here. Although "[c]ourts may invoke judicial estoppel '[w]here a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position," *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (first alteration added), quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), that principle is inapplicable in this case. Judicial estoppel is a fact-intensive inquiry and any difference between the stance the United States took in *Ohio Valley* and the one EPA now takes in this case may be explained by reference to the distinct facts of each case.

First of all, in *Ohio Valley*, it was the Corps – not EPA – that concluded that the mitigation requirements in the permit met the section 404(b)(1) Guidelines and defended those requirements in court. 556 F.3d at 204. But here, it is EPA that is challenging the notion that those mitigation measures are satisfactory, which is precisely what EPA is authorized to do under section 404(c). As a result, while the Fourth Circuit was bound to defer to the Corp in *Ohio Valley*, the Court in this case must defer to EPA's position that they are not sufficient in the context of Spruce No. 1 Mine. Moreover, while both cases involve some overlap with certain mitigation requirements, EPA's position in this case challenges additional issues, such as stream misclassification, not discussed in *Ohio Valley*. And the challenged permits in *Ohio Valley* involved discharges unrelated to the Spruce No. 1 Mine that Mingo Logan seeks to operate. *See id.* at 187.

Second, to the extent that the difference cannot be explained in terms of distinct facts, judicial estoppel is still inappropriate in this case. "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of*

*Crawford Cnty.*, 467 U.S. 51, 60 (1984).[25]  And the Supreme Court has explained that judicial estoppel may not apply when "broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests." *Maine*, 532 U.S. at 755 (citation and internal quotation marks omitted).  EPA must evaluate changes in scientific knowledge in order to carry out its assigned task of protecting the environment, and its updated decisions may vary from earlier positions.  As the agency explained in its motion for summary judgment, "a change in facts and regulatory policy . . . occurred subsequent to issuance of the permits at issue in [*Ohio Valley*]."  Def.'s Mot. at 57.  This change in policy and facts is memorialized in the Corps–EPA 2008 Mitigation Rule, which rescinded the Regulatory Guidance Letter that the *Ohio Valley* court relied upon in determining that the mitigation requirements were adequate in that case.  73 Fed. Reg. 19,594 (Apr. 10, 2008); Def.'s Mot. at 57.  Although EPA cannot apply the 2008 Mitigation Rule retroactively to Mingo Logan's 2007 permit, it may rely on "the scientific information . . . considered in adopting the Mitigation Rule" to inform its "views concerning the Spruce permit, particularly with regard to the difficulty of creating new streams that replace lost values and functions."  Def.'s Mot. at 57. The Court therefore finds that it would be inappropriate to judicially estop EPA from challenging the adequacy of the mitigation measures contained in Mingo Logan's permit.

And third, Mingo Logan's other remaining argument – that EPA failed to adequately explain why the permit's mitigation requirements were inadequate – also fails.  *See* Pl.'s Mot. at 55.  As noted above, the Court found that the record contains a reasoned explanation for why EPA finds the mitigation measures in the permit to be inadequate, and therefore that

---

25      *But Heckler*, 467 U.S. at 61 ("[The Court is] hesitant . . . to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel may be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with the Government.").

determination is entitled to deference. Mingo Logan's specific challenges to EPA's mitigation conclusion would require the Court to "undertake comparative evaluations of conflicting scientific evidence,"[26] which goes beyond the Court's proper role of only "discern[ing] whether the agency's evaluation was rational." *See Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1211, 1216 (D.C. Cir. 1987). Consequently, the Court concludes that EPA satisfied the

---

26      In the Final Determination, EPA set forth the following concerns regarding the permit's mitigation plan:

- The mitigation plan is based on a "misclassification of impacts to perennial and intermittent streams, thereby resulting in an insufficient baseline from which to design adequate stream compensation." AR010188.

- The mitigation plan is based on an "inadequate functional assessment of the impacted resources" because "the baseline assessment of the existing and impacted streams on the site missed and misclassified well over twenty thousand linear feet of headwater streams" and the mitigation plan used "the Stream Habitat Unit (SHU) method to calculate mitigation debits and credits." AR010189.

- EPA believes that "created streams converted from erosion control channels would be considered degraded and will not successfully replace Pigeonroost Branch and Oldhouse Branch as sources of freshwater dilution with healthy biological communities and water quality." AR010191. EPA contends that "[t]here is no evidence . . . that the type of stream creation . . . will successfully replace lost biological function and comparable stream chemistry to high quality stream resources, such as Pigeonroost Branch and Oldhouse Branch." AR010187. Moreover, EPA asserts that "it is extremely unlikely that high-value streams such as these can be replaced by on-site stream creation techniques involving conversion of sedimentation ditches fed by mine spoil runoff and seepage." AR010188.

- EPA does not believe the mitigation plan takes into account the "terrestrial-aquatic linkage" and does not ensure that "restored or created channels provide greater functions than simply service as water conveyance structures." AR010191.

Mingo Logan argues that EPA's discussion of the mitigation requirements is deficient because EPA fails to explain how the measures "do not met the 'practicable and appropriate' standard of the 404(b)(1) Guidelines," why the misclassification of a stream would impact mitigation success, and why stream creation is no longer an appropriate mitigation measure. Pl.'s Mot. at 57–58.

requirement to consider the mitigation measures in Mingo Logan's section 404 permit, and it provided a sufficient explanation to justify why, despite those measures, the proposed discharges would have unacceptable adverse effects on wildlife.

Based on the analysis above, the Court finds that EPA is entitled to judgment as a matter of law. EPA's conclusion that the discharge of dredged or fill material into Pigeonroost Branch and Oldhouse Branch would cause unacceptable adverse effects – as explained in section V.C. – is reasonable, supported by the record, and within EPA's authority to reach. The Court will therefore grant EPA's motion for summary judgment and deny Mingo Logan's motion for summary judgment.

**II.    EPA's decision to revoke the specification of Pigeonroost Branch and Oldhouse Branch as disposal sites in Mingo Logan's section 404 permit was reasonable and supported by section V.D. of the Final Determination.**

The Court's holding that EPA acted reasonably and lawfully when it revoked the specification of the two streams in Mingo Logan's section 404 permit based on the explanation set forth in section V.C. of that document is dispositive of the case. *See* July 30 Hr'g Tr. at 8 (counsel for Mingo Logan agreeing that section V.C. alone could support the Final Determination if it was valid). But the Court will go on to consider Mingo Logan's challenge to section V.D. of the Final Determination, which the Court also concludes is lawful and could serve as an independent basis to uphold the Final Determination.

In section V.D., EPA identified unacceptable adverse effects downstream from the fill sites and the sediment ponds into which the fill water eventually flows. AR010152–75. Specifically, EPA stated:

> Unacceptable adverse impacts will also occur to wildlife downstream of the footprint of the fills and sediment ponds. These unacceptable adverse impacts will be caused by removing Pigeonroost Branch and Oldhouse Branch as sources of freshwater dilution and converting them to sources of

> pollution. . . .  The project as authorized also will create areas of pooled water and increased conductivity, both of which are among the conditions known to be necessary to support harmful blooms of golden algae. . . . This section identifies increased loads of selenium and [total dissolved solids] (measured as conductivity) that are expected to occur as a result of the discharges of coal overburden as authorized . . . .  These impacts to water chemistry are identified because they will adversely affect the native aquatic and water-dependent wildlife communities in the Spruce Fork watershed . . . .

*Id.* at AR010152–53.

Mingo Logan claims that section V.D. cannot support the revocation of the specification because downstream effects on water quality are regulated under section 402 of the CWA, not section 404, and West Virginia has assumed responsibility for administering the section 402 permit program within the territory involved.  Pl.'s Mot. at 29–35.  Mingo Logan points out that selenium and total dissolved solids ("TDS") are not "dredged or fill material," but fall within the category of general pollutants under the CWA, which means they are regulated under section 402, not section 404.  *See, e.g.*, Pl.'s Reply at 15.  As a result, Mingo Logan contends that when EPA considered downstream water quality, it premised the Final Determination on factors that Congress did not intend for it to include in the calculus.  *See State Farm*, 463 U.S. at 43.

Second, Mingo Logan argues that to the extent that EPA may consider downstream effects when deciding to revoke a section 404 permit, EPA must use the water quality standards enacted by West Virginia pursuant to section 303 of the CWA.  Pl.'s Mot. at 35–39.  Mingo claims that EPA created its own water quality standards here instead, *id.* at 35, 37, and that it

failed to link the unacceptable downstream adverse effects to discharges made pursuant to the section 404 permit.[27]  *Id.* at 33–35.

**A.  EPA may consider downstream consequences when evaluating whether proposed discharges of dredged or fill material will have unacceptable adverse effects under section 404(c).**

All water that passes over or though the valley fills created by to a section 404 permit, and any pollutants that leach from the fills as the water passes through them, are eventually collected in a sediment pond for treatment.  Water may be discharged from those ponds pursuant to a section 402 permit, and the discharged water, even after it has been treated, contains elevated levels of selenium and total dissolved solids ("TDS"), which are considered pollutants under the CWA.  The downstream effects on wildlife identified by EPA as being unacceptable in section V.D. of the Final Determination are caused by the discharge from the sediment ponds of water containing elevated levels of the two contaminants.  *See* AR010152–75.

Mingo Logan argues that EPA improperly considered these downstream effects because the water flowing from the sediment ponds is regulated by West Virginia under section 402, and the discharge from the ponds acts as an intervening event that severs EPA's authority to regulate discharge of fill material from the mine under section 404(c).  July 30 Hr'g Tr. at 39 ("[EPA is] allowed to look at wildlife downstream as long as there is not an intervening regulatory decision that is made by the state.").  According to Mingo Logan, once the water contaminated by its movement through the valley fills flows into the sediments ponds that are subject to a different regulatory scheme, EPA can no longer consider the effects the water might have on wildlife

---

27      Mingo Logan also raised the same arguments set forth in its challenge to section V.C. – that EPA needed, but did not have, substantial new information, and that EPA failed to demonstrate that the effects were "unacceptable" – in its challenge to section V.D.  The Court need not address these arguments separately, however, because they fail with respect to section V.D. for the same reasons enumerated above in connection with section V.C.

thereafter. Mingo Logan and amicus curiae Randy C. Huffman, on behalf of the State of West Virginia, contend that EPA has essentially usurped West Virginia's regulatory authority under section 402 of the CWA as well as the SCMRA, and that approving its action would be inconsistent with the Supreme Court's holding in *Coeur Alaska*. Pl.'s Mot. at 29–33; West Virginia Amicus Curiae Br. in Supp. of Pl.'s Mot. ("W. Va. Br.") at 14–19 [Dkt. # 53]. The Court disagrees.

As an initial point, the Court notes that – despite Mingo Logan's repeated attempt to characterize section V.D. as "regulating" discharges from the sediment ponds that are subject to regulation by West Virginia under section 402 – that section does not purport to "regulate" outfall from the sediment ponds. It does not state that Mingo Logan can no longer discharge water from the sediment ponds downstream, and it does not prohibit or manage the upstream discharge of non-fill contaminants into streams that flow into the sediment ponds. Instead, section V.D. merely concludes that the placement of dredged and fill material into Pigeonroost Branch and Oldhouse Branch above the ponds will negatively affect the wildlife below the ponds. *See* AR010152–75.

Once the issue is properly framed, it follows that EPA's consideration of downstream effects does not "usurp" West Virginia's regulatory authority under section 402. Although it is true that West Virginia – in issuing the section 402 permit – reached the conclusion that the discharges from the sediment ponds were permissible despite any effects on downstream water quality, EPA's separate determination that the same streams could have specific unacceptable consequences did not invade West Virginia's regulatory sphere. It is EPA that was charged by Congress to assess the impact of the fill material on municipal water supplies, shellfish beds and fishery areas, wildlife, and recreational areas. EPA's withdrawal of the specification in the

exercise of that function has the effect of prohibiting the proposed discharge of dredged and fill material in certain locations – a matter that is not within West Virginia's regulatory authority under section 402 – and it will only impact the sediment ponds – which are subject to West Virginia's control – to the extent that the discharged water will no longer include those contaminants emanating from the proposed valley fills. The fact that discharges from the sediment pond, and therefore West Virginia's regulatory authority, remains unaffected by EPA's consideration of downstream effects is no small consequence; as Mingo Logan itself points out, the sediment ponds treat water from various parts of the mine, not just the three proposed valley fills.[28] The Court therefore concludes that EPA is not usurping West Virginia's regulatory authority under section 402 or utilizing section 404(c) to veto a section 402 permit.

Moreover, neither the text nor the structure of the CWA supports Mingo Logan's strained interpretation of what EPA may consider when determining whether section 404 discharges will have an unacceptable adverse effect on wildlife. As noted above, the language of section 404(c) itself is broad, and the statute does not define "unacceptable adverse effect[s]." *See* 33 U.S.C. § 1344(c). The only explicit limitation on EPA's section 404(c) authority is that the adverse effects must be caused by the discharge of dredged or fill material, and they must have an unacceptable impact on at least one of four enumerated areas: "municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* Mingo Logan's position therefore finds no textual support.

In fact, the text – if anything – supports the opposite conclusion. As noted above, among other things, Congress directed EPA to protect municipal water supplies under section 404(c).

---

28      For the same reason, the Court is not persuaded by West Virginia's arguments that allowing EPA to consider downstream consequences will nullify the section 402 permit. *See* West Virginia Amicus Curiae Br. in Supp. of Pl.'s Mot. ("W. Va. Br.") at 19–21 [Dkt. # 53].

*See* 33 U.S.C. § 1344(c). Because an entity will never be permitted to discharge dredged and fill material directly into municipal water supplies, it follows that Congress must have contemplated that EPA would be concerned with an effect occurring downstream from the discharge site. And there is nothing in the text to indicate that effects on wildlife are to be considered more narrowly.[29]

Furthermore, EPA's implementing regulations – which are reasonable and entitled to deference, *see Chevron*, 467 U.S. at 845; *Natural Res. Def. Council*, 706 F.3d at 431 – provide additional support for the conclusion that EPA may consider downstream effects when conducting a section 404(c) analysis. The regulations define unacceptable adverse effects as "impact[s] on an aquatic or wetland *ecosystem*," not simply impacts within the footprint of the fill. 40 C.F.R. § 231.2(e) (emphasis added). The use of the word "ecosystem" indicates that EPA has consistently understood that its analysis should not be limited in geographic scope as long as it can connect the identified adverse effects to the upstream discharge. That interpretation is consistent with the text of section 404(c), and it recognizes that the contents of the regulated material do not remain stationary: the discharge of dredged and fill material contaminates water with elements of that material that will move downstream with the natural flow of the current. Those contaminants do not become disassociated with the valley fill just

---

29     Mingo Logan argues that the phrase "municipal water supplies" would not be rendered meaningless by its proposed interpretation that EPA cannot look at downstream effects if there is an intervening circumstance, such as a sediment pond, that is subject to a different regulatory scheme. It notes that the phrase would still have meaning because EPA would be permitted to consider whether the discharge of fill material to build a dam, for example, would dry up municipal water supplies. July 30 Hr'g Tr. at 102. But this argument does not solve the problem that Mingo Logan's proposed interpretation would render that phrase meaningless in the context of surface mining regulation.

because they enter or exit a sediment pond, and if they cause unacceptable adverse effects on wildlife, they fall within the purview of section 404(c).[30]

Finally, the Supreme Court's decision in *Coeur Alaska* does not mandate the conclusion that EPA cannot consider downstream effects under section 404(c). In that case, the Supreme Court addressed the intersection of the regulatory schemes governing the issuance of permits under section 402 and section 404 of the CWA. 557 U.S. at 265. It explained that the two schemes are separate and distinct: section 404 governs the discharge of any pollutant that meets the definition of dredged or fill materials, and section 402 governs the discharge of all other pollutants into the navigable waters of the United States. *See id.* at 273–76. Based on that distinction, the Court held that "when a permit is required to discharge fill material," the entity seeking to discharge that material is only required to obtain a section 404 permit. *Id.* at 286. To require the entity to also obtain a section 402 permit would create "[a] two-permit regime [that] would cause confusion, delay, expense, and uncertainty in the permitting process." *Id.*

Mingo Logan relies on the "two-permit regime" language as support for its position that EPA cannot consider downstream effects where the water causing those effects passes through a sediment pond that is regulated under section 402 by West Virginia. Pl.'s Supp. at 4; *see also* Pl.'s Mot. at 31–33; Pl.'s Reply at 16. But that argument stretches the holding in *Coeur Alaska* too far. First, *Coeur Alaska* does not address EPA's authority under section 404(c) and is therefore not directly controlling in this case. And second, EPA's consideration of downstream

─────────────────

30      Mingo Logan also challenges EPA's consideration of the downstream effects of the proposed discharge of fill material on the grounds that the regulations specify that secondary effects "shall be considered prior to the time final section 404 action is taken by permitting authorities." 40 C.F.R. § 230.11(h)(1). But that provision does not necessarily stand for the point that Mingo Logan hopes. Although it clearly requires the Corps (not necessarily EPA) to consider secondary effects before it issues a permit, the language does not explicitly say that they cannot be considered again after a permit issues.

effects does not run afoul of the Court's holding that only one of the two permits is necessary in any given situation. EPA is not requiring Mingo Logan to obtain a section 404 permit to discharge water from the sediment ponds; instead, it concluded that the discharge of dredged and fill material upstream – which falls within the section 404 regulatory scheme, *see Coeur Alaska*, 557 U.S. at 276 ("[I]f the discharge is fill, the discharger must seek a § 404 permit from the Corps; if not, . . . the discharge requires a § 402 permit from the EPA.") – cannot be permitted in the specified locations because of the negative effect it will cause downstream. As a result, the Court finds that EPA may consider downstream effects when conducting its section 404(c) unacceptable adverse effects analysis.[31]

**B. EPA is not bound by West Virginia's water quality standards when conducting its section 404(c) analysis.**

Mingo Logan next argues that, even if EPA may consider downstream effects, section V.D. cannot lawfully support the agency's determination because EPA ignored the standards set by West Virginia and instead created its own ad hoc water quality standards when concluding that discharges into Pigeonroost and Oldhouse Branches would have unacceptable adverse effects downstream. Pl.'s Mot. at 37; Pl.'s Supp. at 8. Mingo Logan contends that EPA has no authority to create its own standards and that it is state standards that must be used to define what is "acceptable" in the context of all CWA permitting decisions. Pl.'s Reply at 20–22; Pl.'s Supp. at 7–8. Mingo Logan also claims that EPA cannot ignore the fact that West Virginia issued a

---

31  *Ohio Valley* does not warrant a different conclusion. In that case, the Fourth Circuit found that the Corps reasonably interpreted its jurisdiction under NEPA as preventing it from considering the upland environmental impacts of a valley fill because the agency's authority under section 404 is limited to regulating the discharge of fill into water. 556 F.3d at 195–97. But here, EPA linked the identified unacceptable adverse effects to wildlife downstream to discharge of fill material into water – in this case, Pigeonroost and Oldhouse Branches – so its consideration of downstream effects fell squarely within the realm it was tasked to regulate under section 404(c).

section 401 certification, which certified that Mingo Logan's proposed section 404 discharges would not violate the state's water quality standards, Pl.'s Supp. at 8, because EPA's regulations provide that state water quality standards "must be used when . . . evaluating proposed discharges of dredged or fill material under § 404." Pl.'s Mot. at 38, quoting 40 C.F.R. § 131.21(d) (alteration in original). But the Final Determination will not be overturned on these grounds either.

First, the Court is not convinced that EPA is actually creating its own water quality standards. Although it may have applied a conductivity measurement not adopted by West Virginia and come to a different conclusion regarding the acceptability of the selenium levels downstream, *see* W. Va. Br. at 14, EPA's discussion in section V.D. did not adopt those measurements or conclusions as general standards to be applied in cases involving downstream impacts.

More importantly, the Court finds that section 404(c) authorizes EPA to determine that merely meeting state water quality standards is insufficient when it is deciding whether section 404 discharges will have unacceptable adverse effects on something other than the water – in this case, wildlife. As noted above, section 404(c) is silent with respect to what constitutes an unacceptable adverse effect and what EPA may consider when deciding if there will be an unacceptable adverse effect. The section is also silent with respect to what standard EPA should use to decide if something is unacceptable. And unlike section 401 and 402, section 404 does not call for consideration of state water quality standards at all. *See* 33 U.S.C. § 1344.

Section 401 of the CWA provides that all federal permit applicants must request a certification from the state that the proposed discharges would not violate state water quality standards, *see id.* § 1341(a), and section 402 explicitly requires that discharges regulated under

that provision meet state water quality standards. *See id.* § 1342(a)(1) (noting that the Administrator may permit discharges under section 402 "upon [the] condition that such discharge[s] will meet . . . all applicable requirements under section[] 1311"). But even in both of those sections, the CWA has identified state requirements as a floor that must be met, not a limit on federal authority.

It is true that EPA's implementing regulations recognize that water quality – which is regulated by the state – will be an important consideration when dealing with adverse effects on aquatic wildlife. *See* 40 C.F.R. § 131.21(d) (stating that state water quality standards must be used in "evaluating proposed discharges of dredged or fill material under section 404"). But there is nothing about the statute or that acknowledgement that forecloses EPA from imposing stricter requirements than those required by the state standards. *See id.* (emphasis added) (providing that state standards are "the *minimum* standards which must be used"). In other words, section 401 guarantees that the federal government cannot approve conduct that would violate state water standards, but it does not prevent EPA from requiring more than what is required by the state to fulfill its function as the steward of the environment under section 404(c). To hold otherwise would limit EPA's ability to exercise its section 404(c) authority to situations where a state has not issued a section 401 certification. That interpretation would be inconsistent with the broad "whenever" language employed in section 404(c), and it also does not fit within the structure of section 404, which designates EPA as the ultimate decisionmaker with respect to the enumerated types of environmental consequences of section 404 discharges. *See* 33 U.S.C. § 1344; *Mingo Logan*, 714 F.3d at 614 ("[S]ection 404(b) makes equally clear . . . that the Administrator has, in effect, the *final* say on the specified disposal sites 'whenever' he makes the statutorily required 'unacceptable adverse effect' determination."); *see also Newport Galleria*

*Grp.*, 618 F. Supp. at 1184 ("[I]f the section 404(c) veto is to have any meaning at all, the EPA must be able to disagree with the Corps' conclusions.").

### C. EPA demonstrated a causal link between the identified downstream unacceptable adverse effects and the proposed section 404 discharges into Pigeonroost Branch and Oldhouse Branch.

Mingo Logan's final reason for why section V.D. cannot support the Final Determination is that EPA failed to show that the section 404 discharges actually caused the downstream unacceptable adverse effects it identified. Pl.'s Mot. at 34; Pl.'s Reply at 2, 19; Pl.'s Supp. at 6. More specifically, Mingo Logan notes that twenty-nine outfalls drain runoff from the Spruce No. 1 Mine, and only three of those outfalls receive water that passes over or through section 404 fill areas. Pl.'s Reply at 18–19; Pl.'s Supp. at 6. Mingo Logan points out that section 404 does not authorize EPA to regulate surface mines in general, so section V.D. cannot support the section 404(c) veto unless EPA linked the adverse impacts identified in that section with the section 404 discharges that it is permitted to regulate. Pl.'s Mot. at 34, citing *Ohio Valley*, 556 F.3d at 195 (defining the Corps jurisdiction under section 404 as limited to the filling of jurisdictional waters, not the entire valley fill project); Pl.'s Reply at 19; Pl.'s Supp. at 6–7, quoting *Ohio Valley*, 556 F.3d at 195 (assuming "that the entire mine falls within the ambit of section 404 'is to effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by [the] SCMRA'

The Court agrees that EPA must show a causal link between the discharges it seeks to prohibit and the unacceptable adverse effects that justify its decision to prohibit them. So the cause of the unacceptable adverse effects must be related to the only thing EPA can regulate under section 404: the discharge of dredged or fill material. This is not to say, however, that EPA must demonstrate with laser precision that the complained about effects stem only from the

section 404 discharges. It is enough for EPA to establish some causal link between the discharge of fill material upstream and the projected unacceptable adverse effects, and EPA has done that here.

In section V.D., EPA points to two circumstances to demonstrate the causal link between the discharge of dredged and fill material into Pigeonroost Branch and Oldhouse Branch and the effects on wildlife due to the increased quantities of selenium and conductivity downstream.[32] First, EPA's analysis established that the presence of the fill material itself would increase the selenium and conductivity levels. EPA compared the proposed discharges into Pigeonroost and Oldhouse Branches with streams that have been impacted in other mining operations, such as Dal-Tex. *See* AR010154–59, 010161–62. It also looked at the water flowing downstream from the one valley fill that Mingo Logan was permitted to create and that it is currently using to operate Spruce No. 1 Mine. *See id.* From those comparisons, EPA concluded that the discharge of fill material into Pigeonroost Branch and Oldhouse Branch would increase the selenium and conductivity levels downstream, which in turn cause the unacceptable adverse effects to aquatic wildlife in the region. That conclusion is reasonable, supported by the record, and entitled to deference. *See Ohio Valley*, 556 F.3d at 201, quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983) ("In matters involving complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'").

Moreover, EPA demonstrated a causal link between the proposed section 404 discharges into Pigeonroost and Oldhouse Branches and the unacceptable adverse effects to wildlife downstream by reframing the problem as one of a "loss of freshwater dilution" as opposed to

---

32      Section V.D. explains that higher concentrations of selenium and conductivity, among other things, damages the reproductive capability of many aquatic species, and that the negative effects of the increase of those contaminants in the water will also affect the terrestrial wildlife that depend on the contaminated aquatic wildlife as a food source. *See* AR010152–75.

increased contamination.  AR010159–60.  Although Mingo Logan is correct that the loss of freshwater dilution argument is simply another way of explaining the contaminants theory, reframing the issue as one involving dilution helps to clarify the causation link.  Instead of debating whether the increased selenium or conductivity was the product of the section 404 discharges specifically or some other aspect of the mine, focusing on the loss of freshwater dilution establishes that the section 404 discharges do – at least to some extent – cause the downstream consequences listed in section V.D. because the water downstream will be less dilute, with more contaminants in it, when the volume of clean, diluting water decreases.  As a result, the Court finds that EPA reasonably demonstrated that the proposed discharges would cause the downstream unacceptable adverse effects discussed in section V.D. of the Final Determination.

As explained above, the Court finds that EPA may consider downstream effects under section 404(c), that it may use stricter standards than those set as the state's water quality standards, and that, in this case, EPA successfully demonstrated that the unacceptable adverse effects identified in section V.D. would be caused by the proposed section 404 discharges into Pigeonroost Branch and Oldhouse Branch.  Section V.D. may therefore serve as an independent basis on which to rest EPA's Final Determination that specification of the two streams in Mingo Logan's section 404 permit must be revoked.  EPA is therefore entitled to judgment as a matter of law.

## CONCLUSION

Because the Court finds that EPA's decision to revoke the specification of Pigeonroost Branch and Oldhouse Branch as disposal sites for the discharge of dredged or fill material generated in connection with the Spruce No. 1 Mine, as explained in the Final Determination, was reasonable, supported by the record, and based on considerations within EPA's purview, it

will grant EPA's motion for summary judgment and deny Mingo Logan's motion for summary

judgment.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2014